UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
CAROLE NEWMARK,                                    :

                    Plaintiff,                       :         07-CIV-2861 (CLB)

       -against-                                  :

LAWRENCE HOSPITAL CENTER,                           :
PAT ORSAIA, individually, and
CATHY MAGONE, individually,

                            :
             Defendants.
----------------------------------------------------------------x

MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

John P. Keil
Collazo Carling & Mish LLP
Attorneys for Defendants
Office and P.O. Address
747 Third Avenue
New York, New York 10017
Tel: (212) 758-7600

**Table of Contents**

Table of Authorities ................................................................................................. ii

Statement of Facts .................................................................................................... 1

Argument ................................................................................................................. 19

I.      PLAINTIFF FAILS TO ALLEGE A PRIMA FACIE
        CASE OF AGE DISCRIMINATION ......................................................... 19

A.      The Standard for Summary Judgment ...................................................... 19

B.      The Elements and Analytical Framework of
        an Age Discrimination Claim .................................................................... 19

C.      Plaintiff Did Not Suffer an Adverse Employment Action ......................... 20

D.      Plaintiff Has Failed to Establish an Inference of Discrimination ............. 21

II.     THE HOSPITAL DECIDED NOT TO SEND PLAINTIFF ON
        THE BUSINESS TRIP FOR LEGITIMATE,
        NON-DISCRIMINATORY REASONS ....................................................... 22

III.    THE HOSPITAL TERMINATED PLAINTIFF FOR
        LEGITIMATE, NON-RETALIATORY REASONS .................................... 24

A.      Elements and Analytical Framework for a Retaliation Claim ................... 24

B.      The Hospital Had Legitimate, Non-Retaliatory Reasons
        For Terminating Plaintiff's Employment ................................................... 25

C.      Plaintiff Cannot Show the Hospital's Stated Reasons
        To Be False and Pretextual ....................................................................... 26

Conclusion ............................................................................................................... 29

## **Table of Authorities**

*Alban-Davies v. Credit Lyonnais Securities,*
   2001 U.S. Dist. LEXIS 11253 (S.D.N.Y. 2003)...................................19, 21

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505 (1986)...............19

*Austin v. Ford Models, Inc.,* 149 F.3d 148 (2d Cir. 1998)......................................20

*Boyce v. Bank of New York,* 2005 U.S. Dist. LEXIS 20278....................................22

*Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93 (2d Cir. 2001)................19

*Cobian v. New York City,* 2000 U.S. Dist.
   LEXIS 17479 (S.D.N.Y. Dec. 6, 2000). .....................................................20

*Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132 (7th Cir. 1993) ..............20

*Das v. Our Lady of Mercy Medical Center,*
   2002 U.S. Dist. LEXIS 7771 (S.D.N.Y. 2002)...........................................28

*Dawkins v. Witco Corp.,* 103 F.Supp.2d 688 (S.D.N.Y. 2000) ..............................19

*Fairbrother v. Morrison,* 412 F.3d 39 (2d Cir. 2005)..............................................21

*Figueroa v. New York City Health & Hosp. Corp.,*
   500 F.Supp.2d 224 (S.D.N.Y. 2007)..........................................................22

*Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636 (2d Cir. 2000).....................20,21

*Goenaga v. March of Dimes Birth Defects Found'n,* 51 F.3d 14 (2d Cir. 1995)..19

*Grady v. Affiliated Cent., Inc.,* 130 F.3d 553 (2d Cir. 1997) ..................................22

*Johnson v. Eastchester Union Free Sch. Dist.,*
   211 F.Supp.2d 514 (S.D.N.Y. 2002)..........................................................21

*Khan v. Abercrombie & Fitch, Inc.,* 35 F.Supp.2d 272 (E.D.N.Y. 1999) .............26

*Lalanne v. Begin Managed Programs,* 2007 U.S. Dist.
   LEXIS 54283 (S.D.N.Y. July 24, 2004). ............................................ 27, 28

*Morpurgo v. United States,* 437 F.Supp. 1135 (S.D.N.Y. 1977)............................24

*Ofudu v. Barr Labs, Inc.*, 98 F.Supp.2d 510 (S.D.N.Y. 2000) ........................20, 25

*Parcinski v. Outlet Co.,* 673 F.2d 34 (2d Cir. 1982)...............................................26

*Paulose v. New York City Dep't of Ed.,*
    2007 U.S. Dist. LEXIS 34146 (S.D.N.Y. 2007)........................................25

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ...........................................25

*Tarshis v. Riese Organization*, 211 F.3d 30 (2d Cir. 2000)...................................20

*Wanamaker v. Columbian Rope, Co.,* 108 F.3d 462 (2d Cir. 1997)......................24

Defendants Lawrence Hospital Center (the "Hospital") and Catherine Magone submit this motion for summary judgment dismissing plaintiff's claims of age discrimination and retaliation.

## Statement of Facts

### Background

Carole Newmark was hired by Catherine Magone, Director of Quality, Case Management, and Social Work, for the position of Senior Social Worker and began work at Lawrence Hospital Center on March 20, 2006 (56.1 St.[1] ¶¶ 1, 2, 3). Shortly after Newmark's hire, she recommended that Magone hire Nicole Serra (56.1 St. ¶ 7), a social work colleague from Newmark's prior employment (56.1 St. ¶ 8), to fill a second social work position at the Hospital. After interviews, Serra began work on April 24, 2006 (56.1 St. ¶ 9, 10), with virtually identical job requirements (56 St. ¶ 9).

### The Case Management Model

Under the Hospital's case management model, which was installed and continues to be overseen by Magone, a team of nine registered nurses with the title of "Case Manager" oversee the discharge planning of all Hospital patients with a priority of minimizing patient lengths of stay where consistent with sound medical practice (56.1 St. ¶ 11, 12), and accordingly increasing the fraction of medical expenses covered by Medicare, Medicaid, and insurance reimbursements (56.1 St. ¶ 12). Although case managers develop most patient discharge plans, the Hospital's two social workers were called upon to address difficult discharge problems such as homelessness, lack of money, problems at home, psychiatric issues, safety concerns, and complex issues where the patient or family may not be ready for discharge (56.1 St. ¶ 13) by

---

[1] Citations to Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 are indicated herein by "56.1 St. ¶ __).

providing resources and referral information to help patients and their families arrange for care and recovery both in the Hospital and after discharge (56.1 St. ¶ 13).

Newmark handled an average of six to eight patients daily, with a minimum of four and a maximum of fifteen (56.1 St. ¶ 14). Hospital social workers are expected to use their professional judgment to prioritize the referrals they receive based on the individual patient's situation, with psychiatric cases typically requiring particular urgency (56.1 St. ¶ 15). Patient discharges are sometimes directed on short notice, such that at 10 am a case manager may determine that a patient needs to be discharged by 3 pm the same day. In difficult discharge cases, the social worker may be called upon to explain to an upset family the insurance or billing implications of staying past the appointed time for discharge, and in some cases negotiate with a doctor to permit a longer stay (56.1 St. ¶¶ 16, 17). In contrast to the outpatient psychiatric work of Newmark's prior employment, where the relationship between social worker and client could last for years (56.1 St. ¶ 18), psychiatric counseling at the Hospital, which Newmark considered her forte (56.1 St. ¶ 20), was administered only in small doses (56.1 St. ¶ 19) because the priority was to plan the patient's discharge rather than to develop long-term therapeutic relationships (56.1 St. ¶ 21).

**Probationary Policy**

Newmark's continued employment was subject to a six-month probationary period that the Hospital uses to assess the skills and behavior of all new employees (56.1 St. ¶¶ 23, 24), which was scheduled to expire on September 20, 2006 (56.1 St. ¶ 25). The probationary period could be extended up to three additional months at Magone's discretion (56.1 St. ¶ 26). The process ends with a performance evaluation and an assessment of whether the employee has sufficiently met Hospital expectations to warrant a continuation of employment (56.1 St. ¶ 27).

Failure to successfully complete a probationary period does not imply that the employee committed egregious offenses; managers including Magone have decided that an employee's probationary period was unsatisfactory because of poor attendance, attitude problems, personality conflicts, or substandard skills (56.1 St. ¶¶ 28, 29, 30).

## Difficulties at the Beginning of Newmark's Employment

### Newmark's Complaints about Magone and her Department

Newmark admits having difficulty adjusting to her role at the Hospital (56.1 St. ¶ 40) and to the case management model (56.1 St. ¶ 40); Magone, who was not yet Newmark's immediate supervisor, noticed Newmark's difficulty and frustration and, two months into Newmark's employment, sent Newmark an e-mail offering encouragement and urging her to ask questions (56.1 St. ¶ 41). Newmark blames some of her difficulty on her workload (56.1 St. ¶ 42) or on poorly defined roles (56.1 St. ¶ 42), but a few months into her employment, she, Serra, and Magone had a discussion in which they reached consensus on the definition of that role (56.1 St. ¶ 43).

Newmark also had difficulty working with some of the case managers in her department. She describes a "backbiting" and "pathological" mentality in which case managers were territorial and unwilling to share information (56.1 St. ¶ 44), and she arranged a meeting through Magone to resolve the matter with the case managers (56.1 St. ¶ 45) in or about May 2006 (56.1 St. ¶ 45). Some case managers explained to Newmark that although they understood her situation, they were working in an extremely fast-paced work environment (56.1 St. ¶ 46). Newmark maintains that by the end of her employment, she had managed to develop a rapport with all but one of the department's nine case managers (56.1 St. ¶ 47).

3

Newmark's working relationship with Magone was also strained. In May 2006, based on her observations of how case managers responded to Magone, and listening to their remarks to one another, Newmark concluded that all of the Hospital's case managers were afraid of Magone (56.1 St. ¶ 48). Newmark also decided in May 2006 that Magone was tough and unfair (56.1 St. ¶ 49). Newmark described Magone as very demanding, very demeaning, demanding to know what was happening at all times, and managing through fear (56.1 St. ¶ 50). In Newmark's view, Magone was "very volatile at times with other people" (56.1 St. ¶ 51), including all case managers (56.1 St. ¶ 51), and insisted on things being done her own way (56.1 St. ¶ 51).

Newmark expressed these views to coworkers, including both Serra and a case manager, in June 2006 (56.1 St. ¶ 52), and subsequently told Serra that Magone showed no regard for patients, patient situations, or family situations (56.1 St. ¶¶ 53, 54). During interdisciplinary rounds, which involve social workers, physical therapists, and nurses meeting at different units, and in other public forums (56.1 St. ¶ 60), Nurse Practioner Maura Del Bene observed Newmark making audible sighing noises, gesturing to indicate her displeasure, and engaging in emphatic gum chewing to draw attention to her dissatisfaction or disagreement (56.1 St. ¶ 59). Newmark was also openly critical of Magone, Magone's knowledge of social work, the structure and leadership of the department of case management, the lack of technical support in her department, and the utilization or underutilization of social workers in the Hospital, including Newmark and Serra's role in case management generally (56.1 St. ¶ 57).

Maura Del Bene, who never witnessed Magone's conduct or managerial deficiencies as described by Newmark (56.1 St. ¶ 58), coached Newmark on several occasions, including one lunch appointment (56.1 St. ¶ 61), to develop constructive strategies for improving the status of social work within the department of case management (56.1 St. ¶ 61), advocate for social work

more formally (56.1 St. ¶ 62), take initiative in a perceived vacuum to define the social workers' role more clearly (56.1 St. ¶ 62) and integrate social work more securely with other hospital services (56.1 St. ¶ 62).

*Newmark's Preliminary Work with the Palliative Care Service*

Del Bene had been hired to launch the Hospital's Palliative Care Service, and she did so shortly after beginning employment on May 20, 2006 (56.1 St. ¶ 55). The Palliative Care Service is an interdisciplinary program in which doctors, nurses, a psychiatric nurse practitioner, and social workers share their respective insights with patients, families, and one another to achieve the best care possible for the dying, chronically ill, and those suffering from pain by providing services including pain management, bereavement counseling, and hospice arrangements (56.1 St. ¶ 56).

Newmark told Del Bene she wanted to be involved in palliative care (56.1 St. ¶ 63), and Newmark and Del Bene discussed what Newmark could do to involve herself in the program (56.1 St. ¶ 65). Newmark did not follow through, however, on that expression of interest. Del Bene recalled only one instance where Del Bene and Newmark interacted on a palliative care matter (56.1 St. ¶ 66), and even then Newmark declined to participate in a joint conference with the family (56.1 St. ¶ 67). Newmark told Del Bene on several occasions that she was too busy to join her on palliative care cases (56.1 St. ¶ 68), and more than once told Del Bene that it was unnecessary for her to meet with the family again (56.1 St. ¶ 69). Del Bene thus never observed Newmark's interactions with patients (56.1 St. ¶ 70), could not assess how well they would work together (56.1 St. ¶ 70), and was disappointed by Newmark's indication that she was handing a case to Del Bene for completion rather than joining her in an interdisciplinary assessment (56.1 St. ¶ 71). Newmark also failed to attend all but two weekly meetings with Del Bene and Serra to

5

discuss palliative care, (56.1 St. ¶ 72), and ignored Del Bene's request to develop a bereavement policy for the Palliative Care Service (56.1 St. ¶¶ 72, 73). Newmark now claims that no one directed her to prepare the policy (56.1 St. ¶ 75); however, she ignored Del Bene's invitation to demonstrate her interest and initiative in the field of Palliative Care, even after Del Bene persisted in meeting with Newmark to describe the opportunity (56.1 St. ¶ 76). Del Bene's other requests or recommendations to Newmark regarding the role of social work in a palliative care service included networking within the Hospital on palliative care issues, researching palliative care associations and informational websites, and developing a social worker evaluation form to formalize the role of social work on the interdisciplinary team (56.1 St. ¶ 77). Plaintiff failed to implement or show enthusiasm for these suggestions to the extent Serra did (56.1 St. ¶ 78).

### Newmark's Assignment to the Disaster Mental Health Program

Pursuant to a mandate from the New York State Department of Health, Magone directed Newmark to participate in off-site instruction on June 20 and 21, 2006 on how to train Hospital personnel to provide appropriate mental health care in the event of terrorism or disaster (56.1 St. ¶ 79). Although Magone asked Newmark at least twice about the status of her work on disaster mental health training in subsequent months (56.1 St. ¶ 80), Newmark said only that the training would be "a lot of work" (56.1 St. ¶ 81), did not tell Magone the deadline for the project (56.1 St. ¶ 82), did not tell Magone that she was reviewing the training materials (56.1 St. ¶ 83), and did not keep any written notes, outlines, or memoranda regarding any efforts she may have made to implement the training program (56.1 St. ¶ 84).

### Magone Becomes Newmark's Direct Supervisor

Magone became Newmark's direct supervisor in July 2006 after the departure of an intermediate manager (56.1 St. ¶ 85). Beginning with her own direct supervision of Newmark,

Magone became concerned that Newmark showed very little follow-up with patients who were referred to her (56.1 St. ¶ 86). During a July 18 weekly staff meeting to discuss Length of Stay, Magone found that Newmark was unfamiliar with her cases, could not describe them even when given their names, and did not appear to have seen them (56.1 St. ¶ 87). Newmark does not recall the conversation ("I highly doubt that", 56.1 St. ¶¶ 88, 89), but admits she was unprepared for the meeting and could not answer Magone's questions, claiming that she left her paperwork in her office (56.1 St. ¶ 90), even though she realized she could be subjected to questions about her caseload at any time (56.1 St. ¶ 91).

Magone told Newmark on July 20, 2006 (56.1 St. ¶ 92) about her concern that Newmark was not adjusting to the case management model (56.1 St. ¶ 92), and cited Newmark's failure to follow up properly on cases, need to respond more promptly to staff requests for information, inadequate documentation in patient medical records (56.1 St. ¶ 93), and need to be more proactive in beginning discharge planning with families (56.1 St. ¶ 93). Newmark complained that she had too much work and that many of her cases were complicated (56.1 St. ¶ 94), but Magone noted that Newmark was handling only four cases (56.1 St. ¶ 95), and advised Newmark to organize and prioritize her work (56.1 St. ¶ 95). Magone also expressed concern that, one month after attending the Disaster Mental Health training, Newmark had not begun planning to implement the Department of Health mandate (56.1 St. ¶ 96); Newmark replied that doing so would be a lot of work (56.1 St. ¶ 96). Newmark was sufficiently impressed by the severity of Magone's remarks that she asked whether she should consider their discussion a verbal warning (56.1 St. ¶ 97). Magone replied that she did not intend this as discipline (56.1 St. ¶ 98), writing "I want you to be successful and I will work with you to make that happen" (56.1 St. ¶ 98).

7

**The Decision to Appoint Serra to the Palliative Care Service**

In August 2007, Magone advised Del Bene that she was selecting a social worker to travel to observe a palliative care program in Columbus, Ohio (56.1 St. ¶ 99). This assignment was not a transfer or promotion, did not involve a change in pay or benefits, and would not result in either social worker being denied involvement from the provision of palliative care at the Hospital (56.1 St. ¶ 100); in fact, Newmark provided palliative care and worked on palliative care cases throughout her entire period of employment at the Hospital, both before and after the decision to send Serra on the business trip (56.1 St. ¶ 101). Magone determined, however, that it was not appropriate for both social workers to attend the site visit (56.1 St. ¶ 102). Serra did not receive any additional money or benefits as a result of this assignment (56.1 St. ¶ 103). Del Bene had one or two separate discussions with Magone and with her own supervisor, Rose Ann O'Hare, about the selection of a social worker to attend the site visit (56.1 St. ¶ 104).

Magone told Del Bene that Newmark had been assigned a Disaster Mental Health project, which Magone did not believe Newmark had properly attended to, and that she was inclined not to assign Newmark a second project under those circumstances (56.1 St. ¶ 105). Del Bene told Magone that although Newmark had expressed interest in Palliative Care, she had not responded to Del Bene's e-mail requests or offers of Palliative Care projects (56.1 St. ¶ 106), failed to show interest in working as part of an interdisciplinary team (56.1 St. ¶ 106), and displayed a negative, unresponsive attitude that Del Bene felt could be harmful in establishing the credibility of the fledgling service (56.1 St. ¶ 106). Del Bene told Magone that Newmark appeared to be an angry woman, in which assessment Magone concurred (56.1 St. ¶ 107), and that that demeanor was not conducive to the care of dying patients (56.1 St. ¶ 107).

8

By contrast, Del Bene noted to Magone, Serra had responded very positively to Del Bene's suggestions and recommendations regarding investigating resources and learning more about palliative care, actively collaborated with Del Bene on numerous patient care matters, and made numerous palliative care referrals (56.1 St. ¶ 108). Del Bene expressed to Magone her view that Serra's engaging demeanor, positive attitude, positive tone in verbal and written communications, and demonstrated enthusiasm for palliative care would reflect well on the program (56.1 St. ¶ 109). Del Bene and Serra had developed a warm and rewarding style of collaboration, and a good work relationship (56.1 St. ¶ 110) which Newmark characterizes as "amicable" and "wonderful" (56.1 St. ¶ 111), in which Serra demonstrated curiosity and eagerness to learn (56.1 St. ¶ 112), asked numerous questions (56.1 St. ¶ 112), took copious notes (56.1 St. ¶ 112), and made it a point to collaborate with Del Bene where possible (56.1 St. ¶ 112). Del Bene also described her observations to O'Hare (56.1 St. ¶ 113).

Significantly, although Serra had privately agreed with some of Newmark's workplace complaints (56.1 St. ¶ 114), and occasionally complained to Del Bene about managerial issues, Magone's grasp of social work, or the utilization of social work within case management (56.1 St. ¶ 115), she kept her discussions private; there is no evidence to suggest that Serra's overall demeanor was problematic or that she made her complaints public in the department (56.1 St. ¶ 116). To the contrary, Del Bene found that even in coping with difficult interactions with case managers, Serra showed good energy and enthusiasm and worked to overcome these workplace challenges (56.1 St. ¶¶ 117-19).

Accordingly, Magone decided that Serra was a more appropriate choice than Newmark for the site visit to Ohio, based on Del Bene's direct input, input through O'Hare, and her own observations (56.1 St. ¶ 120), including her desire for Serra to develop more independence from

Newmark (56.1 St. ¶ 120). Newmark had, to Magone's mind, demonstrated herself to be overprotective of Serra (56.1 St. ¶ 121), for example requiring Serra to "shadow" Newmark for a two-month period before taking on assignments of her own (56.1 St. ¶ 122), even for the purpose of obtaining an administrator's signature (56.1 St. ¶ 123). Newmark admits that Serra is "bright" (56.1 St. ¶ 125), learned her job well (56.1 St. ¶ 125), and not a poor choice for the Palliative Care Service (56.1 St. ¶ 125). Nor does Newmark dispute that the distribution of work between social workers was a factor in Magone's decision (56.1 St. ¶ 126), or that Magone relied on input from Del Bene and O'Hare (56.1 St. ¶ 126).

Magone reached her decision on August 15, 2006 (56.1 St. ¶ 127), and told Newmark she would send Serra to Ohio with the Palliative Care Service rather than Newmark (56.1 St. ¶ 128). Because of Newmark's past displays of poor attitude, Magone emphasized Serra's strengths rather than Newmark's defects (56.1 St. ¶ 129), saying, "I've decided to appoint Nicole [Serra] to the Palliative Care Program out in Ohio. She's young in her career, this is a good opportunity for her to have something of her own" (56.1 St. ¶¶ 124, 129). Magone explained that her decision had been based in large part on input from Del Bene and O'Hare (56.1 St. ¶ 130). Magone also pointed out that Newmark was going to be very busy with the Disaster Mental Health project and had not shown any initiative or progress with that project (56.1 St. ¶ 131). Newmark, however, construes Magone's remarks to mean that Serra was younger than Newmark and therefore "could handle the job better", and claims those are the words Magone used (56.1 St. ¶ 132).

**Newmark's Complaint to Orsaia**

On or about August 18, 2006 (56.1 St. ¶ 133), Newmark claims she told Patricia E. Orsaia, then the Hospital's Director of Human Resources, that Magone said she had selected

Serra to work on a particular project on palliative care because Serra was younger and could do the job better, and asked whether that was "ageism" (56.1 St. ¶ 133). Newmark also told Orsaia that she was unsure whether her position at the Hospital was a good fit for her (56.1 St. ¶ 134), that she had come from a very different mental-health work environment, and may be having difficulty adjusting to the Hospital's case management model (56.1 St. ¶ 134).

Orsaia tried to clarify what Magone had said (56.1 St. ¶ 135) as well as what Newmark meant by "ageism" (56.1 St. ¶ 135), and discussed with Newmark the possibility that she had misinterpreted Magone's remark (56.1 St. ¶ 135). She pointed out that Magone had known Newmark's approximate age at the time of hire (56.1 St. ¶ 136). Orsaia then offered Newmark the options of discussing the matter with Magone privately, meeting with Magone with Orsaia present, or Orsaia speaking to Magone on Newmark's behalf (56.1 St. ¶ 137). Orsaia understood from this discussion that Newmark first wanted her to speak with Magone on her behalf (56.1 St. ¶¶ 138, 139), and scheduled a meeting to discuss Newmark's concerns with Magone after Orsaia returned from vacation (56.1 St. ¶ 140). When they met, Orsaia explained Newmark's complaint to Magone for the first time (56.1 St. ¶ 142). Magone denied Newmark accusation, telling Orsaia she had not suggested that age had anything to do with her decision (56.1 St. ¶ 143). Although Magone acknowledged that she had used the word "young" or "younger" in her discussion with Newmark, she said the word had been taken out of context: Magone had said Serra was "young in her career and eager to learn" (56.1 St. ¶ 144). Magone also explained that she had relied on input from O'Hare and Del Bene, who both favored Serra's selection (56.1 St. ¶ 145), and that Newmark had not begun work on the disaster mental health project (56.1 St. ¶ 145). Magone agreed with Orsaia that it was important to address and resolve Newmark's concerns (56.1 St. ¶ 146).

11

Orsaia conveyed Magone's response to Newmark (56.1 St. ¶ 147), who said that Magone's clarification was "not acceptable" and denied that Magone had used the phrase "young in her career" (56.1 St. ¶ 147).

**Newmark's Continued Performance Problems**

In addition to speaking with Orsaia, Newmark told many colleagues, sometimes more than once and in public settings, that Magone had chosen to send Serra to the site visit because she was younger. Newmark mentioned Magone's decision to Del Bene (56.1 St. ¶ 148) and Serra (56.1 St. ¶ 148), and also told the case managers (56.1 St. ¶ 148). She also announced during rounds in the Hospital's Intensive Care Unit that Magone had discriminated against her (56.1 St. ¶ 149). Magone was aware of Newmark's extremely negative emotional reaction to the decision (56.1 St. ¶ 150), noting that Newmark continued to complain about the assignment decision, and learning from Del Bene that Newmark was upset to the point of being unable to perform her job duties (56.1 St. ¶ 151). Magone observed Newmark to be visibly angry on many occasions (56.1 St. ¶ 152), and heard from employees that Newmark was continuing to complain to coworkers about the decision (56.1 St. ¶ 152).

Newmark also became increasingly erratic and negligent in the quality of her work, and Magone received complaints from many of Newmark's colleagues about her work performance. On August 31, case manager Susanne Muccio informed Magone that Newmark had told a family that their request for information about nursing homes was premature; when it became time to discharge the patient to a nursing home, the family was unprepared and complained of being rushed by the case manager, and Newmark's advice resulted in a delay in the patient's discharge (56.1 St. ¶ 159). Newmark has testified that she can neither confirm nor deny the exchange took place (56.1 St. ¶ 160).

On September 1, a different case manager asked Magone to intervene because she needed Newmark to prepare a screening form used for transferring patients to a nursing home when a patient was ready to leave, but Newmark was not responding to her calls (56.1 St. ¶ 161). The case manager also told Magone that Newmark generally did not respond to these requests in a timely manner, and had an uncooperative attitude when she received them (56.1 St. ¶ 162). When Magone called Newmark about the screening form, Newmark responded "I will get to it" in an unprofessional tone (56.1 St. ¶ 163). Newmark acknowledges that her usual response was that she was busy and would get to it (56.1 St. ¶¶ 164, 165), a response which Magone considered unacceptable. Newmark's only rebuttal is that this case manager complained frequently, may complained more than once, demanded instant gratification, and that Newmark may not been given advance notice of the need (56.1 St. ¶ 166 ).

On September 7, Magone learned that a patient, who had been in the Hospital for several weeks and had been referred to Newmark for social work, had not been seen by Newmark since August 14, even though the patient's transfer to the Intensive Care Unit on August 27 reflected a change in circumstances; this reflected poor documentation and a lack of follow-up by Newmark (56.1 St. ¶ 167). When Magone questioned Newmark about this, Newmark said that she was overworked and unable to get to all her cases (56.1 St. ¶ 168).

In addition, Newmark's unplanned absences from work were troubling in a probationary employee (56.1 St. ¶ 169). Although five periods of unscheduled absence (i.e., calling in sick) in a year are considered excessive (56.1 St. ¶ 170), Newmark had four unscheduled absences in a six-month period (56.1 St. ¶ 171), including two days of illness early in her employment not reflected in her payroll records (56.1 St. ¶ 171), amounting to at least seven days of illness (56.1

St. ¶ 171). Magone spoke to Newmark about her poor attendance, and about Newmark's failure to follow protocol for scheduling time off for a medical procedure (56.1 St. ¶ 172).

As a result of these observed performance problems, Magone told Orsaia in September 2006 that she was concerned that the employment relationship with Newmark would not be successful, and explained the basis for her concerns (56.1 St. ¶¶ 173-75). At 3 pm on September 12, 2006, after consultation with Orsaia, Magone told Newmark that she was extending Newmark's probationary period (56.1 St. ¶ 176) because "things were not working out" (56.1 St. ¶ 176). Magone also said that there were still issues to be resolved regarding social work roles, case management roles, and palliative care roles (56.1 St. ¶ 177), as well as attendance issues (56.1 St. ¶ 177). Newmark said that she still had problems with case managers failing to give her things in a timely manner (56.1 St. ¶ 178), and expressed her hope that "we would work things out" (56.1 St. ¶ 179). Newmark's complaint to Orsaia did not play a factor in Magone's decision to extend Newmark's probation (56.1 St. ¶ 180). At or about the same time, despite her poor attendance, Newmark persuaded Magone to approve a two-day medical absence (56.1 St. ¶ 221).

A week after Magone told Newmark that her probationary period was being extended, she received an e-mail during her vacation from a case manager saying that Newmark had allowed a patient to leave the Hospital without proper clothing (56.1 St. ¶ 183). The patient had been hospitalized 19 days, but Newmark had not met with him until the 18th day (56.1 St. ¶ 183). Newmark admits the patient left without clothes (56.1 St. ¶ 184), but claims that he had psychiatric problems and, although he had clothes, was refusing to wear them (56.1 St. ¶ 184). When Magone spoke to Newmark about this incident she noted the inadequate documentation and discharge planning Newmark had done for this patient (56.1 St. ¶ 185).

**The September 28 Meeting**

After some additional discussion with Orsaia about her complaint (56.1 St. ¶ 186),

Newmark sent Orsaia an e-mail on September 28 asking her to schedule a meeting with her and

Magone to discuss her concern of age discrimination (56.1 St. ¶ 187). They met the same

afternoon (56.1 St. ¶ 188), and Magone explained to Newmark that Newmark's age had nothing

to do with the decision regarding Serra's assignment to the palliative care project, that she had

taken the word "young" out of context, and that "Serra was younger in her career, eager to learn,

and soaked things up like a sponge" (56.1 St. ¶ 189); Newmark denies that Magone used the

words "in her career" (56.1 St. ¶ 190). Magone also repeated that O'Hare and Del Bene had

contributed input into the decision, that Newmark had attendance and performance issues (56.1

St. ¶ 191), and Newmark had previously been assigned the disaster mental health project because

that was appropriate to her experience (56.1 St. ¶ 191), but had not shown progress with it (56.1

St. ¶ 191). Newmark, who displayed an angry demeanor at this meeting (56.1 St. ¶ 192),

repeated her original complaint (56.1 St. ¶ 193) and requested more detail about Magone's

performance concerns, which Magone agreed to discuss at another time (56.1 St. ¶¶ 194, 195).

Magone also pointed out that she considered herself to be of similar age to Newmark, and had

been aware of her age when she hired her (56.1 St. ¶ 198). The meeting, which had lasted

twenty minutes (56.1 St. ¶ 199), ended by mutual agreement (56.1 St. ¶ 199).

The following day, Newmark sent Orsaia an e-mail revisiting some of the issues that had

been discussed during the September 28 meeting (56.1 St. ¶ 200). Neither Orsaia nor Magone

considered Newmark's e-mail to be an accurate or verbatim recounting of that meeting or of

previous events (56.1 St. ¶ 201), and Orsaia forwarded the e-mail to Magone for Magone's

response (56.1 St. ¶ 202). Magone did so a few days later via e-mail, explaining again the

business reasons for her decision and that age played no part in her deliberations (56.1 St. ¶ 203).

Newmark did not respond (56.1 St. ¶ 204) and considered it an attempt by Magone to "cover her

ass" (56.1 St. ¶ 204).

### Newmark's Failure to Successfully Complete Her Probationary Period

On the basis of earlier discussions with Orsaia (56.1 St. ¶ 205), Magone decided and

informed Orsaia after September 28 that Newmark had not successfully completed her

probationary period (56.1 St. ¶ 206), and explained the facts and events underlying her decision,

including dates of absence, complaints Magone had documented, and Newmark's failure to show

progress on the disaster mental health project (56.1 St. ¶ 207).

Magone prepared a performance evaluation (56.1 St. ¶ 208) as part of the probationary

process in which she observed that Newmark's colleagues found her to be negative,

unapproachable, and difficult to deal with; Newmark became defensive when challenged on her

cases; Newmark frequently complained that she was overwhelmed even with a small caseload;

Newmark had failed to take any initiative on the Mental Health Disaster Program; Newmark was

not proactive in troubleshooting difficult cases; and Newmark did not respond to patient needs in

a timely manner (56.1 St. ¶¶ 208-12). As she had previously expressed to Orsaia (56.1 St. ¶

213), Magone concluded that Newmark had failed to adjust to the Hospital's case management

model. Magone noted that Newmark had not been proactive in preparing patients and families

for discharge (56.1 St. ¶¶ 212, 214) and that this negatively affected average length of stay.

Magone also noted instances of inadequate medical documentation and excessive unscheduled

absences (56.1 St. ¶ 214). Magone wrote in a separate contemporaneous document (56.1 St. ¶

215) about Newmark's poor attendance record, her failure tell Magone about an e-mail with

compliance deadlines for the Disaster Mental Health program, and Newmark's unacceptable

16

reaction to Magone's decision to send Serra on the trip to Ohio, consisting of constant complaints to the detriment of her work performance (56.1 St. ¶ 215).

On the afternoon of October 5, 2006 (56.1 St. ¶ 216), Newmark, Magone, and Orsaia met in Orsaia's office (56.1 St. ¶ 216). Orsaia explained that they were meeting because Magone had ongoing concerns about Newmark's attendance and performance (56.1 St. ¶ 216), and Magone presented Newmark with a written performance evaluation and discussed it briefly (56.1 St. ¶ 216). Magone explained to Newmark that she had not successfully completed her probationary period, and was being separated from employment (56.1 St. ¶ 217). Orsaia offered Newmark the option of having her employment record reflect resignation or termination (56.1 St. ¶ 218). Newmark reserved decision until the following day, when she telephoned Orsaia to ask that her employment record reflect termination (56.1 St. ¶ 225).

**Newmark's Discrimination Claim**

Newmark's claim of age discrimination is based solely on her assertion, which Magone repeatedly denied, that during her August 15 meeting with Magone, Magone said "Nicole is younger and can handle the job better" (56.1 St. ¶ 226). She acknowledges that Magone, who is 54 (56.1 St. ¶ 227) was aware of her age at the time of hire (56.1 St. ¶ 227) and admits that there were no offensive age-based slurs or names in the workplace (56.1 St. ¶ 228), no other age-based comments (56.1 St. ¶ 229), no offensive pictures or cartoons (56.1 St. ¶ 230), no jokes about age (56.1 St. ¶ 231), or indeed any other evidence to suggest that Magone had singled her out because of her age (56.1 St. ¶ 232).

**Newmark's Retaliation Claim**

Newmark claims that she was fired because she complained about ageism to Human Resources (56.1 St. ¶ 233), arguing that after her complaint to Orsaia, Magone overlooked her in

17

meetings (56.1 St. ¶ 234), and failed to make eye contact (56.1 St. ¶ 234), and that Newmark lost

her amicable rapport with Magone (56.1 St. ¶ 234).  Newmark dates their amicable rapport to a

time before Magone had become her immediate supervisor (56.1 St. ¶ 235) when Newmark and

Magone had little interaction (56.1 St. ¶ 235) but Newmark considered Magone tough, unfair

(56.1 St. ¶ 49), demeaning, and managing "through fear" (56.1 St. ¶ 50).  Newmark claims that

Magone was dismissive of her before her complaint to Orsaia (56.1 St. ¶ 236), which she

attributed to Magone being busy (56.1 St. ¶ 237), and alleges that Magone was also dismissive

after her complaint, but "not in the same way" (56.1 St. ¶ 238), and is unable to pinpoint an exact

time when the change took place (56.1 St. ¶ 239).  Indeed, Newmark did not conclude that

Magone was acting differently toward her until mid-September (56.1 St. ¶ 240), saying that she

"never put the pieces together and made connections about anything" (56.1 St. ¶ 240).

Newmark also claims that after her complaint to Human Resources, Magone met with her

less frequently (56.1 St. ¶ 241), whereas she had frequent private weekly meetings with Magone

in July and early August after Lantz's departure (56.1 St. ¶ 242).  Newmark and Magone were

both at work at the same time on only eleven days from August 28 through September 28,

however (56.1 St. ¶ 243), and met or spoke on at least five of them (56.1 St. ¶ 243).  Newmark

also asserts that Magone denied her public recognition for an alleged "Big Heart Award" in or

about September (56.1 St. ¶ 244), of which Magone was unaware (56.1 St. ¶ 245).  Magone said

nothing that suggested retaliatory animus to Newmark (56.1 St. ¶ 246), and Magone and Orsaia

maintain that the decision to terminate Newmark for failure to successfully complete her

probationary period was completely unrelated to Newmark's complaint of age discrimination

(56.1 St. ¶ 247).

## Argument

### POINT I

### PLAINTIFF FAILS TO ALLEGE A PRIMA FACIE CASE OF AGE DISCRIMINATION

A.    The Standard for Summary Judgment

Summary judgment is appropriate where the parties' submissions show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). For plaintiff to avoid summary judgment, she must offer concrete particulars to substantiate her claims; she may not merely rely on the pleadings or raise solely metaphysical doubt as to the material facts. *Dawkins v. Witco Corp.*, 103 F.Supp.2d 688, 695 (S.D.N.Y. 2000). Speculation, conclusory allegations, unsupported assertions, and mere denials are not enough to raise genuine issues of fact; to defeat summary judgment, plaintiff must produce enough evidence that a jury could return a verdict in her favor. *Goenaga v. March of Dimes Birth Defects Found'n*, 51 F.3d 14, 18 (2d Cir. 1995).

B.    The Elements and Analytical Framework of an Age Discrimination Claim

A prima facie case of discrimination under the Age Discrimination in Employment Act ("ADEA") and New York Human Rights Law, N.Y. Exec. L. § 290[2] ("New York Human Rights Law"), requires evidence that (1) at the time of her employment she was 40 years of age or older; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

---

[2] Courts apply the same analysis to New York Human Rights Law claims as to ADEA and Title VII claims. *Alban-Davies v. Credit Lyonnais Securities*, 2001 U.S. Dist. LEXIS 11253 (S.D.N.Y. 2003).

If the plaintiff establishes a prima facie case of unlawful discrimination, the employer is then called upon to articulate a legitimate, non-discriminatory explanation for its actions. *Id. Austin v. Ford Models, Inc.*, 149 F.3d 148, 152-53 (2d Cir. 1998). The plaintiff then must prove, through admissible evidence, that the employer's stated reasons are pretextual, and also that its true reasons were discriminatory. *See Tarshis v. Riese Organization*, 211 F.3d 30, 35 (2d Cir. 2000). Where, as here, the employer provides convincing evidence to explain its conduct and plaintiff's argument consists purely of conclusory allegations of discrimination, for which she can offer no admissible evidence, the Court may conclude that no material issue of fact exists and grant summary judgment to the employer. *Ofudu v. Barr Labs, Inc.*, 98 F.Supp.2d 510, 513-14 (S.D.N.Y. 2000); *Cobian v. New York City,* 2000 U.S. Dist. LEXIS 17479, at *26, 2000 WL 1782744, at *8 (S.D.N.Y. Dec. 6, 2000).

C.      Plaintiff did not suffer an adverse employment action

Plaintiff fails to establish a prima facie case of age discrimination because Magone's choice of Serra rather than Newmark to attend a business trip was not an adverse employment action. An adverse employment action occurs only if plaintiff incurs a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 649 (2d Cir. 2000) (internal quotation omitted). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). A materially adverse change may be signified by a termination of employment; a demotion with a decrease in wage or salary or a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; or other indices unique to a particular

20

situation. *Galabya*, 202 F.3d at 640; see *Johnson v. Eastchester Union Free Sch. Dist.*, 211

F.Supp.2d 514, 517-18 (S.D.N.Y. 2002).

Although plaintiff may have been disappointed that she was not chosen to attend this site

visit on behalf of the Hospital's Palliative Care Service, the assignment did not materially change

her role and duties as a social worker. Before and after the decision was made to send Serra on

the business trip, plaintiff was responsible for performing social work discharge planning with an

average daily caseload of six to eight patients (56.1 St. ¶ 14), and, among other responsibilities,

providing palliative care (56.1 St. ¶ 101). Plaintiff can also point to no materially adverse

change in her salary or benefits as a result of this assignment (56.1 St. ¶¶ 100, 103). *See*

*Galabya*, 202 F.3d at 640; *Fairbrother v. Morrison,* 412 F.3d 39, 56 (2d Cir. 2005).

Accordingly, Newmark has not offered any evidence that she suffered an adverse employment

action. See, e.g., *Alban-Davies v. Credit Lyonnais Sec. (USA) Inc.,* 2001 U.S. Dist. LEXIS

11253 at *6 (exclusion from business trip not adverse employment action because at most, it

shows defendant was not using plaintiff to his full potential).

D.     Plaintiff has failed to establish an inference of discrimination.

According to Newmark's version of events, Magone apparently paid her the courtesy of

prior notice of her decision to send Serra on the site visit with the Palliative Care Service for the

sole purpose of insulting her because of her age (see 56.1 St. ¶¶ 128, 132). Newmark then

ignored all subsequent efforts by Magone to explain her decision further as nothing more than an

exercise in "covering her ass" (56.1 St. ¶ 204). Newmark's cynical explanation, however, that

Magone must be engaging in discriminatory conduct because she was allegedly demeaning to

others, because she recalled events differently, and because Newmark distrusted her (56.1 St. ¶¶

48-51, 147, 204), even when Magone had previously offered encouragement (56.1 St. ¶¶ 41, 98)

21

and tried on three separate occasions to explain otherwise (56.1 St. ¶¶ 143-46, 189, 203), is insufficient to suggest an inference of discriminatory conduct. Newmark has adduced no evidence in this litigation that Magone harbors age-based discriminatory animus. Magone is close in age to Newmark herself (56.1 St. ¶¶ 127, 136, 198) and, apart from the alleged comment of August 15, is not accused of any behavior suggesting prejudice on the basis of age (56.1 St. ¶¶ 228-32).

Further, Magone was aware of Newmark's approximate age when she hired her five months earlier (56.1 St. ¶¶ 2, 128, 198), and this Circuit recognizes a strong presumption that the same individual who hires a person knowing her membership in a legally protected class is very unlikely to later discriminate on that basis. *Figueroa v. New York City Health & Hosp. Corp.*, 500 F.Supp.2d 224, 236 (S.D.N.Y. 2007) (same-actor inference precluded finding of discrimination where same manager participated in decision to promote plaintiff); *see also Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *Boyce v. Bank of New York*, 2006 U.S. Dist. LEXIS 20278, at *23 (no inference of discrimination where same person hired and fired plaintiff in two and a half year period). Accordingly, plaintiff cannot establish a prima facie case of age discrimination, and her claim should be dismissed upon summary judgment.

## POINT II

### THE HOSPITAL DECIDED NOT TO SEND PLAINTIFF ON THE BUSINESS TRIP FOR LEGITIMATE, NON-DISCRIMINATORY REASONS

Even if plaintiff could establish a prima facie case of age discrimination (which she cannot), the Hospital had several legitimate, non-discriminatory reasons for sending Serra instead of Newmark. Newmark had failed in two months to make any progress in planning disaster mental health training at the Hospital, and the Ohio site visit could interfere with that project further (56.1 St. ¶ 105). Newmark had also failed to follow through on opportunities to

work on palliative care during the prior three months with Del Bene, including developing a bereavement policy (56.1 St. ¶ 74), and passing up opportunities to work with Del Bene on palliative care cases (56.1 St. ¶¶ 66-72), and was public and demonstrative about her negative opinion of her manager and her department (56.1 St. ¶¶ 52, 59), which Del Bene regarded as a serious detriment in establishing the credibility of a new Hospital program (56.1 St. ¶ 106). Newmark had also failed to show substantial progress on the areas of concern that Magone herself had expressed on July 20 (56.1 St. ¶¶ 92, 210).

By contrast, Magone and Del Bene concluded, and Newmark does not deny, that Nicole Serra was a suitable candidate for the site visit to Ohio (56.1 St. ¶¶ 111, 120). Serra exhibited a pro-active, enthusiastic attitude and a strong desire to learn more about palliative care (56.1 St. ¶ 109), had responded positively to Del Bene's suggestions and recommendations regarding the Palliative Care Service (56.1 St. ¶ 108), actively collaborated with Del Bene on numerous patient care matters (56.1 St. ¶ 108), and made many palliative care referrals (56.1 St. ¶ 108). Serra and Del Bene had also developed a good working relationship (56.1 St. ¶ 110). Plaintiff admits that Del Bene and Serra had a "wonderful" professional relationship, that Serra demonstrated curiosity and an eagerness to learn, and that she often asked questions (56.1 St. ¶¶ 111, 112). Magone also saw benefit in giving Serra an assignment that would allow her learning opportunities and more independence from Newmark (56.1 St. ¶120).

Against this backdrop, Magone's use of the word "young" or "younger" in her discussion with Newmark on August 15 is insufficient to establish pretext. Newmark can offer no evidence rebutting the Hospital's explanation of its actual decision-making process (56.1 St. ¶ 126). Instead, Newmark's sole response has been to claim that Magone was "covering her ass" (56.1 St. ¶ 204) in all subsequent efforts to explain the decision-making process. It is well-established,

however, that simply accusing an employer's witness of lying, without admissible evidence of same, is insufficient to defeat a motion for summary judgment. *Morpurgo v. United States*, 437 F.Supp. 1135, 1137 (S.D.N.Y. 1977) ("That plaintiff challenges the veracity of affidavits and documents submitted by the defendants cannot, in the absence of evidential facts tending to support her claims, serve to defeat a motion for summary judgment").

Accordingly, the Hospital has articulated several legitimate, non-discriminatory reasons for deciding not to send plaintiff on the Palliative Care site visit, and plaintiff's claim of age discrimination should accordingly be dismissed upon summary judgment.

## POINT III

### THE HOSPITAL TERMINATED PLAINTIFF FOR LEGITIMATE, NON-RETALIATORY REASONS

Plaintiff appears to base her claim of retaliation on the passage of time between her August 18 complaint and her October 5 termination, and on an alleged change in Magone's demeanor (and similar non-verbal and incidental conduct) after August 18. Assuming, for purposes of this discussion, that these allegations sufficed to state a prima facie case of retaliation, they are wholly inadequate – and plaintiff offers nothing more – to undermine the Hospital's stated grounds for her termination.

A. Elements and Analytical Framework for a Retaliation Claim

A prima facie case for retaliation requires evidence that (1) plaintiff participated in a activity protected by the ADEA and the New York Human Rights Law; (2) her employer was aware of this protected activity; (3) her employer adopted an employment action adverse to plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Wanamaker v. Columbian Rope, Co.,* 108 F.3d 462, 465 (2d Cir. 1997).

Courts apply the same standard of proof to retaliation claims under the ADEA and the New York Human Rights Law. *Id.* at 468.

If the plaintiff satisfies these requirements, the employer is then called upon to articulate a legitimate, non-retaliatory reason for its action. *Id.* at 464. Plaintiff must then prove that the employer's proffered reason is false, and merely a pretext for retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993). Where, as in this case, plaintiff provides purely conclusory allegations of retaliation, the Court may conclude that no material issue of fact exists and grant summary judgment for the employer. *Ofudu v. Barr Labs., Inc.*, 98 F.Supp.2d 510, 513-14 (S.D.N.Y. 2000).

B.    The Hospital had legitimate non-retaliatory reasons
      for terminating plaintiff's employment

The Hospital terminated Newmark's employment on October 5, 2006 for failure to successfully complete her probationary period (56.1 St. ¶ 217). *Cf. Paulose v. New York City Dep't of Ed.*, 2007 U.S. Dist. LEXIS 34146 *44 (S.D.N.Y. May 10, 2007) (granting summary judgment on retaliation claim where plaintiff failed to successfully complete probation). Even after Magone had brought to Newmark's attention in July 2006 her concern that Newmark was not adjusting to the Hospital's case management model, Magone failed to see significant improvement. Magone also received numerous complaints about Newmark's neglect of her responsibilities in July, August, and September 2006 (56.1 St. ¶¶ 106, 151, 159, 161, 163, 177, 183, 207). As with other social workers and case managers who had been the subject of numerous staff complaints during their probationary period, Magone concluded from Newmark's conduct, attendance, and work performance in the final months of her employment that a continuing employment relationship would not be in the best interests of the Hospital or the department (56.1 St. ¶¶ 208-215).

C.    Plaintiff cannot show the Hospital's
       <u>stated reasons to be false and pretextual.</u>

That Newmark was not well-suited to the Hospital's case management model of social work is not in serious dispute. Newmark was openly critical of Magone and her department, (56.1 St. ¶ 57), and expressed concern during her August 18 meeting with Orsaia that she was not well-suited to inpatient social work (56.1 St. ¶ 134). After her termination, Newmark acknowledged that her strength lay in psychotherapy, rather than discharge planning (56.1 St. ¶ 20). Nor does Newmark dispute that her coworkers complained to Magone about her job performance (56.1 St. ¶¶ 160, 164-65). At most, she apparently seeks to portray those coworkers as shrill and overly critical (56.1 St. ¶ 166), perhaps suggesting that Magone should not have taken their complaints seriously (56.1 St. ¶ 166).

None of this, however, is evidence of a retaliatory motive on Magone's part. Even if Newmark could prove her coworkers' complaints were false (and she cannot), Magone made a good faith effort to examine the substance of those complaints (56.1 St. ¶¶ 157, 180-81, 209-215), and it is well-established that an employer's decision to act on its good faith beliefs, even if those beliefs turn out to be mistaken, is not evidence of retaliation. *Khan v. Abercrombie & Fitch, Inc.*, 35 F.Supp.2d 272, 278 (E.D.N.Y. 1999) (no pretext where employer relied on staff member's account and accordingly acted on sincere belief of misconduct). Further, the level of outcry to Magone by case managers about Newmark's performance in August and September 2006 is consistent with past circumstances in which Magone had terminated employees for failure to successfully complete their probationary period, showing that Magone held Newmark to the same standards as other new hires who had not accused her of discrimination (56.1 St. ¶¶ 31-39). *Cf. Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982) ("The Age Discrimination in

26

Employment Act does not authorize the courts to judge the wisdom of a corporation's business decisions").

Newmark's allegations that Magone's "demeanor" changed and that Magone "overlooked" her in meetings (56.1 St. ¶ 234), "failed to make eye contact" (56.1 St. ¶ 234) and avoided private meetings with her (56.1 St. ¶ 241) are legally ineffective and conclusory. Even if the Court assumes that Magone's demeanor changed, Newmark offers no evidence to suggest that this alleged change of demeanor was not attributable to mounting complaints about her from department personnel. *Cf. Lalanne v. Begin Managed Programs*, 2007 U.S. Dist. LEXIS 54283 *20-21 (S.D.N.Y. July 24, 2004) (plaintiff failed to state prima facie case of retaliation, or evidence of pretext, based on alleged change in manager's attitude). Second, Newmark claims that Magone *at all times* "managed through fear", was "volatile with the staff", "demanding", and "demeaning", both before and after Newmark complained to Orsaia (56.1 St. ¶¶ 49- 51). Against this background, Newmark's apparent argument that she realized in September (56.1 St. ¶ 240) that Magone was no longer simply dismissive (56.1 St. ¶ 236-37), demeaning (56.1 St. ¶ 237), and "managing through fear" (56.1 St. ¶ 50) (because she was busy, 56.1 St. ¶ 237), but instead "dismissive in a different way" (56.1 St. ¶ 238), failing to make eye contact (56.1 St. ¶ 234), and overlooking her in meetings (56.1 St. ¶ 241) (because of the August complaint), is virtually unintelligible.

As for Magone's alleged avoidance of private meetings with Newmark, this conclusory allegation is unsupported by the record evidence, and in any event readily explained by their attendance. Between August 28 and September 28, for example, Newmark and Magone were at work together on only eleven days (56.1 St. ¶¶ 243), and on those days Magone and Newmark in fact met several times to discuss administrative or performance matters, including Newmark's

disregard of the policy for scheduled absences (56.1 St. ¶¶ 243), Magone's approval of that absence after reconsideration (56.1 St. ¶ 221) and Magone's extension of plaintiff's probationary period (56.1 St. ¶ 177).

Finally, Newmark's reference to the passage of time from her complaint to her termination is of no moment with respect to establishing pretext. *Das v. Our Lady of Mercy Medical Center*, 2002 U.S. Dist. LEXIS 7771, at *36 (S.D.N.Y. April 29, 2002) ("Proximity in time alone will not support a finding (as opposed to making out a minimal prima facie case) that a plaintiff has proved a causal connection between protected activity and an adverse employment action"). In fact, Magone's extension of Newmark's probationary period for further evaluation in September, rather than firing her outright, undermines Newmark's claim that Magone wished to fire her for retaliatory reasons. *Cf. Lalanne v. Begin Managed Programs*, 2007 U.S. Dist. LEXIS 54283, at *20-21 (S.D.N.Y. July 24, 2004) (retaliation claim undermined by supervisor's extension of plaintiff's employment after position had been eliminated). One week after that extension, while Magone was on vacation, another incident occurred where a patient left the Hospital without proper clothing (56.1 St. ¶¶ 183-84), and Magone expressed concern to Orsaia when she returned from vacation that Newmark might not successfully complete her probationary period (56.1 St. ¶ 205). Thus, the timing of Newmark's termination is easily explained by reference to the Hospital's probationary period without indulging in speculation about retaliatory animus, and speculation is all that Newmark has offered.

Because Newmark has offered no admissible evidence that the Hospital's stated grounds for her termination – her failure to successfully complete her probationary period – were false and a pretext for retaliation, her claim should be dismissed upon summary judgment.

## Conclusion

For the foregoing reasons, it is respectfully submitted that plaintiff's Amended Complaint should be dismissed in its entirety upon summary judgment.

Dated: New York, New York
      July 11, 2008

COLLAZO CARLING & MISH LLP

By: _____
     John P. Keil (JK 2794)
     Attorneys for Defendants
     Office and P.O. Address
     747 Third Avenue
     New York, New York 10017
     (212) 758-7862