UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

CAROLE NEWMARK,                      :

                Plaintiff,        :

   -against-                          :

LAWRENCE HOSPITAL,                   :
PAT ORSAIA, individually, and
CATHY MAGONE, individually,

                            :

            Defendants.

---------------------------------------------------------x

**STATEMENT
PURSUANT TO
LOCAL CIVIL RULE 56.1**

07-CIV-2861 (CLB)

     Pursuant to Rule 56.1 of the Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York, defendants Lawrence Hospital Center, (the "Hospital") and Catherine Magone submit that there does not exist a genuine issue of fact to be tried with respect to the matters set forth below.[1]

1.    Plaintiff began work at the Hospital on March 20, 2006 (Magone 6; Newmark 7; Ex. 7).

2.    Plaintiff was interviewed and hired by Catherine Magone, Lawrence Hospital's Director of Quality, Case Management, and Social Work (Magone 6; Newmark 7; Ex. 7).

3.    Plaintiff's job title at Lawrence at all times during her employment was "Senior Social Worker" (Magone 6; Newmark 7; Ex. 7).

4.    During the interview process, Magone noted that plaintiff lacked recent hospital experience and had primarily worked in an outpatient psychiatric setting, which is a

---

[1] All references to dates are to the year 2006 unless otherwise indicated. Citations to pages from the transcribed deposition testimony of plaintiff Carole Newmark are indicated herein by "Newmark __" and attached hereto as Exhibit ("Ex.") 1; of defendant Catherine Magone ("Magone __") as Ex. 2; of Patricia E. Orsaia ("Orsaia __") as Ex. 3; of Maura Del Bene ("Del Bene __") as Ex. 4; of Nicole Serra ("Serra __") as Ex. 5; and of Rose Ann O'Hare ("O'Hare __") as Ex. 6. All other exhibits designated as such are also attached hereto. Citations to paragraphs of the separate Affidavit of Catherine Magone are indicated by "Magone Aff. ¶ __".

different work environment from the Hospital's case management model (Magone 38-39).

5.   Magone expressed concern that plaintiff would have difficulty adapting to the Hospital's emphasis on early discharge planning and reducing patients' length of stay (Magone 13-14, 38-39, 49; Orsaia 112).

6.   Newmark persuaded Magone during the interview process that she was willing to learn what was required for the position of Senior Social Worker (Magone 51-52).

7.   Shortly after plaintiff's hire, plaintiff recommended that Magone hire Nicole Serra (Newmark 215; Magone 64) to fill a second social work position at the Hospital.

8.   Nicole Serra was a social work colleague from plaintiff's prior place of employment (Serra 7-8).

9.   After being interviewed by Lawrence Hospital, Serra was hired as a social worker with virtually identical job requirements to Newmark's (Newmark 215-16).

10.  Serra began work at Lawrence Hospital on April 24, 2006 (Serra 7).

11.  Under the Hospital's case management model, a team of nine registered nurses with the title of "Case Manager" oversee the discharge planning of all Hospital patients.  Their priority is to minimize patient lengths of stay where consistent with sound medical practice (Magone 13; Orsaia 112).

12.  The Hospital's Department of Quality, Case Management, and Social Work plays a central function in ensuring that Hospital finances remain sound.  Because reimbursement to the Hospital for providing medical services to patients under Medicare, Medicaid, and private insurance plans is calculated according to prescribed formulas that do not account for actual cost, Magone's department is charged with ensuring that the actual costs of

providing medical care are minimized to the extent consistent with sound medical practice. A major component of this process is minimizing the length of each patient's hospital stay, and the average length of stay overall, where this is medically appropriate. In 2006, $740,000 of an overall budget shortfall in excess of $2.5 million at the Hospital was attributable to the average Medicare patient's length of stay exceeding budgeted expenses by 0.5 days (6.5 days on average rather than 6.0 as budgeted) and to the average non-Medicare patient's length of stay exceeding budgeted expenses by 0.2 days (3.8 days on average rather than 3.6 as budgeted) (Magone Aff. ¶ 19; Ex. 8, 45).

13. In the course of discharge planning, the Hospital's social workers are called upon to address discharge problems such as homelessness, lack of money, problems at home, psychiatric issues, safety concerns, and complex issues where the patient or family may not be ready for discharge (Serra 10-12; Newmark 66-67, 169-70; Magone 34) by providing resources and referral information to help patients and their families arrange for care and recovery both in the Hospital and after discharge (Orsaia 107).

14. At all relevant times, plaintiff was expected to handle an average of six to eight patients daily, ranging between a minimum of four and a maximum of fifteen (Magone 94; Newmark 194-96).

15. Plaintiff was expected to use her professional judgment to prioritize referrals based on the individual patient's situation, with psychiatric cases typically requiring particular urgency (Magone 67-68).

16. Patient discharges are sometimes directed to occur on five or fewer hours' notice, such as notice at 10 am that a patient would need to vacate by 3 pm (Newmark 170).

17.  In difficult discharge cases, the social worker may be called upon to explain to an upset family the insurance or billing implications of staying past the appointed time for discharge, and in some cases negotiate with a doctor to permit a longer stay (Newmark 170).

18.  In their prior employment at Phelps Memorial Hospital (Ex. 9), plaintiff and Serra did outpatient psychiatric social work, which involves a relationship between social worker and client that can last for years (Serra 10).

19.  Social workers provide psychiatric counseling at the Hospital only in small doses (Serra 10, Newmark 75).

20.  Newmark considered psychiatric counseling and psychotherapy to be her forte (Ex. 10).

21.  The primary task of Hospital social work is to plan the patient's discharge rather than to develop long-term therapeutic relationships (Serra 10).

22.  Plaintiff was at all times an employee at will (Ex. 11).

23.  The Hospital uniformly subjects all new employees to an initial probationary period to assess the individual's skill and behavior in the new position (Magone Aff. ¶ 11).

24.  The probationary period for plaintiff's position was six months (Magone 167; Orsaia 152-53; Ex. 11).

25.  Plaintiff's probationary period was originally due to expire on September 20, 2006 (Magone 127).

26.  Magone, as director of her department, had the discretion to extend Magone's probationary period for up to three additional months (Orsaia 153-58; Magone Aff. ¶ 11).

27.  The probationary process ends with a performance evaluation and an assessment of whether the employee has sufficiently met Hospital expectations to warrant a continuation of employment (Orsaia 153-58; Magone Aff. ¶ 11).

28.  The standards for satisfactory completion of the probationary period are not the same imposed by the Hospital's policy of progressive discipline (Magone ¶ 11).

29.  As a matter of Hospital and department practice, the events that result in a manager's decision that an employee has not successfully completed his or her probationary period need not constitute terminable offenses in their own right (Magone ¶ 11).

30.  Employees may be, and have been, terminated from employment by Magone for failure to successfully complete their probationary period on the basis of attitude problems, personality conflicts, or substandard skills (Magone ¶ 11).

31.  During Magone's career at the Hospital prior to Newmark's employment, Magone terminated social worker Rose Bartone, case manager Dore Kessman, and case manager Beth Jamison for failure to successfully complete their respective probationary periods (Magone Aff. ¶ 11).

32.  Magone decided that Bartone had not successfully completed her probationary period because of Bartone's poor organization, her failure to carry an adequate caseload independently, and her failure to adjust to the Hospital's case management model (Magone ¶ 11).

33.  Bartone, like plaintiff, had previously been employed as a social worker at Phelps Memorial Hospital before coming to Lawrence Hospital, but worked in an inpatient setting rather than an outpatient psychiatric setting (Magone ¶ 11).

34. Magone decided that Kessman had not successfully completed her probationary period because of Kessman's poor attendance, poor punctuality, lack of proper documentation, a negative attitude, difficulty managing her caseload, and failure to take a more pro-active approach to discharge planning and reducing patient length of stay (Magone ¶ 11).

35. The average caseload of a case manager, depending on the floor and the patient census, is usually 15-20 patients (Magone ¶ 11).

36. Magone decided that Jamison had not successfully completed her probationary period because of Jamison's poor attendance and concerns Magone had about Jamison's office comportment and professional judgment, among other problems (Magone ¶ 11).

37. Bartone, Kessman, and Jamison did not submit complaints of discrimination or retaliation against Magone either before or after she terminated their employment (Magone ¶ 11).

38. Magone had previously received multiple complaints about Bartone, Kessman, and Jamison's performance, some of which she documented, from case managers and other staff in her department (Magone Aff. ¶ 11).

39. At no point during Magone's employment at the Hospital has she received numerous complaints from multiple staff members about a single individual's performance, but then concluded that that individual had successfully completed his or her probationary period and remain employed at the Hospital (Magone ¶ 11).

40. Plaintiff admits having difficulty adjusting to her role (Newmark 11) and to the case management model (Newmark 231).

41. In May 2007, Magone noticed plaintiff's difficulty and frustration with her work and sent plaintiff an e-mail offering her encouragement and urging her to ask questions when she was unsure how to proceed (Ex. 12).

42.    Plaintiff blames some problems with her performance on her workload (Newmark 165-66) or on poorly defined roles (Newmark 167, 198).

43.    A few months into her employment, plaintiff, Serra, and Magone had a discussion in which they reached consensus on the definition of plaintiff's and Serra's roles as social workers (Newmark 166-67; Serra 13-16; cf. Ex. 13).

44.    Plaintiff has described the mentality of managers as "backbiting" and "pathological" and claims they were territorial and unwilling to share information (Defendant's Ex. D; Newmark 67-70).

45.    Plaintiff's difficulty working with the Hospital's case managers led her to arrange a meeting through Magone to resolve her conflicts with the case managers (Newmark 68) in or about May 2006 (Newmark 71).

46.    Some case managers responded to plaintiff's complaints by explaining to plaintiff that they understood her situation, but they were working in an extremely fast-paced work environment (Newmark 68).

47.    Plaintiff asserts that by the end of her employment, she managed to develop a rapport with all but one of the department's nine case managers (Newmark 55, 68-70, 73).

48.    In May 2006, based on her observations of how case managers responded to Magone, and listening to their remarks to one another, plaintiff concluded that all of the Hospital's case managers were afraid of Magone (Newmark 37).

49.    Plaintiff decided in May 2006 that Magone was tough and unfair (Newmark 34).

50.    Plaintiff regards Magone as very demanding, very demeaning, demanding to know what was happening at all times, and managing through fear (Newmark 33, 37-38).

51.   In plaintiff's view, Magone was "very volatile at times with other people" (Newmark 30), including all case managers (Newmark 30), and insisted on things being done her own way (Newmark 31).

52.   Plaintiff expressed aloud her opinions about Magone and her own dissatisfaction with her employment at the Hospital, with the role of social work, and with the Hospital leadership (Newmark 40).

53.   Plaintiff expressed her dissatisfaction with her employment to coworkers, including both Serra and a case manager, in June 2006 (Newmark 40).

54.   After June 2006, plaintiff told Serra that Magone showed no regard for patients, patient situations, or family situations (Newmark 42).

55.   Nurse Practioner Maura Del Bene was hired to launch the Hospital's Palliative Care Service, and started the service after beginning employment on May 20, 2006 (Del Bene 7; Magone 58-60).

56.   The Palliative Care Service is an interdisciplinary program for the treatment of the dying, those suffering from pain, and the chronically ill in which doctors, nurses, a psychiatric nurse practitioner, and social workers collaborate on individual patient care assignments to share their respective insights with patients, families, and one another to achieve the best care possible in difficult medical circumstances, with services including pain management, bereavement counseling, and hospice arrangements (Magone 31, 50; Serra 23-24).

57.   Del Bene witnessed plaintiff being openly critical of Magone, Magone's knowledge of social work, the structure and leadership of the department of case management, the lack of technical support in her department, and the utilization or underutilization of social

workers in the Hospital, including plaintiff and Serra's role in the case management model (Del Bene 34-36).

58.     Del Bene never witnessed Magone's conduct or managerial deficiencies as described by plaintiff (Del Bene 38-39).

59.     Del Bene observed plaintiff making audible sighing noises, gesturing to indicate her displeasure, and engaging in emphatic gum chewing during interdisciplinary rounds to draw attention to her dissatisfaction or disagreement (Del Bene 35-36).

60.     Interdisciplinary rounds involve social workers, physical therapists, and nurses meeting at different units to discuss patient care (Del Bene 35-36).

61.     Del Bene offered plaintiff advice on several occasions, including during one lunch appointment (Del Bene 37-38), to develop constructive strategies for improving the status of social work within the department of case management (Del Bene 37).

62.     When giving advice to plaintiff, Del Bene coached her to advocate for social work more formally (Del Bene 38), take initiative in a perceived vacuum to define the social workers' role more clearly (Del Bene 25) and integrate social work more securely with other hospital services (cf. Del Bene 38).

63.     After Del Bene began her employment at the Hospital, plaintiff told her she wanted to be involved in providing palliative care (Del Bene 14-15, 27).

64.     Plaintiff told Magone during the interview process that she was interesting in working in palliative care (Magone 32, 50).

65.     Plaintiff and Del Bene spoke on multiple occasions about what plaintiff could do to involve herself in the palliative care program (Del Bene 15, 20).

66.  Del Bene could recall only a single instance where Del Bene and plaintiff interacted regarding a palliative care matter (Del Bene 46, 50).

67.  On the one palliative care case on which Del Bene recalls interacting with plaintiff, plaintiff declined to participate in a joint conference with the family (Del Bene 47).

68.  Plaintiff told Del Bene on multiple occasions that she was too busy to join her on palliative care cases (Newmark 192).

69.  Plaintiff told Del Bene more than once that it was unnecessary for Newmark to meet with Del Bene and a family for a palliative care consultation that Newmark had already seen (Newmark 191-92).

70.  Del Bene never had the opportunity to observe plaintiff's interactions with patients (Del Bene 50), or to assess how well they would work together (Del Bene 47).

71.  Del Bene was disappointed on the one occasion she recalls interacting with plaintiff on a specific palliative care matter by plaintiff's indication that she was handing a case to Del Bene for completion rather than joining her in an interdisciplinary assessment (Del Bene 47).

72.  Plaintiff failed to attend all but two weekly meetings with Del Bene and Serra to discuss palliative care (Newmark 183-84; Magone 90-91; Ex. 14, 15).

73.  Del Bene asked plaintiff to develop a bereavement policy for use by the palliative care center (Del Bene 15-16; Magone 91-92; Ex. 16).

74.  Plaintiff failed to develop a bereavement policy as requested by Del Bene (Del Bene 15-16; Magone 91-92; Ex. 16).

75.  Plaintiff claims that no one directed her to prepare a bereavement policy (Newmark 188-89).

76.    After plaintiff failed to respond to Del Bene's request to develop a bereavement policy, Del Bene attempted to schedule a meeting to discuss the assignment (Ex. 17).

77.    Del Bene made requests and recommendations to plaintiff regarding the role of social work in a palliative care service including networking within the Hospital on palliative care issues, researching palliative care associations and informational websites, and developing a social worker evaluation form to formalize the role of social work on the interdisciplinary team (Del Bene 16).

78.    Plaintiff did not implement or respond to Del Bene's suggestions for developing the role of social worker in the Palliative Care Services (Ex. 18-21).

79.    Pursuant to a mandate from the New York State Department of Health, Magone directed plaintiff to participate in off-site instruction on June 20 and 21, 2006 on how to train Hospital personnel to provide appropriate mental health care in the event of terrorism or disaster (Newmark 117-20; Magone 74-75, 77, 79).

80.    Magone asked plaintiff at least twice about the status of her work on disaster mental health training the months after the training took place (Newmark 123).

81.    Newmark gave Magone no information about the status of her work on the disaster mental health training other than that it would be "a lot of work" (Newmark 123).

82.    Plaintiff did not advise Magone of the deadline for the mandated training in disaster mental health to be completed (Newmark 122-23).

83.    Plaintiff did not tell Magone that she was reviewing the training materials for the disaster mental health training (Newmark 122-23).

84. Plaintiff did not keep any written notes, outlines, or memoranda regarding any efforts she may have made to implement the disaster mental health training program (Newmark 121).

85. Magone became plaintiff's direct supervisor for the first time in July 2006 after the departure of an intermediate manager (Newmark 8, 168; Magone 136).

86. Beginning with her own direct supervision of plaintiff, Magone became concerned about plaintiff showing very little follow-up with patients whose cases she was handling (Magone 136).

87. During a July 18 weekly staff meeting to discuss Length of Stay, Magone concluded that plaintiff was not familiar with any of plaintiff's cases and could not describe them even when given a list of names. It did not appear to Magone that plaintiff had seen these patients (Magone 136; Newmark 198-200; Ex. 22).

88. Newmark lacks a specific recollections of what she told Magone regarding her inability to report on her cases at the July 18, 2006 length of stay meeting (Newmark 203).

89. Plaintiff "highly doubts" and "does not believe" Magone's recollection that plaintiff said she had not yet seen any patients that day (Newmark 203).

90. Plaintiff admits she was unprepared for the July 18, 2006 meeting and could not answer Magone's questions, claiming that she left her paperwork in her office (Newmark 198-200; Ex. 22).

91. Plaintiff realized while an employee at the Hospital that she could be subjected to questions about her caseload at any time (Newmark 167).

92.    Magone met and spoke with plaintiff on July 20, 2006 to express her concern that
       Newmark was not adjusting to the case management model (Magone 135-37, 141; Ex.
       23).

93.    In their July 20 meeting, Magone mentioned plaintiff's failure to follow up properly on
       cases, need to respond more promptly to staff requests for information, inadequate
       documentation in patient medical records (Magone 137), and need to be more proactive
       in beginning discharge planning with families (Newmark 168; Ex. 23).

94.    Plaintiff told Magone at the July 20 meeting by complaining that she had too much work
       and that many of her cases were complicated (Magone 137; Ex. 23).

95.    When Magone reviewed plaintiff's cases at the July 20 meeting, she found that plaintiff
       was handling only four cases, and advised plaintiff to organize and prioritize her work
       (Ex. 23).

96.    Magone expressed concern to Newmark on July 20 that, one month after attending the
       Disaster Mental Health training, Newmark had not begun planning to implement the
       Department of Health mandate.  Plaintiff told Magone in response that doing so would be
       a lot of work (Magone 137; Ex. 23).

97.    After the July 20 meeting, plaintiff asked Magone whether she should consider their
       discussion a verbal warning (Newmark 164; Magone 137; Ex. 24).

98.    Magone replied to plaintiff that she did not consider their July 20 meeting to be
       discipline, and wrote via e-mail "I want you to be successful and I will work with you to
       make that happen" (Magone 137-38; Ex. 24).

99.   In August 2007, Magone advised Del Bene that she was in the process of selecting a social worker to travel to observe a palliative care program in Columbus, Ohio (Del Bene 27-28; Ex. 15).

100.  The Palliative Care Service's site visit to Ohio was not a transfer or promotion, did not involve a change in pay, benefits, office, or location, would not result in either social worker being denied involvement from the provision of palliative care at the Hospital, and did not involve any other improvements in terms and conditions of employment (Magone 84; O'Hare 10; Magone Aff. ¶ 5).

101.  Plaintiff provided palliative care and worked on palliative care cases throughout her entire period of employment at the Hospital, both before and after the decision to send Serra on the business trip (Newmark 181-82, 190-91).

102.  Magone decided that it was not appropriate for both social workers to attend the palliative care site visit to Columbus, Ohio (see Magone 69-70).

103.  Serra did not receive any additional money or benefits as a result of her site visit to Columbus, Ohio or her further role with the Palliative Care Service (Magone 171).

104.  Del Bene had one or two separate discussions with Magone and with her own supervisor, Rose Ann O'Hare, about the selection of a social worker to participate in the Palliative Care visit to Ohio (Del Bene 19-20).

105.  Magone told Del Bene that Newmark had been assigned a Disaster Mental Health project, which Magone did not believe Newmark had properly attended to, and that Magone did not consider it appropriate to assign Newmark a second project when Newmark had failed to show progress on the first (Del Bene 28-29, 31).

106.    Del Bene told Magone that although Newmark had expressed interest in Palliative Care, she had not responded to Del Bene's e-mail requests or offers of Palliative Care projects (Del Bene 28), failed to show enthusiasm for working as part of an interdisciplinary team (Del Bene 31), and broadcast a negative, unresponsive attitude that Del Bene felt could be harmful in establishing the credibility of the Palliative Care Service (Del Bene 26, 31-32).

107.    Del Bene told Magone that Newmark appeared to be an angry woman.  Magone agreed with Del Bene's assessment (Magone 88-89). Del Bene and Magone agreed that Newmark's demeanor was not conducive to the care of dying patients (Magone 89).

108.    Del Bene told Magone that Serra had responded very positively to Del Bene's suggestions and recommendations regarding investigating resources and learning more about palliative care, actively collaborated with Del Bene on numerous patient care matters, and made numerous palliative care referrals (Del Bene 26; cf. Ex. 18, 19, 21).

109.    Del Bene expressed to Magone her view that Serra's engaging demeanor, positive attitude, positive tone in verbal and written communications, and demonstrated enthusiasm for palliative care would reflect well on the Palliative Care Service (Del Bene 26, 32).

110.    Del Bene and Serra had developed an amicable and professional working relationship (Newmark 220).

111.    Plaintiff characterizes Del Bene and Serra's professional relationship as "wonderful" (Newmark 220).

112.   Serra demonstrated curiosity and desire to learn from Del Bene (Newmark 220), asked numerous questions (Newmark 220), took copious notes (Magone 90), and made it a point to collaborate with Del Bene where possible (Magone 90).

113.   Del Bene described her observations about Newmark and Serra to O'Hare (O'Hare 10-11, 16-18; Del Bene 22-23).

114.   Serra privately agreed with some of plaintiff's workplace complaints (Newmark 42).

115.   Serra occasionally complained to Del Bene about managerial issues, Magone's grasp of social work, or the utilization of social work within case management (Del Bene 37, 39, 45).

116.   There is no evidence to suggest that Serra's overall demeanor was problematic or that she made her complaints public in the department (Magone Aff. ¶ 6).

117.   Magone did not witness and was not aware of any displays by Nicole Serra of a negative attitude in the workplace (Magone Aff. ¶ 6).

118.   Magone was not aware of Serra making any verbal or nonverbal complaints about the department or her working conditions during rounds, meetings, or other public settings within the Hospital (Magone Aff. ¶ 6).

119.   Del Bene found that even in coping with difficult interactions with case managers, Serra showed good energy and enthusiasm and worked to overcome these workplace challenges (Del Bene 41, 43-44; Ex. 19).

120.   Magone decided that Serra was a more appropriate choice than Magone for the site visit to Ohio, based on Del Bene's direct input, input through O'Hare, and her own observations (Del Bene 26-32; Magone 72, 85-86; Ex. 25), including her desire for Serra to develop more independence from Newmark (Magone Aff. ¶3; Ex. 26).

121.    Magone decided that Newmark was overprotective of Serra (Magone Aff. ¶ 3).

122.    Plaintiff admits that she expected Serra to "shadow" Newmark for a two-month period

before taking on assignments of her own (Newmark 113).

123.    Plaintiff required Serra to shadow her for the purpose of obtaining an administrator's

signature (O'Hare 16).

124.    Magone decided that plaintiff's overprotective and sheltering approach towards Serra was

not beneficial to Serra's professional development and explained this to plaintiff when

communicating her reasons for sending Serra on the trip to Columbus, Ohio (Magone

Aff. ¶ 3; Ex. 26).

125.    Plaintiff admits that Serra is "bright" (Newmark 108), learned her job well (Newmark

220), and not a poor choice for the Palliative Care Service (Newmark 108).

126.    Plaintiff does not dispute that distribution of work was a factor in Magone's decision

(Newmark 124), or that Magone relied on input from Del Bene and O'Hare (Newmark

116-17).

127.    On August 15, 2006, Magone selected the social worker who would participate in the

palliative care site visit (Magone 70-71, 83; Newmark 47; Ex. 25).

128.    On August 15, Magone told plaintiff she would send Serra to Ohio with the Palliative

Care Service rather than Newmark (Magone 83; Ex. 25).

129.    Magone asserts that she told plaintiff, "I've decided to appoint Nicole to the Palliative

Care Program out in Ohio.  She's young in her career, this is a good opportunity for her

to have something of her own" (Magone 72, 85-86; Ex. 25).

130.    Magone explained to plaintiff on August 15 that her decision had been based in large part

on input from Del Bene and O'Hare (Magone 71-72; Ex. 25).

131.  Magone told plaintiff on August 15 that she was going to be very busy with the Disaster Mental Health project and had not shown any initiative or progress with that project (Magone 72; Ex. 25).

132.  Plaintiff construes Magone's remarks on August 15 to mean that Serra was younger than Newmark and therefore "could handle the job better", and claims those are the words Magone used (Newmark 49, 132).

133.  On or about August 18, 2006 (Newmark 136), plaintiff met with Patricia E. Orsaia, then the Hospital's Director of Human Resources.  At the meeting, plaintiff told Orsaia that Magone said she had selected Serra to work on a particular project on palliative care because Serra was younger and could do the job better.  Plaintiff asked Orsaia whether that was "ageism" (Newmark 49; Orsaia 36-38, 51).

134.  According to Orsaia, plaintiff told her during the August 18 meeting that she was unsure whether her position at the Hospital was a good fit for her (Orsaia 42), that she had come from a very different mental-health work environment, and that she may be having difficulty adjusting to the Hospital's case management model (Orsaia 41).

135.  During the August 18 meeting with plaintiff, Orsaia tried to clarify what Magone had said to plaintiff (Orsaia 43). She asked what plaintiff meant by "ageism" (Orsaia 31), and discussed with plaintiff the possibility that she had misinterpreted Magone's remark (Newmark 50; cf. Ex. 27).

136.  Orsaia pointed out to plaintiff on August 18 that Magone had known plaintiff's approximate age at the time of hire (Ex. 27; Magone 106-07).

137.  At the August 18 meeting, Orsaia offered plaintiff the option of approaching Magone privately to request clarification and explain her perceptions and feelings about the

decision; Orsaia scheduling a meeting where she joined plaintiff and Magone for a common discussion of the issue; or Orsaia approaching Magone on plaintiff's behalf to seek clarification and report back to plaintiff about the results (Orsaia 43-44).

138.   Plaintiff rejected the option described by Orsaia of approaching Magone privately because she did not trust Magone to work things out with her (Newmark 47).

139.   Orsaia understood the result of her August 18 meeting with plaintiff to be that plaintiff first wanted Orsaia to speak privately with Magone (Orsaia 43-44).

140.   Orsaia scheduled a meeting to discuss Newmark's concerns with Magone after Orsaia returned from vacation (Magone 95-98; Orsaia 45-47, 50).

141.   Orsaia had a full week of vacation scheduled after August 18, 2006 (Orsaia 46).

142.   Orsaia did not tell Magone the specifics of Newmark's complaint until they met in person (Magone 98, 105-07; Orsaia 47, 51).

143.   At Magone's meeting with Orsaia, Magone denied plaintiff's accusation, and told Orsaia she had not suggested that age had anything to do with her decision (Magone 102-07).

144.   Magone acknowledged during her meeting with Orsaia that she had used the word "young" or "younger" in her discussion with plaintiff, and explained said the word had been taken out of context.  Magone told Orsaia she had said to Nermark that Serra was "young in her career and eager to learn" (Orsaia 52; Magone 72, 85-86, 125).

145.   Magone explained during her meeting with Orsaia that she had relied on input from O'Hare and Del Bene, who both favored Serra's selection (Orsaia 52), and that plaintiff had not begun work on another, prior assignment concerning disaster mental health (Orsaia 53).

146. Magone agreed with Orsaia during their meeting to discuss Newmark's complaint that it was important to address and resolve plaintiff's concerns (Orsaia 54).

147. According to Orsaia, she conveyed Magone's response to plaintiff (Orsaia 55, 56) after her meeting with Magone. Orsaia alleges that in response, plaintiff said that Magone's clarification was "not acceptable" and denied that Magone had used the phrase "young in her career" (Orsaia 56).

148. Plaintiff mentioned Magone's decision to Del Bene (Del Bene 33-35) and Serra (Newmark 100-02; Serra 28), and also told the case managers (Newmark 103).

149. Plaintiff mentioned during rounds in the Hospital's Intensive Care Unit that Magone had discriminated against her (Del Bene 34).

150. Magone alleges that plaintiff's reaction to her decision was extremely negative and emotional (Magone 133, 161-62).

151. Magone concluded after speaking with Del Bene that plaintiff was upset about the decision to the point of being unable to perform her job duties (Magone 161-62).

152. Magone observed plaintiff on several occasions to be visibly angry as she went about her work (Magone 162), and heard from employees that plaintiff was continuing to complain to coworkers about the decision (Magone 162).

153. After Orsaia told Magone about plaintiff's discrimination complaint, Magone disclosed it to her supervisor. Thereafter Magone discussed Newmark's discrimination allegation with only Orsaia and Magone's own supervisor (Magone Aff. ¶ 7).

154. At no time during plaintiff's employment did Magone disclose plaintiff's complaint of discrimination to any case managers in her department, or to any other Hospital employees other than her supervisor and Orsaia (Magone Aff. ¶ 7).

155.    Magone did not receive any complaints about Newmark's performance from the case managers who reported to her prior to approximately August 15, 2006 (Magone Aff. ¶ 8).

156.    Magone did not encourage or solicit complaints about Newmark from the case managers at any time (Magone Aff. ¶ 8).

157.    After August 15, 2006, Magone received numerous complaints about Newmark's performance from several different case managers, including complaints that she recorded as notes to file (Magone Aff. ¶ 8).

158.    Magone has not received any complaints from case managers about Serra's performance since Serra began work in April 2006 (Magone Aff. ¶ 8).

159.    On August 31, case manager Susanne Muccio informed Magone that plaintiff had told a family that their request for information about nursing homes was premature. Muccio told Magone that when it came time to discharge the patient to a nursing home, the family was unprepared and complained of being rushed by the case manager. Magone concluded that plaintiff's advice to the family had resulted in a delay in the patient's discharge (N-162; Ex. 28).

160.    Plaintiff can neither confirm nor deny that the exchange between Muccio and Magone on August 31, 2006 took place (Newmark 203-04).

161.    On September 1, case manager Collette Gilardi asked Magone to intervene because she needed plaintiff to prepare a screening form used for transferring patients to a nursing home when a patient was ready to leave. Gilardi told Magone that Newmark was not responding to her telephone calls (Ex. 29).

162.  Gilardi told Magone on September 1, 2006 that plaintiff generally did not respond to her requests in a timely manner, and had an uncooperative attitude when she received them (Ex. 29).

163.  Magone alleges that when she called plaintiff about Gilardi's need for her to complete a screening form, plaintiff responded "I will get to it" in an unprofessional tone (Ex. 29).

164.  Plaintiff acknowledges that her usual response to requests to complete screening forms was that she was busy and would get to it (Newmark 204-06).

165.  Magone did not consider Newmark's response to Gilardi's request acceptable (Newmark 205-206).

166.  Plaintiff's alleges that Gilardi complained frequently, may have made the complaint about failing to respond to requests to complete patient review instruments more than once, and demanded instant gratification, and that plaintiff may not been given advance notice of the need for a screening form to be completed (Newmark 204-06).

167.  On September 7, Magone learned that a patient, who had been in the Hospital for several weeks and had been referred to plaintiff for social work, had not been seen by plaintiff since August 14, even though the patient's transfer to the Intensive Care Unit on August 27 reflected a change in circumstances.  Magone concluded that this constituted poor documentation and a lack of follow-up by plaintiff (Magone 155-57; Ex. 30).

168.  According to Magone, when she questioned plaintiff about a patient who had been transferred to intensive care without a social work note, plaintiff said that she was overworked and unable to get to all her cases (Magone 158).

169.  Magone considered Newmark's unplanned absences from work to be excessive for a probationary employee (Magone 112).

170.    According to Hospital policy, five periods of unscheduled absence (i.e., calling in sick) in a year is considered excessive absenteeism (Magone 111-12; Orsaia 71; Ex. 11).

171.    Plaintiff had four unscheduled absences in her six-month period of employment at the Hospital (Magone 112; Ex. 31), including at least two days of illness early in her employment that were not reflected in her attendance records (Newmark 127-28; Magone Aff. ¶ 17; Ex. 32-33) and one day when plaintiff left work at 9:35 am claiming illness, totaling at least seven days of illness (Ex. 31, 34).

172.    On or about September 12 and 13, 2006, Magone spoke to plaintiff about her poor attendance, and about plaintiff's failure to follow procedure for scheduling time off for a medical procedure (Magone 158-59; Ex. 31, 35).

173.    Magone told Orsaia in the week before September 28, 2006 that she was concerned that Newmark would not successfully complete her probationary period (Magone 131; Orsaia 62-64, 74-75).

174.    Magone told Orsaia about O'Hare and Del Bene's concerns about plaintiff's performance and attitude, and the reasons for assigning Serra instead of plaintiff to the Palliative Care Service (Orsaia 67, 69-70).

175.    Orsaia was aware of plaintiff's attendance and performance problems (Orsaia 69-71), as well as the fact that plaintiff was still in her probationary period, before September 28, 2006 (Orsaia 71).

176.    At 3 pm on September 12, 2006, after consultation with Orsaia, Magone told plaintiff that "things were not working out" and that she was extending plaintiff's probationary period (Newmark 138-39, 143; Ex. 31, 35).

177. During the September 12 meeting, Magone told Newmark that there were still issues to be resolved regarding social work roles, case management roles, and palliative care roles (Newmark 139-40), as well as attendance issues (Newmark 161).

178. At the September 12 meeting, Newmark told Magone that she still had problems with case managers failing to give her things in a timely manner (Newmark 139).

179. At the September 12 meeting, Plaintiff expressed her hope to Magone that "we would work things out" (Newmark 140).

180. Plaintiff's complaint to Orsaia and her public complaints about Magone's alleged age discrimination did not play a factor in Magone's decision to extend plaintiff's probation (Magone Aff. ¶¶ 10, 11).

181. Magone decision to extend Newmark's probationary period decision was based on Newmark's poor attendance and complaints she had received from other Hospital employees about her work performance (Magone Aff. ¶ 10).

182. Prior to Newmark's arrival at the Hospital, Magone extended the probationary period of at least one other staff member, case manager Dore Kessman, for extensive absenteeism (Magone Aff. ¶ 10).

183. On September 19, 2006, Magone received an e-mail from a case manager while Magone was on vacation that plaintiff had allowed a patient to leave the Hospital without proper clothing (Ex. 36). According to the e-mail, the patient had been hospitalized 19 days, but plaintiff had not met with him until the 18th day (Ex. 36).

184. Plaintiff admits a patient left the Hospital without wearing proper clothes on September 19, 2006 (Newmark 210-11), but claims that he had psychiatric problems and, although he had clothes, was refusing to wear them (Newmark 208-11).

185.    Upon review of the incident involving the patient who left the Hospital without proper attire, Magone found that Newmark had failed to properly document this patient's progress and plan his discharge. Magone spoke to plaintiff about this conclusion (Magone 165).

186.    Plaintiff met with Orsaia to discuss her complaint about Magone on or about September 12, 2006 (Newmark 148-49; Ex. 37).

187.    Plaintiff sent Orsaia an e-mail on September 28 asking her to schedule a meeting with her and Magone to discuss her concern of age discrimination (Ex. 38).

188.    Plaintiff, Orsaia, and Magone met on the afternoon of September 28 to discuss Newmark's complaint (Orsaia 70; Magone 123-26; Newmark 152).

189.    Magone told plaintiff on September 28 that plaintiff's age had nothing to do with Magone's decision regarding Serra's assignment to the palliative care project, and that she had taken the word "young" out of context, and she said that "Serra was younger in her career, eager to learn, and soaked things up like a sponge" (Orsaia 78; Magone 125).

190.    Newmark denies that Magone used the words "in her career" (Newmark 154-55).

191.    Magone told Newmark on September 28 that O'Hare and Del Bene had contributed input into her decision, that plaintiff had attendance and performance issues (Newmark 155), and plaintiff had previously been assigned the disaster mental health project because that was appropriate to her experience (Orsaia 79), but had not shown progress with it (Orsaia 89).

192.    According to Orsaia, Newmark, displayed an angry demeanor at the September 28 meeting (Orsaia 87).

193.   At the September 28 meeting, plaintiff repeated her original complaint (Magone 124; Newmark 152-53).

194.   At the September 28 meeting, plaintiff requested more detail about Magone's performance concerns (Orsaia 79-80; Newmark 155-56).

195.   At the September 28 meeting, Magone said she would discuss her concerns about Newmark's performance at another time (Orsaia 79-80; Newmark 155-56).

196.   Plaintiff claimed during the September 28 meeting that Magone had not mentioned performance issues previously (Newmark 155-56).

197.   Magone told plaintiff at the September 28 meeting that she had mentioned performance concerns previously (Newmark 155-56).

198.   Magone said at the September 28 meeting that she considered herself to be of similar age to plaintiff and had been aware of her age when she hired her (Orsaia 83).

199.   The September 28 meeting, which had lasted twenty minutes (Newmark 156), ended by mutual agreement (Newmark 157).

200.   On September 29, 2006, plaintiff sent Orsaia an e-mail concerning some of the issues that had been discussed during the September 28 meeting (Ex. 27).

201.   Neither Orsaia nor Magone considered plaintiff's e-mail of September 29 to be an accurate or verbatim recounting of the September 28 meeting or of previous events (Magone 125-26; Orsaia 85, 88-89, 130-33).

202.   Orsaia forwarded Newmark's September 29 e-mail to Magone and asked Magone to respond to it (Magone 122-33; Orsaia 34, 97-98).

203. Magone responded to Newmark's September 29 e-mail with an e-mail on October 4 that described the business reasons for her decision and explained that age played no part in her decision (Ex. 39).

204. Plaintiff did not respond Magone's October 4 e-mail (Magone 128-29, Ex. 40). Plaintiff considered Magone's e-mail to be an attempt by Magone to "cover her ass" based on Magone's treatment of others and Newmark's distrust of her (Newmark 178-181).

205. Magone discussed the possibility of terminating Newmark's employment in the week before the September 28 meeting (Magone 131, 133; Orsaia 62-64, 74-75).

206. Magone decided after September 28 that plaintiff had not successfully completed her probationary period (Magone 133), and communicated that decision to Orsaia (Orsaia 151).

207. Magone and Orsaia had several discussions after September 28 in which Magone explained to Orsaia in detail the facts and events underlying her decision, including attendance records, complaints Magone had documented, and plaintiff's failure to show progress on the disaster mental health project (Orsaia 100-06, 108-09, 112, 115-17, 120-21, 146-50; Magone 161-64).

208. In the performance evaluation at the end of Newmark's probationary period, Magone observed that plaintiff's colleagues found her to be negative, unapproachable, and difficult to deal with; Newmark became defensive when challenged on her cases; Newmark frequently complained that she was overwhelmed even with a small caseload; Newmark had failed to take any initiative on the Disaster Mental Health Program; Newmark was not proactive in troubleshooting difficult cases; and Newmark did not respond to patient needs in a timely manner (Ex. 7).

209.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone noted under the heading titled "Respect" that Newmark's peers in the department perceived her to be negative and unapproachable, and that Newmark became defensive when challenged regarding her cases. This comment was based on the complaints about Newmark's performance that Magone received from case managers in August and September 2006; observations that Magone made and heard about from others during the same time period that Newmark frequently made gestures, sighed audibly, chewed her gum audibly, and rolled her eyes to express displeasure during rounds, as well as making verbal commentary; and Magone's observation during weekly staff meetings to discuss patient lengths of stay that Newmark became defensive and on many occasions struggled to explain the continued presence in the Hospital of patients who had been referred to her (Ex. 7; Magone Aff. ¶ 12).

210.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone noted under the heading titled "Quality" that Newmark frequently complained that she was overwhelmed even with a small caseload, and had not taken any initiative in working on the Mental Health Disaster Program. This comment was based on the fact that Magone did not see any improvement in Newmark's performance in these areas after Magone spoke to Newmark about her concerns on July 20, 2006, as well as Newmark's own explanation for her lapses in performance (Ex. 7; Magone Aff. ¶ 13).

211.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone rated Newmark as "needs improvement" in the category for "Teamwork" on the performance evaluation because of her apparent lack of regard for

teamwork. Magone noted that Newmark's coworkers complained that Newmark was difficult to work with and did not respond in a timely manner to requests for assistance. This was based, among other considerations, on multiple complaints Magone received from different case managers, not all of which she had an opportunity to document, about Newmark's failure to respond to their requests for Patient Review Instruments to be completed on a timely basis so that patients could be discharged to nursing homes (Ex. 7; Magone Aff. ¶ 14).

212.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone noted under the heading of "Service Excellence" that Newmark did not respond to patient needs in a timely manner and was not pro-active in troubleshooting difficult cases. In the case management model, the social worker is responsible for planning the discharge of any patients referred to her; a serious psychiatric condition or the patient's lack of medical insurance are common reasons for such a referral. In Magone's assessment, Newmark did not take as prompt or pro-active an approach as Magone considered appropriate to ensuring that patients completed Medicaid applications, following up with external contacts that were not immediately responsive, and following up with patients and families about discharge planning (Ex. 7; Magone Aff. ¶ 15).

213.    Magone told Orsaia that she did not believe Newmark had adjusted to the Hospital's case management model (Orsaia 112).

214.    Magone wrote in the performance evaluation that plaintiff had not been proactive in preparing patients and families for discharge and that this negatively affected average length of stay. Magone mentioned in the performance evaluation that Newmark had

displayed instances of inadequate medical documentation and excessive unscheduled absences (Ex. 7).

215.    Magone wrote in a memoranda to Orsaia on October 5 (Magone 160; Ex. 41) about Newmark's attendance record, her failure to inform Magone about an e-mail concerning the Disaster Mental Health program, and plaintiff's unacceptable reaction to Magone's decision to send Serra on the trip to Ohio (Magone 161-62) as reasons she considered in the decision to terminate.

216.    On the afternoon of October 5, 2006 (Newmark 27), plaintiff, Magone, and Orsaia met in Orsaia's office (Orsaia 122; Newmark 28).  Orsaia told Newmark that they were meeting because Magone had ongoing concerns about plaintiff's attendance and performance (Orsaia 122; Newmark 10), and Magone presented plaintiff with a written performance evaluation and discussed it briefly (Orsaia 122-23; Newmark 29; Magone 159-60).

217.    Magone explained to plaintiff that on October 5 she had not successfully completed her probationary period, and was being separated from employment (Orsaia 123; cf. Newmark 28).

218.    Orsaia offered plaintiff the option on October 5, 2006 of having her employment record reflect resignation or termination (Orsaia 123-24).

219.    Magone was out of the office on vacation from July 23, 2006 through approximately August 6, 2006, and from September 18 to September 23, 2006 (Magone Aff. ¶ 17).

220.    Newmark took vacation days on July 3, July 31 to August 4 and September 5 to September 8, 2006 (Magone Aff. ¶ 17; Ex. 33).

221.    Newmark was out of the office for an approved medical absence on September 26 and 27, 2006 (Magone ¶ 17; Orsaia 67-68; Newmark 141-42; Ex. 33).

222.  Newmark was out of the office for holidays on May 29, July 4, and September 4, 2006 (Magone ¶ 17; Ex. 33).

223.  Newmark was out of the office for unscheduled time off (i.e., sick time) on May 15, 16, 17, August 21, and August 29, as well as April 3 and 4, 2006 (Magone Aff. 17; Ex. 32-33).

224.  Magone believes that April 3 and 4, 2006 were inaccurately recorded by Magone's staff as days worked on Newmark's attendance record, when Newmark was in fact out sick (Magone Aff. ¶ 17; Ex. 32-33).

225.  Newmark reserved decision on Orsaia's offer to resign or accept termination until October 6, 2006, when she telephoned Orsaia to ask that her employment record reflect termination (Orsaia 124; Ex. 42).

226.  Plaintiff's claim of age discrimination is based solely on her assertion, which Magone repeatedly denied, that during her August 15 meeting with Magone, Magone said "Nicole is younger and can handle the job better" (Newmark 137; Ex. 27).

227.  Plaintiff acknowledges that Magone, who is 54 (Magone 45, 107) was aware of her age at the time of hire (Ex. 27).

228.  Plaintiff admits that there were no offensive age-based slurs or names in the workplace during her employment (Newmark 233).

229.  Plaintiff admits that no age-based comments other than Magone's alleged remark were made during Newmark's employment at the Hospital (Newmark 233).

230.  Plaintiff admits that no offensive pictures or cartoons were posted or distributed during her employment at the Hospital (Newmark 233).

231.    Plaintiff admits that no jokes were made about age in the workplace during her

employment at the evidence ( Newmark 233).

232.    Plaintiff admits that apart from Magone's alleged comment of August 15, 2006, there is

no evidence to suggest that Magone had singled her out because of her age (Newmark

234).

233.    Newmark claims that she was fired because she complained about ageism to Human

Resources (Newmark 11).

234.    Newmark alleges that after her complaint to Orsaia, Magone overlooked her in meetings

and failed to make eye contact (Newmark 14, 20, 172-73), and that Newmark lost her

amicable rapport with Magone (Newmark 19).

235.    Newmark had little interaction with Magone before Magone became her immediate

supervisor (Newmark 19).

236.    Newmark concedes that Magone was dismissive of her before Newmark's complaint to

Orsaia (Newmark 172).

237.    Newmark attributes Magone's alleged dismissiveness before August 15, 2006 to Magone

being busy (Newmark 172).

238.    Newmark alleges that Magone was dismissive after her complaint, but "not in the same

way" as she was prior to her complaint (Newmark 173).

239.    Newmark is unable to pinpoint an exact time when the alleged change in Newmark's

demeanor took place (Ex. 27).

240.    Newmark did not conclude that Magone was acting differently toward her until mid-

September (Newmark 43) and admits that she "never put the pieces together and made

connections about anything" (Newmark 173).

241.  Newmark claims that after her complaint to Human Resources, Magone met with her less frequently (Newmark 19-21).

242.   Newmark claims she had frequent private weekly meetings with Magone in July and early August after Lantz's departure (Newmark 22).

243.  Newmark and Magone were both at work at the same time on only eleven days from August 28 through September 28 (Magone 165; Magone Aff. ¶ 17; Newmark 128; Ex. 43), and met or spoke on at least five of them (Ex. 29-31, 35; Magone 123-26, 155-57; Newmark 138-41, 143, 152; Orsaia 70).

244.  Newmark asserts that Magone denied her public recognition for an alleged "Big Heart Award" in or about September (Newmark 17; cf. Magone 152).

245.  Magone was unaware of Newmark's alleged nomination for a Big Heart Award in September 2006 (Magone 152).

246.  Magone said nothing that suggested retaliatory animus to Newmark (Newmark 234-35).

247.  Magone and Orsaia maintain that the decision to terminate Newmark for failure to successfully complete her probationary period was completely unrelated to Newmark's complaint of age discrimination (Orsaia 119, Magone 162).

248.  After Magone learned that Newmark had complained about her to Orsaia, Magone did not, nor was it her intention to, subject Newmark to a different manner of treatment than she had previously (Magone ¶ 18).

249.  After Magone learned that Newmark had complained about her to Orsaia, Magone did not ignore or disregard Newmark at meetings, avoid private conversations with Newmark, avoid making eye contact with Newmark, or exhibit any other change in demeanor or manner towards Newmark (Magone Aff. ¶ 18).

250. In describing Serra as "young in her career", Magone was referring to Serra's relative inexperience in the field of social work (Magone 86-88).

251. Serra has been a licensed clinical social worker since October 2004 (Serra 7-8; cf. Ex. 44).

252. Newmark has been a licensed clinical social worker since in or about 1997 (Ex. 9).

253. During the time of Newmark's employment, Magone considered Newmark to have approximately twice as much social work experience as Serra (Magone 86-88).

254. Newmark admits that there are situations where it is appropriate for a manager to assign a task or project to a junior employee rather than to a more experienced employee (Newmark 236-37).

255. After Newmark was terminated On October 5, 2006, she said to Magone, "You're a fucked up person and a fucked up manager" (Newmark 33).


Dated: New York, New York
       July 11, 2008

                    **COLLAZO CARLING & MISH LLP**

                    By: _John Keil_
                        John P. Keil (JK 2794)

                        Attorneys for Defendant
                        Lawrence Hospital
                        Office and P.O. Address
                        747 Third Avenue
                        New York, New York 10017-2803
                        (212) 758-7600