# EXHIBIT 1
# continued

**Carole Newmark**

Page 141

```
 1              `     C. Newmark
 2  separate discussion?
 3       A.    That's a separate issue.
 4       Q.    Was that the same day or a
 5  different day?
 6       A.    I'm not sure.
 7       Q.    Ms. Magone initially denied your
 8  request for your days off for your
 9  colonoscopy?
10       A.    Yes, she did.
11       Q.    Did you ask her to reconsider?
12       A.    Yes, I did.
13       Q.    And did she reconsider your
14  request?
15       A.    She said that I didn't follow the
16  proper policy and procedure for asking for a
17  day off.  She was incensed that I wrote her
18  an e-mail stating that I had scheduled a
19  colonoscopy and would need the time off.
20            I was not aware of the policy for
21  taking a planned sick day in that you needed
22  to fill out a vacation or a day off/time off
23  request.  As soon as she told me that I
24  couldn't have the time off, I put it in
25  writing and I asked -- I said I'm sorry that
```

Carole Newmark

Page 142

1                    C. Newmark

2 I didn't know the procedure.  I put a Post-it

3 note on it and I said I would like you to

4 reconsider, because this is scheduled and

5 it's something I need, and I had

6 documentation from my doctor that I needed to

7 have this done.  And I put it in her mailbox

8 and she received it and she okayed it.

9            MR. KEIL:  Can you please mark this

10       Defendants' Exhibit E.

11            (Defendants' Exhibit E, E-mail

12       exchange, marked for identification, as

13       of this date.)

14       Q.   Ms. Newmark, you've been handed

15 what's been marked as Defendants' Exhibit E.

16            Do you recognize this document?

17       A.   Yes, I do.

18       Q.   And there's some handwriting -- for

19 the record, this is a printout of an e-mail

20 exchange between Carole Newmark and Cathy

21 Magone on September 11, 2006.

22            There's some handwriting in the

23 upper right-hand corner of the page.  Is that

24 your handwriting?

25       A.   Yes.

**Carole Newmark**

Page 143

1            C. Newmark

2      Q.   And what does that say?

3      A.   I met with Cathy at 3 o'clock on

4 the 12th.

5      Q.   Did you have some meeting with Ms.

6 Magone on September 12th at 3 p.m.?

7      A.   I don't recall, but obviously I

8 wrote this and we probably met to discuss --

9 she probably wanted to meet with me to say

10 she was okaying my request that I had

11 resubmitted.

12      Q.   Drawing your attention to the

13 portion from Cathy Magone, there is a line,

14 "I would like to meet with you tomorrow at

15 9:30 to discuss your overall attendance."

16         Did you have such a meeting?

17      A.   I don't believe so, because I

18 didn't have an opportunity to take this

19 e-mail off the computer.

20      Q.   What do you mean by that?

21      A.   I didn't go to my computer.  I went

22 directly -- I came in and went directly on to

23 patient opportunities to do my work.  That

24 wasn't unusual that I didn't get to look at

25 my e-mails until later on in the day.

Carole Newmark

Page 148

1          C. Newmark

2          MR. KEIL:  Can you please mark this

3      as Exhibit H?

4          (Defendants' Exhibit H, E-mail

5      exchange, marked for identification, as

6      of this date.)

7      Q.   Ms. Newmark, do you recognize the

8  e-mail exchange reflected in Defendants'

9  Exhibit H?

10     A.   Yes.

11     Q.   Do you recall whether you met with

12  Pat Orsaia at about 3:30 on September 13th?

13     A.   If I confirmed it here and said

14  that today at 3:30 is fine, then I did meet

15  with her.

16     Q.   Did anyone else attend that

17  meeting?

18     A.   I believe Cathy Magone was there.

19     Q.   Do you have a recollection of Cathy

20  Magone being at that meeting or are you

21  drawing a conclusion from things you've --

22  from documents you have seen here today or at

23  some other time?

24          MS. NICAJ:  Objection.

25          You can answer.

**Carole Newmark**

Page 149

1           C. Newmark

2      A.    I don't think it was with Cathy,

3 because I think we met on the 28th with Cathy

4 Magone.

5      Q.    So the meeting on the 13th was you

6 and Pat Orsaia and no one else?

7      A.    Right.

8      Q.    Where did the meeting take place?

9      A.    In Pat Orsaia's office.

10      Q.    How long did it last?

11      A.    10, 15 minutes.

12      Q.    How did the meeting begin?

13      A.    I believe I asked her for how it

14 was going with the meeting, the upcoming

15 meeting and whatever, because I hadn't heard

16 from anyone.

17      Q.    What did she say?

18      A.    I believe at that time she said

19 that we haven't met because of our vacation

20 times and because of scheduling differences.

21      Q.    Was there anything else you said to

22 Pat Orsaia at this meeting?

23      A.    Not that I recall.

24      Q.    Was there anything else she said to

25 you?

Carole Newmark

Page 152

1                    C. Newmark

2 there had been quite a -- there had been

3 quite a number of days, and maybe even a

4 month between the time that I brought up the

5 issue and this, and I felt that I wanted, as

6 I said here, I wanted to put some closure on

7 it, so I could get back to work and do what I

8 have to do without having this on my mind.

9        Q.   You were out of work because of

10 your colonoscopy on September 26th and 27th,

11 2006?

12       A.   That sounds about right.

13       Q.   Do you have any reason to dispute

14 that Cathy Magone was on vacation from

15 approximately September 18th to September

16 21st of 2006?

17       A.   I have no -- I don't know where she

18 was.

19       Q.   Did you have a meeting with Pat

20 Orsaia and Cathy Magone after you sent the

21 e-mail that's been marked as Defendants'

22 Exhibit I?

23       A.   Yes.

24       Q.   Was that the same day?

25       A.   Yes.

Carole Newmark

Page 153

1              C. Newmark

2      Q.    Where did it take place?

3      A.    In Pat Orsaia's office.

4      Q.    At what time?

5      A.    I'm not sure of what time.

6  Possibly in the afternoon.

7      Q.    The people in attendance were

8  yourself, Pat Orsaia and Cathy Magone?

9      A.    Right.

10     Q.    No one else?

11     A.    No one else.

12     Q.    Did you take notes during this

13  meeting?

14     A.    No, I didn't.

15     Q.    Did you take notes after the

16  meeting?

17     A.    No, I didn't.

18     Q.    How did the meeting begin?

19     A.    It began by Pat Orsaia stating that

20  I had some issues that needed to be

21  discussed, and that she wanted me to discuss

22  them with Cathy, and I proceeded by saying

23  that I had an issue with her making a

24  statement about Nicole being younger than I

25  and better able to do the job of work.  And

**Carole Newmark**

Page 154

1               C. Newmark

2 it took off from there.

3     Q.   How did Cathy Magone respond to

4 what you said?

5     A.   She said she never said that.  She

6 denied saying it, and she got a little angry,

7 and she said what I meant to say is she's

8 younger and can take in information like a

9 sponge.

10     Q.   Didn't Cathy Magone say Nicole was

11 younger in her career and could soak things

12 up like a sponge?

13          MS. NICAJ:  Objection.

14          You can answer.

15     A.   It's a matter of semantics at this

16 point.  Maybe she said it that way, but she

17 did say she's younger, she's young.  She

18 didn't say at this point in her career.  She

19 said she's young and could soak things up

20 like a sponge.

21     Q.   When you say it's a matter of

22 semantics, my question is:  The exact words

23 that Cathy Magone said in the September 28th

24 meeting, as best you can recall?

25     A.   I retract that.  Cathy Magone says

Carole Newmark

1            C. Newmark

2 she's young and can soak things up like a

3 sponge.

4      Q.    **Did Cathy Magone mention any**

5 **concerns about the quality of your work**

6 **performance during this meeting?**

7      A.    She did.

8      Q.    **What did she say?**

9      A.    She said that my work performance

10 was not up to par.  I asked her why she

11 didn't bring this up to me before.  That why

12 was it is being brought up at this meeting.

13 Why had she not mentioned it to me before so

14 that we had an opportunity to work on it.

15           She said she did.  She didn't.  And

16 she brought up attendance.  I asked her why

17 she didn't make an issue of this, or why she

18 didn't say anything prior to this meeting,

19 that I had to ask for this meeting and why is

20 she bringing it up at this point.

21      Q.    **What did she say?**

22      A.    She got very angry.

23      Q.    **What did she say?**

24      A.    She sat there and disputed what I

25 was saying.  She said well, something to the

**Carole Newmark**

```
 1                 C. Newmark
 2 effect, and I can't quote her, something to
 3 the effect that she had been telling me about
 4 my work, et cetera, et cetera.  And I
 5 disputed that.  I said you haven't.
 6        Q.    How long did the meeting last?
 7        A.    Maybe 20 minutes.
 8        Q.    Did you say anything else during
 9 the meeting other than what you already
10 testified to?
11        A.    I don't recall.
12        Q.    Did Ms. Magone say anything during
13 this meeting other than what you already
14 testified to?
15        A.    I don't recall anything else.
16        Q.    Did Ms. Orsaia say anything during
17 this meeting?
18        A.    Not really.  She allowed Cathy and
19 I to talk about whatever the issues were.
20        Q.    How did the meeting end?
21        A.    It ended really with no resolution,
22 no real resolution.  I thanked Pat Orsaia for
23 her time.  I -- we both got up to leave,
24 Magone and I.  I got to the door and Magone
25 said, "Pat, may I meet with you?"  And she
```

Carole Newmark

Page 157

1              C. Newmark

2 stayed behind.

3     Q.   Who indicated that the meeting was

4 over?

5     A.   I don't recall.  I think it was

6 mutual.

7          MR. KEIL:   Could you please mark

8     this as Defendants' Exhibit J.

9          (Defendants' Exhibit J, Document,

10     marked for identification, as of this

11     date.)

12     Q.   Ms. Newmark, do you recognize

13 Defendants' Exhibit J?

14     A.   Yes, I do, and this refreshes my

15 memory that I asked Cathy Magone how long my

16 probation period was going to be extended.

17 And she said that that was for her to know.

18 And she wouldn't answer, you know, the

19 question.

20     Q.   Did you ask Pat Orsaia any

21 questions about your probationary period

22 being extended during that meeting?

23     A.   I may have.  I don't recall.  I may

24 have asked her if there was some policy or

25 procedure about when you extend someone's

Carole Newmark

```
 1              C. Newmark
 2 document something, it didn't happen, and
 3 that's part of social work practice, to have
 4 good documentation.
 5      Q.   And you printed this out on the
 6 same day that you wrote it, September 29th?
 7      A.   Yeah, maybe for my records, yes.
 8      Q.   Do you see the partially cutoff
 9 date at the bottom, it looks like it may say
10 9/29/06?
11      A.   Right.
12      Q.   Does that look accurate to you as
13 the date of printing?
14      A.   Yes.
15      Q.   Did you print out any other e-mails
16 that day?
17      A.   I may have.  I may have printed out
18 all the e-mails I had.
19      Q.   Why did you print out all the
20 e-mails that day?
21      A.   For my records, and I just got a
22 gut feeling that I was being -- that I was
23 being -- having charges piled up against me
24 and I wanted my documentation.
25      Q.   So as of the time when you printed
```

Carole Newmark

Page 161

```
 1              C. Newmark
 2 we had talked about.  And there was no
 3 clarification, as I indicated in the second
 4 line, that there were issues raised in the
 5 meeting that were not clarified.  They were
 6 just left hanging and I just -- I wanted some
 7 resolve.
 8       Q.   Drawing your attention to the
 9 paragraph that begins with a numeral 2, the
10 first line there says, "When I asked Cathy
11 what was the basis for my probation being
12 extended, she stated it was because of
13 attendance."
14            When you wrote that, were you
15 referring to a meeting with Cathy Magone on
16 or about September 12th or 13th?
17       A.   Right, when she mentioned the
18 attendance, yes.
19       Q.   So during that meeting that's on
20 September 12th or 13th, you were told that
21 your probation is being extended, correct?
22       A.   Correct.
23       Q.   You were being told it was because
24 of your attendance?
25       A.   Right.
```

Carole Newmark

1                   C. Newmark

2        Q.    In that meeting on September 12th

3  or 13th, did you have any -- was there any

4  elaboration of your attendance problems?

5        A.    Not at all.

6        Q.    Did you ask any questions about it?

7        A.    I'm not sure.

8        Q.    You don't remember?

9        A.    No.

10       Q.    Didn't Cathy Magone bring some

11  concerns about your work to your attention in

12  July 2006?

13       A.    Not that I'm aware of.

14       Q.    Do you recall sending Cathy Magone

15  an e-mail asking Ms. Magone if you should

16  consider a prior conversation to be a

17  warning?

18       A.    Yes.

19       Q.    What were you referring to in that

20  e-mail?

21       A.    Okay.  I had gone up to Cathy

22  Magone's office and asked her to please

23  discuss with me the inconsistencies in the

24  procedures between myself and the case

25  manager, and she did not call me there.  I

Carole Newmark

Page 163

1              C. Newmark

2 went on my own.

3              And she said, "Well, let's talk

4 about something else."

5              And I said, "Well, what is it?"

6              And she said, "It's believed that

7 you are invisible around the hospital."

8              And I said, "What do you mean by

9 that?"

10             She said across the board -- no,

11 she said, "It's believed that you are not

12 able to be reached and that you can't be

13 found anywhere."

14             I told her that I had not only a

15 beeper but I had a Nextel and I had overhead

16 page, that if anyone wanted to reach me, they

17 could reach me very easily, that I didn't

18 know what she was referring to, and I asked

19 her to please let me know who thinks that I'm

20 invisible.

21             And she said across the board,

22 everyone feels that you're invisible.  And I

23 didn't understand the -- I didn't understand

24 why she wouldn't tell me who thinks that I'm

25 invisible, and she wouldn't qualify the

Carole Newmark

Page 164

1                    C. Newmark

2  statement.

3            I said, "Cathy, tell me why someone

4  thinks I'm invisible.  What are the issues?

5  Let's work on them." And she had no comment.

6            Once again, she stood up and said

7  goodbye.

8      Q.    That was the total conversation?

9      A.    That was it.

10     Q.    Why did you send her that e-mail?

11     A.    Because I'm a very

12 policy-and-procedure type person.  And I know

13 that when someone takes me into an office and

14 makes a statement that I'm invisible, that it

15 may mean something else down the line, and I

16 wanted to know if it was a verbal warning.

17           I had supervised people before.  I

18 know when I'm giving someone a verbal

19 warning.  I let them know that I'm giving

20 them a verbal warning, and I also let them

21 know that I am putting a letter or note in

22 their file, so I was just qualifying that.  I

23 just wanted to make sure that wasn't the

24 case.  Because it sounded like it was a

25 reprimand.

Carole Newmark

1              C. Newmark

2      Q.   Did Cathy Magone tell you that she

3 was concerned that you weren't adjusting to

4 the case management model at Lawrence

5 Hospital?

6      A.   Yes, she did.

7      Q.   Was that during that same meeting?

8      A.   No, it was at another time.  I

9 don't recall when.

10      Q.   It could have been in July of 2006?

11      A.   It could have been at any time,

12 because I told her that I was willing to work

13 with her and the case managers to write

14 whatever she felt was not being done the way

15 they wanted it to be done.

16      Q.   To write, as in to correct?

17      A.   Yes.

18      Q.   Did you tell Cathy Magone that you

19 were overworked?

20      A.   I told her that the hospital, in

21 its size and in its patient needs, was

22 overwhelming for two social workers, and

23 that, you know, I felt overworked, yes.  And

24 that I needed some concrete social work job

25 descriptions to clarify what it is that I'm

**Carole Newmark**

1                    C. Newmark

2 supposed to do.

3          Because there were nine case

4 managers, or eight, who would call me at the

5 same time and I didn't know, you know, I had

6 to stop and prioritize which one should I

7 respond to first.  Where should I go first.

8          And then I would get a call from

9 the ER, and I would have to go down there,

10 because someone was overdosing.  So I

11 consistently brought this to her attention,

12 as well as Diane Lance.

13          We had several meetings going over

14 paperwork to try to streamline my position,

15 because as I mentioned, when I interviewed

16 with Cathy Magone, she said this is an

17 opportunity -- and I don't know if I

18 mentioned this, but what she said to me was

19 this is an opportunity for you to write your

20 own ticket here and make the job what you

21 want it to be.

22          And so there was really no job

23 description.  And I have paperwork at home

24 that indicates when we met, but I have all

25 the paperwork trying to define my position

Carole Newmark

Page 167

1              C. Newmark

2 and my role at Lawrence Hospital.

3         It was very frustrating to me not

4 to know, you know, where I fit in, what I

5 should do, who I should answer to first.  I

6 had many supervisors.  Each one of the case

7 managers represented themselves as my

8 supervisor.

9     Q.   Did Cathy Magone ever review your

10 caseload with you?

11     A.   On several occasions, sure.

12     Q.   Do you recall her doing so when you

13 met with her on the occasion that you -- let

14 me rephrase that.

15         You've testified earlier about a

16 meeting after which you sent Ms. Magone an

17 e-mail asking whether you should consider the

18 conversation to be a verbal warning.

19     A.   Uh-huh.

20     Q.   During that conversation that

21 prompted your e-mail, did you and Cathy

22 Magone have a discussion of your caseload?

23     A.   I don't recall.  That was a common

24 question on a daily basis.  That's a question

25 that he could be asked at any time.

Carole Newmark

Page 168

```
 1                    C. Newmark
 2        Q.   Did Cathy Magone tell you you
 3  needed to be more proactive in beginning
 4  discharge planning the families?
 5        A.   Yes.
 6        Q.   How many times?
 7        A.   Twice maybe.
 8        Q.   When?
 9        A.   I'm not sure.
10        Q.   Did Cathy Magone tell you that you
11  needed to better prioritize your workload?
12        A.   Not that I recall.
13        Q.   Turning your attention back to
14  Defendants' Exhibit J, your September 29th
15  e-mail, the paragraph that starts numeral 3,
16  the last sentence reads, "Cathy does not know
17  what my capabilities are.  She has not taken
18  the time to learn about who I am and know
19  exactly my strengths are."
20             What did you mean by that sentence?
21        A.   What I meant by that was Cathy had
22  not really supervised me until after Diane
23  Lance left.  She really didn't know anything
24  about the work that I was doing in the
25  capacity of a social worker, which was very
```

Carole Newmark

Page 169

1                     C. Newmark

2 different from the -- what the case managers

3 did.  She knew nursing and she knew what case

4 managers did as nurses, but she didn't really

5 have a good grasp on what I did as a social

6 worker.  She knew nothing about hospital

7 social work.

8     Q.   **What do you consider to be the**

9 **difference between what the case managers**

10 **were doing and hospital social work?**

11     A.   Okay.  Hospital social work takes a

12 different bend.  Case manager's main focus,

13 which was my focus as well, but not to the

14 same degree, was discharge planning.  My role

15 was to assist them in discharge planning and

16 working with difficult patients, patients who

17 didn't believe that they needed to leave when

18 they had to leave.

19          Patients whose families said my

20 loved one is not going home right now because

21 they're not ready.  And the case managers did

22 not know how to deal with this and did not

23 know how to go in and finesse the situation

24 and get these people to understand that they

25 can't stay in the hospital.

Carole Newmark

```
 1              C. Newmark

 2              I was kind of like the closer, so

 3 to speak.  And I would go in and speak to the

 4 families and speak to the patient.  And

 5 explain to them why they had to leave, that

 6 their insurance was not covering their stay,

 7 that they might be billed for the time that

 8 they were here.  And et cetera, et cetera.

 9 And that's how my job differed from theirs.

10              They would go in and say you're

11 leaving at 3 o'clock and it could be 10

12 o'clock.  They would go in at 10 o'clock and

13 say you're leaving at 3 o'clock, and many

14 families and patients would get upset, and

15 the case managers didn't know how to deal

16 with that.  That wasn't their forte.

17              I would go in and explain to them

18 this is why.  Perhaps if it needed to be

19 extended for whatever reason, I would work

20 with the doctor.  The doctor would say he

21 could stay another day, he's got a fever or

22 whatever, and buy them a little time.  It's a

23 very different role.

24    Q.   Drawing your attention to the last

25 paragraph in Exhibit J, the second sentence
```

Carole Newmark

Page 171

1                C. Newmark

2    reads, "I know that she hired me knowing that

3    I am older.  However, her comments and

4    actions during the past few months in regard

5    to me have been dismissive and

6    non-supportive."

7                When you're referring to the past

8    few months in that sentence, what period of

9    time are you referring to?

10        A.    I was referring to after I had made

11   my complaint to Pat Orsaia.

12        Q.    You weren't referring to any events

13   that had happened before then?

14        A.    No, no.

15        Q.    Then why did you use the words "the

16   past few months"?

17              MS. NICAJ:   Objection.

18              You can answer.

19        A.    Past few months is August,

20   September.  It's a few months.

21        Q.    When you said, "I know that she

22   hired me knowing that I am older," what did

23   you mean by that?

24        A.    I was referring to a statement that

25   Pat Orsaia said to me.  She said well, she

Carole Newmark

1                    C. Newmark

2 knew you were an older woman when she hired

3 you.  If there was age discrimination, she

4 would not have hired you.  And that's what

5 I'm referring to here.  I didn't -- I wasn't

6 real clear about it.  I was just responding

7 to what she had told me.

8        Q.    By the words "the past few months,"

9 were you referring to beginning with your

10 meeting with Pat Orsaia on or about August

11 18th, why did you have the next sentence, "I

12 cannot pinpoint when things changed between

13 Cathy and I"?

14       A.    Well, I couldn't pinpoint to say it

15 was Wednesday, the 14th of whatever.  I

16 couldn't, you know, but her interactions with

17 me were very different.  They were very

18 dismissive.  They were very vague.  They were

19 not responsive.

20       Q.    Wasn't Cathy Magone dismissive of

21 you before August 15th?

22             MS. NICAJ:   Objection.

23             You can answer.

24       A.    Yeah.  She was dismissive, but you

25 know what, I chalked it up to she's busy and

Carole Newmark

Page 173

1              C. Newmark

2 whatever.   I never really put the pieces

3 together and made connections about anything.

4 I just assumed, you know -- wasn't dismissive

5 in the same way.

6        Q.    How is it different?

7        A.    When someone doesn't make eye

8 contact with you, when someone is insincere,

9 when someone doesn't respond to something you

10 say in a meeting, when prior there was a

11 response, when you are singled out and asked

12 to do certain things that maybe someone else

13 wouldn't do.

14              And I don't have an example of

15 that.  I just know -- there was just so much

16 going on.  Her whole attitude towards me had

17 changed.  She wasn't supportive.  I stayed in

18 the ER one night until 7 o'clock.  I was

19 supposed to leave at 4.  She said the only

20 reason you stayed there was because you

21 couldn't get your work done in a timely

22 manner.  That's not supportive.

23        Q.    She was not supportive for you at

24 any time after she became your immediate

25 supervisor, correct?

Carole Newmark

Page 174

1          C. Newmark

2          MS. NICAJ:  Objection.

3          You can answer.

4     A.    She was supportive at times.  Sure

5 she was.

6     Q.    How was she supportive of you at

7 times?

8     A.    I think there is a memo that's

9 floating around somewhere where she said

10 there are problems, but we will work through

11 them and I will help you through that.  Don't

12 worry about it.  Things happen.  We will work

13 through this.  We will work through that.

14 Please keep me abreast of when the case

15 managers treat you unfairly and I will take

16 care of it.  That's supportive.

17          MR. KEIL:  Will you please mark

18     this as Defendants' Exhibit K.

19          (Defendants' Exhibit K, E-mail

20     dated 5/11, marked for identification,

21     as of this date.)

22     Q.    I'm showing you a May 11 e-mail

23 that's been marked as Defendants' Exhibit K.

24          Is this the e-mail that you were

25 just referring to?

Carole Newmark

Page 175

1                    C. Newmark

2        A.    It might be one of the e-mails or

3   one of the statements that she made to me

4   that showed her being supportive.

5        Q.    Didn't Cathy Magone send you this

6   e-mail before she became your immediate

7   supervisor?

8              MS. NICAJ:  Objection.

9              You can answer.

10       A.    I believe she did.

11       Q.    Drawing your attention back to

12  Exhibit J, the next-to-last line of text

13  includes the words, "This makes me feel very

14  vulnerable and insecure about my job at LHC."

15             What were you referring to there?

16       A.    There was a feeling that Cathy was

17  not supportive, that she was not -- after our

18  meeting, you know, I just felt, I felt

19  vulnerable.  I felt vulnerable.  I felt that

20  my job wasn't secure, and as it turns out, I

21  was correct.  So I don't know what to say.  I

22  have a sense of when something is not right.

23  It's intuitive.  It's on the mark.

24       Q.    Weren't you insecure about your job

25  at Lawrence Hospital prior to September of

Carole Newmark

1              C. Newmark

2  2006?

3       A.    Prior to that?

4       Q.    Yes.

5       A.    Can you repeat that?

6       **Q.    Were you insecure about your job at**

7  **Lawrence Hospital prior to September of 2006?**

8       A.    I felt that things were not gelling

9  the way I wanted them to.  When I met with

10  Cathy Magone at one point, and I said to her,

11  I think -- and this may have prompted this,

12  this is Exhibit K, from her, I said that no

13  one could be -- could be harder on me than I

14  am on myself because I have very high

15  standards, and I have taken an oath of ethics

16  in my work as a social worker, and no one can

17  beat me up as well as I can beat myself up.

18              And I knew that I wanted things to

19  be perfect.  And that things weren't

20  happening for me.  And I kept going to her

21  and asking her time after time to please

22  let's meet, let's meet with the case

23  managers, let's get this together.  Let's

24  pull this together, and I wasn't getting the

25  responses that I wanted.  And that's probably

**Carole Newmark**

Page 177

1                    C. Newmark
2 why I felt vulnerable.
3      Q.   Did you feel any confusion about
4 your role at Lawrence Hospital as compared to
5 what the case managers were doing?
6           MS. NICAJ:   Objection.
7           You can answer.
8      A.   Confused, I wasn't confused.
9      Q.   Did you have any uncertainty about
10 what your role at Lawrence Hospital was
11 supposed to be after Maura Del Bene started
12 working there?
13     A.   It became a little more ambiguous
14 when she came on board, yes.
15     Q.   In what regards did it become more
16 ambiguous?
17     A.   Because we -- social workers were
18 doing that palliative care piece, not calling
19 it palliative care, before Maura Del Bene
20 came on board.  And when she came on board,
21 it wasn't clear what the dynamics would be
22 and how our jobs would be affected, which is
23 why I tried meeting with Maura Del Bene to
24 clarify what the roles are and not reinvent
25 the wheel.

## Carole Newmark

Page 178

1              C. Newmark

2        Q.    Did Maura Del Bene help you clarify

3    those roles?

4        A.    She tried.  She tried.

5              MR. KEIL:   I would like this marked

6        as Defendants' Exhibit L.

7              (Defendants' Exhibit L, Document,

8        marked for identification, as of this

9        date.)

10       Q.    Do you remember receiving

11   Defendants' Exhibit L?

12       A.    Yes, I do.

13       Q.    What was your reaction when you

14   received it?

15       A.    That I was never told that she

16   needed to have a project of her own.  I was

17   never told that she needed to have a project

18   of her own.  And to be frank, I think she was

19   covering her ass by sending this.

20       Q.    Why do you think she was covering

21   her ass?

22       A.    I don't know.  She didn't respond

23   to me at any other time, and now all of a

24   sudden I got this a day before she let me go.

25   Oh, that was a Thursday, so I don't know.

**Carole Newmark**

Page 179

1             C. Newmark

2      Q.   Well, in the next to last and last

3 line of the first paragraph, you see the

4 words, "I never intended to imply that you

5 are not chosen because of your age or that

6 anyone's age was relevant to my decision."

7           Did you have any reason to doubt

8 what Ms. Magone was saying there?

9           MS. NICAJ:   Read the entire

10     sentence to yourself.

11     Q.   Read the whole document.

12     A.   That's not what she said to me.

13 She said, Nicole, you know, is younger and

14 can handle the job better.  And can handle

15 the job better.  So I don't know where this

16 came from.

17     Q.   When Ms. Magone wrote to you that

18 she never intended to imply that anyone's age

19 was relevant to her decision, what reason do

20 you have to doubt her saying that?

21           MS. NICAJ:   Objection.

22           You can answer.

23     A.   There was distrust there.

24     Q.   Meaning you did not trust her?

25     A.   Yes.  Based on her attitude and

**Carole Newmark**

Page 180

1                    C. Newmark

2 her, just how she treated me, how she treated

3 other people.  There was a sense of distrust.

4 So why would I trust anything she said.  She

5 lied so, you know, why would I believe there

6 was some substance to that.

7       **Q.   So your reaction on reading that**

8 **sentence was that Ms. Magone was lying?**

9       A.   Yeah, because she didn't describe

10 Nicole as a new young social worker needing

11 to have a project of her own.

12       **Q.   Assuming for the sake of argument**

13 **that you're assertion is correct, do you have**

14 **any reason to believe that Ms. Magone was**

15 **lying when she said that age was not relevant**

16 **to her decision?**

17             MS. NICAJ:  Objection.

18             You can answer.

19       A.   Well, she lied in the beginning

20 saying that she never said it.  So that's the

21 basis of my believing her or not believing

22 her.

23       **Q.   So your basis for believing that**

24 **Ms. Magone was lying in Defendants' Exhibit L**

25 **is that you believe she was lying in prior**

**Carole Newmark**

Page 181

1                    C. Newmark

2 meetings you had had with her?

3           MS. NICAJ:  Objection.

4           You can answer.

5     A.    I don't know how to answer that.

6           MS. NICAJ:  Can you rephrase that?

7           MR. KEIL:  Can you read the

8     question back?

9           (Whereupon, the requested portion

10    was read back by the court reporter.)

11    A.    Yes.

12    Q.    Is there any other reason?

13    A.    Not that I can think of at this

14 time.

15    Q.    What do you understand the term

16 palliative care to mean?

17    A.    Palliative care is where a patient

18 is cared for in the later stages of life when

19 they're dying, and palliative care is

20 offering a way for them to die with dignity,

21 without pain and without suffering.

22    Q.    Were you involved in providing

23 palliative care while you were at Lawrence

24 Hospital?

25    A.    Yes, I was.

Carole Newmark

1                    C. Newmark

2        Q.    Did you provide palliative care

3  during the entire time that you worked at

4  Lawrence Hospital?

5        A.    For the most part, yes.

6        Q.    Starting in approximately March of

7  '06 through your last week of employment?

8        A.    Yes.  Not palliative care in the

9  sense of providing medication for pain, but

10  providing a source of compassion.  A source

11  of just being there with someone.  Holding

12  someone's hand as they're dying.  That's my

13  piece in the palliative care piece.

14        Q.    Are you licensed to prescribe

15  medication?

16        A.    No, I'm not.

17        Q.    Was a formal palliative care

18  program operating at Lawrence Hospital when

19  you started work there?

20        A.    No, not in the true sense of a

21  palliative care unit or center.

22        Q.    When did it begin?

23        A.    It began to my -- to the best of my

24  knowledge, when Maura Del Bene was hired as a

25  nurse practitioner to be a liaison between

Carole Newmark

Page 183

1                  C. Newmark

2 Jansen Memorial Hospice Care and the hospital

3 working with Dr. Page.

4      Q.    Did the palliative care program

5 have dedicated staff at Lawrence Hospital?

6      A.    Maura Del Bene.

7      Q.    Anyone else?

8      A.    Nicole Serra.

9      Q.    Did you participate at any meetings

10 regarding the creation of the palliative care

11 program?

12      A.    Early on, I did.  I met with Maura

13 one or two times.  Then it became a little

14 more complicated to meet with her.  Her time

15 to meet was basically early in the morning.

16 She came in at 9 o'clock.  I came in at 8.

17 So she would want to meet at 9:30 or so.

18          I had line up at 10 and I was busy

19 getting my patients for the day, so we really

20 didn't meet as often as I would have liked to

21 because I didn't have the liberty of time.

22      Q.    Did you ask Ms. Del Bene if you

23 could meet at another time that was more

24 convenient to you?

25      A.    Yes, we tried on several occasions

Page 184

1              C. Newmark

2  to meet up at different times.

3         MR. KEIL:  I would like this marked

4      as Defendants' Exhibit M.

5         (Defendants' Exhibit M, E-mail

6      exchanges, marked for identification, as

7      of this date.)

8      Q.   I've handed you a series of e-mail

9  exchanges.  It's three pages.  It's been

10 marked as Defendants' Exhibit M.  Why don't

11 you just take a quick look through it to

12 familiarize yourself with it.

13         Are you ready?

14     A.   Yes.

15     Q.   In the last -- in the top message

16 in the e-mail exchange listed as Defendants'

17 Exhibit M, that was sent by you on Monday,

18 June 5th, there is a reference to trying to

19 meet on the following Wednesday at 2:00 p.m.

20         Do you see that?

21     A.   Yes.

22     Q.   Did you meet with Ms. Del Bene on

23 that Wednesday?

24     A.   I don't recall.

25     Q.   A little bit further down on that

Carole Newmark

1              C. Newmark

2         MR. KEIL:  I would like this marked

3     as Defendants' Exhibit N.

4         (Defendants' Exhibit N, E-mail

5     exchange, marked for identification, as

6     of this date.)

7     Q.   Ms. Newmark, you have been handed

8 an e-mail exchange that's been labeled as

9 Defendants' Exhibit N.

10        Do you remember this e-mail

11 exchange with Maura Del Bene?

12    A.   Let me read it.

13        Yes.

14    Q.    In what you wrote on July 5th, it

15 says let's talk, okay.  Did you schedule time

16 with Maura Del Bene to discuss a bereavement

17 process?

18    A.   I don't recall.  I probably did.  I

19 probably did if she wanted to go over the

20 process, because it was confusing as to where

21 we were going with it, what was happening.

22    Q.   Do you recall having a discussion

23 with Maura Del Bene about the bereavement

24 process?

25    A.   No.

Carole Newmark

Page 189

1                    C. Newmark

2      Q.   Did you ever put together a policy

3 for the bereavement process?

4      A.   No.

5      Q.   Do you know who did?

6      A.   I would assume that it was Maura

7 and Dr. Page.

8      Q.   Did you understand the bereavement

9 policy to be a part of the palliative care

10 service?

11      A.   Yes.

12      Q.   Why didn't you put together the

13 bereavement policy?

14           MS. NICAJ:  Objection.

15           You can answer.

16      A.   No one ever asked me to do that.

17      Q.   Did Maura Del Bene invite you to

18 coffee to discuss the bereavement process?

19      A.   We met over coffee a few times.

20      Q.   To discuss that topic?

21      A.   I think to just discuss palliative

22 care in general.  And also how things were

23 working on the units.  She had a lot of

24 complaints about case managers also and how

25 things were done.  And her role in working

Carole Newmark

Page 190

1              C. Newmark

2 with case managers.  She had some

3 difficulties as well.

4        Q.    You mentioned a case manager

5 earlier named Kitty.

6              Was her given name Thelma Gordon?

7        A.    Yes.

8        Q.    Did Maura Del Bene contact you

9 while you were working at Lawrence Hospital

10 to assist her in providing palliative care in

11 particular cases?

12        A.    On numerous occasions.

13        Q.    How many times?

14        A.    As the need arose.  I couldn't give

15 you a number.

16        Q.    Do you know whether Maura Del Bene

17 contacted Nicole Serra to get her assistance

18 on providing palliative care in particular

19 cases?

20        A.    Yes, at times she did, yes.

21        Q.    Maura Del Bene contacted you to

22 assist with palliative care cases after you

23 complained to Pat Orsaia on or about August

24 15th, correct?

25        A.    Can you repeat that?

Carole Newmark

Page 191

1                    C. Newmark

2      Q.   Did you work on any palliative care

3 cases with Maura Del Bene after you

4 complained to Pat Orsaia?

5      A.   I'm sure I did.  It was an ongoing

6 thing.  It depended on who the patient was

7 and what their need was.

8      Q.   Did the number of palliative care

9 cases you worked on or their frequency drop

10 off after you complained to Pat Orsaia?

11      A.   They dropped off after Nicole Serra

12 was assigned to the palliative care center.

13      Q.   Did you refer any cases to Maura

14 Del Bene that you felt would be appropriate

15 for palliative care service?

16      A.   Yes.

17      Q.   Approximately how many?

18      A.   20.  That's a ballpark figure.

19      Q.   Did Maura Del Bene ever ask you to

20 sit in on any meetings she was having with

21 families?

22      A.   Yes.

23      Q.   How many times?

24      A.   Whenever she felt that it was a

25 shared case, that it was my patient and there

**Carole Newmark**

Page 192

1              C. Newmark

2 was some issue, she always invited me to join

3 in on a meeting.

4      Q.    Did you join her on those meetings?

5      A.    Yes.

6      Q.    All of them?

7      A.    May not have been all of them, no,

8 but we always made contact afterwards and

9 discussed the case, because it was my

10 patient.  And the reason I didn't meet with

11 her perhaps is because I was busy with

12 another family or another patient.

13      Q.    You didn't tell Maura Del Bene that

14 you had already met with the family and it

15 wasn't necessary to meet with them again?

16      A.    Perhaps I did on occasion, sure.

17      Q.    More than once?

18      A.    Maybe, yes.  That wasn't unusual.

19 If I had met with them, she had a different

20 bend.  She had a very different bend.  So I

21 may have met with them at a certain level and

22 then she met with them to talk more about --

23 she was a nurse practitioner, so she knew

24 about the medical status of the patient and

25 things that, you know, were not in my realm

Carole Newmark

Page 194

1               C. Newmark

2       A.    I don't even understand that

3 question, because I never heard that before.

4 My answer is no.

5       Q.    Did you tell Maura Del Bene that

6 social work takes time and isn't about

7 completing tasks?

8       A.    I may have said that working with

9 patients and families who are dying does take

10 time, and that's a fact.

11      Q.    Did you complain to anyone at

12 Lawrence Hospital that there were not enough

13 social workers?

14      A.    Absolutely.

15      Q.    Who did you complain to?

16      A.    Cathy Magone.

17      Q.    Anyone else?

18      A.    Maybe the case managers.

19      Q.    Were you aware that there was a

20 hiring freeze at Lawrence Hospital in 2006?

21      A.    I have no idea.

22      Q.    Approximately how many active cases

23 did you have on a given day after Nicole

24 Serra started working at Lawrence Hospital?

25              MS. NICAJ:  Objection.

Carole Newmark

Page 195

1          C. Newmark

2          You can answer.

3     A.    It varied.  It depended on the need

4 for social work intervention, so it varied.

5 There were times when I would have four or

6 five.  There were other times when I would

7 have 12 and 15.  It depended on what

8 intervention was required.  And how I got my

9 referrals.

10     Q.   On average, how many new referrals

11 did you receive each day?

12     A.    Anywhere between 4 and 15.

13     Q.   What were your responsibilities

14 with regard to a new referral?

15     A.    New referral to go in and do a

16 biosocial on them.  To see what their needs

17 were.  To ascertain if there was anything I

18 could do for them to help them with the

19 discharge process in tandem with the case

20 managers.  There was casework that was done.

21 There were referrals to nursing homes.  There

22 were referrals to hospices.

23          There were referrals to department

24 of social services.  Sometimes it was just a

25 matter of sitting and listening and listening

**Carole Newmark**

1                    C. Newmark

2 to someone and making sure they understood

3 that they were heard because they were in

4 pain, either emotionally or physically.

5        **Q.   Now, you said at any given time you**

6 **could have 4 to 15 active cases, but you were**

7 **also receiving anywhere from 4 to 15 new**

8 **referrals a day?**

9        A.    Anywhere from there, and if it

10 became overwhelming, sometimes Nicole and I

11 would split them.  If it was the opposite,

12 where in her unit there were too many cases,

13 I would step in and do them.

14       **Q.   Do you have an understanding of**

15 **what Nicole Serra's caseload was at the same**

16 **time in terms of active cases?**

17       A.    It's about the same.  At one point

18 I kept each and every face sheet on the

19 patients that I had and I had tons of face

20 sheets.  I destroyed them when I left.

21       **Q.   Approximately how many were there?**

22       A.    That I had seen over the period

23 that I was there.  I don't know.  Anywhere

24 from given 4 to 15 a day, I can only

25 approximate for each week, 16 to 20 a week at

**Carole Newmark**

Page 198

1                    C. Newmark

2       Q.    Did you find your caseload at

3  Lawrence Hospital overwhelming?

4       A.    No.

5       Q.    Did you find your caseload at

6  Lawrence Hospital more than you can handle

7  successfully?

8       A.    No.

9       Q.    But you did mention to people at

10  Lawrence Hospital that you felt overwhelmed?

11      A.    I felt overwhelmed with the

12  inconsistencies and with the lack of

13  direction as to who did what and why.  That's

14  what became overwhelming.  The patients never

15  became overwhelming.

16      Q.    Do you recall a length-of-stay

17  meeting during which Cathy Magone asked you

18  about your cases and you said you weren't

19  familiar with them?

20      A.    Yes, I do.

21            MS. NICAJ:  Objection.

22            You can answer.

23      A.    Yes, I do.

24      Q.    When was that?

25      A.    I don't recall when it was, but I