# EXHIBIT 1
# continued

**Carole Newmark**

1                    C. Newmark

2 do recall the meeting.

3      **Q.   And you told Cathy Magone that you**

4 **had not seen any of your cases yet that day?**

5      A.   No, I didn't say that.  What I said

6 was that I didn't have -- usually I had a

7 binder with all of the face sheets of each

8 patient who came in or each patient I was

9 following.  And I would write on that face

10 sheet whatever work I was doing with them

11 because there were so many patients that it

12 was hard to keep track of them.  You just

13 can't.  They're in and out so quickly.

14           So I was organized in having it in

15 a binder.  That particular day I was held up

16 and I didn't go to lunch til late, and I

17 grabbed lunch and then the length of stay

18 meeting was happening.  And instead of going

19 back to my office and grabbing my binder with

20 all of my gear and all of my stuff in there

21 and my patient caseload, I just went up to

22 the meeting without it.

23           I had never done that before.  I

24 could tell her who the cases were, some of

25 the cases I was working on, but I couldn't

Carole Newmark

Page 200

1                    C. Newmark

2 tell her all of them because I didn't have it

3 in front of me.

4              Nicole Serra or any one of the case

5 managers could not say who their patients are

6 without having a list of them in front of

7 them.  That particular day I was rushing and

8 I didn't want to be late for her meeting, so

9 I didn't stop back at my office to get what I

10 needed.

11      Q.   **When you say face sheets, could you**

12 **describe the document for me?**

13      A.   Sure, it's a face sheet.  When a

14 person is admitted to the hospital there's

15 the name, the address, all of the

16 demographics, all of the personal

17 information, a diagnosis, insurance

18 information.  It's a face sheet on that

19 person.

20              We would get them through the fax

21 machine and that's how we would get who --

22 one way of receiving our patients.  And I

23 would write on that sheet.  You know, spoke

24 to the wife today, et cetera, or you know,

25 spoke to Visiting Nurse Service.  So I could

**Carole Newmark**

Page 203

1                    C. Newmark

2 not enough, we would write front and back,

3 you know.

4      Q.   During this length-of-stay meeting

5 where you didn't have your paperwork with

6 you, did you tell Cathy Magone that you had

7 not seen any of your patients yet that day?

8      A.   I highly doubt that.  What would I

9 be doing from 8 o'clock to 1 o'clock.

10      Q.   Do you remember one way or another

11 whether you said that to her?

12      A.   I don't believe I would say that

13 because I was there.  I had to see patients.

14      Q.   Do you recall a situation on or

15 about August 31st of '06 where the case

16 manager Suzanne complained that a family had

17 had not been properly prepared for entering

18 their -- the patient into a nursing home?

19           MS. NICAJ:  Objection.

20           You can answer.

21      A.   I wasn't aware of it until I read

22 the statement.

23      Q.   Not until the litigation?

24      A.   Yes, not aware of that at all.

25      Q.   You don't know one way or another

Carole Newmark

Page 204

1                    C. Newmark

2 whether that situation happened?

3      A.    I have no way of knowing.

4      Q.    What's a PRI screening?

5      A.    It's a patient review instrument.

6 You need training to do that.  What it is,

7 it's a screening on a patient in order to get

8 them into a nursing home and they can't be

9 admitted to a nursing home without this PRI.

10           And the case managers, I think

11 there was only one who could do it, I was the

12 only other person who could do it.  Nicole

13 did not have the training to do it.  I had

14 set it up at some point but was not doing it

15 yet.  So I had to do every PRI of every

16 patient who went into a nursing home.

17      Q.    Approximately how many PRIs did you

18 need to do a day?

19      A.    It varied.  It varied from none to

20 maybe 10 in a day.  Anywhere in between

21 there.

22      Q.    Do you recall hearing from Cathy

23 Magone on or about September 1st that a case

24 manager named Collette had complained about

25 you're not completing a PRI as requested?

Carole Newmark

Page 205

1                    **C. Newmark**

2              MS. NICAJ:  Objection.

3              You can answer.

4        A.    Collette complained a lot about a

5 lot of things.  For me to delineate when she

6 complained and what she complained about

7 would be very difficult for me.  Collette

8 would pick up the phone and scream at me to

9 get there and do a PRI when the patient was

10 just about ready to leave, which was unfair

11 because the patient had been there for days,

12 and had she given me a heads-up, I would have

13 been able to do that in a timely manner.

14              So this is someone who enjoys

15 instant gratification.  And so if I'm working

16 somewhere else, like in the ICU or in the ER

17 or on a unit with a family and she calls me,

18 I would jot it down as I did with every case

19 manager and then I would have to prioritize

20 which unit and which patient I would see

21 next.

22              So if she asked for a PRI and I

23 didn't run and jump, she would call Cathy

24 Magone and she would say I asked Carole to do

25 a PRI.  She's not doing it, which is not

Carole Newmark

Page 206

1                  C. Newmark

2 true.

3      Q.   Do you remember Cathy Magone

4 contacting you about that?

5      A.   She probably did on an occasion or

6 two.

7      Q.   Do you recall it?

8      A.   Not in detail.

9      Q.   Do you recall how you responded to

10 Cathy Magone?

11      A.   I probably said that I was busy

12 doing something and that I would get to it,

13 which was my usual response.  I didn't leave

14 my job at 4 o'clock.  I usually stayed until

15 everything was done.

16      Q.   What time did you normally leave

17 your job?

18      A.   4 o'clock.  I was supposed to leave

19 at 4 o'clock.

20      Q.   What time did you actually leave

21 your job?

22      A.   I tried to leave at 4 o'clock.

23 Many days I was there until five or six.  If

24 there was a PRI or anything that needed to be

25 done, I would stay and do it.

**Carole Newmark**

Page 208

1              C. Newmark

2      Q.   Did you ever hear about a situation

3 about a patient who was assigned to you was

4 discharged from the hospital without suitable

5 clothing?

6      A.   Yes, I did.

7      Q.   How did you hear about it?

8      A.   I heard about it from Collette who

9 called me.  I was in my office making phone

10 calls to patients, families and following up

11 on some things.  It was, I would venture to

12 say, 3 o'clock, 3:30, which was kind of the

13 time I would wind down, go back to my office

14 and kind of clean up for the next day.

15           She called me to say that a patient

16 that I had met, I believe that day for the

17 first time, patient had been in the hospital

18 for several days, and I may be wrong, I may

19 have seen him the day before or maybe that

20 day, I'm not sure, but he was there for

21 several days.  I didn't get the referral

22 until she called me and started screaming

23 that the man -- I got the referral.  I saw

24 him.  I saw him.  I met with him.

25           We ascertained that he was going

Carole Newmark

1                    C. Newmark

2 home.  He was -- he had some psychiatric

3 problems.  I ascertained that he was going

4 home.  That a friend was going to pick him

5 up.  I said is there anything you need,

6 anything that we can do for you.

7              He said no.  He was a very

8 difficult patient and he was a very difficult

9 patient to work with.  I looked at the side

10 of his dresser, he had a pair of pants and

11 shirt.  He had his shoes.  He was ready to

12 go.

13              So I went, I did my note.  I went

14 back to my office.  I get a screaming call

15 from Collette.  Get over here.  The patient

16 is leaving and he has no clothes on.  So that

17 seemed to be something that was a priority.

18              So I went back to the unit.  He was

19 sitting in front of the nurses' station in a

20 gown, in a nursing gown.

21              I said, "Where are you going like

22 that?"

23              He said, "I'm going home."

24              I said, "Where are your clothes?"

25              He said, "I don't want to wear

Carole Newmark

1               C. Newmark

2 clothes." I said -- we had a little chat.

3 And he left.  His friend came and wheeled him

4 out.  There wasn't much I could do.

5          First of all, I'm not responsible

6 for dressing patients.  It's not my role to

7 do that.  That's number one.

8          Number two, I can't make a person

9 put their clothes on.  So he left.  What I

10 was able to do for him, knowing he had a

11 psychiatric background, was I called Visiting

12 Nurse Service, and he had no insurance and he

13 had no money.  I was able to get him Visiting

14 Nurse Service gratis, which is almost unheard

15 of.  No one acknowledged that I did this, but

16 they acknowledged that I let him leave the

17 hospital without clothes, which is ludicrous.

18     Q.    Which division of Visiting Nurse

19 Service did you contact?

20     A.    Visiting Nurse, I believe, of

21 Westchester.  I had called a few.  I'm not

22 certain if that's -- I think it was

23 Westchester.  It wound up to be Visiting

24 Nurse, or maybe Dominican Sisters.  I'm not

25 sure.  I was able to get the point across

Carole Newmark

Page 211

1                    C. Newmark

2  that this was someone who really needs some

3  after care and had no insurance and was there

4  some kind of slush fund that they had so they

5  could see him.

6            I've never done this in my career,

7  and I was able to get it for him.  I was

8  never commended on that, but I was raked

9  across the coals for letting him leave

10 without clothes on.

11     Q.    The registered nurse that had

12 attended the disaster mental health training

13 with you, Rita Barbieri --

14     A.    I believe that's her name.

15     Q.    Did she send you an e-mail about

16 the disaster mental health project in

17 September or October?

18     A.    I don't recall.

19     Q.    Let's back up to your interview

20 with Cathy Magone.  You testified earlier you

21 believe that you remembered an interview in

22 approximately December of 2005?

23     A.    It was actually December 1st.

24     Q.    December 1, 2005?

25     A.    Yes.

Carole Newmark

1                    C. Newmark

2        Q.   Is your daughter familiar with the

3  medical treatment you received after your

4  termination?

5        A.   Yes.

6        Q.   Is she familiar with the medication

7  were you prescribed?

8        A.   Yes.

9        Q.   As far as you know, is the basis of

10 her knowledge what you told her?

11       A.   Yes.

12       Q.   Did you have trouble adjusting to

13 the case management model that had been

14 implemented at Lawrence Hospital?

15       A.   In the beginning I did.

16       Q.   In what regards did you have

17 trouble adjusting to the model?

18       A.   Not understanding whose roles it

19 was to do certain things and the model was

20 different from the model that we used when I

21 was there prior.

22       Q.   Did you have trouble adjusting to

23 the time constraints associated with the case

24 management model?

25              MS. NICAJ:  Objection.

Carole Newmark

Page 215

1                    C. Newmark

2        A.   I didn't give it any thought.   I

3 had no reason to think about that.

4        Q.   You recommended Nicole Serra to be

5 hired as a social worker at Lawrence

6 Hospital?

7        A.   Yes.

8        Q.   Did you take any steps to recruit

9 Nicole Serra?

10       A.   I didn't.   I told Nicole there was

11 a position available.   I knew that Nicole

12 didn't want to work at Phelps anymore.   I

13 gave Cathy Magone her name and her number,

14 and I told Nicole Serra that I was not

15 promising her anything.   That I didn't -- I

16 was not the one to hire her.   That it was

17 Magone's decision, and that's where I left

18 it.

19       Q.   Did you participate in the

20 interview of Nicole Serra?

21       A.   I did not.

22       Q.   What was your understanding of what

23 Nicole Serra's job at Lawrence would be?

24       A.   She would be a hospital social

25 worker who would report to me as the senior

Carole Newmark

Page 216

1               C. Newmark

2 social worker.  And she would do the same

3 duties that I would do after being trained.

4       Q.    What was her job title?

5       A.    I think social worker.

6       Q.    Did you consider yourself Nicole

7 Serra's supervisor while the two of you

8 worked at Lawrence together?

9       A.    Yes.

10      Q.    Did you have the authority to

11 adjust Nicole Serra's rate of pay?

12      A.    No.

13      Q.    Did you have the authority to

14 approve her request for time off?

15      A.    She gave them to me and then I gave

16 them to Magone.

17      Q.    Or to Diane Lance at the time?

18      A.    Yes, or to Diane Lance at the time.

19      Q.    When you gave those requests to

20 Ms. Lance or Ms. Magone, did you make any

21 comment or recommendations about whether you

22 thought the request for time off should be

23 approved?

24      A.    No, that was at their discretion.

25      Q.    Did you have the authority to issue

Carole Newmark

Page 220

```
 1              C. Newmark

 2 other a lot also, if I was out or if she was

 3 out.

 4     Q.   Did she learn her job well at

 5 Lawrence Hospital while you were there?

 6     A.   She learned it fairly well.  It's

 7 the type of job that you learn on the job.

 8 It's not something you can really -- it's as

 9 things come up, that's how you deal with

10 them.

11     Q.   Did you have occasion to observe

12 Nicole Serra's working relationship with

13 Maura Del Bene?

14     A.   On occasion.

15     Q.   How would you characterize it?

16     A.   Maura and --

17     Q.   Ms. Serra.

18     A.   It was amicable.  It was

19 professional.  I observed that Nicole would

20 ask her a lot more questions than I would ask

21 her, but I knew the answers to some of the

22 things that she was asking her.  She was very

23 curious and willing to learn and wanting to

24 learn, so she would align herself with Maura

25 and I thought it was wonderful.  If she could
```

Carole Newmark

Page 231

```
 1                    C. Newmark
 2       Q.   Is your daughter familiar with the
 3  medical treatment you received after your
 4  termination?
 5       A.   Yes.
 6       Q.   Is she familiar with the medication
 7  were you prescribed?
 8       A.   Yes.
 9       Q.   As far as you know, is the basis of
10  her knowledge what you told her?
11       A.   Yes.
12       Q.   Did you have trouble adjusting to
13  the case management model that had been
14  implemented at Lawrence Hospital?
15       A.   In the beginning I did.
16       Q.   In what regards did you have
17  trouble adjusting to the model?
18       A.   Not understanding whose roles it
19  was to do certain things and the model was
20  different from the model that we used when I
21  was there prior.
22       Q.   Did you have trouble adjusting to
23  the time constraints associated with the case
24  management model?
25            MS. NICAJ:  Objection.
```

Carole Newmark

Page 233

1                    C. Newmark

2        A.    No, because I made the assignments.

3        Q.    Do you believe you received less

4 pay than other people because of your age?

5        A.    No.

6        Q.    Did you receive the same benefits

7 in terms of employment as other employees in

8 your approximate field?

9        A.    Yes.

10        Q.    Did anyone call you or anyone else

11 of your approximate age, any word or name

12 that you found offensive?

13        A.    No.

14        Q.    Aside from what you testified to

15 about Cathy Magone's comments in that meeting

16 in August, did anyone say anything to you

17 that made you believe you were being treated

18 differently because of your age?

19        A.    No.

20        Q.    Did anyone show you any pictures or

21 cartoons that you found offensive?

22        A.    No.

23        Q.    Did anyone tell you any jokes about

24 age that you found funny or offensive?

25        A.    I found funny.  I don't know that

**Carole Newmark**

Page 234

1                    C. Newmark

2 they were particularly about age, but --

3      Q.   Was there anything in Cathy

4 Magone's words or behavior that made you feel

5 that you were singled out because of your age

6 other than the comment that she made to you

7 in that meeting?

8      A.   No, I can't say so.

9      Q.   Did anyone else tell you something

10 about Cathy Magone that made you believe she

11 was treating you differently because of your

12 age?

13     A.   No.

14     Q.   Do you know whether your position

15 was filled after you were fired?

16     A.   I have no idea.

17     Q.   Did your pay or benefits change

18 when you complained to Pat Orsaia about Cathy

19 Magone's comments?

20     A.   No.

21     Q.   Did anyone make any comments to you

22 that made you believe that your complaint to

23 Pat Orsaia was the cause of any change in

24 treatment you were receiving?

25     A.   Can you repeat that, please.

Carole Newmark

Page 235

1           C. Newmark

2           MR. KEIL:   Can you read it back?

3           (Whereupon, the requested portion

4       was read back by the court reporter.)

5       A.   It wasn't verbal, no.

6       Q.   **Did anyone else tell you that they**

7   **had witnessed something that made them**

8   **believe your termination was motivated by the**

9   **fact that you had complained to Pat Orsaia?**

10      A.   At Lawrence Hospital?

11      Q.   **Yes.**

12      A.   Ms. Dandridge.

13      Q.   **What did Ms. Dandridge say?**

14      A.   That it sounded like it was

15  retaliatory.

16      Q.   **When did she say that?**

17      A.   Maybe a week after I was

18  terminated.  Days to a week.  I'm not sure.

19  I had no contact with anyone once I left.

20      Q.   **Did Ms. Dandridge tell you why she**

21  **thought it sounded retaliatory?**

22      A.   Because the proximity of the time

23  of my complaint and when I was let go.

24      Q.   **Is that all she said?**

25      A.   Yes.

Carole Newmark

Page 236

1                  C. Newmark

2        Q.    When you negotiated the job title

3  of senior social worker with Cathy Magone,

4  you did not consider the use of the word

5  senior to be offensive or discriminatory, did

6  you?

7        A.    No.

8              MS. NICAJ:  Objection.

9              You can answer.

10       A.    No.

11       Q.    If Cathy Magone had explained her

12  decision by saying that Nicole Serra was more

13  junior and that the assignment was more

14  appropriate for that reason, would you have

15  been offended?

16             MS. NICAJ:  Objection.

17       A.    That's not the basis for giving

18  someone a job because they're, you know, no,

19  I mean because she was more junior?  Yeah, I

20  would have been offended.

21       Q.    Would you believe that it was age

22  discrimination?

23       A.    Yes.

24             MS. NICAJ:  Objection.

25             You can answer.

Page 237

```
 1              C. Newmark

 2      A.    Yes.

 3      Q.    Do you believe that there are some

 4 situations where it can be more appropriate

 5 for a manager to assign something to a more

 6 junior employee rather than to a more

 7 experienced employee?

 8            MS. NICAJ:   Objection.

 9            You can answer.

10      A.    Yes.  It doesn't negate the fact

11 that she said she's younger and can do the

12 job better.

13            MR. KEIL:  Let's take a five-minute

14      break.  We may be just about done.

15            (Recess taken from 4:33 p.m. to

16      4:38 p.m.)

17 EXAMINATION BY

18 MR. KEIL:

19      Q.    Who is Joanne Reed?

20      A.    Joanne Reed was a temporary social

21 worker who was hired to help me.

22      Q.    Was that the temporary social

23 worker you referred to earlier?

24      A.    Yes.

25      Q.    That would be available after you
```

**ERRATA**

I, Carole Newmark, do hereby certify that I have read the foregoing transcript of the deposition given by me on the 5th day of March 2008, and that it is a true and accurate record of the testimony given by me, except for the following corrections I believe should be made.

| PAGE | LINE | READS | SHOULD READ |
|------|------|-------|-------------|
| 29 | 25 | Cathy & Ms. Magone | Me & Ms. Magone |
| 77 | 19 | Cathy | Kathy Anderson |
| 80 | 19 | To | No |
| 86 | 24 | I took myself off it | I asked Dr. Page to wean me off it |
| 97 | 3 | It was $439 over a per. | It was $439 per wk. over a per... |
| 123 | 7 | required over a yr. period | within a one yr. period |
| 143 | 23 | pt. opportunities | pt. units |
| 153 | 25 | to do the job of work | to do the job. |
| 165 | 13 | to write | to right |
| 165 | 16 | to write | to right |
| 167 | 25 | he could | I could |
| 195 | 16 | biosocial on them | biopsychosocial on them |
| 204 | 13 | I had | She had |
| 222 | 14 | something excellence | Service Excellence |
| 87 | 11 | 1 or 2 months after | 8 days after |
| 87 | 19&20 | Maybe 2 months | 3 4 months |
| 88 | 23 | two month | 3 month |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Carole Newmark*
Carole Newmark

Sworn to before me this
9th day of April, 2008

*Margaret Arnim*
Notary Public

**MARGARET ARNIM**
**Notary Public, State of New York**
**No. 4922623**
**Qualified in Westchester County**
**Commission Expires May 8, 2010**