# EXHIBIT 2

6

1          *Catherine Magone*

2          Q.     If at any time during the course of

3    your deposition you want to add, change or

4    otherwise supplement an earlier answer, you can

5    do so.  Let me know, okay?

6          A.     Okay.

7          Q.     Is there anything I've said so far

8    that you do not understand?

9          A.     No.

10         Q.     Are you currently employed?

11         A.     Yes.

12         Q.     By whom?

13         A.     Lawrence Hospital Center.

14         Q.     In what capacity?

15         A.     I'm the director of quality and

16   case management.

17         Q.     How long have you been director of

18   quality and case management?

19         A.     Eight years.

20         Q.     Were you employed at Lawrence

21   prior?

22         A.     No.

23         Q.     What is your educational

24   background?

25         A.     I have a master's in public

13

Catherine Magone

1

2       Q.      And Ms. O'Hare?

3       A.      Yes.

4       Q.      Did there come a time you were

5   offered the position?

6       A.      Yes.

7       Q.      When?

8       A.      The day after I interviewed with

9   the COO and the VP for patient care.

10      Q.      When did you come to learn what

11  your duties and responsibilities were going to

12  be?

13      A.      Well, when I was interviewed, it

14  was talked about with the medical director.

15      Q.      What did the medical director say

16  with respect to that in words or substance?

17      A.      Well, that I would be responsible

18  for quality and case management.  We were just

19  beginning a case management model at Lawrence at

20  the time, so I was hired to put it together.

21      Q.      What do you mean, about just

22  beginning a case management model?

23      A.      Well, previous to my coming to

24  Lawrence, there were nurses that did

25  utilization.  And social work did the discharge

*Catherine Magone*

1
2  planning, okay.  So there was change in -- going
3  to be changes in roles, that the nurses would be
4  doing some discharge planning, so there was just
5  changes in the model.  The utilization nurses
6  would be given additional responsibility.
7        Q.    And did that impact a number of
8  social workers that would remain employed at
9  Lawrence, if you know?
10       A.    The social workers were not
11 reporting to me at that time.
12       Q.    How many social workers were there
13 at the time you first became employed?
14       A.    I don't recall, actually.  Probably
15 four.
16       Q.    I'm sorry?
17       A.    Four, maybe.  I'm not entirely
18 sure, though.
19       Q.    At the time you first became
20 employed at Lawrence, who supervised the social
21 workers?
22       A.    There was a social work director.
23       Q.    And that person is?
24       A.    Barbara Clark.
25       Q.    And is Ms. Clark still employed

30

Catherine Magone

1

2     A.     Probably late February.

3     Q.     Was anyone present apart from you

4 and Ms. Newmark for either of those interviews?

5     A.     No.

6     Q.     Do you recall the substance of

7 your -- the first interview with Ms. Newmark?

8     A.     The first interview that I had with

9 Ms. Newmark was -- she expressed interest in

10 coming back to Lawrence Hospital and taking on

11 this position.

12     Q.     Did she say why she was interested

13 in the position?

14     A.     She wasn't happy where she was

15 working currently.

16     Q.     What did she say with respect to

17 that?

18     A.     She said that she wasn't happy

19 where she was working.

20     Q.     Did you ever advise her during that

21 first interview in words or substance that there

22 was a new palliative care services unit that was

23 in the process of being developed?

24     A.     I don't recall if that happened on

25 the first interview or the second interview.

*Catherine Magone*

Q.     But you do recall mentioning that?

A.     That there was -- that --

Q.     Let me finish.  You do recall
mentioning that in one of those interviews, is
that right?

A.     Mentioning what?

Q.     The palliative care services unit
that was going to be developed.

A.     That it was on the horizons, yes.

Q.     What did you say with respect to
that?

A.     That the hospital was planning on
developing a palliative care program and that
they would be hiring somebody in the future to
spearhead the program.

Q.     What is the palliative care
program?

A.     Palliative care program is a
multi-disciplinary program where you would
involve physicians, nursing, social work, case
management, all working to physically make the
patient more comfortable.  It involved pain
management.  It could involve, you know, a lot
of family dynamics, working with families to

*Catherine Magone*

deal with dying, chronic illness.

Q.    Who was developing that at the time?

A.    Nobody.

Q.    So is there a reason why you mentioned it to Ms. Newmark at either of those interviews?

A.    Just to give her an idea of things that were coming down the pike in the department.  There were other things that I talked about as well.

Q.    Did she express an interest in being involved in the palliative care services unit?

A.    I believe she did.

Q.    When you say you believe she did, the basis is your memory, is that right?

A.    Yes.

Q.    She actually expressed it?

A.    Yes.

Q.    At the time of Ms. Newmark's interview, did you know that Ms. Jones was going to be leaving?

A.    First interview?  No.

*Catherine Magone*

1  little bit until we got extra help on board, and

2  the case managers had to take on some of the

3  social worker's responsibility because obviously

4  she couldn't handle a whole house.

5        Q.    How many houses are there, so to

6  speak, in the hospital that social workers would

7  be responsible for?

8        A.    Well, the social worker is

9  responsible -- they are not unit based; they are

10 responsible by -- according to the type of

11 patient.  So it can vary from day to day what

12 their caseload would be.

13       Q.    What departments would that cover?

14       A.    I don't know what you mean.

15       Q.    For example, would social work

16 cover ER?

17       A.    They could.  But case managers

18 could also cover it.  There is a lot of overlap

19 in the role of a case manager and a social

20 worker.  Case managers can do the social work

21 part in a hospital setting, but the social

22 worker cannot do case management, because they

23 are not registered nurses.

24       Q.    With respect to Ms. Newmark being

Catherine Magone

1
2    to what's been marked as Plaintiff's Exhibit 1
3    for identification.  Can you take a look at
4    that.
5        A.    Yes.
6        Q.    When you are done reviewing what is
7    marked as Plaintiff's Exhibit 1 for
8    identification, let me know, please.
9        A.    I'm finished.
10        Q.    Have you seen what is marked as
11    Plaintiff's Exhibit 1 prior to today?
12        A.    Yes.
13        Q.    I'm going to direct your attention
14    to the second page of Exhibit 1.  Does that
15    refresh your recollection as to how long
16    Ms. Newmark had worked as an intern at Lawrence
17    Hospital?
18        A.    Yes.
19        Q.    Going back to your interviews of
20    Ms. Newmark, what in words or substance do you
21    recall saying to her during the first interview?
22        A.    I recall having concerns that she
23    did not have recent hospital experience and that
24    her primary experience was in an outpatient
25    psychiatric setting which is very, very

39

Catherine Magone

1
2  different from a hospital setting.

3        Also, that when she was a social worker

4  here before, it was a very different time, very

5  different model.  So the way social work in

6  hospitals is run now is very different from when

7  she was last here.  So I was concerned that she

8  wouldn't be able to adapt.

9        Q.     Did you express that to her?

10       A.     Yes.

11       Q.     Did you ever reduce that in writing

12  anywhere --

13       A.     No.

14       Q.     -- your concerns?

15       A.     No.

16       Q.     What else do you recall saying to

17  her during the interview, the first interview?

18       A.     The first interview was rather

19  short.  It was really more of a getting to know

20  you, getting -- gave her my resume.  At the time

21  I was still looking for other social workers.

22       Q.     What do you recall saying at the

23  interview apart from what you have already

24  testified to?

25       A.     Well, I would have explained to her

45

*Catherine Magone*

1

2    Q.    What was Ms. Gogliettino's

3    position?

4    A.    Vice-president human resources.

5    Q.    Who replaced her?

6    A.    I can't remember his name.  I'm

7    drawing a blank.  He wasn't here long.

8    Q.    Who replaced that person you are

9    drawing a blank on?

10    A.    Tom Mastroianni.

11    Q.    And his position was VP of HR?

12    A.    Correct.

13    Q.    Is he still employed there?

14    A.    Yes.

15    Q.    Was there someone by the name of

16    Pat Orsaia that worked at HR?

17    A.    Yes.

18    Q.    What was her position?

19    A.    Director.

20    Q.    Who to your knowledge did she

21    directly report to?

22    A.    She reported to Deb.

23    Q.    How old are you?

24    A.    Me?  54.

25    Q.    What are your duties and

49

Catherine Magone

1

2    A.    I would discard them.

3    Q.    When?

4    A.    I don't recall.

5    Q.    Before or after Ms. Newmark was no

6    longer employed at Lawrence?

7    A.    Oh, before.

8    Q.    What in words or substance did you

9    say during the second interview?

10   A.    During the second interview, I

11   explained to Carole my concerns about her lack

12   of experience.  I described what the role of a

13   social worker in the case management model would

14   be.  We talked about some of the things that

15   were coming down the pike that would need to be

16   taken care of; one of them being a disaster

17   mental health training program that she would

18   need to go to training for.  We also spoke about

19   the palliative care program.

20   Q.    The --

21   A.    Palliative care program that was on

22   the horizon, because I was very excited about

23   that.

24   Q.    What in words or substance did you

25   say about the program?

*Catherine Magone*

1
2    A.    Just that it was something that was
3    coming about, that it was going to be a multi-
4    disciplinary approach to chronic and -- chronic
5    illness and also dying patients.
6    Q.    Did she express again an interest
7    in that?
8    A.    She did.
9    Q.    What did she say in words or
10   substance?
11   A.    I'd be interested in doing
12   something like that.
13   Q.    Did there come a time she was
14   hired?
15   A.    Yes.
16   Q.    Was there anyone else interviewed
17   apart from Ms. Newmark with respect to the
18   position?
19   A.    I don't recall.
20   Q.    As you sit here today, do you
21   recall seeing any resumes or anything of that
22   nature --
23   A.    Yes.
24   Q.    Hold on.
25   -- with respect to that position?

*Catherine Magone*

1

2      A.      Yes.

3      Q.      Do you know how you came to receive

4   those resumes?

5      A.      Through human resources.

6      Q.      Do you know whether it was in

7   response to any advertisements or anything of

8   that nature?

9      A.      I don't know.

10     Q.      Did you interview any of the people

11  that -- whose resumes you saw in connection with

12  the social work position?

13     A.      I don't believe so.

14     Q.      So she is the only one you

15  interviewed?

16     A.      I believe so.

17     Q.      And this is despite the fact that

18  you were concerned about her lack of experience,

19  is that right?

20     A.      (No response.)

21     Q.      You said lack of experience in the

22  case management program?

23     A.      Yes.  However, Carole showed

24  willingness to learn.

25     Q.      And you -- she was the only person

52

*Catherine Magone*

1

2    you interviewed despite the various concerns you

3    testified to earlier, is that right?

4           A.    There were no other candidates out

5    there that were suitable.

6           Q.    She was the only suitable

7    candidate?

8           A.    At that time.

9           Q.    Did you ever seek to locate any

10   other candidates that were more suitable than

11   Ms. Newmark?

12                MR. KEIL:  Do you want to

13       clarify that as to time frame?

14          Q.    At that time when she wasn't hired

15   yet, she said she had these concerns, and yet

16   this is the only person she interviewed.  So I

17   wondered did you seek to look for any other

18   qualified candidates?

19          A.    Yes.

20          Q.    Did you make any postings or

21   advertise --

22          A.    I believe so.

23          Q.    Hold on, hold on.

24          --  in connection with the position of

25   social worker?

58

*Catherine Magone*

1
2  did anyone ever communicate to you that

3  employees at the hospital had communicated their

4  concerns about you to them?

5      A.    No.

6      Q.    Did anyone in HR ever speak to you

7  about the fact that employees had complained

8  about you?

9      A.    No.

10      Q.    Apart from communicating with

11  Ms. Galloway concerning Ms. Newmark prior to an

12  offer being extended to Ms. Newmark, did you

13  ever seek to ascertain any of Ms. Newmark's

14  references and call them?

15      A.    No.   Human resources checks

16  references.

17      Q.    Did you ever communicate with

18  anyone at the hospital apart from Ms. Galloway

19  in connection with their previous working

20  relationship with Ms. Newmark?

21      A.    No.

22      Q.    Did there come a time that the

23  palliative care program was actually established

24  or developed?

25      A.    Well, somebody was hired.   That

Catherine Magone

1
2    would have been --
3        Q.    When was that person hired?
4        A.    The end of May.
5        Q.    And was that position created?
6        A.    Yes.
7        Q.    What was the position?
8        A.    It's a nurse practitioner.
9        Q.    Was there a specific title apart
10   from nurse practitioner?
11       A.    I believe her title is nurse
12   practitioner for the palliative care program.
13       Q.    And she -- you said she
14   specifically was hired for this program, is that
15   right?
16       A.    That's correct.
17       Q.    Who interviewed her?
18       A.    I wasn't privy to that information.
19   I could assume who interviewed her.
20       Q.    Did you interview her?
21       A.    No, no.
22       Q.    Apart from your assumption, you
23   don't know who interviewed her?
24       A.    No, I was never told.
25       Q.    You didn't participate in her hire

60

*Catherine Magone*

1

2    or anything of that nature?

3        A.    No, no.

4        Q.    And this person is who?

5        A.    Maura Del Bene.

6        Q.    To your knowledge, what was

7    Ms. Del Bene's background prior to her being

8    hired in May of 2006?

9        A.    She is -- her background, I

10   believe, was psychiatric nurse practitioner.

11       Q.    To your knowledge, did she have any

12   experience in the palliative care program

13   elsewhere?

14       A.    I believe so, but I'm not  -- I

15   never saw her resume.

16       Q.    And the basis of your belief is

17   what?

18       A.    That she came with an incredible

19   amount of knowledge regarding palliative care,

20   so I'm assuming that she did have.

21       Q.    Apart from your assumption, you

22   don't know what her experience was?

23       A.    No.

24       Q.    Again, I don't want you to assume

25   or guess or anything like that.  If you --

64

*Catherine Magone*

assigning a social worker in the palliative care
program.

    A.    I don't believe it ever came up.

    Q.    Was there a time that another
social worker was hired after Ms. Newmark was?

    A.    Yes.

    Q.    And that person is who?

    A.    Nicole Serra.

    Q.    Who recommended Ms. Serra?

    A.    Ms. Newmark.

    Q.    When was Ms. Serra hired?

    A.    I believe it was May.  It may have
been the end of April.

    Q.    Was anyone else interviewed apart
from Ms. Serra?

    A.    No.

    Q.    Did she have any case management --

    A.    No.

    Q.    -- experience?  Hold on.  I'm not
finished.  I'll withdraw that portion and ask
the question again.

    Did she have any case management
experience?

    A.    No.

67

Catherine Magone

1    to taking the case.

2         Q.    You indicated that the social

3    workers get referrals in a number of ways.  You

4    just listed two.  I just want to make sure those

5    are the only two ways.  You said referrals

6    through case managers and referrals through

7    physicians.

8         A.    Correct.

9         Q.    Any other ways?

10        A.    So nursing can refer as well.

11        Q.    When you say nursing, in all

12   departments or specific departments?

13        A.    All departments.

14        Q.    Any other ways in which social

15   workers get referrals?

16        A.    You can get referrals from the

17   emergency room.

18        Q.    Any other ways?

19        A.    No.

20        Q.    In order -- is there a way in which

21   a social worker determines whose referral to

22   respond to first if there is a number of

23   referrals from the different areas?

24        A.    They would be expected to

68

1                          Catherine Magone

2    prioritize.

3          Q.    Meaning what, prioritize as to

4    seriousness?

5          A.    Prioritizing to the work,

6    seriousness, type of referral.  For instance, if

7    it was a psychiatric referral, you would want to

8    see that patient first unless they were in a

9    coma in the unit.

10          Q.    Is that set forth anywhere in

11    writing in terms of how social workers should

12    prioritize with different referrals?

13          A.    No.  It would be my expectation

14    that as a social worker you should be able to do

15    that on your own.

16          Q.    But what I'm saying, apart from

17    your expectations, is this prioritizing set

18    forth anywhere in writing?

19          A.    Prioritizing, no.

20          Q.    In other words, there is no you

21    take the physician's referral above the nurse's

22    referrals and so forth and so on?

23          A.    No.

24          Q.    Did there come a time that you

25    communicated with Ms. Magone concerning the

69

*Catherine Magone*

palliative care unit?

                  MR. KEIL:    Object as to
form.    The witness is Ms. Magone.

                  MS. NICAJ:    I'm sorry.    I
apologize.

    Q.    Did you ever communicate with
Ms. Newmark concerning the palliative care unit
when she became employed there?

    A.    There is no palliative care unit.

    Q.    Care service.

    A.    Care service, correct.    I
communicated with Ms. Newmark when the decision
was made for who was going to travel out to Ohio
for a site visit.

    Q.    Prior to that communication, did
you ever communicate with her as to who was
going to be assigned to the palliative care
service?

    A.    No.

    Q.    When you say who is going to be
assigned to go to travel to Ohio, what was that
about?

    A.    I was approached by the nurse
practitioner, Maura Del Bene, and we talked

1                       *Catherine Magone*

2    about there was going to be a site visit.

3         Q.    A site visit?

4         A.    A site visit of a hospital that had

5    currently had a palliative care program.  And

6    that the vice-president for patient care would

7    be attending, Maura would be attending, and we

8    needed to assign a social worker to attend.

9         Q.    Why did you need to assign a social

10   worker to attend?

11        A.    Because that's part of a team.

12        Q.    Just to attend, not to be part of

13   the palliative care service?

14        A.    Well, no one social worker would be

15   assigned necessarily to the palliative care

16   service.  Both social workers would be involved

17   in palliative care, but only one person could go

18   out there for the site visit.

19        Q.    Did you communicate this to

20   Ms. Newmark?

21        A.    When I made my decision.

22        Q.    And the decision was what?

23        A.    To appoint Nicole Serra.

24        Q.    Did you have more than one

25   communication with Ms. Newmark concerning this?

Catherine Magone

1

2      A.    No.

3      Q.    Was this communication by

4 telephone, in person or in some other manner?

5      A.    In person.

6      Q.    Where?

7      A.    In my office.

8      Q.    Was this a prearranged meeting?

9      A.    No.

10      Q.    How did -- to your knowledge, did

11 Ms. Newmark know to come to your office?

12      A.    I called her.

13      Q.    You called her and said what?

14      A.    Would you please come to my office.

15      Q.    Did you say anything else?

16      A.    On the telephone?  No.

17      Q.    What then happened?

18      A.    She came to my office.

19      Q.    And then what?

20      A.    And I told her that the decision

21 had been made based on input from Maura Del Bene

22 and Roseanne O'Hare.

23      Q.    Whose ultimate decision was it?

24      A.    The decision was ultimately mine.

25 But the information that I received from Maura

72

*Catherine Magone*

1
2  Del Bene greatly affected my decision.

3      Q.    What did you say to Ms. Newmark?

4      A.    I told her that we had made the

5  decision to appoint Nicole Serra to the

6  palliative -- to attend the palliative care

7  program out in Ohio.  I told her that I felt

8  that Nicole being young in her career, that it

9  would be a good opportunity for her to have

10  something of her own.  I also expressed that

11  Carole would be very busy working on the mental

12  health disaster training program that she had

13  attended two months prior and still had not

14  taken any initiative to get the program moving.

15      Q.    Was there anything in writing as to

16  when she needed to do that by?

17      A.    There was timelines related to that

18  and just recently before that we had some

19  communications saying that the timelines would

20  be set out.  I don't know what those set

21  timelines are, though.  They had to be done

22  within a year.

23      Q.    Were they ever reduced in writing

24  to her by you?

25      A.    It was not me.  She went to the

*Catherine Magone*

1
2        for the production of that communication.
3            A.    I don't know if I have it still.
4                    MR. KEIL:  I'll take it
5        under advisement.
6    -DOCUMENT/DATA REQUESTED: Communication
7    concerning 2006 timeline for disaster training
8    plan.
9            Q.    What was that communication again?
10   What exactly did you receive?
11           A.    It is a -- it was a new regulation.
12   I don't recall exactly what the regulation is,
13   but it was communicated to me by a
14   vice-president that it needed to be done.
15           Q.    In writing?
16           A.    E-mail.
17           Q.    And the vice-president whose name
18   is what?
19           A.    James Keogh.
20           Q.    Can you spell it?
21           A.    K E O G H.
22           Q.    When did Ms. Newmark go to the
23   disaster training, mental health disaster
24   training?
25           A.    June.

75

1                          *Catherine Magone*

2          Q.    How long was this disaster

3    training?

4          A.    Two days.

5          Q.    Where?

6          A.    I don't recall.

7          Q.    Who else attended if you know from

8    the hospital?

9          A.    A per diem nurse.

10         Q.    And that nurse's name is?

11         A.    I don't know her name.

12         Q.    Did the nurse have any duties and

13   responsibilities in connection with this mental

14   health disaster program?

15         A.    They were supposed to be doing it

16   collaboratively.

17         Q.    Did you ever communicate with the

18   nurse --

19         A.    No.

20         Q.    -- concerning this?

21         A.    Did I communicate with the nurse?

22         Q.    Yes.

23         A.    No.  I communicated with her

24   supervisor.

25         Q.    Did you ever communicate with the

*Catherine Magone*

1

2    A.    That means she is not a full-time

3    employee.

4    Q.    Do you know how many hours she

5    devoted to the hospital?

6    A.    I don't know.

7    Q.    Do you know whether she worked

8    there every other week, once a month?  Do you

9    know what the arrangement was with that per diem

10   nurse?

11   A.    I do not know.

12   Q.    Did you ever seek to ascertain that

13   from Ms. Enright?

14   A.    I just knew that she was per diem.

15   Q.    Did you ever seek to ascertain that

16   from Ms. Enright whether how many hours that

17   nurse devoted to Lawrence?

18   A.    No.

19   Q.    Did you ever discuss with

20   Ms. Enright the disaster program that you sent

21   Ms. Newmark to?

22   A.    Yes.

23   Q.    Did you ever reduce your

24   communications to her in writing?

25   A.    No.

79

*Catherine Magone*

1

2      Q.    When in June was it, in the end,

3   the beginning, middle?

4      A.    I believe the end.

5      Q.    The end of June?  Did you have an

6   understanding what Ms. Newmark was required to

7   do in connection with the training?

8      A.    It was to train the trainer.

9      Q.    What does that mean?  I'm sorry.

10     A.    Well, you get the training and then

11  you train other people to assist with the

12  training.

13     Q.    Which other people was she -- was

14  Ms. Newmark expected to train?

15     A.    That hadn't even been discussed.

16     Q.    Did Ms. Enright ever communicate

17  with you as to the number of times that per diem

18  nurse --

19     A.    No.

20     Q.    -- tried to contact Ms. Newmark?

21     A.    I just know it was more than once.

22     Q.    Do you know how many times?

23     A.    No.

24     Q.    You indicated you only learned of

25  this after Ms. Newmark left, is that right?

*Catherine Magone*

1

2          of this date.)

3          Q.     I'm going to show you what's been

4   marked Plaintiff's Exhibit 2 for identification.

5   Do you recognize that document?

6          A.     Sure.

7          Q.     What do you recognize it to be?

8          A.     A note to my file.

9          Q.     The first sentence, the first full

10  sentence, of that document there is a date of

11  8/15/06:  "I met with Carole Newmark today to

12  inform her of my decision to appoint Nicole

13  Serra the social worker for the palliative care

14  service."  Do you see that?

15         A.     Mm-hmm.

16         Q.     Do you want to change your earlier

17  response?

18         A.     Yes.

19         Q.     And how would you like to change

20  that?

21         A.     All right.  I told Carole that I

22  was going to appoint Nicole to the palliative

23  care service.

24         Q.     So when you testified before it was

25  not true, is that right?