# EXHIBIT 2
# continued

84

Catherine Magone

A.     Well, semantics.

Q.     What do you mean?

A.     Because the palliative care
service, even though I was appointing her with
the palliative care, that would not mean that
Carole would not be involved with palliative
care.  Her patients needed palliative care; she
would be expected to be a part of the palliative
care program.

Q.     Is that contained anywhere in
Plaintiff's Exhibit 2 for identification?

A.     I don't know what you mean.

Q.     You just testified that Carole
would be expected if any of her patients were
part of this program to be part of the -- to
participate in that.  Is that contained anywhere
in Plaintiff's Exhibit 2?

A.     No.

MR. KEIL:     She is referring
to the document in front of you.

A.     Right.  No.

Q.     You met with her in your office;
you told her to come over, is that right?

A.     Correct.

*Catherine Magone*

1

2      Q.      Was it right away that she came

3      over after you called her?

4      A.      I believe so.

5      Q.      And who spoke first?

6      A.      I did.

7      Q.      What in words or substance did you

8      say?

9              MR. KEIL:    I'm going to

10             object.   This is all -- you've already

11             asked this question.

12             MS. NICAJ:    I'm permitted

13             to ask it again, and I am just warning you

14             you are violating the federal rules by

15             making a speaking objection.   So you can

16             make, state your objection but that's it.

17             Go ahead.

18     Q.      What in words or substance did you

19     say?

20     A.      I told her that I was assigning

21     Nicole Serra to be the person that would be

22     appointed to the palliative care service and

23     would be traveling to Ohio with Roseanne O'Hare

24     and Maura Del Bene.  I told her I made this

25     decision based on input from Maura Del Bene and

1     *Catherine Magone*

2     Roseanne and that I felt that Carole would be

3     busy with her disaster mental health training

4     and that Nicole being young in her career would

5     need to have something that I think that she

6     would call her own.

7          Q.    What do you mean, young in her

8     career?  What do you mean by that?

9          A.    She is a relatively new social

10    worker.  She has only been working for four

11    years, and she showed a lot of interest in the

12    palliative care program.

13         Q.    Wasn't Ms. Newmark also relatively

14    new in the social work career as you put it?

15         A.    Twice as long.

16              MS. NICAJ:    Plaintiff's

17         Exhibit 3.

18              (Plaintiff's Exhibit 3

19         5-page Resume of Nicole Serra marked for

20         identification, as of this date.)

21         Q.    When you say twice as long, what do

22    you mean by twice as long in her career?

23         A.    I believe that Nicole had four

24    years' experience.

25         Q.    What about her counseling

88

*Catherine Magone*

1
2  done.
3        A.      I don't remember.
4        Q.      Hold on.  I'm asking what do you
5  recall asking her.
6        A.      I don't remember.
7        Q.      In response to what you advised
8  Ms. Newmark about assigning Ms. Serra to the
9  palliative care service, what, if anything, did
10 she say?
11       A.      She was very angry.
12       Q.      What did she say?
13       A.      I'm very disappointed.
14       Q.      Anything else?
15       A.      Just visibly angry and
16 disappointed.
17       Q.      When you say visibly angry, what
18 was her expression?
19       A.      Anger.
20       Q.      How did that manifest itself?
21       A.      Huffing and puffing.
22       Q.      Huffing and puffing?
23       A.      Mm-hmm.
24       Q.      Can you demonstrate that for us?
25       A.      (Indicating) visibly angry.  Carole

*Catherine Magone*

1
2     was a very angry woman.
3          Q.     Apart from this communication with
4     Ms. Newmark, did you ever -- concerning
5     Ms. Newmark, did you ever document her anger?
6          A.     No.
7          Q.     When you say she was a very angry
8     woman, what do you mean by that?
9          A.     Well, part of the reason why I
10    chose not to appoint Carole to the position of
11    the palliative care was her input from Maura
12    Del Bene who stated to me that she is a very
13    angry woman, and her demeanor would not lend
14    itself to taking care of dying patients.
15         Q.     Did Ms. Del Bene ever express any
16    similar concerns about Ms. Serra?
17         A.     No.
18         Q.     Did you ever see any E-mails
19    concerning Ms. Serra's demeanor that Maura
20    Del Bene submitted?
21         A.     No.
22         Q.     Did you ever ask her?
23         A.     If she felt that Maura -- that
24    Nicole had a negative angry demeanor?
25         Q.     Did you ever ask her about Nicole's

1       *Catherine Magone*

2    performance?

3          A.    Yes.

4          Q.    In words or substance what did she

5    say?

6          A.    You are talking about Maura

7    Del Bene?

8          Q.    Yes.

9          A.    Oh, she highly recommended Nicole

10   to be the person that would be in the palliative

11   care program for a number of reasons.  Okay.

12   Nicole sought her out, always willing to learn,

13   takes copious notes whenever you are teaching

14   her anything.  Made it a point of corroborate --

15   collaborating with Maura on cases that involved

16   palliative care, showed an interest in

17   palliative care, unlike Carole who Maura told me

18   had made -- Maura had made many attempts to meet

19   with Carole to talk about palliative care.  She

20   apparently had set up weekly meetings which

21   Carole did not show up.  I believe she only

22   showed up twice.

23          Q.    Out of how many weekly meetings?

24          A.    I don't know.  I don't know.

25          Q.    Do you know whether she failed to

Catherine Magone

2  show up at one?

3        A.    No.  Ten.

4        Q.    She failed to show up at ten?

5        A.    Eight.  I'm guessing the number.

6        Q.    Don't guess.

7        A.    Okay.  I don't know.  I don't know.

8  I don't -- I don't know but it was --

9        Q.    Did you ask her how many meetings

10  did Ms. Newmark fail to attend after having

11  those scheduled meetings?

12        A.    I don't remember what she told me.

13  She probably -- she might have given me a

14  number, but I don't remember what it was.

15        Q.    I don't want you to guess.

16        A.    Okay.  She also told me that

17  despite attempts to get Carole involved in

18  policy writing and procedure writing related to

19  palliative care, specifically for a bereavement

20  policy, she didn't do anything.

21        Q.    Did you ever see that in writing

22  anywhere, that Ms. Del Bene attempted to get

23  Ms. Newmark involved in writing as you put it?

24        A.    Did I see anything in writing?  No.

25        Q.    Did you ever ask her for any

1              *Catherine Magone*

2    documents, incidents wherein she requested from

3    Ms. Newmark her participating in this writing

4    process?

5                        MR. KEIL:   Could you read

6         the question back, please.

7                        (Record read.)

8         A.    No.

9         Q.    Who supervised Ms. Serra?

10        A.    Diane Lantz.

11        Q.    You indicated that Ms. Newmark's

12   position was what?

13        A.    Senior social worker.

14        Q.    Was she, in fact, Ms. Serra's

15   direct supervisor?

16        A.    She was the lead social worker with

17   some --

18        Q.    Was she her direct supervisor?

19        A.    Not on paper.

20        Q.    When you say not on paper?

21        A.    Not part of her job description.

22        Q.    What was her job description?

23        A.    She was senior social worker.

24        Q.    Was her position as senior social

25   worker reduced to writing?

94

Catherine Magone

1

2      A.    It could vary day to day.  It could

3   be four one day eight the next.

4      Q.    What about with Ms. Newmark?

5      A.    Same.

6      Q.    And that was the limit; eight was

7   the most?

8      A.    We don't have a number on the

9   limit.  But I would say that their caseload was

10  probably an average of six to eight.

11     Q.    Were there any statistics ever kept

12  in reference to the caseload or maintained by

13  your office?

14     A.    No.

15     Q.    Did anyone ever seek to compile

16  statistics in reference to the number of cases

17  each social worker was assigned?

18     A.    I would know that on a daily basis

19  pretty much because I was -- I would ask the

20  question.

21     Q.    Did anyone seek to compile

22  information concerning the number of cases or

23  patients each social worker was assigned each

24  day?

25     A.    No, no.

95

Catherine Magone

1

2    Q.    Are there any records to your

3    knowledge regarding that?

4    A.    No.

5    Q.    Apart from what you've already

6    testified to, what, if anything else, do you

7    recall communicating with Ms. Newmark about

8    assigning Nicole Serra to the palliative care

9    services?

10    A.    Nothing.

11    Q.    Apart from what you've already

12    testified to, what, if anything, do you recall

13    Ms. Newmark stating in words or substance with

14    respect to your decision?

15    A.    Nothing else.

16    Q.    Did there come a time that anyone

17    communicated with you concerning your decision

18    to appoint Nicole Serra to the palliative care

19    services?

20    A.    I don't understand the question.

21    Q.    Did anyone ever communicate with

22    you that Ms. Newmark had gone to them about your

23    decision?

24    A.    To human resources, yes.

25    Q.    Apart from human resources did

*Catherine Magone*

1
2  anyone else ever communicate with you that
3  Ms. Newmark had expressed concern about that?
4         A.    No.
5         Q.    I'm going to show you again what's
6  marked as Plaintiff's Exhibit 2 for
7  identification.  You have it underneath some of
8  those documents.
9         When did human resources first
10  communicate with you concerning Ms. Newmark
11  expressing her concern about your decision?
12         A.    I don't know the exact date.
13         Q.    Can you approximate how many days?
14         A.    It was a few days after our
15  discussion.
16         Q.    Who communicated with you?
17         A.    Pat Orsaia.
18         Q.    Was this verbally, in writing or
19  some other manner?
20         A.    I believe E-mail.
21         Q.    What was the substance of the
22  E-mail?
23         A.    I believe that Pat was going on
24  vacation and she just E-mailed me that Carole
25  Newmark had come to her with some concerns and

97

*Catherine Magone*

1

2  that she would be in touch with me when she

3  returned.

4          Q.     What was stated in the E-mail?

5          A.     Something to that effect.

6                     MS. NICAJ:  Four.

7                     (Plaintiff's Exhibit 4

8          8/22/06 E-Mail marked for identification,

9          as of this date.)

10         Q.     I'm going to direct your attention

11  to what is marked as Plaintiff's Exhibit 4 for

12  identification.  Do you see that?

13         A.     Yes.

14         Q.     It appears to be an E-mail from you

15  to Pat Orsaia and the subject is accept that

16  Carole Newmark's concerns.  Do you know what her

17  E-mail to you was?

18                    MR. KEIL:   I object as to

19         form.  Do you understand the question?

20                    THE WITNESS:  No.

21         Q.     You said she E-mailed you.  What

22  was the substance of her E-mail to you?

23         A.     Well, this is back in -- this is

24  August.

25         Q.     Right.

98

*Catherine Magone*

1
2    A.    This is July.  It's a month later.
3    But it wouldn't be related.
4    Q.    What is July?  What is July?  Both
5    of them are August.
6    A.    Oh, August.  I'm sorry, I'm sorry.
7    I'm sorry.  I'm sorry.
8    Q.    It's okay.
9    What were you referring to as July, by
10    the way?
11    A.    I was just thinking it was July.
12    You know.  It wasn't July.  It's August.
13    Q.    What E-mail did Ms. Orsaia send to
14    you?
15    A.    This E-mail was probably when she
16    came back setting up a meeting with Carole and
17    I.
18    Q.    I'm not asking about probably.  I'm
19    asking -- you indicated that Ms. Orsaia first
20    sent you an E-mail and you read it and related
21    it to Ms. Newmark's concerns.
22    A.    At that time she didn't elaborate.
23    Q.    Do you know where that E-mail is,
24    because we don't have it.
25    A.    Maybe it wasn't an E-mail then.

*Catherine Magone*

1

2       Q.    Prior to any meeting with

3  Ms. Newmark, do you know what those concerns

4  Ms. Newmark had expressed to Patricia Orsaia

5  were?

6       A.    Yes.

7       Q.    What?

8       A.    That she felt that the conversation

9  that I had had with her when I told her that I

10 was appointing Nicole Serra to the program,

11 palliative care program, that in using the word

12 "young" that implied ageism.

13      Q.    Well, she doesn't exactly say you

14 just used the word "young," did she, to your

15 knowledge?

16      A.    Using the word "young" implied

17 ageism is what she said.

18      Q.    Did she identify what comment she

19 exactly attributed to you in connection with

20 using the word "young" to your knowledge?

21      A.    Yes.

22      Q.    What?

23      A.    She said that I said, which I deny,

24 that Nicole was younger therefore could do a

25 better job.

Catherine Magone

1

2      Q.    When did you learn that she had

3  communicated this concern to Pat Orsaia?

4      A.    I don't recall.

5      Q.    Was this around the time you

6  received the appointment for August, accepted

7  Carole Newmark's concerns?

8      A.    Pardon me?

9      Q.    Verbal response, she said.

10      A.    I don't know the exact date.

11      Q.    Do you recall communicating with

12  Ms. Orsaia prior or around August 21 about

13  Ms. Newmark's concerns about --

14      A.    Yes.

15      Q.    So if it wasn't August 21, it was

16  around that time, is that right?

17      A.    Yes.

18      Q.    When was the next communication

19  that you had with anyone concerning Ms. Newmark

20  after your August 21, 2006 E-mail?

21      A.    I don't recall exact dates.

22      Q.    With whom?

23      A.    Pat Orsaia.

24      Q.    Was this at a meeting with

25  Ms. Orsaia?

104

Catherine Magone

1

2      A.      Yes.

3      Q.      Was anyone else present?

4      A.      No.

5      Q.      Did Ms. Orsaia take notes?

6      A.      I don't recall.

7      Q.      Did she have you write a statement

8   as to what you actually told Ms. Newmark?

9      A.      No.

10     Q.      How did you come to meet with

11  Ms. Orsaia?

12     A.      She asked to meet with me.

13     Q.      Do you know how long after the

14  August 21, 2006 E-mail?

15     A.      I don't recall.

16     Q.      What did she say?

17     A.      I just told you.

18     Q.      She asked to meet with you?

19     A.      She asked to meet with me to

20  discuss Carole's concerns.

21     Q.      When she asked you to meet with her

22  to discuss Carole's concerns, did she identify

23  what those concerns were?

24     A.      I don't recall.

25     Q.      Did you meet -- then meet with her?

1                      *Catherine Magone*

2          A.    Yes.

3          Q.    Apart from what you've already

4    testified to, did you say anything else to her

5    or did she say anything else to you?

6          A.    No.

7          Q.    How long after your telephone

8    conversation with her did you meet with

9    Ms. Orsaia?

10         A.    I don't recall.

11         Q.    Was it the same day, the next day,

12   sometime after?

13         A.    Probably sometime after.

14         Q.    Who spoke first at this meeting?

15         A.    At the meeting that Pat Orsaia and

16   myself were at?

17         Q.    That's correct.

18         A.    I don't recall who spoke first.

19         Q.    What do you recall her saying in

20   words or substance?

21         A.    That Carole had come to meet with

22   her, that she -- and that she had indicated --

23   Carole had indicated that I had said that I was

24   giving the position to Nicole because she was

25   younger and better able to do the job and that

Catherine Magone

this was constituting ageism.

        Q.    What, if anything, did you say in
response?

        A.    I totally denied that.  I in no way
implied or inferred that age had anything to do
with my decision.

        Q.    Did you reduce that to writing at
that time to Ms. Orsaia?

        A.    No, I did not.

        Q.    Did Ms. Orsaia take any notes of
your meeting with her?

        A.    I don't recall.

        Q.    Did she record the conversation?

        A.    No.

        Q.    Was anyone else present?

        A.    No.

        Q.    What else was said by you or her at
this meeting?

        A.    She told me that she had expressed
to Carole that she had worked with me for the
past -- for four years and that no -- at no time
during that period had age ever been an issue.
She also told Carole -- she also told me that
she told Carole that I hired her knowing her age

1          *Catherine Magone*

2    and I'm close to her age myself.

3          Q.    who is close to Carole's age?

4          A.    (Indicating).

5          Q.    How old are you?

6          A.    I'm going to be 55.

7          Q.    Do you know how old Ms. Newmark is?

8          A.    I think she's 62.  I also have many

9    staff in the department that are over 55 and 60.

10         Q.    Did Ms. Orsaia take any notes as

11   far as you can tell of what you told her?

12         A.    I don't recall.

13         Q.    Did you request that she document

14   your response in writing?

15         A.    No.

16         Q.    Did she ever ask you to reduce what

17   you in fact told Ms. Newmark in writing?

18         A.    Yes.

19         Q.    When?

20         A.    After our meeting with Carole.

21         Q.    So you actually met with

22   Ms. Newmark.  How long did your meeting with Pat

23   Orsaia last, the one in which you and she were

24   by yourselves?

25         A.    40 minutes.

111

Catherine Magone

A.    Yeah, I gave everything to them.

Q.    So is it fair to say if there is
nothing documented concerning Ms. Newmark's
absences prior to her expressing her concern to
Pat Orsaia about your comments or comments she
attributed you making, that there aren't any?

A.    I don't recall if what is
documented in her file was prior to or after.  I
just can't recall when it was.  But I do have
documentation in her file regarding a discussion
about issues with time off.

Q.    Was that after she had complained
about you?

A.    I don't recall.

Q.    You indicated you met with Pat
Orsaia about Ms. Newmark's unscheduled time off.
When you say unscheduled time off, what do you
mean by that?

A.    Calling in sick.

Q.    Do you know whether those -- the
calling in sick were legitimate?

A.    Legitimate?

Q.    Yes.

A.    She was sick.

112

*Catherine Magone*

2  Q.    Did you have any doubt that she was
3  sick?
4  A.    We don't ask.  It's a policy,
5  unscheduled time off.  The policy is that you
6  don't -- my concern was that she was only there
7  a short period of time, and she had already had
8  three unscheduled times off.  And one day she
9  left after an hour and a half, went home sick,
10  and then she was requesting an additional day
11  off to have a procedure.
12  Q.    And did she document that procedure
13  that she was having?  Did she submit a doctor's
14  note?
15  A.    She did.
16  Q.    Now, are there any rules and
17  regulations with respect to unscheduled time
18  off?
19  A.    The rule is that if anything over
20  five unscheduled time off in a year is
21  considered excessive.
22  Q.    Is there a certain amount of
23  discretion that is allotted to managers in
24  determining the scheduled be -- the unscheduled
25  time off?

123

1                    *Catherine Magone*

2    that E-mail to Pat Orsaia?

3            A.    Yes.

4            Q.    So you saw Ms. Newmark's September

5    29 E-mail to Pat Orsaia, is that right?

6            A.    Yes, yes.

7            Q.    And you were responding to that?

8            A.    Yes.

9            Q.    Now, I'm going to direct your

10   attention to -- you indicated that you had

11   discussed with Pat Orsaia some issues concerning

12   Ms. Newmark, is that right?

13           A.    Yes.

14           Q.    Now, you also at one point met with

15   Ms. Newmark, is that right, and Pat Orsaia --

16           A.    Yes.

17           Q.    -- concerning Ms. Newmark's concern

18   with respect to Nicole Serra and the comments

19   she attributed you making?

20           A.    Yes.

21           Q.    And that occurred on September 28,

22   2006, is that right?

23           A.    Yes.

24           Q.    Where did you, Ms. Newmark and

25   Ms. Orsaia meet?

124

Catherine Magone

1

2    A.    Her office, Pat Orsaia's office.

3    Q.    Was this a prearranged meeting?

4    A.    Yes.

5    Q.    Did you get to the meeting before

6    Ms. Newmark?

7    A.    I don't recall. .

8    Q.    Do you recall who spoke first

9    during the meeting?

10   A.    I don't recall.

11   Q.    What in words or substance did

12   Ms. Newmark say at this meeting?

13   A.    Well, she reiterated the issue of

14   ageism, and I attempted to clarify what it was

15   what I meant when I used the word "young."

16   Q.    I'm going to direct your attention

17   to paragraph No. 3 of Ms. Newmark's E-mail to

18   Pat Orsaia which you received and you responded

19   to.  No. 3 reads, "When we went over the issue

20   of ageism, Cathie denied that she said 'Nicole

21   was younger and could handle the job better than

22   I could.'  She stated that she did say that

23   Nicole was young and could take things in like a

24   sponge."  Did you say that at the meeting with

25   Pat Orsaia and Ms. Newmark?

125

*Catherine Magone*

1

2     A.    Not that exact word.

3     Q.    What did you say about Ms. Serra

4 being young and taking things up like a sponge?

5     A.    I said that she was young in her

6 career and that she took things in like a

7 sponge.  I did say that.

8     Q.    Did you ever deny in your other --

9 in your correspondence to Ms. Newmark that what

10 you said about Nicole being young and could take

11 things up like a sponge being stated at the

12 meeting with Ms. Orsaia?

13     A.    Did I ever deny it?

14     Q.    Yes.

15     A.    That she could take things in like

16 a sponge in --

17     Q.    No.  At the meeting with

18 Ms. Orsaia, she, Ms. Newmark, attributed that

19 you said at that meeting that Nicole Serra was

20 young and could take things up -- could take

21 things in like a sponge, close quote.  Do you

22 see that?

23     A.    Yes.

24     Q.    Did you -- and you were responding

25 to her E-mail, is that right, Ms. Newmark's

126

*Catherine Magone*

1
2   E-mail to Pat Orsaia?
3          A.    Yes.
4          Q.    Did you ever deny saying -- stating
5   that quote at the meeting with Ms. Orsaia?
6          A.    Yes.
7          Q.    You denied it?
8          A.    Yes.
9          Q.    Where is that contained?
10                MR. KEIL:    Just to clarify,
11         you are referring to Plaintiff's Exhibit
12         5?
13         Q.    Five with respect to Ms. Newmark's
14  E-mail and then her response in Plaintiff's
15  Exhibit 6.
16         A.    I don't understand your question.
17  This is Carole's recollection of that meeting,
18  not mine.
19         Q.    Did you ever deny stating in your
20  subsequent E-mail in response that you told her
21  in the meeting with Pat Orsaia that Nicole was
22  young and could take things in like a sponge?
23         A.    No.
24         Q.    I'm going to direct your attention
25  to No. 1 of Plaintiff's Exhibit 5, the paragraph

127

Catherine Magone

2  that is numbered No. 1.  It states, "I would

3  like to know how long my probation has been

4  extended.  This should not be held from me until

5  I receive my performance evaluation."  Did the

6  fact that her probation was extended, was that

7  communicated to her on September 28?

8       A.    I believe it was before that.

9       Q.    Did you ever put that in writing to

10 her?

11      A.    No.

12      Q.    Did you ever advise the human

13 resources in writing that you were extending

14 Ms. Newmark's probation?

15      A.    No.

16      Q.    How long was her probationary

17 period?

18      A.    Six months.

19      Q.    And when was it due to expire?

20      A.    The end of September.

21      Q.    Was it, in fact, September 20 that

22 it had expired?

23      A.    Yes.

24      Q.    So at the meeting on September 28

25 there was a discussion on the probationary

*Catherine Magone*

1

2  period being extended, is that right?

3          A.    Yes.

4          Q.    Along with the meeting, along with

5  it, Ms. Newmark also expressed her concern about

6  ageism, is that right?

7          A.    Yes.

8          (Off the record discussion.)

9                    MS. NICAJ:   Plaintiff's

10         Exhibit 7.

11                    (Plaintiff's Exhibit 7

12         10/5/06 Memo marked for identification, as

13         of this date.)

14         Q.    I'm going to direct your attention

15  to Plaintiff's Exhibit 7 for identification.  Do

16  you recognize that document?

17         A.    I do.

18         Q.    What do you recognize it to be?

19         A.    An E-mail that I sent to Pat

20  Orsaia.

21         Q.    What is that in reference to?

22         A.    It's in reference to Exhibit 6.

23         Q.    What did you mean, "I just wanted

24  you to know that Carole picked up her E-mail at

25  5:30 last night"?  How did you know that?

129

*Catherine Magone*

1
2    A.    How did I know she picked up her

3   E-mail at 5:30?

4    Q.    Yes.

5    A.    Because I can tell on my E-mail.

6    Q.    Did you request a receipt, is that

7   what you did?

8    A.    I get receipts on everybody.

9    Q.    Do you default to get a receipt?

10    A.    Yes.

11    Q.    "Has not responded to me or spoken

12   to me about it."  What were you referring to,

13   about what, your E-mail?

14    A.    About my E-mail.

15    Q.    Did you know what her schedule was

16   between 5:30 on October 4 through 10:50, October

17   5?

18    A.    No.

19    Q.    Did you know whether she had, in

20   fact, an opportunity to respond to your E-mail?

21    A.    No.

22    Q.    Ms. Newmark was fired on October 5,

23   wasn't she?

24    A.    Yes, she was.

25    Q.    When was that -- you were present

131

*Catherine Magone*

1

2    Ms. Orsaia your intent to terminate

3    Ms. Newmark's employment?

4         A.    I don't recall.

5         Q.    It was after that meeting on

6    September 28, 2006?

7         A.    We had been talking about it prior

8    to that.

9         Q.    When did you first talk about it?

10        A.    Well, I had concerns for some time

11   about Carole's performance.

12        Q.    When did you first start talking to

13   Pat Orsaia about possibly terminating

14   Ms. Newmark's employment?

15        A.    After that meeting.

16        Q.    After the September 28 meeting?

17        A.    No.  Actually, I believe it was

18   before that.

19        Q.    When?

20        A.    I don't recall the exact date.  It

21   was that week.

22        Q.    That week prior to the meeting?

23        A.    Yes.

24        Q.    You already learned that she had --

25   you already learned at that point that she had

132

*Catherine Magone*

1

2   expressed -- Ms. Newmark had expressed concern

3   about possible ageism on your part, is that

4   right?

5       A.    Yes.

6       Q.    When did you first document your

7   intent to explore terminating Ms. Newmark's

8   employment?

9       A.    I have no documentation of that.

10      Q.    When did you, in fact, decide to

11  terminate her employment?

12      A.    I don't recall the exact date.

13      Q.    Was this before or after that

14  meeting with Ms. Newmark and Ms. Orsaia?

15      A.    The September 28 --

16      Q.    Yes.

17      A.    -- meeting?  There was some

18  discussion before that.

19      Q.    I understand there was discussion.

20  When did you, in fact, decide that she was going

21  to be terminated?

22      A.    It would have been after that

23  meeting.

24      Q.    What happened from the point of

25  that meeting to the point of Ms. Newmark's

*Catherine Magone*

1
2    termination that prompted you to decide to, in

3    fact, terminate her employment?

4         A.    Well, there actually had been a

5    number of things that I was concerned over

6    several months -- let me finish.  Let me finish.

7         Q.    You can.  Go ahead.

8         A.    A number of things that had

9    concerned me for months prior to this event that

10    I have documented.  But I think that the thing

11    that really drove it was Carole's inability to

12    accept a management decision and letting go of

13    her anger.  It affected how she was performing

14    her duties.

15         Q.    What happened between September 28

16    meeting and when you, in fact, decided to

17    terminate her that made you decide?

18         A.    Because I decided that during her

19    probationary period she didn't pass her

20    probationary period.

21         Q.    Nothing happened from the period of

22    the September 28 meeting, in which you advised

23    her that her probation was being extended, to

24    October 5 when her termination was communicated

25    to her, is that right?

*Catherine Magone*

1

2    Q.    From September 28 which was a

3    Thursday if I'm not mistaken, take a look at

4    Plaintiff's Exhibit 5 for identification,

5    because it says from, and the date is Friday,

6    September 29.  The meeting was on the 28th, so

7    I'm assuming it was a Thursday, is that a fair

8    assumption?

9    A.    Yes.

10    Q.    From Thursday, September 28,

11    through Wednesday -- Thursday, October 5, what,

12    if any, incidents do you recall relating to

13    Ms. Newmark that made you decide to, in fact,

14    terminate her employment?

15    A.    I don't recall.

16    Q.    We are going to go into the

17    instances of her performance shortly.  When did

18    you first have any issues concerning

19    Ms. Newmark's performance?

20    A.    July.

21    Q.    July.  And did you document that?

22    A.    Yes.

23    Q.    Did you ever notify her?

24    A.    Yes.

25    Q.    Did you put your notice in writing