# EXHIBIT 2
# continued

*Catherine Magone*

to her?

    A.    No.

    Q.    Did you ever express your concerns about her performance in writing to her?

    A.    No.

    Q.    What issues did you have about her performance in July?

    A.    It was very clear to me -- well, first of all, it was -- it was really in July that I began to directly supervise Carole. Prior to that Diane Lantz was supervising her. So upon Diane's resignation, I started to take more notice of what Carole was doing. I found that there was very little follow up of a lot of her cases. There was a meeting, that we have weekly meetings that we talk about cases and length of stay and issues regarding that. There was one particular meeting which is held at 1 o'clock where every case that I asked her about, she claimed that she did not -- had not seen yet. There were -- and I talked to her about that. I talked to her about her -- my concern that she was not adjusting to a case management model that we had at Lawrence. She complained

*Catherine Magone*

1
2  that her workload was too high and that she --

3  you know, she had so much work to do.  That's

4  why she hadn't done anything with the mental

5  health training.  We discussed that she needed

6  to prioritize better.

7          Q.    The mental health training you are

8  referring to had happened in the end of June?

9          A.    Yes.

10         Q.    And you are stating you made these

11 expressions of concern to her in July?

12         A.    Oh, let me take that back.  That

13 wouldn't have been July.  That wouldn't have

14 been July, no.  That wouldn't have been July.

15 No.  July my concerns were her follow up on

16 cases, her response to staff, asking for

17 information or request on her part.  Her lack of

18 documentation in the medical record was a real

19 concern for me.  And we had a discussion about

20 that.  And Carole knew that it was serious

21 enough that she E-mailed me the following day,

22 asking if I was considering that a verbal

23 warning.

24         Q.    You said no, right?

25         A.    I said no because it wasn't at the

138

Catherine Magone

time.  But I was concerned.

Q.    Well, was it not -- if it wasn't a
verbal warning, then what was it?

A.    It was a little counseling session,
because I wanted her to be successful.

Q.    Didn't she, in fact, ask to meet
with you prior to this what you call work
session with her prior?

A.    No.

Q.    She didn't ask to meet with you?

A.    No.  I asked to meet with her.

Q.    So -- but correct me if I'm wrong.
There was no verbal warning.  You never warned
her, is that right?

A.    No, I just expressed my concerns.

Q.    You never warned her, is that
right?

A.    That's right.

Q.    And you put that in writing, isn't
that right?

A.    I put the discussion --

Q.    The fact that it wasn't -- you said
you put what discussion that you had in writing?

A.    That I had met with her and what we

1    *Catherine Magone*

2        Q.    I'm going to show you what is

3    actually Plaintiff's Exhibit 10 for

4    identification.  Do you see that?

5        A.    Yes.

6        Q.    That one you confirmed there was no

7    verbal warning to Ms. Newmark, is that right?

8        A.    That's correct.

9        Q.    Was there anything inaccurate about

10   what your response was to her?

11       A.    No.

12       Q.    Did you ever meet with Ms. Newmark

13   concerning her performance?

14       A.    Yes.

15       Q.    When?

16       A.    In July.

17       Q.    When you say July, when in July?

18       A.    July 20.

19       Q.    And that, the E-mail that you have

20   before you, Exhibit 10, that relates to that

21   same meeting, isn't that right?

22       A.    Yes.

23       Q.    Wherein you say there was no verbal

24   warning, is that right?

25       A.    That's correct.

*Catherine Magone*

1

2     Q.    Do you know whether Ms. Newmark

3  received more than one nomination for a big

4  heart award?

5     A.    Not to my knowledge.

6     Q.    Did you ever do anything in

7  connection with receiving the nomination for big

8  heart award with respect to Ms. Newmark?

9     A.    No.

10     Q.    Did you ever have a procedure by

11  which you did do that for other employees?

12              MR. KEIL:    Objection as to

13        form.

14     A.    It is my style if I think about it,

15  I will try to give recognition to people, but it

16  is not always.

17     Q.    When you say you give recognition

18  to people, what do you do?

19     A.    If I knew about it and thought

20  about it, I might bring it up in line up.  But I

21  don't do that all the time.

22     Q.    Did you do that with respect to

23  Ms. Newmark?

24     A.    No.

25     Q.    Apart from Plaintiff's Exhibit 8

Catherine Magone

2  name of Susan relayed to you, is that right?

3    A.    Yes.

4    Q.    Did you ever ask Ms. Newmark about

5  her side of the story, so to speak?

6    A.    No, I did not.

7    Q.    Did you ever attempt to ask

8  Ms. Newmark about her side of the story?

9    A.    No.

10    Q.    It says one of the CM staff.  Is

11  that case management?

12    A.    Correct.

13    Q.    Susan is -- what is her position?

14    A.    Case manager.

15    Q.    Did you ever speak to Ms. Newmark

16  at any of the meetings you attended with Pat

17  Orsaia about the issue that is relayed in

18  Plaintiff's Exhibit 13?

19    A.    No.

20    Q.    Directing your attention to

21  Plaintiff's Exhibit 14, do you see that?

22    A.    Yes.

23    Q.    This case manager that you are

24  referring to, there are how many case managers

25  in the case management department?

Catherine Magone

1
2     A.     Nine.

3     Q.     Colette in this instance, did you

4     ever ask Ms. Newmark about what her view of this

5     incident was, Plaintiff's Exhibit 14?

6     A.     No, I did not.

7     Q.     Is there a reason why not?

8     A.     Because I called her and asked her

9     to do the PRI.

10    Q.     Did you ask Ms. Newmark?

11    A.     I did ask her why she didn't

12    respond.

13    Q.     What did she say to you?

14    A.     She said to me that she didn't get

15    the message.

16    Q.     Did you put that anywhere in

17    writing?

18    A.     No, I did not.

19    Q.     Directing your attention to

20    Plaintiff's Exhibit 15, what does Plaintiff's

21    Exhibit 15 relate to?

22    A.     It relates to evidence of poor

23    documentation.  Patients should not remain in

24    the ICU for two weeks with only one social work

25    note.

156

Catherine Magone

1

2   Q.    Was that placed in Nicole Serra's

3   file?

4   A.    This was a case that Carole was

5   working on.

6   Q.    How do you know it was a case that

7   Carole was working on?

8   A.    Because this was told to me by a

9   case manager.

10   Q.    Where is that stated anywhere in

11   Plaintiff's Exhibit 15?  Where is the reference

12   to the particular social worker, Ms. Newmark,

13   Ms. Serra, hold on a second, or the case manager

14   for --

15   A.    That was involved in --

16   Q.    Yes.

17   A.    I have access to MIDAS (ph).  We

18   are on Meditech.  We are electronic.  And I can

19   go in to see what, who is the social worker and

20   when the note was written, so it is a fact.

21   Q.    Why wasn't that stated anywhere in

22   what is Plaintiff's Exhibit 15?

23   A.    I didn't feel it was necessary.

24   Q.    You didn't feel identifying the

25   social worker was necessary?

Catherine Magone

1
2    A.    If it is in her file.

3    Q.    Whose file?

4    A.    Carole's file.

5    Q.    What about the case manager you

6    said you referred to?

7    A.    I didn't include that.

8    Q.    Why not?

9    A.    Well, I felt it was really

10   irrelevant, because I went into the medical

11   record myself and saw that what the person told

12   me was actually true.

13   Q.    What was this person?

14   A.    The case manager when she got to

15   the floor.

16   Q.    Who is the case manager?

17   A.    I don't recall which case manager

18   it was.

19   Q.    Okay.

20   A.    It showed no follow up.

21   Q.    Incidentally, by August 31, 2006,

22   you had been aware that Ms. Newmark had

23   complained about you about ageism, isn't that

24   right?

25   A.    That's correct.

158

*Catherine Magone*

1

2    Q.    So there is no reference to which

3    social worker or case manager. Did you speak to

4    Ms. Newmark about this?

5    A.    Yes.

6    Q.    Where is that documented?

7    A.    I didn't document it.

8    Q.    What did she say?

9    A.    Over worked, unable to get to all

10   her cases.

11   Q.    Where is that documented?

12   A.    It is not documented.

13   Q.    Going to Plaintiff's Exhibit 16,

14   you indicate in this that you spoke to

15   Ms. Newmark regarding her attendance?

16   A.    That's correct.

17   Q.    UTO is -- what does it stand for?

18   A.    Unscheduled time off.

19   Q.    What did she say with respect to

20   her need for the time off?

21   A.    She had E-mailed me that she was

22   taking time off for this procedure. And that's

23   not the procedure that we follow when you are

24   requesting time off. There is a form to be

25   filled out, and it has to be approved by me.

159

*Catherine Magone*

1

2    Q.    Did she fill that form out?

3    A.    She did afterwards.

4    Q.    So at that point it wasn't an

5    unscheduled time off?

6    A.    No.  But originally I had wanted to

7    think about whether or not I was going to

8    approve it.

9    Q.    What was the reason for her taking

10    time off that you came to learn?

11    A.    I don't understand the question.

12    Q.    Why did she request the time off?

13    A.    Which time off?

14    Q.    In reference to the --

15    A.    The three --

16    Q.    No.  You said I spoke --

17    A.    Oh, she had a procedure, yes,

18    needed a procedure.

19    Q.    What was the procedure?

20    A.    A colonoscopy.

21    Q.    Did you ever show Ms. Newmark any

22    of this correspondence concerning her?

23    A.    No.

24    Q.    Did you ever give her a performance

25    evaluation?

160

*Catherine Magone*

1

2        A.      At her termination meeting.

3        Q.      Prior to her termination meeting,

4    did you ever sit with her and go over her

5    performance?

6        A.      The performance evaluation, per se?

7        Q.      Performance evaluation, yes.

8        A.      No.

9                    (Plaintiff's Exhibit 17

10               10/5/06 Memo marked for identification, as

11               of this date.)

12       Q.      Directing your attention to

13   Plaintiff's Exhibit 17, what was the purpose of

14   this memo to file and copy to Pat Orsaia?

15       A.      I did this at the request of Pat

16   Orsaia.

17       Q.      And was this to delineate the

18   reasons you decided to terminate Ms. Newmark's

19   employment?

20       A.      To recap.

21       Q.      And was one of the reasons Carole's

22   reaction to a business decision to assign

23   another team member to a palliative program was

24   unacceptable?

25       A.      Correct.

1      *Catherine Magone*

2          Q.    And her reaction involved going to

3    Pat Orsaia and complaining about ageism?

4          A.    No.

5          Q.    What did it involve?

6          A.    Negativity.

7          Q.    What negativity are you referring

8    to?

9          A.    Negative behavior in general.

10   Going around -- I got information from Maura

11   Del Bene that she could not let it go.  She was

12   harping on it all day long, unable to perform

13   her duties because she was so upset about it,

14   about not getting the palliative care position.

15         Q.    Where was that communicated by you

16   concerning what Ms. Del Bene said to you?

17                   MR. KEIL:   Objection as to

18         form.

19         Q.    Did you reduce what Ms. Del Bene

20   said to you in writing anywhere?

21         A.    No.

22         Q.    Did you ask Ms. Newmark what her

23   reaction as relayed to you by Ms. Del Bene was?

24         A.    No.

25                   MR. KEIL:   Objection.

162

*Catherine Magone*

Q.    So Carole's reaction to a business decision didn't mean Ms. Newmark repeatedly asking to meet with Pat Orsaia and you concerning the fact that she believed you were subjecting her to an age discrimination?

A.    No.

Q.    It wasn't based on that?

A.    No.

Q.    What happened, if anything, between the September 28 meeting and the October 5 meeting -- termination of Ms. Newmark's employment?

A.    She started to decompensate.

Q.    Decompensate, what do you mean?

A.    She was so angry that she couldn't get her work done.  She was visibly angry.

Q.    Where is that contained in writing that she was visibly angry and couldn't get her work done?

A.    She was visibly angry and she was talking amongst the other case managers and social workers.

Q.    In your presence?

A.    No, but I was hearing about it.

1        *Catherine Magone*

2        Q.    September 28 was the date in which

3    she expressed her concern about the fact that

4    you advised her you were selecting Ms. Serra

5    because of her age, and October 5 she was

6    decompensating.  Is that what you are saying?

7        A.    No.  She was decompensating ever

8    since she found out that Nicole, before Pat and

9    I even ever met to -- with me to discuss it.

10        Q.    Where was that ever in writing?

11    Where did you ever reduce that to writing?

12        A.    It is not in writing.

13        Q.    In her E-mail to Pat Orsaia, which

14    Pat Orsaia forwarded to you, you never accused

15    her of being angry or anything of that nature

16    with respect to appointing Nicole Serra, right?

17                    MR. KEIL:    Objection as to

18            form.  Can you read the question back?

19                    MS. NICAJ:    I'll withdraw

20            it.

21        Q.    September 28 was the meeting with

22    Pat Orsaia.

23        A.    Correct.

24        Q.    Ms. Newmark followed up with her

25    again her concerns about age related ageism

164

*Catherine Magone*

1

2    which you selected Nicole Serra, is that right?

3         A.    That's correct.

4         Q.    You received that communication --

5         A.    Yes.

6         Q.    -- from Pat Orsaia?

7         A.    Yes.

8         Q.    Did you ever in any subsequent

9    communication to Ms. Newmark indicate in words

10   or substance that she was handling the matter

11   irrationally, that she was being angry, that you

12   heard from other people that she was

13   decompensating?  I don't know what that means,

14   but I'm using your word, decompensating.

15        A.    No.

16                    (Plaintiff's Exhibit 18

17            5/23/06 Memo marked for identification, as

18            of this date.)

19        Q.    I'm going to direct your attention

20   to Plaintiff's Exhibit 18 for identification.

21   Do you recognize that document?

22        A.    I do.

23        Q.    Did you ever respond to Ms. Newmark

24   in writing?

25        A.    I don't recall.

1          *Catherine Magone*

2                    (Plaintiff's Exhibit 19

3          9/19/06 Memo marked for identification, as

4          of this date.)

5          Q.    I'm going to show you what's been

6    marked as Exhibit 19 for identification.  Do you

7    see that?

8          A.    Yes.

9          Q.    Did you communicate with

10   Ms. Newmark about what is marked as Plaintiff's

11   Exhibit 19?

12         A.    I communicated with her regarding

13   that there had been no note and no plan on this

14   patient.

15         Q.    Did you reduce that in writing?

16         A,    I did not.

17         Q.    Do you know what Colette Gelardi

18   meant by just thought you might like to know,

19   hope you are having a good time if you pick this

20   up?

21         A.    I was on vacation.

22                    (Plaintiff's Exhibit 20

23         9-page Performance Evaluation marked for

24         identification, as of this date.)

25         Q.    I'm going to direct your attention

*Catherine Magone*

period?

    A.    I don't know.

                (Plaintiff's Exhibit 21

    24-page Human Resource Policies and

    Procedures Guide marked for

    identification, as of this date.)

    Q.    I'm going to show you what has been marked as Plaintiff's Exhibit 21 for identification.  Directing your attention to -- I'm going to read to you, it is Lawrence Hospital Human Resources Policies and Procedures Guide.  I have them Bates stamped N 423 through N 446.  To your knowledge, was Ms. Newmark a non-exempt employee or an exempt employee?

    A.    Exempt.

    Q.    That means what?

    A.    Where are you?  I'm asking you.

    Q.    That means what?

    A.    What does an exempt employee mean?

    Q.    Yes.

    A.    It's a salaried employee.

    Q.    To your knowledge, how long is probationary period for a salaried employee?

    A.    Six months.

*Catherine Magone*

1

2      Q.     What interactions, if any, did you

3   have with Ms. Newmark from September 28 until

4   October 5?

5      A.     I don't recall.

6      Q.     Did the appointment of Nicole Serra

7   by you to the palliative care unit or care

8   services come with any additional money, salary?

9      A.     No.

10     Q.     Any additional benefits,

11  compensation?

12     A.     No.

13     Q.     Apart from what you've already

14  testified to, do you recall ever meeting with

15  Pat Orsaia to communicate your concerns about

16  Carole Newmark?

17     A.     I don't recall.

18     Q.     Were you ever interviewed in

19  connection with Ms. Newmark's complaint about

20  age discrimination on your part?

21                MR. KEIL:    Apart from

22          discussions with counsel?

23                MS. NICAJ:    I'm not talking

24          about -- I mean during her employment at

25          the hospital.

187

CORRECTION SHEET
Re:  Newmark v. Lawrence Hospital

     The following corrections, additions
or deletions were noted on the transcript of the
testimony which I gave in the above- captioned
matter, held on February 20, 2008.

PAGE(S)        LINE(S)        SHOULD READ

109             13-16     I'm trying to get my time

frames clear.  I'm confused.

I believe I met with her to

discuss -- but I'm not sure --

to discuss Carole's unscheduled

time off.

Subscribed and sworn to
before me this
4th day of April 2008.    _____

Rita C. DiLippo        CATHERINE MAGONE

RITA C. DiPIPPO
Notary Public, State of New York
No. 4926137
Qualified in Westchester Co.
Comm. Filed in Westchester Co.
Commission Expires _____4/11/2010_____

COMPU-TRAN SHORTHAND REPORTING