# EXHIBIT 3
# continued

115

*Pat Orsaia*

1

2    rehired at Lawrence; isn't that right?

3        A.    Yes.

4        Q.    Had she been terminated for any

5    reason, she would not have been eligible to be

6    rehired; is that right?

7        A.    That is not necessarily correct, no.

8        Q.    Why isn't that necessarily correct?

9        A.    Well, there could be a situation

10   where someone is hired into a particular position

11   and perhaps during the probationary period

12   resigns, or is told that it is not a good fit by

13   the organization and leaves, and then sometime

14   later, comes back and applies for a job, as I

15   said, having gotten different credentials, a

16   different job, a different situation.  It's

17   possible the person could be rehired.

18       Q.    Has that happened in Lawrence?

19       A.    I can't say for certain if it has

20   happened or not happened.  I'm speaking more

21   toward the philosophy of what the rehire practice

22   would be.

23       Q.    Going back to your communication

24   with Ms. Magone after the first time following

25   this first meeting on September 28th, with

1          Pat Orsaia

2    Ms. Newmark and Ms. Magone, what else, if

3    anything, did she say concerning Ms. Newmark?

4          A.    Ms. Magone told me that she was

5    preparing the performance-evaluation

6    documentation that would be delivered to

7    Ms. Newmark during the separation discussion.

8          Q.    Anything else that was said by her

9    that you can recall?

10         A.    Not that I recall at this time.

11         Q.    What, if anything, as you sit here

12    today -- you said "at this time."

13               Are there any documents you can use

14    to refresh your recollection?

15         A.    No.

16         Q.    Did you reduce anything that

17    Ms. Magone told you during this time, in writing?

18         A.    No.

19         Q.    What, if anything, did you say to

20    Ms. Magone?

21         A.    As I have already stated, we talked

22    about the details of the performance concerns.

23         Q.    What did you say?  Not what you both

24    said.  What did you say, specifically, in words

25    or substance?

117

*Pat Orsaia*

1

2       A.    I asked her to provide me with the

3   specific dates for the attendance, the unplanned

4   absences.  And she did.

5              I asked her to tell me about the

6   performance concerns.  And she did.

7              I asked some clarifying questions

8   during our discussion of the performance

9   concerns.

10             I stated to Cathy that, as Ms.

11  Newmark was in her probationary period, as per

12  our policy, either Ms. Newmark or Lawrence

13  Hospital Center could decide to separate

14  employment.

15             I asked Cathy, what would be a

16  convenient time to schedule Ms. Newmark's

17  separation discussion.  I asked her about

18  Ms. Newmark's work schedule for that day, as we

19  thought it would be best to, if possible,

20  schedule the separation discussion toward the end

21  of her shift.

22             I asked Ms. Magone if she had had

23  any response from Ms. Newmark, to Ms. Magone's

24  e-mail to Ms. Newmark, which, again, addressed

25  Ms. Magone's intent and use of the word "young."

119

1                          *Pat Orsaia*

2      reconcile the point?

3              A.      The fact that she was being

4      separated from employment, had nothing to do with

5      the alleged comment, using the word "young."

6              Q.      And that is based on what Cathy

7      Magone told you; isn't that right - that it had

8      nothing to do with that?

9              A.      It's based on the documentation in

10     the specific detail that the manager gave me

11     regarding her reasons for separating employment.

12             Q.      Who is the manager again?

13             A.      Cathy Magone.

14             Q.      And who did Ms. Newmark complain

15     about?

16             A.      She complained about an alleged

17     comment from Cathy Magone.

18             Q.      So, you're saying, with respect to

19     Magone, these are not allegations; but with

20     respect to Ms. Newmark's alleged comment --

21             A.      I'm not sure what you mean.

22             Q.      When you characterize what

23     Ms. Magone tells you, it's a statement of fact.

24     When you characterize what Ms. Newmark related to

25     you what Ms. Magone told her, you use the word

120

*Pat Orsaia*

1
2      "alleged."

3              Why is there a difference?

4              A.    The information that was provided to

5      me by Cathy Magone as to the rationale behind

6      Ms. Newmark not successfully completing her

7      probation, was documented information. That is

8      why I asked Ms. Magone for the dates of unplanned

9      absence, which she took right off her time sheets

10     and showed me, and the information about the

11     complaint about Ms. Newmark's performance, the

12     lack of progress on the project, et cetera.

13             Q.    What was documented?  What did you

14     see that was documented?

15             A.    Ms. Magone had notes of the

16     complaints from the other case managers that she

17     shared with me.

18             Q.    She had notes?

19             A.    Yes.

20             Q.    Did you see any documents or

21     complaints from those case managers?

22             A.    Yes.  I believe there were one or

23     two, at least, that were actually maybe e-mails

24     to Cathy Magone, expressing concern over

25     Ms. Newmark's lack of responsiveness.

Pat Orsaia

1

2          Q.      Well, did anyone seek to inquire of

3   Ms. Newmark's position on those points?

4          A.      You would have to ask Ms. Magone

5   that.

6          Q.      I'm asking, did you?

7          A.      Not that I know of.

8          Q.      Did you ask Ms. Magone whether she

9   did?

10         A.      I asked Ms. Magone if she had

11  followed up with Carole after receiving the

12  various complaints from case managers and others.

13                 And she said, yes.

14         Q.      She did say, yes?

15         A.      Yes.

16         Q.      Did you communicate with Ms. Magone

17  at any other time, apart from what you have

18  testified to, concerning Ms. Newmark?

19         A.      On the date of the separation

20  discussion, I believe I contacted Cathy to be

21  sure that Carole was actually at work that day

22  and our meeting was still planned for the same

23  time.

24         Q.      Do you know who communicated with

25  Ms. Newmark about the meeting?  Was it you, or

122

Pat Orsaia

2  Ms. Magone, or someone else?

3       A.    It was not me.

4       Q.    Where did the meeting take place?

5       A.    In my office.

6       Q.    What time?

7       A.    I don't recall.

8       Q.    Who was present there?

9       A.    Cathy Magone, and Carole Newmark,

10  and myself.

11       Q.    Who spoke during this meeting first?

12       A.    To the best of my recall, I spoke

13  first.

14       Q.    What did you say, in words or

15  substance?

16       A.    I stated to Carole that we were

17  meeting because Cathy had ongoing concerns about

18  her attendance and performance, and then I turned

19  the conversation over to Ms. Magone, who provided

20  the details.

21       Q.    What did she, Ms. Magone, say, in

22  words or substance?

23       A.    She had the prepared probationary

24  performance-evaluation document with her, which

25  had already been completed and signed by

*Pat Orsaia*

1   Ms. Magone.  She went through it, although
2   briefly, with Ms. Newmark.
3           Cathy advised Ms. Newmark that she
4   had not successfully completed her probation and
5   that we were separating employment.
6           And to the best of my recall at that
7   point, Carole was not interested in going through
8   the document or, you know, reading through it, or
9   taking the time to do that.
10          It was my sense that Carole wanted
11  the meeting to end as quickly as possible after
12  she knew that it was a separation discussion.
13      Q.    What, if anything, did Ms. Newmark
14  say?
15      A.    I don't recall her saying very much.
16  I recall that she understood where the
17  conversation was going.  I believe she said, "I
18  understand I'm being separated from employment."
19          I offered her at that point the
20  option of submitting a letter of resignation.
21  And I told Ms. Newmark that we were going to
22  separate employment, but she did have a choice
23  about whether it would officially be on the
24  record as a termination of employment or

124

*Pat Orsaia*

resignation.

I pointed out to her that, should
she decide to resign, that Lawrence Hospital
Center would not stand in the way of any claim
for unemployment insurance that she might put
forth and that would otherwise be determined by
the Department of Labor as being a legitimate
claim.

And I told her that in terms of any
prospective employment, that, as was our
practice, we'll only share dates of employment
and job title.

And I offered her the opportunity to
decide whether she wanted it to be a resignation
as opposed to a termination. I offered her the
opportunity to make that determination -- take
overnight to make that determination.

And we agreed that she would contact
me the next day with her decision.

Q.    Was there anything else discussed at
the meeting, apart from what you have already
testified to?

A.    Yes.  I advised Ms. Newmark that,
when our meeting concluded, that Cathy would

130

Pat Orsaia

     A.    Ms. Newmark's -- Ms. Newmark stated,
her allegation to me, that Ms. Magone had used
the word "young" when explaining to her why
Nicole was assigned to the palliative-care
project.

     Q.    I'm going to direct your attention
to what is marked as Plaintiff's Exhibit 5.
Here, I'm going to show you the formal exhibit.
(Handing)

          Do you see paragraph three?

     A.    I do.

     Q.    She made that allegation in your
presence, didn't she, that "Nicole was younger
and could handle the job better than I could," in
reference to Ms. Newmark; is that right?

          MR. KEIL:  I'm going to
       object.  Your question seems to be
       ambiguous.  Are you asking the witness --

          MS. NICAJ:  I'm going to
       rephrase the question.

          Please don't make a speaking
       objection, okay?

     Q.    Did Ms. Newmark state to you at any
time, that Ms. Magone told her Nicole was younger

*Pat Orsaia*

1

2    and could handle the job better than she could,

3    in words or substance?

4         A.    That is not a direct quote that I

5    recall hearing from Ms. Newmark.

6         Q.    Well, did she ever write that to

7    you, for example, like Plaintiff's Exhibit 5?

8                   MR. KEIL:   Object.   The

9            document speaks for itself.

10                  You may answer if you can.

11        A.    Plaintiff's 5, number three says,

12    when we went over the issue --

13        Q.    I'm asking you a question.

14        A.    You're asking me what the document

15    says.  I'm reading it back.

16        Q.    Did she; yes or no?

17        A.    Please rephrase.  Did who, what?

18        Q.    Did Ms. Newmark ever advise you,

19    whether it's in writing, or verbally, or in

20    person, or in any manner, that Ms. Magone told

21    her, "Nicole was younger and could handle the job

22    better than I could"?

23        A.    Not in those exact words, she did

24    not.

25        Q.    In writing?

132

Pat Orsaia

1

2      A.      What Ms. Newmark says in this

3  document --

4      Q.      I'm asking --

5      A.      -- that Cathy denied that she said

6  that, quote, "Nicole was younger and could handle

7  the job better than I could."

8      Q.      Did she ever advise you, yes or no,

9  that Ms. Magone told her that Nicole was young

10  and could handle -- was younger and could handle

11  the job better than she could?

12      A.      No.

13      Q.      She never did.  Okay.

14          Did Ms. Magone ever, at the

15  September 29th, meeting, ever state, in words or

16  substance, Nicole was young and could take things

17  in like a sponge?

18              MR. KEIL:  I object as to

19      form.

20              Answer if you can.

21      A.      I do not recall that as a direct

22  quote from Cathy Magone.

23      Q.      You see how there is a quote that

24  Ms. Newmark wrote?  She stated that she did say

25  that Nicole was quote, "young and could take

133

*Pat Orsaia*

1
2      things in like a sponge."  Do you see that?

3          A.    Yes, I do.

4          Q.    Do you dispute that's what

5      Ms. Magone said at the September 28th meeting?

6          A.    I do.

7          Q.    You do dispute that?

8          A.    Yes.

9          Q.    Did you submit your dispute or --

10     withdrawn.

11              Did you reply to Ms. Newmark,

12     disputing her recollection of what Ms. Magone

13     said at the meeting?

14         A.    No.

15         Q.    Have there been claims of

16     discrimination brought against Lawrence Hospital

17     by other employees?

18              MR. KEIL:  Over what period

19         of time?

20              MS. NICAJ:  Since her

21         employment, to the time she ceased

22         employment.

23         A.    For the almost five years that I was

24     employed at Lawrence Hospital?

25         Q.    Yes.

146

Pat Orsaia

her e-mail"?  What e-mail is she referring to?

A.    I think Cathy is referring to the

e-mail she sent Carole, which again attempted to

clarify, in writing, what went into Cathy's

decision to assign Nicole to the palliative-care

program.

Q.    And you asked her for a -- to find

out when, if she received any response from

Ms. Newmark?

A.    I asked Cathy if her e-mail had

prompted any further dialogue with Carole.

Q.    October 5th, the date in which

Ms. Magone e-mailed you, is the date in which

Ms. Newmark was terminated; isn't that right?

A.    Yes.

Q.    To your knowledge, did anything

occur from September 29th, 2006, until October

5th, 2006, concerning Ms. Newmark's performance -

anything new; additional absences, new incidents?

A.    I do recall Cathy told me that she

became aware during that time period, through

some other source, that there had been some

communication to Ms. Newmark from the registered

nurse assigned to the palliative-care project,

147

Pat Orsaia

1
2  and that Cathy was concerned that Carole had not
3  brought Cathy into the loop about that.
4       Q.    I'm sorry.  I'm not -- what are you
5  referring to?  What communication?
6       A.    I don't know exactly what the nature
7  of the communication was.  Cathy told me that she
8  had already stated to me and to Carole that Cathy
9  was concerned that Carole had not made any
10  progress to date on the project that she had been
11  assigned to, the mental-health project.  I'll
12  call it that for lack --
13      Q.-    You knew that already; you had known
14  that already?
15      A.    Yes, I knew that already.
16      Q.    What are you referring to about the
17  palliative care?
18      A.    I'm not referring to palliative
19  care.
20      Q.    I'm sorry; I misheard you, then.
21  What palliative-care project are you referring
22  to?
23      A.    I need to clarify that.  I misspoke.
24  I meant the mental-health project.
25      Q.    You knew about that previous to

*Pat Orsaia*

1
2    that; right - about the issue with the mental-

3    health project you testified to?

4          A.    I knew that Cathy had performance

5    concerns in terms of Carole not making any

6    progress on the mental-health program.

7          Q.    Right.

8          A.    In response to your question - what,

9    if anything, new from a performance perspective

10   was brought to my attention during that time

11   period - what I'm saying is that during that time

12   period, Cathy told me that she was even more

13   concerned about Carole's lack of progress in

14   regards to the mental-health project, because she

15   had become aware that, in fact, Carole didn't

16   share with her that the nurse, who was supposed

17   to be working with Carole on this and had

18   attended the training with her on the mental-

19   health project, had communicated with Carole

20   about the project.  And Carole failed to tell

21   Cathy that there had been this communication.

22         Q.    So, there had been some progress

23   or --

24         A.    No; not only had there been no

25   progress, Carole, knowing that Cathy was keenly

Pat Orsaia

1
2   interested in seeing progress and had prompted
3   Carole about it, Carole received some
4   communication from the RN she was supposed to be
5   working with on the project and did not go to
6   Cathy to give her an update, and Cathy was
7   concerned about that.
8       Q.    So, the fact that she didn't relay a
9   communication she had with a nurse, she was
10  concerned about?
11      A.    Yes, yes.  Cathy was concerned that
12  Carole did not relay to Cathy that there had been
13  some communication or some update regarding the
14  project.  I don't know the specifics of it.
15      Q.    Do you know when Carole Newmark
16  communicated with that nurse?
17      A.    I don't.
18      Q.    Do you know what the nurse's name
19  is?
20      A.    No.
21      Q.    Do you know where she works or where
22  she is assigned to?
23      A.    No, I don't.
24      Q.    So, in fact, there had been
25  communications concerning the mental-health

1                    *Pat Orsaia*

2    department with Ms. Newmark and the nurse, and I

3    just want to clarify something:  You're saying

4    that Ms. Magone had an issue because Ms. Newmark

5    had been communicating with the nurse and hadn't

6    relayed that communication to her?

7         A.    Not exactly.  I'm saying that

8    Ms. Magone relayed to me that she was concerned

9    because it came to her attention that the nurse

10   had initiated communication with Carole Newmark

11   about the project, and Carole had not updated her

12   director about that.

13        Q.    About the fact that the nurse called

14   her about the project?

15        A.    I don't know if it was a call, an

16   e-mail, written correspondence.  I don't know

17   what the nature of the communication was or what

18   the specifics of it were.

19        Q.    And that was her concern?

20        A.    That was her concern.

21        Q.    Anything else?  Was there anything

22   else from September 28th, until October 5th --

23   withdrawn.

24             When did Ms. Magone decide to

25   terminate Ms. Newmark's employment?

1                    *Pat Orsaia*

2         A.    I don't know exactly.

3         Q.    When did she communicate that to

4    you?

5         A.    Sometime between September 28th and

6    October 5th.

7         Q.    Apart from -- withdrawn.

8               Didn't she communicate with you

9    sooner than October 5th?

10        A.    She communicated that she had

11   concerns about Carole's attendance and

12   performance prior to September 28th.

13        Q.    When did she do so for the first

14   time, to you?

15        A.    I don't recall exactly.

16        Q.    From September 28th through

17   October 5th, any other communications with

18   Ms. Magone about Ms. Newmark's performance, any

19   that you have not testified to?

20        A.    No.

21        Q.    Any other concerns?

22        A.    No.

23        Q.    Have you communicated with anyone

24   concerning your deposition here today, apart from

25   Mr. Keil?

152

*Pat Orsaia*

A.    About the deposition?

Q.    About the deposition.

A.    No.

Q.    Have you been in contact with any former employees of Lawrence Hospital since you left, apart from the two communications you have had with Ms. Magone?

A.    Yes; I have communicated with some of my former colleagues at Lawrence Hospital Center.

Q.    With whom?

A.    With members of the human resources department; with the former vice-president of human resources who left Lawrence, before I did; I have communicated with her.  I spoke with the nurse manager at the ER at the time when I had a friend who was a patient at Lawrence.  I spoke with another former member of the human resources department who left Lawrence before I did.  I spoke with people at the switchboard.

That's all I can recall.

Q.    Do you know whether -- how long the probationary period for Ms. Newmark's employment is?

1                          *Pat Orsaia*

2          A.     Yes.

3          Q.     Or was?

4          A.     Yes.

5          Q.     How long?

6          A.     Six months.

7          Q.     Do you know when her date of hire

8    was?

9          A.     I don't know the precise date, no.

10         Q.     Do you know whether she was hired on

11   or about March 20th, 2006?

12         A.     That sounds correct.

13         Q.     And she was fired after that six-

14   month probationary period?

15         A.     Her probationary period had been

16   extended.

17         Q.     By whom?

18         A.     By her department director, as per

19   policy.

20         Q.     Was it required that she -- when you

21   say "per policy," what policy are you referring

22   to?

23         A.     The policy is called Probationary

24   Periods.  It's a human resources policy.

25         Q.     What does it say, in words or

154

*Pat Orsaia*

1
2      substance, the policy?

3          A.    It says that the probationary period

4      for exempt-level employees is six months. It says

5      the probationary period for non-exempt employees

6      is three months.  It says that at the department

7      manager's discretion, probation can be extended

8      for a period of up to three months.  It says that

9      the probationary period is meant to introduce the

10     individual to the organization, and vice versa.

11     And that at any time during the probation, either

12     party can determine that they do not want to

13     continue the employment relationship.

14         Q.    Does that require approval from

15     anyone to extend the probationary period?

16         A.    I think it says -- the policy says

17     it's with discussion with human resources.

18         Q.    Discussion or approval?

19         A.    I don't know.  You have the policy

20     in front of you.  Maybe you can tell me what it

21     says - discussion or approval.

22         Q.    To your knowledge, as the director

23     of HR, are there any requirements that the head

24     of a department needs the approval of the HR

25     department?

155

Pat Orsaia

1

2         A.    Are there any occasions in which --

3         Q.    No.  Does it have to be approved

4    by --

5         A.    Does what have to be approved?

6         Q.    The probationary extension period.

7         A.    The actual practice is that any time

8    a department leader is recommending that a

9    probationary period be extended, there is a

10   discussion with human resources.

11        Q.    Is that discussion anywhere in

12   writing about the extension of a probationary

13   period of an employee?

14        A.    Not necessarily.

15        Q.    Was that done in Ms. Newmark's case?

16        A.    Yes.

17        Q.    Did you submit anything in writing,

18   extending her probationary period?

19        A.    Did I?  No.

20        Q.    Did Ms. Magone?

21        A.    It would have been Ms. Magone's

22   responsibility to communicate the extension for

23   Ms. Newmark.  Which, as far as I know, she did.

24        Q.    Did Ms. Magone send anything to you

25   in writing, which requested an extension of the

156

*Pat Orsaia*

probationary period?

    A.    Well, she would not have requested it.

    Q.    Did she?

    A.    She would have discussed it with me.

    Q.    Did she submit anything in writing requesting an extension of probation?

    A.    No.

    Q.    Did you submit anything in writing approving an extension of a probationary period?

    A.    No.

    Q.    Did Ms. Magone ever recommend Ms. Newmark's termination in writing?

    A.    No.

    Q.    Do you know if there are any policies at Lawrence concerning that?

    A.    The policy suggests that any decision to terminate employment, would be discussed with human resources.  And there is a policy, I believe, on termination, that states that the person who can approve terminations, is the vice-president of human resources or her designee.

    Q.    I'm going to show you what was

157

Pat Orsaia

2  previously marked as Plaintiff's Exhibit 21, for

3  identification.

4          I would like to direct your

5  attention to Plaintiff's Exhibit 1, N425,

6  directing your attention to 4.3, Paragraph 4.3:

7  "During the last week of the probationary period,

8  the supervisor will conduct a performance-review

9  discussion with the employee."

10         Do you see that?

11      A.    Yes.

12      Q.    Do you know whether Ms. Magone, the

13  last week before the probationary period, the

14  original probationary period for Ms. Newmark

15  ended, had that meeting with her?

16      A.    Well, the probationary period being

17  extended, I don't know that she did or didn't,

18  but I don't believe that is the scenario that is

19  discussed --

20      Q.    I'm asking you --

21      A.    -- in the policy.

22      Q.    I'm asking you a question:  Do you

23  know whether Ms. Magone met with Ms. Newmark a

24  week prior to the original probationary period

25  ending, to discuss her performance?

158

Pat Orsaia

1

2          A.    I don't know that.

3          Q.    I'm going to direct your attention

4    to 4.5, of the same page.  It says, "The

5    supervisor may recommend termination of

6    employment at any time during the probationary

7    period.  This recommendation must be submitted in

8    writing to human resources and the department

9    head."

10              Did Ms. Magone ever submit her

11   recommendation prior to the termination in

12   writing?

13         A.    No, but she is the department head.

14         Q.    I understand, but this says this

15   recommendation must be submitted in writing to

16   human resources.  I'm asking --

17         A.    This is referencing what the

18   supervisor of the department is supposed to do at

19   the supervisory level.

20         Q.    I'm asking you:  Did Ms. Magone

21   submit a request, a recommendation for

22   termination to you prior to Ms. Newmark's

23   termination?

24         A.    Not in writing, no.

25         Q.    Apart from Ms. Magone, did you