UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

CAROLE NEWMARK,

                        Plaintiff,                    07 CIV. 2861 (CS)

        -against-                    **PLAINTIFF'S**

LAWRENCE HOSPITAL CENTER,        **COUNTER-STATEMENT**
                                      **OF MATERIAL FACTS**
PAT ORSAIA, individually, and CATHY    **PURSUANT TO LOCAL**
MAGONE, individually,                    **RULE 56.1**

                        Defendants.

-----------------------------------------------------X

       Plaintiff Carole Newmark submits the following Counter-Statement of Material Facts

which contains a concise statement of the material facts. Following Plaintiff's 56.1 Counter-

Statement, Plaintiff has responded to each of the statements contained in Defendants' 56.1

Statement starting on page 18 *infra*.


             **PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS**

     **Parties**

     1.     Plaintiff Carole Newmark (hereinafter "Plaintiff" or "Newmark" will be sixty-

three years old on September 16, 2008 (Lawrence Hospital Personnel Computer Printout,

annexed hereto to the Affidavit of Drita Nicaj (hereinafter "Nicaj Aff. Ex" followed by exhibit

number) as Exhibit 11).

2.      Defendant Pat Orsaia[1] was at all times relevant the Director of Human Resources at Defendant Lawrence Hospital Center (hereinafter "Lawrence") (Deposition of Pat Orsaia Dep. 8 (hereinafter "Orsaia Dep."), Nicaj Aff. Ex. 25).

3.      Defendant Cathy Magone was at all times relevant the Director of Quality and Case Management (Deposition of Cathy Magone Dep. 6 (hereinafter "Magone Dep."), Nicaj Aff. Ex. 24).

**Plaintiff's Prior Work History, including at Lawrence**

4.      In connection with Plaintiff obtaining her masters degree in social work, Plaintiff performed internships, first in the Family Service Society of Yonkers from September 1994 until July 1994 and then later for Lawrence Hospital during the period from June 1995 to May 1996 (Def. Ex. 9).

5.      Plaintiff then worked as a Clinical Social Worker at Lawrence Hospital during the period from June 1997 until December 1998 (Def. Ex. 9; Newmark Dep. 36, Nicaj Aff. Ex. 23). At the time Denise Galloway was her supervisor (Newmark Dep. 36).  During her employment at Lawrence, Plaintiff received positive performance evaluations and positive feedback relating to her work (Newark Aff. ¶2).

6.      Thereafter, Plaintiff was employed as a Clinical Family Counselor for the North Bronx Family Service Center during the period from August 2000 through October 2004 (Def. Ex. 9).

7.      From November 1, 2004 through February 2006, Plaintiff was employed at Phelps Memorial Hospital providing outpatient mental health care to patients (Def. Ex. 9; Newmark Dep. 197-98, Nicaj Aff. Ex. 23).

---

[1]Orsaia was named as a Defendant, but a Summons and Complaint was never served on her.

**Plaintiff's Interview at Lawrence Hospital**

8.      Galloway first advised Magone that Plaintiff would be a good candidate for Lawrence because she (Newmark) had worked there in previous years (Magone Dep. 6, 21, Nicaj Aff. Ex. 24). Galloway advised Magone that Plaintiff had worked in the social work department where Galloway was the Assistant Director for Social Work (Magone Dep. 22-24, Nicaj Aff. Ex. 24). Galloway as Plaintiff's former supervisor, recommended Plaintiff because Plaintiff was a good worker (Magone Dep. 23-24, Nicaj Aff. Ex. 24).

9.      Galloway retired after twenty-eight years of working at Lawrence (Magone Dep. 26, 37, Nicaj Aff. Ex. 24; Newmark Dep. 35, Nicaj Aff. Ex. 23). Galloway had expressed to Plaintiff that Magone was very difficult to work for and she was leaving because Magone had stripped Galloway of all her authority and responsibility (Newmark Dep. 35, Nicaj Aff. Ex. 23).

10.     In trying to persuade Plaintiff to leave Phelps where she was happy, Galloway initially stated that "perhaps it's me. And it won't happen to you because I have been there so long. Perhaps you're a new person. Maybe it would be better for you" (Newmark Dep. 35, Nicaj Aff. Ex. 23).

11.     Despite the fact that Plaintiff was happy working at Phelps, Galloway actively recruited Plaintiff – advising her that it would be a good opportunity and it would mean more money, closer to home and the physicians working at Lawrence would be happy to have Newmark back (Newmark Dep. 60-61, Nicaj Aff. Ex. 23).

12.     At the time of Newmark's interview, there were three social workers – Denise Galloway, Jeretha Jones, and Elizabeth Basil (Magone Dep. 27-28, Nicaj Aff. Ex. 24).

13.     Magone then interviewed Newmark (Newmark Dep. 63-65, Nicaj Aff. Ex. 23). Magone assured Plaintiff that while she did not have case management experience, Plaintiff

3

would be able to use her mental and behavioral health experience extensively at Lawrence (Newmark Dep. 64-65, Nicaj Aff. Ex. 23). Magone also advised Newmark that she would be able to use her experience in the palliative care program that was in the process of being developed and would be able to use it working with patients and families who have issues relating serious illnesses, including terminal illness, finance and any other human-related issues that arose (Newmark Dep. 64-65, Nicaj Aff. Ex. 23; Newmark Aff. ¶¶7-8).

14.    In short at the interview, Magone assured Plaintiff that she would be able to "write" her own ticket at Lawrence because Magone did not have a profile of what Lawrence was looking for in a social worker (Newmark Dep. 64-65, 212-214, Nicaj Aff. Ex. 23). Magone also promised that Plaintiff would be assigned to the palliative care team because it would be a great "opportunity" to utilize Plaintiff's mental health skills  (Newmark Dep. 106, 212-214, , Nicaj Aff. Ex. 23; Newmark Aff. ¶7).   Plaintiff expressed an interest in being involved in the palliative care program (Magone Dep. 31-32, Nicaj Aff. Ex. 24).

15.    Magone explained that there was a new case management model at Lawrence which was created after Newmark left employment at Lawrence in 1998 but Magone assured Plaintiff would not have any problems (Newmark Dep. 212-213, Nicaj Aff. Ex. 23).  But Magone advised Plaintiff that the case managers "could be difficult, but she felt [Newmark] had the skills, being someone who worked in mental health, to work with them" (Newmark Dep. 212-13, Nicaj Aff. Ex. 23).

16.    Magone further advised that there were not going to be any social workers working with her but that Plaintiff could be part of the process of hiring another social worker (Newmark Dep. 214). Plaintiff was the only person interviewed for the position (Magone Dep.

4

51, Nicaj Aff. Ex. 23). Despite receiving resumes from other candidates, Plaintiff was the only

suitable candidate (Magone Dep. 51-52, Nicaj Aff. Ex. 23).

17.    During the interview process Plaintiff also expressed to Nicole Serra, a co-worker

at Phelps her interest in working at the palliative care program (Deposition of Nicole Serra

(hereinafter "Serra Dep.") 22, Nicaj Aff. Ex. 26). Plaintiff advised Serra that Magone had

promised to assign Plaintiff to the palliative care program (Serra Dep. 26, Nicaj Aff. Ex. 26).

### Shortage of Social Workers at Lawrence

18.    Before Galloway ceased being employed at Lawrence, she had expressed concern

to Orsaia that the social work department needed more than three social workers, which included

Galloway (Orsaia Dep. 141-42, Nicaj Aff. Ex. 25).

19.    Shortly after Galloway retired from Lawrence, Elizabeth Basile a social worker

also left Lawrence. At Basile's exit interview with Orsaia, Basile stated she was leaving due to

Galloway leaving (Orsaia Dep. 12-13, Nicaj Aff. Ex. 25).

20.    During her communication with Orsaia, Basile also advised that there was a

shortage of social workers and that she (Basile) had expressed the same sentiment to Magone

(Orsaia Dep. 23, Nicaj Aff. Ex. 25). Orsaia in turn communicated Basile's concerns to Orsaia

(Orsaia Dep. 23, Nicaj Aff. Ex. 25).

### Plaintiff's Employment at Lawrence

21.    Plaintiff commenced employment as a Senior Social Worker at Lawrence in

March 2006 (Magone Dep. 20, Nicaj Aff. Ex. 24). The social work department went from

having three social workers – which according to Galloway and Basile was still deficient --

before Plaintiff was hired to one social worker (Plaintiff) at the time she commenced

5

employment on March 20, 2006 (Magone Dep. 29, Nicaj Aff. Ex. 24; Newmark Dep. 214-215, Nicaj Aff. Ex. 23).

22.     While working at Lawrence, Plaintiff recommended Serra who she had worked with at Phelps (Newmark Dep. 215, Nicaj Aff. Ex. 23). At the time, Serra was approximately thirty years of age (Form & Applicant Release, Nicaj Aff. Ex. 10). Plaintiff did not have authority to hire Serra nor did she participate in any interview of Serra (Newmark Dep. 215, Nicaj Aff. Ex. 23). Serra was hired as a social worker who would report to Plaintiff (Newmark Dep. 215-16, Nicaj Aff. Ex. 23). As Serra's supervisor, Plaintiff was responsible for the day to day activities of Serra and ensuring that she met certain requirements and was responsible for the cases she was assigned (Newmark Dep. 217, Nicaj Aff. Ex. 23).

23.     On May 11, 2006, Magone advised Plaintiff that she wanted to let Plaintiff know that "I really think you are going to be amazing" (5/11/06 Email, Nicaj Aff. Ex. 17).

**Magone Fails Plaintiff as the Social Worker Dedicated to the Palliative Care Program Because of Plaintiff's Age**

24.     The reason Plaintiff accepted the position at Lawrence was on the assurance by Magone that Plaintiff would be appointed to be the social worker for the palliative care service (Serra Dep. 22-23, 27, Nicaj Aff. Ex. 26; Newmark Aff. ¶7).

25.     The Palliative Care Program is a multi-disciplinary program comprising of physicians, nurses, social workers and case management who work cohesively to make a patient more comfortable (Magone Dep. 31-32, Nicaj Aff. Ex. 24; Serra Dep. 23-24, Nicaj Aff. Ex. 26; Newmark Aff. ¶3). It involves pain management, family dynamics and working with families to deal with dying and chronic illnesses (Magone Dep. 31-32, Nicaj Aff. Ex. 24; Serra Dep. 23-24, Nicaj Aff. Ex. 26).

6

26.     On August 15, 2006, Plaintiff was called into Magone's office and advised that

Serra had been selected the social worker dedicated to the palliative care service(Newmark Dep.

48, Nicaj Aff. Ex. 23; Def. Ex. 25; 8/15/06 Note, Nicaj Aff. Ex. 1; Nicole Serra's Performance

Evaluation, Nicaj Aff. Ex. 12).  When Plaintiff inquired as to why she had not been involved in

Serra's selection as her supervisor, Magone said that "the decision was made and that's it"

(Newmark Dep. 48, Nicaj Aff. Ex. 23).  When Plaintiff asked on what basis the decision was

made, Magone advised Plaintiff,

> Nicole Serra **is a younger than you are** and can take things in better than
> you can.

(Newmark Dep. 48-49, Nicaj Aff. Ex. 23; Magone Dep. 71, Nicaj Aff. Ex. 23; Def. Ex.

25; 8/15/06 Notes, Nicaj Aff. Ex. 1).

27.     Magone initially denied ever communicating to Newmark that she was

appointing to Serra to the palliative care service (Magone Dep. 82, Nicaj Aff. Ex. 24).

When Magone was confronted with her August 15, 2006 note wherein she stated "I met

with Carole Newmark today to inform her of my decision to appoint Nicole the social

worker for the palliative care service", she admitted her testimony had been false

(Magone Dep. 83, Nicaj Aff. Ex. 24; Def. Ex. 25 8/15/06 Notes, Nicaj Aff. Ex. 1).

Indeed, Serra's later performance evaluation identified her as the "dedicated palliative

care Social Worker" (1/17/07 Evaluation, Nicaj Aff. Ex. 12; Deposition of Maura Del

Bene (hereinafter "Del Bene Dep.') 7-8, Nicaj Aff. Ex. 28).

28.     Plaintiff advised Serra that she was not angry with Serra and Serra "never

felt that she [Plaintiff] was angry at [her] for the situation.  It was the kind of thing that

was decided that was out of [Serra and Plaintiff's] hands" (Serra Dep. 27-28, Nicaj Aff.

Ex. 26).

7

29.    Maura Del Bene, the nurse practitioner assigned to the palliative care program confirms after Serra's appointment to the palliative care service, Newmark did not have any hard feelings towards Del Bene and Del Bene's relationship with Newmark continued to be cordial as it was before (Del Bene dep. 7, 42, Nicaj Aff. Ex. 28).

**Plaintiff's Complaints Regarding Age Discrimination**

30.    Within approximately a day or two of Newmark's meeting with Magone, Newmark went to Human Resources and met with Orsaia who was the Director of Human Resources to complain (Orsaia Dep. 8; Newmark Dep. 44, Nicaj Aff. Ex. 23). In that connection, Newmark told Orsaia that Magone said she decided to select Serra because she was younger than Newmark and could handle the job better than Newmark could (Newmark Dep. 45-46, 48-49, Nicaj Aff. Ex. 23).

31.    Orsaia then told Newmark that "that there have been other people that have come here to complain about Cathy Magone" (Newmark Dep. 46, Nicaj Aff. Ex. 23). In particular, Orsaia indicated that social workers and case managers had complained (Newmark Dep. 46, Nicaj Aff. Ex. 23). Despite the fact that Orsaia was not present at the August 15th meeting, she also tried to justify Magone's statement by stating that "sometimes people filter things out differently" (Newmark Dep. 50, Nicaj Aff. Ex. 23; Newmark Aff. ¶12). Moreover, Orsaia never reduced what Newmark told her in writing either then or later (Orsaia Dep. 31, Nicaj Aff. Ex. 25).

32.    According to Orsaia, Plaintiff made reference to ageism at the meeting (Orsaia Dep. 37, Nicaj Aff. Ex. 25). Despite her position as Human Resources Director,

8

Orsaia was not familiar with the word so she had Plaintiff clarify (Id.). Newmark said that Magone had selected Serra because she was younger (Id.).

33.    Plaintiff then inquired when all three could meet -- Plaintiff, Magone and Orsaia (Newmark Dep. 50, Nicaj Aff. Ex. 23). Plaintiff wanted to resolve issue, to continue doing her job without any interference and to let know Orsaia about how she (Plaintiff) felt about the age discrimination (Newmark Dep. 138, Nicaj Aff. Ex. 23).

34.    Shortly after, Orsaia communicated with Magone (Orsaia Dep. 49, Nicaj Aff. Ex. 25; Magone Dep. 103, Nicaj Aff. Ex. 24; 8/21/06 Email, Nicaj Aff. Ex. 2). Orsaia spoke to Magone alone and did not take any notes (Orsaia Dep. 50-51, 58, Nicaj Aff. Ex. 25). According to Orsaia, Magone said that she said Nicole was younger in her career (Orsaia Dep. 56, Nicaj Aff. Ex. 25; Magone Dep. 102-03, Nicaj Aff. Ex. 25).

35.    According to Orsaia, she then communicated with Plaintiff regarding Magone's explanation about her earlier conversation with Plaintiff (Orsaia Dep. 55-56, Nicaj Aff. Ex. 25). Plaintiff stated to Orsaia that Magone never claimed that Nicole was younger in her career (Orsaia Dep. 55-56, Nicaj Aff. Ex. 25).

36.    Following Orsaia's discussion with Plaintiff, they agreed that Orsaia, Plaintiff and Magone would meet (Orsaia Dep. 57, Nicaj Aff. Ex. 25).

37.    Orsaia then communicated with Magone to advise her that she had spoken to Plaintiff and provided Magone's explanation but Plaintiff disagreed with it (Orsaia Dep. 61, Nicaj Aff. Ex. 25).

38.    Following initial Plaintiff's meeting with Orsaia to complain about Magone's discriminatory-based decision, Magone was less cordial and dismissive of Plaintiff than she had been previously (Newmark Dep. 17-20, 72, Nicaj Aff. Ex. 23).

9

Magone did not make eye contact with Plaintiff, did not meet with Plaintiff privately and ignored Plaintiff when she asked a question or raised an issue at staff meetings (Newmark Dep. 17-23, 172-173, Nicaj Aff. Ex. 23).

39.    Magone also overlooked Plaintiff in connection Plaintiff's receipt of the Big Heart award which was an award that an employee of Lawrence would receive as a result of a patient or staff member having nominated that employee (Newmark Dep. 14-15, Nicaj Aff. Ex. 23). During Plaintiff's employment at Lawrence during 2006, she received two awards which were rarely issued to employees – one in April and the other in September (Newmark Dep. 14-15, Nicaj Aff. Ex. 23; 4/17/06 Big Heart Award, Nicaj Aff. Ex. 18).

40.    In or about September 2006, Plaintiff was nominated by a co-worker for the award and in fact received the award (Newmark Dep. 14-17). On the same day Plaintiff's award was issued, Serra also received the same award. While acknowledging and congratulating Serra's receipt of the award, Magone failed to even acknowledge Plaintiff's receipt of the same award even though Magone was notified and had Plaintiff's award in her hand (Newmark Dep. 14-18, Nicaj Aff. Ex. 23; Newmark Aff. ¶13).

41.    Following the meeting with Magone, Plaintiff attempted to schedule a meeting with Orsaia and Magone, advising:

> Hi, Pat [Orsaia], this is a follow up to our meeting of approximately two weeks ago. Please let me know what the status is of the proposed meeting with Cathy Magone where we were going to discuss several issues, including most importantly, the issue of possible ageism. This is troublesome and needs to be addressed in a timely manner. Thank you for your anticipated response (9/12/06 Email Exchanges, Nicaj Aff. Ex 3; Def. Ex. 43).

42.    On September 13, 2006, Plaintiff sent another email and then met with Orsaia (Newmark Dep. 149, Nicaj Aff. Ex. 23; 9/13/06 Email, Nicaj Aff. Ex. 4; Def. Ex. 37).  At the meeting, Plaintiff inquired that she had not heard from anyone concerning scheduling the meeting with both Orsaia and Magone (Id.).  In response, Orsaia indicated there were some scheduling conflicts (Newmark Dep. 149, Nicaj Aff. Ex. 23).

43.    Since Plaintiff had not heard from Orsaia about Magone, on September 28, 2006, she emailed Orsaia again requesting a meeting with Orsaia and Magone in order to "put some closure on the issues. . ." they had previously discussed (9/28/2006 Email, Nicaj Aff. Ex. 5; Def. Ex. 38; Newmark Dep. 151-52, Nicaj Aff. Ex. 23).

44.    There was a meeting then held the same day with Orsaia and Magone in Orsaia's office (Newmark Dep. 152-53, Nicaj Aff. Ex. 23).  At the meeting Plaintiff stated she had an issue with Magone making a statement that Serra was younger and therefore better able to do the job (Magone Dep. 153-54, Nicaj Aff. Ex. 24).

45.    Magone angrily denied making the statement (Newmark Dep. 154, 155-56, Nicaj Aff. Ex. 24).  Instead Magone stated that she told Plaintiff that Serra was young and could take in information like a sponge (Newmark Dep. 154, Nicaj Aff. Ex. 23).

46.    Magone then mentioned to Plaintiff for the first time that her (Plaintiff's) performance was not up to "par" and she brought up Plaintiff's attendance (Newmark Dep. 155-56).  Plaintiff advised Magone that she had not brought up that fact before the meeting and inquired why it was being brought up at this meeting -- the purpose of which was to discuss what Magone said with respect to Serra being young (Newmark Dep. 155, Nicaj Aff. Ex. 23).

47.    At the meeting, Magone advised Plaintiff that her probation was being extended (Newmark Dep. 157-158, Nicaj Aff. Ex. 23).  When Plaintiff asked for how long it was being

11

extended, Magone told her that "that was for her to know" (Newmark Dep. 157, Nicaj Aff. Ex.23).

48.     In short, the meeting ended with no resolution (Newmark Dep. 156, Nicaj Aff. Ex. 23). As Plaintiff was exiting Orsaia's office, Magone asked to meet with Orsaia privately (Newmark Dep. 156-57, Nicaj Aff. Ex. 23).

49.     On Friday, September 29, 2006, Plaintiff sent Orsaia an email to follow up on the day's before meeting with Orsaia and Magone (Newmark 158-59, Nicaj Aff. Ex. 23; 9/29/06 Email, Nicaj Aff. Ex. 6; Def. Ex. 27). Plaintiff's September 29, 2006 email to Orsaia states in pertinent respect:

> Hi Pat,
>
> Thank you for taking the time to meet with Cathy Magone and me, I appreciate your assistance.
>
> There are a few issues that were raised in the meeting that I would like clarified, as follows:
>
> 1. I would like to know how long my probation has been extended, this should not be held from me until I receive my performance evaluation.
>
> 2. When I asked Cathy [Magone] what was the basis for my probation being extended, she stated it was because of attendance. In our meeting yesterday, she alluded to the fact that there are work issues, but would not state what these are until she goes over my evaluation with me. This was a surprise to me, as she has never brought up any work issues until our meeting yesterday. I cannot remedy issues if they are not brought to my attention, and should not have to wait until my evaluation to hear what the work issues are.
>
> 3. When we went over the issue of ageism, Cathy denied that she said 'Nicole was younger and could handle the job better than I could.' She stated that she did say that Nicole was '[y]oung and could take things in like a sponge.' This statement is tantamount to saying that I am old and [am] not able to absorb information as well. Cathy does not know what my capabilities are, she has not taken the time to learn about who I am and know exactly [what] my strengths are.

> . . .[H]owever, I still contend that Cathy is holding my age against me. . .
> her comments and actions during the past few months in regard to me
> have been dismissive and non-supportive. I cannot pinpoint when things
> changed between Cathy and I but there has been a palpable change in her
> interactions with me, and this makes me feel very vulnerable and insecure
> about my job at LHC (9/29/06 Email, Nicaj Aff. Ex. 6).

Orsaia confirmed that the first two sentences of paragraph numbered "3" of the email Plaintiff

sent to her was an accurate statement as to what Magone said at the September 29th meeting,

notably that Magone did say that Serra "'[y]oung and could take things in like a sponge'"

(Orsaia Dep. 87, Nicaj Aff. Ex. 25; 9/29/06 Email, Nicaj Aff. Ex. 6; Def. Ex. 27). Moreover,

Orsaia never disputed what was said at the September 28th meeting as recollected by Plaintiff in

her September 29, 2006 meeting (Orsaia Dep. 133, Nicaj Aff. Ex. 25).

50.    While Plaintiff was not able to provide a date in which Magone was no longer

supportive, it occurred after Plaintiff first went to Orsaia to complain about Magone's age

discriminatory comments of August 15th (Newmark Dep. 170-172, Nicaj Aff. Ex. 23).

51.    With respect to Plaintiff's recollection as contained in the September 29th email

about the meeting with Orsaia and Magone, Orsaia never denied in writing Magone's statements

during the September 28th meeting with Plaintiff and Orsaia (Orsaia Dep. 132-33, Nicaj Aff. Ex.

23).

52.    Apparently, Orsaia forwarded Plaintiff's email to Magone who on Wednesday,

October 4, 2006, responded to Newmark claiming that she described as a Serra as a "new, young

social worker needing to have a project of her own" (10/5/06 Email, Nicaj Aff. Ex. 7; Def. Ex.

40). However, in Magone's October 4, 2006 email, she did not deny saying that Serra was

"young and could take things in like a sponge" at the September 29, 2006 meeting (Magone Dep.

126, Nicaj Aff. Ex. 24; 10/5/06 Email, Nicaj Aff. Ex. 7; Def. Ex. 40).

13

53.     On October 5, 2006, Magone sent Orsaia an email on October 5, 2006 at 10:50

am advising Orsaia that Plaintiff had received the email the previous evening at 5:30 p.m. and

had not yet responded or spoken to Magone about it (10/5/06 Email, Nicaj Aff. Ex. 7).

**Six Days After Newmark's Meeting with Orsaia and Magone to Complain About
Age Discrimination and Five Days After Newmark's September 29th Email
Complaining of Discrimination, Her Position is Terminated**

54.     On October 5, 2006, in Magone's office with Orsaia present, Plaintiff's position

was terminated by Magone (Magone Dep. 129-30, Nicaj Aff. Ex. 24).  At the meeting, Orsaia

claimed that Plaintiff was not a good fit and "they" were terminating her employment (Newmark

Dep. 28, , Nicaj Aff. Ex. 23).

55.     Orsaia then advised Plaintiff that it was not working out and that she was to get

her belongings together, empty her office, leave the premises immediately and she had an hour

in which to do that (Newmark Dep. 29, Nicaj Aff. Ex. 23).  Orsaia then handed Plaintiff

termination papers at which point Magone threw Plaintiff's evaluation at her (Plaintiff) (Id.).

56.     Plaintiff was then told by Orsaia that Magone would be the person escorting her

out of the building (Newmark Dep. 29-30, Nicaj Aff. Ex. 23).  At that point, Newmark requested

that a security guard escort her instead because she did not trust Magone because Newmark had

observed that Magone was very volatile at times with people -- particularly just about all of

Magone's case managers (Id.; Newmark Aff. ¶¶16-17).

57.     Orsaia advised Plaintiff that the security guard would not escort Plaintiff -- that

Magone would instead, which was very unusual (Newmark Dep. 31-32, Nicaj Aff. Ex. 23).

58.     According to Magone, she "explored" with Orsaia terminating Plaintiff's

employment one week prior to September 28th meeting (Magone Dep. 131-32, Nicaj Aff. Ex.

14

23). Magone confirmed never documented that particular exploration (Magone Dep. 132, Nicaj Aff. Ex. 23).

59.     In fact, Magone made her decision to terminate Plaintiff's employment only following the September 28th meeting (Magone Dep. 132, Nicaj Aff. Ex. 23).

60.     There was nothing new that transpired in connection with Plaintiff's performance from the September 29, 2006 meeting in which Magone advised Plaintiff that her probationary period was being extended to Plaintiff's termination on October 5, 2006 (Magone Dep. 133-34).

61.     Magone has admitted that **the decision to terminate** Newmark's employment was in part that based on her "**reaction to a business decision to assign another team member to our palliative program was unacceptable**" (10/5/07 Memorandum, Nicaj Aff. Ex. 9; Def. Ex. 41; Magone Dep. 160-61, Nicaj Aff. Ex. 24)(emphasis added).

62.     Following her termination, Plaintiff corresponded with Galloway who advised her that she had complained about Magone's treatment of her to Orsaia on at least two occasions and that Basile also went to see Orsaia over a number of years with the same concerns (10/23/06 Email, Nicaj Aff. Ex. 14).  Additionally, case managers went Orsaia to complain as a group about Magone (Id.).  Moreover other employees have complained about Magone's treatment of them (Id.).

63.     After her termination, Newmark received an email from Katherine Anderson, the Clinical Educator for Oncology at Lawrence voicing her support of Newmark (10/12/2006 Email, Nicaj Aff. Ex. 15; Def. Ex. 10).


**Difficulty of Working with Case Managers and Magone**

15

64.     Diane Lance the Assistant Director of Case Management had approached Orsaia concerning the dysfunction among the case managers (Orsaia Dep. 144, Nicaj Aff. Ex 25).

65.     Some of the case managers are very difficult to work with (Serra Dep. 33-34, Nicaj Aff. Ex. 26).   Serra was sure that at least some managers complained about her (Serra Dep. 36, Nicaj Aff. Ex 26).  In an email dated July 19, 2006, Serra corresponded with Del Bene thanking her for understanding her "bad attitude last week" (7/20/06 Email, Nicaj Aff. Ex. 13; Sera Dep. 33-34, Nicaj Aff. Ex 26; Def. Ex. 19).   In another email, Serra expressed to Del Bene that "it is often hard to work in this environment when you don't know who you can trust" (7/20/06 Email, Nicaj Aff. Ex. 13; Def. Ex. 19).  Serra was referring to case managers because "some of them are very difficult to work with and they are more interested in talking about other people's work and this and that, versus paying attention to their own situations" (Serra Dep. 34, Nicaj Aff. Ex 26).

66.     Del Bene invited Plaintiff to coffee to complain about how things were handled in the units.  In particular, Del Bene had many complaints about cases managers and how things were handled (Newmark Dep. 189-90, Nicaj Aff. Ex. 23).  Del Bene specifically complained about her role in working with the case managers and the difficulties in working with them (Id.).

67.     Moreover, on number of occasions, Del Bene expressed her belief to Plaintiff that Magone did not how to communicate with people (Newmark Dep. 52, Nicaj Aff. Ex 23).  In particular, Del Bene commented to Plaintiff on several occasions about the fact that Magone's behavior "was really out there" (Newmark Dep. 52-53, Nicaj Aff. Ex 23).

68.     Serra expressed to Del Bene that Magone lacked an understanding of what the social work role was and how it was to be utilized within the case management department (Del Bene Dep. 39, Nicaj Aff. Ex 28; 5/23/06 Email, Nicaj Aff. Ex. 16).  For example, on May 23,

16

2006, Plaintiff sought to follow up on a job description meeting she had with Magone about reducing the social work functions in writing (5/23/06 Email, Nicaj Aff. Ex. 16). Magone did not recall whether she ever responded to Plaintiff in writing (Magone Dep. 164, Nicaj Aff. Ex 23).

69.    In an evaluation done of Magone in February 2004, it was admitted by her that she had been unsuccessful in eliminating staff unrest (2/2/04 Evaluation, Nicaj Aff. Ex. 22). Magone initially explained that there were "personality issues" (Magone Dep. 174, Nicaj Aff. Ex. 24). But Magone then changed her response to employees not getting along -- not being happy with one another (Id.). The employees were case managers and social workers (Magone Dep. 175, Nicaj Aff. Ex 24).

70.    Magone confirmed "[s]ocial workers and case managers historically have issues with one another" (Magone Dep. 175, Nicaj Aff. Ex). Well after Plaintiff's termination on October 5, 2006 and as of February 2008, Magone confirmed that staff unrest is ongoing issue (Magone Dep. 176).

**PLAINTIFF'S REPONSE TO DEFENDANTS' STATEMENT PURSUANT TO 56.1**

1.  Plaintiff began work at the Hospital on March 20, 2006 (Magone 6; Newmark 7; Ex. 7).

**Response:**    **Admits.**

2.  Plaintiff was interviewed and hired by Catherine Magone, Lawrence Hospital's Director of Quality, Case Management, and Social Work (Magone 6; Newmark 7; Ex. 7).

**Response:**    **Admits.**

3.  Plaintiff's job title at Lawrence at all times during her employment was "Senior Social Worker" (Magone 6; Newmark 7; Ex. 7).

**Response:**    **Admits.**

4.  During the interview process, Magone noted that plaintiff lacked recent hospital experience and had primarily worked in an outpatient psychiatric setting, which is a different work environment from the Hospital's case management model (Magone 3839).

**Response:**    **Denies (Newmark Dep. 212-213, Nicaj Aff. Ex. 23). Magone explained that there was a new case management model at Lawrence since the last time Plaintiff had worked there but Magone did not believe that Plaintiff should have any problems (Newmark Dep. 212-213, Nicaj Aff. Ex. 23). Magone also advised Plaintiff that the case managers "could be difficult, but she felt [she] had the skills, being someone who worked in mental health, to work with them" (Newmark Dep. 212-13, Nicaj Aff. Ex. 23).**

5.  Magone expressed concern that plaintiff would have difficulty adapting to the Hospital's emphasis on early discharge planning and reducing patients' length of stay (Magone 1314, 38-39, 49; Orsaia I12).

**Response:**   **Denies.** *See* response to ¶4 *supra.* **Moreover, most of the time length of stay determinations are out of the social worker's hands because the doctor treating the patient must come in and write a discharge plan or order and there is nothing that anyone could do until that is done (Serra Dep. 42).**

6.   Newmark persuaded Magone during the interview process that she was willing to learn what was required for the position of Senior Social Worker (Magone 51-52).

**Response:**   **Denies. Magone assured Plaintiff that she would not be occupying Galloway's assistant director title but that she would be senior social worker (Newmark Dep. 213-214, Nicaj Aff. Ex. 23).**

7.   Shortly after plaintiff's hire, plaintiff recommended that Magone hire Nicole Serra (Newmark 215; Magone 64) to fill a second social work position at the Hospital.

**Response:**   **Admits.**

8.   Nicole Serra was a social work colleague from plaintiff's prior place of employment (Serra 7-8).

**Response:**   **Admits.**

9.   After being interviewed by Lawrence Hospital, Serra was hired as a social worker with virtually identical job requirements to Newmark's (Newmark 215-16).

**Response:**   **Admits.**

10.   Serra began work at Lawrence Hospital on April 24, 2006 (Serra 7).

**Response:**   **Admits.**

11.   Under the Hospital's case management model, a team of nine registered nurses with the title of "Case Manager" oversee the discharge planning of all Hospital patients. "Their

priority is to minimize patient lengths of stay where consistent with sound medical practice (Magone 13; Orsaia 112).

**Response:**     **Denies materiality.**

12.     The Hospital's Department of Quality, Case Management, and Social Work plays a central function in ensuring that Hospital finances remain sound. Because reimbursement to the Hospital for providing medical services to patients under Medicare, Medicaid, and private insurance plans is calculated according to prescribed formulas that do not account for actual cost, Magone's department is charged with ensuring that the actual costs of providing medical care are minimized to the extent consistent with sound medical practice. A major component of this process is minimizing the length of each patient's hospital stay, and the average length of stay overall, where this is medically appropriate. In 2006, $740,000 of an overall budget shortfall in excess of $2.5 million at the Hospital was attributable to the average Medicare patient's length of stay exceeding budgeted expenses by 0.5 days (6.5 days on average rather than 6.0 as budgeted) and to the average non-Medicare patient's length of stay exceeding budgeted expenses by 0.2 days (3.8 days on average rather than 3.6 as budgeted) (Magone Aff. 1119; Ex. 8, 45).

**Response:**     **Denies materiality.**

13.     In the course of discharge planning, the Hospital's social workers are called upon to address discharge problems such as homelessness, lack of money, problems at home, psychiatric issues, safety concerns, and complex issues where the patient or family may not be ready for discharge (Serra 10-12; Newmark 66-67, 169-70; Magone 34) by providing resources and referral information to help patients and their families arrange for care and recovery both in the Hospital and after discharge (Orsaia 107).

**Response:**     **Admits.**

14.    At all relevant times, plaintiff was expected to handle an average of six to eight patients daily, ranging between a minimum of four and a maximum of fifteen (Magone 94; Newmark 194-96).

**Response:    Denies.  In fact, Magone admitted that there is no limit and furthermore, there were never any statistics complied or records kept concerning the number of cases each social worker was assigned (Magone Dep. 94-95; , Nicaj Aff. Ex. 24; , Nicaj Aff. Ex. Newmark Dep. 194-196, Nicaj Aff. Ex. 23)**

15.    Plaintiff was expected to use her professional judgment to prioritize referrals based on the individual patient's situation, with psychiatric cases typically requiring particular urgency (Magone 67-68).

**Response:    Admits.**

16.    Patient discharges are sometimes directed to occur on five or fewer hours' notice, such as notice at 10 am that a patient would need to vacate by 3 pm (Newmark 170).

**Response:    Denies materiality.   Furthermore, Defendants' citation does not support their assertion (Id.).**

17.    In difficult discharge cases, the social worker may be called upon to explain to an upset family the insurance or billing implications of staying past the appointed time for discharge, and in some cases negotiate with a doctor to permit a longer stay (Newmark 170).

**Response:    Denies materiality.**

18.    In their prior employment at Phelps Memorial Hospital (Ex. 9), plaintiff and Serra did outpatient psychiatric social work, which involves a relationship between social worker and client that can last for years (Serra 10).

21

**Response:    Denies materiality.  Furthermore, Plaintiff had more admitted patient experience than Serra (Def. 9; Def. Ex. 44; Newmark Dep. 197-98, Nicaj Aff. Ex. 23).**

19.    Social workers provide psychiatric counseling at the Hospital only in small doses (Serra 10, Newmark 75).

**Response:    Denies materiality.**

20.    Newmark considered psychiatric counseling and psychotherapy to be her forte (Ex- 10).

**Response:    Denies materiality.**

21.    The primary task of Hospital social work is to plan the patient's discharge rather than to develop long-term therapeutic relationships (Serra 10).

**Response:    Denies materiality.  Furthermore, the social workers at Lawrence deal with a number of social issues (Serra Dep. 10).**

22.    Plaintiff was at all times an employee at will (Ex. 11).

**Response:    Denies materiality.  Plaintiff does not dispute this.  However, it goes without saying that Defendants cannot take action against Newmark by reason of her age or in retaliation for opposing discrimination in the work place.**

23.    The Hospital uniformly subjects all new employees to an initial probationary period to assess the individual's skill and behavior in the new position (Magone Aff. ¶ 11).

**Response:    Denies materiality.**

24.    The probationary period for plaintiff's position was six months (Magone 167; Orsaia 152-53; Ex. 11),

**Response:    Admits.**

25.     Plaintiff's probationary period was originally due to expire on September 20, 2006 (Magone 127).

**Response:      Admits.**

26.     Magone, as director of her department, had the discretion to extend Magone's probationary period for up to three additional months (Orsaia 153-58; Magone Aff. ¶ 11).

**Response:      Denies.  The extension of the probationary policy was subject to the approval of Human Resources (Def. Ex. 11 N424-425).  Indeed, there was nothing in writing to/from Magone and to/from HR concerning extending Plaintiff's probationary period (Orsaia Dep. 154-156).**

27.     The probationary process ends with a performance evaluation and an assessment of whether the employee has sufficiently met Hospital expectations to warrant a continuation of employment (Orsaia 153-58; Magone Aff. ¶11).

**Response:      Admits.**

28.     The standards for satisfactory completion of the probationary period are not the same imposed by the Hospital's policy of progressive discipline (Magone ¶11).

**Response:      Denies.  Nothing in Lawrence's policy states that there is a difference (Def. Ex. 11 N-424-425).**

29.     As a matter of Hospital and department practice, the events that result in a manager's decision that an employee has not successfully completed his or her probationary period need not constitute terminable offenses in their own right (Magone ¶ 11).

**Response:      Denies.  There is nothing contained in Def. Ex. 11 that states this so-called difference (See Def. Ex. 11 N424-425).**

30.     Employees may be, and have been, terminated from employment by Magone for failure to successfully complete their probationary period on the basis of attitude problems, personality conflicts, or substandard skills (Magone ¶ 11).

**Response:     Denies materiality.**

31.     During Magone's career at the Hospital prior to Newmark's employment, Magone terminated social worker Rose Bartone, case manager Dore Kessman, and case manager Beth Jamison for failure to successfully complete their respective probationary periods (Magone Aff. ¶ 11).

**Response:     Denies materiality.   These examples are totally inappropriate and not relevant to the issues here.  In any event, conveniently here Defendants do not provide these employees' evaluations, their unscheduled time off or any other documentation of their deficiencies.  Most importantly, Magone's self-serving affidavit containing these so-called other examples attempts to cloud the ultimate issue as to Plaintiff's retaliation claim -- whether Magone's termination of Plaintiff's employment just a five days after her last communication opposing discrimination is retaliatory.**

32.     Magone decided that Bartone had not successfully completed her probationary period because of Bartone's poor organization, her failure to carry an adequate caseload independently, and her failure to adjust to the Hospital's case management model (Magone ¶ 11).

**Response:     Denies materiality.  See response to ¶31 *supra.***

33.     Bartone, like plaintiff, had previously been employed as a social worker at Phelps Memorial Hospital before coming to Lawrence Hospital, but worked in an inpatient setting rather than an outpatient psychiatric setting (Magone ¶ 11).

24

**Response:**    **Denies materiality.  See response to ¶31** *supra.*

34.    Magone decided that Kessman had not successfully completed her probationary period because of Kessman's poor attendance, poor punctuality, lack of proper documentation, a negative attitude, difficulty managing her caseload, and failure to take a more pro-active approach to discharge planning and reducing patient length of stay (Magone ¶ 11).

**Response:**    **Denies materiality.  See response to ¶31** *supra*

35.    The average caseload of a case manager, depending on the floor and the patient census, is usually 15-20 patients (Magone ¶11).

**Response:**    **See response to ¶31** *supra.*

36.    Magone decided that Jamison had not successfully completed her probationary period because of Jamison's poor attendance and concerns Magone had about Jamison's office comportment and professional judgment, among other problems (Magone ¶ 11).

**Response:**    **See response to ¶31** *supra.*

37.    Bartone, Kessman, and Jamison did not submit complaints of discrimination or retaliation against Magone either before or after she terminated their employment (Magone ¶ 11).

**Response:**    **See response to ¶31** *supra.*

38.    Magone had previously received multiple complaints about Bartone, Kessman, and Jamison's performance, some of which she documented, from case managers and other staff in her department (Magone Aff. ¶11).

**Response:**    **See response to ¶31** *supra.*

39.    At no point during Magone's employment at the Hospital has she received numerous complaints from multiple staff members about a single individual's performance, but

then concluded that that individual had successfully completed his or her probationary period and remain employed at the Hospital (Magone ¶ 11).

**Response:**    **See response to ¶31 *supra*.**

40.    Plaintiff admits having difficulty adjusting to her role (Newmark 11) and to the case management model (Newmark 231).

**Response:**    **Denies. Plaintiff had some difficulty in the beginning of her tenure (Id.; Newmark Dep. 198, Nicaj Aff. Ex. 23).**

41.    In May 2007, Magone noticed plaintiff's difficulty and frustration with her work and sent plaintiff an e-mail offering her encouragement and urging her to ask questions when she was unsure how to proceed (Ex. 12).

**Response:**    **Denies.    The email does not support Defendants' contention (Id.).**

42.    Plaintiff blames some problems with her performance on her workload (Newmark 16566) or on poorly defined roles (Newmark 167, 198).

**Response:**    **Denies while she did state at Lawrence "there was lack of direction as to who did and why" (Newmark Dep. 198, Nicaj Aff. Ex. 23).**

43.    A few months into her employment, plaintiff, Serra, and Magone had a discussion in which they reached consensus on the definition of plaintiff's and Serra's roles as social workers (Newmark 166-67; Serra 13-16; cf. Ex. 13).

**Response:**    **Admits.**

44.    Plaintiff has described the mentality of managers as "backbiting" and "pathological" and claims they were territorial and unwilling to share information (Defendant's Ex. D; Newmark 67-70).

**Response:**    **Admits. And adds that Magone herself testified about the difficulty of case manager and staff unrest (See Pl. 56.1 Stmt ¶¶62-70). Moreover, Serra who is still employed at Lawrence also states that some of the case managers "are very difficult to work with and they are more interested in talking about other people's work and this and that, versus paying attention to their situations" (Serra Dep. 34, Nicaj Aff. Ex. 26). In fact, Serra did not want to have lunch at the same table because the case managers "talked negatively about other people in the department as they are sitting two feet away from them, talk about patients and something that — Carole [Newmark] and [Serra] come from [a] mental health background, and [Newmark and Serra] respect people's privacy and would not be talking about cases in the middle of the cafeteria (Serra Dep. 38-39, Nicaj Aff. Ex. 26).**

45.    Plaintiff's difficulty working with the Hospital's case managers led her to arrange a meeting through Magone to resolve her conflicts with the case managers (Newmark 68) in or about May 2006 (Newmark 71).

**Response:**    **Denies. Plaintiff and Serra both had difficulty working with the managers (Newmark Dep. 68-69, 71, Nicaj Aff. Ex. 23). There were numerous complaints about case managers made by other employees apart from Plaintiff, including Serra, Del Bene and Magone (See Pl. 56.1 Stmt ¶¶62-68).**

46.    Some case managers responded to plaintiff's complaints by explaining to plaintiff that they understood her situation, but they were working in an extremely fast-paced work environment (Newmark 68).

**Response:**    **Denies. Defendants' citation does support their contention (Newmark Dep. 68). Furthermore, both Serra and Plaintiff raised concerns at this meeting.**

47.     Plaintiff asserts that by the end of her employment, she managed to develop a rapport with all but one of the department's nine case managers (Newmark 55, 68-70, 73).

**Response:     Denies based on the fact that Defendants' citations to the record do not support their assertion.**

48.     In May 2006, based on her observations of how case managers responded to Magone, and listening to their remarks to one another, plaintiff concluded that all of the Hospital's case managers were afraid of Magone (Newmark 37).

**Response:     Admits.**

49.     Plaintiff decided in May 2006 that Magone was tough and unfair (Newmark 34).

**Response:     Denies.  Defendants intentionally mischaracterize Plaintiff's testimony. Plaintiff stated in relevant part, in response to the question, "When did you first start to believe Cathy Magone was a bad manager?", Plaintiff answered "I got information prior to accepting the position that she was a very tough manager and not fair.  I, being the person that I am, I thought I would come to my own conclusions about anyone I met."  (Newmark Dep. 34, Nicaj Aff. Ex. 23).**

50.     Plaintiff regards Magone as very demanding, very demeaning, demanding to know what was happening at all times, and managing through fear (Newmark 33, 37-38).

**Response:     Admits.**

51.     In plaintiffs view, Magone was "very volatile at times with other people" (Newmark 30), including all case managers (Newmark 30), and insisted on things being done her own way (Newmark 31).

**Response:     Admits.**

52.     Plaintiff expressed aloud her opinions about Magone and her own dissatisfaction with her employment at the Hospital, with the role of social work, and with the Hospital leadership (Newmark 40).

**Response:     Denies.  Plaintiff did not do so in public as implied by Defendants (See Newmark Aff. ¶¶16-17).**

53.     Plaintiff expressed her dissatisfaction with her employment to coworkers, including both Serra and a case manager, in June 2006 (Newmark 40).

**Response:     Denies.  Plaintiff expressed concern in July but more so in August with Serra.  Serra agreed with Newmark's observations (Newmark Dep. 41-42, Nicaj Aff. Ex. 23).**

54.     After June 2006, plaintiff told Serra that Magone showed no regard for patients, patient situations, or family situations (Newmark 42).

**Response:     Admits.**

55.     Nurse Practitoner Mauna Del Bene was hired to launch the Hospital's Palliative Care Service, and started the service after beginning employment on May 20, 2006 (Del Bene 7; Magone 58-60).

**Response:     Admits.**

56.     The Palliative Care Service is an interdisciplinary program for the treatment of the dying, those suffering from pain, and the chronically ill in which doctors, nurses, a psychiatric nurse practitioner, and social workers collaborate on individual patient care assignments to share their respective insights with patients, families, and one another to achieve the best care possible in difficult medical circumstances, with services including pain management, bereavement counseling, and hospice arrangements (Magone 31, 50; Serra 23-24).

**Response:**     **Admits.**

57.     Del Bene witnessed plaintiff being openly critical of Magone, Magone's knowledge of social work, the structure and leadership of the department of case management, the lack of technical support in her department, and the utilization or underutilization of social workers in the Hospital, including plaintiff and Serra's role in the case management model (Del Bene 34-36).

**Response:**     **Denies. Plaintiff was never openly critical of Magone (Newmark Aff. ¶16-17). In fact, Del Bene reluctantly admitted that Serra raised similar concerns to her (Del Bene Dep. 37, Nicaj Aff. Ex. 28). Moreover, Del Bene was constrained to admit that other employees including Del Bene criticized Magone's leadership style (Del Bene Dep. 37, Nicaj Aff. Ex. 23). In fact, Del Bene communicated with Newmark on a number of occasions about Magone's unprofessionalism towards staff and the fact that Magone did not know how to communicate with staff (Newmark Dep. 52-53, Nicaj Aff. Ex. 23).**

58.     Del Bene never witnessed Magone's conduct or managerial deficiencies as described by plaintiff (Del Bene 38-39).

**Response:**     **Denies. In fact, Del Bene herself discussed that Magone's leadership style was less than optimal (Del Bene Dep. 37, Nicaj Aff. Ex. 28). Del Bene also communicated with Newmark on a number of occasions about Magone's unprofessionalism towards staff and the fact that Magone did not know how to communicate with employees (Newmark Dep. 52-53, Nicaj Aff. Ex. 23).**

59.     Del Bene observed plaintiff making audible sighing noises, gesturing to indicate her displeasure, and engaging in emphatic gum chewing during interdisciplinary rounds to draw attention to her dissatisfaction or disagreement (Del Bene 35-36).

**Response:    Denies.  Plaintiff never made any such gestures during interdisciplinary rounds (Plaintiff Aff. ¶¶16-17).**

60.    Interdisciplinary rounds involve social workers, physical therapists, and nurses meeting at different units to discuss patient care (Del Bene 35-36).

**Response:    Admits.**

61.    Del Bene offered plaintiff advice on several occasions, including during one lunch appointment (Del Bene 37-38), to develop constructive strategies for improving the status of social work within the department of case management (Del Bene 37).

**Response:    Denies.  Defendants' citation does not support their assertion.  Moreover, Del Bene admits that Magone had a lack of understanding of social work (Del Bene Dep. 37-38, Nicaj Aff. Ex. 28).**

62.    When giving advice to plaintiff, Del Bene coached her to advocate for social work more formally (Del Bene 38), take initiative in a perceived vacuum to define the social workers' role more clearly (Del Bene 25) and integrate social work more securely with other hospital services (cf. Del Bene 38).

**Response:    Denies.  Del Bene claims there was a discussion concerning how Plaintiff as well as Serra could advocate in a more formal way (Del Bene 37-38, Nicaj Aff. Ex. 28).**

63.    After Del Bene began her employment at the Hospital, plaintiff told her she wanted to be involved in providing palliative care (Del Bene 14-15, 27).

**Response:    Admits.**

64.    Plaintiff told Magone during the interview process that she was [sic.] interesting in working in palliative care (Magone 32, 50).

31

**Response:    Admits.  Furthermore, Magone promised that Plaintiff would be assigned to Palliative care and that she would be able to "write" her own ticket (Newmark Dep. 64-65, 106, 212-214, Nicaj Aff. Ex. 28; Newmark Aff. ¶7).**

65.    Plaintiff and Del Bene spoke on multiple occasions about what plaintiff could do to involve herself in the palliative care program (Del Bene 15, 20).

**Response:    Admits.**

66.    Del Bene could recall only a single instance where Del Bene and plaintiff interacted regarding a palliative care matter (Del Bene 46, 50).

**Response:    Denies.  Del Bene recalled at least one instance where Plaintiff already met with the family and communicated to Del Bene about that and Plaintiff then passed the case over to Del Bene (Del Bene Dep. 46, Nicaj Aff. Ex. 28).  furthermore, Plaintiff and Del Bene discussed the palliative care program on a number of occasions, including while at lunch (Newmark Dep. 53-54, Nicaj Aff. Ex. 23).**

67.    On the one palliative care case on which Del Bene recalls interacting with plaintiff, plaintiff declined to participate in a joint conference with the family (Del Bene 47).

**Response:    Denies.  Del Bene never asked her to participate in any joint conference (Del Bene Dep. 46-47).**

68.    Plaintiff told Del Bene on multiple occasions that she was too busy to join her on palliative care cases (Newmark 192).

**Response:    Denies materiality.  Furthermore, for while Plaintiff did not always join Del Bene, she joined her at these meetings frequently but Plaintiff always made contact afterwards and discussed the cases (Newmark Dep. 192, Nicaj Aff. Ex. 23).**

69.    Plaintiff told Del Bene more than once that it was unnecessary for Newmark to meet with Del Bene and a family for a palliative care consultation that Newmark had already seen (Newmark 191-92).

**Response:    Denies the characterization made by Defendants.  Plaintiff stated she may have on more than one occasion advised Del Bene that she had already met with the family and so it was not necessary to meet with them when Del Bene was meeting with them because Del Bene focused on a different area.  Del Bene communicated with families as a nurse practitioner and she knew about the medical status of the patient (Newmark Dep. 192-93, Nicaj Aff. Ex. 23).  As a social worker, Plaintiff's area was not medical and thus was not within her realm of knowledge (Newmark Dep. 192-93, Nicaj Aff. Ex. 23).**

70.    Del Bene never had the opportunity to observe plaintiff's interactions with patients (Del Bene 50), or to assess how well they would work together (Del Bene 47).

**Response:    Denies.  Plaintiff and Del Bene attended a number meetings together with patients (Newmark Dep. 191-92, Nicaj Aff. Ex. 23).**

71.    Del Bene was disappointed on the one occasion she recalls interacting with plaintiff on a specific palliative care matter by plaintiff's indication that she was handing a case to Del Bene for completion rather than joining her in an interdisciplinary assessment (Del Bene 47).

**Response:    Denies.  Furthermore, Del Bene never testified about any so-called interdisciplinary assessment (Del Bene Dep. 46-47, Nicaj Aff. Ex. 28).  Moreover, Del Bene never asked Plaintiff to stay for Del Bene's meeting with the family nor did she know whether Plaintiff had other patients that Plaintiff was required to see (Del Bene Dep. 46-48, Nicaj Aff. Ex. 28).  Indeed, Defendants are contradicting their positions.  On one hand,**

**they attempt to justify Magone's discriminatory decision to appoint Serra by claiming that Magone selected Serra as the social worker dedicated to the palliative care service because Serra was shadowing Newmark but on the other hand, they seem to imply that despite the fact that Plaintiff had seen the patient she was expected to shadow Del Bene.**

72.    Plaintiff failed to attend all but two weekly meetings with Del Bene and Serra to discuss palliative care (Newmark 183-84; Magone 90-91; Ex. 14, 15).

**Response:    Denies. Plaintiff stated she met with Del Bene one or two times early on but later on while it was more difficult to meet, she did meet with Del Bene as often as she could (Newmark Dep. 183, Nicaj Aff. Ex. 23).**

73.    Del Bene asked plaintiff to develop a bereavement policy for use by the palliative care center (Del Bene 15-16; Magone 91-92; Ex. 16).

**Response:    Denies (Newmark Dep. 188-89, Nicaj Aff. Ex. 23). Plaintiff was never asked (Newmark Dep. 188-89, Nicaj Aff. Ex. 23). Del Bene never testified she asked Plaintiff to develop a bereavement policy (Del Bene, Nicaj Aff. Ex. 28). Indeed, Del Bene thanked Plaintiff for providing information to her on another issue and advised Plaintiff that Del Bene and a doctor were trying to develop a bereavement process and merely invited Plaintiff to collaborate (Def. Ex. 16).**

74.    Plaintiff failed to develop a bereavement policy as requested by Del Bene (Del Bene 1516; Magone 91-92; Ex. 16).

**Response:    Denies. Plaintiff was never asked (Newmark Dep. 188-89, Nicaj Aff. Ex. 23).**

75.    Plaintiff claims that no one directed her to prepare a bereavement policy (Newmark 18889).

**Response:    Denies. Plaintiff testified that she was never asked (Newmark Dep. 188-89).**

76.    After plaintiff failed to respond to Del Bene's request to develop a bereavement policy, Del Bene attempted to schedule a meeting to discuss the assignment (Ex. 17).

**Response:    Denies.  Plaintiff was never asked to prepare a bereavement policy (See ¶¶75 *supra*).**

77.    Del Bene made requests and recommendations to plaintiff regarding the role of social work in a palliative care service including networking within the Hospital on palliative care issues, researching palliative care associations and informational websites, and developing a social worker evaluation form to formalize the role of social work on the interdisciplinary team (Del Bene 16).

**Response:    Plaintiff complied with some of the requests and met with Del Bene to discuss palliative care (Def. Ex. 16; Newmark Dep. 189-190, Nicaj Aff. Ex. 23).**

78.    Plaintiff did not implement or respond to Del Bene's suggestions for developing the role of social worker in the Palliative Care Services (Ex. 18-21).

**Response:    Denies the email exhibits cited by Defendants evidence anything whatsoever about developing the role of a social worker, that Plaintiff was asked to implement such a policy and did not respond to Del Bene's suggestions (Def. Ex. 18-21).**

79.    Pursuant to a mandate from the New York State Department of Health, Magone directed plaintiff to participate in off-site instruction on June 20 and 21, 2006 on how to train Hospital personnel to provide appropriate mental health care in the event of terrorism or disaster (Newmark 117-20; Magone 74-75, 77, 79).

**Response:    Admits.**

80.    Magone asked plaintiff at least twice about the status of her work on disaster mental health training the months after the training took place (Newmark 123).

**Response:**    **Admits.**

81.    Newmark gave Magone no information about the status of her work on the disaster mental health training other than that it would be "a lot of work" (Newmark 123).

**Response:**    **Denies.  When Magone asked Plaintiff how it went, Plaintiff advised her it was very good and furthermore, Plaintiff "recognized her responsibility to the hospital and to the training . . .[she] was formulating how . . .[she] would proceed (Newmark Dep. 122-23, Nicaj Aff. Ex. 23)**

82.    Plaintiff did not advise Magone of the deadline for the mandated training in disaster mental health to be completed (Newmark 122-23).

**Response:**    **Denies.  Plaintiff was never asked by Magone about the deadline for the mandated training.   It should be noted that Magone clearly did not perceive the Mental Health training important for Magone as of February 20, 2008 (when she was deposed), which was well after Plaintiff was terminated, Magone did not know who received mental health training, the number of people who were trained, how long the training lasted, where the training took place, whether anyone else was assigned to replace Plaintiff in the training and whether the project had even been completed (Magone Dep. 80-81, Nicaj Aff. Ex. 24).**

83.    Plaintiff did not tell Magone that she was reviewing the training materials for the disaster mental health training (Newmark 122-23).

**Response:**    **Denies.  Magone never asked Plaintiff (Newmark Dep. 122-23, Nicaj Aff. Ex. 23).  Plaintiff had more than one year to complete the project and in any event, well after Plaintiff was fired from her position, Magone did not even know whether the training had been completed as of February 20, 2008! (Newmark Dep. 122-23, Nicaj Aff. Ex. 23;**

36

Magone Dep. 81, Nicaj Aff. Ex. 24; Nicaj Aff. Ex. 19).  **This fact alone belies Defendants'**
**claim that the mental health project was important.**

84.    Plaintiff did not keep any written notes, outlines, or memoranda regarding any
efforts she may have made to implement the disaster mental health training program (Newmark
121).

**Response:    Denies materiality for she had more than one year in which to complete the**
**task (Newmark Dep. 122-23, Nicaj Aff. Ex. 23; Nicaj Aff. Ex. 29).  In any event, by all**
**accounts the deadline in which to implement this disaster mental health training was on or**
**before August 30, 2007 obviously that Magone clearly did not consider the Mental Health**
**training important because as of February 20, 2008, Magone did not know who received**
**mental health training, the number of people who were trained, how long the training**
**lasted, where the training took place, whether anyone else was assigned to replace Plaintiff**
**in the training and whether the project had ever been completed (Magone Dep. 80-81;**
**10/5/06 Email, Nicaj Aff. Ex. 29).**

85.    Magone became plaintiff's direct supervisor for the first time in July 2006 after
the departure of an intermediate manager (Newmark 8, 168; Magone 136).

**Response:    Denies based on the fact that Defendants' citation does not support their**
**assertion (Id.).**

86.    Beginning with her own direct supervision of plaintiff, Magone became
concerned about plaintiff showing very little follow-up with patients whose cases she was
handling (Magone 136).

**Response:    Denies.  Magone never reduced her concerns about Plaintiff's performance**
**in writing (Magone Dep. 136, , Nicaj Aff. Ex. 24).**

87.    During a July 18 weekly staff meeting to discuss Length of Stay, Magone concluded that plaintiff was not familiar with any of plaintiff's cases and could not describe them even when given a list of names. It did not appear to Magone that plaintiff had seen these patients (Magone 136; Newmark 198-200; Ex. 22).

**Response:    Denies. In a writing which Magone prepared, she claimed that she communicated to Newmark about her cases as of 1:00 p.m. (Def. Ex. 22). Magone falsely claimed in the note that as of 1:00 p.m., Plaintiff stated that she had not seen the patients on the list (Id.). Newmark denies ever telling Magone that she had not seen any patients (Newmark Dep. 199, Nicaj Aff. Ex. 23). Instead, Newmark explained that because she was so busy that day, she did not have an opportunity to obtain her binder where she kept all the information containing her patient caseload located in her office and she did not want to be late to the meeting so she went directly to the meeting (Newmark Dep. 199-200, Nicaj Aff. Ex. 23). From memory, Plaintiff was able to describe some of the cases she was working on but Plaintiff could not identify all of them because she did not have the names in front of her (Id.).**

88.    Newmark lacks [sic.] a specific recollections of what she told Magone regarding her inability to report on her cases at the July 18, 2006 length of stay meeting (Newmark 203).

**Response:    Denies. Newmark made it clear that she did in fact tell Magone she saw patients (Newmark Dep. 199-200, Nicaj Aff. Ex. 23)**

89.    Plaintiff "highly doubts" and "does not believe" Magone's recollection that plaintiff said she had not yet seen any patients that day (Newmark 203).

**Response:    Denies based on the fact that there were no questions regarding Magone's**

**recollection put to Plaintiff (Id.).  Plaintiff did see patients (Newmark Dep. 199-203, Nicaj**

**Aff. Ex. 23).**

90.    Plaintiff admits she was unprepared for the July 18, 2006 meeting and could not

answer Magone's questions, claiming that she left her paperwork in her office (Newmark 198

200; Ex. 22).

**Response:    Denies.  See Plaintiff's response to ¶¶87-89 *supra.***

91.    Plaintiff realized while an employee at the Hospital that she could be subjected to

questions about her caseload at any time (Newmark 167).

**Response:    Admits and adds that general questions regarding case load is vastly**

**different from questions about specific patients (Newmark Dep. 167, 198-200, Nicaj Aff.**

**Ex. 23).**

92.    Magone met and spoke with plaintiff on July 20, 2006 to express her concern that

Newmark was not adjusting to the case management model (Magone 135-37, 141; Ex. 23).

**Response:    Denies.  Plaintiff went to Magone's office on her own accord for the purposes**

**discussing inconsistencies in procedure between the social workers (Plaintiff and Serra)**

**and case managers (Newmark Dep. 162, Nicaj Aff. Ex. 23).**

93.    In their July 20 meeting, Magone mentioned plaintiff's failure to follow up

properly on cases, need to respond more promptly to staff requests for information, inadequate

documentation in patient medical records (Magone 137), and need to be more proactive in

beginning discharge planning with families (Newmark 168; Ex. 23).

**Response:    Denies.  Indeed by the very nature, there is a significant difference between**

**case managers and social workers.  The case managers' main focus which to a lesser degree**

is a social worker's focus is discharge planning.  A social worker's role is to work with difficult patients some of whom want to stay longer at Lawrence (Newmark Dep. 169-70, Nicaj Aff. Ex. 23).  Moreover depending on the mental health of a patient, sometimes a social worker needs to spend hours with a patient (Serra Dep. 39-43, Nicaj Aff. Ex. 23).  This is especially true in circumstances where there is a suicidal patient, someone who has overdosed or a rape victim (Id.).

94.    Plaintiff told Magone at the July 20 meeting [sic.] by complaining that she had too much work and that many of her cases were complicated (Magone 137; Ex. 23).

Response:    Denies.  Plaintiff never stated that she had too much work or that many of her cases were complicated at the July 20th meeting (Newmark Dep. 162-65, Nicaj Aff. Ex. 23).

95.    When Magone reviewed plaintiff's cases at the July 20 meeting, she found that plaintiff was handling only four cases, and advised plaintiff to organize and prioritize her work (Ex. 23).

Response:    Admits that is what is claimed.  Plaintiff and Serra not only received patient referrals from managers.  Plaintiff and Serra received patient referrals a number of different ways which would not be reflected in Magone's review of Plaintiff's cases (Serra Dep. 41-43, Nicaj Aff. Ex. 26).

96.    Magone expressed concern to Newmark on July 20 that, one month after attending the Disaster Mental Health training, Newmark had not begun planning to implement the Department of Health mandate. Plaintiff told Magone in response that doing so would be a lot of work (Magone 137; Ex. 23).

**Response:     Denies.  Magone never discussed that with Plaintiff (Newmark Dep. 162-65, Nicaj Aff. Ex. 23).**

97.     After the July 20 meeting, plaintiff asked Magone whether she should consider their discussion a verbal warning (Newmark 164; Magone 137; Ex. 24).

**Response:     Admits.**

98.     Magone replied to plaintiff that she did not consider their July 20 meeting to be discipline, and wrote via e-mail "I want you to be successful and I will work with you to make that happen" (Magone 137-3R; Ex. 24).

**Response:     Denies.  In fact, in response to Plaintiff's question, "[w]as our conversation of today to be considered a verbal warning?" , Magone stated emphatically "absolutely not." (Def. Ex. 23).**

99.     In August 2007, Magone advised Del Bene that she was in the process of selecting a social worker to travel to observe a palliative care program in Columbus, Ohio (Del Bene 27-28; Ex. 15).

**Response:     Denies.  Defendants' citation does not support their claims.  Furthermore, the trip to Ohio was for training – not to merely observe (O'Hare Dep. 13-14, Nicaj Aff. Ex. 27; Del Bene Dep. 17-18, Nicaj Aff. Ex. 28).**

100.     The Palliative Care Service's site visit to Ohio was not a transfer or promotion, did not involve a change in pay, benefits, office, or location, would not result in either social worker being denied involvement from the provision of palliative care at the Hospital, and did not involve any other improvements in terms and conditions of employment (Magone 84; O'Hare 10; Magone Aff. ¶ 5).

**Response:     Denies.  Magone's note of August 15, 2007 states that she advised Plaintiff that she decided to appoint Serra the Social Worker for the palliative care service (Def. Ex. 25).**

101.    Plaintiff provided palliative care and worked on palliative care cases throughout her entire period of employment at the Hospital, both before and after the decision to send Serra on the business trip (Newmark 181-82, 190-91).

**Response:     Admits but to a lesser degree (Id.).  Indeed, Serra was the social worker dedicated to the palliative care service (Newmark Dep. 47-48, 182-83, Nicaj Aff. Ex. 23; O'Hare Dep. 13-14, Nicaj Aff. Ex. 27).**

102.    Magone decided that it was not appropriate for both social workers to attend the palliative care site visit to Columbus, Ohio (see Magone 69-70).

**Response:     Denies.  Defendants' citation does not support their claim.**

103.    Serra did not receive any additional money or benefits as a result of her site visit to Columbus, Ohio or her further role with the Palliative Care Service (Magone 171).

**Response:     Admits.**

104.    Del Bene had one or two separate discussions with Magone and with her own supervisor, Rose Ann O'Hare, about the selection of a social worker to participate in the Palliative Care visit to Ohio (Del Bene 19-20).

**Response:     Admits.**

105.    Magone told Del Bene that Newmark had been assigned a Disaster Mental Health project, which Magone did not believe Newmark had properly attended to, and that Magone did not consider it appropriate to assign Newmark a second project when Newmark had failed to show progress on the first (Del Bene 28-29, 31).

42

**Response:    Admits that is what is claimed. But Magone's actions clearly contradict what she may have communicated for Magone clearly did not perceive the mental health training as important.  In fact, as of February 20, 2008, Magone did not know who received the mental health training in connection with the project, the number of people who were trained, how long the training lasted, where the training took place, whether anyone else was assigned to replace Plaintiff after she left to do mental health training and whether the training had even been completed (Magone Dep. 80-81, Nicaj Aff. Ex. 24).**

106.    Del Bene told Magone that although Newmark had expressed interest in Palliative Care, she had not responded to Del Bene's e-mail requests or offers of Palliative Care projects (Del Bene 28), failed to show enthusiasm for working as part of an interdisciplinary team (Del Bene 31), and broadcast a negative, unresponsive attitude that Del Bene felt could be harmful in establishing the credibility of the Palliative Care Service (Del Bene 26, 3132).

**Response:    Denies.  Indeed, Del Bene admitted that Serra also expressed the same concerns Plaintiff had communicated to Del Bene.  Moreover, the only written communication about a negative attitude to which Del Bene was a participant did not come from Plaintiff but rather form Serra who apologized to Del Bene about her "bad attitude" the week before (Def. Ex. 19).**

107.    Del Bene told Magone that Newmark appeared to be an angry woman. Magone agreed with Del Bene's assessment (Magone 88-89). Del Bene and Magone agreed that Newmark's demeanor was not conducive to the care of dying patients (Magone 89).

**Response:    Denies.  In fact, Magone admitted that Newmark was not angry in her presence (Magone Dep. 162, Nicaj Aff. Ex. 24).  Magone never reduced anything Del Bene supposedly said in writing nor did she ask Newmark about this supposed anger (Magone**

43

Dep. 161).  In any event, Newmark denies that she was angry.  Plaintiff never displayed

any anger, disparaging and/or aggressive behavior in public in the workplace before or

after Magone's August 15th meeting with Newmark announcing that she was selecting

Serra as the social worker dedicated to the palliative care service because she was younger

and could handle the job better than Newmark could (Newmark Aff. ¶¶15-17).  Indeed, it

was Magone and some of the case managers who displayed unprofessional behavior

(Newmark Aff. ¶16).

     108.    Del Bene told Magone that Serra had responded very positively to Del Bone's

suggestions and recommendations regarding investigating resources and learning more about

palliative care, actively collaborated with Del Bene on numerous patient care matters, and made

numerous palliative care referrals (Del Bene 26; cf. Ex. 18, 19, 21).

**Response:**    **Admits that is what is claimed but see Plaintiff's response to ¶¶106-107**

*supra.*

     109.    Del Bene expressed to Magone her view that Serra's engaging demeanor, positive

attitude, positive tone in verbal and written communications, and demonstrated enthusiasm for

palliative care would reflect well on the Palliative Care Service (Del Bene 26,32).

**Response:**    **Admits that is what is claimed but see Plaintiff's response to ¶106** *supra.* **In**

**addition, Serra emailed Del Bene expressing that "[i]t is often hard work in this**

**environment when you don't know who you can trust" (Serra Dep. 33-34, Nicaj Aff. Ex.**

**26; 7/20/06 Email, Nicaj Aff. Ex. 13; Def. Ex. 19).  Serra was referring to the case managers**

**who are very difficult to work with and more interested in talking about other people and**

**other people's work than paying attention to their own work (Serra Dep. 33-34, Nicaj Aff.**

**Ex. 26).**

110. Del Bene and Serra had developed an amicable and professional working relationship (Newmark 220).

**Response:**     **Denies materiality for Plaintiff and Del Bene also had a cordial relationship (Del Bene Dep. 7, 42, Nicaj Aff. Ex. 28).**

111. Plaintiff characterizes Del Bene and Serra's professional relationship as "wonderful" (Newmark 220).

**Response:**     **Denies as Defendants mischaracterize Newmark's testimony.  Newmark testified that she found it wonderful that Serra aligned herself with Del Bene (Newmark Dep. 220-221, Nicaj Aff. Ex. 23)**

112. Serra demonstrated curiosity and desire to learn from Del Bene (Newmark 220), asked numerous questions (Newmark 220), took copious notes (Magone 90), and made it a point to collaborate with Del Bene where possible (Magone 90).

**Response:**     **Admits.**

113. Del Bene described her observations about Newmark and Serra to O'Hare (O'Hare 10 11, 16-18; Del Bene 22-23).

**Response:**     **Admits that is what is claimed.**

114. Serra privately agreed with some of plaintiff's workplace complaints (Newmark 42).

**Response:**     **Denies.  Serra expressed complaints to Del Bene about case managers and Cathy Magone (Serra Dep. 33-36, Nicaj Aff. Ex. 26; Del Bene Dep. 39, Nicaj Aff. Ex. 28).**

115. Serra occasionally complained to Del Bene about managerial issues, Magone's grasp of social work, or the utilization of social work within case management (Del Bene 37, 39, 45).

**Response:     Denies that Serra's complaints were occasional for there is nothing in the record to support Defendants' assertion.  In addition, Serra emailed Del Bene expressing that "[i]t is often hard work in this environment when you don't know who you can trust" (Serra Dep. 33-34, Nicaj Aff. Ex. 26).  Serra was referring to the case managers who are very difficult to work with and more interested in talking about other people and other people's work than paying attention to their own work (Serra Dep. 33-34, Nicaj Aff. Ex. 26).**

116.     There is no evidence to suggest that Serra's overall demeanor was problematic or that she made her complaints public in the department (Magone Aff. 116).

**Response:     Denies.  See response to ¶115 *supra*.**

117.     Magone did not witness and was not aware of any displays by Nicole Serra of a negative attitude in the workplace (Magone Aff. 16).

**Response:     Denies materiality.  Magone admits Plaintiff never displayed anger in her presence (Magone Dep. 161, Nicaj Aff. Ex. 24).**

118.     Magone was not aware of Serra making any verbal or nonverbal complaints about the department or her working conditions during rounds, meetings, or other public settings within the Hospital (Magone Aff. ¶ 6).

**Response:     Denies materiality.**

119.     Del Bene found that even in coping with difficult interactions with case managers, Serra showed good energy and enthusiasm and worked to overcome these workplace challenges (Del Bene 41, 43-44; Ex. 19).

**Response:     Denies materiality.**

120.   Magone decided that Serra was a more appropriate choice than Magone for the site visit to Ohio, based on Del Bene's direct input, input through O'Hare, and her own observations (Del Bene 26-32; Magone 72, 85-86; Ex. 25), including her desire for Serra to develop more independence from Newmark (Magone Aff. 113; Ex. 26).

**Response:     Denies.  Magone advised Plaintiff that she (Magone) was selecting Serra because she was young and could handle the job better (Def. Ex. 27).  Despite Defendants' attempt to minimize Magone's decision, Magone appointed Serra as the social worker dedicated to the palliative care service (8/15/06 Note, Nicaj Aff. Ex. 1; Serra Evaluation, Nicaj Aff. 12 N-317).**

121.   Magone decided that Newmark was overprotective of Serra (Magone Aff. ¶ 3).

**Response:     Denies.  In her entire deposition, Defendant Magone never claimed that Newmark was overprotective of Serra.   Magone's decision was based on the fact that Plaintiff was old and Serra was young and could handle the job better (Def. Ex. 27).**

122.   Plaintiff admits that she expected Serra to "shadow" Newmark for a two-month period before taking on assignments of her own (Newmark 113).

**Response:     Denies.  The record cited to by Defendants do not support that Plaintiff "expected" Serra to shadow her for two-month period (Id.).**

123.   Plaintiff required Serra to shadow her for the purpose of obtaining an administrator's signature (O'Hare 16).

**Response:     Denies.  Nothing in O'Hare's testimony indicates that Plaintiff required Serra to do anything much less shadow her for the purpose of obtaining an administrator's signature (Id.).**

124.    Magone decided that plaintiff's overprotective and sheltering approach towards Serra was not beneficial to Serra's professional development and explained this to plaintiff when communicating her reasons for sending Serra on the trip to Columbus, Ohio (Magone Aff. ¶ 3; Ex. 26).

**Response:    Denies.  Magone's self-serving affidavit contradicts not only her note of August 15, 2006 but her deposition, too.  The August 15, 2006 note contains no reference to Plaintiff being overprotective and sheltering (Def. Ex. 25; Nicaj Aff. Ex. 1).  Furthermore, when Magone was asked about the substance of the August 15, 2006 meeting with Newark on at her deposition, Magone failed to mention anything with respect to the eleventh hour allegation that Plaintiff was overprotective (Magone Dep. 85-86, Nicaj Aff. Ex. 24).  Once more, Defendant Magone never claimed that Newmark was overprotective of Serra. Magone's decision was based on the fact that Plaintiff was old, Serra was young and could handle the job better (Def. Ex. 27).**

125.    Plaintiff admits that Serra is "bright" (Newmark 108), learned her job well (Newmark 220), and not a poor choice for the Palliative Care Service (Newmark 108).

**Response:    Admits.**

126.    Plaintiff does not dispute that distribution of work was a factor in Magone's decision (Newmark 124), or that Magone relied on input from Del Bene and O'Hare (Newmark 116-17).

**Response:    Denies. In fact Plaintiff clarified what she said and not surprisingly, Defendants fail to cite that page, stating "you're asking if Cathy Magone considered the fact that this is such a daunting task that I couldn't do the palliative care piece, and my answer is no.  I don't think that – I believe that I could have done the palliative care piece**

as well as the disaster mental health training, as well as everything else that I was doing, because my workload started easing up a bit because Nicole was getting on board and beginning to be out on her own and picking up some of the slack" (Newmark Dep. 124-25, Nicaj Aff. Ex. 23).

127.    On August 15, 2006, Magone selected the social worker who would participate in the palliative care site visit (Magone 70-71, 83; Newmark 47; Ex. 25).

**Response:    Denies. Magone actually appointed Serra as the social worker for the palliative care service (Magone Dep. 82-83, Nicaj Aff. Ex. 24). Once, Magone initially and self-servingly denied ever communicating with Newmark that she (Magone) was had appointed to Serra to the palliative care service (Magone Dep. 82-83, Nicaj Aff. Ex. 24). When Magone was confronted with her August 15, 2006 note wherein she stated "I met with Carole Newmark today to inform her of my decision to appoint Nicole the social worker for the palliative care service", Magone was forced to admit that her testimony had been false (Magone Dep. 82-83, Nicaj Aff. Ex. 23; Def. Ex. 25; 8/15/06 Email, Nicaj Aff. Ex. 1).**

128.    On August 15, Magone told plaintiff she would send Serra to Ohio with the Palliative Care Service rather than Newmark (Magone 83; Ex. 25).

**Response:    Denies (Newmark Dep. 46-48, Nicaj Aff. Ex. 23). Magone told her that she was selecting Serra to be the social worker dedicated to the palliative care program (Newmark Dep. 47-48. 193, Nicaj Aff. Ex. 23).**

129.    Magone asserts that she told plaintiff, "I've decided to appoint Nicole to the Palliative Care Program out in Ohio. She's young in her career, this is a good opportunity for her to have something of her own" (Magone 72, 85-86; Ex. 25).

49

**Response:     Denies.  When Newmark asked Magone how the decision to appoint Serra was made, Magone advised Plaintiff that Serra is younger than you are and can take things in better than you can (Newmark Dep. 48-49, Nicaj Aff. Ex. 23; 9/29/06 Email, Nicaj Aff. Ex. 6; Def. Ex. 27).**

130.    Magone explained to plaintiff on August 15 that her decision had been based in large part on input from Del Bene and O'Hare (Magone 71-72; Ex. 25).

**Response:     Denies.  See response to ¶129 *supra*; *see also* Newmark Dep. at 47-49, Nicaj Aff. Ex. 23.**

131.    Magone told plaintiff on August 15 that she was going to be very busy with the Disaster Mental Health project and had not shown any initiative or progress with that project (Magone 72; Ex. 25).

**Response:     Denies.  See response to 129 *supra*; *see also Newmark Dep. at 47-49.***

132.    Plaintiff construes Magone's remarks on August 15 to mean that Serra was younger than Newmark and therefore "could handle the job better", and claims those are the words Magone used (Newmark 49, 132).

**Response:     Denies.  Plaintiff did not construe anything.  Magone told Newmark that the reason Magone was selecting Serra was because Serra is younger than Newmark and could handle the job better than Newmark could (Newmark Dep. 48-49, Nicaj Aff. Ex. 23; 9/29/06 Email, Nicaj Aff. Ex. 6; Def. Ex. 27).**

133.    On or about August 18, 2006 (Newmark 136), plaintiff met with Patricia E. Orsaia, then the Hospital's Director of Human Resources. At the meeting, plaintiff told Orsaia that Magone said she had selected Serra to work on a particular project on palliative care because

Serra was younger and could do the job better. Plaintiff asked Orsaia whether that was "ageism" (Newmark 49; Orsaia 36-38, 51).

**Response:    Denies.  Plaintiff advised Orsaia that Magone told her (Plaintiff) that she was selecting Serra for the palliative care service because Serra was young and could take things in better than Plaintiff (Newmark Dep. 49, Nicaj Aff. Ex. 23).  Plaintiff did not ask Orsaia whether it was ageism she advised Orsaia that it was ageism (Newmark Dep. 48-49, Nicaj Aff. Ex. 23).**

134.    According to Orsaia, plaintiff told her during the August 18 meeting that she was unsure whether her position at the Hospital was a good fit for her (Orsaia 42), that she had come from a very different mental-health work environment, and that she may be having difficulty adjusting to the Hospital's case management model (Orsaia 41).

**Response:    Denies.  Plaintiff never said those things to Orsaia (Newmark Dep. 48-50, , Nicaj Aff. Ex. 23).**

135.    During the August 18 meeting with plaintiff, Orsaia tried to clarify what Magone had said to plaintiff (Orsaia 43). She asked what plaintiff meant by "ageism" (Orsaia 31), and discussed with plaintiff the possibility that she had misinterpreted Magone's remark (Newmark 50; cf. Ex. 27).

**Response:    Denies.  Orsaia did not try to clarify -- she tried to excuse Magone's statement to Plaintiff despite the fact that she was not at the meeting when Magone uttered the age discriminatory statement and had not yet communicated with Magone.  Instead, Orsaia claimed instead to Plaintiff that "sometimes people filter things out differently" and maybe Plaintiff did not understand what Magone meant (Newmark Dep. 49-50, Nicaj Aff. Ex. 23; Newmark Aff. ¶12).**

136.    Orsaia pointed out to plaintiff on August 18 that Magone had known plaintiffs

approximate age at the time of hire (Ex. 27; Magone 106-07).

**Response:    Denies materiality.**

137.    At the August 18 meeting, Orsaia offered plaintiff the option of approaching

Magone privately to request clarification and explain her perceptions and feelings about the

decision; Orsaia scheduling a meeting where she joined plaintiff and Magone for a common

discussion of the issue; or Orsaia approaching Magone on plaintiff's behalf to seek clarification

and report back to plaintiff about the results (Orsaia 43-44).

**Response:    Denies. Orsaia presented Plaintiff with two options -- either meeting with**

**Magone privately or Plaintiff meeting with Orsaia and Magone (Newmark Dep. 44-45,**

**Nicaj Aff. Ex. 23).**

138.    Plaintiff rejected the option described by Orsaia of approaching Magone privately

because she did not trust Magone to work things out with her (Newmark 47).

**Response:    Admits and adds that Plaintiff did not trust to meet with Magone privately**

**based on the way Plaintiff observed Magone treating other people (Magone Dep. 47, Nicaj**

**Aff. Ex. 24).**

139.    Orsaia understood the result of her August 18 meeting with plaintiff to be that

plaintiff first wanted Orsaia to speak privately with Magone (Orsaia 43-44).

**Response:    Denies. Plaintiff asked her when she, Magone and Orsaia could meet**

**(Newmark Dep. 47-51, Nicaj Aff. Ex. 23; Newmark ¶¶15-16).**

140.    Orsaia scheduled a meeting to discuss Newmark's concerns with Magone after

Orsaia returned from vacation (Magone 95-98; Orsaia 45-47, 50).

**Response:    Admits but only after Plaintiff sent three emails on three different occasions requesting a meeting (Nicaj Aff. Ex. 3, 4 & 5).**

141.    Orsaia had a full week of vacation scheduled after August 18, 2006 (Orsaia 46).

**Response:    Denies materiality.**

142.    Orsaia did not tell Magone the specifics of Newmark's complaint until they met in person (Magone 98, 105-07; Orsaia 47, 51 ).

**Response:    Denies (Magone Dep. 102-103, Nicaj Aff. Ex. 24).   Magone learned on or before August 21, 2006 that Plaintiff made a complaint of age discrimination (Magone Dep. 101-104, Nicaj Aff. Ex. 24).   Moreover, independent of Magone's admission, it is clear that Orsaia did communicate to Magone about Plaintiff's concerns prior to Magone going on vacation.   Orsaia communicated with Magone first by telephone (Orsaia Dep. 46-47, Nicaj Aff. Ex. 24).   Orsaia admitted that it was possible that she discussed Plaintiff's concerns but not in detail.  As of August 21, 2006, Magone accepted Orsaia's proposal for a meeting to discus Plaintiff's "concerns" (Orsaia Dep. 47-48, Nicaj Aff. Ex. 25; 8/21/06 Email, Nicaj Aff. Ex. 2).**

143.    At Magone's meeting with Orsaia, Magone denied plaintiff's accusation, and told Orsaia she had not suggested that age had anything to do with her decision (Magone 102-07).

**Response:    Admits that is what is claimed.**

144.    Magone acknowledged during her meeting with Orsaia that she had used the word "young" or "younger" in her discussion with plaintiff, and explained said the word had been taken out of context. Magone told Orsaia she had said to Newmark that Serra was "young in her career and eager to learn" (Orsaia 52; Magone 72, 85-86, 125).

**Response:**    **Admits that is what is claimed but denies veracity (See Pl. 56.1 Stmt ¶26) in view of the fact that Plaintiff did not have that many years more of social work experience that Serra having pursued a career in social work later in life (Def. Exs. 9 & 44).**

145.    Magone explained during her meeting with Orsaia that she had relied on input from O'Hare and Del Bene, who both favored Serra's selection (Orsaia 52), and that plaintiff had not begun work on another, prior assignment concerning disaster mental health (Orsaia 53).

**Response:**    **Admits as the citation does not support Defendants' assertion.**

146.    Magone agreed with Orsaia during their meeting to discuss Newmark's complaint that it was important to address and resolve plaintiff's concerns (Orsaia 54).

**Response:**    **Denies as the citation to which Defendants do not support their self-serving assertion (Id.)**

147.    According to Orsaia, she conveyed Magone's response to plaintiff (Orsaia 55, 56) after her meeting with Magone. Orsaia alleges that in response, plaintiff said that Magone's clarification was "not acceptable" and denied that Magone had used the phrase "young in her career" (Orsaia 56).

**Response:**    **Admits that is what is claimed.**

148.    Plaintiff mentioned Magone's decision to Del Bene (Del Bene 33-35) and Serra (Newmark 100-02; Serra 28), and also told the case managers (Newmark 103).

**Response:**    **Denies. In essence, Newmark did not know how the cases managers learned of Serra's selection. In response to a question concerning the case managers, when asked "[d]id you tell them yourself?", Plaintiff responded "I probably did, or maybe word got out**

through Nicole. I'm not sure. It wasn't something that I dwelled on." (Newmark Dep. 102-03, Nicaj Aff. Ex. 23).

149.    Plaintiff mentioned during rounds in the Hospital's Intensive Care Unit that Magone had discriminated against her (Del Bene 34).

**Response:    Denies based on the fact that Del Bene was not sure where Plaintiff told her that she was filing a complaint of discrimination (Del Bene Dep. 33-34).**

150.    Magone alleges that plaintiff's reaction to her decision was extremely negative and emotional (Magone 133, 161-62).

**Response:    Denies (Newmark Aff. ¶¶16-17). Magone was asked about what happened between the September 28th meeting wherein Plaintiff again expressed her concerns about age discrimination and her termination on October 5, 2006, Magone responded that Plaintiff was unable to accept a management decision about the appointment of Serra as the social worker dedicated to the palliative care service (Magone Dep. 132-33, Nicaj Aff. Ex. 24). Furthermore, Magone denied that she ever witnessed Plaintiff angry in her presence (Magone Dep. 162-63, Nicaj Aff. Ex. 24).**

151.    Magone concluded after speaking with Del Bene that plaintiff was upset about the decision to the point of being unable to perform her job duties (Magone 161-62).

**Response:    Denies (See Newmark Aff. ¶¶15-17). While Magone, with great enthusiasm, documented alleged incidents concerning Plaintiff, Magone failed document anything concerning Plaintiff being so upset that she was unable to perform her job duties (Magone Dep. 162-63). Furthermore, in her termination memorandum, Magone failed to document any such allegations concerning that plaintiff was so upset that she was unable to perform her job duties (10/5/06 Memorandum, Nicaj Aff. Ex. 9; Def. Ex. 41)**

152.    Magone observed plaintiff on several occasions to be visibly angry as she went about her work (Magone 162), and heard from employees that plaintiff was continuing to complain to coworkers about the decision (Magone 162).

**Response:    Denies. In fact, Magone superficially denied being present for those alleged incident (Magone Dep. 162, Nicaj Aff. Ex. 24). In Magone's termination memorandum, she failed to document any such allegations of visible anger and never documented those alleged incidents that plaintiff was so upset that she was unable to perform her job duties (10/5/06 Memorandum, Nicaj Aff. Ex. 9; Def. Ex. 41; Magone Dep. 162-65, Nicaj Aff. Ex. 24; see also Newmark Aff. ¶¶15-17).**

153.    After Orsaia told Magone about plaintiff's discrimination complaint, Magone disclosed it to her supervisor. Thereafter Magone discussed Newmark's discrimination allegation with only Orsaia and Magone's own supervisor (Magone Aff. ¶ 7).

**Response:    Admits that is what is claimed.**

154.    At no time during plaintiff's employment did Magone disclose plaintiff's complaint of discrimination to any case managers in her department, or to any other Hospital employees other than her supervisor and Orsaia (Magone Aff. ¶ 7).

**Response:    Admits that is what is claimed.**

155.    Magone did not receive any complaints about Newmark's performance from the case managers who reported to her prior to approximately August 15, 2006 (Magone Aff. ¶ 8).

**Response:    Admits that is what is claimed.**

156.    Magone did not encourage or solicit complaints about Newmark from the case managers at any time (Magone Aff. ¶ 8).

**Response:**    **Admits that is what is claimed.  Indeed, the case managers were very difficult to deal with in that they gossiped about other employees' work (Serra Dep. 34-36, Nicaj Aff. Ex. 26).  Serra is sure that the case managers complained about her (Serra) on a number of occasions (Serra Dep. 35-36, Nicaj Aff. Ex. 26;** *see also* **Pl. 56.1 Stmt ¶¶62-68)**

157.    After August 15, 2006, Magone received numerous complaints about Newmark's performance from several different case managers, including complaints that she recorded as notes to file (Magone Aff. 18).

**Response:**    **Denies.  Magone never stated this in her termination memorandum of October 5, 2006 (10/5/06 Memorandum, Nicaj Aff. Ex. 9).**

158.    Magone has not received any complaints from case managers about Serra's performance since Serra began work in April 2006 (Magone Aff. ¶ 8).

**Response:**    **Denies.  Given that deal with case managers are so difficult to deal with, Serra is sure that at some managers complained about her (Serra) on a number of occasions (Serra Dep. 35-36, Nicaj Aff. Ex. 26).  Some of the case managers "are very difficult to work with and they are more interested in talking about other people's work and this and that, versus paying attention to their own situations" (Serra Dep. 34, Nicaj Aff. Ex. 26).**

159.    On August 31, case manager Susanne Muccio informed Magone that plaintiff had told a family that their request for information about nursing homes was premature. Muccio told Magone that when it came time to discharge the patient to a nursing home, the family was unprepared and complained of being rushed by the case manager. Magone concluded that plaintiff's advice to the family had resulted in a delay in the patient's discharge (N-162; Ex. 28).

**Response:     Denies.  Admittedly, Magone did not show this so-called writing she made to Plaintiff nor did Magone ever communicate with Plaintiff about the incident (Magone Dep. 153-54, Nicaj Aff. Ex. 26).**

160.     Plaintiff can neither confirm nor deny that the exchange between Muccio and Magone on August 31, 2006 took place (Newmark 203-04).

**Response:     Denies.  Plaintiff was never aware of any such incidents (Newmark Dep. 203, Nicaj Aff. Ex. 23).**

161.     On September 1, case manager Collette Gilardi asked Magone to intervene because she needed plaintiff to prepare a screening form used for transferring patients to a nursing home when a patient was ready to leave. Gilardi told Magone that Newmark was not responding to her telephone calls (Ex. 29).

**Response:     Denies.  Again, Magone never asked Plaintiff for her view of the so-called incident identified in Defendants' Exhibit 29.  Instead, Magone claimed that she asked Plaintiff why she did not respond to Gilardi and Plaintiff advised her that she did not receive the message (Magone Dep. 154-55, Nicaj Aff. Ex. 24).  Conveniently Magone did not indicate that on her note (Magone Dep. 154-55, Nicaj Aff. Ex. 24; Def. Ex. 29).**

162.     Gilardi told Magone on September 1, 2006 that plaintiff generally did not respond to her requests in a timely manner, and had an uncooperative attitude when she received them (Ex. 29).

**Response:     Denies.  Plaintiff and Serra state Gilardi was one of the most difficult case managers (Serra Dep. 34-37, Nicaj Aff. Ex. 26).  Gilardi would disclose the most confidential medical information about patients loudly in the cafeteria and would loudly speak negatively about co-workers (Serra Dep. 38-39, Nicaj Aff. Ex. 26).  Furthermore,**

**Gilardi screamed at Plaintiff to prepare a patient review instrument ("PRI") that is needed in order to get a patient into a nursing home just as the patient was ready to leave which Gilardi should have requested in a timely manner (Newmark Dep. 204-205, Nicaj Aff. Ex. 23).**

163.    Magone alleges that when she called plaintiff about Gilardi's need for her to complete a screening form, plaintiff responded "I will get to it" in an unprofessional tone (Ex. 29).

**Response:    Denies (See Newmark Aff. ¶¶16-17). According to Defendants' Exhibit 29, Plaintiff responded "curtly."**

164.    Plaintiff acknowledges that her usual response to requests to complete screening forms was that she was busy and would get to it (Newmark 204-06).

**Response:    Admits that if she did not respond immediately to requests for a PRI that she said she was busy doing something else and would get to it and Plaintiff stayed late until it was completed (Newmark Dep. 206-207, Nicaj Aff. Ex. 23).**

165.    Magone did not consider Newmark's response to Gilardi's request acceptable (Newmark 205-206).

**Response:    Denies. Defendants' citation does not support their assertion.**

166.    Plaintiff's alleges that Gilardi complained frequently, may have made the complaint about failing to respond to requests to complete patient review instruments more than once, and demanded instant gratification, and that plaintiff may not been given advance notice of the need for a screening form to be completed (Newmark 204-06).

**Response:    Denies. See Plaintiff's response to ¶162 *supra*.**

167.    On September 7, Magone learned that a patient, who had been in the Hospital for several weeks and had been referred to plaintiff for social work, had not been seen by plaintiff since August 14, even though the patient's transfer to the Intensive Care Unit on August 27 reflected a change in circumstances. Magone concluded that this constituted poor documentation and a lack of follow-up by plaintiff (Magone 155-57; Ex. 30).

**Response:    Admits that is what is claimed. But there were no policies concerning how often patients referred to social work should be followed up (Newmark Dep. 207, Nicaj Aff. Ex. 23). Decisions relating to the frequency of visits are done on a case-by-case basis (Newmark Dep. 207, Nicaj Aff. Ex. 23).**

168.    According to Magone, when she questioned plaintiff about a patient who had been transferred to intensive care without a social work note, plaintiff said that she was overworked and unable to get to all her cases (Magone 158).

**Response:  Admits that is what is claimed and also points out that while Magone claimed that she communicated with Plaintiff about the incident and that was never documented by Magone in her note (Def. Ex. 30; Magone Dep. 157-58, Nicaj Aff. Ex. 24). In the note, Magone does not reveal the identity of the patient, the unit, social worker or the case manager (Def. Ex. 30).**

169.    Magone considered Newmark's unplanned absences from work to be excessive for a probationary employee (Magone 112).

**Response:    Admits that is what is claimed.**

170.    According to Hospital policy, five periods of unscheduled absence (i.e., calling in sick) in a year is considered excessive absenteeism (Magone 111-12; Orsaia 71; Ex. 11).

**Response:**    **Admits that is what is claimed but clearly the policies are discretionary: "lateness and absenteeism may be considered excessive when 5 or more occurrences exist within a floating, but consecutive 12-month cycle" evidencing flexibility for determinations on a case-by-case basis (Def. Ex. 11 N-426). Indeed, Magone does not dispute that Newmark was legitimately absent by reason of illness (Magone Dep. 111-112, Nicaj Aff. Ex. 24).**

171.    Plaintiff had four unscheduled absences in her six-month period of employment at the Hospital (Magone 112; Ex. 31 ), including at least two days of illness early in her employment that were not reflected in her attendance records (Newmark 127-28; Magone Aff. ¶ 17; Ex. 32-33) and one day when plaintiff left work at 9:35 am claiming illness, totaling at least seven days of illness (Ex. 31, 34).

**Response:**    **Denies. According to Defendants' Exhibit 33, Plaintiff had three unscheduled absences.**

172.    On or about September 12 and 13, 2006, Magone spoke to plaintiff about her poor attendance, and about plaintiffs failure to follow procedure for scheduling time off for a medical procedure (Magone 158-59; Ex. 31, 35).

**Response:**    **Denies.   No reference is made to "poor" attendance (Id.). Moreover, Magone was incensed that Plaintiff wrote an email requesting time off in order for Plaintiff have a scheduled colonoscopy (Newmark Dep. 141-42, Nicaj Aff. Ex. 23). As soon as Newmark learned of what the policy was, she filled out the form  (Newmark Dep. 141-42, Nicaj Aff. Ex. 23).**

173.    Magone told Orsaia in the week before September 28, 2006 that she was concerned that Newmark would not successfully complete her probationary period (Magone 131; Orsaia 62-64, 74-75).

**Response:    Denies.  Orsaia initially testified that prior to meeting with Plaintiff and Magone on September 28, 2006 to discuss Plaintiff's age discrimination complaint, there was no communication concerning terminating Plaintiff's employment (Orsaia Dep. 74, Nicaj Aff. Ex. 25).  In any event, nothing was ever reduced to writing (Orsaia Dep. 75, Nicaj Aff. Ex. 25).**

174.    Magone told Orsaia about O'Hare and Del Bene's concerns about plaintiff's performance and attitude, and the reasons for assigning Serra instead of plaintiff to the Palliative Care Service (Orsaia 67, 69-70).

**Response:    Denies.  Prior to Orsaia telling Magone of Plaintiff's concerns about age discrimination, Magone never communicated with Orsaia concerning Plaintiff's performance (Orsaia Dep. 66-67, Nicaj Aff. Ex. 25).  Moreover, O'Hare never observed Plaintiff's performance (O'Hare Dep. 16-17, Nicaj Aff. Ex. 27).**

175.    Orsaia was aware of plaintiffs attendance and performance problems (Orsaia 69-71), as well as the fact that plaintiff was still in her probationary period, before September 28, 2006 (Orsaia 71).

**Response:    Admits that is what is claimed and adds that prior to Orsaia telling Magone of Plaintiff's concerns about age discrimination, Magone never communicated with Orsaia concerning Plaintiff's performance (Orsaia Dep. 66-67, Nicaj Aff. Ex. 25).**

176.    At 3 pm on September 12, 2006, after consultation with Orsaia, Magone told plaintiff that "things were not working out" and that she was extending plaintiff's probationary period (Newmark 138-39, 143; Ex. 31, 35).

**Response:    Denies.  There is no evidence in the record that Magone consulted with Orsaia first.  Moreover, Defendants omit the rest of Plaintiff's testimony stating while Magone stated "she didn't thinks were working out but she felt that they could, you know, perhaps there was a way we could work things out and that she was going to extend my [Plaintiff's] probation, and I told her that things, you know, there are still existing problems with the case managers not giving me things in a timely manner . . ." (Newmark Dep. 139, Nicaj Aff. Ex. 23).**

177.    During the September 12 meeting, Magone told Newmark that there were still issues to be resolved regarding social work roles, case management roles, and palliative care roles (Newmark 139-40), as well as attendance issues (Newmark 161).

**Response:    Denies.  Magone said that probation was being extended "because there were still issues with roles, social work roles, case management roles, palliative care roles. (Newmark Dep. 140, Nicaj Aff. Ex. 23).**

178.    At the September 12 meeting, Newmark told Magone that she still had problems with case managers failing to give her things in a timely manner (Newmark 139).

**Response:    Admits.**

179.    At the September 12 meeting, Plaintiff expressed her hope to Magone that "we would work things out"" (Newmark 140).

**Response:    Admits.**

180.    Plaintiff's complaint to Orsaia and her public complaints about Magone's alleged

age discrimination did not play a factor in Magone's decision to extend plaintiff's probation

(Magone Aff. ¶¶ 10, 11).

**Response:    Denies.  Plaintiff did not publicly complain about age discrimination**

**(Newmark Aff. ¶¶15-17).**

181.    Magone decision to extend Newmark's probationary period decision was based on

Newmark's poor attendance and complaints she had received from other Hospital

employees about her work performance (Magone Aff. 1110).

**Response:    Denies as it is not listed in Magone's termination memorandum (Def. Ex. 41;**

**Nicaj Aff. Ex. 9).**

182.    Prior to Newmark's arrival at the Hospital, Magone extended the probationary

period of at least one other staff member, case manager Dore Kessman, for extensive

absenteeism (Magone Aff. 110).

**Response:    Denies as immaterial.**

183.    On September 19, 2006, Magone received an e-mail from a case manager while

Magone was on vacation that plaintiff had allowed a patient to leave the Hospital without proper

clothing (Ex. 36). According to the e-mail, the patient had been hospitalized 19 days, but

plaintiff had not met with him until the 18'h day (Ex. 36).

**Response:    Denies.  Based on the email, Plaintiff had shorts and hospital gown.  The**

**patient was a psychiatric patient (Newmark Dep. 208-09, Nicaj Aff. Ex. 23).  Furthermore,**

**Plaintiff did not get the referral until Gilardi started screaming at her.  When Plaintiff**

**went to the patient's hospital room, the patient had a pair of pants, a shirt and shoes there.**

**When Plaintiff went back to her office, Gilardi contacted her again, screamed at her to**

"get over here. The patient is leaving and has no clothes on". When Newmark went back to the unit, she observed him sitting in front of the nurses' station in a nursing gown (Newmark Dep. 209, Nicaj Aff. Ex. 23). The patient advised Plaintiff that he was going home and advised her that he did not want to put his clothes on. A friend of the patient then came to pick him up and wheeled him out (Newmark Dep. 209-210, Nicaj Aff. Ex. 23). As a social worker, Plaintiff cannot force anyone to put his clothes on and is not responsible for dressing patients (Newmark Dep. 210, Nicaj Aff. Ex. 23). Furthermore, Plaintiff went above and beyond what her responsibilities are by calling the Visiting Nurse Service in an attempt get the patient some treatment after he was discharged because he had no health insurance and no money (Newmark Dep. 209-210, Nicaj Aff. Ex. 23). Because of Newmark's diligent efforts, she was able to get him outpatient treatment from the Service (Id.).

184.    Plaintiff admits a patient left the Hospital without wearing proper clothes on September 19, 2006 (Newmark 210-11), but claims that he had psychiatric problems and, although he had clothes, was refusing to wear them (Newmark 208-11).

**Response:    Admits and see further explanation contained in response to ¶183 *supra*.**

185.    Upon review of the incident involving the patient who left the Hospital without proper attire, Magone found that Newmark had failed to properly document this patient's progress and plan his discharge. Magone spoke to plaintiff about this conclusion (Magone 165).

**Response:    Denies. Magone did not document any of the foregoing and furthermore, see Plaintiff's response to ¶183 *supra*.**

186.    Plaintiff met with Orsaia to discuss her complaint about Magone on or about September 12, 2006 (Newmark 148-49; Ex. 37).

**Response:**    **Admits but it was only after Plaintiff sent Orsaia two emails requesting a meeting (Nicaj Aff. Ex. 3 & 4).   Plaintiff wanted to know what, if anything, happened in connection with setting up a meeting with all three -- Plaintiff, Orsaia and Magone to discuss Plaintiff's complaint of discrimination (Newmark Dep. 149, Nicaj Aff. Ex. 23).**

187.    Plaintiff sent Orsaia an e-mail on September 28 asking her to schedule a meeting with her and Magone to discuss her concern of age discrimination (Ex. 38).

**Response:**    **Admits.**

188.    Plaintiff, Orsaia, and Magone met on the afternoon of September 28 to discuss Newmark's complaint (Orsaia 70; Magone 123-26; Newmark 152).

**Response:**    **Admits.   Plaintiff told Magone that she had an issue of Magone making the statement about Nicole being younger than she was and better able to do the job (Newmark Dep. 153-54, Nicaj Aff. Ex. 23).   Magone claimed she never said that, became angry and advised Newmark what she (Magone) meant to say that Serra was younger and could soak things up like a sponge (Newmark Dep. 153-54, Nicaj Aff. Ex. 23; 9/29/06 Email, Nicaj Aff. Ex. 6).**

189.    Magone told plaintiff on September 28 that plaintiff's age had nothing to do with Magone's decision regarding Serra's assignment to the palliative care project, and that she had taken the word "young" out of context, and she said that "Serra was younger in her career, eager to learn, and soaked things up like a sponge" (Orsaia 78; Magone 125).

**Response:**    **Denies.   *See* Plaintiff response to ¶188 *supra.***

190.    Newmark denies that Magone used the words "in her career" (Newmark 154-55).

**Response:**    **Admits and *see* Plaintiff response to ¶188 *supra.***

191.    Magone told Newmark on September 28 that O'Hare and Del Bene had contributed input into her decision, that plaintiff had attendance and performance issues (Newmark 155), and plaintiff had previously been assigned the disaster mental health project because that was appropriate to her experience (Orsaia 79), but had not shown progress with it (Orsaia 89).

**Response:    Denies.  Magone did not to mention O'Hare or Del Bene or the disaster mental health project (Newmark Dep. 154-55, Nicaj Aff. Ex. 23).  The meeting was supposed to be about Plaintiff's age discrimination complaint.  When Magone stated that Newmark's work performance was not up to par, Plaintiff asked why Magone had not previously brought it up (Newmark Dep. 154-55, Nicaj Aff. Ex. 23) and expressed concern that Magone was suddenly bringing these issues at that particular meeting (Newmark Dep. 155, Nicaj Aff. Ex. 23).**

192.    According to Orsaia, Newmark, displayed an angry demeanor at the September 28 meeting (Orsaia 87).

**Response:    Denies.  Magone is the person who displayed anger at the meeting (Newmark Dep. 154; see also Newmark ¶¶15-17).  It was Magone -- not Plaintiff who displayed anger at the meeting (Newmark Dep. 153-54, Nicaj Aff. Ex. 23).**

193.    At the September 28 meeting, plaintiff repeated her original complaint (Magone 124; Newmark 152-53).

**Response:    Admits.**

194.    At the September 28 meeting, plaintiff requested more detail about Magone's performance concerns (Orsaia 79-80; Newmark 155-56).

67

**Response:     Admits and Plaintiff requested more detail only after Magone first brought up her performance in a meeting which was supposed to be about Magone's age discriminatory statement at the August 15, 2006 meeting (Magone Dep. 155-56, Nicaj Aff. Ex. 23).**

195.    At the September 28 meeting, Magone said she would discuss her concerns about Newmark's performance at another time (Orsaia 79-80; Newmark 155-56).

**Response:     See Plaintiff's response to ¶¶192, 194 *supra*.**

196.    Plaintiff claimed during the September 28 meeting that Magone had not mentioned performance issues previously (Newmark 155-56).

**Response:     Admits.**

197.    Magone told plaintiff at the September 28 meeting that she had mentioned performance concerns previously (Newmark 155-56).

**Response:     Admits.**

198.    Magone said at the September 28 meeting that she considered herself to be of similar age to plaintiff and had been aware of her age when she hired her (Orsaia 83).

**Response:     Denies materiality.**

199.    The September 28 meeting, which had lasted twenty minutes (Newmark 156), ended by mutual agreement (Newmark 157).

**Response:     Admits and adds as Plaintiff was leaving, Magone asked to meet Orsaia alone (Newmark Dep. 156-57, Nicaj Aff. Ex. 23).**

200.    On September 29, 2006, plaintiff sent Orsaia an e-mail concerning some of the issues that had been discussed during the September 28 meeting (Ex. 27).

**Response:     Admits.**

201.    Neither Orsaia nor Magone considered plaintiff s e-mail of September 29 to be an accurate or verbatim recounting of the September 28 meeting or of previous events (Magone 125-26; Orsaia 85, 88-89, 130-33).

**Response:    Denies. admittedly, Magone never denied that she stated at the September 28, 2006 that Serra was young and could take in things like a sponge (Magone Dep. 126-27, Nicaj Aff. Ex. 24). Furthermore, Orsaia admitted that Magone stated during the September 28th meeting that Serra was "young and could take things in like a sponge." (Orsaia Dep. 87, Nicaj Aff. Ex. 25). Furthermore, Orsaia never disputed Plaintiff's recollection of the September 28th meeting which she reduced to writing on September 29, 2006 (Orsaia Dep. 89, Nicaj Aff. Ex. 25).**

202.    Orsaia forwarded Newmark's September 29 e-mail to Magone and asked Magone to respond to it (Magone 122-33; Orsaia 34, 97-98).

**Response:    Admits.**

203.    Magone responded to Newmark's September 29 e-mail with an e-mail on October 4 that described the business reasons for her decision and explained that age played no part in her decision (Ex. 39).

**Response:    Admits.**

204.    Plaintiff did not respond [sic.] Magone's October 4 e-mail (Magone 128-29, Ex. 40). Plaintiff considered Magone's e-mail to be an attempt by Magone to "cover her ass" based on Magone's treatment of others and Newmark's distrust of her (Newmark 178-181).

**Response:    Denies. Plaintiff states that it was Magone's attempt to cover herself because Magone had never previously responded to Plaintiff and was now conveniently doing so one day before Magone terminated Plaintiff's employment (Newmark Dep. 178-79, Nicaj**

Aff. Ex. 23). **Plaintiff apparently received the email at 5:30 p.m. on October 4, 2006 (10/5/06 Email, Nicaj Aff. Ex. 8). At approximately 10:50 a.m. on October 5, 2006, Magone reported to Orsaia that Plaintiff had not yet responded (10/5/06 Email, Nicaj Aff. Ex. 8). In fact, Plaintiff did not have an adequate opportunity because her position was terminated that day (10/5/2006 Memorandum, Nicaj Aff. Ex. 9; Def. Ex. 1).**

205.    Magone discussed the possibility of terminating Newmark's employment in the week before the September 28 meeting (Magone 131, 133; Orsaia 62-64, 74-75).

**Response:    Admits that is what is claimed and point out at the time of this so-called discussion, Magone was already aware that Plaintiff had expressed concern about age discrimination (Magone Dep. 131-32, Nicaj Aff. Ex. 24).   And furthermore, when Magone advised Plaintiff on September 28, 2006 that her probationary period was being extended, nothing happened in connection with Plaintiff's performance (Magone Dep. 133-34, Nicaj Aff. Ex. 24).**

206.    Magone decided after September 28 that plaintiff had not successfully completed her probationary period (Magone 133), and communicated that decision to Orsaia (Orsaia 151).

**Response:    Admits that is what is claimed.**

207.    Magone and Orsaia had several discussions after September 28 in which Magone explained to Orsaia in detail the facts and events underlying her decision, including attendance records, complaints Magone had documented, and plaintiff's failure to show progress on the disaster mental health project (Orsaia 100-06, 108-09, 112, 115-17, 12021, 146-50; Magone 161-64).

**Response:    Admits that is what is claimed.**

208.    In the performance evaluation at the end of Newmark's probationary period, Magone observed that plaintiff's colleagues found her to be negative, unapproachable, and difficult to deal with; Newmark became defensive when challenged on her cases; Newmark frequently complained that she was overwhelmed even with a small caseload; Newmark had failed to take any initiative on the Disaster Mental Health Program; Newmark was not proactive in troubleshooting difficult cases; and Newmark did not respond to patient needs in a timely manner (Ex. 7).

**Response:    Denies. In fact, Plaintiff stated she was never overwhelmed by the caseload but had expressed that she felt overwhelmed with inconsistencies and with the lack of direction as to who did what and why (Newmark Dep. 198, Nicaj Aff. Ex. 23).**

209.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone noted under the heading titled "Respect" that Newmark's peers in the department perceived her to be negative and unapproachable, and that Newmark became defensive when challenged regarding her cases. This comment was based on the complaints about Newmark's performance that Magone received from case managers in August and September 2006; observations that Magone made and heard about from others during the same time period that Newmark frequently made gestures, sighed audibly, chewed her gum audibly, and rolled her eyes to express displeasure during rounds, as well as making verbal commentary; and Magone's observation during weekly staff meetings to discuss patient lengths of stay that Newmark became defensive and on many occasions struggled to explain the continued presence in the Hospital of patients who had been referred to her (Ex. 7; Magone Aff. T 12).

**Response:    Denies (Newmark Aff. ¶¶15-17). Moreover, Magone never documented any of the incidents in questions.**

210.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone noted under the heading titled "Quality" that Newmark frequently complained that she was overwhelmed even with a small caseload, and had not taken any initiative in working on the Mental Health Disaster Program. This comment was based on the fact that Magone did not see any improvement in Newmark's performance in these areas after Magone spoke to Newmark about her concerns on July 20, 2006, as well as Newmark's own explanation for her lapses in performance (Ex. 7; Magone Aff. ¶ 13).

**Response:**    **Denies. During the July 20th meeting, Magone emphatically denied to Plaintiff that she was issuing a warning (Def. Ex. 24).**

211.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone rated Newmark as "needs improvement" in the category for "Teamwork" on the performance evaluation because of her apparent lack of regard for teamwork. Magone noted that Newmark's coworkers complained that Newmark was difficult to work with and did not respond in a timely manner to requests for assistance. This was based, among other considerations, on multiple complaints Magone received from different case managers, not all of which she had an opportunity to document, about Newmark's failure to respond to their requests for Patient Review Instruments to be completed on a timely basis so that patients could be discharged to nursing homes (Ex. 7; Magone Aff: ¶ 14).

**Response:**    **Denies. Plaintiff stayed late until the PRIs were completed despite the fact that on numerous occasions, the PRI given to Plaintiff and Sera to complete at the last minute  (Newmark Dep. 206-207, Nicaj Aff. Ex. 23).**

212.    In the performance evaluation that Magone completed at the end of Newmark's probationary period, Magone noted under the heading of "Service Excellence" that Newmark did

72

not respond to patient needs in a timely manner and was not pro-active in troubleshooting

difficult cases. In the case management model, the social worker is responsible for planning the

discharge of any patients referred to her; a serious psychiatric condition or the patient's lack of

medical insurance are common reasons for such a referral. In Magone's assessment, Newmark

did not take as prompt or pro-active an approach as Magone considered appropriate to ensuring

that patients completed Medicaid applications, following up with external contacts that were not

immediately responsive, and following up with patients and families about discharge planning

(Ex. 7; Magone Aff. ¶ 15).

**Response:    Denies.  In fact, Plaintiff received Two Big Heart awards that Magone failed**

**to acknowledge (Newmark Aff. ¶12; See Pl. 56.1 Stmt ¶¶39-40).**

213.    Magone told Orsaia that she did not believe Newmark had adjusted to the

Hospital's case management model (Orsaia 112).

**Response:    Admits that is what is claimed.**

214.    Magone wrote in the performance evaluation that plaintiff had not been proactive

in preparing patients and families for discharge and that this negatively affected average length

of stay. Magone mentioned in the performance evaluation that Newmark had displayed instances

of inadequate medical documentation and excessive unscheduled absences (Ex. 7).

**Response:    Admits that is what is claimed.**

215.    Magone wrote in a memoranda to Orsaia on October 5 (Magone 160; Ex. 4 1 )

about Newmark's attendance record, her failure to inform Magone about an e-mail concerning

the Disaster Mental Health program, and plaintiff's unacceptable reaction to Magone's decision

to send Serra on the trip to Ohio (Magone 161-62) as reasons she considered in

the decision to terminate.

73

**Response:    Admits that what was claimed by Defendants and adds Plaintiff that disputes the reasons for her termination given because she performed all her responsibilities and frequently worked numerous hours to fill those responsibilities (Newmark Dep. 10-11, Nicaj Aff. Ex. 23).**

216.    On the afternoon of October 5, 2006 (Newmark 27), plaintiff, Magone, and Orsaia met in Orsaia's office (Orsaia 122; Newmark 28). Orsaia told Newmark that they were meeting because Magone had ongoing concerns about plaintiff's attendance and performance (Orsaia 122; Newmark 10), and Magone presented plaintiff with a written performance evaluation and discussed it briefly (Orsaia 122-23; Newmark 29; Magone 159-60).

**Response:    Admits.**

217.    Magone explained to plaintiff that on October 5 she had not successfully completed her probationary period, and was being separated from employment (Orsaia 123; cf. Newmark 28).

**Response:    Denies.  In fact, Magone was highly rude to Plaintiff throwing Plaintiff's evaluation at her (Newmark Dep. 29).  Moreover, Orsaia advised Plaintiff she was not a good fit (Newmark Dep. 28).**

218.    Orsaia offered plaintiff the option on October 5, 2006 of having her employment record reflect resignation or termination (Orsaia 123-24).

**Response:    Denies.  Orsaia gave her termination papers and advised Newmark she was entitled to COBRA (Newmark Dep. 29, Nicaj Aff. Ex. 23).**

219.    Magone was out of the office on vacation from July 23, 2006 through approximately August 6, 2006, and from September 18 to September 23, 2006 (Magone Aff. ¶ 17).

74

**Response:**    **Admits that is what is claimed.**

220.    Newmark took vacation days on July 3, July 31 to August 4 and September 5 to September 8, 2006 (Magone Aff. ¶ 17; Ex. 33).

**Response:**    **Admits that is what is claimed.**

221.    Newmark was out of the office for an approved medical absence on September 26 and 27, 2006 (Magone ~ 17; Orsaia 67-68; Newmark 141-42; Ex. 33).

**Response:**    **Admits.**

222.    Newmark was out of the office for holidays on May 29, July 4, and September 4, 2006 (Magone ¶ 17; Ex. 33).

**Response:**    **Admits.**

223.    Newmark was out of the office for unscheduled time off (i.e., sick time) on May 15, 16, 17, August 21, and August 29, as well as April 3 and 4, 2006 (Magone Aff. 17; Ex. 32-33).

**Response:**    **Denies based on Defendants' Exhibit 33.**

224.    Magone believes that April 3 and 4, 2006 were inaccurately recorded by Magone's staff as days worked on Newmark's attendance record, when Newmark was in fact out sick (Magone Alf. ¶ 17; Ex. 32-33).

**Response:**    **Denies the materiality of what Magone's belief is. There is thus a dispute what Magone claims and what the documents in fact show.**

225.    Newmark reserved decision on Orsaia's offer to resign or accept termination until October 6, 2006, when she telephoned Orsaia to ask that her employment record reflect termination (Orsaia 124; Ex. 42).

**Response:**    **Denies. She was terminated then (Newmark Dep. 29-30, Nicaj Aff. Ex. 23)**

226.    Plaintiff's claim of age discrimination is based solely on her assertion, which Magone repeatedly denied, that during her August 15 meeting with Magone, Magone said "Nicole is younger and can handle the job better" (Newmark 137; Ex. 27).

**Response:    Denies. In addition, during the September 29, 2006 meeting with Orsaia and Plaintiff, Magone stated what she said to Plaintiff at the August 15, 2007 meeting was that Serra was young and "could take things in like a sponge" (9/29/06 Email, Nicaj Aff. Ex. 6; Def. Ex. 27). So there were two occasions when Magone provided age discriminatory reasons for her appointment of Serra as the social worker dedicated to the palliative care service (Id.; Newmark Dep. 153-56, Nicaj Aff. Ex. 23)**

227.    Plaintiff acknowledges that Magone, who is 54 (Magone 45, 107) was aware of her age at the time of hire (Ex. 27).

**Response:    Denies materiality.**

228.    Plaintiff admits that there were no offensive age-based slurs or names in the workplace during her employment (Newmark 233).

**Response:    Denies materiality. In any event, Plaintiff never made any such allegations.**

229.    Plaintiff admits that no age-based comments other than Magone's alleged remark were made during Newmark's employment at the Hospital (Newmark 233).

**Response:    Denies. Magone made discriminatory comments on two separate occasions -- first on August 15, 2006 and then on September 29, 2006 (9/29/06 Email, Nicaj Aff. Ex. 6; Newmark Dep. 153-56, Nicaj Aff. Ex. 23; Def. Ex. 27).**

230.    Plaintiff admits that no offensive pictures or cartoons were posted or distributed during her employment at the Hospital (Newmark 233).

**Response:    Denies materiality. In any event, Plaintiff never made any such allegations.**

231.    Plaintiff admits that no jokes were made about age in the workplace during her employment at the evidence (Newmark 233).

**Response:    Denies materiality.  In any event, Plaintiff never made any such allegations.**

232.    Plaintiff admits that apart from Magone's alleged comment of August 15, 2006, there is no evidence to suggest that Magone had singled her out because of her age (Newmark 234).

**Response:    Denies.  Plaintiff's also raised the issue of Magone's discriminatory comments at the September 29, 2007 meeting (Defendants' Exhibit 27, Nicaj Aff. Ex. 6). Furthermore, the two discriminatory statements by Magone are sufficient to establish direct evidence of her discriminatory animus.**

233.    Newmark claims that she was fired because she complained about ageism to Human Resources (Newmark 11).

**Response:    Admits.**

234.    Newmark alleges that after her complaint to Orsaia, Magone overlooked her in meetings and failed to make eye contact (Newmark 14, 20, 172-73), and that Newmark lost her amicable rapport with Magone (Newmark 19).

**Response:    Admits.**

235.    Newmark had little interaction with Magone before Magone became her immediate supervisor (Newmark 19).

**Response:    Admits.**

236.    Newmark concedes that Magone was dismissive of her before Newmark's complaint to Orsaia (Newmark 172).

**Response:**    **Admits but Plaintiff explained it was different for following Plaintiff's**

**complaint to Orsaia, Magone did not make eye contact, was insincere, did not respond to**

**her in meetings (Newmark 172-74, Nicaj Aff. Ex. 23).  Moreover, Magone failed to**

**acknowledge Plaintiff's receipt of the Big Heart Award while acknowledging and**

**congratulating Serra who is more than three decades Plaintiff's junior (Newmark Aff.**

**¶13).**

237.    Newmark attributes Magone's alleged dismissiveness before August 15, 2006 to

Magone being busy (Newmark 172).

**Response:    Admits.**

238.    Newmark alleges that Magone was dismissive after her complaint, but "not in the

same way" as she was prior to her complaint (Newmark 173).

**Response:    Admits.  See response to ¶236 *supra*.**

239.    Newmark is unable to pinpoint an exact time when the alleged change in [sic.]

Newmark's demeanor took place (Ex. 27).

**Response:    Denies as incomprehensible. With respect to Defendants' Exhibit 27, Plaintiff**

**explained in her deposition that the change occurred after she made the initial age**

**discrimination complaint to Orsaia within a day or two of her meeting with Magone**

**(Newmark Dep. 171-172, , Nicaj Aff. Ex. 23; 9/29/06 Email, Nicaj Aff. Ex. 6)**

240.    Newmark did not conclude that Magone was acting differently toward her until

mid September (Newmark 43) and admits that she "never put the pieces together and made

connections about anything" (Newmark 173).

**Response:    Denies as incomprehensible.   Plaintiff stated approximately in**

**August/September, Magone's attitude towards her changed (Newmark Dep. 43, Nicaj Aff.**

**Ex. 23). At this point, Magone ignored Plaintiff and acted differently towards Plaintiff (Newmark Dep. 43, Nicaj Aff. Ex. 23).**

241.    Newmark claims that after her complaint to Human Resources, Magone met with her less frequently (Newmark 19-21).

**Response:    Admits and adds that after she first complained to Human Resources, Magone stopped being cordial to Plaintiff (Newmark Dep. 19, Nicaj Aff. Ex. 23).**

242.    Newmark claims she had frequent private weekly meetings with Magone in July and early August after Lantz's departure (Newmark 22).

**Response:    Denies based on the fact Defendants' assertion is not supported by the citation.**

243.    Newmark and Magone were both at work at the same time on only eleven days from August 28 through September 28 (Magone 165; Magone Aff.117; Newmark 128; Ex. 43), and met or spoke on at least five of them (Ex. 29-31, 35; Magone 123-26, 155-57; Newmark 138-41, 143, 152; Orsaia 70).

**Response:    Admits those are Magone's claims.**

244.    Newmark asserts that Magone denied her public recognition for an alleged "Big Heart Award" in or about September (Newmark 17; cf. Magone 152).

**Response:    Admits.**

245.    Magone was unaware of Newmark's alleged nomination for a Big Heart Award in September 2006 (Magone 152).

**Response:    Denies. Magone received that information because the Department of Excellence sent a copy to her and Plaintiff saw a copy in her hands when Magone**

**acknowledged and congratulated Serra on her receipt of the same award (Newmark Dep. 17-18, Nicaj Aff. Ex. 23; Newmark Aff. ¶13).**

246. Magone said nothing that suggested retaliatory animus to Newmark (Newmark 234-35).

**Response:    Admits and adds that is a question of fact. In fact, when Plaintiff communicated with Yolanda Danridge, the Director of Excellence at Lawrence, Danridge advised Plaintiff that her termination appeared to be retaliatory in view of the fact of the proximity of Plaintiff's complaint of age discrimination to her termination (Newmark Dep. 222, 235, Nicaj Aff. Ex. 23).**

247. Magone and Orsaia maintain that the decision to terminate Newmark for failure to successfully complete her probationary period was completely unrelated to Newmark's complaint of age discrimination (Orsaia 119, Magone 162).

**Response:    Denies. It is a question of fact.**

248. After Magone learned that Newmark had complained about her to Orsaia, Magone did not, nor was it her intention to, subject Newmark to a different manner of treatment than she had previously (Magone 118).

**Response:    Denies. It is a question of fact.**

249. After Magone learned that Newmark had complained about her to Orsaia, Magone did not ignore or disregard Newmark at meetings, avoid private conversations with Newmark, avoid making eye contact with Newmark, or exhibit any other change in demeanor or manner towards Newmark (Magone Aff. ¶ 18).

**Response:    Denies. It is a question of fact.**

250.    In describing Serra as "young in her career", Magone was referring to Serra's relative inexperience in the field of social work (Magone 86-88).

**Response:    Denies. Magone advised Plaintiff that Serra is a younger than you are and can take things in better than you can (Newmark Dep. 48-49, Nicaj Aff. Ex. 23).**

251.    Serra has been a licensed clinical social worker since October 2004 (Serra 7-8; cf. Ex. 44).

**Response:    Admits.**

252.    Newmark has been a licensed clinical social worker since in or about 1997 (Ex. 9).

**Response:    Admits.**

253.    During the time of Newmark's employment, Magone considered Newmark to have approximately twice as much social work experience as Serra (Magone 86-88).

**Response:    Admits that is what is claimed.**

254.    Newmark admits that there are situations where it is appropriate for a manager to assign a task or project to a junior employee rather than to a more experienced employee (Newmark 236-37).

**Response:    Denies materiality.   As Newmark explained that situation does not mean it was acceptable for Magone to say that her decision was based on the fact that Serra was younger and could do the job better (Newmark Dep. 237, Nicaj Aff. Ex. 23).**

255.    After Newmark was terminated On October 5, 2006, she said to Magone, "You're a fucked up person and a fucked up manager" (Newmark 33).

**Response:    Denies materiality. Plaintiff did so only after her termination and Plaintiff candidly admitted that "I don't say this proudly, but I told her that she was a fucked up**

81

**person and that she was a fucked up manager, and that was after my employ there**

**(Newmark 32-33, Nicaj Aff. Ex. 23).**

Wherefore, upon the foregoing Plaintiff's Counter-Statement made pursuant to local Rule

56.1 and Plaintiff's Response to Defendants' 56.1 Statement, the Affidavit of Drita Nicaj with

annexed exhibits thereto, the Affidavit of Carole Newmark and the Memorandum of Law in

opposition to Defendants' motion, Defendants' motion for summary judgment should in all

respects, be denied.

Dated:        White Plains, New York
              September 2, 2008

                              LOVETT & GOULD, LLP

                              By: _____
                              Drita Nicaj (DN 0966)
                              Attorneys for Plaintiff
                              222 Bloomingdale Road
                              White Plains, New York 10605
                              (914) 428-8401