**EXHIBIT 1**

8/15/06

I met with Carole Newmark today to inform her of my decision to appoint Nicolle Scira the Social Worker for the palliative care service. Nicole will be traveling with the team to Ohio to visit a hospital that has a program in place. I told Carole that I felt that as a new social worker, young in her career it is important to give her something she can become expert in. I also told Carole that she has the responsibility for the mental health training and that will take up her time. I informed her that this decision was made with input from both RoseAnn and Maura. Carole was visibly angry and expressed disappointment in my decision.



PLAINTIFF'S
EXHIBIT
2
N/P    2/20/08

**EXHIBIT 2**

Orsaia, Patricia

| | |
|---|---|
| From: | Magone, Catherine |
| Sent: | Monday, August 21, 2006 11:30 AM |
| To: | Orsaia, Patricia |
| Subject: | Accepted: Carole Newmark's concerns |



N-255          1

**EXHIBIT 3**

## Orsaia, Patricia

**From:** Newmark, Carole
**Sent:** Tuesday, September 12, 2006 4:30 PM
**To:** Orsaia, Patricia
**Subject:** RE: can we meet this afternoon?

Hi Pat,

Sorry I did not get your email until just now, have been on the units and do not have access to my email on the units. Can we meet tomorrow at some time? Please let me know, I can always be reached on my hospital Nextel @ 224-8201. Thanks, Carole

## Carole Newmark, LCSW

-----Original Message-----
**From:** Orsaia, Patricia
**Sent:** Tuesday, September 12, 2006 12:09 PM
**To:** Newmark, Carole
**Subject:** can we meet this afternoon?
**Importance:** High

Hi Carole,

I am sorry that we have not been able to connect due to several factors – my vacation, your vacation, your unplanned absence, etc. I can meet with you to discuss next steps today anytime from 3-4:30 in my office if you are available. Please let me know.

Thanks,
Pat

*Pat Orsaia, Director of Human Resources*
*Lawrence Hospital Center*
*Phone 914-787-3078*
*Fax 914-787-3069*

-----Original Message-----
**From:** Newmark, Carole
**Sent:** Tuesday, September 12, 2006 11:45 AM
**To:** Orsaia, Patricia
**Subject:**

Hi Pat,

This is a follow up to our meeting of approximately two weeks ago. Please let me know what the status is of the proposed meeting with Cathy Magone where we were going to discuss several issues including, and most importantly, the issue of possible ageism. This is troublesome and needs to be addressed in a timely manner. Thank you for your anticipated response.



**EXHIBIT 4**

**Orsaia, Patricia**

From: Newmark, Carole
Sent: Wednesday, September 13, 2006 8:17 AM
To: Orsaia, Patricia
Subject: RE: can we meet this afternoon?

Hi Pat,

Today at 3:30 is fine, thank you.

**Carole Newmark, LCSW**


-----Original Message-----
From: Orsaia, Patricia
Sent: Tuesday, September 12, 2006 4:35 PM
To: Newmark, Carole
Subject: RE: can we meet this afternoon?

Hi Carol,

I can meet with you in my office tomorrow at 3:30 or Thursday morning.  Let me know what works best for you.

Thanks,
Pat

*Pat Orsaia, Director of Human Resources*
*Lawrence Hospital Center*
*Phone 914-787-3078*
*Fax 914-787-3069*

-----Original Message-----
From: Newmark, Carole
Sent: Tuesday, September 12, 2006 4:30 PM
To: Orsaia, Patricia
Subject: RE: can we meet this afternoon?

Hi Pat,

Sorry I did not get your email until just now, have been on the units and do not have access to my email on the units.  Can we meet tomorrow at some time?  Please let me know, I can always be reached on my hospital Nextel @ 224-8201.  Thanks, Carole


**Carole Newmark, LCSW**

**EXHIBIT 5**

## Orsaia, Patricia

| | |
|---|---|
| **From:** | Newmark, Carole |
| **Sent:** | Thursday, September 28, 2006 8:19 AM |
| **To:** | Orsaia, Patricia |
| **Subject:** | meeting |

Hi Pat,

Can we set up a meeting with Cathy, you and me so that we can put some closure on the issues that we discussed?  Thank you.

## Carole Newmark, LCSW

10/6/2006

**EXHIBIT 6**

**Orsaia, Patricia**

From:     Newmark, Carole
Sent:     Friday, September 29, 2006 8:39 AM
To:       Orsaia, Patricia
Subject:  Meeting with Cathy Magone on 9/28/06

EXHIBIT
Plaintiff's
NP 2/20/08

Hi Pat,

Thank you for taking the time to meet with Cathy Magone and me, I appreciate your assistance.

There are a few issues that were raised in the meeting that I would like clarified, as follows:

1. I would like to know how long my probation has been extended, this should not be held from me until I receive my performance evaluation.

2. When I asked Cathy what was the basis for my probation being extended, she stated that it was because of attendance. In our meeting yesterday, she alluded to the fact that there are work issues, but would not state what these are until she goes over my evaluation with me. This was a surprise to me, as she has never brought up any work issues until our meeting yesterday. I cannot remedy issues if they are not brought to my attention, and should not have to wait until my evaluation to hear what the work issues are.

3. When we went over the issue of ageism, Cathy denied that she said that "Nicole was younger and could handle the job better than I could." She stated that she did say that Nicole was "Young and could take things in like a sponge." This statement is tantamount to saying that I am old and are not able to absorb information as well. Cathy does not know what my capabilities are, she has not taken the time to learn about who I am and know exactly my strengths are.

I know that we have discussed that incoming information is filtered differently by each person, however, I still contend that Cathy is holding my age against me. I know that she hired me knowing that I am older, however, her comments and actions during the past few months in regard to me have been dismissive and non-supportive. I cannot pinpoint when things changed between Cathy and I, but there has been a palpable change in her interactions with me, and this makes me feel very vulnerable and insecure about my job at LHC. I can go into detail at another time, if you wish.

**Carole Newmark, LCSW**

**EXHIBIT 7**

## Orsaia, Patricia

**From:** Magone, Catherine
**Sent:** Wednesday, October 04, 2006 9:27 AM
**To:** Newmark, Carole
**Cc:** Orsaia, Patricia
**Subject:** clarification



Carole, I am writing in response to an email that you sent to Pat Orsaia where you continue to express concerns regarding my use of the word "young" in describing Nicole Serra. I would like to reiterate that my decision to appoint Nicole to be the Social Worker for the palliative service was based on input from R O'Hare and Maura Delbene as well as the needs of the department. In describing Nicole as a new, young social worker needing to have a project of her own, I never intended to imply that you were not chosen because of your age or that anyone's age was relevant to my decision.

I trust that this finally clarifies the comment in question and my use of the word "young" in the full context of my comment.

10/4/2006

**EXHIBIT 8**

## Orsaia, Patricia



**From:**     Magone, Catherine
**Sent:**     Thursday, October 05, 2006 10:50 AM
**To:**       Orsaia, Patricia
**Subject:**  Carle Newmark

Pat, Just wanted you to know that Carole picked up her email at 5:30 last night and has not responded or spoken to me about it.

**N-283**

12/12/2006

**EXHIBIT 9**

Lawrence Hospital Center

# Memo

**To:** File

**From:** Cathy Magone, Dir., Quality/Risk and Case Management

**CC:** P. Orsaia

**Date:** October 5, 2006

**Re:** Carole Newmark

EXHIBIT
Plaintiff 17
NP 7/20/08

Carole Newmark Points discussed at Termination Meeting on 10/05/06

Reviewed Performance Evaluation

Carole has not adjusted to Lawrence's Case Management Model. My concerns were conveyed to her on 7/20/06 regarding need to be more proactive in discharge planning and meeting with families and collaborating with the multidisciplinary team. The need to be more focused and prioritize her work load was also stressed.

Carole has not made any progress in developing a Disaster Mental Health Training Program. This assignment was given to her 4 months ago. In addition, she has not kept me informed of an email sent on 9/28 regarding this program and the expectations.

Carole's reaction to a business decision to assign another team member to our palliative program was unacceptable.

Carole has had four unscheduled time off episodes during her probationary period.

1

**EXHIBIT 10**

**First Advantage™**

## Fax Order Form & Applicant Release

In connection with your application for employment, understand that consumer reports or investigative consumer reports which may contain public record information may be requested or made on you including consumer credit, criminal records, driving record, education, current and prior employer verification, workers compensation claims and others. These reports will include experience along with reasons for termination of past employment. Further, understand that information from various Federal, State, local and other agencies which contain your past activities will be requested.

By signing below, you hereby authorize without reservation, any party or agency contacted by this employer to furnish the above mentioned information. You further authorize ongoing procurement of the above mentioned reports at any time during your employment. You have the right to make a request of First Advantage, upon proper identification and the payment of any authorized fees, for the information in its files on you at the time of your request.

App Sign: _Serra (Nicole Serra)_    Date: _3/14/06_

Name: | S | e | r | r | a | | | | N | i | c | o | l | e | | | | A | |

LAST            FIRST            MIDDLE

Position:

Maiden Name or A/K/A: | S | e | r | r | a | |

Soc Sec #: [redacted]    Sex: [redacted]    Race: [redacted]    DOB: | 0 | 3 | / | 0 | 6 | / | 1 | 9 | 7 | 6 |

Driver's Lic #: [redacted]    Issuing State: | N | Y |

**Addresses: Past five (5) years**

Current Address: 95 Beekman Ave
City: Sleepy Hollow    State: NY    Zip: 10591
County: Westchester
Dates Resided:  From: 2000    To: current

Previous Address: 32 Lafayette St
City: New Rochelle    State: NY    Zip:
County: Westchester
Dates Resided:  From: 1999    To: 2000

Previous Address: 2609 Farsuna D.
City: Yorktown Hgts    State: NY    Zip: 10591
County: Westchester
Dates Resided:  From: 1976    To: 1999

For California applicants only, if you would like to receive a copy of your credit report, if one is obtained, please check this box. ☐  For Minnesota or Oklahoma applicants only, if you would like to receive a copy of the consumer report, if one is obtained, please check this box. ☐

**EXHIBIT 11**

**View Employee Personnel**

| Personnel | Skills & Dependants | Cust-Def Personnel | Cust-Def - Restrict |

**Social Security #**

**Name**
NEWMARK, CAROLE

**Empl #**
20636

**Address**
89 HILLTOP ACRES

**Country (not US)    Name**

**User**

**City**
YONKERS

**ST Zip Code**
NY 10704

**EEOC**
WHITE

**Home Phone**

**E-Mail Addr**

**Emer Phone**

**Birthdate** 09/16/1945
**Sex** F

**Type** FT
**Date** 03/28/06

**Hire Date** 03/28/06
**Adj Hire Date** 03/28/06

**Marital Status** S
**Date**

**Status** ACTIVE
**Date** 03/28/06
**Reason** SA-NEW

**Seniority Date** 03/28/06
**Next Eval**

**Exempt** Y
**Health Ins**
**Disability**

**Medicare Date**

**Review Date**
**Reason**

**EXHIBIT 12**

.

**Lawrence Hospital**
# Bronxville, NY

## Criteria Based Job Description and Performance Evaluation

*(Check One)*
[ x ] Probationary Period
[ ] Annual
[ ] Special review for purpose of:

Name: Nicole Serra
Department: Quality and Case Management
Evaluation Period: *(Month / Year)* 10/06

Date of Hire: 4-17-06
Supervisor – Catherine Magone

**I.    Job Title/ Job Summary:  Senior Social Worker**
Provides supervision to Social Work staff.  Provides care coordination services across the continuum including identification of patients at risk or in need of services, assessments, education and plan development. Implements and coordinates services needed at discharge. Provides counseling and clinical interventions toward helping patients achieve their optimal level of health.

## II. Evaluations:
Evaluations must be completed by the supervisor/manager and discussed with the employee at the completion of the training period as well as annually thereafter.  The employee is encouraged to comment on his/her evaluation and participate in the development of a work improvement plan. Employees should be given a copy of their evaluation.

## III. Position Accountability / Performance Criteria:
Performance is evaluated in terms of the level of achievement by the individual for each measure. The following scale is used:

**Exceeds Expectations:** *(EE)*    Performance is continually and consistently above job requirements.

**Meets Expectations:** *(ME)*    Performance is aligned with the job requirements.

**Needs Improvement:** *(NI)*    Performance is below the job requirements.



Core Value: Respect -- Treating patients we serve and those with whom we work with

**Core Value: Respect** – Treating patients we serve and those with whom we work with compassion, demonstrating a high regard for the dignity and worth of each person.

Consider the following behaviors when evaluating the core value of Respect:

Promotes a professional atmosphere through courteous communication.

Responds to customer concerns as soon as possible with compassion and understanding.

Observes and respects the privacy and confidentiality of medical and non-medical information.

Contributes towards maintaining a safe, comfortable environment for patients, visitors and staff.

Exhibits good interpersonal skills, including a positive approach with people and tasks.

Comments: Nicole demonstrates respect and compassion in all her interactions with patients and colleagues.

| Core Value:  Respect  - Rating   (EE, ME, or NI) → | ME |
|---|---|

**Core Value: Quality** – Continuous improvement through innovation and a commitment to recognized standards of excellence.

Consider the following behaviors when evaluating the core value of Quality:

Efficiently uses work time for maximum productivity, meets deadlines and when assigned work is completed, anticipates and prepares for future assignments.

Maintains/develops professional competence through required in-service and educational programs.  Demonstrates ability to work independently in the absence of supervision.

Attends /participates in unit/departmental staff meetings and reviews/signs minutes of all meetings not attended (as required).

Demonstrates interest in maintaining awareness in new developments in area of specialty. Participates in departmental performance improvement.  Demonstrates follow through on assignments and instructions. Maintains a safe, uncluttered environment and follows all safe work practices.

COMMENTS:

Nicole works independently and has survived the last few months being the only Social Worker with grace and professionalism. +

| Core Value:  Quality - Rating  (EE, ME, or NI) → | EE |
|---|---|

**Core Value: Integrity** – Honesty and straight forwardness in all relationships.

Consider the following behaviors when evaluating the core value of Integrity:

Demonstrates support of the organization's mission, vision and core values.

Complies with all policies and procedures.

Completes all tasks thoroughly and honestly.

Refrains from negative comments about others and the organization.

Resolves any personal or management issues with appropriate parties and does not involve others.

Reports for duty punctually and uses break time and time away from work appropriately.

COMMENTS: Nicole maintains a positive attitude and demonstrates behaviors that are consistent with our Core Values.

| Core Value:  Integrity  - Rating    (EE, ME, or NI) → | ME |
|---|---|

N-313

**Core Value: Teamwork** – Enthusiastic cooperation focused on accountability, mutual support and common goals.

Consider the following behaviors when evaluating the core value of Teamwork:

Approaches relationships to foster a productive and supportive environment.

Demonstrates ability to work well with coworkers and exhibits enthusiastic cooperation.

Uses expertise to support others.

Accepts personal responsibility and feedback.

Accepts assignments and suggestions willingly and embraces change.

COMMENTS: Nicole is a team player and is always willing to share resources and her expertise.

| | |
|---|---|
| **Core Value: Teamwork - Rating  (EE, ME, or NI)** → | ME |

**SERVICE EXCELLENCE STANDARDS: Courtesy and First Impressions, Telephone Etiquette, Sensitivity and Comfort, Professionalism and Teamwork, Service Recovery.**

Consider the following behaviors when evaluating the Service Excellence Standards:

Anticipate customer needs and assist before asked, smile and make eye contact, be pleasant in all interactions, respond to requests promptly and efficiently, avoid loud laughter and noise, no use of profanity, escort to destinations, inform customers about delays in service, provide a comfortable atmosphere.

Practice telephone courtesy, ask permission before using speakerphone, identify yourself to caller by providing name and department, use Good Morning – Good Afternoon – Good Evening, ask and wait for reply before placing caller on hold, use hold button, take complete messages and repeat information to verify, provide name and number before transferring a call, apologize if you reach a wrong number, record an appropriate voice mail greeting including name, department and availability details.

Handle each situation with care, respond in a way that ensures respect, knock or announce yourself before entering patient areas, pull curtains and close doors for privacy, provide a proper sized gown/robe and covering during transport, give patients the option of having visitors leave the room while providing care, always speak English while performing duties.

Follow HIPAA guidelines regarding patient confidentiality, communicate with customers in private areas, observe personal appearance departmental uniform policies, stay informed about our services, resources, policies and procedures, do not make negative comments or discuss work-related concerns in public, take every opportunity to speak positively about the LHC family, communicate with other departments with respect, cooperation and consideration of each other's priorities.

Be available to hear and respond to customer's concerns, offer an apology for the lapse in service, assure customers that you understand and care, help solve the problem with information and guidance, assure a timely response and then follow-up, use the LHC Service Recovery Program, and refer appropriate concerns to leadership and the Patient Advocate.

Follows department specific Service Excellence Standards.

Comments:

| | |
|---|---|
| Comments | ME |

| Essential Functions: | E.E | M.E | N.I |
|---|---|---|---|
| Interviews patients/significant others to obtain data on personal, social, medical and emotional history in order to delineate problems requiring Social Work intervention and to plan appropriate services. | | X | |
| Coordinates with the Case Manager and Multidisciplinary Team members regard discharge planning for needed care in the home or in an alternate setting. | | X | |
| Evaluates patient and family data, selects appropriate Social Work methods and implements treatment program in conjunction with the Case Manager and Multidisciplinary Team. | | X | |
| Provides support, counseling and/or crisis intervention to patients/families experiencing and/or anticipating issues in adjusting to illness, catastrophic diagnoses, changes in living situations and bereavement. | | X | |
| Actively participates and provides pertinent information at length of stay meetings and  multidisciplinary discharge planning rounds. | | X | |
| Provides advanced directive education. | | X | |
| Reviews financial resources for long term placement and provides education to patient/family. | | X | |
| Coordinates the hospital's program for management of cases of suspected child/ adult abuse/ maltreatment, assuring compliance with regulatory requirements and applicable law. | | X | |
| Assists  patients and families in accessing appropriate entitlements. | | X | |
| Initiates family and provider team meetings to clarify and plan strategies related to psychosocial and economic issues particularly those related to care progression and transition.  May act as the liaison between patient/families and all providers of care within and external to the organization on social issues. | | X | |
| Conducts support groups for targeted populations | | NA | |
| Provides coverage to designated units/services and the ED in the absence of the assigned Social Worker. | | X | |
| Participates and assists in departmental studies and projects and hospital committees as assigned. | | X | |
| | | | |

| Age Specific Performance Evaluation: Indicate your evaluation by inserting the appropriate letter in each column. Method: T=Written/Post Test; V=Verbal Test; P=Peer Review; D=Documentation; SLM=Self Learning Module; S=Skills Observation C=Competent  NI=Needs Improvement  NA=Not Applicable to employee | | | |
|---|---|---|---|

| Method    Neonatal    Pediatric | Adol es | Adul t | Ger iat |
|---|---|---|---|
| See age specific list. | C | C | C |
| | | | |
| | | | |
| | | | |

**Competency Evaluation:** The employee will demonstrate the ability to perform the following department specific items that are high risk, low volume and/or problem prone. Method: T=Written/Post Test; V=Verbal Test; P=Peer Review; D=Documentation; SLM=Self Learning Module; S=Skills Observation C=Competent  NI=Needs Improvement  NA=Not Applicable

| Skills / Equipment: | Method | C | IN | NA |
|---|---|---|---|---|
| Knowledge about indicators of abuse and how to interface with appropriate agencies. | S, D | X | | |
| Accurately fills out the screen. | S, D | X | | |
| Knowledge of Meditech | S | X | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Summary / Supervisor Comments:**

| | E.E. | M.E | N.I. |
|---|---|---|---|
| Overall Performance: | | X | |

## Employee Improvement Plan/Goals and Needs Assessment:

Ms. Serra has successfully completed her probationary period. She is a conscientious, dedicated professional who works hard to achieve good outcomes for her patients. She brings a strong psych background to the department and her clinical skills are a valuable asset.  As the dedicated palliative care Social Worker, she is developing the skills necessary to deal with a vulnerable population. She is always willing to learn and maintains a positive attitude even in stressful situations. Nicole, thank you for all your hard work. I am happy to have you on my team!


*(Improvement items should be addressed)*


## Employee Comments:




Employee Signature: _____ Date: 1/12/07

Evaluator Signature: _____ Date: 1/11/07

**EXHIBIT 13**



PLAINTIFF'S
EXHIBIT
26
3-18-08    WR

——Original Message——
From: Serra, Nicole
Sent: Thursday, July 20, 2006 1:38 PM
To: Delbene, Maura
Subject: RE: Mental Health Service Locator

Maura. Thanks for you e-mail.. I'm glad that you are part of the team also... it is often hard to work in this environment when you don't know who you can trust... I consider you a person who is supportive and also personally and professionally.. hope that you have a good day!!! Let me know what I need to do for you on the cases you wne to see from this morning's rounds!!! Thanks.. Nicole

——Original Message——
From: Delbene, Maura
Sent: Wednesday, July 19, 2006 1:30 PM
To: Serra, Nicole
Subject: RE: Mental Health Service Locator

Nicole

Thank you for your response, it is often so busy that our time as professionals to meet, exchange information and grow in our fields is not often a priority.

I love to mine for resources and then share them (it makes our work easier) and hope that if I send too much your way you will tell me —

You have good energy and enthusiasm in your work here –don't let one slip up cloud the picture of your real spirit. We all need to help and support each other and I am glad to be part of the team.

Maura

——Original Message——
From: Serra, Nicole
Sent: Wednesday, July 19, 2006 11:55 AM
To: Delbene, Maura
Subject: RE: Mental Health Service Locator

Hi Maura.. I just wanted to say thank you so much for sharing this important info with Carole and I. It always feels like finding a gold mind when one finds out good resources for continued learning and assistance!! Once again, thanks for understanding my bad attitude last week.. I appreciate your mindset. Anyway, hope to see you on Monday.. I may have a case for you to view for your medical opinion.. I will update you when I know more.. Thanks again for thinking of us!! Have a great day, Nicole

——Original Message——
From: Delbene, Maura
Sent: Monday, July 17, 2006 12:29 PM
To: Newmark, Carole; Serra, Nicole

Message

Cc: O'Hare, RoseAnn; 'Dr. Page'
**Subject:** Mental Health Service Locator

Carole and Nicole —

Hope you are both well.

Came across an informative web site (by state) regarding resources for mental health services that I thought you might find helpful.

http://www.mentalhealth.samhsa.gov/databases/

I was impressed with the extensiveness of the database.

Maura


Maura L. Del Bene, MS, RN, NP-P
*Palliative Care Service*
Lawrence Hospital Center
55 Palmer Avenue
Bronxville, NY 10708

Voice 914-787-4190
Fax 914-787-5056

*Palliative Care is interdisciplinary care that aims to relieve suffering an improve quality of life*
*for patients with serious or life threatening illness*

---

**Note:**
This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. **STELLARIS HEALTH NETWORK** and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks.

Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity.

---

N-137

**EXHIBIT 14**

**Carole Newmark**

| | |
|---|---|
| **From:** | Denise Galloway [DGalloway37@nc.rr.com] |
| **Sent:** | Monday, October 23, 2006 6:58 PM |
| **To:** | 'Carole Newmark' |
| **Subject:** | RE: |

Hi. I was in Washington for a few days so I am just home now.

I always think it is so unfair when troubles come in multiples, and then I remember that my mother taught me the world wasn't fair. I am sorry for all you have dealt with these past few weeks! It isn't easy. I think death strikes our hearts, while injustice strikes right to the core of outrage and feelings of impotence (as least for me!).

Let's see now. I went to Pat Orsaia at least twice. I'm sure Elizabeth went more than once over the years. She usually went to Deb. In fact, I believe Elizabeth went to Ed Dinan and told him what she thought of Cathy and Dr. Roeder before she left, and specifically how poorly she felt they had treated me. I believe the case managers have been together, and for all I know also on their own; and I know Diane Lantz went at least once. I also think other departments have complained about her treatment of them, and doctors have been to Ed. Does that give you a perspective?

I am confused. I did not find Pat Orsaia unsympathetic to me. In your previous e-mail you sounded as though you didn't like her. I don't mean to intrude, but what happened? We don't have to e-mail unless you prefer it. I have Time Warner so I don't pay for long distance calls. If you'd rather chat, let me know a good time to call. What's important here is that you do not let yourself be too demoralized by this experience. The theory of "if she picks you she will support you" sure was flawed. I can't believe no one has reported her to the Dept of Health, NYS and JACHO for having no social work on site. I'm sure that is a no/no.

I hope the info helps you. Let me hear from you when you are up to it!

---

**From:** Carole Newmark [mailto:newmarkc1@optonline.net]
**Sent:** Sunday, October 22, 2006 7:58 PM
**To:** Denise Galloway
**Subject:**

Hi Denise,

Hope you are well and enjoying retirement.

Margie's mother died last Saturday, so things have become even more complicated, but we are getting through it all.

I have had some time to process and think about certain aspects of LHC environment. You stated that Cathy M was brought to HR before me, but you did not expand on this. Who took her to HR and for what? I'd like to know. Pat Orsaia also eluded to this, but did not give specifics.

Keep in touch and be well.

Carole

**EXHIBIT 15**

## Carole Newmark

**From:** Andersen, Katherine [kandersen@stellarishealth.org]
**Sent:** Thursday, October 12, 2006 7:08 AM
**To:** Carole Newmark
**Subject:** RE: HI

So glad to hear from you and that the turkeys did not get you down. It is a tough place here sometimes and not everyone gives what they would like to receive, I am sorry for that, I know whatever you do someone will be lucky to have you and your expertice, please contact me every so often and good luck I will await your new found sucssess story in the near future.
Love Kathy

-----Original Message-----
**From:** Carole Newmark [mailto:newmarkc1@optonline.net]
**Sent:** Wednesday, October 11, 2006 9:33 AM
**To:** Andersen, Katherine
**Subject:** RE: HI

Hi Cathy,

I was really good to hear from you, I appreciate your email more than you can imagine. LHC is not the same as it was years ago, that's for sure. I have to find my place, and that is in mental health. I am looking into starting up a private practice, since my forte is psychotherapy. I thought I could fit in at LHC, but there is such a back biting mentality and pathology in case management dept. so I didn't stand a chance. I did leave LHC with my head held high, and will continue to see the experience as one that will catapult me into what I really should be doing. I have always loved working in Oncology, and perhaps I will continue to do social work in this arena plus do private practice.

Again, thank you for contacting me. My being let go was so sudden and demeaning that I didn't get a chance to say goodbye to many of the "good guys." Be well, and thanks for being such a good support.

Carole

-----Original Message-----
**From:** Andersen, Katherine [mailto:kandersen@stellarishealth.org]
**Sent:** Wednesday, October 11, 2006 8:09 AM
**To:** newmarkc1@optonline.net
**Subject:** HI

Carol I was off for the Fri and Monday and got back yesterday and heard, I am devestated and so sorry, I don't even know what happened, Denise told me. You were getting on board so nicely and we were all getting to know you so well, please keep in touch, again, I am so sorry you are not here.
Kathy

Kathy Andersen RN, MPA, OCN
Clinical Educator Oncology, IV Team, HomeCare
Lawrence Hospital Center
914 787-5047
kandersen@lawrencehealth.org

**Note:**
This message is for the named person's use only. It may contain confidential, proprietary

**EXHIBIT 16**

.

## Newmark, Carole

| | |
|---|---|
| **From:** | Newmark, Carole |
| **Sent:** | Tuesday, May 23, 2006 10:33 AM |
| **To:** | Magone, Catherine |
| **Subject:** | Job description |



Cathy,

I know that we have both been out recently, and I was wondering what the status is from our job description meeting. There are still some questions about roles, etc. that the CMs bring up. Please advise.

## Carole Newmark, LCSW

**EXHIBIT 17**

**Newmark, Carole**

**From:**    Magone, Catherine

**Sent:**    Thursday, May 11, 2006 8:24 PM

**To:**    Newmark, Carole

**Subject:** Stuff



I just wanted you to know that I really think you are going to be amazing. You are just going to have to be patient with yourself and accept that there are some things that you just don't know! Wisdom comes from knowing when to ask the right questions and getting the right answers. Unfortunately, I don't have all the right answers but I will always try and help you to find the resources that you need. Six months from now, we will be laughing- I promise. I look forward to spending this time learning with you and Nicole. Thank you, Cathy.

**EXHIBIT 18**

# NOMINATION FOR BIG HEART AWARD

Staff Member's Name: Carole Newmark

Work Area: 3 North    Date: 4/17/06

Social Worker

Did a member of our staff do something special for you?

Please fill out this card and tell us how someone created a memorable moment for you at Lawrence Hospital Center.

We want to thank Carole for doing a very good job of preparing my husband Carl to leave the hospital. It was tedious work and she gave some very well, getting him to the VA home. We are not an easy place. Lots of paper work.



EXHIBIT
PENGAD 800-631-6989
Plaintiff 12
MP Tansey

Signature: Eric Udaze

☒ Patient Son    ☐ Staff

Send to: Administrative Offices via interoffice mail or place in "ballot box" located in several areas of the Hospital.

**EXHIBIT 19**

## Magone, Catherine

**From:** Enright, Catherine
**Sent:** Thursday, October 05, 2006 11:44 AM
**To:** Magone, Catherine
**Subject:** FW: Disaster Mental Health Training Update

*Catherine Enright MSN,RN,CNAA*
*Director Patient Care Services*

-----Original Message-----
**From:** Herrmann, Jack [mailto:Jack_Herrmann@URMC.Rochester.edu]
**Sent:** Thursday, September 28, 2006 5:14 PM
**To:** Shaughness, Karen; rarmstrong@cayugamed.org; icl1993@aol.com; igavzy@aol.com; Ogrodnick, Joie
**Subject:** FW: Disaster Mental Health Training Update

Sorry Folks:
I put in an incorrect email for you which is why you didn't get this email I sent out earlier.  Jack

Dear Disaster Mental Health Instructors:

I hope you are all doing well and enjoyed your summer.  I'm writing to give you an update on the disaster mental health training program as well as provide you with contact information for the other DMH instructors across the state.  Please review the attached contact list by October 1 and let me know if your information is correct.  I will be sending out a final copy (one alpha list and one by your region) once all the corrections have been made.

As you recall from the course, each facility that receives funding under the NYS DOH Hospital Bioterrorism Preparedness grant is required to provide training and education to hospital personnel on the mental health consequences of disasters and other public health emergencies.  Over the last year, you were trained as an instructor in the *Disaster Mental Health: A Critical Response* curriculum.  We explained that this course should be used to train mental health and spiritual care professionals in your facility so that they have the requisite skills and knowledge that allow them to respond to the disaster-related needs of victims, hospital employees, disaster responders, and the families of these individuals.  **Your hospital has agreed, by sending you to the instructor training, to conduct at least one training for your facility over the next year (before August 30, 2007)**.  While technically only one training is required in this time period, some facilities will need to consider hosting additional trainings in order to prepare an adequate number of professionals based upon the size of your facility and the population you serve.  Other facilities, which have limited mental health/spiritual care resources and are smaller in size, may need to join together with other area hospitals or the county mental health authority to train a combined team that can meet the needs of your community.  There are many different ways to meet this goal, though some of them take a little bit more energy and creativity to initiate.  If you are having difficulty recruiting enough participants to take the course (i.e., minimum 12-maximum 26), please let me know and I'm happy to brainstorm ways to help resolve this dilemma.

If you are not in the position of authorizing the course and have solely been assigned just as your facility's instructor, please contact your hospital disaster planner, bioterrorism coordinator, hospital

administrator, or your direct supervisor and make them aware of this agreement. Chances are they already are aware of this or know who to direct you to. If you have any difficulty identifying the appropriate contact person at your facility, please contact the Regional Resource Center coordinator in your area. His/her email address can be found above in the 'cc' line.

Once you have identified the dates of your training, please contact me at the email address below with your dates. **Please remember, the course was designed as a 14 hour training currculum and must be administered in its entirety in order to meet the DOH grant deliverable.** Whether you conduct it in 2 consecutive 8-hr days or over a period of multiple days or weeks is entirely up to your facility, but it cannot be conducted in less than 14 hours. Please be prepared to provide the following documents to me once your facility has completed the course: the *Sign-In Sheet*, the *Web Log*, and the participant **Pre-Training Questionnaire**. These documents can be sent to my attention at the address below. Also, please consider keeping copies of these documents for your own tracking purposes or in case they are lost in the mail.

Once we have received these documents we will contact your trainees and ask them to complete the on-line questionnaires we discussed during your training. Once the deadline for completion has passed, my assistant will compile the instructor evaluation data and send it to you. This will be your prompt to send out Certificates of Completion to your trainees. Please do not send these certificates out until you have received the evaluation data from us. All of the forms I have referred to above are located on the CD-ROM you received during your training and are also available on the secure instructor area of our website.

NYS DOH has also strongly encourages healthcare facilities (as outlined in the grant deliverables) to train other hospital personnel in the psychological consequences of disaster and supportive techniques that will be useful to them in their disaster response roles. These individuals are typically non-mental health professionals who may be providing direct patient care (physician, nurses, aides, technicians, security officers, etc.) or come in contact with patients and their families during disaster (cafeteria workers, housekeeping staff, etc.). The Disaster Mental Health: A Critical Response curriculum, while a helpful course to many, is more training than is needed for these individuals and should only be reserved for hospital personnel that will be providing direct disaster mental health intervention. In lieu of this course we have developed a 75 minute, on-line training entitled, *Psychological First Aid: Helping People Cope During Disasters and Public Health Emergencies*. This self-study course teaches individuals the importance of emotional and practical support in the immediate aftermath of disasters and how to provide such support. The training can be found on the University of Rochester Center for Disaster Medicine and Emergency Preparedness website at: http://www.centerfordisastermedicine.org/disaster_mental_health.html. We are also working currently on a skills-based companion training to this course for those individuals that will need more advanced skills in providing PFA.

I wish you good luck as you go on to schedule and conduct your training. Please know you can call me with any questions or concerns at any time.

Warmest Regards,
Jack

Jack Herrmann, MSEd., NCC, LMHC
Assistant Professor of Psychiatry and of Clinical Nursing
Director, Program in Disaster Mental Health
University of Rochester Medical Center
300 Crittenden Blvd., Box Psych
Rochester, New York 14642

**EXHIBIT 20**

.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

CAROLE NEWMARK,

                         Plaintiff,                    07 Civ. 2861 (CLB)

        -against-

LAWRENCE HOSPITAL CENTER,         **FIRST AMENDED**
PAT ORSAIA, individually, and CATHY     **COMPLAINT**
MAGONE, individually,

                                  **Jury Trial Demanded**

                 Defendants.

-----------------------------------------------------X

      Plaintiff CAROLE NEWMARK, by her attorneys Lovett & Gould, LLP, for her

first amended complaint respectfully states:

OCT 0 9 2007

USDC-WP-SDNY

## NATURE OF THE ACTION

      1. This is an action for compensatory and liquidated damages proximately

resulting from Defendants' violation of Plaintiff's rights as guaranteed by the Age

Discrimination in Employment Act, 29 U.S.C. §621 *et. seq.* and Section 296 *et seq.* of the

Executive Law of the State of New York.

## JURISDICTION

      2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343. In that

connection on or about November 20, 2006, Plaintiff duly filed a Charge of

Discrimination premised on age (#520-2007-00751) with the United States Equal

Employment Opportunity Commission (hereinafter "EEOC"). On or about February 23,

2007, the EEOC issued to Plaintiff a Notice of Right to Sue. Plaintiff's state law claim is interposed in accordance with the Court's supplemental jurisdiction, 28 U.S.C. §1367.

## THE PARTIES

3. Plaintiff CAROLE NEWMARK is a sixty-one year old citizen of the United States, a domiciliary of the State of New York and a resident of the Northern Counties. She has a Master of Social Work degree.

4. Defendant LAWRENCE HOSPITAL CENTER (hereinafter "Hospital") is a New York domestic corporation with premises for the conduct of business at 55 Palmer Avenue, Bronxville, New York.

5. Defendant CATHY MAGONE (hereinafter "Magone"), who is sued in her individual and personal capacities only, at all times relevant to this complaint was employed by the Hospital as its Director of Case Management. She was also responsible for Risk Management and Quality Assurance.

6. Defendant PAT ORSAIA (hereinafter "Orsaia"), who is sued in her individual and personal capacities only, at all times relevant to this complaint was employed by the Hospital as its Director of Human Resources. Orsaia and Magone were at all times referenced *infra* vested by the Hospital with final decision-making authority with respect to terminations of employment.

## THE FACTS

7. In or about March of 2006 Plaintiff was hired by the Hospital, having been advised by Magone in words or substance that she would be considered for assignment as

2

a Senior Social Worker dedicated to the Hospital's new Palliative Care Unit (hereinafter "Unit").

8. Shortly after the commencement of Plaintiff's employment Nicole Serra (hereinafter "Serra") was hired by the Hospital as a Social Worker. Serra is a considerably younger, former co-worker of Plaintiff's from Phelps Memorial Hospital. Plaintiff thereafter trained Serra with respect to her job duties at the Hospital.

9. Following the completion of Serra's training and on or about August 18, 2006, Magone advised Plaintiff that Serra rather than Plaintiff was being appointed to the Unit "because she [Serra] is younger and can handle the job better than [Plaintiff] can".

10. Plaintiff shortly thereafter met initially with Orsaia at which time Plaintiff reported what Magone had said, as referenced in the preceding paragraph "9". Plaintiff then met with both Magone and Orsaia regarding Magone's age discriminatory comment.

11. Magone falsely denied having made the subject statement, and instead then advised that the reason for Serra's appointment to the Unit instead of Plaintiff was: "Nicole [Serra] is young and could take things in like a sponge".

12. Magone and Orsaia thereupon advised Plaintiff that she was not a "good fit" for the Hospital. Her employment was thus terminated by reason of her age and in retaliation for having lodged an age discrimination complaint effective October 5, 2006.

13. By reason of Defendants' conduct Plaintiff was caused to suffer: pecuniary losses; loss of fringe benefits; emotional upset; discrimination by reason of her age; retaliation; anxiety; public embarrassment; public humiliation; impairment of her professional reputation; impairment of her professional career; and she was otherwise rendered sick and sore.

3

## AS AND FOR A FIRST CLAIM
## AGAINST THE HOSPITAL

14. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "13", inclusive.

15. Under the premises Defendant violated Plaintiff's rights as guaranteed by the Age Discrimination in Employment Act.

## AS AND FOR A SECOND CLAIM
## AGAINST THE HOSPITAL

16.    Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "13", inclusive.

17.  Under the premises the Defendants violated Plaintiff's right to be free from retaliation for having opposed discrimination in the workplace on the basis of age, which right is guaranteed her by reason of the Age Discrimination in Employment Act.

## AS AND FOR A THIRD CLAIM
## AGAINST ALL DEFENDANTS

18. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "13", inclusive.

19. Under the premises Defendants violated Plaintiff's rights as guaranteed by reason of Section 296 *et. seq* of the New York State Executive Law.

4

## AS AND FOR A THIRD CLAIM
## AGAINST ALL DEFENDANTS

20. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "13/", inclusive.

21. Under the premises the Defendants violated Plaintiff's right to be free from retaliation for having opposed discrimination in the workplace on the basis of age, which right is guaranteed her by reason of Section 296 et seq. of the Executive Law of the State of New York.

WHEREFORE a judgment is respectfully demanded:

    a.  On the First Claim awarding such compensatory damages as the jury may determine, awarding liquidated damages, reasonable attorney's fees and costs,

    b.  On the Second Claim awarding such compensatory damages as the jury may determine, and,

    c.  Granting such other and further relief as to the Court seems just and proper.

Dated: White Plains, N.Y.
      October 8, 2007

LOVETT & GOULD, LLP
By: _____
    Drita Nicaj (DN0966)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

5

**EXHIBIT 21**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

CAROLE NEWMARK,

                                 Plaintiff,           07-CIV-2861(CLB)

           -against-                                  **ANSWER TO THE**
                                                   **FIRST AMENDED**
LAWRENCE HOSPITAL CENTER,              **COMPLAINT**
PAT ORSAIA, individually, and CATHY
MAGONE, individually

                                Defendants.
_____x

       Defendants Lawrence Hospital Center (the "Hospital") and Catherine Magone, by their

attorneys, Collazo Carling & Mish LLP, for their Answer to the First Amended Complaint

herein:

       1.      Deny the allegations contained in paragraph 1 of the First Amended Complaint,

except admit that this action purports to assert claims pursuant to the Age Discrimination in

Employment Act, 29 U.S.C. § 621 *et seq.*, and the New York State Human Rights Law, Section

290 *et seq.* of the New York State Executive Law.

       2.      Admit the allegations contained in paragraph 2 of the First Amended Complaint.

       3.      Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 3 of the First Amended Complaint, except admit that

Newmark ("plaintiff") has a Master of Social Work degree.

       4.      Admit the allegations contained in paragraph 4 of the First Amended Complaint.

       5.      Deny the allegations contained in paragraph 5 of the First Amended Complaint,

and aver that Magone's title is Director of Clinical Quality and Case Management.

1

6.    Deny the allegations contained in paragraph 6 of the First Amended Complaint, except admit that Orsaia's title was Director of Human Resources, and admit that Magone and Orsaia had authority to terminate Newmark.

7.    Deny the allegations contained in paragraph 7 of the First Amended Complaint, except admit that plaintiff was hired in March 2006.

8.    Deny the allegations contained in paragraph 8 of the First Amended Complaint, except admit that Nicole Serra was hired by the Hospital as a Social Worker.

9.    Deny the allegations contained in paragraph 9 of the First Amended Complaint.

10.    Deny the allegations contained in paragraph 10 of the First Amended Complaint, except admit that Magone and Orsaia met with plaintiff to discuss her complaint.

11.    Deny the allegations contained in paragraph 11 of the First Amended Complaint, except admit that Magone denied making any discriminatory remarks.

12.    Deny the allegations contained in paragraph 12 of the First Amended Complaint, except admit that the Hospital terminated plaintiff on October 5, 2006.

13.    Deny the allegations contained in paragraph 13 of the First Amended Complaint.

14.    Repeat and incorporate the responses contained in paragraphs 1 to 13 herein.

15.    Deny the allegations contained in paragraph 15 of the First Amended Complaint.

16.    Repeat and incorporate the responses contained in paragraphs 1 to 15 herein.

17.    Deny the allegations contained in paragraph 17 of the First Amended Complaint.

18.    Repeat and incorporate the responses contained in paragraphs 1 to 17 herein.

19.    Deny the allegations contained in paragraph 19 of the First Amended Complaint.

20.    Repeat and incorporate the responses contained in paragraphs 1 to 19 herein.

21.    Deny the allegations contained in paragraph 21 of the First Amended Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

22.     Plaintiff failed to exhaust her administrative remedies with respect to her retaliation claims against defendants.

**WHEREFORE**, defendants demand that judgment be entered in its favor dismissing this action in its entirety, awarding to defendants their costs, inclusive of attorney's fees, and such other relief as the Court may deem just and proper.

Dated: New York, New York
        October 23, 2007

                                        COLLAZO CARLING & MISH LLP

                                        By:    John Keil
                                        _____
                                        John P. Keil (JK 2794)
                                        Attorneys for Defendants
                                        Lawrence Hospital Center and
                                        Catherine Magone
                                        Office and P.O. Address
                                        747 Third Avenue
                                        New York, New York 10017
                                        (212) 758-7862

To:     Drita Nicaj (DN 0966)
        Lovett & Gould, LLP
        Attorneys for Plaintiff
        222 Bloomingdale Road
        White Plains, New York 10605
        (914) 428-8401

3

**EXHIBIT 22**

# Lawrence Hospital Center
## Management Performance Appraisal

EXHIBIT
Plaintiff 22
NP 7/2/8

Employee Name:    Catherine Magone      Job Title:    Director
Department:       Clinical Quality and Case Management    Date:  2/23/2004

Review:    ___ Training period    _X_ Annual    ___ Special    Period of Review:_____

---

Part I

ATTAINMENT OF ANNUAL OBJECTIVES: List your mutually agreed upon individual objectives and the corresponding degree to which they have been satisfied (results achieved). Add additional sheets, if necessary.

| INDIVIDUAL OBJECTIVES | RESULTS ACHIEVED |
|---|---|
| Reduce the Medicare LOS | Medicare LOS reduced from 7.1 to 6.7 resulting in a savings of $3.7 million. |
| Under the leadership of the Medical Director, initiated Clinical Risk and Patient Safety Program | Initiated weekly Clinical Risk and Patient Safety Committee. Meetings. Promoted "I can Prevent Risk" Campaign. Developed Patient Safety news letter and completed two editions.  Began patient safety rounds. Revised policies and procedures. Revised current incident report to capture better information. |
| Reduce the number of insurance denials. | Reduced the number of insurance denials from 391 in 2002 to 283 in 2003. Reduced the number of denied days from 770 in 2002 to 613 in 2003 (savings of approx $157,000) |

RATINGS:

. Some Improvement Desired – Meets most requirements.
Consistent and/or needs significant management support.

. Consistently Competent – Meets full requirements of the
job and performs some key aspect in a superior fashion.

3. Frequently Above Standard: Exceeds most requirements and excels
in all key aspects of performance.

4. Consistently Exceptional – Exceeds in all requirements and
contributes substantially to organizational results.

| MANAGEMENT STANDARDS OF PERFORMANCE | RATE | COMMENTS |
|---|---|---|
| **Budgetary Planning**<br>Creates accurate and realistic budgets. Tracks and adjusts expense to meet changing hospital needs. Monitors and adjusts operations accordingly without impairing quality and efficiency. | 3 | |
| **Leadership**<br>Effectiveness in motivating and building morale, eliciting cooperation from subordinates and associates and getting results through people. Develops a shared sense of purpose, is persuasive, fair and sets high team standards. | 3 | |
| **Managing Performance**<br>Establishing clear performance standards. Conducts evaluations in a timely fashion and resolves performance problems. Is direct but tactful, providing guidance and support. | 3 | |
| **People Development and Management**<br>Provides feedback, training and coaching for subordinates to achieve their maximum potential. Creates clear development goals and plans. Exhibits consistent application of policies and procedures. Rewards employees. Encourages individual growth. Defines roles and responsibilities. Practices collaborative management. | 3 | Attempt to promote teamwork but have been unsuccessful in eliminating staff unrest.<br><br>*why ?* |
| **Project Management**<br>Establishes project goals and milestones. Develops procedures and systems. Defines roles, responsibilities, and project resources. Effectively coordinates projects. | 4 | Team leader for ED Patient Satisfaction team resulting in improved scores in patient satisfaction. |
| **Decision Making**<br>Makes thoughtful, systematic decisions. Utilizes good judgment in making decisions. Gets input, considers all available information, builds consensus, includes others. Considers impact of decisions. | 4 | *EXCELLENT JUDGMENT BASED ON VALUES* |
| **Meeting Management**<br>Holds appropriate number of meetings. Sets meeting goals. Develops and follows an agenda. Adequately prepares for a meeting. Involves appropriate people and encourages a balancing input. | 4 | Holds monthly department meetings, LOS meetings. Responsible for Coordinating all Hospital Quality Improvement Committees - agendas, reports, minutes. etc |
| **Planning and Organization**<br>Develops realistic plans. Effective in setting future goals, setting priorities and use of time. Balances short and long term goals. Aligns plans with hospital strategic plan. Achieves results with minimum direction. | 4 | Met objectives and achieved positive results.<br><br>*ALWAYS* |

| Results Focus Targets and achieves results. Establishes goals and prioritizes tasks. Overcomes obstacles. Accepts accountability. Establishes team standards and responsibilities. Creates a results-focused environment. | 4 | Successfully achieved goals. *BOTH LARGE AND SMALL* |
|---|---|---|

## GENERAL STANDARDS

|  | Rate | Comments |
|---|---|---|
| **Communication** Effective in expressing information in a clear and coherent fashion. Produces accurate, punctual reports. Is an effective, active listener. | 3 | *4 - PEOPLE LISTEN WITH RESPECT AND INTEREST* |
| **Dependability** Meets commitments, work standards. Works independently. Accepts accountability. Handles change. Stays focused under pressure. Meeting attendance requirements are met. | 4 | *TOTALLY.* |
| **Job Knowledge** Understands job duties and responsibilities. Has necessary job skills, technical skills, and equipment skills. Keeps current with new developments. | 4 | Attends conferences, Maintains certification in Healthcare Quality. *TOTAL COMMAND* |
| **Initiative** Tackles problems. Takes independent action. Seeks out new responsibilities. Recognizes and acts on opportunities. Generates new ideas. Exhibits self-development. | 4 | Requested to be a part of the team that went for the Ritz Carlton Training. Member of Service Excellence Team. Educated self on principles of Risk Management through readings, conference. |
| **Delegation** Effective in delegating and following up regularly to ensure that delegated duties and responsibilities are carried out. | 3 |  |
| **Analytical Ability and Judgment** Anticipates and prevents problems. Defines problems. Obtains adequate facts. Generates alternative solutions, and selects appropriate solution. Makes thoughtful and timely decisions. | 3 | . |
| **Innovation** Exhibits effectiveness in developing new ideas, concepts and approaches. Applies imagination to the position. Willing to challenge the status quo. | 3 / 4 | Developed the patient safety newsletter. *MANIFESTION TO ALWAYS DO MORE.* |
| **Interpersonal Skills** Is perceived as enthusiastic, competent, fair and is respected by peers and subordinates. Is people oriented and possesses a sense of humor. Is flexible and open minded. | 3 |  |

Age Specific Performance Evaluation: Indicate your evaluation by inserting the appropriate letter in each column. Method: T= Written/Post Test; V= Verbal Test; P= Peer Review; D=Documentation; SLM= Self Learning Module; S= Skills Observation

C= Competent; NI= Needs Improvement; NA= Not Applicable to Employee

|  | Method | Neonatal | Pediatric | Adoles. | Adult | Geriat |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

## JOB SPECIFIC STANDARDS

| | Rate | Comments |
|---|---|---|
| Responsible for planning and implementing the Quality Improvement program. Evaluates program and effects changes as needed to improve program and ensure compliance with regulatory standards. | 3 | Responsible for the hospital wide PI Program. Incorporated patient Satisfaction into Departmental PI. Working with Department Managers to develop patient safety indicators. Revised the PI and Patient Safety Plan. |
| Responsible for overseeing the completion and submission of NYPORT data to the DOH. | 3 | Conducts RCA's. In conjunction with the assistant Director of Quality and the Medical Director investigates all events. |
| Responsible overseeing the preparation and ensuring compliance with plans of correction submitted to the department of health. | 4 | Coordinates responses with the Medical Director and other appropriate parties. |
| Oversees Utilization Management / Case Management Program and ensures compliance with regulatory agencies while maintaining high quality patient care. | 3 | Acts as IPRO Liaison and HCQIP Liaison. Oversees denial management program. |
| Has knowledge of JCAHO standards and ensures compliance in responsible areas. | 4 | Attends JCAHO educational sessions and keeps current with updates/changes. |
| Oversees the Root Cause Analyses done in response to sentinel events. | 3 | |
| | | |
| | | |
| | | |

## STANDARDS FOR CORE VALUES

| | Rate | Comments |
|---|---|---|
| **Quality**<br>Performs high quality work and is a role model and example to others. Encourages other to always strive for excellence. Ensures the proper education, training and skills are available for getting the job done. | 3<br>4 | |
| **Respect**<br>Demonstrates sensitivity and high regard for the worth, dignity and cultural characteristics of others. Communicates in a courteous and pleasant manner. Avoids blaming others. Discusses problems with those involved, not with others. Protects the patients' right to privacy. | 3<br>4 | |
| **Integrity**<br>Fosters and demonstrates honesty in all circumstance and communications. Accepts responsibility for own actions. Follows through on promises and commitments. Considers the values in all decisions related to the hospital and our service. | 3<br>4 | |
| **Teamwork**<br>Fosters inter/intradepartmental participation in care and services. Avoids negative criticism and blaming others. Goes above and beyond to assist the hospital team meet the needs in caring for our patients. Willing to lend a hand. | 3<br>4 | |

Overall Rating:    ✓  Consistently     _____ Frequently Above     _____ Consistently
                        Exceptional            Standard                   Competent

                   _____ Improvement
                        Desired

PLOYEE COMMENTS: Please state your comments regarding this appraisal.

PRAISER'S COMMENTS (results of interview):

Discussed methods to defuse and/or
elimate staff arrest. 9
3004 Plans

ppraised by: _Wener Thueder_                3·2·04
                                            Date

eviewed by: _O_                            _____
                                            Date

his appraisal was reviewed with me on: _2/2/04_
                                        Date

_____
Employee Signature

N-388

**EXHIBIT 23**

Carole Newmark

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------)

CAROLE NEWMARK,

        Plaintiff,

        vs.              07-CIV-2861

LAWRENCE HOSPITAL CENTER,    (CLB)

PAT ORSAIA, individually, and

CATHY MAGONE, individually,

        Defendants.

------------------------------)

DEPOSITION OF CAROLE NEWMARK

New York, New York

Wednesday, March 5, 2008

Reported by:
Linda Salzman
JOB NO. 201131

Carole Newmark

Page 2

```
 1
 2                March 5, 2008
 3                10:00 a.m.
 4
 5        Deposition of CAROLE NEWMARK, the
 6   Plaintiff herein, held at the offices of
 7   Collazo, Carling & Mish, LLP, 747 Third
 8   Avenue, New York, New York, pursuant to
 9   Notice, before Linda Salzman, a Notary
10   Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties herein, that filing
 5   and sealing be and the same are hereby
 6   waived.
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the
 9   form of the question, shall be reserved
10   to the time of the trial.
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn
13   to and signed before any officer
14   authorized to administer an oath, with
15   the same force and effect as if signed
16   and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4   LOVETT & GOULD, LLP
 5   Attorneys for Plaintiff
 6        222 Bloomingdale Road
 7        White Plains, New York 10605
 8   BY:  DRITA NICAJ, ESQ.
 9
10
11   COLLAZO CARLING & MISH, LLP
12   Attorneys for Defendants
13        747 Third Avenue
14        New York, New York 10017
15   BY:  JOHN P. KEIL, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2   C A R O L E   N E W M A R K,
 3        called as a witness, having been duly
 4        sworn by a Notary Public, was examined
 5        and testified as follows:
 6   EXAMINATION BY
 7   MR. KEIL:
 8        Q.  Good morning, Ms. Newmark.  My name
 9   is John Keil.  I represent Lawrence Hospital
10   and Cathy Magone in this matter, as well as
11   Pat Orsaia, who's not a party.
12        Do you understand that you're under
13   oath?
14        A.  Yes, I do.
15        Q.  Have you ever had your deposition
16   taken before?
17        A.  No, I haven't.
18        Q.  Have you ever testified under oath
19   before?
20        A.  No, I haven't.
21        Q.  And you've seen the way depositions
22   work from the prior ones you have attended in
23   this matter?
24        A.  Yes.
25        Q.  So I will ask you questions.
```

2  (Pages  2  to  5)

Carole Newmark

Page 6

1          C. Newmark
2    You're expected to answer those questions
3    fully and truthfully to the best of your
4    recollection. Please wait for me to finish
5    my questions before you respond, and please
6    make sure you answer out loud and in words so
7    the court reporter can take down your
8    response.
9          Do you understand all that?
10   A.  Yes, I do.
11   Q.  If at any time you don't understand
12   my question, will you let me know?
13   A.  I will.
14   Q.  If at any time during the
15   deposition today you realize that a prior
16   answer you gave me was incorrect or
17   incomplete, will you let me know?
18   A.  Yes, I will.
19   Q.  And if you need to take a short
20   break at any time, please let me know and we
21   can arrange that as soon as you answer
22   whatever question may be pending.
23          Okay?
24   A.  Yes.
25   Q.  Are you taking any medication that

Page 7

1          C. Newmark
2    would interfere with your ability to remember
3    or tell the truth today?
4    A.  No.
5    Q.  Can you think of any reason why you
6    would not be not be able to answer my
7    questions fully and truthfully today?
8    A.  No.
9    Q.  What was your position at Lawrence
10   Hospital?
11   A.  I was senior social worker.
12   Q.  Did you work a particular shift or
13   have particular hours?
14   A.  I worked from 8:00 a.m. to 4:00
15   p.m.
16   Q.  Were those your hours of work for
17   the entire time that you were employed?
18   A.  Yes.
19   Q.  When did your employment start with
20   Lawrence Hospital?
21   A.  It started in March 2006.
22   Q.  And at the time your employment was
23   terminated, who was your supervisor?
24   A.  My supervisor was Cathy Magone.
25   Q.  How long had Ms. Magone been your

Page 8

1          C. Newmark
2    immediate supervisor prior to your
3    termination?
4    A.  About four months.
5    Q.  Do you recall the date when she
6    became your immediate supervisor?
7    A.  I think it was in June or July.
8    I'm not sure.
9    Q.  June or July of '06?
10   A.  Of '06.
11   Q.  Was there anyone else that you
12   reported to during your employment at
13   Lawrence Hospital?
14   A.  Yes, Diane Lance.
15   Q.  And over what he period of time did
16   you report to Ms. Lance?
17   A.  From March 2006 until somewhere
18   around June or July '06, when she left.
19   Q.  Was there anyone else who was your
20   immediate supervisor while you were at
21   Lawrence?
22   A.  No.
23   Q.  Who gave you assignments while you
24   were employed at Lawrence?
25          MS. NICAJ: Objection.

Page 9

1          C. Newmark
2          You can answer.
3    A.  My assignments came from various
4    sources. They came off a daily run of
5    patients that was taken off the fax machine.
6    They were spontaneously given to me by the
7    case managers. They were spontaneously given
8    to me by nurses, by doctors. That's how I
9    got my assignments for the day.
10   Q.  What form did these assignments
11   take?
12   A.  I would be called either on my
13   phone or my beeper or in person, or even just
14   walking through the halls. I would be
15   stopped and asked to do something by someone
16   who needed me.
17   Q.  Was there a typical or regular task
18   that you were asked to perform?
19   A.  The tasks were assisting the case
20   manager, basically assisting the case
21   managers in providing discharge planning. My
22   piece -- in particular, my piece was the
23   behavioral health piece.
24   Q.  And what was the behavioral health
25   piece?

3  (Pages 6 to 9)

Carole Newmark

Page 10

```
1              C. Newmark
2      A.  That was working with families and
3  patients and working through emotional
4  issues, psychiatric issues, working through
5  problems that arose within families and
6  patients.  Just helping them get through the
7  hospital stay.
8      Q.  Who, if anyone, provided you
9  evaluation or feedback on your performance
10 while you were at Lawrence Hospital?
11     A.  Cathy Magone and Diane Lance, when
12 she was there.
13     Q.  Why were you fired?
14     A.  Why was I fired?  I was told when
15 they terminated me on October 5th that I was
16 not a good fit, that there were attendance
17 issues, punctuality issues, there were issues
18 relating to the general work.
19     Q.  Do you have any reason to doubt
20 what you were told?
21     A.  Yes.
22     Q.  What are those reasons?
23     A.  I performed the job duties as
24 delineated by Ms. Magone and Ms. Lance to the
25 best of my ability.  I was always on time.  I
```

Page 11

```
1              C. Newmark
2  worked many hours overtime.  So there was not
3  a punctuality issue.  I was very cohesive
4  with my co-workers.  There were problems in
5  the beginning, which I believe had been
6  worked out.  And I was a loyal and
7  trustworthy employee at Lawrence Hospital.
8      Q.  What do you believe to be the
9  reason why you were fired?
10     A.  I believe that I went to HR to
11 discuss an issue of ageism, and I believe
12 from that point on my relationship with Cathy
13 Magone had changed, and I believe that I was
14 let go in retaliation for going to HR.
15     Q.  What's your basis for believing
16 that?
17     A.  My basis for believing that, the
18 ageism piece is related to a comment that
19 Cathy Magone made to me on August the 13th,
20 '06.  And I believe that once I went to HR,
21 Cathy Magone felt I was out of order, or out
22 of line perhaps, and began to find reasons to
23 let me go and not pass my probation.
24     Q.  But what is the basis for your
25 belief that Cathy Magone felt you were out of
```

Page 12

```
1              C. Newmark
2  line and looked for reasons to let you go
3  because of your complaint?
4          MS. NICAJ:  Objection.
5          You can answer.
6      A.  Can you rephrase that so I can
7  better understand?
8      Q.  You've testified to your belief as
9  to -- your belief that Cathy Magone's reasons
10 for firing you were related to your complaint
11 about a comment that she had made.
12          What is your -- why do you
13 attribute that motivation to Cathy Magone?
14     A.  Because up until that time there
15 were no warnings, there were no major issues
16 that came about that were related to me in
17 any way, shape or form that led me to believe
18 that there was a problem.
19     Q.  Was there anything else that
20 supports your belief?
21     A.  I can't think of anything at this
22 time.
23     Q.  Was there anything that Cathy
24 Magone said that led you to believe that her
25 decision was related to the complaint you had
```

Page 13

```
1              C. Newmark
2  made about her?
3      A.  Can you repeat that?
4          MR. KEIL:  Can you read that back,
5  please?
6          (Whereupon, the requested portion
7          was read back by the court reporter.)
8      A.  Not that I can recall.  Excuse me,
9  other than she denied making that statement.
10     Q.  How does that -- how do you see
11 that supporting your belief?
12     A.  Because she denied saying something
13 to me that prompted me to go to HR, and I
14 believe that she was angry with me for going
15 to HR and for bringing up something that she
16 denied happened.  I don't know if I'm
17 answering exactly the way you would like me
18 to.
19          MS. NICAJ:  Don't worry about the
20          way he would like you to.  You answered
21          the question.
22     Q.  Your obligation is to tell the
23 truth to the best of your recollection.
24 That's all I'm looking for.
25     A.  Okay.
```

4 (Pages 10 to 13)

Carole Newmark

Page 14

```
1              C. Newmark
2        Q.  What did Cathy Magone say or do
3    that made you believe that she was angry with
4    you because you had complained?
5             MS. NICAJ:  Objection.
6             You can answer.
7        A.  Her entire demeanor and attitude
8    towards me had changed.  I was overlooked in
9    several instances where other people weren't
10   for various things that were going on in the
11   hospital.  Ms. Magone, just her whole
12   attitude changed towards me.  That's the
13   basis of my belief that she was angry with me
14   for going to HR with something that she said.
15       Q.  When you say that her entire
16   demeanor and attitude changed, what do you
17   mean by that?
18       A.  She wouldn't meet with me as
19   frequently.  She wouldn't make eye contact
20   with me.  Her whole demeanor changed.  We had
21   something at Lawrence Hospital called a Big
22   Heart and a Little Heart, which was when you
23   were nominated -- you were nominated by
24   patients or staff for deeds well done.
25           I received two of them.  Cathy
```

Page 15

```
1              C. Newmark
2    Magone never acknowledged them.  As a matter
3    of fact, one day there was two of them, one
4    for someone else and mine right underneath
5    it, and in a staff meeting she was very happy
6    to announce the one that was on top and not
7    mine.  And I felt that, you know, that that
8    was rather subjective.
9        Q.  When did that happen?
10       A.  I can't recall the date.
11       Q.  Do you recall the month?
12       A.  Perhaps in September of '06.
13       Q.  How did you find out that you had
14   been nominated for this award?
15       A.  There is a statement that was given
16   to me and to my supervisor, and they're very
17   rare.
18       Q.  Do you have a copy of that
19   statement?
20       A.  I believe I have a copy of one of
21   them.
22       Q.  There was only one produced in
23   discovery.  Is that the one you're referring
24   to?
25       A.  Probably.  There's another one
```

Page 16

```
1              C. Newmark
2    also, which I don't have a copy of because I
3    was never given a copy of it.
4        Q.  When was the date of this other
5    one?
6        A.  Perhaps April of '06.  I don't
7    recall the exact date.
8             MR. KEIL:  Can the court reporter
9        please mark this as Defendants' Exhibit
10       A.
11           (Defendants' Exhibit A, Big Heart
12       award nomination, marked for
13       identification, as of this date.)
14       Q.  Ms. Newmark, I'm going to show you
15   what's been marked as Defendants' Exhibit A.
16           Do you recognize this document?
17       A.  Yes.
18       Q.  Is this one of the Big Heart award
19   nominations that you were referring to?
20       A.  Yes, it is.
21       Q.  Was this for the April -- does this
22   reflect the April nomination?
23       A.  Yes, it does.
24       Q.  So is this the Big Heart award you
25   received a copy of?
```

Page 17

```
1              C. Newmark
2        A.  Yes, I received a copy of this one
3    and it was posted on a board.
4        Q.  Which board was it posted on?
5        A.  The secretary's office.  There was
6    a general board for postings.
7        Q.  In the department of case
8    management and social work?
9        A.  Yes, that's correct.
10       Q.  So the nomination that you said you
11   believe may have been in September, is the
12   one you didn't receive a copy of?
13       A.  That's correct.
14       Q.  Do you know who submitted that
15   nomination?
16       A.  Yes, I do.  It was a co-worker.  It
17   was, I believe, I'm not sure, I believe it
18   was a nurse's aide.
19       Q.  Do you know the name of that
20   individual?
21       A.  I don't.
22       Q.  How did you find out that this one
23   had been submitted, the September nomination?
24       A.  Actually, my daughter worked for
25   the department of excellence at Lawrence
```

5 (Pages 14 to 17)

Carole Newmark

Page 18

```
1              C. Newmark
2   Hospital, and all of the Big Heart and Little
3   Heart awards were given through her
4   department. And so when she received it, she
5   let me know that I received this.
6       Q.  Did she let you know you had
7   received it before or after your termination
8   from employment?
9       A.  Before.
10      Q.  Approximately how long before?
11      A.  Approximately September,
12  mid-September. I'm not sure.
13      Q.  You're not sure?
14      A.  I'm not sure. I do have
15  documentation at home in regard to it.
16      Q.  What sort of documentation do you
17  have?
18      A.  I have a letter that was given --
19  that was sent from the department of
20  excellence to, I believe to Cathy Magone.
21      Q.  And you testified earlier that you
22  said that one of the ways in which you
23  perceived Cathy Magone's demeanor and
24  attitude to change was that she met with you
25  less frequently?
```

Page 19

```
1              C. Newmark
2       A.  She met with me less frequently.
3   She just didn't have the same rapport with me
4   that she had on the onset of my working at
5   Lawrence Hospital.
6       Q.  How would you describe your rapport
7   with Cathy Magone at the beginning of your
8   work?
9       A.  At the beginning, it was amicable.
10  I really didn't have much to do with her
11  because I was reporting directly to Diane
12  Lance, but it was cordial. It was not bad.
13      Q.  Did your working relationship with
14  Cathy Magone stop being cordial at some
15  point?
16      A.  Yes.
17      Q.  When?
18      A.  I would have to say after I went to
19  HR.
20      Q.  Why do you say that?
21      A.  Because it's the truth. Because
22  that's what happened.
23      Q.  What did Cathy Magone do after you
24  went to HR that you would characterize as a
25  change in her being cordial to you or not?
```

Page 20

```
1              C. Newmark
2       MS. NICAJ:  Objection.
3       You can answer.
4       A.  She, as I said before, she stopped
5   making eye contact with me. She stopped
6   meeting with me. She was rather dismissive
7   with me. I'd ask a question or I'd raise an
8   issue and she would ignore it in meetings, in
9   staff meetings.
10      Q.  What questions did you ask that she
11  ignored?
12      A.  Just general comments, or I just
13  made a general comment or asked a question
14  and she just didn't answer it, or just went
15  on to something else.
16      Q.  What would be an example of a
17  comment you made?
18      A.  Maybe something in regard to a
19  patient or in regard to something we were
20  doing, and I would make a comment, and in the
21  beginning she would be very responsive to me
22  and she became less responsive.
23      Q.  When you say she met with you less
24  frequently, you're referring to one-on-one
25  meetings?
```

Page 21

```
1              C. Newmark
2       A.  Yes.
3       Q.  Or some other?
4       A.  One-on-one.
5       Q.  At the beginning of your employment
6   at Lawrence while Diane Lance was your
7   supervisor, how often did you meet with Cathy
8   Magone?
9       A.  I didn't.
10      Q.  Not at all?
11      A.  No, no, except for -- we had what
12  they called lineup in the morning, which is a
13  Ritz Carlton prototype where everyone lines
14  up and you discuss what's going to be done
15  for the day. That occurred at 10:00 a.m. in
16  the morning.
17      Q.  10:00 a.m. every day?
18      A.  Yes.
19      Q.  That continued after Diane Lance
20  left?
21      A.  Yes, it was a mandate at the
22  hospital.
23      Q.  After Diane Lance left, how often
24  did you meet with Cathy Magone?
25      A.  We all met with Cathy Magone in the
```

6 (Pages 18 to 21)

Carole Newmark

Page 22

C. Newmark
1
2    mornings. And she would meet with me
3    sporadically. There was not an agenda set or
4    a set time where she would meet with me. If
5    she needed to ask me a question, she would
6    ask me to come up and ask me a question. It
7    wasn't formal.
8        Q.  Did it happen at least once a week?
9        A.  Yes.
10       Q.  At least four times a week?
11       A.  Perhaps.
12       Q.  Were there weeks when it happened
13   more often than that?
14       A.  Not really. We would also see each
15   other in the hallways or on a unit.
16       Q.  After you complained to Human
17   Resources, how often did you meet with Cathy
18   Magone?
19       A.  I don't think I did meet with
20   Cathy.
21       Q.  Not once?
22       A.  Afterwards, let me just get my --
23   not for any specific reason. We would meet
24   in the mornings at lineup or we would meet on
25   a unit where she would ask me how things are,

Page 23

C. Newmark
1
2    how is it going, you know, but it wasn't a
3    formal meeting.
4        Q.  So your testimony is after you
5    complained to Human Resources, you did not
6    have any further private meetings with Cathy
7    Magone of any kind?
8        A.  Not that I recall.
9        Q.  You testified you believe you were
10   overlooked in several instances where other
11   people weren't.
12          Do you remember that testimony?
13       A.  Yes, I do.
14       Q.  What were you referring to?
15       A.  I was referring to the Big Heart,
16   Little Heart.
17       Q.  Was there anything else?
18       A.  Not that I can recall.
19       Q.  So when you said several instances,
20   you were just referring to the -- to these
21   two Big Heart award issues?
22       A.  It was that, and there were subtle
23   things that I can't recall at this point, but
24   there were.
25       Q.  When did you first begin to believe

Page 24

C. Newmark
1
2    that your termination was connected to your
3    complaint to Human Resources?
4        A.  I have to be honest and say when I
5    was terminated, because I didn't know they
6    were terminating me.
7        Q.  So as of the date of your
8    termination, you believe there was a
9    connection between your termination and your
10   complaint to Human Resources in August?
11       A.  Yes. It was a surprise to me.
12          MR. KEIL: Can the court reporter
13   please mark this as Defendants' Exhibit
14   B.
15          (Defendants' Exhibit B, Narrative,
16   marked for identification, as of this
17   date.)
18       Q.  Ms. Newmark, I'm showing you what's
19   been marked as Defendants' Exhibit B. If
20   you'd like can you take a moment to read
21   through it.
22          Do you recognize the document?
23       A.  Yes, I do.
24       Q.  Just let me know when you're ready.
25       A.  Yes.

Page 25

C. Newmark
1
2        Q.  Did you write the narrative in
3    Defendants' Exhibit B yourself?
4        A.  Yes.
5        Q.  Did anyone help you?
6        A.  I don't think so.
7        Q.  Did you show it to anybody before
8    you completed it?
9        A.  No. My lawyer.
10       Q.  I'm sorry?
11       A.  My lawyer.
12       Q.  Drawing your attention to the box
13   immediately above the typewritten paragraph,
14   you see the top of it says, "Cause of
15   discrimination based on, check appropriate
16   boxes"?
17       A.  Yes.
18       Q.  And there are two Xs next to the
19   word age?
20       A.  Yes.
21       Q.  Did you put those Xs there?
22       A.  No.
23       Q.  Do you know who did?
24       A.  This was typed by my attorney's
25   office, I believe.

7 (Pages 22 to 25)

Carole Newmark

Page 26

```
 1              C. Newmark
 2      Q.  Did you type the paragraph that
 3  appears on Exhibit B yourself?
 4      A.  No.
 5      Q.  Were you shown Exhibit B before it
 6  was filed?
 7      A.  Yes, I signed it.
 8      Q.  And at that time, did you agree
 9  with the checking of the box next to the word
10  age?
11      A.  Yes.
12      Q.  Why, if you know, was the box next
13  to the word retaliation not checked?
14      A.  I'm not sure.
15      Q.  Did you review the original
16  complaint that was filed in Federal Court in
17  this matter before it was filed?
18      A.  Yes.
19      Q.  Were you aware that your complaint
20  was amended in October of 2007?
21      A.  I'm not sure.
22      Q.  You're not aware of that?
23      A.  I'm not sure.
24      Q.  When did you first find out that
25  you were going to be fired from Lawrence
```

Page 27

```
 1              C. Newmark
 2  Hospital?
 3      A.  On October 5, 2006.
 4      Q.  What time of day did you find out?
 5      A.  At exactly 3:30.  Correction.  I
 6  can give you an approximation of 3 o'clock.
 7      Q.  3 o'clock is your best
 8  recollection?
 9      A.  That's my best recollection,
10  correct.
11      Q.  Where were you when you found out
12  you were going to be fired?
13      A.  I was in the intensive care unit.
14      Q.  And what were you doing at the
15  time?
16      A.  I was working with a psychotic
17  patient who needed discharge to a facility,
18  an inpatient mental health facility.  I had
19  been working on that case for about an hour.
20      Q.  And how did you find out that you
21  were going to be fired?
22      A.  I went to -- I was in the ICU.  I
23  got a call on my beeper.  I returned the call
24  to Cathy Magone.  She said, "Please come up
25  to my office."
```

Page 28

```
 1              C. Newmark
 2          I said, "Do you need me right now?
 3  I'm working with this case that has to be
 4  transferred to an inpatient psychiatric
 5  facility."
 6          She said, "You are no longer on the
 7  case.  Nicole Serra is.  Come up to my office
 8  immediately."
 9      Q.  Did you do that?
10      A.  I did.
11      Q.  Who was present at Cathy Magone's
12  office when you arrived?
13      A.  Pat Orsaia.
14      Q.  And Cathy Magone?
15      A.  Yes, of course.
16      Q.  And how did the meeting begin?
17      A.  I sat down, Pat Orsaia said -- I
18  can't say verbatim, but she said that we were
19  meeting because I was not a good fit at
20  Lawrence Hospital, and they were terminating
21  my employment there.
22      Q.  You don't recall the precise words
23  that Ms. Orsaia used?
24      A.  Not exactly, but that's as close
25  as --
```

Page 29

```
 1              C. Newmark
 2      Q.  Did Ms. Orsaia say anything else?
 3      A.  She proceeded to -- actually, I was
 4  in shock, so I may not have heard a lot of
 5  what she said, but she proceeded to tell me
 6  that it wasn't working out and that I was to
 7  get my belongings together, empty my office,
 8  and leave the premises immediately, and that
 9  I had an hour to do that.
10      Q.  Did she say anything else?
11      A.  Not that I recall.  She gave me
12  some paperwork.  She gave me termination
13  letters and some other paperwork that she
14  wanted me to see.  She said I was entitled to
15  COBRA.  She went over the basics of, I guess
16  what people do when they're fired.  I have
17  never been fired before, so I don't know what
18  the procedure is.
19          Then Cathy Magone kind of threw my
20  evaluation at me.  She pushed it across the
21  desk.  Pat Orsaia asked me to read it.  I
22  asked her if I could read it when I left.  I
23  believe I did look at it, I flipped through
24  it.  There was some exchange of words, you
25  know, between Cathy and Ms. Magone and Pat
```

8 (Pages 26 to 29)

Carole Newmark

**Page 30**

1           C. Newmark
2    Orsaia, and then I was told that Cathy Magone
3    would escort me out of the building.
4           At that point, I asked if a
5    security guard could escort me because I
6    didn't trust her.
7       Q.   Why didn't you trust her?
8       A.   I just didn't.
9       Q.   No particular reason?
10      A.   I didn't trust her. I felt she was
11   very volatile at times with other people.
12   And I didn't want her to escort me out of the
13   building, and I thought that the formality
14   would be a security guard to take me back to
15   my office.
16      Q.   When you say you had seen Cathy
17   Magone be volatile with other people, what
18   are you referring to?
19      A.   Her staff.
20      Q.   Which staff members?
21      A.   All the case managers.
22      Q.   Every single one?
23      A.   Just about.
24      Q.   How many times did you see this
25   happen?

**Page 31**

1           C. Newmark
2       A.   Quite often.
3       Q.   Was it every day?
4       A.   I couldn't say every day.
5       Q.   Was it every week?
6       A.   I didn't see her that much, but
7    when I did see her on the units with people,
8    she was quite demanding.
9       Q.   When you say volatile, you're
10   saying she was quite demanding?
11      A.   Demanding and maybe volatile is a
12   little strong, but she would want her way and
13   insist on having things her way.
14      Q.   How long did the meeting last?
15      A.   That meeting lasted about ten
16   minutes.
17      Q.   How did it end?
18      A.   I got up, I took my paperwork with
19   me, I proceeded to go to the elevator to go
20   back to my office to empty the contents of my
21   office, Cathy Magone escorted me. Pat Orsaia
22   told me that a security guard would not
23   escort me, that Cathy Magone would escort me.
24          I thought that was very unusual,
25   but I was kind of reeling from being fired,

**Page 32**

1           C. Newmark
2    and I just picked up my stuff, went to my
3    office, Cathy followed me, and I proceeded to
4    put things into boxes and bags. And Cathy
5    watched me do this. And I left.
6       Q.   Did you say anything to Cathy
7    Magone before you left?
8       A.   Before I left?
9       Q.   Yes.
10      A.   I said absolutely nothing to her.
11   Correction. She asked me if I needed a box
12   or a wagon or something. And I said that
13   would be helpful. And she went and got me a
14   cart and I put things into my cart.
15      Q.   Did you say to her you're a
16   terrible manager?
17      A.   I told her -- when the cart was
18   emptied into my car, and I was no longer an
19   employee there, I did tell her that.
20      Q.   So you used the words you're a
21   terrible manager?
22      A.   No.
23      Q.   What words did you use?
24      A.   I don't say this proudly, but I
25   told her that she was a fucked up person and

**Page 33**

1           C. Newmark
2    that she was a fucked up manager, and that
3    was after my employ there. I had an hour to
4    get out. It was 4:15. And that was it.
5       Q.   It took you approximately an hour
6    to pack up?
7       A.   Yes.
8       Q.   How did Cathy Magone respond to the
9    words you used?
10      A.   She turned around and said, "Nice
11   Carole, very nice."
12      Q.   When you said to her, "You're a
13   fucked up manager," was there anything
14   specific that you're referring to?
15      A.   Just the way she managed her people
16   out of fear. I'm a very gentle person and I
17   don't operate that way, so I found it
18   unusual. I found it unusual how she --
19          MS. NICAJ: Raise your voice.
20      Q.   Is there anything you wanted to add
21   to that?
22      A.   Add to what?
23      Q.   Your prior answer. I didn't know
24   if you had been interrupted.
25      A.   No.

9  (Pages 30 to 33)

Carole Newmark

Page 34

1           C. Newmark
2      Q.  Was there anything in particular
3  you were referring to when you said, "You're
4  a fucked up person"?
5      A.  It was just a release of emotion, I
6  guess.  It was a very tense hour for me.
7      Q.  When did you first start to believe
8  that Cathy Magone was a bad manager?
9      A.  I got information prior to
10  accepting the position that she was a very
11  tough manager and not fair.  I, being the
12  person that I am, I thought I would come to
13  my own conclusions about anyone that I met.
14  So it was hearsay.  And that's the first time
15  that I heard certain things about Cathy
16  Magone.
17      Q.  But my question is, when did you
18  first start to believe it?
19      A.  About two months into my employ
20  there.
21      Q.  So approximately May, late May?
22      A.  About that.
23      Q.  Who had you received this prior
24  information from?
25      A.  Denise Galloway.

Page 35

1           C. Newmark
2      Q.  What did she tell you?
3      A.  That she was very difficult to work
4  for.  That Denise, who had worked for
5  Lawrence Hospital, let me say, for over 28
6  years and had been a manager then, had to
7  report to Cathy Magone when Cathy Magone came
8  on board, and she kind of stripped her of any
9  of her authority and decision-making
10  responsibilities.
11          I was told that she was cold, that
12  she really didn't care about people.  Cathy
13  was a bean counter.  It was about money and
14  getting patients in and out of the hospital.
15      Q.  Is there anything else that Denise
16  Galloway told you before you started work at
17  Lawrence Hospital about Cathy Magone as a
18  manager?
19      A.  She said perhaps it's me.  And it
20  won't happen to you because I have been here
21  so long.  Perhaps you're a new person.  Maybe
22  it would be better for you.
23      Q.  Did you hear this from Ms. Galloway
24  before you accepted the position at Lawrence
25  Hospital?

Page 36

1           C. Newmark
2      A.  I did.
3      Q.  How many conversations did you have
4  with Ms. Galloway on this subject before you
5  accepted employment?
6      A.  Maybe one or two.  Nothing
7  extensive.
8      Q.  How do you know Ms. Galloway?
9      A.  Ms. Galloway was my supervisor when
10  I was an intern at Lawrence Hospital in 1994
11  to '95.  Denise Galloway was my supervisor,
12  once again, when I graduated from college
13  with my master's degree.  She was my
14  supervisor when I worked at Lawrence Hospital
15  in 1997.
16      Q.  Did you stay in touch with
17  Ms. Galloway over the years after you left
18  Lawrence Hospital?
19      A.  Infrequently.
20      Q.  Once a year?
21      A.  Perhaps.
22      Q.  Do you consider her a personal
23  friend?
24      A.  Yes.  More so mentor than friend.
25      Q.  You said that you started to reach

Page 37

1           C. Newmark
2  your own conclusions about Cathy Magone as a
3  manager approximately late May of 2006?
4      A.  Yes.
5      Q.  What happened that made you form
6  that belief?
7      A.  I was just observing, which is part
8  of my job and part of what I do as a social
9  worker and a psychotherapist, I observed how
10  she treated people.  I observed how people
11  felt in her presence.  I heard people talking
12  about her and how frightened they were of
13  her.
14      Q.  Who did you perceive to be
15  frightened of Cathy Magone?
16      A.  Oh, there is a list of people, and
17  I hope that I can remember all of their
18  names.
19      Q.  Do your best.
20      A.  Kitty -- these are all case
21  managers.  Kitty, Lori Bachmann, Barbara.
22  There's another case manager who left.  I
23  can't recall her name.  These were people who
24  have been at Lawrence Hospital for quite some
25  time, and then there were new people who had

Carole Newmark

Page 38

1           C. Newmark
2   -- who hadn't really made up their mind one
3   way or the other about how they felt about
4   her. There were a lot of new people, but
5   those were the people.
6       Q.   What did Cathy Magone do
7   specifically that led you to conclude that
8   she managed through fear?
9       A.   She was very demanding, very
10  demeaning in other people's presence on
11  units. She demanded to know what was going
12  on. That's part of her job, but in my
13  opinion, there is a way of relating to people
14  and she was forceful, demeaning at times,
15  dismissive of other people when she had
16  something to say.
17      Q.   How old is the case manager? You
18  mentioned Kitty, how old is she?
19      A.   Ballpark, late 50s.
20      Q.   How old is Lori Bachmann?
21      A.   Lori Bachmann was well into her
22  60s, also worked there for maybe 30 years.
23      Q.   How old was Barbara?
24      A.   40s maybe.
25      Q.   Did you ever discuss these

Page 39

1           C. Newmark
2   observations you made about Cathy Magone with
3   other employees of Lawrence Hospital?
4       A.   More like they discussed it with
5   me.
6       Q.   Who discussed it with you?
7       A.   Lori Bachmann.
8       Q.   Anyone else?
9       A.   Barbara. Nicole Serra. There may
10  have been others. I don't recall.
11      Q.   Did Kitty say anything to you?
12      A.   Kitty is a very passive woman who
13  internalizes whatever she feels and just
14  makes herself very ill. Woman spent most of
15  her time on the job in the bathroom feeling
16  sick because she couldn't keep up with Cathy
17  Magone's demands. She really didn't speak
18  much.
19      Q.   Is that a no?
20      A.   No.
21      Q.   So just to make sure I understand,
22  your testimony is that these other
23  individuals that you've named expressed their
24  concerns to you about Cathy Magone, but you
25  didn't express your own observations with

Page 40

1           C. Newmark
2   them?
3       A.   Not at the beginning, I didn't,
4   because I felt that it's in my nature to
5   allow people to present themselves as who
6   they are. And I always give people a chance.
7           And I don't come -- I'm not
8   reactive and I don't come to rash decisions
9   and I don't really take people's, you know,
10  what someone thinks about someone, I kind of
11  put it somewhere in the back of my head and
12  come to my own conclusions about people.
13      Q.   When did you first express your
14  concerns about Cathy Magone to someone else
15  at Lawrence Hospital?
16      A.   Ballpark, maybe, June.
17      Q.   You don't remember the exact date?
18      A.   I don't.
19      Q.   Who did you express these concerns
20  to?
21      A.   To Lori Bachmann, to Nicole Serra
22  to Denise Galloway, via telephone.
23      Q.   Is there anyone else?
24      A.   No, because I was busy working and
25  I don't like to get into gossip on the job,

Page 41

1           C. Newmark
2   you know, it's not something that I do.
3       Q.   What did you say to Nicole Serra
4   about your perceptions of Cathy Magone?
5       A.   At what time?
6       Q.   At the time you started?
7       A.   At the time I started, I didn't
8   really have any opinions of Cathy one way or
9   the other. I didn't have much to do with
10  her. Most of my interactions were with Diane
11  Lance, so she seemed okay, I guess. That's
12  what I told her.
13      Q.   Allow me to clarify.
14          When did you first express your
15  concerns to Nicole Serra -- you said there
16  was a time when you started expressing them
17  to Nicole Serra.
18      A.   Yeah.
19      Q.   When was that?
20      A.   Maybe the end of July, August.
21  More so August than July.
22      Q.   What did you say to Nicole Serra at
23  that time?
24      A.   That I made some observations, we
25  both made observations about Cathy Magone and

11 (Pages 38 to 41)

Carole Newmark

Page 42

1        C. Newmark
2    her management style and how dichotomous it
3    was to -- how we did our job as social
4    workers, and we had a very humane bend to
5    what we did, and it seemed to be very
6    business and very money-oriented when, you
7    know, when Magone talked about certain
8    things. There was no regard for patients or
9    their situations or family situations.
10        Q.   Was that one conversation you had
11    with Nicole Serra?
12        A.   It was probably several.
13        Q.   Over what span of time, you said
14    beginning, end of July or August and lasting
15    how long?
16        A.   It wasn't constant. It was when
17    anything came up that merited talking about
18    it at lunchtime or on a break.
19        Q.   Did Nicole Serra say anything to
20    you about her observations of Cathy Magone?
21        A.   Yes, she agreed with me. She
22    agreed we're very different. The way we
23    perform our work is very different from the
24    way nurses and managers perform their work.
25        Q.   Was there anything else the two of

Page 43

1        C. Newmark
2    you discussed about Cathy Magone?
3        A.   I recall towards the end or middle
4    of September telling Nicole that I felt that
5    she held me to a different standard from
6    other people, and that's when I began to feel
7    that things were changing, really changing,
8    that she was kind of ignoring me and just
9    acting differently towards me than she had in
10    the beginning.
11        Q.   So you felt that began in late
12    September?
13        MS. NICAJ: Objection.
14        You can answer.
15        A.   August, September. When you have a
16    conversation with someone you don't really
17    jot down the dates, so I can't say for sure.
18        Q.   I'm not asking about the date of
19    your conversation. I'm asking about the date
20    when you felt that things -- the date that
21    you thought that Cathy Magone's treatment of
22    you changed. I guess there are two questions
23    there.
24        The first is: When did you form
25    the belief that her treatment of you had

Page 44

1        C. Newmark
2    changed?
3        A.   After I had gone to HR.
4        Q.   How long after you had gone to HR
5    did you form that belief?
6        A.   Immediately.
7        Q.   The same day?
8        A.   I wouldn't say the same day. Maybe
9    that week.
10        Q.   What day did you go to Human
11    Resources?
12        A.   I went to Human Resources on August
13    15, 2006.
14        Q.   Do you recall whether there were
15    any union elections scheduled that week at
16    Lawrence Hospital, were you aware of that?
17        A.   No.
18        Q.   Were you aware of Pat Orsaia's
19    vacation schedule in August?
20        A.   Not in detail, no. I know that
21    after I met with her she said there were
22    several courses of action. I could either
23    meet with Cathy Magone and discuss my
24    feelings. I could meet -- or I could meet
25    with the two of them.

Page 45

1        C. Newmark
2        Those were the two options given to
3    me, and I opted for meeting with Cathy Magone
4    because I just felt that I don't have any
5    hidden agendas, and if I was going to work at
6    Lawrence Hospital, I wanted things to be
7    cleared and I didn't want any hard feelings,
8    and I just wanted to lay everything on the
9    table and talk about how I felt about the
10    ageism.
11        Q.   Didn't you ask Pat Orsaia to speak
12    to Cathy Magone first and report back to you?
13        A.   No, I didn't.
14        Q.   Did she present that to you as an
15    option?
16        A.   Not that I recall.
17        Q.   What do you recall Pat Orsaia's
18    exact words to be during that conversation?
19        A.   When I went to her on August 15th?
20        Q.   That's correct.
21        A.   Well, when I walked into the room,
22    Pat Orsaia, you know, greeted me, cordial, we
23    talked about the weather, we talked about
24    knickknacks in her office, we talked about
25    the Jersey Shore and it was very cordial, and

12  (Pages 42 to 45)

Carole Newmark

C. Newmark

1  C. Newmark
2  then she asked me why I was there.
3      And I told her that this statement
4  was made, you know, about Nicole being
5  younger than me and could handle the job
6  better than I can. And I thought it was
7  quite fascinating that Pat Orsaia said to me,
8  you know, Carole, I just want to let you know
9  that there have been other people that have
10  come here to complain about Cathy Magone.
11      And I was kind of taken aback,
12  given my position as a social worker,
13  confidentiality and people's rights are very
14  important to me. And I thought that this was
15  some -- it just didn't feel right that she
16  would disclose this to me as soon as I walked
17  in the door. And I kind of let it go. I
18  didn't respond to it. I just said oh.
19      And she said yes, social workers
20  have come in here, case managers have come in
21  here. This has been an issue for awhile.
22  And I just went on to talk about my business,
23  because other people's business doesn't
24  pertain to me.
25      Q.  My question was what were the exact

C. Newmark

1  C. Newmark
2  words that Pat Orsaia said to you in this
3  meeting about your options about how to
4  proceed?
5      A.  She said I could meet with Cathy
6  Magone alone and try to work this out. I
7  didn't feel that I could trust Cathy Magone
8  to work things out with me. Because I saw
9  the way she treated other people and I didn't
10  want to be treated that way, or we could meet
11  together, the three of us, Pat, Cathy and
12  myself, and that's what I opted for.
13      Q.  When you communicated your concerns
14  about what Cathy Magone had said to Pat
15  Orsaia, what were the exact words that you
16  had used in speaking to Ms. Orsaia?
17      A.  Can you repeat that?
18      Q.  What were the exact words you used
19  to communicate your concern to Pat Orsaia
20  about what Cathy Magone had said?
21      A.  What I said to her was that I was
22  called in to Cathy Magone's office, I believe
23  it was on the 15th of August, '06, and that
24  she had informed me that Nicole Serra was
25  chosen for the -- to be the social worker

C. Newmark

1  C. Newmark
2  dedicated to the palliative care center, and
3  that I was very much surprised that this
4  position was given to someone who was not
5  there that long and didn't have the
6  experience that I had.
7      And also, it was implied upon my
8  taking the position at Lawrence Hospital and
9  in my interview, my job interview with Cathy
10  Magone, it was implied because there were no
11  other social workers there, that the
12  palliative care center was going to be
13  something that everyone was looking forward
14  to, and it would be a place where I could do
15  my work, particularly the behavioral health
16  piece, knowing that I came from a mental
17  health background and that I was surprised
18  when it was given to Nicole Serra.
19      And that the reason when I asked
20  why was I not involved in that decision
21  because Nicole Serra was supervised by me,
22  she said that -- let me get this right --
23  that the decision was made and that's it.
24      And I said, "Well, Cathy, how was
25  the decision made? Based on what?"

C. Newmark

1  C. Newmark
2      And that's when she said to me,
3  "Nicole Serra is younger than you are and can
4  take things in better than you can or can
5  absorb things better than you can" -- not
6  absorb.
7      "Nicole Serra is younger than you
8  are and can take things in better than you
9  can."
10      Q.  Those are the exact words that
11  Cathy Magone said to you?
12      A.  To the best of my recollection.
13      Q.  And those are the exact words you
14  communicated to Pat Orsaia?
15      A.  Yes, I did. And I told Pat Orsaia
16  that I felt that this was ageism.
17      Q.  How did Ms. Orsaia respond?
18      A.  She didn't really. She just
19  listened to me. I think she said something
20  like, are you sure that's what was said?
21      I said, "Yes, I'm absolutely sure.
22  Why would I come here and tell you this if it
23  were not true? Why would I do that?"
24      Q.  Was there anything else that you
25  said to Ms. Orsaia during that meeting?

13  (Pages 46 to 49)

Carole Newmark

Page 50

```
 1              C. Newmark
 2      A.  I asked her when my evaluation
 3   would be coming.  I think it was close to the
 4   time when my evaluation was due.  She said
 5   she couldn't answer that at the time.  She
 6   didn't know.
 7      Q.  Was there anything else?
 8      A.  I don't recall at this point.
 9      Q.  Apart from what you already
10   testified to, did Pat Orsaia say anything
11   else to you during this meeting?
12      A.  She said that sometimes people
13   filter things out differently.  That people
14   filter things differently and that perhaps I
15   didn't understand what she meant.
16          I said I think I understood what
17   she meant, but I would consider the fact that
18   people do filter things out differently.
19      Q.  Did Pat Orsaia say anything else
20   during this meeting?
21      A.  No.
22      Q.  Did you?
23      A.  I asked when we could meet, and she
24   said she would set something up, and then I
25   believe there were vacations all around, both
```

Page 51

```
 1              C. Newmark
 2   myself and Pat and maybe even Cathy Magone,
 3   so it was postponed to a later time.
 4      Q.  When was your vacation?
 5      A.  It was in August.  I want to say
 6   around August 3rd, I'm not sure.
 7      Q.  So before your meeting with Pat
 8   Orsaia?
 9      A.  I believe so.  I don't recall when
10   I had vacation.  I know that I set it up
11   prior to -- it was one of the things we had
12   agreed to as terms of employment, because I
13   had not had a vacation in quite some time,
14   that I would take a week or so without pay,
15   and they agreed and I did take that time.
16      Q.  Did you take any vacation time
17   between your -- the day when you met with Pat
18   Orsaia and your termination?
19      A.  I don't recall.  I would have to
20   look at an old calendar and see the exact
21   dates that I was on vacation.
22      Q.  You believe you have a calendar
23   that reflects that information?
24      A.  I might.  I might.
25      Q.  Did you ever discuss your concerns
```

Page 52

```
 1              C. Newmark
 2   about Cathy Magone with Maura Del Bene?
 3      A.  Yes.
 4      Q.  When did that happen?
 5      A.  I'm not exactly sure when Maura Del
 6   Bene came on board.  I want to say at the end
 7   of June, possibly the beginning of July.
 8   More so in June.  I voiced my concerns to
 9   Maura, when Maura said things to me like boy,
10   she's really something.  And I said yeah,
11   well, that's the way it is.
12          We were basically talking about her
13   demeanor with other people.  I didn't write
14   down any conversations I had with Maura or
15   when it happened, so I can't give you dates.
16   Keep in mind that I really didn't have many
17   conversations with people because I was
18   always busy doing something, so I didn't have
19   time to sit and chat.
20      Q.  How many conversations did you have
21   with Maura Del Bene about your concerns about
22   Cathy Magone?
23      A.  A handful, two, three.  I can't say
24   for sure.
25      Q.  Do you believe these -- well, over
```

Page 53

```
 1              C. Newmark
 2   what period of time did they take place?  You
 3   believe the first was in June or July?
 4      A.  No, no.  That's when Maura Del Bene
 5   came on board.  She is a psychiatric nurse
 6   and was very aware of people's behaviors and
 7   had commented to me on several occasions, and
 8   I don't know the dates because I don't jot
 9   these things down, but she had commented to
10   me on many occasions that the behavior is
11   really out there.
12      Q.  Meaning Cathy Magone's?
13      A.  Yes.
14      Q.  Did you ever have lunch with Maura
15   Del Bene in the Chinese restaurant?
16      A.  Yes.
17      Q.  Near Lawrence Hospital?
18      A.  Yes.
19      Q.  How many times?
20      A.  Once.
21      Q.  And what was discussed during that
22   conversation?
23      A.  The palliative care unit.
24      Q.  Do you recall when that discussion
25   took place?
```

14  (Pages 50 to 53)

Carole Newmark

Page 54

```
 1          C. Newmark
 2      A.  I don't.
 3      Q.  How long was the discussion?
 4      A.  A lunchtime.  Within 45 minutes or
 5  so.
 6      Q.  Did you express any concerns or
 7  complaints about Cathy Magone to Maura Del
 8  Bene during that conversation?
 9      A.  I don't recall.
10      Q.  You don't recall one way or the
11  other?
12      A.  I don't recall if we spoke about
13  Cathy.  I believe we spoke about the
14  palliative care unit and an upcoming trip to
15  Ohio or somewhere.  I don't remember where it
16  was.
17      Q.  What were the specific topics that
18  you discussed with Ms. Del Bene during that
19  conversation?
20      A.  As far as I can recollect, we
21  talked about daily work.  We talked about the
22  palliative care unit and my interest in it.
23  She didn't say anything one way or another in
24  regard to me working solely in the palliative
25  care unit.  I think that was the crux of it.
```

Page 55

```
 1          C. Newmark
 2  General talk; some shop, some weather, some
 3  food.
 4      Q.  Did you have a good working
 5  relationship with Ms. Del Bene?
 6      A.  I thought so.
 7      Q.  Did you have a good working
 8  relationship with Nicole Serra?
 9      A.  Absolutely.
10      Q.  Did you have a good working
11  relationship with the caseworkers?
12      A.  Not all of them.
13      Q.  Which ones did you not have a good
14  working relationship with?
15      A.  In particular, Collette Gelardi
16  G-E-L-A-R-D-I, I believe.
17      Q.  Anyone else?
18      A.  That I didn't have a good working
19  relationship with?
20      Q.  That's correct.
21      A.  Not that I'm aware of.
22      Q.  When was the last time before today
23  that you had contact with Denise Galloway?
24      A.  When was the last time?
25      Q.  Yes.
```

Page 56

```
 1          C. Newmark
 2      A.  That I spoke with her?
 3      Q.  By telephone, by e-mail, meeting
 4  her in person?
 5      A.  Before today?
 6      Q.  Before today.
 7      A.  Maybe yesterday or the day before,
 8  via e-mail.
 9      Q.  What was the subject matter of the
10  e-mail?
11      A.  We talked about how she's doing in
12  North Carolina, where she lives, presently
13  lives.  We talked about her grandchildren.
14  Talked about my having a deposition that I
15  was anxious about.
16      Q.  When was the last time you had
17  contact with Denise Galloway either by
18  telephone, in person or by e-mail about your
19  employment situation at Lawrence Hospital?
20      A.  I would have to say after I was
21  terminated.
22      Q.  Would that be on or around of
23  October 23rd of '06?
24      A.  It's as good a guess as any.  I
25  don't know.  I don't recall.
```

Page 57

```
 1          C. Newmark
 2      MR. KEIL:  Can you please mark this
 3  as Defendants' Exhibit C.
 4      (Defendants' Exhibit C, E-mail
 5  correspondence, marked for
 6  identification, as of this date.)
 7      Q.  You have just been handed what's
 8  been marked as Defendants' Exhibit C.
 9      Do you recognize this document?
10      A.  Vaguely.
11      Q.  Does this document reflect your
12  most recent e-mail correspondence with Denise
13  Galloway about your employment at Lawrence
14  Hospital?
15      A.  It might.  You know, I don't know.
16  I don't keep my e-mails, so I don't know.
17      Q.  Why did you keep this one?
18      A.  Do you mind if I read it?
19      Q.  Of course.  Go ahead.
20      A.  Thank you.  I guess I kept it as
21  proof that other people have gone to HR in
22  regard to Cathy Magone.
23      Q.  When was the last time you looked
24  at Defendants' Exhibit C before today?
25      A.  When was the last time?
```

15 (Pages 54 to 57)

Carole Newmark

Page 58

```
1              C. Newmark
2      Q.  Yes.
3      A.  Probably when I gave this over to
4  Drita.
5      Q.  Did you review any documents prior
6  to your testimony here today?
7      A.  Did I review them?  Yes.
8      Q.  What documents did you review?
9      A.  Just some notes that Cathy Magone
10  had written in regard to me.
11      Q.  Documents that you received in the
12  course of this litigation?
13      A.  Yes.
14      Q.  Were there any other documents you
15  reviewed?
16      A.  Just some of the e-mails.  I don't
17  recall looking at this one, though.
18      Q.  After this e-mail correspondence
19  reflected in Defendants' Exhibit C, did you
20  have a telephone conversation with Denise
21  Galloway?
22          MS. NICAJ:  Objection.
23          You can answer.
24      A.  Probably not.  I don't recall.  I
25  don't recall.  Our relationship at this point
```

Page 59

```
1              C. Newmark
2  is we send Christmas cards and we
3  occasionally see each other if she's in New
4  York, and even then I don't really --
5      Q.  Drawing your attention to, in
6  Ms. Galloway's response, approximately five
7  lines up from the bottom you see the line,
8  "If you'd rather chat, let me know a good
9  time to call."
10      A.  Yes.
11      Q.  Did you follow up with Ms. Galloway
12  to schedule time to talk?
13      A.  I don't recall.  I may have.  I
14  don't recall.
15      Q.  You don't recall one way or the
16  other?
17      A.  No.  This was a very hard time for
18  me after losing my job, so I don't remember.
19      Q.  And one line down from that towards
20  the end, it says, "The theory of 'if she
21  picks you, she will support you' sure was
22  flawed."
23          Do you know what Ms. Galloway was
24  referring to by that line?
25      A.  No, I don't.  Correction.  I think,
```

Page 60

```
1              C. Newmark
2  but I'm not sure, because I didn't write it.
3  I think what she meant was she was not
4  supported by Cathy Magone, but, however, she
5  picked me and hired me, so she felt she will
6  support me, and that's why she said, "sure
7  was flawed."
8      Q.  Did you have a discussion with
9  Denise Galloway prior to your own beginning
10  employment where Ms. Galloway had expressed
11  that theory to you?
12      A.  Yes.
13      Q.  Was that before you accepted
14  employment?
15      A.  Yes.
16      Q.  What else did Ms. Galloway say to
17  you during that conversation?
18      A.  That it would be a good opportunity
19  for me.  That it was more money.  That it was
20  closer to home, and she really played up the
21  positives.  That I know the work.  That it is
22  a different model.  It's a case management
23  model, but I do know hospital social work.
24          That my relationship, and I quote
25  her, "Your relationship with the physicians
```

Page 61

```
1              C. Newmark
2  at Lawrence Hospital is sterling.  They would
3  be pleased to have you back, to work with
4  you.  You know, but the decision is yours."
5          And she said, "I know you're not
6  looking for work at this time.  I know you're
7  happy where you are, but give it some
8  consideration."
9          She also felt an obligation to Ed
10  Dinan, who is the president, I believe he's
11  the president, to leave him, as she said, in
12  good hands.  She felt a sense of loyalty to
13  Lawrence, being an employee there for so many
14  years, and she felt that -- I guess she felt
15  if I took on this position, that she knew
16  that things would just flow and that things
17  would be okay.
18          She also said, you know, getting
19  along with the doctors and having a good
20  rapport with them is key.  And I've always
21  known that.
22      Q.  Do you know Denise Galloway's
23  mailing address?
24      A.  Yes, I do.  I don't know it
25  offhand, but I can certainly get that.
```

16  (Pages 58 to 61)

Carole Newmark

Page 62

```
1              C. Newmark
2      Q.  Do you know her telephone number?
3      A.  Not offhand.
4      Q.  But you have a record of it?
5      A.  Sure.
6      Q.  Who is Katherine Andersen?
7      A.  She is the nurse on the oncology
8  unit. I believe she's a nurse educator.
9      Q.  Did you have any e-mail
10 correspondence with Katherine Andersen?
11     A.  Yes, I did.
12     Q.  After your employment?
13     A.  Yes, I did.
14     Q.  How many times did you correspond
15 with Ms. Anderson, if you recall?
16     A.  Maybe twice.
17         MR. KEIL:  Would you please mark
18     this Defendants' Exhibit D.
19         (Defendants' Exhibit D, E-mail
20     correspondence, marked for
21     identification, as of this date.)
22     Q.  Please take a look through
23 Defendants' Exhibit D and let me know when
24 you're finished.
25     A.  Okay.
```

Page 63

```
1              C. Newmark
2      Q.  Is Defendants' Exhibit D the e-mail
3  correspondence with Katherine Andersen that
4  you were referring to?
5      A.  Yes, it is.
6      Q.  In the middle of the page in the
7  part that you drafted, the second line down
8  contains the words, "I have to find my place,
9  and that is in mental health."
10         Do you remember writing that?
11     A.  Oh, yes.
12     Q.  What did you mean by that?
13     A.  Well, I meant that I came from a
14 mental health -- I originally started at
15 Lawrence Hospital in hospital social work and
16 found my way into mental health, which was
17 really what I love to do, and that since this
18 didn't work out, I would go back to doing
19 psychotherapy.
20     Q.  And the next line, you said, "I am
21 looking to start up a private practice since
22 my forte is psychotherapy."
23         Do you remember writing that?
24     A.  Yeah, sure.
25     Q.  Did you know that your forte was
```

Page 64

```
1              C. Newmark
2  psychotherapy before you started at Lawrence
3  Hospital?
4      A.  Absolutely.
5      Q.  Did you anticipate your job at
6  Lawrence Hospital involving psychotherapy?
7      A.  Absolutely.
8      Q.  Did it?
9      A.  Not to the degree that I was
10 promised it would be.
11     Q.  How did it fall short of your
12 expectations?
13     A.  When I was interviewed, Cathy
14 Magone assured me that although I didn't have
15 the case management model expertise at this
16 point, I would be able to use my mental
17 health experience and my behavioral health
18 experience to a very large degree at Lawrence
19 Hospital.
20         And the reason that she said that
21 was that I would be able to use it in the
22 palliative care center and I would be able to
23 use it working with patients and families who
24 have issues, who have issues of death and
25 dying, issues of finance, any human-related
```

Page 65

```
1              C. Newmark
2  issues.
3         And she assured me, and I quote
4  her, that I will be able to use my behavioral
5  health background and basically I could write
6  my own ticket at Lawrence Hospital.
7      Q.  Those are her exact words?
8      A.  Those are her words.
9      Q.  How many interviews did you have
10 with Cathy Magone?
11     A.  I remember one after 5 p.m., I
12 believe it was, on December 1, 2005. Cathy
13 Magone alluded to seeing me a second time,
14 and I don't recall that, so...
15     Q.  You're referring to Cathy Magone's
16 deposition testimony?
17     A.  Yes.
18     Q.  So you only remember one interview?
19     A.  I do.
20     Q.  Did you expect to be performing or
21 providing psychotherapy at Lawrence Hospital
22 full-time when you started?
23     A.  No.
24     Q.  What other types of care or what
25 other types of work did you expect to be
```

17  (Pages 62 to 65)

Carole Newmark

Page 66

1           C. Newmark
2    doing?
3        A.  What I was told was I would be
4    working very closely with the case managers,
5    that they would, in fact, be feeding patients
6    to me that needed to be seen, and that there
7    would be other sources of providing me with
8    work via MDs, nurses, emergency room,
9    whatever was needed of me.  But the major
10   portion of my job would be behavioral health.
11       Q.  When you're using the phrase
12   behavioral health, you're referring to a type
13   of social work here that includes
14   psychotherapy?
15       A.  Absolutely.
16       Q.  And the work that you, for example,
17   referrals that you received from case
18   managers or other patients that were directed
19   to you by doctors or nurses, that was social
20   work of another kind?
21       A.  No, no.  It was cases that they
22   couldn't manage that needed that -- how do I
23   put this -- that needed a social worker's
24   touch, that needed some nurturing and caring
25   and being able to work with the patients and

Page 67

1           C. Newmark
2    their families in determining how they could
3    be discharged in a way that made sense to
4    Lawrence Hospital, as well as to the patient.
5    Keeping in mind the length of stay, keeping
6    in mind many other factors, which I
7    understood.
8        MR. KEIL:  Let's take a five-minute
9    break.
10       (Recess taken from 11:24 a.m. to
11   11:30 a.m.)
12       Q.  Drawing your attention back to
13   Defendants' Exhibit D, you see the line, "I
14   thought I could fit in at LHC but there's
15   such a back-biting mentality and pathology in
16   case management dept, so I didn't stand a
17   chance."
18       What did you mean by that sentence?
19       A.  What I meant by that was that at
20   the onset, the case managers were very
21   territorial about their cases and about what
22   they did.  And when I came on board, there
23   wasn't lot of sharing of information with me,
24   so I kind of worked in a vacuum for some
25   time, and I just felt like it wasn't working.

Page 68

1           C. Newmark
2        In regard to that, I -- after a
3    month, two, three months, I don't recall, I
4    asked Cathy Magone if we could possibly have
5    a meeting with myself and Nicole, who were
6    the only two social workers, and the case
7    managers, so that we could clear the air, so
8    that they could understand that my
9    relationship with them was not adversarial
10   and that I wanted to work with them, but I
11   couldn't help them if they didn't give me the
12   information I needed in a timely manner and
13   allowed me to do my job.
14       And we had a meeting in regard to
15   this.  At the meeting, some of them
16   understood what I meant.  Some said, you
17   know, welcome.  We understand.  You know, but
18   we work at a very fast pace and social
19   workers work at a different pace because you
20   have to get in there and understand the
21   patient and understand the needs, but we will
22   try to work with you.
23       Working with me happened with some
24   of the case managers, but not with all.  And
25   when I say back-biting, there was a lot of

Page 69

1           C. Newmark
2    just e-mails back and forth to Cathy Magone,
3    particularly by Collette Gelardi, watching
4    everything that I did, calling me and saying,
5    "I need you here immediately."
6        And me saying, "I'm with a patient"
7    or, "I'm with a patient's family and the
8    patient is dying.  I can't come there at this
9    moment," and her becoming very angry with me
10   and calling Cathy and saying that I'm not
11   responding to her.  And I'm not responding
12   the way that they want me to respond.
13       That's what I meant by back-biting.
14   That instead of being cohesive, some of them,
15   not all, set up this relationship with me
16   that I felt was adversarial.  And which also
17   impaired my ability to do what I needed to
18   do.  Because if I have to help them
19   discharging, I need to know who's discharged
20   from day one, not when the person is getting
21   dressed to go home, and then they would call
22   me and say, "They're angry, they're going
23   home.  They don't want to go home.  Get in
24   there and make it right before they leave."
25       That's not working together and

18 (Pages 66 to 69)

Carole Newmark

Page 70

C. Newmark
1
2    that's not working in a cohesive manner and
3    that's what I meant by that.
4        Q.   Who besides Collette Gelardi
5    behaved in that way?
6        A.   Kitty.  I don't know Kitty's last
7    name.  I apologize.
8        Q.   Is Kitty her given name?
9        A.   That's the name she uses, Kitty.
10   Kitty was extremely territorial and sometimes
11   wouldn't share cases with me at all.  And
12   say, "I'm not even going to call.  I'll do it
13   myself.  Don't worry.  I'll handle this."
14       So it was very hard for me to do
15   the work that I needed to do.
16       Q.   How many case managers were there?
17       A.   I want to say seven to nine.  I
18   don't know exactly.  Eight or nine.
19       Q.   Were there any besides Collette
20   Gelardi and Kitty that you feel had this
21   attitude?
22       A.   Barbara, in the beginning, and then
23   she and I talked about working together, and
24   when I left, at the time that I was
25   terminated, we had a good working

Page 71

C. Newmark
1
2    relationship, a very good working
3    relationship, I would say.
4        Q.   When you and Barbara talked, was
5    this at that meeting that you referred to or
6    was it at some other time?
7        A.   It was before that.
8        Q.   When was the meeting that you and
9    Nicole Serra had with the case managers?
10       A.   As I said before, I don't recall.
11   Nicole came on board in April, I believe
12   April, so it may have been May, sometime in
13   May.  It was one of our length-of-stay
14   meetings, and we used that to discuss our
15   roles and how we could work together.
16       Q.   Was Cathy Magone also present at
17   the meeting?
18       A.   Yes, she was.
19       Q.   How long did you have the stay
20   meetings while you were at Lawrence?
21       A.   Every week, once a week.
22       Q.   Did it have a regular schedule?
23       A.   Yes.
24       Q.   When was that?
25       A.   It was either 12 or 1 o'clock.  I

Page 72

C. Newmark
1
2    believe it was 1 o'clock.  I believe we had
3    lunch at 12 and then we met at the
4    length-of-stay meeting afterwards.
5        Q.   What day of the week?  Was there a
6    regular day of the week?
7        A.   Yes, there was.  I want to say
8    Tuesday, but I'm not sure.
9        Q.   How old is Kitty?
10       A.   As I said before, probably her late
11   50s.  I don't really know.  We didn't speak
12   on a personal level.
13       Q.   How old is Collette?
14       A.   This is a guesstimate.  Late 40s,
15   50.
16       Q.   Who was the youngest case manager,
17   as far as you know?
18       A.   Possibly someone by the name of
19   Suzanne.  And I don't know if she's still
20   there.  I don't know her last name.  I don't
21   recall her last name.  Muccio, Suzanne
22   Muccio, I believe.
23       Q.   How old is she?
24       A.   I would say late 30s, guesstimated.
25       Q.   Do you recall whether this meeting

Page 73

C. Newmark
1
2    with all the case managers happened before or
3    after Maura Del Bene started working at
4    Lawrence Hospital?
5        A.   I want to say before.
6        Q.   In Defendants' Exhibit D, what did
7    you mean by the word pathology in that same
8    sentence I read to you earlier?
9        A.   Pathology is, how do I explain
10   this, pathology is like the genesis of
11   something.  The pathology of it, where it
12   stems from, how it progresses.
13       Q.   Were you using the word in a
14   clinical sense?
15       A.   Yes.
16       Q.   Is there anything specific that you
17   intended to refer to with that word other
18   than the back-biting mentality?
19       A.   Just in general.  Yeah, that's it.
20       Q.   Is it fair to say as of the time
21   you wrote this e-mail you did not believe
22   that you fit in with the case managers at
23   Lawrence Hospital?
24       A.   No, I did fit in after a while.
25       Q.   So why did you say, "So I didn't

19  (Pages 70 to 73)

Carole Newmark

Page 74

C. Newmark
1        C. Newmark
2   stand a chance"?
3        A.  Obviously from being terminated, I
4   just didn't feel I stood a chance.  I felt I
5   was kind of, you know, working against the
6   tide.
7        Q.  Didn't stand a chance to do what?
8        A.  To succeed.
9        Q.  In the next sentence, you say, "I
10  did leave LHC with my head held high and will
11  continue to see the experience as one that
12  will catapult me into what I really should be
13  doing."
14        What were you referring to in this
15  sentence, what you really should be doing?
16        A.  Going back into doing
17  psychotherapy, because Lawrence Hospital,
18  although they promised me the opportunity to
19  do that, did not avail that to me.
20        Q.  Approximately what percentage of
21  your time did you spend doing psychotherapy
22  at Lawrence Hospital?
23        A.  30 percent.  30 to 40.
24        Q.  Approximately what percentage of
25  your caseload involved psychotherapy at

Page 75

1        C. Newmark
2   Lawrence Hospital?
3        A.  I think, given the nature of
4   patients and people who were in the hospital
5   and in an environment that's unusual for them
6   and that's very disorienting for them, every
7   one that I came in contact with, I could not
8   do psychotherapy per se with any one of them.
9   They were there for such a short period of
10  time.
11        If you talk about some really,
12  really brief therapy, I guess that's what's
13  done.  Get to the point, get to the feelings
14  and have them move on.
15        Q.  So when you say that your
16  expectation was that you would be doing more
17  psychotherapy at Lawrence Hospital than
18  turned out to be the case, you're referring
19  to the amount of time you would be able to
20  spend with each patient?
21        A.  That, but not so much that, but the
22  promise of the palliative care center, which
23  was my reason for coming to Lawrence
24  Hospital.
25        Q.  What was your salary with your

Page 76

1        C. Newmark
2   prior employer?
3        A.  50,000.
4        Q.  And that was at --
5        A.  Phelps Memorial.
6        Q.  And your salary at Lawrence
7   Hospital was about 70,000?
8        A.  70.
9        Q.  That didn't play a consideration
10  for you?
11        A.  It was an enticement, but I've
12  learned over the years that money isn't
13  everything and that you have to wake up and
14  like yourself in the morning and do what you
15  need to do.  And so it was nice.  But it
16  wasn't the end-all and be-all.
17        Q.  You've referred to several times
18  the palliative care center.  Was there a
19  specific location in the hospital that was
20  designated for palliative care?
21        A.  Not at that point.  It was in the
22  works.
23        Q.  Did you have an understanding of
24  where this specific location would be?
25        A.  No.

Page 77

1        C. Newmark
2        Q.  Did you hear about any plans for
3   construction or modification to the building
4   for this?
5        A.  Just that it was in the works and
6   that they were going to hire a palliative
7   care nurse practitioner, and they did, in
8   Maura Del Bene, and that it would take off
9   from there.  That the palliative care work
10  would begin, but that there would be a
11  designated unit, so to speak, or center for
12  palliative care.
13        Q.  Now, in the last paragraph of your
14  e-mail in Defendants' Exhibit D, you referred
15  to or you used the phrase "you good guys" in
16  quotes?
17        A.  Yes.
18        Q.  Who is that?
19        A.  Cathy and most of the people that I
20  worked with on the units, Kathy Anderson and
21  most of the people that I worked with on the
22  units.  Some case management people, nurses,
23  doctors, technicians.  It was a loss for me.
24        Q.  Was there anyone you specifically
25  exclude from the phrase "good guys"?

20  (Pages 74 to 77)

Carole Newmark

Page 78

```
1              C. Newmark
2       A.  Anyone that I excluded?
3       Q.  Well, anyone you didn't intend to
4   refer to by your using that phrase?
5       A.  No, I think if I wanted to say
6   anything about someone, I would mention their
7   names.
8       Q.  Had you included Nicole Serra to be
9   among the good guys?
10      A.  Absolutely.
11      Q.  How about Maura Del Bene?
12      A.  Yes.
13      Q.  Your daughter's name is Janice
14  Powers?
15      A.  That's correct.
16      Q.  Does she still work at Lawrence
17  Hospital?
18      A.  No, she doesn't.
19      Q.  Do you know the circumstances under
20  which she left Lawrence Hospital?
21      A.  Yes, I do.  She moved to Danbury,
22  Connecticut about the same time as I was
23  terminated.  She had given notice that she
24  was leaving and that she would stay for a
25  while but she might be leaving, and when they
```

Page 79

```
1              C. Newmark
2   terminated me, she felt that she couldn't
3   stay there.  That was a decision that she
4   made on her own and she resigned.
5       Q.  And you know this based on what she
6   told you?
7       A.  I know this for a fact.
8       Q.  Is it because she told you or for
9   some other reason?
10      A.  Because she told me.
11      Q.  Do you know if your daughter played
12  a role in submitting one of the Big Heart
13  awards on your behalf?
14      A.  Absolutely not.  She has nothing to
15  do with what's submitted to her.  That's done
16  on an individual basis by employees or
17  patients and their families.
18      Q.  Do you know if her resignation was
19  connected in any way with the response of the
20  hospital to the second Big Heart award
21  nomination?
22      A.  Can you repeat that?
23      Q.  You testified that Ms. Powers told
24  you the reasons for her resignation from
25  Lawrence Hospital.
```

Page 80

```
1              C. Newmark
2       A.  Uh-huh.
3       Q.  Is it your understanding that her
4   resignation from Lawrence Hospital was
5   connected in any way with either of the Big
6   Heart award nominations that you received?
7       A.  Absolutely not.  She moved to
8   Danbury, Connecticut.  That was quite a trek
9   for her to come back to Lawrence.
10      Q.  As of the date of your termination
11  from Lawrence Hospital, were you working for
12  anyone else?
13      A.  No.
14      Q.  Were you engaged in private
15  practice?
16      A.  No.
17      Q.  Were you engaged in any form of
18  consulting?
19      A.  To.
20      Q.  This was your only source of
21  income?
22      A.  Correct.
23      Q.  When did you start looking for a
24  job after your termination?
25      A.  About a week after.
```

Page 81

```
1              C. Newmark
2       Q.  And what did you do to look for a
3   job?
4       A.  I searched the internet.  I went to
5   unemployment and used them as a reference.  I
6   answered ads in the papers.  I did some cold
7   calls and sent my resume out.
8       Q.  Did you find a job?
9       A.  EventuaLLY.
10      Q.  When?
11      A.  I found a job -- I started my
12  present job on March 12, 2007.
13      Q.  Where are you currently employed?
14      A.  I'm working at Our Lady of Mercy
15  outpatient mental health clinic.
16      Q.  And you've had that employment
17  since March 12th?
18      A.  Yes.
19      Q.  Did you have any other jobs between
20  your termination from Lawrence and your
21  beginning work at Our Lady of Mercy?
22      A.  No.
23      Q.  What is your current salary at Our
24  Lady of Mercy?
25      A.  61 and change.  I was hired at
```

21 (Pages 78 to 81)

Carole Newmark

<table>
<tr><td>

Page 82

C. Newmark
1
2 $60,321. It's a union position.
3    Q. Which union?
4    A. 1199.
5    Q. When did you receive a pay
6 increase?
7    A. After probation.
8    Q. How long was your probationary
9 period?
10    A. Six months.
11    Q. So on or about September 12th of
12 '07?
13    A. Correct.
14    Q. Is your salary at Our Lady of Mercy
15 determined by the union contracts?
16    A. Yes.
17    Q. Are you receiving any pay
18 differentials connected with your experience
19 or other factors relating to your employment?
20    A. No, it goes according to how many
21 years you have in the field.
22    Q. So you are receiving a differential
23 based on your own experience in the field?
24    A. It's not a differential. It's a
25 set amount of salary. For instance, if

</td><td>

Page 84

C. Newmark
1
2 that you were terminated from Lawrence and
3 when you started at Our Lady of Mercy, did
4 you discuss your efforts to find a job with
5 anybody else?
6    A. With almost everyone I met. I'm a
7 professional and I wanted to get right back
8 to work. Even people who didn't want to hear
9 me.
10    Q. Did you suffer any health or
11 medical problems as a result of your
12 termination from employment at Lawrence?
13    A. Yes, I did.
14    Q. What were those?
15    A. Depression, lack of self-esteem,
16 self doubt, some gastrointestinal problems,
17 which are exacerbated by stress.
18    Q. Anything else?
19    A. No, pretty much.
20    Q. The gastrointestinal problems that
21 you testified to existed prior to your
22 termination?
23    A. Yes. Correct.
24    Q. Is this the same problem for which
25 you requested a couple days off in September

</td></tr>
<tr><td>

Page 83

C. Newmark
1
2 you're there -- if you're in the social work
3 field for eight to nine years, you're at the
4 top level. And so there is no -- it's
5 different from people who are making less
6 than me who have had less years in.
7    Q. Are you earning at the top level?
8    A. Yes, I am.
9    Q. Do you receive any increase in pay
10 based on any licensing or educational
11 background that you have?
12    A. No.
13    Q. Do you have a copy of the
14 collective bargaining agreement between Our
15 Lady of Mercy and 1199?
16    A. I do.
17    Q. Is Our Lady of Mercy a member of
18 the League of Voluntary Hospitals?
19    A. I don't know. It's a Catholic
20 hospital. It's actually in the midst of
21 being taken over by Montefiore.
22    Q. So you don't know?
23    A. I'm not sure.
24    Q. Did you discuss your efforts to
25 find a job with anybody else between the time

</td><td>

Page 85

C. Newmark
1
2 2006?
3    A. That's correct.
4    Q. For the record, what is that
5 diagnosis?
6    A. It's irritable bowel syndrome.
7    Q. Did you seek any professional help
8 or treatment in connection with your
9 depression?
10    A. I didn't seek formal professional
11 help. I have a former supervisor who is in
12 private practice, and I had talked to her
13 just in e-mails and maybe once or twice on
14 the telephone about what I was going through
15 and what I was feeling.
16    Q. Who is that?
17    A. Eve First, F-I-R-S-T.
18    Q. Over what period of time did you
19 talk and correspond with Ms. First about your
20 depression?
21    A. Over the course of maybe two months
22 after being terminated.
23    Q. When did it start?
24    A. Probably a few days after I was
25 terminated.

</td></tr>
</table>

22 (Pages 82 to 85)

Carole Newmark

Page 86

```
1            C. Newmark
2       Q.  And when did it stop?
3       A.  A month or two afterwards.  Two
4   months maybe afterwards.
5       Q.  And you referred to one or two
6   times over the telephone?
7       A.  Basically by e-mail, I guess.
8       Q.  How often did you e-mail Ms. First
9   about your depression?
10      A.  A couple of times.
11      Q.  In that one-month to two-month
12  period?
13      A.  Yes.
14      Q.  Did Ms. First diagnose you with
15  depression?
16      A.  No.
17      Q.  Is that your own assessment?
18      A.  The depression?
19      Q.  Yes.
20      A.  Yes.  I also was diagnosed, I don't
21  know if she wrote this down, but I went to my
22  doctor, Dr. Page, and Dr. Page put me on
23  Cymbalta for depression, which I fought, and
24  then I took it and then I took myself off it.
25      Q.  What was the medication?
```

Page 87

```
1            C. Newmark
2       A.  Cymbalta.
3       Q.  Did Dr. Page diagnose your
4   condition?
5       A.  She knew I was depressed.
6       Q.  So she prescribed it for
7   depression?
8       A.  Yes.  And I wasn't sleeping.
9       Q.  When did Dr. Page prescribe
10  Cymbalta?
11      A.  I would say one or two months after
12  my being terminated.  I don't know for sure.
13      Q.  Was it before or after you stopped
14  corresponding with Ms. First on the subject
15  of your depression?
16      A.  It may have coincided.
17      Q.  So there may be some overlap time?
18      A.  There might be.  I'm not sure.
19      Q.  How long did you take Cymbalta?
20      A.  Maybe two months.
21      Q.  And you took it because you were
22  having trouble sleeping?
23      A.  I wasn't sleeping.  I was
24  depressed.  I've never been terminated from a
25  position before.
```

Page 88

```
1            C. Newmark
2       Q.  Were there any other symptoms that
3   you understood this Cymbalta to be intended
4   to treat?
5       A.  No, depression.
6       Q.  How did you pay for the medication?
7       A.  I had COBRA.
8       Q.  Was the medication effective?
9       A.  To a degree.
10      Q.  Why did you stop taking it?
11      A.  Because I decided that -- I'm not
12  one to take medication.  I don't like to take
13  medication, and I decided I would process
14  what had happened to me on my own, which is
15  what I did.
16      Q.  Did you stop taking the medication
17  in consultation with Dr. Page?
18      A.  Oh, yes.  She had to wean me off
19  it.
20      Q.  And she started weaning you off the
21  medication during the one-to-two-month period
22  you referred to?
23      A.  Probably after the two-month
24  period, we started just taking it every other
25  day, I believe.  I'm not sure.  I don't
```

Page 89

```
1            C. Newmark
2   recall.
3       Q.  How long was the weaning off
4   period?
5       A.  Maybe a month.
6       Q.  So in total you may have taken the
7   Cymbalta for two to three months or over a
8   two-to-three-month period?
9       A.  Approximately.
10      Q.  Did Dr. Page prescribe any other
11  medication?
12      A.  For depression?
13      Q.  Yes.
14      A.  No.
15      Q.  Did Dr. Page prescribe you any
16  other medication for any other reason?
17          MS. NICAJ:  You can answer.
18      A.  Yes.
19      Q.  For what symptoms?
20      A.  For high blood pressure.
21      Q.  Anything else?
22      A.  Restless leg syndrome.
23      Q.  Are your high blood pressure and
24  restless leg syndrome conditions you had
25  prior to your termination?
```

23  (Pages 86 to 89)

Carole Newmark

Page 90

1        C. Newmark
2      A.  Yes.
3      Q.  Did your symptoms related to those
4   conditions change in any way after your
5   termination?
6      A.  Yes, my blood pressure got higher
7   and she had to work with my medication and I
8   had to see her more frequently, maybe on a
9   monthly basis. I now see her every three
10  months for it and it's under control.
11     Q.  How long did it take to get your
12  high blood pressure under control?
13     A.  Approximately three months maybe.
14     Q.  Approximately how long after your
15  termination did your high blood pressure go
16  up?
17     A.  It was immediate.
18     Q.  The same day?
19     A.  Probably.
20     Q.  Did Dr. Page change your medication
21  for high blood pressure in order to treat
22  this?
23     A.  I don't think so.
24     Q.  Either the type of medication or
25  the dosage?

Page 91

1        C. Newmark
2      A.  No.  The type is the same.  And the
3   dosage, I believe, is the same, or maybe she
4   increased it.  Perhaps she did increase it.
5      Q.  Do you know?
6      A.  I don't know for sure.  I don't
7   recall.  It's been a while since I have been
8   on this medication.
9      Q.  What medication is it?
10     A.  Cozaar, C-O-Z-A-A-R.
11     Q.  What did Dr. Page prescribe you for
12  restless leg syndrome?
13     A.  Sinemet, S-I-N-E-M-E-T.
14     Q.  Did the symptoms associated with
15  your restless leg syndrome change in any way
16  after your termination?
17     A.  No.
18     Q.  Did you also see Eve First for your
19  lack of self esteem and self doubt?
20     A.  I didn't see her.  We corresponded.
21  Yes, absolutely.
22     Q.  So all three topics, your
23  depression, your lack of self esteem, your
24  self doubt, were covered in those
25  communications you described earlier?

Page 92

1        C. Newmark
2      A.  Yes.
3      Q.  What is Eve First's profession?
4      A.  She's a clinical social worker in
5   private practice.
6      Q.  Aside from the medication
7   prescribed by Dr. Page for your depression,
8   did you receive any other prescriptions
9   connected to your depression, your lack of
10  self esteem or your self doubt following your
11  termination?
12     A.  No.
13     Q.  Did you communicate with Eve First
14  about your own mental health in the year
15  preceding your termination from employment at
16  Lawrence?
17     A.  No.
18     Q.  Had you ever corresponded or had
19  contact with her before your termination with
20  Lawrence in connection with your own mental
21  health?
22     A.  No.
23     Q.  Why did you reach out to Eve First
24  on this occasion?
25     A.  I reached out to her both as a

Page 93

1        C. Newmark
2   colleague and a friend, just to say that I
3   wasn't doing very well.  That I was really
4   affected by being terminated.  This has never
5   happened to me before, and I'm beginning to
6   have self doubt, and she was very positive in
7   her feedback to me about my capabilities and
8   what she knew to be true about me as a social
9   worker and as a therapist, and I guess I
10  needed a pep rally, and she provided me with
11  that.  This was very informal.  It was not
12  anything formal.
13     Q.  Did you consider your
14  correspondence and communications with Eve
15  First to be therapeutic treatment?
16     A.  It was therapeutic.  It wasn't
17  therapy per se.
18     Q.  Aside from your communications with
19  Eve First and the prescription you received
20  from Dr. Page, did you seek mental health
21  treatment or therapy from anybody else
22  following your termination from Lawrence?
23     A.  No, I did not.
24     Q.  Who treated you for your
25  gastrointestinal problems?

24  (Pages 90 to 93)

Carole Newmark

Page 94

1              C. Newmark
2       A.  Dr. Finegold.
3       Q.  How long had you been seeing Dr.
4  Finegold for this diagnosis?
5       A.  I had been seeing Dr. Finegold
6  since approximately 1998.
7       Q.  Did your gastrointestinal problems
8  or your irritable bowel syndrome become worse
9  after your termination from Lawrence
10 Hospital?
11      A.  Yes.
12      Q.  When?
13      A.  Shortly after.
14      Q.  Was it the same day?
15      A.  No, I doubt if, it was the same
16 day.  Maybe the next week.  It was
17 short-lived.
18      Q.  How long did it last?
19      A.  Two or three days.
20      Q.  Did you seek medical treatment for
21 it?
22      A.  I'm not sure.
23      Q.  Did you take any medication for it?
24      A.  No.
25      Q.  As a general matter, were you

Page 95

1              C. Newmark
2  taking medication to treat your irritable
3  bowel syndrome or other gastrointestinal
4  problems in 2007?
5       A.  No.
6       Q.  Would it be fair to say as of the
7  first month or two of 2007 you had recovered
8  from the health, medical or mental health
9  problems that you suffered as a result of
10 your termination from Lawrence Hospital?
11          MS. NICAJ:  Objection.
12          You can answer.
13      A.  Within the first few months of?
14      Q.  Yes.
15      A.  No.  It lasted for awhile.  It
16 lasted -- I felt unsure of myself for awhile.
17 I continued to do what I needed to do.  I
18 continued to look for work.  It was the
19 holiday season.  People don't hire you during
20 the holiday season, so it was very difficult,
21 so I was feeling pretty badly about not
22 working.
23      Q.  Did those feelings go away when you
24 started working at Our Lady of Mercy?
25      A.  Absolutely.

Page 96

1              C. Newmark
2       Q.  Were you fully recovered as of
3  March 12, 2007?
4          MS. NICAJ:  Objection.
5          You can answer.
6       Q.  In your own opinion?
7       A.  Fully recovered from?
8       Q.  From depression, lack of
9  self-esteem?
10      A.  Absolutely, yes.
11      Q.  Self doubt?
12      A.  Yes.
13      Q.  The exacerbation of your irritable
14 bowel syndrome?
15      A.  Fine.
16      Q.  That's a yes?
17      A.  Yes.
18      Q.  Did you file for unemployment after
19 your termination?
20      A.  Yes, I did.
21      Q.  To your knowledge, did Lawrence
22 Hospital contest your request for
23 unemployment?
24      A.  No, they didn't.
25      Q.  How much money did you receive in

Page 97

1              C. Newmark
2  total in unemployment compensation?
3       A.  It was $439 over a period of eight
4  months or so.  I don't have a -- I can get
5  that for you.  I don't have it off the top of
6  my head.
7          MS. NICAJ:  Over eight months?
8       Q.  Are you sure it's not six months?
9       A.  Maybe six months, yeah.  It's six
10 months.
11      Q.  You said approximately $439?
12      A.  $439.
13      Q.  Per week over six months?
14      A.  Yes, and that was taxed.
15          Correction.  It was $349.  My
16 dyslexia.  No, I don't have dyslexia.  It was
17 349 after taxes.
18      Q.  Dr. Kerrianne Page was your
19 personal physician?
20      A.  Correct.
21      Q.  How long had Dr. Page been your
22 personal physician?
23      A.  Since 1998 as well.
24      Q.  So since your prior time at
25 Lawrence Hospital?

25 (Pages 94 to 97)

Carole Newmark

Page 98

```
1              C. Newmark
2      A.  That's correct.  We started on the
3   same day.
4      Q.  Aside from the health, medical and
5   mental health conditions that you already
6   described, and your loss in salary as a
7   result of your termination from Lawrence
8   Hospital, did you suffer any other monetary
9   or non-monetary injuries as a result of your
10  termination?
11     A.  I suffered the ability to go to
12  Lawrence Hospital, when I have an emergency
13  or when I have a test to do.  They've been my
14  hospital since forever and that's been a
15  great inconvenience for me.
16     Q.  Anything else?
17     A.  Not that I can think of at this
18  time.
19     Q.  Why do you say that you lost the
20  ability to go to Lawrence Hospital?
21     A.  Because I wouldn't go there.  I'm
22  in a legal situation with them and I just
23  don't feel that it's -- it would behoove me
24  to go there.
25     Q.  Has anyone at Lawrence Hospital
```

Page 99

```
1              C. Newmark
2   told you you would not be allowed to go
3   there?
4      A.  No, this is my decision.  What I
5   sustained at Lawrence Hospital by being
6   terminated was a real blow to my ego and I
7   wouldn't want to see the same people there
8   that knew I worked there and knew I was
9   terminated.  That's one of the reason why I
10  wouldn't go there.
11     Q.  I want to take you back to that
12  conversation with Cathy Magone in which she
13  told you about her decision to appoint Nicole
14  Serra rather than yourself for the palliative
15  care team.
16         Did you take any notes during that
17  meeting?
18     A.  No, I didn't.
19     Q.  Did you take any notes afterwards?
20     A.  No, I didn't.
21     Q.  Did you make any written record of
22  the discussion that you had with Cathy
23  Magone?
24     A.  Not written.
25     Q.  Did you type it up in any way?
```

Page 100

```
1              C. Newmark
2      A.  I did not.
3      Q.  Did you record the conversation?
4      A.  I recorded it verbally to Nicole
5   Serra.
6      Q.  Meaning you told Nicole Serra?
7      A.  I told Nicole Serra.
8      Q.  When did you tell Nicole Serra?
9      A.  Nicole Serra was -- when I left
10  Cathy Magone's office, Nicole Serra was
11  summoned to her office so she could learn of
12  being appointed to the palliative care unit.
13  And so I kind of passed her in the hallway
14  and I said, "I'll speak to you later."
15         So when she finished meeting with
16  Cathy Magone, that's when I told her, and of
17  course she knew.  She said, "I can't believe
18  this.  I just can't believe this has
19  happened."
20         I said, "Well, that's what
21  happened."
22         And she said, "This is why you came
23  to Lawrence Hospital."
24     Q.  Those are Nicole Serra's exact
25  words to you on that occasion?
```

Page 101

```
1              C. Newmark
2      A.  Yes.
3      Q.  "I can't believe this happened and
4   that's why you came to Lawrence Hospital"?
5      A.  Yeah.  She told me she felt very
6   badly.
7      Q.  Did she say anything else to you on
8   that occasion?
9      A.  We just talked about it.  She said
10  I remember when we both worked at Phelps and
11  you went for your interview and you came back
12  to me and said this is a great opportunity
13  for me because I will be able to use my
14  behavioral health skills and there is a
15  wonderful palliative care unit that's up and
16  coming.
17         So the next day after my interview,
18  I went back to work and spoke to Nicole and I
19  told her about it and she was sad that I
20  might be leaving, but she said I'm really
21  happy for you.
22     Q.  Was there anything else that you
23  said to Ms. Serra or that she said to you
24  during that conversation?
25     A.  I don't recall.  I mean, we had a
```

26 (Pages 98 to 101)

Carole Newmark

Page 102

```
1            C. Newmark
2   lengthy conversation.
3       Q.  Approximately how long?
4       A.  During a lunch hour.
5       Q.  You were having lunch with her at
6   the time?
7       A.  Yes, in the office.
8       Q.  Did you tell anyone other than
9   Nicole Serra and Pat Orsaia about the
10  conversation you had with Cathy Magone?
11      A.  Yes.
12      Q.  Who else?
13      A.  I told my daughter Janice Powers.
14      Q.  Anyone else?
15      A.  I told my partner.
16      Q.  What is your partner's name?
17      A.  Margaret Arnim.
18      Q.  When you say partner, you mean
19  domestic partner?
20      A.  That's correct.
21      Q.  Was there anyone else?
22      A.  No, not immediately.  I was
23  disappointed by the decision.  And I really
24  didn't want to talk about it.
25      Q.  Was there anyone else that you told
```

Page 103

```
1            C. Newmark
2   about your conversation with Cathy Magone
3   prior to your termination from Lawrence
4   Hospital?
5       A.  About?
6       Q.  About what Cathy Magone had said to
7   you?
8       A.  About Nicole -- yes, I think the
9   case managers knew what was, you know, what
10  had happened.
11      Q.  Did you tell them yourself?
12      A.  I probably did, or maybe word got
13  out through Nicole.  I'm not sure.  It wasn't
14  something that I dwelled on.
15      Q.  What did you say to Janice Powers
16  immediately or shortly after your
17  conversation with Cathy Magone?
18      A.  I told her that I couldn't believe
19  that the position was given to Nicole Serra.
20  That it had been implied that the position
21  would be mine.  I told her I guess I was
22  upset about it.
23      Q.  Did you say anything else to
24  Ms. Powers about -- about that conversation?
25      A.  No, that was the crux of it.
```

Page 104

```
1            C. Newmark
2       Q.  Did you tell Ms. Powers the exact
3   words that Cathy Magone had said to you?
4       A.  Yes.
5       Q.  Was there anything else that you
6   told Ms. Powers in that conversation?
7       A.  That we were going shopping that
8   evening.
9       Q.  How did you Ms. Powers respond?
10      A.  She was appalled.
11      Q.  What did she say?
12      A.  That she couldn't believe it.
13      Q.  Did she say anything else?
14      A.  No.
15      Q.  I'm sorry.  What was the last name
16  of your partner?
17      A.  Arnim, A-R-N-I-M.
18      Q.  Did you speak to Ms. Arnim the same
19  day as your conversation with Cathy Magone?
20      A.  Yes.
21      Q.  What did you say to Ms. Arnim?
22      A.  Same thing I said to my daughter,
23  that she had given it to Nicole Serra, the
24  position to Nicole Serra, that she made a
25  comment about her being younger than me and
```

Page 105

```
1            C. Newmark
2   could handle the job better.
3       Q.  When you say the same thing, you're
4   not saying it was the same word for word, it
5   was the same in substance?
6       A.  In substance, and she said Nicole
7   was younger and could handle the job better.
8       Q.  Did you make a point of repeating
9   Cathy Magone's precise words to Ms. Arnim in
10  this conversation?
11      A.  Yes.
12      Q.  You made a point of repeating Cathy
13  Magone's precise words to Ms. Powers in your
14  conversation to her?
15      A.  Yes.
16      Q.  These were two separate
17  conversations?
18      A.  Yes.
19      Q.  Did they both happen the same day?
20      A.  Yes.
21      Q.  Did you tell Nicole Serra the
22  precise words that Cathy Magone had used?
23      A.  Yes.
24      Q.  Why did you do you that?
25      A.  Why did I do that?  I just did it.
```

27  (Pages 102 to 105)

Carole Newmark

Page 106

```
 1            C. Newmark
 2      Q.  No particular reason?
 3      A.  Because it felt like ageism to me.
 4      Q.  You've testified that you believe
 5   that it had been implied that you would be
 6   assigned to the palliative care team during
 7   your interview with Cathy Magone; is that
 8   correct?
 9      A.  Yes.
10      Q.  Cathy Magone never promised you
11   that assignment, did she?
12      A.  There were no other social workers
13   there. It was just me.
14      Q.  At the time of your interview?
15      A.  At the time of my interview. There
16   was another social worker, but she was
17   leaving, so the only person that would be
18   there would be me, and she said this is a
19   great opportunity for you because you know
20   it's up and coming and I just want to give
21   you some of the things that are down the pike
22   here, so to speak.
23      Q.  As far as you know, Cathy Magone
24   had the authority to appoint Ms. Serra to the
25   palliative care team, correct?
```

Page 107

```
 1            C. Newmark
 2      A.  As far as I know.
 3      Q.  And as you understand it, that was
 4   a matter within her discretion?
 5      A.  Yes.
 6      Q.  Do you believe that you are more
 7   deserving of the appointment than Ms. Serra
 8   was?
 9      A.  Yes.
10      Q.  Why?
11      A.  Because of my experience. Because
12   it was implied that that would be part of my
13   job when the palliative care unit or center
14   was up and running.
15      Q.  Any other reasons?
16      A.  It was one of the reasons I came to
17   Lawrence Hospital.
18      Q.  What were the other reasons you
19   came to Lawrence Hospital?
20      A.  Proximity to my home. Some
21   advantage of making more money. Going back
22   to a place that I had loved and worked very
23   well in, and hoping to retire into.
24          I had even mentioned to Cathy
25   Magone that I had felt I had gone full circle
```

Page 108

```
 1            C. Newmark
 2   from the time that I graduated and that I
 3   came back to Lawrence Hospital. I was very
 4   pleased to be there.
 5      Q.  At the time that you started at
 6   Lawrence Hospital, did you have any plans or
 7   expectations about when you would be
 8   retiring?
 9      A.  I figured around 70.
10      Q.  Have those plans changed since?
11      A.  No.
12      Q.  What is your date of birth?
13      A.  9/16/45.
14      Q.  Do you believe that Nicole Serra
15   was a poor choice for the palliative care
16   team?
17          MS. NICAJ: Objection.
18          You can answer.
19      A.  I didn't think she was a poor
20   choice. And my rationale for that was Nicole
21   had no prior hospital social work experience
22   when she came to Lawrence Hospital. And I
23   had enough faith in Nicole knowing that she
24   was a bright young lady, that she would be
25   able to, you know, to do well under my
```

Page 109

```
 1            C. Newmark
 2   tutelage.
 3          This was an issue for Cathy Magone
 4   because she said she has no social work
 5   experience, and I said don't worry about it.
 6   She will learn. I'll, you know, mentor her.
 7      Q.  I'm sorry, did you mean to say that
 8   Cathy Magone said Nicole Serra had no prior
 9   social work experience or hospital social
10   work experience?
11      A.  Hospital social work experience,
12   yes. I'm sorry. And unlike me, Nicole
13   wanted to leave Phelps Memorial and she
14   wanted to make more money. So it seemed, you
15   know, when I said there was a position
16   available, I spoke to, you know, Cathy Magone
17   about Nicole, and, you know, and they made an
18   interview or two, and it was a done deal.
19      Q.  Just to clarify, are those the
20   reasons why you believe that Nicole Serra was
21   not a poor choice to work at Lawrence
22   Hospital or not a poor choice for selection
23   to the palliative care team?
24          MS. NICAJ: Objection.
25          You can answer.
```

28 (Pages 106 to 109)

Carole Newmark

Page 110

1          C. Newmark
2       A.  I didn't think she was a poor
3   choice to work at Lawrence Hospital. And I
4   thought that I was a better choice for the
5   palliative care unit. I don't knock Nicole
6   Serra's ability to learn. But I think
7   working with dying people and working in an
8   area where death is imminent, I think it's
9   important to have some expertise and to have
10  -- to learn how to -- to know how to deal
11  with people during this very fragile time.
12  Nicole didn't have that experience.
13      Q.  You and Ms. Serra had worked
14  together at Phelps Memorial Hospital?
15      A.  Right.
16      Q.  For what period of time?
17      A.  I worked at Phelps for about two
18  years. And she actually was my supervisor.
19      Q.  What was your title at Phelps?
20      A.  Clinical social worker
21  psychotherapist.
22      Q.  And what was Ms. Serra's title?
23      A.  Supervisor. I'm not sure what her
24  exact title was.
25      Q.  Was there anything that you did at

Page 111

1          C. Newmark
2   Lawrence Hospital that you believe shows that
3   you would have been a better choice than
4   Nicole Serra for appointment to the
5   palliative care team?
6       A.  Is there anything I did?
7       Q.  That's correct.
8       A.  What I did prior to this
9   employment, this last employment at Lawrence
10  Hospital, was I worked on the oncology unit.
11  I was assigned to it. That's the relevance
12  of my feeling that I could do a better job or
13  that I was capable of doing the palliative
14  care piece because I worked with dying
15  patients and their families. That was my
16  prior assignment when I worked there in '97,
17  '98. That was one of my assignments.
18      Q.  So when you were referring to the
19  oncology unit, you're referring to the
20  oncology unit at Lawrence Hospital in '97 and
21  '98?
22      A.  That's correct. That would hold
23  over to my last employment at Lawrence
24  Hospital.
25      Q.  Was there anything that you did

Page 112

1          C. Newmark
2   while you were at Lawrence Hospital in 2006
3   that you felt showed that you were a better
4   choice than Nicole Serra for the palliative
5   care team?
6       A.  Yes. I worked on the oncology unit
7   again in 2007 -- 2006, and so it was a
8   continuation of what I had been doing prior
9   at Lawrence Hospital.
10      Q.  Did Nicole Serra do any work at the
11  oncology unit at Lawrence Hospital?
12      A.  No, she wasn't assigned to that. I
13  made the assignment. I assigned her to other
14  units.
15      Q.  What units did you assign Ms. Serra
16  to?
17      A.  Med-surg, medical surgical unit,
18  labor and delivery, peds.
19      Q.  Meaning pediatrics?
20      A.  Pediatrics. That was it, because
21  she was new and I didn't assign her to those
22  units until at least two months into her
23  being there. She shadowed me on the units
24  that I was on and that was every unit there
25  is in the hospital.

Page 113

1          C. Newmark
2       Q.  Over what period of time did Nicole
3   Serra shadow you?
4       A.  Over a period of -- intensely
5   without seeing any of her own patients for
6   about two months.
7       Q.  Was it after that two-month period
8   that you assigned her to medical surgical,
9   labor and delivery and pediatrics?
10      A.  Yes.
11      Q.  To your knowledge, has Lawrence
12  Hospital completed a physical site for
13  palliative care on its premises?
14      A.  I don't know.
15      Q.  In the next few questions that I
16  will be asking you, I'm going to be focusing
17  the attention on some slightly different
18  topics. One of the topics will be your
19  understanding of the process -- the
20  decision-making process that Cathy Magone
21  used to reach her decision to appoint Nicole
22  Serra rather than yourself to the palliative
23  care team.
24          Another focus for some questions
25  will be the merits of the decision that she

29 (Pages 110 to 113)