Carole Newmark

Page 114

```
 1              C. Newmark
 2  made.  And some other questions will deal
 3  with the manner in which Cathy Magone
 4  communicated her decision to you.  You don't
 5  have to agree with the way I've set it up,
 6  but you understand the difference between
 7  those three areas?
 8       A.  I believe so.
 9       Q.  Do you find anything objectionable
10  in the merits of Cathy Magone's decision to
11  appoint Nicole Serra rather than yourself to
12  the palliative care team?
13          Leaving aside the decision-making
14  process that she used to get there or how she
15  communicated it to you, aside from the fact
16  that you believe that it was implied that you
17  would get that appointment and your views of
18  your better qualifications?
19       MS. NICAJ:  Objection.
20       You can answer.
21       A.  Do I have an objection to that?
22       MS. NICAJ:  Do you want the
23  question read back?
24       THE WITNESS:  Yes.
25       (Whereupon, the requested portion
```

Page 115

```
 1              C. Newmark
 2  was read back by the court reporter.)
 3       A.  I found it objectionable when it
 4  was proposed to me.  I do not find it
 5  objectionable now.  I did not find it
 6  objectionable when I met with Pat Orsaia at
 7  our September 13th meeting.
 8          I told her, she said, "How are you
 9  doing?"
10          I said, "I'm doing okay."
11          She said, "Well, how are you doing
12  in regard to the palliative care unit?"
13          I said, "I'm over it."
14          She said, "You are?"
15          And I said, "Yes.  I needed time to
16  go home and process it.  I needed time to
17  think about it.  And I can't remain stuck in
18  this, you know, feeling badly or slighted
19  about this, about not being assigned to that
20  position."
21       Q.  Did you ever tell Cathy Magone that
22  you were over it?
23       A.  No, I didn't have occasion to do
24  that.
25       Q.  Do you find anything objectionable
```

Page 116

```
 1              C. Newmark
 2  in what you know or believe to be the
 3  decision-making process that Cathy Magone
 4  used in order to make that decision?
 5       MS. NICAJ:  Objection.
 6       You can answer.
 7       A.  At the time I did, because I felt
 8  that I was Nicole's supervisor, and if there
 9  was going to be a decision made about where
10  she would work and what she would do, I felt
11  I should be in the loop in making that
12  decision.
13       Q.  Do you have any reason to doubt
14  that Cathy Magone relied on input from
15  Roseanne O'Hare and Maura Del Bene in making
16  that decision?
17       MS. NICAJ:  Objection.
18       You can answer.
19       A.  When I questioned why the decision
20  was made, Cathy Magone said it was a decision
21  that was made -- I'm not quoting her, but
22  something to this effect, the decision has
23  been made and that's it.  And she stood up
24  and dismissed me.
25          So I really didn't have a chance to
```

Page 117

```
 1              C. Newmark
 2  process anything or have a conversation with
 3  her about it, except that the decision was
 4  made.  She didn't say how it was made.  She
 5  didn't say Roseanne O'Hare or anyone else was
 6  involved in the decision.
 7       Q.  You heard testimony to that effect
 8  when Ms. Magone testified recently, correct?
 9       MS. NICAJ:  Objection.
10       You can answer.
11       A.  That they were involved, yes.
12       Q.  Do you have any reason to believe
13  that that's not true?
14       MS. NICAJ:  Objection.
15       You can answer.
16       A.  No.  If that's how it happened,
17  that's how it happened.
18       Q.  During your employment at Lawrence
19  Hospital, were you assigned to attend
20  training in connection with disaster mental
21  health or mental health projects?
22       A.  Yes, I was.
23       Q.  When was that?
24       A.  That was on June 20th and June 21st
25  of 2006.
```

30  (Pages 114 to 117)

Carole Newmark

## Page 118

```
 1              C. Newmark
 2     Q.  Is there any particular reason why
 3  you remember the dates so precisely?
 4     A.  I just do.  I just remember that.
 5  I'm pretty good at remembering things.  I
 6  remember being asked to go to this training
 7  because it was a hospital mandate in regard
 8  to -- in light of the fact that there's
 9  terrorism and there might be an event where
10  there would be the need for a mental health
11  professional to have a team of people to help
12  in the event of a disaster.
13          And Cathy Magone asked me if I
14  would go.  I said sure.  I didn't know what
15  it entailed.  I didn't know anything except
16  it was a disaster mental health training and
17  I thought it would behoove me to have extra
18  training, and it sounded like something that,
19  you know, I didn't question it.  I just went.
20     Q.  Did anyone else from the hospital
21  attend?
22     A.  There was a nurse, I believe her
23  last name was Barbieri.  Rita Barbieri?  I'm
24  not sure.  I didn't know she was from
25  Lawrence Hospital until halfway through the
```

## Page 119

```
 1              C. Newmark
 2  first day, or I just heard that she worked at
 3  Lawrence Hospital, and so we just introduced
 4  ourselves.
 5          She was a per diem nurse at
 6  Lawrence Hospital working one day a week.  I
 7  don't know what she did.
 8     Q.  The training took two full days?
 9     A.  Yes.
10     Q.  Where did it take place?
11     A.  In Valhalla, at the fire academy,
12  fire training academy.
13     Q.  Did you receive any written
14  materials at this training?
15     A.  Yes.
16     Q.  What did you receive?
17     A.  A book with training and how to --
18  the training was how to train trainers.  So
19  the idea was after I was trained, that I
20  would then pull together a training with
21  Ms. Barbieri, if I have her name correct, and
22  possibly people from other hospitals who
23  attended, because it was an extremely,
24  extremely intensive training that had to be
25  done, and the person who gave the training
```

## Page 120

```
 1              C. Newmark
 2  suggested that a few hospitals band together
 3  and do the training.
 4     Q.  After you returned from this
 5  training on June 20th and 21st of '06, what
 6  steps did you take to develop mental health
 7  program at Lawrence?
 8          MS. NICAJ:  Objection.
 9          You can answer.
10     Q.  By mental health, I'm referring to
11  this specific disaster mental health project?
12          MS. NICAJ:  Objection.
13          You can answer.
14     A.  What I did was I read over the
15  manual, which was about that big, and it was
16  very intensive.
17     Q.  You're indicating a couple inches
18  thick?
19     A.  About three inches thick.
20     Q.  Okay.
21     A.  And I tried to read it at work when
22  I could, which was usually my lunch hour.
23  And I started formulating in my mind how I
24  could go about doing this training and where
25  I would do the training, because you needed a
```

## Page 121

```
 1              C. Newmark
 2  certain facility.  You needed a certain
 3  physical facility, which is noted in this
 4  disaster training manual.  It had to be a
 5  very large, large room with certain seating.
 6  There was a method and a formula to it.
 7          So I started formulating it in my
 8  mind how I was going to go about doing this.
 9     Q.  Did you take any notes or prepare
10  any documents in connection with formulating
11  how you were going to implement the training?
12     A.  They were mental.  They were mental
13  notes.
14     Q.  So it's a no, just mental notes and
15  no paper documents or electronic documents?
16     A.  No, I didn't do anything like that.
17     Q.  When you returned from the
18  training, did you talk to anyone at Lawrence
19  Hospital about what you would need to do?
20     A.  I spoke to Nicole Serra.  And I
21  believe I spoke to Cathy Magone, who asked me
22  how it went, and I said it went well.  It was
23  good.  It was informative and eye-opening.
24     Q.  Did you speak to Ms. Barbieri?
25     A.  I tried to reach Ms. Barbieri on
```

31  (Pages 118 to 121)

Carole Newmark

|  | Page 122 |  | Page 124 |
|---|---|---|---|

**Page 122**

C. Newmark

1
2 several occasions. I left her messages on
3 her answering machine. She was there one day
4 a week, and I think a few times she wasn't in
5 and I tried to get together with her.
6        The training that I was required to
7 do was required over a year period. It
8 wasn't immediate. It was to, because there
9 was so much information and there was so much
10 admittedly by the person who developed it,
11 there was so much information that the
12 trainers needed time to assimilate the
13 information and then teach it. So there was
14 a timeframe of one year.
15     Q. And that was the expectation
16 communicated to you during the training?
17     A. Right, that's correct.
18     Q. Did you tell Cathy Magone that?
19     A. No, she didn't ask me. I didn't
20 tell her.
21     Q. Did you tell Cathy Magone that you
22 were reading through the binder and making
23 mental notes about how to conduct the
24 training?
25     A. I don't believe we had an occasion

**Page 123**

C. Newmark

1
2 to talk about it. If she asked how it went,
3 I said it was very good. I knew what my
4 responsibility was to the hospital and to the
5 training, and I was formulating how I would
6 proceed with the training.
7     Q. Did Cathy Magone ever ask you for
8 updates on your progress?
9     A. She did.
10     Q. How many times?
11     A. Once she said are you getting that
12 together, and I said yes, meaning that I was
13 looking it over and that I was trying to
14 reach Ms. Barbieri and was unsuccessful in
15 speaking with her.
16        I think another time she asked me
17 and I said, you know, I'm getting through it,
18 I'm pulling it together.
19     Q. Did you tell Ms. Magone on one of
20 these occasions that it was going to be a lot
21 of work?
22     A. Yes.
23     Q. Approximately when was that?
24     A. Probably the first time that she
25 asked me about it, and I don't know when it

**Page 124**

C. Newmark

1
2 was. Maybe a month after, she asked me after
3 the training. Maybe in July. And I said
4 it's a lot of work. It takes a lot of work.
5 You can't just set it up and do it.
6     Q. Do you have any reason to doubt
7 that your workload in connection with this
8 disaster mental health project was a
9 consideration that Cathy Magone took into
10 account in deciding who to appoint to the
11 palliative care team?
12     A. No, no, because I had been
13 multitasking and I had been doing many things
14 at one time. If a person could do six things
15 at a time, that's what I was doing. I didn't
16 think of it as I couldn't do the palliative
17 care piece as well as this, as well as
18 prepare for the disaster mental health
19 training.
20        MS. NICAJ: Read back the question.
21        (Whereupon, the requested portion
22        was read back by the court reporter.)
23     Q. Is there anything you want to add
24 or change about your answer?
25     A. No. If I'm hearing it correctly,

**Page 125**

C. Newmark

1
2 you're asking if Cathy Magone considered the
3 fact that this was such a daunting task that
4 I couldn't do the palliative care piece, and
5 my answer is no, I don't think that -- I
6 believe that I could have done the palliative
7 care piece, as well as the disaster mental
8 health training, as well as everything else
9 that I was doing, because my workload started
10 easing up a bit because Nicole was getting on
11 board and beginning to be out on her own and
12 picking up some of the slack.
13     Q. But if Cathy Magone said it was a
14 consideration of hers, do you have any reason
15 to believe that not to be true?
16        MS. NICAJ: Objection.
17        You can answer.
18     A. She never said that. It wasn't a
19 thought.
20     Q. Were you entitled to paid time off
21 as part of your employment benefits at
22 Lawrence Hospital?
23     A. Yes.
24     Q. Did you receive a lump sum of paid
25 time off at the beginning or did you accrue

32 (Pages 122 to 125)

Carole Newmark

Page 126

```
1              C. Newmark
2   paid time off overtime?
3       A.  I'm not sure how it worked.  I
4   think you accrue time as you work, 5.64 hours
5   is accrued biweekly in your paycheck.
6       Q.  When you were terminated from
7   employment at Lawrence Hospital, did you
8   receive a check in the following weeks for
9   your unused paid time off?
10      A.  I received a check for the work
11  that I did.
12      Q.  For your salary?
13      A.  Yeah.  I'm not sure if there was
14  any time that wasn't -- maybe to answer your
15  original question, maybe the time was accrued
16  and you couldn't take it within a six-month
17  period.  If that makes any sense.
18      Q.  Did you use any paid time off
19  during your employment at Lawrence Hospital?
20      A.  Paid time off?
21      Q.  Yes.
22      A.  I used sick time.  And I used -- I
23  took vacation without pay.
24      Q.  Was it your understanding that paid
25  time off could be used for either sick time
```

Page 127

```
1              C. Newmark
2   or religious holidays or vacation time, if
3   you had earned it?
4       A.  Right.  There was a bank of time.
5   That's correct.
6       Q.  Did you use any paid time off while
7   you were employed at Lawrence?
8       A.  If it's referring to sick time,
9   yes.
10      Q.  How many days were you out sick
11  while you were at Lawrence?
12      A.  When I first got there, I was put
13  off the job by Dr. Page because she believed
14  that I had shingles and I can't be around
15  patients with shingles because it's
16  contagious, and I believe I was there two
17  weeks, and I went to her with this rash on
18  the trunk of my body and she put me out for a
19  week or more.
20          I was out from Monday through
21  Wednesday morning, at which time I went back
22  to Dr. Page to please reassess what was going
23  on and to assure me that it was shingles,
24  because I told her it was a new job and I had
25  to get back to work as quickly as possible.
```

Page 128

```
1              C. Newmark
2          And after looking at it again, she
3   decided that it was not shingles and that I
4   was cleared to go back to work.  That was the
5   first event.
6       Q.  Were you cleared to return to work
7   the following day?
8       A.  That day.  I went 8 o'clock in the
9   morning and came back to work right across
10  the street, I went to work after seeing her.
11  And I told her it was imperative that I not
12  be off because this was a new position and I
13  just felt an obligation to be there.  I
14  couldn't take time off.
15      Q.  So that was two days?
16      A.  It was Monday and Tuesday, and when
17  I went in the morning on Wednesday.
18      Q.  During your employment at Lawrence
19  Hospital from March 2006 until the beginning
20  of October 2006, how many days in total were
21  you out sick?
22      A.  I was out for my colonoscopy, I
23  believe, for two days.  I may have had
24  another day off for another illness, but I
25  don't recall more than that.  There may or
```

Page 129

```
1              C. Newmark
2   may not have been.  I don't recall it.
3       Q.  How long was your unpaid vacation?
4       A.  Can you expound on that?
5       Q.  You said you had an unpaid
6   vacation.
7       A.  Oh, yes.  I believe it was a week.
8       Q.  And your best recollection is that
9   was around the beginning of August?
10      A.  I believe so.
11      Q.  That first incident that you
12  described where you were out for the Monday
13  and Tuesday and the beginning of the day on
14  Wednesday, was that in May 2006?
15      A.  It may have been.
16      Q.  Did you have any sick days in the
17  first two weeks of June 2006?
18      A.  I don't recall.
19      Q.  The training that you attended for
20  the disaster mental health, what days of the
21  week did that take place on?  Was it two
22  weekdays or did it go into a weekend?
23      A.  It was weekdays.  I believe it was
24  a Tuesday/Wednesday, but I'm not sure.
25      Q.  Did you take part in any other
```

33 (Pages 126 to 129)

Carole Newmark

Page 130

1          C. Newmark
2  educational programs while you were at
3  Lawrence in 2006?
4      A.  Not that I recall.  I went to
5  Calvary Hospital for an in-house, they call
6  it an in-house day, where they, you know,
7  featured what they do at Calvary for referral
8  purposes, and I went there with Nicole Serra.
9  We didn't go to the first part because we
10  were very busy, but we went to the second
11  part in the afternoon.  I don't recall any
12  other trainings.
13      Q.  Do you take any time off in
14  connection with the 4th of July either before
15  or after?
16      A.  I'm not sure.
17      Q.  Do you recall having two sick days
18  in the first two weeks of July?
19          MS. NICAJ:  Objection.
20          You can answer.
21      A.  I don't recall.
22      Q.  Did you take three sick days in the
23  first two weeks of August?
24      A.  I don't recall.  I can look back on
25  my pay stubs.

Page 131

1          C. Newmark
2      Q.  If your pay stubs reflect paid time
3  off, do you have reason to believe it would
4  be for a reason other than sick time?
5          MS. NICAJ:  Objection.
6          You can answer.
7      A.  I don't know.
8      Q.  Would it surprise you to learn that
9  you used 18 paid time off days in your six
10  weeks at Lawrence?
11      A.  Yes.
12          MR. KEIL:  Why don't we take a
13  break for lunch.  It's two minutes after
14  one.
15          (Whereupon, a luncheon recess was
16  taken at 1:02 p.m.)
17
18              *  *  *
19
20
21
22
23
24
25

Page 132

1          C. Newmark
2  A F T E R N O O N   S E S S I O N
3      (Time noted: 1:49 p.m.)
4
5  C A R O L E   N E W M A R K,
6      Resumed and testified as follows:
7  EXAMINATION BY (Cont'd.)
8  MR. KEIL:
9      Q.  Ms. Newmark, you understand that
10  you are still under oath this afternoon?
11      A.  Yes, I do.
12      Q.  And you testified earlier to the
13  words that Cathy Magone used when she
14  explained her decision to appoint Nicole
15  Serra rather than yourself to the palliative
16  care team.
17          Was there anything you found
18  offensive or objectionable in the way she
19  explained her decision?
20      A.  The objectionable piece was saying
21  that she was younger than me and could handle
22  the job better.
23      Q.  Was there anything else in what she
24  said to you in that meeting that you found
25  offensive or objectionable?

Page 133

1          C. Newmark
2      A.  Just that I was dismissed, that
3  there was not an opportunity for dialogue or
4  anything.
5      Q.  While you were employed at Lawrence
6  Hospital, was there -- were you aware of a
7  trip being planned for certain
8  representatives to go to Ohio to visit a site
9  with a palliative care program?
10      A.  No.
11      Q.  You --
12      A.  Correction.  I was aware when I had
13  lunch with Maura Del Bene.  She did mention
14  there was a trip to Ohio.
15      Q.  That was the only discussion you
16  had with anyone at Lawrence about the site
17  trip to Ohio?
18      A.  Yes.
19      Q.  Do you know one way or the other
20  whether Ms. Serra made a trip to Ohio in
21  connection with the palliative care team?
22      A.  Yes, I knew she went on a trip.
23      Q.  When did you find out?
24      A.  It's not exact, but I believe that
25  I found out shortly after when Nicole was

34  (Pages 130 to 133)

Carole Newmark

| Page 134 | Page 136 |
|---|---|
| C. Newmark | C. Newmark |
| 1 | 1 |
| 2 told that she was going to be doing the | 2 Pat Orsaia's office on or around August 18th |
| 3 palliative care piece. | 3 to inform her what -- |
| 4    Q.  Did you find out that she would be | 4    A.  Yes. |
| 5 going on the trip before or after the trip | 5    Q.  Let me finish the question -- to |
| 6 took place, to your knowledge? | 6 inform her of what Cathy Magone had said to |
| 7    A.  I found out before.  I believe | 7 you? |
| 8 Nicole told me. | 8    A.  I'm not sure if I met with her in |
| 9    Q.  What did she tell you? | 9 her office or if I called her. |
| 10    A.  That she was going on a site visit | 10    Q.  But your effort to contact Ms. |
| 11 to Ohio to learn how they ran a palliative | 11 Orsaia was on or about August 18th? |
| 12 care center. | 12    A.  That sounds plausible. |
| 13    Q.  Did she go on that trip? | 13    Q.  Do you remember? |
| 14    A.  Yes. | 14    A.  No, not to the exact day, no. |
| 15    Q.  When did she go on the trip? | 15    Q.  Would it be fair to say it was |
| 16    A.  I don't recall. | 16 approximately three days after you met with |
| 17    Q.  Was it while you were employed at | 17 Cathy Magone? |
| 18 Lawrence? | 18    A.  There may have been a weekend |
| 19    A.  I believe so. | 19 there.  There may have been a weekend.  I'm |
| 20    Q.  Did she tell you about it when she | 20 not sure.  I would have to look at a |
| 21 came back? | 21 calendar.  And they may have done it on a |
| 22    A.  Yes. | 22 Monday.  I'm not sure. |
| 23    Q.  What did she tell you? | 23    Q.  In that first contact with Pat |
| 24    A.  She told me that she learned a lot, | 24 Orsaia, did she tell you she was going on |
| 25 that it was very exciting and that she had | 25 vacation? |

| Page 135 | Page 137 |
|---|---|
| C. Newmark | C. Newmark |
| 1 | 1 |
| 2 learned a lot and that she felt better | 2    A.  I'm not sure if that's when I knew |
| 3 prepared to do the job.  I was happy for her. | 3 that she was going on vacation.  I may have |
| 4    Q.  Did you have any meeting with Ms. | 4 learned about that when a date was trying to |
| 5 Serra to discuss what she had learned? | 5 be set for us to meet. |
| 6    A.  Just a very brief overview she gave | 6    Q.  Was it your own idea to go to Pat |
| 7 me.  She really didn't give me much | 7 Orsaia or did someone else recommend it to |
| 8 information.  I think she felt badly that I | 8 you? |
| 9 didn't go and that I wasn't, you know, that | 9    A.  My own idea. |
| 10 she went. | 10    Q.  Why did you decide to go to Pat |
| 11    Q.  And you went to visit Pat Orsaia in | 11 Orsaia? |
| 12 Human Resources in mid-August to complain | 12    A.  Because I felt there was age |
| 13 about what Cathy Magone had said to you, | 13 discrimination. |
| 14 correct? | 14    Q.  And that was based on the words |
| 15    A.  Correct. | 15 that Ms. Magone had used to you on the |
| 16    Q.  Was that the same day that Cathy | 16 meeting on the 15th? |
| 17 Magone spoke to you or was it at a later | 17    A.  Exactly, that Nicole was younger |
| 18 date? | 18 and could do the job better. |
| 19    A.  It was at a later date. | 19    Q.  Was there any other reason at that |
| 20    Q.  How many days later? | 20 time that made you think there was age |
| 21    A.  I met with Pat Orsaia on September | 21 discrimination? |
| 22 13th.  I met with Cathy Magone on August | 22    A.  No. |
| 23 15th. | 23    Q.  Was there a particular result you |
| 24    Q.  In addition to meeting with Pat | 24 were looking for when you went to Pat Orsaia? |
| 25 Orsaia on September 13th, did you also visit | 25    A.  Yes. |

35  (Pages 134 to 137)

Carole Newmark

Page 138

```
 1            C. Newmark
 2       Q.  What was the result you were
 3   looking for?
 4       A.  The result was I wanted to air
 5   this, I wanted it to be out on the table so
 6   that I could continue doing my job without
 7   any interference and without -- and I wanted
 8   her to know how I felt, that I felt it was
 9   age discrimination and I was uncomfortable
10   working with Cathy without this being hashed
11   out.
12       Q.  Did you have a private meeting with
13   Cathy Magone on or about September 12th?
14       A.  I don't recall.
15       Q.  Do you recall having a meeting with
16   Cathy Magone in September of 2006 in which
17   she told you that your attendance had been
18   unsatisfactory?
19       MS. NICAJ:  Objection.
20       You can answer.
21       A.  No.
22       Q.  Did you have any meeting with Cathy
23   Magone prior to September 28th in which Cathy
24   Magone told you that your probation was being
25   extended?
```

Page 139

```
 1            C. Newmark
 2       A.  Yes, I did.
 3       Q.  Was that on or about September
 4   12th?
 5       A.  Perhaps.  I don't know.
 6       Q.  What do you remember about that
 7   conversation?
 8       A.  She said that she didn't think
 9   things were working out but she felt that
10   they could, you know, perhaps there was a way
11   we could work things out and that she was
12   going to extend my probation, and I told her
13   that things, you know, there was still
14   existing problems with the case managers not
15   giving me things in a timely manner, and that
16   I understood the extension, if that's what
17   she wanted to do, that I understood that.  I
18   just wanted things to be right.
19       Q.  What else did Cathy Magone say to
20   you in that meeting?
21       A.  I don't recall anything else.
22       Q.  What else did you say to Cathy
23   Magone during that meeting?
24       A.  That that was fine, that she was
25   extending my probation, that I understood
```

Page 140

```
 1            C. Newmark
 2   that.  And that hopefully we would work
 3   things out.
 4       Q.  Did Cathy Magone say anything to
 5   you during that meeting that you believed was
 6   untrue or inaccurate?
 7       A.  She really didn't say much.  She
 8   just said that it was being extended because
 9   there were still issues with roles, social
10   work roles, case management roles, palliative
11   care roles.
12       Q.  Did Cathy Magone say anything to
13   you during that meeting that you believe was
14   unfair?
15       MS. NICAJ:  Objection.
16       You can answer.
17       A.  No, I didn't balk at the fact that
18   she was extending my probation.  I said if
19   that's what you need to do, then that's fine.
20       Q.  Was anything else discussed during
21   this meeting?
22       A.  No.
23       Q.  Did you also have a discussion
24   during this meeting about your need to take
25   time off for a colonoscopy, or was that a
```

Page 141

```
 1            C. Newmark
 2   separate discussion?
 3       A.  That's a separate issue.
 4       Q.  Was that the same day or a
 5   different day?
 6       A.  I'm not sure.
 7       Q.  Ms. Magone initially denied your
 8   request for your days off for your
 9   colonoscopy?
10       A.  Yes, she did.
11       Q.  Did you ask her to reconsider?
12       A.  Yes, I did.
13       Q.  And did she reconsider your
14   request?
15       A.  She said that I didn't follow the
16   proper policy and procedure for asking for a
17   day off.  She was incensed that I wrote her
18   an e-mail stating that I had scheduled a
19   colonoscopy and would need the time off.
20       I was not aware of the policy for
21   taking a planned sick day in that you needed
22   to fill out a vacation or a day off/time off
23   request.  As soon as she told me that I
24   couldn't have the time off, I put it in
25   writing and I asked -- I said I'm sorry that
```

36 (Pages 138 to 141)

Carole Newmark

**Page 142**

```
1           C. Newmark
2   I didn't know the procedure.  I put a Post-it
3   note on it and I said I would like you to
4   reconsider, because this is scheduled and
5   it's something I need, and I had
6   documentation from my doctor that I needed to
7   have this done.  And I put it in her mailbox
8   and she received it and she okayed it.
9           MR. KEIL:  Can you please mark this
10   Defendants' Exhibit E.
11           (Defendants' Exhibit E, E-mail
12      exchange, marked for identification, as
13      of this date.)
14      Q.  Ms. Newmark, you've been handed
15   what's been marked as Defendants' Exhibit E.
16      Do you recognize this document?
17      A.  Yes, I do.
18      Q.  And there's some handwriting -- for
19   the record, this is a printout of an e-mail
20   exchange between Carole Newmark and Cathy
21   Magone on September 11, 2006.
22      There's some handwriting in the
23   upper right-hand corner of the page.  Is that
24   your handwriting?
25      A.  Yes.
```

**Page 143**

```
1           C. Newmark
2      Q.  And what does that say?
3      A.  I met with Cathy at 3 o'clock on
4   the 12th.
5      Q.  Did you have some meeting with Ms.
6   Magone on September 12th at 3 p.m.?
7      A.  I don't recall, but obviously I
8   wrote this and we probably met to discuss --
9   she probably wanted to meet with me to say
10   she was okaying my request that I had
11   resubmitted.
12      Q.  Drawing your attention to the
13   portion from Cathy Magone, there is a line,
14   "I would like to meet with you tomorrow at
15   9:30 to discuss your overall attendance."
16      Did you have such a meeting?
17      A.  I don't believe so, because I
18   didn't have an opportunity to take this
19   e-mail off the computer.
20      Q.  What do you mean by that?
21      A.  I didn't go to my computer.  I went
22   directly -- I came in and went directly on to
23   patient opportunities to do my work.  That
24   wasn't unusual that I didn't get to look at
25   my e-mails until later on in the day.
```

**Page 144**

```
1           C. Newmark
2      Q.  Later on in the day on September
3   12th?
4      A.  On any given day and on this day as
5   well.
6      Q.  Drawing your attention to the date
7   in the bottom left-hand corner of the page,
8   it says 9/12/2006.
9      Is that the day you printed out
10   this e-mail?
11      A.  Maybe.
12      Q.  Do you have any reason to believe
13   otherwise?
14      A.  No.
15      Q.  When you met with Ms. Magone at 3
16   o'clock on the 12th, was that in connection
17   with your overall attendance?
18      A.  I don't recollect.
19      Q.  You don't recall one way or the
20   other?
21      A.  No.
22      Q.  Is it possible you had a discussion
23   with Cathy Magone about your attendance in
24   general on the afternoon of September 12th?
25           MS. NICAJ:  Objection.
```

**Page 145**

```
1           C. Newmark
2      You can answer.
3      A.  I honestly don't recall.
4      MR. KEIL:  I would like this marked
5   as Defendants' Exhibit F.
6           (Defendants' Exhibit F, E-mail,
7      marked for identification, as of this
8      date.)
9      Q.  Do you recognize Defendants'
10   Exhibit F?
11      A.  Yes.
12      Q.  Do you recall sending this e-mail
13   to Pat Orsaia?
14      A.  Yes, I do.
15      Q.  Did you send this e-mail to Pat
16   Orsaia before or after you met with Cathy
17   Magone?
18      A.  I don't recall, because the time
19   stamped here was 11:45.  I may have met with
20   and I most likely had met with her right
21   after lineup, which would be about 10:30.  So
22   I probably sent this then.
23      Q.  And you're referring to meeting
24   with Cathy Magone after lineup?
25      A.  Yes, if we met on the 12th, but
```

37 (Pages 142 to 145)

Carole Newmark

**Page 146**

```
 1              C. Newmark
 2   this says 3 o'clock, so this negates that. I
 3   met with her at 3 o'clock, so --
 4       Q.  Did Pat Orsaia respond to the
 5   e-mail that you sent her that's been marked
 6   as Defendants' Exhibit F?
 7       A.  I believe she did.
 8       Q.  Do you recall what Ms. Orsaia's
 9   response was?
10       A.  I don't.
11           MR. KEIL:  Can you please mark this
12   as Defendants' Exhibit G.
13           (Defendants' Exhibit G, E-mail
14       exchange, marked for identification, as
15       of this date.)
16       Q.  Do you recognize the e-mail
17   exchange reflected in Defendants' Exhibit G?
18       A.  Yes, I do.
19       Q.  Does this refresh your recollection
20   as to the response you received from Pat
21   Orsaia?
22       A.  Yes.
23       Q.  How did Pat Orsaia respond to the
24   e-mail that you sent her, Exhibit F?
25           MS. NICAJ:  Objection.
```

**Page 147**

```
 1              C. Newmark
 2       A.  I believe we met on the -- I'm not
 3   sure.
 4       Q.  Did you meet on the 13th?
 5       A.  I'm not sure.
 6       Q.  Drawing your attention to what Ms.
 7   Orsaia wrote in the middle of the page on
 8   Exhibit G, you see there is a reference to --
 9   well, it says, "I am sorry that we have not
10   been able to meet to connect" -- I'm sorry, I
11   will start again.
12           "I'm sorry that we have not been
13   able to connect due you several factors; my
14   vacation, your vacation, your unplanned
15   absence, et cetera."
16           Does this refresh your recollection
17   as to whether you took any vacation time
18   between when you met with Pat Orsaia on or
19   about August 18th and the date of this
20   e-mail?
21       A.  No.
22       Q.  Does this refresh your recollection
23   as to any unplanned absence you may have had
24   in that period?
25       A.  No.
```

**Page 148**

```
 1              C. Newmark
 2           MR. KEIL:  Can you please mark this
 3   as Exhibit H?
 4           (Defendants' Exhibit H, E-mail
 5       exchange, marked for identification, as
 6       of this date.)
 7       Q.  Ms. Newmark, do you recognize the
 8   e-mail exchange reflected in Defendants'
 9   Exhibit H?
10       A.  Yes.
11       Q.  Do you recall whether you met with
12   Pat Orsaia at about 3:30 on September 13th?
13       A.  If I confirmed it here and said
14   that today at 3:30 is fine, then I did meet
15   with her.
16       Q.  Did anyone else attend that
17   meeting?
18       A.  I believe Cathy Magone was there.
19       Q.  Do you have a recollection of Cathy
20   Magone being at that meeting or are you
21   drawing a conclusion from things you've --
22   from documents you have seen here today or at
23   some other time?
24           MS. NICAJ:  Objection.
25           You can answer.
```

**Page 149**

```
 1              C. Newmark
 2       A.  I don't think it was with Cathy,
 3   because I think we met on the 28th with Cathy
 4   Magone.
 5       Q.  So the meeting on the 13th was you
 6   and Pat Orsaia and no one else?
 7       A.  Right.
 8       Q.  Where did the meeting take place?
 9       A.  In Pat Orsaia's office.
10       Q.  How long did it last?
11       A.  10, 15 minutes.
12       Q.  How did the meeting begin?
13       A.  I believe I asked her for how it
14   was going with the meeting, the upcoming
15   meeting and whatever, because I hadn't heard
16   from anyone.
17       Q.  What did she say?
18       A.  I believe at that time she said
19   that we haven't met because of our vacation
20   times and because of scheduling differences.
21       Q.  Was there anything else you said to
22   Pat Orsaia at this meeting?
23       A.  Not that I recall.
24       Q.  Was there anything else she said to
25   you?
```

38  (Pages 146 to 149)

Carole Newmark

Page 150

```
1           C. Newmark
2     A.  Not that I recall.
3     Q.  How did the meeting end?
4     A.  I don't recall.
5     Q.  What was the result or outcome of
6  the meeting, as you understood it?
7     A.  It's not clear to me.
8     Q.  You don't remember?
9     A.  No.
10    Q.  Do you recall the meeting ending
11 with you and Pat Orsaia agreeing that you
12 would contact her to indicate how you wanted
13 to proceed?
14       MS. NICAJ:  Objection.
15       You can answer.
16    A.  No, I believe I wanted a meeting
17 with the three of us.
18    Q.  So as far as you were concerned,
19 the only question was when that meeting would
20 be scheduled?
21    A.  Right.
22    Q.  Did Cathy Magone take any vacation
23 in September 2006?
24    A.  She may have.  I didn't keep track
25 of her vacation.
```

Page 151

```
1           C. Newmark
2     Q.  Did you contact Pat Orsaia again to
3  indicate that you wanted to have a meeting?
4     A.  With Magone and her?
5     Q.  Yes.
6     A.  It's possible.
7        MR. KEIL:  Can you please mark this
8  as Defendants' Exhibit I.
9        (Defendants' Exhibit I, E-mail,
10 marked for identification, as of this
11 date.)
12    Q.  Do you recognize what's been marked
13 as Defendants' Exhibit I?
14    A.  Yes, I do.
15    Q.  Do you remember sending this e-mail
16 to Pat Orsaia?
17    A.  Yes, I do.
18    Q.  Does this e-mail refresh your
19 recollection as to whether you were going to
20 indicate to Pat Orsaia how you wanted to
21 proceed with regard to the concerns that you
22 expressed about Cathy Magone?
23       MS. NICAJ:  Objection.
24       You can answer.
25    A.  No, I was following up because
```

Page 152

```
1           C. Newmark
2  there had been quite a -- there had been
3  quite a number of days, and maybe even a
4  month between the time that I brought up the
5  issue and this, and I felt that I wanted, as
6  I said here, I wanted to put some closure on
7  it, so I could get back to work and do what I
8  have to do without having this on my mind.
9     Q.  You were out of work because of
10 your colonoscopy on September 26th and 27th,
11 2006?
12    A.  That sounds about right.
13    Q.  Do you have any reason to dispute
14 that Cathy Magone was on vacation from
15 approximately September 18th to September
16 21st of 2006?
17    A.  I have no -- I don't know where she
18 was.
19    Q.  Did you have a meeting with Pat
20 Orsaia and Cathy Magone after you sent the
21 e-mail that's been marked as Defendants'
22 Exhibit I?
23    A.  Yes.
24    Q.  Was that the same day?
25    A.  Yes.
```

Page 153

```
1           C. Newmark
2     Q.  Where did it take place?
3     A.  In Pat Orsaia's office.
4     Q.  At what time?
5     A.  I'm not sure of what time.
6  Possibly in the afternoon.
7     Q.  The people in attendance were
8  yourself, Pat Orsaia and Cathy Magone?
9     A.  Right.
10    Q.  No one else?
11    A.  No one else.
12    Q.  Did you take notes during this
13 meeting?
14    A.  No, I didn't.
15    Q.  Did you take notes after the
16 meeting?
17    A.  No, I didn't.
18    Q.  How did the meeting begin?
19    A.  It began by Pat Orsaia stating that
20 I had some issues that needed to be
21 discussed, and that she wanted me to discuss
22 them with Cathy, and I proceeded by saying
23 that I had an issue with her making a
24 statement about Nicole being younger than I
25 and better able to do the job of work.  And
```

39 (Pages 150 to 153)

Carole Newmark

Page 154

C. Newmark

1 it took off from there.
2     Q.  How did Cathy Magone respond to
3 what you said?
4     A.  She said she never said that.  She
5 denied saying it, and she got a little angry,
6 and she said what I meant to say is she's
7 younger and can take in information like a
8 sponge.
9     Q.  Didn't Cathy Magone say Nicole was
10 younger in her career and could soak things
11 up like a sponge?
12     MS. NICAJ:  Objection.
13     You can answer.
14     A.  It's a matter of semantics at this
15 point.  Maybe she said it that way, but she
16 did say she's younger, she's young.  She
17 didn't say at this point in her career.  She
18 said she's young and could soak things up
19 like a sponge.
20     Q.  When you say it's a matter of
21 semantics, my question is:  The exact words
22 that Cathy Magone said in the September 28th
23 meeting, as best you can recall?
24     A.  I retract that.  Cathy Magone says

Page 155

C. Newmark

1 she's young and can soak things up like a
2 sponge.
3     Q.  Did Cathy Magone mention any
4 concerns about the quality of your work
5 performance during this meeting?
6     A.  She did.
7     Q.  What did she say?
8     A.  She said that my work performance
9 was not up to par.  I asked her why she
10 didn't bring this up to me before.  That why
11 was it is being brought up at this meeting.
12 Why had she not mentioned it to me before so
13 that we had an opportunity to work on it.
14     She said she did.  She didn't.  And
15 she brought up attendance.  I asked her why
16 she didn't make an issue of this, or why she
17 didn't say anything prior to this meeting,
18 that I had to ask for this meeting and why is
19 she bringing it up at this point.
20     Q.  What did she say?
21     A.  She got very angry.
22     Q.  What did she say?
23     A.  She sat there and disputed what I
24 was saying.  She said well, something to the

Page 156

C. Newmark

1 effect, and I can't quote her, something to
2 the effect that she had been telling me about
3 my work, et cetera, et cetera.  And I
4 disputed that.  I said you haven't.
5     Q.  How long did the meeting last?
6     A.  Maybe 20 minutes.
7     Q.  Did you say anything else during
8 the meeting other than what you already
9 testified to?
10     A.  I don't recall.
11     Q.  Did Ms. Magone say anything during
12 this meeting other than what you already
13 testified to?
14     A.  I don't recall anything else.
15     Q.  Did Ms. Orsaia say anything during
16 this meeting?
17     A.  Not really.  She allowed Cathy and
18 I to talk about whatever the issues were.
19     Q.  How did the meeting end?
20     A.  It ended really with no resolution,
21 no real resolution.  I thanked Pat Orsaia for
22 her time.  I -- we both got up to leave,
23 Magone and I.  I got to the door and Magone
24 said, "Pat, may I meet with you?"  And she

Page 157

C. Newmark

1 stayed behind.
2     Q.  Who indicated that the meeting was
3 over?
4     A.  I don't recall.  I think it was
5 mutual.
6     MR. KEIL:  Could you please mark
7 this as Defendants' Exhibit J.
8     (Defendants' Exhibit J, Document,
9 marked for identification, as of this
10 date.)
11     Q.  Ms. Newmark, do you recognize
12 Defendants' Exhibit J?
13     A.  Yes, I do, and this refreshes my
14 memory that I asked Cathy Magone how long my
15 probation period was going to be extended.
16 And she said that that was for her to know.
17 And she wouldn't answer, you know, the
18 question.
19     Q.  Did you ask Pat Orsaia any
20 questions about your probationary period
21 being extended during that meeting?
22     A.  I may have.  I don't recall.  I may
23 have asked her if there was some policy or
24 procedure about when you extend someone's

40  (Pages 154 to 157)

Carole Newmark

Page 158

1              C. Newmark
2   probation, do they need to be informed.  I
3   never got an answer to that.  I never knew
4   what it was or --
5        Q.  Looking at Defendants' Exhibit J,
6   this is the copy of the e-mail that was
7   produced by your attorney during discovery.
8        Did you print out this copy before
9   you sent it to -- before you sent this e-mail
10  to Pat Orsaia?
11       A.  I don't know.
12       Q.  The reason I ask is because this
13  copy doesn't have a date or time when it was
14  sent.
15       A.  It was probably done on 9/29/06, as
16  I indicated on top.
17       Q.  That's your handwriting at the top?
18       A.  Yes, it is.
19       Q.  Did you print out this copy to
20  review it before you hit send?
21       A.  No.  As a matter of how I work in
22  practice, I have been taught that when
23  there's an issue, you document it.  So that's
24  why I documented it, and that's why I printed
25  it out, because I felt that if you don't

Page 159

1              C. Newmark
2   document something, it didn't happen, and
3   that's part of social work practice, to have
4   good documentation.
5        Q.  And you printed this out on the
6   same day that you wrote it, September 29th?
7        A.  Yeah, maybe for my records, yes.
8        Q.  Do you see the partially cutoff
9   date at the bottom, it looks like it may say
10  9/29/06?
11       A.  Right.
12       Q.  Does that look accurate to you as
13  the date of printing?
14       A.  Yes.
15       Q.  Did you print out any other e-mails
16  that day?
17       A.  I may have.  I may have printed out
18  all the e-mails I had.
19       Q.  Why did you print out all the
20  e-mails that day?
21       A.  For my records, and I just got a
22  gut feeling that I was being -- that I was
23  being -- having charges piled up against me
24  and I wanted my documentation.
25       Q.  So as of the time when you printed

Page 160

1              C. Newmark
2   out this and other e-mails, you were
3   concerned about the future of your employment
4   at Lawrence Hospital?
5        A.  Absolutely.
6            MS. NICAJ:  Objection.
7        A.  Absolutely.  And I indicated that
8   in one of my other e-mails that I felt
9   vulnerable.
10       Q.  Are you referring to the last line
11  of this e-mail, Defendants' Exhibit J?
12       A.  Yes, yes.
13       Q.  Is there any other e-mail you're
14  referring to?
15       A.  I'm not sure.  I'm referring to
16  this one at this time.
17       Q.  When you wrote this e-mail to Pat
18  Orsaia, did you try to include everything --
19  all the facts you thought were important?
20           MS. NICAJ:  Objection.
21           You can answer.
22       A.  To the best of my recall, yes.
23       Q.  And that was your intention in
24  writing the e-mail in part, correct?
25       A.  No, I just wanted to reiterate what

Page 161

1              C. Newmark
2   we had talked about.  And there was no
3   clarification, as I indicated in the second
4   line, that there were issues raised in the
5   meeting that were not clarified.  They were
6   just left hanging and I just -- I wanted some
7   resolve.
8        Q.  Drawing your attention to the
9   paragraph that begins with a numeral 2, the
10  first line there says, "When I asked Cathy
11  what was the basis for my probation being
12  extended, she stated it was because of
13  attendance."
14           When you wrote that, were you
15  referring to a meeting with Cathy Magone on
16  or about September 12th or 13th?
17       A.  Right, when she mentioned the
18  attendance, yes.
19       Q.  So during that meeting that's on
20  September 12th or 13th, you were told that
21  your probation is being extended, correct?
22       A.  Correct.
23       Q.  You were being told it was because
24  of your attendance?
25       A.  Right.

41  (Pages 158 to 161)

Carole Newmark

Page 162

C. Newmark

1
2    Q.  In that meeting on September 12th
3    or 13th, did you have any -- was there any
4    elaboration of your attendance problems?
5        A.  Not at all.
6        Q.  Did you ask any questions about it?
7        A.  I'm not sure.
8        Q.  You don't remember?
9        A.  No.
10       Q.  Didn't Cathy Magone bring some
11   concerns about your work to your attention in
12   July 2006?
13       A.  Not that I'm aware of.
14       Q.  Do you recall sending Cathy Magone
15   an e-mail asking Ms. Magone if you should
16   consider a prior conversation to be a
17   warning?
18       A.  Yes.
19       Q.  What were you referring to in that
20   e-mail?
21       A.  Okay.  I had gone up to Cathy
22   Magone's office and asked her to please
23   discuss with me the inconsistencies in the
24   procedures between myself and the case
25   manager, and she did not call me there.  I

Page 163

C. Newmark

1
2    went on my own.
3            And she said, "Well, let's talk
4    about something else."
5            And I said, "Well, what is it?"
6            And she said, "It's believed that
7    you are invisible around the hospital."
8            And I said, "What do you mean by
9    that?"
10           She said across the board -- no,
11   she said, "It's believed that you are not
12   able to be reached and that you can't be
13   found anywhere."
14           I told her that I had not only a
15   beeper but I had a Nextel and I had overhead
16   page, that if anyone wanted to reach me, they
17   could reach me very easily, that I didn't
18   know what she was referring to, and I asked
19   her to please let me know who thinks that I'm
20   invisible.
21           And she said across the board,
22   everyone feels that you're invisible.  And I
23   didn't understand the -- I didn't understand
24   why she wouldn't tell me who thinks that I'm
25   invisible, and she wouldn't qualify the

Page 164

C. Newmark

1
2    statement.
3            I said, "Cathy, tell me why someone
4    thinks I'm invisible.  What are the issues?
5    Let's work on them." And she had no comment.
6            Once again, she stood up and said
7    goodbye.
8        Q.  That was the total conversation?
9        A.  That was it.
10       Q.  Why did you send her that e-mail?
11       A.  Because I'm a very
12   policy-and-procedure type person.  And I know
13   that when someone takes me into an office and
14   makes a statement that I'm invisible, that it
15   may mean something else down the line, and I
16   wanted to know if it was a verbal warning.
17           I had supervised people before.  I
18   know when I'm giving someone a verbal
19   warning.  I let them know that I'm giving
20   them a verbal warning, and I also let them
21   know that I am putting a letter or note in
22   their file, so I was just qualifying that.  I
23   just wanted to make sure that wasn't the
24   case.  Because it sounded like it was a
25   reprimand.

Page 165

C. Newmark

1
2    Q.  Did Cathy Magone tell you that she
3    was concerned that you weren't adjusting to
4    the case management model at Lawrence
5    Hospital?
6        A.  Yes, she did.
7        Q.  Was that during that same meeting?
8        A.  No, it was at another time.  I
9    don't recall when.
10       Q.  It could have been in July of 2006?
11       A.  It could have been at any time,
12   because I told her that I was willing to work
13   with her and the case managers to write
14   whatever she felt was not being done the way
15   they wanted it to be done.
16       Q.  To write, as in to correct?
17       A.  Yes.
18       Q.  Did you tell Cathy Magone that you
19   were overworked?
20       A.  I told her that the hospital, in
21   its size and in its patient needs, was
22   overwhelming for two social workers, and
23   that, you know, I felt overworked, yes.  And
24   that I needed some concrete social work job
25   descriptions to clarify what it is that I'm

42  (Pages 162 to 165)

Carole Newmark

Page 166

1    C. Newmark
2  supposed to do.
3       Because there were nine case
4  managers, or eight, who would call me at the
5  same time and I didn't know, you know, I had
6  to stop and prioritize which one should I
7  respond to first. Where should I go first.
8       And then I would get a call from
9  the ER, and I would have to go down there,
10  because someone was overdosing. So I
11  consistently brought this to their attention,
12  as well as Diane Lance.
13       We had several meetings going over
14  paperwork to try to streamline my position,
15  because as I mentioned, when I interviewed
16  with Cathy Magone, she said this is an
17  opportunity -- and I don't know if I
18  mentioned this, but what she said to me was
19  this is an opportunity for you to write your
20  own ticket here and make the job what you
21  want it to be.
22       And so there was really no job
23  description. And I have paperwork at home
24  that indicates when we met, but I have all
25  the paperwork trying to define my position

Page 167

1    C. Newmark
2  and my role at Lawrence Hospital.
3       It was very frustrating to me not
4  to know, you know, where I fit in, what I
5  should do, who I should answer to first. I
6  had many supervisors. Each one of the case
7  managers represented themselves as my
8  supervisor.
9    Q.  Did Cathy Magone ever review your
10  caseload with you?
11    A.  On several occasions, sure.
12    Q.  Do you recall her doing so when you
13  met with her on the occasion that you -- let
14  me rephrase that.
15       You've testified earlier about a
16  meeting after which you sent Ms. Magone an
17  e-mail asking whether you should consider the
18  conversation to be a verbal warning.
19    A.  Uh-huh.
20    Q.  During that conversation that
21  prompted your e-mail, did you and Cathy
22  Magone have a discussion of your caseload?
23    A.  I don't recall. That was a common
24  question on a daily basis. That's a question
25  that he could be asked at any time.

Page 168

1    C. Newmark
2    Q.  Did Cathy Magone tell you you
3  needed to be more proactive in beginning
4  discharge planning the families?
5    A.  Yes.
6    Q.  How many times?
7    A.  Twice maybe.
8    Q.  When?
9    A.  I'm not sure.
10    Q.  Did Cathy Magone tell you that you
11  needed to better prioritize your workload?
12    A.  Not that I recall.
13    Q.  Turning your attention back to
14  Defendants' Exhibit J, your September 29th
15  e-mail, the paragraph that starts numeral 3,
16  the last sentence reads, "Cathy does not know
17  what my capabilities are. She has not taken
18  the time to learn about who I am and know
19  exactly my strengths are."
20       What did you mean by that sentence?
21    A.  What I meant by that was Cathy had
22  not really supervised me until after Diane
23  Lance left. She really didn't know anything
24  about the work that I was doing in the
25  capacity of a social worker, which was very

Page 169

1    C. Newmark
2  different from the -- what the case managers
3  did. She knew nursing and she knew what case
4  managers did as nurses, but she didn't really
5  have a good grasp on what I did as a social
6  worker. She knew nothing about hospital
7  social work.
8    Q.  What do you consider to be the
9  difference between what the case managers
10  were doing and hospital social work?
11    A.  Okay. Hospital social work takes a
12  different bend. Case manager's main focus,
13  which was my focus as well, but not to the
14  same degree, was discharge planning. My role
15  was to assist them in discharge planning and
16  working with difficult patients, patients who
17  didn't believe that they needed to leave when
18  they had to leave.
19       Patients whose families said my
20  loved one is not going home right now because
21  they're not ready. And the case managers did
22  not know how to deal with this and did not
23  know how to go in and finesse the situation
24  and get these people to understand that they
25  can't stay in the hospital.

43  (Pages 166 to 169)

Carole Newmark

Page 170

C. Newmark

1      C. Newmark
2      I was kind of like the closer, so
3  to speak. And I would go in and speak to the
4  families and speak to the patient. And
5  explain to them why they had to leave, that
6  their insurance was not covering their stay,
7  that they might be billed for the time that
8  they were here. And et cetera, et cetera.
9  And that's how my job differed from theirs.
10     They would go in and say you're
11 leaving at 3 o'clock and it could be 10
12 o'clock. They would go in at 10 o'clock and
13 say you're leaving at 3 o'clock, and many
14 families and patients would get upset, and
15 the case managers didn't know how to deal
16 with that. That wasn't their forte.
17     I would go in and explain to them
18 this is why. Perhaps if it needed to be
19 extended for whatever reason, I would work
20 with the doctor. The doctor would say he
21 could stay another day, he's got a fever or
22 whatever, and buy them a little time. It's a
23 very different role.
24     Q.  Drawing your attention to the last
25 paragraph in Exhibit J, the second sentence

Page 171

C. Newmark

1      C. Newmark
2  reads, "I know that she hired me knowing that
3  I am older. However, her comments and
4  actions during the past few months in regard
5  to me have been dismissive and
6  non-supportive."
7      When you're referring to the past
8  few months in that sentence, what period of
9  time are you referring to?
10     A.  I was referring to after I had made
11 my complaint to Pat Orsaia.
12     Q.  You weren't referring to any events
13 that had happened before then?
14     A.  No, no.
15     Q.  Then why did you use the words "the
16 past few months"?
17     MS. NICAJ: Objection.
18     You can answer.
19     A.  Past few months is August,
20 September. It's a few months.
21     Q.  When you said, "I know that she
22 hired me knowing that I am older," what did
23 you mean by that?
24     A.  I was referring to a statement that
25 Pat Orsaia said to me. She said well, she

Page 172

C. Newmark

1      C. Newmark
2  knew you were an older woman when she hired
3  you. If there was age discrimination, she
4  would not have hired you. And that's what
5  I'm referring to here. I didn't -- I wasn't
6  real clear about it. I was just responding
7  to what she had told me.
8      Q.  By the words "the past few months,"
9  were you referring to beginning with your
10 meeting with Pat Orsaia on or about August
11 18th, why did you have the next sentence, "I
12 cannot pinpoint when things changed between
13 Cathy and I"?
14     A.  Well, I couldn't pinpoint to say it
15 was Wednesday, the 14th of whatever. I
16 couldn't, you know, but her interactions with
17 me were very different. They were very
18 dismissive. They were very vague. They were
19 not responsive.
20     Q.  Wasn't Cathy Magone dismissive of
21 you before August 15th?
22     MS. NICAJ: Objection.
23     You can answer.
24     A.  Yeah. She was dismissive, but you
25 know what, I chalked it up to she's busy and

Page 173

C. Newmark

1      C. Newmark
2  whatever. I never really put the pieces
3  together and made connections about anything.
4  I just assumed, you know -- wasn't dismissive
5  in the same way.
6      Q.  How is it different?
7      A.  When someone doesn't make eye
8  contact with you, when someone is insincere,
9  when someone doesn't respond to something you
10 say in a meeting, when prior there was a
11 response, when you are singled out and asked
12 to do certain things that maybe someone else
13 wouldn't do.
14     And I don't have an example of
15 that. I just know -- there was just so much
16 going on. Her whole attitude towards me had
17 changed. She wasn't supportive. I stayed in
18 the ER one night until 7 o'clock. I was
19 supposed to leave at 4. She said the only
20 reason you stayed there was because you
21 couldn't get your work done in a timely
22 manner. That's not supportive.
23     Q.  She was not supportive for you at
24 any time after she became your immediate
25 supervisor, correct?

44  (Pages 170 to 173)

Carole Newmark

Page 174

```
1            C. Newmark
2        MS. NICAJ: Objection.
3        You can answer.
4     A.  She was supportive at times.  Sure
5  she was.
6     Q.  How was she supportive of you at
7  times?
8     A.  I think there is a memo that's
9  floating around somewhere where she said
10 there are problems, but we will work through
11 them and I will help you through that.  Don't
12 worry about it.  Things happen.  We will work
13 through this.  We will work through that.
14 Please keep me abreast of when the case
15 managers treat you unfairly and I will take
16 care of it.  That's supportive.
17        MR. KEIL:  Will you please mark
18    this as Defendants' Exhibit K.
19        (Defendants' Exhibit K, E-mail
20    dated 5/11, marked for identification,
21    as of this date.)
22     Q.  I'm showing you a May 11 e-mail
23  that's been marked as Defendants' Exhibit K.
24        Is this the e-mail that you were
25  just referring to?
```

Page 175

```
1            C. Newmark
2     A.  It might be one of the e-mails or
3  one of the statements that she made to me
4  that showed her being supportive.
5     Q.  Didn't Cathy Magone send you this
6  e-mail before she became your immediate
7  supervisor?
8        MS. NICAJ: Objection.
9        You can answer.
10    A.  I believe she did.
11    Q.  Drawing your attention back to
12 Exhibit J, the next-to-last line of text
13 includes the words, "This makes me feel very
14 vulnerable and insecure about my job at LHC."
15        What were you referring to there?
16    A.  There was a feeling that Cathy was
17 not supportive, that she was not -- after our
18 meeting, you know, I just felt, I felt
19 vulnerable.  I felt vulnerable.  I felt that
20 my job wasn't secure, and as it turns out, I
21 was correct.  So I don't know what to say.  I
22 have a sense of when something is not right.
23 It's intuitive.  It's on the mark.
24    Q.  Weren't you insecure about your job
25 at Lawrence Hospital prior to September of
```

Page 176

```
1            C. Newmark
2  2006?
3     A.  Prior to that?
4     Q.  Yes.
5     A.  Can you repeat that?
6     Q.  Were you insecure about your job at
7  Lawrence Hospital prior to September of 2006?
8     A.  I felt that things were not gelling
9  the way I wanted them to.  When I met with
10 Cathy Magone at one point, and I said to her,
11 I think -- and this may have prompted this,
12 this is Exhibit K, from her, I said that no
13 one could be -- could be harder on me than I
14 am on myself because I have very high
15 standards, and I have taken an oath of ethics
16 in my work as a social worker, and no one can
17 beat me up as well as I can beat myself up.
18        And I knew that I wanted things to
19 be perfect.  And that things weren't
20 happening for me.  And I kept going to her
21 and asking her time after time to please
22 let's meet, let's meet with the case
23 managers, let's get this together.  Let's
24 pull this together, and I wasn't getting the
25 responses that I wanted.  And that's probably
```

Page 177

```
1            C. Newmark
2  why I felt vulnerable.
3     Q.  Did you feel any confusion about
4  your role at Lawrence Hospital as compared to
5  what the case managers were doing?
6        MS. NICAJ: Objection.
7        You can answer.
8     A.  Confused, I wasn't confused.
9     Q.  Did you have any uncertainty about
10 what your role at Lawrence Hospital was
11 supposed to be after Maura Del Bene started
12 working there?
13    A.  It became a little more ambiguous
14 when she came on board, yes.
15    Q.  In what regards did it become more
16 ambiguous?
17    A.  Because we -- social workers were
18 doing that palliative care piece, not calling
19 it palliative care, before Maura Del Bene
20 came on board.  And when she came on board,
21 it wasn't clear what the dynamics would be
22 and how our jobs would be affected, which is
23 why I tried meeting with Maura Del Bene to
24 clarify what the roles are and not reinvent
25 the wheel.
```

45  (Pages 174 to 177)

Carole Newmark

Page 178

```
1            C. Newmark
2      Q.  Did Maura Del Bene help you clarify
3  those roles?
4      A.  She tried.  She tried.
5          MR. KEIL:  I would like this marked
6      as Defendants' Exhibit L.
7          (Defendants' Exhibit L, Document,
8      marked for identification, as of this
9      date.)
10     Q.  Do you remember receiving
11  Defendants' Exhibit L?
12     A.  Yes, I do.
13     Q.  What was your reaction when you
14  received it?
15     A.  That I was never told that she
16  needed to have a project of her own.  I was
17  never told that she needed to have a project
18  of her own.  And to be frank, I think she was
19  covering her ass by sending this.
20     Q.  Why do you think she was covering
21  her ass?
22     A.  I don't know.  She didn't respond
23  to me at any other time, and now all of a
24  sudden I got this a day before she let me go.
25  Oh, that was a Thursday, so I don't know.
```

Page 179

```
1            C. Newmark
2      Q.  Well, in the next to last and last
3  line of the first paragraph, you see the
4  words, "I never intended to imply that you
5  are not chosen because of your age or that
6  anyone's age was relevant to my decision."
7          Did you have any reason to doubt
8  what Ms. Magone was saying there?
9          MS. NICAJ:  Read the entire
10     sentence to yourself.
11     Q.  Read the whole document.
12     A.  That's not what she said to me.
13  She said, Nicole, you know, is younger and
14  can handle the job better.  And can handle
15  the job better.  So I don't know where this
16  came from.
17     Q.  When Ms. Magone wrote to you that
18  she never intended to imply that anyone's age
19  was relevant to her decision, what reason do
20  you have to doubt her saying that?
21          MS. NICAJ:  Objection.
22          You can answer.
23     A.  There was distrust there.
24     Q.  Meaning you did not trust her?
25     A.  Yes.  Based on her attitude and
```

Page 180

```
1            C. Newmark
2  her, just how she treated me, how she treated
3  other people.  There was a sense of distrust.
4  So why would I trust anything she said.  She
5  lied so, you know, why would I believe there
6  was some substance to that.
7      Q.  So your reaction on reading that
8  sentence was that Ms. Magone was lying?
9      A.  Yeah, because she didn't describe
10  Nicole as a new young social worker needing
11  to have a project of her own.
12     Q.  Assuming for the sake of argument
13  that you're assertion is correct, do you have
14  any reason to believe that Ms. Magone was
15  lying when she said that age was not relevant
16  to her decision?
17          MS. NICAJ:  Objection.
18          You can answer.
19     A.  Well, she lied in the beginning
20  saying that she never said it.  So that's the
21  basis of my believing her or not believing
22  her.
23     Q.  So your basis for believing that
24  Ms. Magone was lying in Defendants' Exhibit L
25  is that you believe she was lying in prior
```

Page 181

```
1            C. Newmark
2  meetings you had had with her?
3          MS. NICAJ:  Objection.
4          You can answer.
5      A.  I don't know how to answer that.
6          MS. NICAJ:  Can you rephrase that?
7          MR. KEIL:  Can you read the
8      question back?
9          (Whereupon, the requested portion
10     was read back by the court reporter.)
11     A.  Yes.
12     Q.  Is there any other reason?
13     A.  Not that I can think of at this
14  time.
15     Q.  What do you understand the term
16  palliative care to mean?
17     A.  Palliative care is where a patient
18  is cared for in the later stages of life when
19  they're dying, and palliative care is
20  offering a way for them to die with dignity,
21  without pain and without suffering.
22     Q.  Were you involved in providing
23  palliative care while you were at Lawrence
24  Hospital?
25     A.  Yes, I was.
```

46  (Pages 178 to 181)

Carole Newmark

1           C. Newmark
2     Q.  Did you provide palliative care
3  during the entire time that you worked at
4  Lawrence Hospital?
5     A.  For the most part, yes.
6     Q.  Starting in approximately March of
7  '06 through your last week of employment?
8     A.  Yes.  Not palliative care in the
9  sense of providing medication for pain, but
10 providing a source of compassion.  A source
11 of just being there with someone.  Holding
12 someone's hand as they're dying.  That's my
13 piece in the palliative care piece.
14    Q.  Are you licensed to prescribe
15 medication?
16    A.  No, I'm not.
17    Q.  Was a formal palliative care
18 program operating at Lawrence Hospital when
19 you started work there?
20    A.  No, not in the true sense of a
21 palliative care unit or center.
22    Q.  When did it begin?
23    A.  It began to my -- to the best of my
24 knowledge, when Maura Del Bene was hired as a
25 nurse practitioner to be a liaison between

1           C. Newmark
2  Jansen Memorial Hospice Care and the hospital
3  working with Dr. Page.
4     Q.  Did the palliative care program
5  have dedicated staff at Lawrence Hospital?
6     A.  Maura Del Bene.
7     Q.  Anyone else?
8     A.  Nicole Serra.
9     Q.  Did you participate at any meetings
10 regarding the creation of the palliative care
11 program?
12    A.  Early on, I did.  I met with Maura
13 one or two times.  Then it became a little
14 more complicated to meet with her.  Her time
15 to meet was basically early in the morning.
16 She came in at 9 o'clock.  I came in at 8.
17 So she would want to meet at 9:30 or so.
18    I had line up at 10 and I was busy
19 getting my patients for the day, so we really
20 didn't meet as often as I would have liked to
21 because I didn't have the liberty of time.
22    Q.  Did you ask Ms. Del Bene if you
23 could meet at another time that was more
24 convenient to you?
25    A.  Yes, we tried on several occasions

1           C. Newmark
2  to meet up at different times.
3           MR. KEIL:  I would like this marked
4     as Defendants' Exhibit M.
5           (Defendants' Exhibit M, E-mail
6     exchanges, marked for identification, as
7     of this date.)
8     Q.  I've handed you a series of e-mail
9  exchanges.  It's three pages.  It's been
10 marked as Defendants' Exhibit M.  Why don't
11 you just take a quick look through it to
12 familiarize yourself with it.
13    Are you ready?
14    A.  Yes.
15    Q.  In the last -- in the top message
16 in the e-mail exchange listed as Defendants'
17 Exhibit M, that was sent by you on Monday,
18 June 5th, there is a reference to trying to
19 meet on the following Wednesday at 2:00 p.m.
20    Do you see that?
21    A.  Yes.
22    Q.  Did you meet with Ms. Del Bene on
23 that Wednesday?
24    A.  I don't recall.
25    Q.  A little bit further down on that

1           C. Newmark
2  first page there is a message you sent
3  Ms. Del Bene, "Hi, Maura, I'm so sorry about
4  missing our meeting yesterday."
5     Do you recall the circumstances of
6  your missing that meeting?
7     A.  It probably had to do with
8  something, with a patient, patients are a
9  priority.  Meetings we can reschedule to talk
10 about things.
11    Q.  Do you remember the reason why you
12 missed that meeting?
13    A.  I don't.
14    Q.  Did Maura Del Bene propose regular
15 meetings on Mondays at 9 a.m. to discuss
16 palliative care?
17    A.  She did.
18    Q.  Did you accept that as a meeting
19 time?
20    A.  I told her that was not a good time
21 because there were discharges that needed to
22 be done from the weekend, I didn't work
23 weekends, and that Monday was a very, very
24 busy time.  Almost as busy as Thursdays and
25 Fridays were, and that Wednesdays were a

47  (Pages 182 to 185)

Carole Newmark

| Page 186 |
| --- |

```
1              C. Newmark
2    better time for us to meet.
3          Mondays generally were very hectic.
4    The voice mails, 20, 30 voice mails on the
5    phone, you know, come in, take your
6    assignments, get everything together.  It was
7    not a good time.  9 o'clock was not a good
8    time.
9        Q.  Did you propose another date and
10   time for regular meetings?
11       A.  I proposed, as I said here,
12   Wednesday at 2:00.
13       Q.  I show you Defendants' Exhibit M,
14   you're referring to Wednesday in general at
15   2:00, or simply Wednesday, June 7th?
16       A.  At that particular time it was
17   probably for the Wednesday that followed --
18   yeah, June 5th, right.
19       Q.  How did Ms. Del Bene respond to the
20   proposal to reschedule meetings in general
21   for Wednesday?
22       A.  I don't recall.
23       Q.  Did you have any meetings with
24   Ms. Del Bene Mondays at 9 a.m.?
25       A.  When she first came on board, I
```

| Page 187 |
| --- |

```
1              C. Newmark
2    did.  I had them with both her and Nicole.
3        Q.  Do you know if Nicole Serra
4    attended any meetings with Maura Del Bene
5    Mondays at 9 a.m. in your absence?
6        A.  She may have.
7        Q.  Do you know one way or the other?
8        A.  No, I don't.  I didn't micro-manage
9    Nicole.  Once Nicole was set, she did her
10   thing.  She came in and did what she had to
11   do.
12       Q.  Was this during the first couple of
13   months when she was shadowing you or did that
14   start afterwards?
15       A.  Much afterwards.
16       Q.  While Ms. Serra was shadowing you,
17   did she attend the same meetings that you
18   did?
19       A.  Yes.
20       Q.  Including those with Maura Del
21   Bene?
22       A.  Maura wasn't there then.  Maura
23   came on, I don't know her hire date, it was
24   sometime, I believe, in June -- May, end of
25   May, June.
```

| Page 188 |
| --- |

```
1              C. Newmark
2        MR. KEIL:  I would like this marked
3    as Defendants' Exhibit N.
4        (Defendants' Exhibit N, E-mail
5    exchange, marked for identification, as
6    of this date.)
7        Q.  Ms. Newmark, you have been handed
8    an e-mail exchange that's been labeled as
9    Defendants' Exhibit N.
10       Do you remember this e-mail
11   exchange with Maura Del Bene?
12       A.  Let me read it.
13       Yes.
14       Q.  In what you wrote on July 5th, it
15   says let's talk, okay.  Did you schedule time
16   with Maura Del Bene to discuss a bereavement
17   process?
18       A.  I don't recall.  I probably did.  I
19   probably did if she wanted to go over the
20   process, because it was confusing as to where
21   we were going with it, what was happening.
22       Q.  Do you recall having a discussion
23   with Maura Del Bene about the bereavement
24   process?
25       A.  No.
```

| Page 189 |
| --- |

```
1              C. Newmark
2        Q.  Did you ever put together a policy
3    for the bereavement process?
4        A.  No.
5        Q.  Do you know who did?
6        A.  I would assume that it was Maura
7    and Dr. Page.
8        Q.  Did you understand the bereavement
9    policy to be a part of the palliative care
10   service?
11       A.  Yes.
12       Q.  Why didn't you put together the
13   bereavement policy?
14       MS. NICAJ:  Objection.
15       You can answer.
16       A.  No one ever asked me to do that.
17       Q.  Did Maura Del Bene invite you to
18   coffee to discuss the bereavement process?
19       A.  We met over coffee a few times.
20       Q.  To discuss that topic?
21       A.  I think to just discuss palliative
22   care in general.  And also how things were
23   working on the units.  She had a lot of
24   complaints about case managers also and how
25   things were done.  And her role in working
```

48  (Pages 186 to 189)

Carole Newmark

Page 190

C. Newmark
1  C. Newmark
2  with case managers. She had some
3  difficulties as well.
4      Q. You mentioned a case manager
5  earlier named Kitty.
6          Was her given name Thelma Gordon?
7      A. Yes.
8      Q. Did Maura Del Bene contact you
9  while you were working at Lawrence Hospital
10 to assist her in providing palliative care in
11 particular cases?
12     A. On numerous occasions.
13     Q. How many times?
14     A. As the need arose. I couldn't give
15 you a number.
16     Q. Do you know whether Maura Del Bene
17 contacted Nicole Serra to get her assistance
18 on providing palliative care in particular
19 cases?
20     A. Yes, at times she did, yes.
21     Q. Maura Del Bene contacted you to
22 assist with palliative care cases after you
23 complained to Pat Orsaia on or about August
24 15th, correct?
25     A. Can you repeat that?

Page 191

1      C. Newmark
2      Q. Did you work on any palliative care
3  cases with Maura Del Bene after you
4  complained to Pat Orsaia?
5      A. I'm sure I did. It was an ongoing
6  thing. It depended on who the patient was
7  and what their need was.
8      Q. Did the number of palliative care
9  cases you worked on or their frequency drop
10 off after you complained to Pat Orsaia?
11     A. They dropped off after Nicole Serra
12 was assigned to the palliative care center.
13     Q. Did you refer any cases to Maura
14 Del Bene that you felt would be appropriate
15 for palliative care service?
16     A. Yes.
17     Q. Approximately how many?
18     A. 20. That's a ballpark figure.
19     Q. Did Maura Del Bene ever ask you to
20 sit in on any meetings she was having with
21 families?
22     A. Yes.
23     Q. How many times?
24     A. Whenever she felt that it was a
25 shared case, that it was my patient and there

Page 192

1      C. Newmark
2  was some issue, she always invited me to join
3  in on a meeting.
4      Q. Did you join her on those meetings?
5      A. Yes.
6      Q. All of them?
7      A. May not have been all of them, no,
8  but we always made contact afterwards and
9  discussed the case, because it was my
10 patient. And the reason I didn't meet with
11 her perhaps is because I was busy with
12 another family or another patient.
13     Q. You didn't tell Maura Del Bene that
14 you had already met with the family and it
15 wasn't necessary to meet with them again?
16     A. Perhaps I did on occasion, sure.
17     Q. More than once?
18     A. Maybe, yes. That wasn't unusual.
19 If I had met with them, she had a different
20 bend. She had a very different bend. So I
21 may have met with them at a certain level and
22 then she met with them to talk more about --
23 she was a nurse practitioner, so she knew
24 about the medical status of the patient and
25 things that, you know, were not in my realm

Page 193

1      C. Newmark
2  of knowledge.
3          So she would meet with them and
4  give them the odds; your father has this,
5  your mother has this, this is what's going to
6  happen. Many times I set patients up for her
7  and talked about cavalry or going on to
8  hospice or whatever, and she would come in
9  and talk to them.
10     Q. Did you tell Maura Del Bene that
11 you believe that social workers were poorly
12 utilized at Lawrence Hospital?
13     A. I don't recall saying that. I
14 don't recall saying that.
15     Q. Did you tell Maura Del Bene that
16 you felt that social workers were treated
17 like dogs?
18     A. I don't recall saying that.
19     Q. Did you tell Maura Del Bene that
20 social workers were expected to do the
21 bidding of nurses and case managers?
22     A. The what?
23     Q. Did you tell Maura Del Bene that
24 social workers were expected to do the
25 bidding of nurses and case managers?

49 (Pages 190 to 193)

Carole Newmark

**Page 194**

1         C. Newmark
2      A.  I don't even understand that
3  question, because I never heard that before.
4  My answer is no.
5      Q.  Did you tell Maura Del Bene that
6  social work takes time and isn't about
7  completing tasks?
8      A.  I may have said that working with
9  patients and families who are dying does take
10  time, and that's a fact.
11      Q.  Did you complain to anyone at
12  Lawrence Hospital that there were not enough
13  social workers?
14      A.  Absolutely.
15      Q.  Who did you complain to?
16      A.  Cathy Magone.
17      Q.  Anyone else?
18      A.  Maybe the case managers.
19      Q.  Were you aware that there was a
20  hiring freeze at Lawrence Hospital in 2006?
21      A.  I have no idea.
22      Q.  Approximately how many active cases
23  did you have on a given day after Nicole
24  Serra started working at Lawrence Hospital?
25         MS. NICAJ:  Objection.

**Page 195**

1         C. Newmark
2      You can answer.
3      A.  It varied.  It depended on the need
4  for social work intervention, so it varied.
5  There were times when I would have four or
6  five.  There were other times when I would
7  have 12 and 15.  It depended on what
8  intervention was required.  And how I got my
9  referrals.
10      Q.  On average, how many new referrals
11  did you receive each day?
12      A.  Anywhere between 4 and 15.
13      Q.  What were your responsibilities
14  with regard to a new referral?
15      A.  New referral to go in and do a
16  biosocial on them.  To see what their needs
17  were.  To ascertain if there was anything I
18  could do for them to help them with the
19  discharge process in tandem with the case
20  managers.  There was casework that was done.
21  There were referrals to nursing homes.  There
22  were referrals to hospices.
23      There were referrals to department
24  of social services.  Sometimes it was just a
25  matter of sitting and listening and listening

**Page 196**

1         C. Newmark
2  to someone and making sure they understood
3  that they were heard because they were in
4  pain, either emotionally or physically.
5      Q.  Now, you said at any given time you
6  could have 4 to 15 active cases, but you were
7  also receiving anywhere from 4 to 15 new
8  referrals a day?
9      A.  Anywhere from there, and if it
10  became overwhelming, sometimes Nicole and I
11  would split them.  If it was the opposite,
12  where in her unit there were too many cases,
13  I would step in and do them.
14      Q.  Do you have an understanding of
15  what Nicole Serra's caseload was at the same
16  time in terms of active cases?
17      A.  It's about the same.  At one point
18  I kept each and every face sheet on the
19  patients that I had and I had tons of face
20  sheets.  I destroyed them when I left.
21      Q.  Approximately how many were there?
22      A.  That I had seen over the period
23  that I was there.  I don't know.  Anywhere
24  from given 4 to 15 a day, I can only
25  approximate for each week, 16 to 20 a week at

**Page 197**

1         C. Newmark
2  the low end and then, you know.
3      Q.  How many visits did you have with
4  each patient that was referred to you?
5      A.  Whatever was required.  There was
6  no set number of times that you should see a
7  patient.
8      (Recess taken from 3:29 p.m. to
9  3:33 p.m.)
10      Q.  Are you ready, Ms. Newmark?
11      A.  Yes, I am.
12      Q.  When you had worked at Phelps
13  Memorial Hospital, you had been providing
14  outpatient social work services?
15      A.  Outpatient mental health.
16      Q.  Outpatient mental health.
17      What was your caseload at any given
18  time at Phelps Memorial Hospital?
19      A.  Patient-wise?
20      Q.  Yes.
21      A.  The average patient caseload was
22  70.
23      Q.  That you, yourself, were
24  responsible for?
25      A.  Yes.

50  (Pages 194 to 197)

Carole Newmark

Page 198

1    C. Newmark
2    Q.  Did you find your caseload at
3  Lawrence Hospital overwhelming?
4    A.  No.
5    Q.  Did you find your caseload at
6  Lawrence Hospital more than you can handle
7  successfully?
8    A.  No.
9    Q.  But you did mention to people at
10 Lawrence Hospital that you felt overwhelmed?
11   A.  I felt overwhelmed with the
12 inconsistencies and with the lack of
13 direction as to who did what and why.  That's
14 what became overwhelming.  The patients never
15 became overwhelming.
16   Q.  Do you recall a length-of-stay
17 meeting during which Cathy Magone asked you
18 about your cases and you said you weren't
19 familiar with them?
20   A.  Yes, I do.
21     MS. NICAJ:  Objection.
22     You can answer.
23   A.  Yes, I do.
24   Q.  When was that?
25   A.  I don't recall when it was, but I

Page 199

1    C. Newmark
2  do recall the meeting.
3    Q.  And you told Cathy Magone that you
4  had not seen any of your cases yet that day?
5    A.  No, I didn't say that.  What I said
6  was that I didn't have -- usually I had a
7  binder with all of the face sheets of each
8  patient who came in or each patient I was
9  following.  And I would write on that face
10 sheet whatever work I was doing with them
11 because there were so many patients that it
12 was hard to keep track of them.  You just
13 can't.  They're in and out so quickly.
14     So I was organized in having it in
15 a binder.  That particular day I was held up
16 and I didn't go to lunch til late, and I
17 grabbed lunch and then the length of stay
18 meeting was happening.  And instead of going
19 back to my office and grabbing my binder with
20 all of my gear and all of my stuff in there
21 and my patient caseload, I just went up to
22 the meeting without it.
23     I had never done that before.  I
24 could tell her who the cases were, some of
25 the cases I was working on, but I couldn't

Page 200

1    C. Newmark
2  tell her all of them because I didn't have it
3  in front of me.
4     Nicole Serra or any one of the case
5  managers could not say who their patients are
6  without having a list of them in front of
7  them.  That particular day I was rushing and
8  I didn't want to be late for her meeting, so
9  I didn't stop back at my office to get what I
10 needed.
11   Q.  When you say face sheets, could you
12 describe the document for me?
13   A.  Sure, it's a face sheet.  When a
14 person is admitted to the hospital there's
15 the name, the address, all of the
16 demographics, all of the personal
17 information, a diagnosis, insurance
18 information.  It's a face sheet on that
19 person.
20     We would get them through the fax
21 machine and that's how we would get who --
22 one way of receiving our patients.  And I
23 would write on that sheet.  You know, spoke
24 to the wife today, et cetera, or you know,
25 spoke to Visiting Nurse Service.  So I could

Page 201

1    C. Newmark
2  keep on top of what I was doing with each
3  person.
4    Q.  Were the face sheets separate from
5  social work notes that would go in the
6  patient's file?
7    A.  Yes.
8    Q.  Did copies of the face sheets that
9  you wrote on go into the patient's file?
10   A.  No.  Information from the face
11 sheet could go into a note, and as I said,
12 you know, I document, because if you don't
13 document, it didn't happen.
14     So I would use the computer to
15 document when I saw a patient.  I would use
16 the computer.  I didn't use the same -- I
17 didn't use and I wasn't trained on the same,
18 I don't know what you call it, the same site
19 or whatever that the case managers used.
20   Q.  Is that Meditech?
21   A.  If it was Meditech or something
22 else, but they used one thing and social
23 workers used something else.  And sometimes
24 the case managers didn't know that we put our
25 notes in this other place and would say,

51 (Pages 198 to 201)

Carole Newmark

Page 202

1          C. Newmark
2    either write a note and then I would bring it
3    up and say here it is.
4          Q.  So when you entered your social
5    work notes for a particular patient, you
6    would enter it directly into the computer
7    system at the hospital?
8          A.  Yes.
9          Q.  Through whatever application?
10         A.  Right.  There was no paper.
11         Q.  Other than your face sheets?
12         A.  Other than my face sheets, that
13   stayed with me.
14         Q.  Do you know whether Nicole Serra or
15   any of the case managers had the same
16   practice of keeping face sheets on the
17   patients assigned to them?
18         A.  I don't know what the case managers
19   did, but Nicole Serra did that.
20         Q.  Was that as a result of your
21   instruction?
22         A.  Yes, and it was practical.  That
23   was our way of tracking who we were seeing.
24   We also had a notebook that we would write
25   various things in if the face sheet became

Page 203

1          C. Newmark
2    not enough, we would write front and back,
3    you know.
4          Q.  During this length-of-stay meeting
5    where you didn't have your paperwork with
6    you, did you tell Cathy Magone that you had
7    not seen any of your patients yet that day?
8          A.  I highly doubt that.  What would I
9    be doing from 8 o'clock to 1 o'clock.
10         Q.  Do you remember one way or another
11   whether you said that to her?
12         A.  I don't believe I would say that
13   because I was there.  I had to see patients.
14         Q.  Do you recall a situation on or
15   about August 31st of '06 where the case
16   manager Suzanne complained that a family had
17   had not been properly prepared for entering
18   their -- the patient into a nursing home?
19         MS. NICAJ:  Objection.
20         You can answer.
21         A.  I wasn't aware of it until I read
22   the statement.
23         Q.  Not until the litigation?
24         A.  Yes, not aware of that at all.
25         Q.  You don't know one way or another

Page 204

1          C. Newmark
2    whether that situation happened?
3          A.  I have no way of knowing.
4          Q.  What's a PRI screening?
5          A.  It's a patient review instrument.
6    You need training to do that.  What it is,
7    it's a screening on a patient in order to get
8    them into a nursing home and they can't be
9    admitted to a nursing home without this PRI.
10         And the case managers, I think
11   there was only one who could do it, I was the
12   only other person who could do it.  Nicole
13   did not have the training to do it.  I had
14   set it up at some point but was not doing it
15   yet.  So I had to do every PRI of every
16   patient who went into a nursing home.
17         Q.  Approximately how many PRIs did you
18   need to do a day?
19         A.  It varied.  It varied from none to
20   maybe 10 in a day.  Anywhere in between
21   there.
22         Q.  Do you recall hearing from Cathy
23   Magone on or about September 1st that a case
24   manager named Collette had complained about
25   you're not completing a PRI as requested?

Page 205

1          C. Newmark
2          MS. NICAJ:  Objection.
3          You can answer.
4          A.  Collette complained a lot about a
5    lot of things.  For me to delineate when she
6    complained and what she complained about
7    would be very difficult for me.  Collette
8    would pick up the phone and scream at me to
9    get there and do a PRI when the patient was
10   just about ready to leave, which was unfair
11   because the patient had been there for days,
12   and had she given me a heads-up, I would have
13   been able to do that in a timely manner.
14         So this is someone who enjoys
15   instant gratification.  And so if I'm working
16   somewhere else, like in the ICU or in the ER
17   or on a unit with a family and she calls me,
18   I would jot it down as I did with every case
19   manager and then I would have to prioritize
20   which unit and which patient I would see
21   next.
22         So if she asked for a PRI and I
23   didn't run and jump, she would call Cathy
24   Magone and she would say I asked Carole to do
25   a PRI.  She's not doing it, which is not

52 (Pages 202 to 205)

Carole Newmark

<table>
<tr><td>

Page 206

1         C. Newmark
2  true.
3      Q.  Do you remember Cathy Magone
4  contacting you about that?
5      A.  She probably did on an occasion or
6  two.
7      Q.  Do you recall it?
8      A.  Not in detail.
9      Q.  Do you recall how you responded to
10  Cathy Magone?
11      A.  I probably said that I was busy
12  doing something and that I would get to it,
13  which was my usual response. I didn't leave
14  my job at 4 o'clock. I usually stayed until
15  everything was done.
16      Q.  What time did you normally leave
17  your job?
18      A.  4 o'clock. I was supposed to leave
19  at 4 o'clock.
20      Q.  What time did you actually leave
21  your job?
22      A.  I tried to leave at 4 o'clock.
23  Many days I was there until five or six. If
24  there was a PRI or anything that needed to be
25  done, I would stay and do it.

</td><td>

Page 208

1         C. Newmark
2      Q.  Did you ever hear about a situation
3  about a patient who was assigned to you was
4  discharged from the hospital without suitable
5  clothing?
6      A.  Yes, I did.
7      Q.  How did you hear about it?
8      A.  I heard about it from Collette who
9  called me. I was in my office making phone
10  calls to patients, families and following up
11  on some things. It was, I would venture to
12  say, 3 o'clock, 3:30, which was kind of the
13  time I would wind down, go back to my office
14  and kind of clean up for the next day.
15      She called me to say that a patient
16  that I had met, I believe that day for the
17  first time, patient had been in the hospital
18  for several days, and I may be wrong, I may
19  have seen him the day before or maybe that
20  day, I'm not sure, but he was there for
21  several days. I didn't get the referral
22  until she called me and started screaming
23  that the man -- I got the referral. I saw
24  him. I saw him. I met with him.
25      We ascertained that he was going

</td></tr>
<tr><td>

Page 207

1         C. Newmark
2      Q.  Was there a policy or practice at
3  Lawrence Hospital about how quickly a patient
4  should be seen after being referred to you?
5      A.  No. I believe it's in a timely
6  manner, which I understood.
7      Q.  And what would you consider to be a
8  timely manner?
9      MS. NICAJ: Objection.
10      You can answer.
11      A.  A timely manner would be within a
12  day, depending on what other things I was
13  working on.
14      Q.  Were there any policies or
15  practices at Lawrence Hospital about how
16  often patients referred to you for social
17  work that should be followed up on?
18      A.  How often?
19      Q.  Yes.
20      A.  Not that I'm aware of. It was at
21  my discretion. Some people required more
22  visits than others. Some people just
23  required one time, go in, ask them questions,
24  get the information, give it back to the case
25  managers for discharge.

</td><td>

Page 209

1         C. Newmark
2  home. He was -- he had some psychiatric
3  problems. I ascertained that he was going
4  home. That a friend was going to pick him
5  up. I said is there anything you need,
6  anything that we can do for you.
7      He said no. He was a very
8  difficult patient and he was a very difficult
9  patient to work with. I looked at the side
10  of his dresser, he had a pair of pants and
11  shirt. He had his shoes. He was ready to
12  go.
13      So I went, I did my note. I went
14  back to my office. I get a screaming call
15  from Collette. Get over here. The patient
16  is leaving and he has no clothes on. So that
17  seemed to be something that was a priority.
18      So I went back to the unit. He was
19  sitting in front of the nurses' station in a
20  gown, in a nursing gown.
21      I said, "Where are you going like
22  that?"
23      He said, "I'm going home."
24      I said, "Where are your clothes?"
25      He said, "I don't want to wear

</td></tr>
</table>

53 (Pages 206 to 209)

Carole Newmark

```
 1            C. Newmark
 2  clothes." I said -- we had a little chat.
 3  And he left. His friend came and wheeled him
 4  out. There wasn't much I could do.
 5        First of all, I'm not responsible
 6  for dressing patients. It's not my role to
 7  do that. That's number one.
 8        Number two, I can't make a person
 9  put their clothes on. So he left. What I
10  was able to do for him, knowing he had a
11  psychiatric background, was I called Visiting
12  Nurse Service, and he had no insurance and he
13  had no money. I was able to get him Visiting
14  Nurse Service gratis, which is almost unheard
15  of. No one acknowledged that I did this, but
16  they acknowledged that I let him leave the
17  hospital without clothes, which is ludicrous.
18     Q.  Which division of Visiting Nurse
19  Service did you contact?
20     A.  Visiting Nurse, I believe, of
21  Westchester. I had called a few. I'm not
22  certain if that's -- I think it was
23  Westchester. It wound up to be Visiting
24  Nurse, or maybe Dominican Sisters. I'm not
25  sure. I was able to get the point across
```

```
 1            C. Newmark
 2  that this was someone who really needs some
 3  after care and had no insurance and was there
 4  some kind of slush fund that they had so they
 5  could see him.
 6        I've never done this in my career,
 7  and I was able to get it for him. I was
 8  never commended on that, but I was raked
 9  across the coals for letting him leave
10  without clothes on.
11     Q.  The registered nurse that had
12  attended the disaster mental health training
13  with you, Rita Barbieri --
14     A.  I believe that's her name.
15     Q.  Did she send you an e-mail about
16  the disaster mental health project in
17  September or October?
18     A.  I don't recall.
19     Q.  Let's back up to your interview
20  with Cathy Magone. You testified earlier you
21  believe that you remembered an interview in
22  approximately December of 2005?
23     A.  It was actually December 1st.
24     Q.  December 1, 2005?
25     A.  Yes.
```

```
 1            C. Newmark
 2     Q.  Do you know if Ms. Magone
 3  interviewed any other applicants?
 4     A.  I had no knowledge of that.
 5     Q.  As best you can recall, what did
 6  Cathy Magone say to you during that
 7  interview?
 8     A.  She was describing the new case
 9  management model that was at Lawrence
10  Hospital. She was explaining that things
11  were different from the time that I worked
12  there, but she didn't think that would be a
13  problem.
14        She described the palliative care
15  center. She talked about how the case
16  managers could be difficult, but she felt I
17  had the skills, being someone who worked in
18  mental health, to work with them.
19        She talked about salary. Basic
20  things. That there were not going to be any
21  social workers there, that I would be the
22  only one, but they would get a temp to work
23  with me in the beginning. And then I could
24  be part of the process of hiring another
25  social worker, possibly two, because she knew
```

```
 1            C. Newmark
 2  she needed more than one social worker.
 3        She asked me if -- I don't know if
 4  it was then. I recall getting resumes from
 5  her before I was hired on different people
 6  for social workers she felt I might be able
 7  to work well with. Looking at their resumes
 8  -- I wasn't hired at the time, and I did it,
 9  gave her my feedback, so I assumed there was
10  going to be another social worker hired and
11  eventually there was, Nicole.
12        I think that's about it. It was
13  rather quick. It was after work hours. I
14  got out of work at five. I got there about
15  5:30.
16     Q.  Did you have any discussions with
17  Cathy Magone prior to beginning work at
18  Lawrence Hospital about what your job title
19  would be?
20     A.  Yes.
21     Q.  When did those discussions take
22  place?
23     A.  After the interview, I believe.
24  Although I'm not certain. We had talked
25  before I came to visit with her also. She
```

54 (Pages 210 to 213)

Carole Newmark

Page 214

```
1              C. Newmark
2  assured me it wouldn't be Denise Galloway's
3  title because she was like, I don't know,
4  assistant director or whatever of social
5  work. I don't know what her title was. She
6  assured me that wouldn't be it, but it would
7  be a senior social worker.
8         At the time of interview, she also
9  told me that this would be a wonderful
10 opportunity to utilize my mental health
11 skills because of the palliative care
12 situation. And the need for someone who is
13 compassionate and who could work with people.
14        She also said this is a job you
15 could write your own ticket, Carole, because
16 we really don't have a profile of what we
17 want.
18     Q.  Did you accept the proposed title
19 of senior social worker?
20     A.  Yes.
21     Q.  You understood your employment at
22 Lawrence Hospital to be employment at will at
23 all times?
24     A.  I think I know that's -- yeah.
25     Q.  Yes?
```

Page 215

```
1              C. Newmark
2      A.  I didn't give it any thought. I
3  had no reason to think about that.
4      Q.  You recommended Nicole Serra to be
5  hired as a social worker at Lawrence
6  Hospital?
7      A.  Yes.
8      Q.  Did you take any steps to recruit
9  Nicole Serra?
10     A.  I didn't. I told Nicole there was
11 a position available. I knew that Nicole
12 didn't want to work at Phelps anymore. I
13 gave Cathy Magone her name and her number,
14 and I told Nicole Serra that I was not
15 promising her anything. That I didn't -- I
16 was not the one to hire her. That it was
17 Magone's decision, and that's where I left
18 it.
19     Q.  Did you participate in the
20 interview of Nicole Serra?
21     A.  I did not.
22     Q.  What was your understanding of what
23 Nicole Serra's job at Lawrence would be?
24     A.  She would be a hospital social
25 worker who would report to me as the senior
```

Page 216

```
1              C. Newmark
2  social worker. And she would do the same
3  duties that I would do after being trained.
4      Q.  What was her job title?
5      A.  I think social worker.
6      Q.  Did you consider yourself Nicole
7  Serra's supervisor while the two of you
8  worked at Lawrence together?
9      A.  Yes.
10     Q.  Did you have the authority to
11 adjust Nicole Serra's rate of pay?
12     A.  No.
13     Q.  Did you have the authority to
14 approve her request for time off?
15     A.  She gave them to me and then I gave
16 them to Magone.
17     Q.  Or to Diane Lance at the time?
18     A.  Yes, or to Diane Lance at the time.
19     Q.  When you gave those requests to
20 Ms. Lance or Ms. Magone, did you make any
21 comment or recommendations about whether you
22 thought the request for time off should be
23 approved?
24     A.  No, that was at their discretion.
25     Q.  Did you have the authority to issue
```

Page 217

```
1              C. Newmark
2  discipline or corrective action to any
3  hospital employees?
4      A.  Not on paper.
5      Q.  Did you in practice?
6      A.  Can you define disciplinary action?
7      Q.  Anything from verbal warning to
8  termination?
9      A.  No. My understanding is that I
10 would be responsible for the day-to-day
11 activities of the social worker, whether it
12 be Nicole or anyone else.
13     Q.  So would it be fair to say you
14 understood your supervisory capacity to be
15 with respect to the quality of Nicole Serra's
16 social work?
17     A.  Yes.
18     Q.  And no other aspect of her
19 employment?
20     A.  No, just in making sure that she
21 met certain requirements, that she was there
22 on time, that she left on time, that she, you
23 know, was responsible for the cases that she
24 was assigned.
25     Q.  Did you keep track of Nicole
```

55 (Pages 214 to 217)

Carole Newmark

| Page 218 |
| --- |

```
1              C. Newmark
2    Serra's time reporting to work and departing
3    from work?
4         A.  I didn't do it formally.
5         Q.  When you say you didn't do it
6    formally, did you keep written records of her
7    time?
8         A.  No.  We were exempt employees, so
9    we usually came in on time and stayed late on
10   occasion.
11        Q.  In your view, did you and Ms. Serra
12   have the same job at Lawrence Hospital or
13   different jobs?
14        A.  By virtue of my title and by virtue
15   of the fact that I was told that I was
16   supervising her, I assumed that I was her
17   supervisor.  However, I didn't treat her in
18   any other way other than a colleague and a
19   collateral.
20        Q.  Were there any social work cases or
21   assignments that you believed were
22   appropriate for you to handle but not Ms.
23   Serra?
24        A.  At the onset of her employment,
25   yes.
```

| Page 219 |
| --- |

```
1              C. Newmark
2         Q.  During the first couple of months?
3         A.  Sure.
4         Q.  How about after that?
5         A.  She would call me.  She would get
6    cases, as I would off, the fax through
7    doctors, et cetera, and if there was
8    something that she didn't understand or she
9    didn't know, she would call me and I would
10   assist her in working through it.
11        Q.  But subject to consultation, there
12   were no cases or assignments that she was not
13   equipped to handle?
14        A.  There was a lot that she had to
15   learn.  I gave her the easier assignments,
16   the medical surgical unit, you know, things
17   that were a lot more, for lack of a better
18   word, palatable for someone who was new at
19   social work.  I took on the more difficult
20   units because I knew what I was doing and I
21   knew how to do it.
22             She eventually, as she followed me
23   and she shadowed me, was learning what I did
24   and after a while -- we still had our
25   assigned units, but we would cross-cover each
```

| Page 220 |
| --- |

```
1              C. Newmark
2    other a lot also, if I was out or if she was
3    out.
4         Q.  Did she learn her job well at
5    Lawrence Hospital while you were there?
6         A.  She learned it fairly well.  It's
7    the type of job that you learn on the job.
8    It's not something you can really -- it's as
9    things come up, that's how you deal with
10   them.
11        Q.  Did you have occasion to observe
12   Nicole Serra's working relationship with
13   Maura Del Bene?
14        A.  On occasion.
15        Q.  How would you characterize it?
16        A.  Maura and --
17        Q.  Ms. Serra.
18        A.  It was amicable.  It was
19   professional.  I observed that Nicole would
20   ask her a lot more questions than I would ask
21   her, but I knew the answers to some of the
22   things that she was asking her.  She was very
23   curious and willing to learn and wanting to
24   learn, so she would align herself with Maura
25   and I thought it was wonderful.  If she could
```

| Page 221 |
| --- |

```
1              C. Newmark
2    learn more from anyone, it was great.
3         Q.  Do you believe that Lori Bachmann
4    has information that supports your claims of
5    age discrimination and retaliation?
6         MS. NICAJ:  Objection.
7         You can answer.
8         A.  Do I believe that she has
9    information?
10        Q.  Yes.
11        A.  Only what I've told her.
12        Q.  When was the last time you spoke or
13   wrote or met with Lori Bachmann?
14        A.  The day before I was, or the day I
15   was terminated.
16        Q.  Did you repeat to Lori Bachmann the
17   words that Cathy Magone had said to you when
18   she was explaining her decision to appoint
19   Nicole Serra rather than yourself to the
20   palliative care team?
21        A.  I didn't tell her initially because
22   I felt that there was enough dissension
23   amongst these case managers, and there was
24   enough problems between case managers and
25   Cathy Magone and I didn't want to fuel that
```

56  (Pages 218 to 221)

Carole Newmark

Page 222

```
1           C. Newmark
2  fire. So I remained very neutral, and I did
3  not tell Lori Bachmann until much later what
4  was going on.
5       Q.  When did you tell her?
6       A.  Maybe a month or so after, after I
7  met with Magone and she made this comment to
8  me.
9       Q.  Would that be approximately
10 September?
11      A.  Maybe. Yes.
12      Q.  Who is Yolanda Dandridge?
13      A.  Yolanda Dandridge was the director
14 of something excellence department, patient
15 excellence department. It was the same
16 department that my daughter worked in.
17      Q.  Is that the department of service
18 excellence?
19      A.  Service excellence, thank you. And
20 she was my daughter's superior.
21      Q.  Do you believe that Ms. Dandridge
22 has any information in connection with your
23 claims of age discrimination and retaliation?
24      A.  That she has any information?
25      Q.  Yes.
```

Page 223

```
1           C. Newmark
2       A.  Only what I've told her.
3       Q.  When was the last time you spoke or
4  wrote or met with Ms. Dandridge?
5       A.  Probably sometime in the week that
6  I was terminated. I don't know for sure.
7       Q.  Did you repeat to Ms. Dandridge the
8  words that Cathy Magone had used with you in
9  describing her decision to appoint Nicole
10 Serra, rather than yourself, to the
11 palliative care team?
12      A.  I don't recall. I probably did. I
13 did.
14      Q.  Do you recall doing so?
15      A.  Yes.
16      Q.  When did you do that?
17      A.  It's not clear.
18      Q.  You don't know?
19      A.  No.
20      Q.  In that conversation that you
21 recall, what did you say to Ms. Dandridge and
22 what did she say to you?
23      A.  In thinking about it, I may not
24 have told her. My daughter may have told her
25 because I'm a very private person and I
```

Page 224

```
1           C. Newmark
2  wouldn't go around talking about this.
3       Q.  What, to your knowledge, does
4  Ms. Dandridge know about the reasons for your
5  termination from Lawrence Hospital?
6       A.  Just that I was terminated.
7       Q.  Who is Vicki Arimus?
8       A.  Vicki Arimus was a case manager who
9  I worked with and who I got along very well
10 with, who was very respectful of my role, as
11 undefined as it may have been, and I was very
12 respectful of her role. We worked very well
13 together. She eventually left to go to work
14 as a case manager at St. John's Hospital in
15 Yonkers.
16      I had spoken to her right before
17 she left about the comment that Cathy had
18 told me.
19      Q.  Right before you left?
20      A.  Right before she left.
21      Q.  When did she leave?
22      A.  Maybe September.
23      Q.  What did you tell Ms. Arimus?
24      A.  I told her the comment that Cathy
25 Magone told to me about Nicole Serra being
```

Page 225

```
1           C. Newmark
2  younger than me.
3       Q.  Did you tell her anything else?
4       A.  Just that I felt threatened.
5       Q.  When was the last time you spoke or
6  wrote or met with Ms. Arimus?
7       A.  About a week after she left, she
8  had e-mailed me on the job to tell me that
9  she was doing well and she was hoping that
10 things worked out well for me.
11      Q.  What, if anything, do you believe
12 your daughter knows about the reasons for
13 your termination from Lawrence Hospital?
14      A.  She knows what I know. She's my
15 daughter.
16      Q.  Because you told her?
17      A.  Because I told her.
18      Q.  What, if anything, do you believe
19 your daughter knows about Cathy Magone's
20 reasons for assigning Nicole Serra rather
21 than yourself to the palliative care team?
22      A.  That she is younger and can handle
23 the job better.
24      Q.  Do you believe your daughter knows
25 anything other than what you have told her?
```

57 (Pages 222 to 225)

Carole Newmark

Page 226

1    C. Newmark
2    A.  No.
3    Q.  Who is Marianne Amato?
4    A.  My cousin.
5    Q.  What, if anything, do you believe
6  Ms. Amato knows relating to your claim of age
7  discrimination or retaliation?
8    A.  Everything that I know.
9    Q.  And her basis of knowledge, as far
10  as you know, is that you told her?
11    A.  From me, yes.
12    Q.  What, if anything, does Marianne
13  Amato know about your claims for damages in
14  this case?
15    A.  Nothing.
16    Q.  Who is Pat O'Grady?
17    A.  She is a friend of mine and
18  neighbor and a confidant.
19    Q.  How long have you known her?
20    A.  I have known her since 1967.
21    Q.  What, if anything, do you believe
22  Ms. O'Grady knows relating to your claim of
23  age discrimination or retaliation?
24    A.  Some of the things that I know.
25    Q.  Again, because you told her?

Page 227

1    C. Newmark
2    A.  I told her.
3    Q.  What, if anything, do you believe
4  Ms. O'Grady knows about your damage claims in
5  this case?
6    A.  Nothing.
7    Q.  Who is Jodi Fellows?
8    A.  Jodi Fellows was a co-worker at
9  Phelps Memorial.
10    Q.  How long have you known her?
11    A.  Since I began work at Phelps
12  Memorial. I'm going to be hard-pressed for a
13  date. Do you want a date?
14    Q.  Can you estimate a year?
15    A.  That's what I'm trying to do.  2004
16  approximately.
17    Q.  When was the last time you
18  communicated, saw or wrote to Ms. Fellows?
19    A.  About a month ago.
20    Q.  What do you believe Ms. Fellows
21  knows about your efforts to find a job after
22  your termination from Lawrence Hospital?
23    A.  She knows how difficult it was for
24  me to find work.
25    Q.  What do you understand to be the

Page 228

1    C. Newmark
2  basis for that knowledge?
3    A.  I told her that it was the holiday
4  it was very difficult to get a job.
5    Q.  Did you have discussions with
6  Ms. Fellows about your efforts to find a job?
7    A.  Yes.
8    Q.  More than one?
9    A.  Oh, sure.  It was more networking
10  than anything else.
11    Q.  Do you believe Ms. Fellows has any
12  knowledge that relates to your claim of age
13  discrimination or retaliation against the
14  hospital?
15    A.  She knows that I was terminated.
16  She knows very little about some of the
17  reasons.
18    Q.  As far as you know, whatever she
19  knows is because you told her?
20    A.  Oh, yes.
21    Q.  Do you believe Ms. Fellows has any
22  information about your claims for damages?
23    A.  No, she doesn't.
24    Q.  How long have you known Ms. Arnim?
25    A.  30 years.

Page 229

1    C. Newmark
2    Q.  Do you believe Ms. Arnim has any
3  knowledge or information relating to your
4  claim of age discrimination or retaliation
5  other than what you have told her?
6    A.  Other than what I have told her,
7  no.
8    Q.  Do you believe that Ms. Arnim has
9  any knowledge or information relating to your
10  claims of damages against the hospital?
11    A.  Yeah, she knows.
12    Q.  What is your understanding of the
13  information that Ms. Arnim has about your
14  claim for damages?
15    A.  She understands that there is a
16  lawsuit.  She understands that I'm seeking
17  damages for the suffering that I endured and
18  the monies that I was unable to make.
19    Q.  Did Ms. Arnim participate in your
20  communications with Eve First?
21    A.  No.
22    Q.  Is Ms. Arnim familiar with the
23  monetary damages that you suffered as a
24  result of your termination?
25    A.  Absolutely.

58  (Pages 226 to 229)

Carole Newmark

Page 230

1        C. Newmark
2        Q.  Is Ms. Arnim familiar with your
3    medical diagnoses?
4        A.  Yes.
5        Q.  Is she familiar with the medication
6    you've been prescribed?
7        A.  Yes.
8        Q.  Is your daughter familiar with your
9    monetary damages resulting from your
10    termination from employment?
11        A.  Not in its entirety, no.
12        Q.  As far as you know, what is
13    Ms. Powers' familiarity within that regard?
14        A.  In regard to finances?
15        Q.  Yes.
16        A.  I don't like to talk finances with
17    my daughter.  She has enough of her own
18    things to deal with.  I don't really discuss
19    those things with her.  She knows that I lost
20    money.  She knows that I was out of work and
21    how it affected me.
22        Q.  Is your daughter familiar with the
23    contact that you've had with Ms. First
24    relating to your mental health issues?
25        A.  No.

Page 231

1        C. Newmark
2        Q.  Is your daughter familiar with the
3    medical treatment you received after your
4    termination?
5        A.  Yes.
6        Q.  Is she familiar with the medication
7    were you prescribed?
8        A.  Yes.
9        Q.  As far as you know, is the basis of
10    her knowledge what you told her?
11        A.  Yes.
12        Q.  Did you have trouble adjusting to
13    the case management model that had been
14    implemented at Lawrence Hospital?
15        A.  In the beginning I did.
16        Q.  In what regards did you have
17    trouble adjusting to the model?
18        A.  Not understanding whose roles it
19    was to do certain things and the model was
20    different from the model that we used when I
21    was there prior.
22        Q.  Did you have trouble adjusting to
23    the time constraints associated with the case
24    management model?
25        MS. NICAJ: Objection.

Page 232

1        C. Newmark
2        You can answer.
3        A.  No.
4        Q.  You testified earlier that you had
5    prior experience as a supervisor?
6        A.  Yes.
7        Q.  When was that?
8        A.  I worked as an administrator for
9    the pulmonary division at Westchester Medical
10    Center.  May not be on my resume.  That was
11    in 19 -- maybe '90 to 1993 or so.
12        Q.  Was that your only management
13    experience in healthcare prior to --
14        A.  Yes.
15        Q.  Prior to starting work at Lawrence
16    Hospital in 2006?
17        A.  Right.
18        Q.  Did you have any prior management
19    experience outside of the healthcare field?
20        A.  No.
21        Q.  Do you believe that you received
22    less favorable job assignments at Lawrence
23    Hospital because of your age other than the
24    appointment of a social worker to the
25    palliative care team?

Page 233

1        C. Newmark
2        A.  No, because I made the assignments.
3        Q.  Do you believe you received less
4    pay than other people because of your age?
5        A.  No.
6        Q.  Did you receive the same benefits
7    in terms of employment as other employees in
8    your approximate field?
9        A.  Yes.
10        Q.  Did anyone call you or anyone else
11    of your approximate age, any word or name
12    that you found offensive?
13        A.  No.
14        Q.  Aside from what you testified to
15    about Cathy Magone's comments in that meeting
16    in August, did anyone say anything to you
17    that made you believe you were being treated
18    differently because of your age?
19        A.  No.
20        Q.  Did anyone show you any pictures or
21    cartoons that you found offensive?
22        A.  No.
23        Q.  Did anyone tell you any jokes about
24    age that you found funny or offensive?
25        A.  I found funny.  I don't know that

59  (Pages 230 to 233)

Carole Newmark

Page 234

1              C. Newmark
2    they were particularly about age, but --
3        Q.  Was there anything in Cathy
4    Magone's words or behavior that made you feel
5    that you were singled out because of your age
6    other than the comment that she made to you
7    in that meeting?
8        A.  No, I can't say so.
9        Q.  Did anyone else tell you something
10   about Cathy Magone that made you believe she
11   was treating you differently because of your
12   age?
13       A.  No.
14       Q.  Do you know whether your position
15   was filled after you were fired?
16       A.  I have no idea.
17       Q.  Did your pay or benefits change
18   when you complained to Pat Orsaia about Cathy
19   Magone's comments?
20       A.  No.
21       Q.  Did anyone make any comments to you
22   that made you believe that your complaint to
23   Pat Orsaia was the cause of any change in
24   treatment you were receiving?
25       A.  Can you repeat that, please.

Page 235

1              C. Newmark
2        MR. KEIL:  Can you read it back?
3        (Whereupon, the requested portion
4    was read back by the court reporter.)
5        A.  It wasn't verbal, no.
6        Q.  Did anyone else tell you that they
7    had witnessed something that made them
8    believe your termination was motivated by the
9    fact that you had complained to Pat Orsaia?
10       A.  At Lawrence Hospital?
11       Q.  Yes.
12       A.  Ms. Dandridge.
13       Q.  What did Ms. Dandridge say?
14       A.  That it sounded like it was
15   retaliatory.
16       Q.  When did she say that?
17       A.  Maybe a week after I was
18   terminated.  Days to a week.  I'm not sure.
19   I had no contact with anyone once I left.
20       Q.  Did Ms. Dandridge tell you why she
21   thought it sounded retaliatory?
22       A.  Because the proximity of the time
23   of my complaint and when I was let go.
24       Q.  Is that all she said?
25       A.  Yes.

Page 236

1              C. Newmark
2        Q.  When you negotiated the job title
3    of senior social worker with Cathy Magone,
4    you did not consider the use of the word
5    senior to be offensive or discriminatory, did
6    you?
7        A.  No.
8        MS. NICAJ:  Objection.
9        You can answer.
10       A.  No.
11       Q.  If Cathy Magone had explained her
12   decision by saying that Nicole Serra was more
13   junior and that the assignment was more
14   appropriate for that reason, would you have
15   been offended?
16       MS. NICAJ:  Objection.
17       A.  That's not the basis for giving
18   someone a job because they're, you know, no,
19   I mean because she was more junior?  Yeah, I
20   would have been offended.
21       Q.  Would you believe that it was age
22   discrimination?
23       A.  Yes.
24       MS. NICAJ:  Objection.
25       You can answer.

Page 237

1              C. Newmark
2        A.  Yes.
3        Q.  Do you believe that there are some
4    situations where it can be more appropriate
5    for a manager to assign something to a more
6    junior employee rather than to a more
7    experienced employee?
8        MS. NICAJ:  Objection.
9        You can answer.
10       A.  Yes.  It doesn't negate the fact
11   that she said she's younger and can do the
12   job better.
13       MR. KEIL:  Let's take a five-minute
14   break.  We may be just about done.
15       (Recess taken from 4:33 p.m. to
16   4:38 p.m.)
17   EXAMINATION BY
18   MR. KEIL:
19       Q.  Who is Joanne Reed?
20       A.  Joanne Reed was a temporary social
21   worker who was hired to help me.
22       Q.  Was that the temporary social
23   worker you referred to earlier?
24       A.  Yes.
25       Q.  That would be available after you

60  (Pages 234 to 237)

Carole Newmark

**Page 238**

```
1              C. Newmark
2  started work at Lawrence Hospital?
3      A.  Yes.
4      Q.  How long did Ms. Reed work at
5  Lawrence Hospital?
6      A.  Maybe month or so.
7      Q.  Did she stop working at Lawrence
8  after Nicole Serra started?
9      A.  No, before.
10     Q.  Did you have a written job
11 description while you were at Lawrence
12 Hospital?
13     A.  None was given to me upon hiring,
14 but I got a job description when I asked to
15 sit down with Cathy Magone and Diane Lance to
16 discern what my role was going to be so they
17 worked off a job description.
18     MR. KEIL:  Mark this Defendants'
19 Exhibit O.
20     (Defendants' Exhibit O, Document,
21 marked for identification, as of this
22 date.)
23     Q.  Ms. Newmark, you have been handed
24 what's been marked Defendants' Exhibit O.
25     Do you recognize this document?
```

**Page 239**

```
1              C. Newmark
2      A.  I recognize it, yes.
3      Q.  Does this appear to be the document
4  that you were given in your meeting with or
5  -- withdrawn.
6      Does this resemble the document
7  that you said was referred to in your meeting
8  with Ms. Magone and Ms. Lance?
9      A.  No, I don't think so.
10     Q.  You believe it was another
11 document?
12     A.  Yes, which I have at home.
13     Q.  How is it that you recognize
14 Defendants' Exhibit O?
15     A.  I'm not sure.
16     MR. KEIL:  Can we mark this
17 Defendants' Exhibit P.
18     (Defendants' Exhibit P, Document,
19 marked for identification, as of this
20 date.)
21     Q.  Ms. Newmark, you have been handed a
22 document which has been marked as Defendants'
23 Exhibit P.
24     Do you recognize this document?
25     A.  I'm not sure.
```

**Page 240**

```
1              C. Newmark
2      Q.  Do you know one way or the other
3  whether this was the document that Ms. Magone
4  and Ms. Lance were referring to?
5      A.  It could be.  It could be.  I would
6  have to look over my documents that I have at
7  home.
8      Q.  Did you have any out-of-pocket
9  medical expenses after your termination from
10 Lawrence Hospital that were not covered by
11 COBRA?
12     A.  Co-pays.  Co-pays on medication and
13 doctors' visits.
14     Q.  Anything else?
15     A.  No.
16     Q.  Did you retain receipts from those
17 co-pays?
18     A.  Yes.
19     Q.  Do you know approximately how much
20 those co-pays total?
21     A.  No, but I could figure that out
22 from my taxes.
23     (Continued on next page to include
24 signature and jurat.)
25
```

**Page 241**

```
1              C. Newmark
2      MR. KEIL:  I have no further
3  questions.
4      (Time Noted:  4:44 p.m.)
5
6
7
8              CAROLE NEWMARK
9
10 Subscribed and sworn to before me
11 this ___ day of _____, 2008.
12
13 _____
```

61 (Pages 238 to 241)

**EXHIBIT 24**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

CAROLE NEWMARK,

        Plaintiff,

   -against-     07 Civ. 2861
                (CLB)

LAWRENCE HOSPITAL CENTER, PAT ORSAIA,
Individually, and CATHY MAGONE,
Individually,

        Defendants.

------------------------------------x

          222 Bloomingdale Road
          White Plains, New York
          February 20, 2008
          10:10 a.m.

     EXAMINATION BEFORE TRIAL of CATHY MAGONE, a

Defendant in the above-captioned matter, held

pursuant to Notice at the above time and place,

before a Notary Public of the State of New

York.

          Nina Purcell,
          Shorthand Reporter

     COMPU-TRAN SHORTHAND REPORTING

---

2

APPEARANCES:

LOVETT & GOULD, LLP
   Attorneys for Plaintiff
   222 Bloomingdale Road
   White Plains, New York  10605
BY: DRITA NICAJ, ESQ.

COLLAZO CARLING & MISH, LLP
   Attorneys for Defendants
   747 Third Avenue
   New York, New York  10017
BY: JOHN P. KEIL, ESQ.

ALSO PRESENT: Carole Newmark

       oOo

     COMPU-TRAN SHORTHAND REPORTING

---

3

2       IT IS HEREBY STIPULATED AND AGREED,

3  by and between the attorneys for the respective

4  parties hereto that objections to any question,

5  except as to form, are reserved for the trial of

6  this action.

11      IT IS FURTHER STIPULATED AND AGREED

12  that this deposition may be sworn to by any

13  Notary Public other the Notary Public before

14  whom this examination was begun.

19      IT IS FURTHER STIPULATED AND AGREED

20  that the filing and certification of the

21  original of this deposition are waived.

     COMPU-TRAN SHORTHAND REPORTING

---

4

2       CATHERINE MAGONE

3   having been duly sworn by Nina Purcell,

4  a Notary Public within and for the State

5  of New York, was examined and testified

6      as follows:

8       oOo

10  EXAMINATION BY MS. NICAJ:

11    Q.  State your name and address for the

12  record, please.

13    A.  Catherine Magone, 882 Benris

14  Avenue, Franklin Square, New York 11010.

15    Q.  Good morning, Ms. Magone. My name

16  is Drita Nicaj. I'm an attorney. I represent

17  the plaintiff in this action, Carole Newmark.

18  I'm going to be asking you a series of questions

19  today. I'm looking for truthful and responsive

20  answers, okay?

21    A.  Okay.

22    Q.  I notice you are speaking softly.

23  I would ask you to raise your voice a little

24  bit -- I won't be offended -- so we can all hear

25  you. The court reporter may ask you to speak up.

     COMPU-TRAN SHORTHAND REPORTING

**5**

Catherine Magone

2 herself, okay?

3    A.   Sure.

4    Q.   If at any time you don't understand

5 the question, you haven't heard the question or

6 want the question read back, you can let me know

7 and I'll be happy to do any of those three.

8 Okay?

9    A.   Okay.

10    Q.   If at any time you want to take a

11 break, you can do so. But what I would ask you

12 to do is if there are any pending questions

13 that -- any questions that have not been fully

14 responded to, first answer the question and then

15 you can take your break. Okay?

16    A.   Okay.

17    Q.   All your responses need to be

18 verbal. There is a tendency naturally when you

19 are talking to someone to either nod your head

20 or say mm-hmm or uh-huh. And I would ask all

21 your responses be verbal, okay?

22    A.   Yes.

23    Q.   The court reporter can't take those

24 responses down. Okay?

25    A.   Okay.

COMPU-TRAN SHORTHAND REPORTING

**6**

Catherine Magone

2    Q.   If at any time during the course of

3 your deposition you want to add, change or

4 otherwise supplement an earlier answer, you can

5 do so. Let me know, okay?

6    A.   Okay.

7    Q.   Is there anything I've said so far

8 that you do not understand?

9    A.   No.

10    Q.   Are you currently employed?

11    A.   Yes.

12    Q.   By whom?

13    A.   Lawrence Hospital Center.

14    Q.   In what capacity?

15    A.   I'm the director of quality and

16 case management.

17    Q.   How long have you been director of

18 quality and case management?

19    A.   Eight years.

20    Q.   Were you employed at Lawrence

21 prior?

22    A.   No.

23    Q.   What is your educational

24 background?

25    A.   I have a master's in public

COMPU-TRAN SHORTHAND REPORTING

**7**

Catherine Magone

2 administration. And I'm a registered nurse.

3    Q.   When did you receive your master's?

4    A.   1993.

5    Q.   When did you become a registered

6 nurse?

7    A.   1975.

8    Q.   Can you list all your employment

9 since you became a registered nurse in 1975

10 starting with the earliest?

11    A.   Booth Memorial Hospital which later

12 became New York Hospital Queens. I worked there

13 from 1975 to 19 -- let me think -- until 1999.

14 Hospital for Special Surgery, 1999.

15    Q.   Did your employment at Hospital for

16 Special Surgery overlap with your employment at

17 Booth or there are two different periods?

18    A.   Two separate periods.

19    Q.   What were the circumstances of your

20 leaving Booth Memorial?

21    A.   Just to pursue a better position.

22    Q.   How long were you employed?

23    A.   At Special Surgery?

24    Q.   Yes.

25    A.   Six months.

COMPU-TRAN SHORTHAND REPORTING

**8**

Catherine Magone

2    Q.   What were the circumstances of your

3 leaving special surgery?

4    A.   I was recruited to be director at

5 Lawrence.

6    Q.   Who were you recruited by?

7    A.   Well, actually, I wasn't really

8 recruited. I shouldn't say that. There were

9 head hunters that were calling me, and I heard

10 about this position actually from a friend who

11 saw it in the New York Times. And it was for a

12 better position.

13    Q.   When you say head hunters were

14 calling you, was it in reference to this?

15    A.   Not that particular job, no, no.

16    Q.   One of the things that I neglected

17 to tell you is there is also a tendency while

18 there is a back and forth to start answering

19 while I'm still asking my question. What I

20 would ask you to do is let me finish the

21 question and then you can respond. The court

22 reporter can't take us both talking.

23        MR. KEIL:  The question

24 might not be what you expect.

25    A.   Yes.

COMPU-TRAN SHORTHAND REPORTING

9

**Catherine Magone**

2  Q.    From time to time I may think
3  you're finished with your response. If I
4  interrupt you, by all means let me know. Okay?
5  A.    Okay.
6  Q.    So when you mentioned that there
7  were head hunters --
8  A.    Actually, okay, sorry, because I
9  just wanted to rephrase what I said.
10  Q.    Head hunters were not seeking to
11  recruit you for a position at Lawrence Hospital,
12  were they?
13  A.    No.
14  Q.    And this you responded to an ad in
15  the New York Times for that position?
16  A.    Yes.
17  Q.    And the friend who referred you to
18  that posting is who?
19  A.    Um, the director of quality at New
20  York Hospital Queens, my former boss.
21  Q.    Did you apply for the position?
22  A.    For Lawrence Hospital?
23  Q.    Yes.
24  A.    Yes.
25  Q.    You submitted a resume?

*COMPU-TRAN SHORTHAND REPORTING*

11

**Catherine Magone**

2  A.    One person.
3  Q.    And was that Paul or someone else?
4  A.    Paul.
5  Q.    And you also mentioned a second
6  interview with the medical director.
7  A.    The medical director.
8  Q.    And that person is who?
9  A.    Werner Roeder.
10  Q.    W E R --
11  A.    N E R, R O E D E R.
12  Q.    And Mr. Roeder is the director of?
13  A.    He is the medical director,
14  Dr. Roeder.
15  Q.    For the entire Lawrence Hospital?
16  A.    Yes.
17  Q.    Is he still the medical director?
18  A.    Yes.
19  Q.    Did there come a time when you
20  learned what your duties and responsibilities
21  were going to be?
22  A.    Yes.
23  Q.    When?
24  A.    When I was interviewed for the
25  position. I was also interviewed by two other

*COMPU-TRAN SHORTHAND REPORTING*

10

**Catherine Magone**

2  A.    Yes.
3  Q.    Did you hear back from someone?
4  A.    Yes.
5  Q.    From whom?
6  A.    The human resources.
7  Q.    Who is that person?
8  A.    I don't recall his name. He is no
9  longer there. His name was Paul. I don't
10  remember his last name.
11  Q.    What was his position in human
12  resources?
13  A.    He was a manager.
14  Q.    Did you -- were you interviewed?
15  A.    Yes.
16  Q.    On how many occasions?
17  A.    Two.
18  Q.    Who interviewed you on the first
19  occasion?
20  A.    Well, I was interviewed by human
21  resources, and then I was interviewed by the
22  medical director.
23  Q.    When you say you were interviewed
24  by human resources, was it one person or more
25  than one person?

*COMPU-TRAN SHORTHAND REPORTING*

12

**Catherine Magone**

2  people on another time when I was at the second
3  time. That was the VP for patient care services
4  and the COO.
5  Q.    When you say on the second occasion
6  you were interviewed by Mr. Roeder and then you
7  were interviewed by the VP of patient care and
8  the COO --
9  A.    Yes.
10  Q.    -- that was on the same date?
11  A.    No, different date. The two of
12  them were the same date.
13  Q.    So there was a third round of
14  interviews?
15  A.    No. I believe I had my interview
16  with Dr. Roeder the same day as I met with human
17  resources. And then I came back a second day.
18  Q.    And who was the VP of patient care
19  at that time?
20  A.    Roseanne O'Hare.
21  Q.    And at that time who was the COO?
22  A.    Vivian Jenkins.
23  Q.    Is Ms. Jenkins still employed
24  there?
25  A.    No.

*COMPU-TRAN SHORTHAND REPORTING*

13

*Catherine Magone*

1
2    Q.    And Ms. O'Hare?
3    A.    Yes.
4    Q.    Did there come a time you were
5    offered the position?
6    A.    Yes.
7    Q.    When?
8    A.    The day after I interviewed with
9    the COO and the VP for patient care.
10   Q.    When did you come to learn what
11   your duties and responsibilities were going to
12   be?
13   A.    Well, when I was interviewed, it
14   was talked about with the medical director.
15   Q.    What did the medical director say
16   with respect to that in words or substance?
17   A.    Well, that I would be responsible
18   for quality and case management. We were just
19   beginning a case management model at Lawrence at
20   the time, so I was hired to put it together.
21   Q.    What do you mean, about just
22   beginning a case management model?
23   A.    Well, previous to my coming to
24   Lawrence, there were nurses that did
25   utilization. And social work did the discharge

14

*Catherine Magone*

2    planning, okay. So there was change in -- going
3    to be changes in roles, that the nurses would be
4    doing some discharge planning, so there was just
5    changes in the model. The utilization nurses
6    would be given additional responsibility.
7    Q.    And did that impact a number of
8    social workers that would remain employed at
9    Lawrence, if you know?
10   A.    The social workers were not
11   reporting to me at that time.
12   Q.    How many social workers were there
13   at the time you first became employed?
14   A.    I don't recall, actually. Probably
15   four.
16   Q.    I'm sorry?
17   A.    Four, maybe. I'm not entirely
18   sure, though.
19   Q.    At the time you first became
20   employed at Lawrence, who supervised the social
21   workers?
22   A.    There was a social work director.
23   Q.    And that person is?
24   A.    Barbara Clark.
25   Q.    And is Ms. Clark still employed

15

*Catherine Magone*

1
2    there?
3    A.    No.
4    Q.    When did she cease being employed
5    at Lawrence?
6    A.    I don't know. I don't recall the
7    date.
8    Q.    Can you approximate the year in
9    relation to when you started working?
10   MR. KEIL:  Don't guess, but
11   if you can estimate or, in other words,
12   give a judgment, please try.
13   A.    Maybe 2003, 2002. I'm guessing
14   really.
15   Q.    Was she ever replaced with anyone?
16   A.    No.
17   Q.    Who assumed her duties and
18   responsibilities, if anyone?
19   A.    The social workers reported to me.
20   Q.    Apart from her supervision of the
21   social workers, did she have any other
22   responsibilities that you are aware of?
23   A.    No.
24   Q.    So her only responsibility was
25   actual supervision of the social workers?

16

*Catherine Magone*

2    A.    I don't understand the question.
3    Q.    You indicated that the social
4    workers that she supervised reported to you in
5    connection with what her duties and
6    responsibilities were. I'm asking as far as you
7    are aware of, those were her only duties and
8    responsibilities is the supervision of those
9    social workers?
10   A.    Well, she had budgetary
11   responsibilities for her department.
12   Q.    At the time that Ms. Clark ceased
13   being employed as the social worker director,
14   how many social workers worked in that
15   department?
16   A.    I believe three. I'm blacking out,
17   blanking out.
18   Q.    Was the social work director
19   position eliminated or how did it come to be
20   that Ms. Clark was no longer employed there?
21   A.    She found other employment.
22   Q.    And that position was never filled?
23   A.    It was eliminated.
24   Q.    Whose decision was it to eliminate
25   the position, if you know?

17

**Catherine Magone**

2    A.    The vice-president for patient care
3  services.
4    Q.    And that was Ms. O'Hare?
5    A.    Yes.  At that time that's who
6  Barbara Clark reported to.
7    Q.    Who were the three social workers
8  that Ms. Clark supervised prior to her leaving?
9    A.    Denise Galloway, Gia Lago -- I
10  can't remember his name.
11    Q.    If I leave a space in the
12  transcript, if you recall it, you can -- you are
13  going to have an opportunity at the conclusion
14  of this deposition when the court reporter
15  prepares a final version to review and correct
16  and fill in things that you may have not -- you
17  may have forgotten.  If you do remember, I am
18  going to leave a space in the transcript for you
19  to do that.  Okay?
20    A.    Okay.
21  -DOCUMENT/DATA REQUESTED:Name of social worker
22  who worked under Ms. Clark.
23    Q.    Do you recall his first name or
24  last name?
25    A.    No.

*COMPU-TRAN SHORTHAND REPORTING*

18

**Catherine Magone**

2    Q.    Was this elimination ever reduced
3  in writing, to your knowledge, the elimination
4  of the social worker -- the social worker
5  director position?
6    A.    It would have been off the budget
7  sheet, you know, when the budgets are done.
8    Q.    There wasn't a model or anything
9  that was formed in connection with eliminating
10  that position or anything?
11    A.    Well, at the time I believe that
12  going forward with the case management model,
13  the case managers and social workers were felt
14  should be one department.
15    Q.    Who felt that?
16    A.    Administration.
17    Q.    Who in administration?
18    A.    The COO.
19    Q.    When you say the COO felt that this
20  should be one department --
21    A.    Well, we had --
22    Q.    Hold on.  I'm not finished with my
23  question.  It's okay.
24        When you say that the COO felt that the
25  case managers and the social workers should be

*COMPU-TRAN SHORTHAND REPORTING*

19

**Catherine Magone**

2  one department, did Ms. Jenkins express that in
3  words or substance?
4    A.    Well, we had consultants at the
5  time that made this recommendation to her.
6    Q.    Did the consultants make any
7  recommendations as to the number of social
8  workers that were needed at the hospital?
9    A.    I don't believe so.
10    Q.    Prior to coming here today, did you
11  meet with your attorney or someone else in order
12  to prepare for today's deposition?
13    A.    Yes.
14    Q.    On how many occasions?
15    A.    One.
16    Q.    When?
17    A.    Yesterday.
18    Q.    Where was the meeting?
19    A.    In my office.
20    Q.    How long?
21    A.    Two hours.
22    Q.    Did you review any documents
23  yesterday or at any time prior to your
24  deposition to prepare?
25    A.    Yes.

*COMPU-TRAN SHORTHAND REPORTING*

20

**Catherine Magone**

2    Q.    What?
3    A.    Ms. Newmark's file.
4    Q.    Anything else?
5    A.    No.
6    Q.    When you say Ms. Newmark's file,
7  what do you mean?
8    A.    Her file with her performance
9  evaluations, any memos that I have in her file
10  related to performance.
11    Q.    You said memos.  Did you ever
12  direct any of those memos to anyone?
13    A.    I don't believe so.
14    Q.    You mentioned Ms. Newmark.  At some
15  point Ms. Newmark was employed at Lawrence, is
16  that right?
17    A.    Yes.
18    Q.    When did she commence her
19  employment while you were employed there?
20    A.    March of 2006.
21    Q.    Prior to her employment at
22  Lawrence, did you ever learn that she had at
23  some point been employed there?
24    A.    Yes.
25    Q.    How did you come to learn that?

*COMPU-TRAN SHORTHAND REPORTING*

21

**Catherine Magone**

2    A.    Denise Galloway told me.

3    Q.    Do you know how Ms. Newmark came to

4    be hired at Lawrence in 2006?

5    A.    She completed an application and

6    forwarded her resume to me.

7    Q.    Do you know whether someone

8    recruited her from the hospital?

9    A.    No.

10    Q.    Did you ever speak to anyone about

11    recruiting Ms. Newmark for a position in --

12    shortly before she was hired in 2006?

13    A.    Denise Galloway told me about her.

14    Q.    "Her," being Ms. Newmark?

15    A.    Yes.

16    Q.    And what did Denise Galloway say in

17    words or substance to you?

18    A.    Denise Galloway thought that she

19    would be a good candidate for Lawrence because

20    she had worked here in previous years.

21    Q.    Did Denise Galloway or anyone else

22    identify in what capacity Ms. Newmark had worked

23    there in previous years?

24    A.    It was on her resume, that she had

25    worked there in previous years.

*COMPU-TRAN SHORTHAND REPORTING*

22

**Catherine Magone**

2    Q.    I understand. But you said Denise

3    Galloway -- I asked you about recruiting. You

4    said Denise Galloway had spoken to you about

5    Ms. Newmark.

6    Did you receive the application or a

7    resume before Denise Galloway spoke to you about

8    Ms. Newmark?

9    A.    No.

10    Q.    So Ms. Galloway spoke to you

11    concerning Ms. Newmark first, is that right?

12    A.    Yes.

13    Q.    And what, in words or substance,

14    did she say at that time?

15    A.    That she felt that she would be a

16    good candidate, because she had worked here

17    years before.

18    Q.    So prior to your actual seeing --

19    your seeing the resume, you were aware that

20    Ms. Newmark had worked there because

21    Ms. Galloway had told you?

22    A.    Yes.

23    Q.    Did Ms. Galloway at that time tell

24    you where and in what capacity Ms. Newmark had

25    worked at the hospital?

*COMPU-TRAN SHORTHAND REPORTING*

23

**Catherine Magone**

2    A.    Yes.

3    Q.    What did she say in words or

4    substance?

5    A.    She said that she had been in the

6    social work department.

7    Q.    Do you know whether Ms. Galloway

8    had supervised Ms. Newmark in her previous

9    employment at Lawrence?

10    A.    Yes.

11    Q.    How were you aware of that?

12    A.    Well, Denise Galloway's position

13    was the same position then as it was when Carole

14    was hired.

15    Q.    What position is that?

16    A.    Assistant director for social work.

17    Q.    What do you mean, that

18    Ms. Galloway's position then was the same as --

19    A.    Well, in her position as assistant

20    director for social work, she was responsible

21    for supervising the social workers under her.

22    So I'm assuming that that was the same when

23    she -- when Carole worked there before.

24    Q.    Did Ms. Galloway express to you in

25    words or substance that she was recommending

*COMPU-TRAN SHORTHAND REPORTING*

24

**Catherine Magone**

2    Ms. Newmark for the position?

3    A.    Yes.

4    Q.    Did she say in words or substance

5    what her -- what Ms. Newmark's performance had

6    been at Lawrence, her prior work performance?

7    A.    She felt that she was a good

8    worker.

9    Q.    By virtue of her recommending

10    Ms. Newmark to be hired, isn't that right?

11    A.    Yes.

12    Q.    When you say Ms. Galloway felt that

13    she was a good worker, did she express that to

14    you in words or substance?

15    A.    Yes.

16    Q.    What did she say with respect to

17    that?

18    A.    That in her experience with Carole

19    years ago, she had been a good worker.

20    Q.    Do you know what the periods of

21    Ms. Newmark's prior employment at Lawrence had

22    been?

23    A.    I believe it was 18 months.

24    Q.    Do you know how long prior to March

25    of 2006 she had been employed at Lawrence?

*COMPU-TRAN SHORTHAND REPORTING*

25

**Catherine Magone**

2    A.    18 months.
3    Q.    Which year?
4    A.    I'm guessing 1998.
5    Q.    I'm going to show you her resume
6    shortly.
7         Apart from Ms. Newmark's prior
8    employment, did you understand that she also had
9    interned at the hospital?
10    A.    Yes.
11    Q.    So in addition to that 18 month
12    period in which she was employed, she had also
13    interned?
14    A.    Yes.
15    Q.    Do you know for how long?
16    A.    No.
17    Q.    And do you know which department
18    she had interned at?
19    A.    I believe it was the social work
20    department.
21    Q.    Do you know whether Ms. Galloway
22    had supervised her while she was an intern?
23    A.    I don't know.
24    Q.    Did you ever speak to Ms. Galloway
25    concerning Ms. Newmark's internship?

*COMPU-TRAN SHORTHAND REPORTING*

26

**Catherine Magone**

2    A.    No.
3    Q.    Did you ever communicate with
4    anyone else concerning Ms. Newmark's internship
5    at Lawrence?
6    A.    No.
7    Q.    Did there come a time Ms. Newmark
8    was interviewed, to your knowledge?
9    A.    Yes.
10    Q.    For what position?
11    A.    For a social work position.
12    Q.    Was that to replace Ms. Galloway?
13    A.    No.  Well, the position, yes.
14    Q.    Did you have an understanding
15    Ms. Galloway was leaving the hospital?
16    A.    Did I know that she was leaving?
17    Q.    Yes.
18    A.    Yes.
19    Q.    Who interviewed her, Ms. Newmark?
20    A.    I did.
21    Q.    Do you know whether she had any
22    other interviews apart from you?
23    A.    I believe Diane Lantz interviewed
24    her as well.
25    Q.    And Ms. Lantz's position or

*COMPU-TRAN SHORTHAND REPORTING*

27

**Catherine Magone**

2    Dr. Lantz's?
3    A.    She was assistant director for case
4    management.
5    Q.    What was Ms. Newmark's title going
6    to be if she had been hired?
7    A.    Originally it was supposed to be
8    social worker.
9    Q.    When you say originally, did there
10    come a time that the title changed?
11    A.    During the interview process I made
12    it very clear to Ms. Newmark that we were not
13    planning on replacing this position with a
14    managerial position.
15    Q.    Why not?  I'm sorry.  I interrupted
16    you.  I apologize.  What were you about to say?
17    A.    I lost my train of thought.
18         MS. NICAJ:  Can you read my
19    last question and her response and maybe
20    she'll remember.
21         (Record read.)
22    A.    Therefore, Carole expressed
23    interest in a managerial position.  So as a
24    compromise I agreed that the title would be
25    senior social worker.  In that role as a senior

*COMPU-TRAN SHORTHAND REPORTING*

28

**Catherine Magone**

2    social worker, she would be a lead social worker
3    but would have no managerial.
4    Q.    At the time that she was
5    interviewed, how many social workers were there?
6    A.    Three.
7    Q.    Who were they?
8    A.    Denise Galloway.
9    Q.    Did she and Denise Galloway ever
10    actually work with one another?
11         MR. KEIL:  You mean in
12    2006?
13    Q.    In 2006.
14    A.    No.
15    Q.    Who else?
16    A.    Jeretha Jones, J E R E T H A.
17    Q.    What was her position?
18    A.    Social worker.
19    Q.    Anyone else?
20    A.    Elizabeth Basil, social worker.
21    Q.    Did there come a time that
22    Ms. Newmark was hired in 2006, is that right?
23    A.    Yes.
24    Q.    Did Ms. Jones remain employed at
25    the hospital?

*COMPU-TRAN SHORTHAND REPORTING*

---

**29**

**Catherine Magone**

2  A.   No.

3  Q.   When did she leave?

4  A.   I'm not sure.  April?

5  Q.   And Elizabeth Basil?

6  A.   March.

7  Q.   Denise Galloway left when?

8  A.   February.

9  Q.   Did anyone replace Jeretha Jones

10 and Elizabeth Basil?

11 A.   Yes.

12 Q.   Who?

13 A.   Nicole Serra.

14 Q.   When Ms. Newmark was hired in 2006,

15 you interviewed her once or more than once?

16 A.   More than once.

17 Q.   On how many occasions?

18 A.   Twice.

19 Q.   When was the first time?

20 A.   I don't recall the exact date.

21 Q.   Can you approximate the month?

22 A.   It was probably late January.

23 Q.   Of 2006?

24 A.   Yes.

25 Q.   When was the second time?

---

**30**

**Catherine Magone**

2  A.   Probably late February.

3  Q.   Was anyone present apart from you

4  and Ms. Newmark for either of those interviews?

5  A.   No.

6  Q.   Do you recall the substance of

7  your -- the first interview with Ms. Newmark?

8  A.   The first interview that I had with

9  Ms. Newmark was — she expressed interest in

10 coming back to Lawrence Hospital and taking on

11 this position.

12 Q.   Did she say why she was interested

13 in the position?

14 A.   She wasn't happy where she was

15 working currently.

16 Q.   What did you say with respect to

17 that?

18 A.   She said that she wasn't happy

19 where she was working.

20 Q.   Did you ever advise her during that

21 first interview in words or substance that there

22 was a new palliative care services unit that was

23 in the process of being developed?

24 A.   I don't recall if that happened on

25 the first interview or the second interview.

---

**31**

**Catherine Magone**

2  Q.   But you do recall mentioning that?

3  A.   That there was -- that --

4  Q.   Let me finish.  You do recall

5  mentioning that in one of those interviews, is

6  that right?

7  A.   Mentioning what?

8  Q.   The palliative care services unit

9  that was going to be developed.

10 A.   That it was on the horizons, yes.

11 Q.   What did you say with respect to

12 that?

13 A.   That the hospital was planning on

14 developing a palliative care program and that

15 they would be hiring somebody in the future to

16 spearhead the program.

17 Q.   What is the palliative care

18 program?

19 A.   Palliative care program is a

20 multi-disciplinary program where you would

21 involve physicians, nursing, social work, case

22 management, all working to physically make the

23 patient more comfortable.  It involved pain

24 management.  It could involve, you know, a lot

25 of family dynamics, working with families to

---

**32**

**Catherine Magone**

2  deal with dying, chronic illness.

3  Q.   Who was developing that at the

4  time?

5  A.   Nobody.

6  Q.   So is there a reason why you

7  mentioned it to Ms. Newmark at either of those

8  interviews?

9  A.   Just to give her an idea of things

10 that were coming down the pike in the

11 department.  There were other things that I

12 talked about as well.

13 Q.   Did she express an interest in

14 being involved in the palliative care services

15 unit?

16 A.   I believe she did.

17 Q.   When you say you believe she did,

18 the basis is your memory, is that right?

19 A.   Yes.

20 Q.   She actually expressed it?

21 A.   Yes.

22 Q.   At the time of Ms. Newmark's

23 interview, did you know that Ms. Jones was going

24 to be leaving?

25 A.   First interview?  No.

---

## 33

**Catherine Magone**

2   Q.   At either of those interviews.

3   A.   Second interview I believe yes.

4   Q.   And Ms. Basil, did you know at the
5   time of either of those interviews of
6   Ms. Newmark that she was going to be leaving?

7   A.   I believe so.

8   Q.   Do you know the circumstances in
9   which Ms. Jones left Lawrence?

10   A.   Just to take another position.

11   Q.   And Ms. Basil?

12   A.   Take another position nearer her
13   home.

14   Q.   At the time you interviewed
15   Ms. Newmark, by the second interview you
16   realized that she would be the only person at
17   the social work department at that time, is that
18   right?

19   A.   That's correct.

20   Q.   How many units would she be
21   responsible for?

22   A.   At that time?

23   Q.   At that time.

24   A.   At that time, that's hard to say.
25   What we had to do is we had to restructure a

*COMPU-TRAN SHORTHAND REPORTING*

## 34

**Catherine Magone**

2   little bit until we got extra help on board, and
3   the case managers had to take on some of the
4   social worker's responsibility because obviously
5   she couldn't handle a whole house.

6   Q.   How many houses are there, so to
7   speak, in the hospital that social workers would
8   be responsible for?

9   A.   Well, the social worker is
10   responsible -- they are not unit based; they are
11   responsible by -- according to the type of
12   patient. So it can vary from day to day what
13   their caseload would be.

14   Q.   What departments would that cover?

15   A.   I don't know what you mean.

16   Q.   For example, would social work
17   cover ER?

18   A.   They could. But case managers
19   could also cover it. There is a lot of overlap
20   in the role of a case manager and a social
21   worker. Case managers can do the social work
22   part in a hospital setting, but the social
23   worker cannot do case management, because they
24   are not registered nurses.

25   Q.   With respect to Ms. Newmark being

*COMPU-TRAN SHORTHAND REPORTING*

## 35

**Catherine Magone**

2   hired at this time, did you advise her in words
3   or substance that she would be the only person
4   at the social work department when she was
5   interviewed?

6   A.   Well, there was no social work
7   department.

8   Q.   Or --

9   A.   Case management.

10   Q.   -- working as a social worker?

11   A.   Did I advise her of that?

12   Q.   Yes.

13   A.   Yes, until we got another person on
14   board.

15   Q.   You indicated that things needed to
16   be restructured, right, in order for Ms. -- for
17   the fact that there would no longer be three
18   social workers, and instead there would be one
19   for a little while, is that right?

20   A.   Well, what I said was that the --
21   whenever you're short staffed, you kind of have
22   to sit back, restructure, rethink how the work
23   is going to get done. So there was a plan for
24   how we were going to get through this period.

25   Q.   Did you ever reduce that in writing

*COMPU-TRAN SHORTHAND REPORTING*

## 36

**Catherine Magone**

2   so that Ms. Newmark could have that as a model?

3   A.   No.

4   Q.   What was the plan?

5   A.   The plan was that the case managers
6   would have to take on some of the social
7   workers' responsibilities in the meantime until
8   we got another social worker on board.

9   Q.   Was that ever reduced into writing
10   as to what social work aspects of the job a case
11   manager would take on?

12   A.   No.

13   Q.   Who decides what functions the case
14   managers would perform instead of the social
15   worker?

16   A.   I did.

17   Q.   And did you ever reduce that to
18   writing?

19   A.   No.

20   Q.   When Ms. Newmark was hired, did
21   you -- prior to her being interviewed, rather,
22   do you know whether the hospital posted any
23   classified ads for social workers?

24   A.   I don't recall.

25   Q.   Apart from the communicating with

*COMPU-TRAN SHORTHAND REPORTING*

37

**Catherine Magone**

1

2  Ms. Galloway concerning Ms. Newmark's

3  performance, her earlier performance at

4  Lawrence, did you communicate with anyone else?

5      A.   No.

6      Q.   Where was Ms. Newmark employed at

7  the time she was interviewed by you?

8      A.   Phelps.

9      Q.   Did she ever express in words or

10  substance that she was, in fact, happy where she

11  was?

12      A.   No.

13      Q.   Did you ever communicate with

14  Ms. Galloway for her to try to find someone to

15  work at Lawrence Hospital?

16      A.   No.

17      Q.   What were the circumstances in

18  which Ms. Galloway left Lawrence?

19      A.   She retired.

20          MS. NICAJ:   Can you mark

21  this Plaintiff's Exhibit 1.

22          (Plaintiff's Exhibit 1

23  5-page Resume of Carole Newmark marked for

24  identification, as of this date.)

25      Q.   I'm going to direct your attention

*COMPU-TRAN SHORTHAND REPORTING*

38

**Catherine Magone**

1

2  to what's been marked as Plaintiff's Exhibit 1

3  for identification. Can you take a look at

4  that.

5      A.   Yes.

6      Q.   When you are done reviewing what is

7  marked as Plaintiff's Exhibit 1 for

8  identification, let me know, please.

9      A.   I'm finished.

10      Q.   Have you seen what is marked as

11  Plaintiff's Exhibit 1 prior to today?

12      A.   Yes.

13      Q.   I'm going to direct your attention

14  to the second page of Exhibit 1. Does that

15  refresh your recollection as to how long

16  Ms. Newmark had worked as an intern at Lawrence

17  Hospital?

18      A.   Yes.

19      Q.   Going back to your interviews of

20  Ms. Newmark, what in words or substance do you

21  recall saying to her during the first interview?

22      A.   I recall having concerns that she

23  did not have recent hospital experience and that

24  her primary experience was in an outpatient

25  psychiatric setting which is very, very

*COMPU-TRAN SHORTHAND REPORTING*

39

**Catherine Magone**

1

2  different from a hospital setting.

3      Also, that when she was a social worker

4  here before, it was a very different time, very

5  different model. So the way social work in

6  hospitals is run now is very different from when

7  she was last here. So I was concerned that she

8  wouldn't be able to adapt.

9      Q.   Did you express that to her?

10      A.   Yes.

11      Q.   Did you ever reduce that in writing

12  anywhere --

13      A.   No.

14      Q.   -- your concerns?

15      A.   No.

16      Q.   What else do you recall saying to

17  her during the interview, the first interview?

18      A.   The first interview was rather

19  short. It was more of a getting to know

20  you, getting -- gave her my resume. At the time

21  I was still looking for other social workers.

22      Q.   What do you recall saying at the

23  interview apart from what you have already

24  testified to?

25      A.   Well, I would have explained to her

*COMPU-TRAN SHORTHAND REPORTING*

40

**Catherine Magone**

1

2  about the department, the department, how the

3  department functions.

4      Q.   With all due respect, I'm not

5  concerned with would have. I'm concerned with

6  what you remember saying to her.

7      So what in words or substance do you

8  recall saying to her apart from what you've

9  already testified to?

10      A.   I told her about the role of a

11  social worker in a case management model.

12      Q.   What did you say in reference to

13  that?

14      A.   That the role is very fast paced,

15  you need to really learn to multi-task, very big

16  drive on to reduce the length of stay for

17  patients. Very important to begin discharge

18  planning early as to facilitate length of stay

19  reduction. And I also explained to her how it

20  was different in 1998, when patients stayed in

21  the hospital a much longer time.

22      Q.   Were you employed at Lawrence in

23  1998?

24      A.   No.

25      Q.   Now, you said that the discharge

*COMPU-TRAN SHORTHAND REPORTING*

**41**

*Catherine Magone*

2  plan to facilitate patients, you previously
3  testified that the case managers were also
4  involved in that, is that right?
5      A.   That's correct.
6      Q.   Because of the shortage of social
7  workers, is that right?
8      A.   No, that's not right.
9      Q.   What is not right about that?
10      A.   Both social workers and case
11  managers do discharge planning.
12      Q.   So it is not limited to social
13  workers, is that right?
14      A.   No.
15      Q.   Is the model you are testifying to
16  reduced anywhere in writing?
17      A.   Yes.
18      Q.   Where is it?
19      A.   Policies and procedures.
20      Q.   What is it called?
21      A.   I'm trying to remember the policy.
22  There are a number of policies that refer to the
23  role of the social worker.  I believe the policy
24  name is social work screen.
25      Q.   Is the case management model

*COMPU-TRAN SHORTHAND REPORTING*

**42**

*Catherine Magone*

2  reduced anywhere in writing, the model itself,
3  the role of social workers and case managers
4  that you've testified to?
5      A.   It's in multiple policies.
6      Q.   So there is not one framework
7  anywhere, contained anywhere in writing with
8  respect to the case management model you've
9  testified to?
10      A.   No.
11      Q.   Did you ever submit a job
12  description as to what Ms. Newmark's role would
13  be at the hospital?
14      A.   Yes.
15      Q.   Did she ever sign off on anything
16  acknowledging receipt of what her duties and
17  responsibilities would be?
18      A.   Not to me.
19      Q.   Did you ever ask her to?
20      A.   No.  I believe human resources does
21  that, though.
22      Q.   I'm asking you questions specific
23  to you, okay?
24      A.   Okay.
25      Q.   You have reviewed Ms. Newmark's

*COMPU-TRAN SHORTHAND REPORTING*

**43**

*Catherine Magone*

2  personnel file, you said, prior to today's
3  deposition, is that right?
4      A.   Yes.
5      Q.   Did you see anything which had a
6  signature marking Carole Newmark in receipt of
7  job functions and responsibilities?
8      A.   No.
9      Q.   What training did you receive, if
10  any, in connection with your supervision of
11  personnel at Lawrence?
12      A.   Well, as a manager we have many
13  opportunities to receive training.
14      Q.   I'm not concerned with your
15  opportunities.  What training did you actually
16  receive?
17      A.   As a manager there was a -- human
18  resources put on -- I don't know exactly what it
19  is called, but they did put on programs that I
20  have attended.
21      Q.   What programs?
22      A.   Related to managing people.
23      Q.   What programs did you attend and
24  what years?
25      A.   I don't know the name of the

*COMPU-TRAN SHORTHAND REPORTING*

**44**

*Catherine Magone*

2  program.  It was a series of sessions that
3  managers attended.  I don't recall what the name
4  of it was.
5      Q.   What year?
6      A.   I would say 2000, 2001.
7      Q.   Any others?
8      A.   No.
9      Q.   How long did they last?
10      A.   It was a series of lectures.
11      Q.   On what topics?
12      A.   I don't recall.
13      Q.   Did you have to sign in?
14      A.   I don't recall.
15      Q.   At the time Ms. Newmark was
16  interviewed by you, who was head of the human
17  resources department at Lawrence?
18      A.   At that time?
19      Q.   At that time.
20      A.   Deb Gogliettino.
21      Q.   Did there come a time that that
22  changed following Ms. Newmark --
23      A.   Yes.
24      Q.   Following Ms. Newmark being hired?
25      A.   I believe so.

*COMPU-TRAN SHORTHAND REPORTING*

**45**

*Catherine Magone*

2 Q. What was Ms. Gogliettino's

3 position?

4 A. Vice-president human resources.

5 Q. Who replaced her?

6 A. I can't remember his name. I'm

7 drawing a blank. He wasn't here long.

8 Q. Who replaced that person you are

9 drawing a blank on?

10 A. Tom Mastroianni.

11 Q. And his position was VP of HR?

12 A. Correct.

13 Q. Is he still employed there?

14 A. Yes.

15 Q. Was there someone by the name of

16 Pat Orsaia that worked at HR?

17 A. Yes.

18 Q. What was her position?

19 A. Director.

20 Q. Who to your knowledge did she

21 directly report to?

22 A. She reported to Deb.

23 Q. How old are you?

24 A. Me? 54.

25 Q. What are your duties and

*COMPU-TRAN SHORTHAND REPORTING*

---

**46**

*Catherine Magone*

2 responsibilities as director?

3 A. I'm responsible for the quality and

4 performance improvement program for the

5 hospital.

6 Q. What does that mean exactly?

7 A. Well, there are two different

8 portions of it. There is the performance

9 improvement, is improving performance. Okay.

10 So my department — I have quality people that

11 work under me that are responsible for quality

12 management. We in that role are multiply

13 responsible for physician compliance with state

14 and regulatory — I have regulatory and state

15 responsibilities to ensure that we are

16 complying. I'm responsible for the case

17 management portion of the department, which

18 includes case managers, RN case managers, and

19 social workers. And I'm also responsible for a

20 new program we just started, clinical

21 documentation.

22 Q. What do you do in connection with

23 your quality management aspect of your position?

24 A. Well, my staff support the

25 physicians' peer review committees. I'm

*COMPU-TRAN SHORTHAND REPORTING*

---

**47**

*Catherine Magone*

2 responsible for supporting the board quality

3 committee and the medical staff quality

4 improvement committee, ensuring compliance with

5 core measures and regulatory requirements and

6 joint commission responsibility.

7 Q. What about with the case management

8 aspect of the position?

9 A. I'm responsible for length of stay

10 reduction, reduction in the number of insurance

11 denials, so I interface with insurance

12 companies.

13 Q. Do you have an assistant in that

14 capacity?

15 A. I have an assistant director for

16 case management.

17 Q. What about social work?

18 A. No. I have an assistant director

19 for quality as well.

20 Q. Who are the social workers

21 currently employed at Lawrence?

22 A. Nicole Serra is the only social

23 worker with an MSW.

24 Q. You are distinguishing it — are

25 there other social workers assigned at Lawrence

*COMPU-TRAN SHORTHAND REPORTING*

---

**48**

*Catherine Magone*

2 that do not have their MSW?

3 A. She is not a social worker. She is

4 a social service coordinator, the second person.

5 Q. And her name is?

6 A. Elaine Tolontino.

7 Q. Apart from what you've already

8 testified to with respect to the first interview

9 of Ms. Newmark, do you recall anything else that

10 was said?

11 A. No.

12 Q. Do you recall what she said during

13 the interview, the first interview?

14 A. No.

15 Q. Are there any documents you can use

16 to refresh your recollection?

17 A. No.

18 Q. Did you maintain or take any notes

19 during the interview?

20 A. Yes.

21 Q. Do you still have possession of

22 those notes?

23 A. No.

24 Q. What, if anything, did you do with

25 them?

*COMPU-TRAN SHORTHAND REPORTING*

---

**49**

1                    Catherine Magone
2        A.    I would discard them.
3        Q.    When?
4        A.    I don't recall.
5        Q.    Before or after Ms. Newmark was no
6    longer employed at Lawrence?
7        A.    Oh, before.
8        Q.    What in words or substance did you
9    say during the second interview?
10       A.    During the second interview, I
11   explained to Carole my concerns about her lack
12   of experience. I described what the role of a
13   social worker in the case management model would
14   be. We talked about some of the things that
15   were coming down the pike that would need to be
16   taken care of; one of them being a disaster
17   mental health training program that she would
18   need to go to training for. We also spoke about
19   the palliative care program.
20       Q.    The --
21       A.    Palliative care program that was on
22   the horizon, because I was very excited about
23   that.
24       Q.    What in words or substance did you
25   say about the program?

*COMPU-TRAN SHORTHAND REPORTING*

---

**50**

1                    Catherine Magone
2        A.    Just that it was something that was
3    coming about, that it was going to be a multi-
4    disciplinary approach to chronic and -- chronic
5    illness and also dying patients.
6        Q.    Did she express again an interest
7    in that?
8        A.    She did.
9        Q.    What did she say in words or
10   substance?
11       A.    I'd be interested in doing
12   something like that.
13       Q.    Did there come a time she was
14   hired?
15       A.    Yes.
16       Q.    Was there anyone else interviewed
17   apart from Ms. Newmark with respect to the
18   position?
19       A.    I don't recall.
20       Q.    As you sit here today, do you
21   recall seeing any resumes or anything of that
22   nature --
23       A.    Yes.
24       Q.    Hold on.
25            -- with respect to that position?

*COMPU-TRAN SHORTHAND REPORTING*

---

**51**

1                    Catherine Magone
2        A.    Yes.
3        Q.    Do you know how you came to receive
4    those resumes?
5        A.    Through human resources.
6        Q.    Do you know whether it was in
7    response to any advertisements or anything of
8    that nature?
9        A.    I don't know.
10       Q.    Did you interview any of the people
11   that -- whose resumes you saw in connection with
12   the social work position?
13       A.    I don't believe so.
14       Q.    So she is the only one you
15   interviewed?
16       A.    I believe so.
17       Q.    And this is despite the fact that
18   you were concerned about her lack of experience,
19   is that right?
20       A.    (No response.)
21       Q.    You said lack of experience in the
22   case management program?
23       A.    Yes. However, Carole showed
24   willingness to learn.
25       Q.    And you -- she was the only person

*COMPU-TRAN SHORTHAND REPORTING*

---

**52**

1                    Catherine Magone
2    you interviewed despite the various concerns you
3    testified to earlier, is that right?
4        A.    There were no other candidates out
5    there that were suitable.
6        Q.    She was the only suitable
7    candidate?
8        A.    At that time.
9        Q.    Did you ever seek to locate any
10   other candidates that were more suitable than
11   Ms. Newmark?
12            MR. KEIL:  Do you want to
13   clarify that as to time frame?
14       Q.    At that time when she wasn't hired
15   yet, she said she had these concerns, and yet
16   this is the only person she interviewed. So I
17   wondered did you seek to look for any other
18   qualified candidates?
19       A.    Yes.
20       Q.    Did you make any postings or
21   advertise --
22       A.    I believe so.
23       Q.    Hold on, hold on.
24            -- in connection with the position of
25   social worker?

*COMPU-TRAN SHORTHAND REPORTING*

---

53

*Catherine Magone*

1
2    A.    I believe so.
3    Q.    How did you do that?
4    A.    Probably the newspaper, but I
5    cannot tell you for sure.
6    Q.    What did you do?  What did you do?
7    You are saying probably and believe so.  I'm not
8    concerned with your belief or probably.
9         What do you recall doing in connection
10   with interviewing or locating qualified
11   candidates for the social work position?
12   A.    It is not my responsibility to
13   place ads in the paper.  My responsibility --
14   that's a human resource responsibility.  I put
15   in a position.  If I have a position that is
16   approved, human resources will work with me to
17   either -- we have a posting in the hospital,
18   first of all, where all positions are posted.
19   Q.    Did you do that?
20   A.    Yes.  Not me personally.
21        MS. NICAJ:  I'm going to
22   call for production of all documents
23   concerning the social work position that
24   Ms. Newmark interviewed for starting
25   with -- starting in December 2005 and

*COMPU-TRAN SHORTHAND REPORTING*

54

*Catherine Magone*

1
2    continuing on through March of 2006
3    including any advertisements that were
4    made and so forth.
5    -DOCUMENT/DATA REQUESTED: All documents
6    concerning social worker position 12/05-3/06
7         MR. KEIL:  I'll take it
8    under advisement.
9    Q.    Did there come a time that
10   Ms. Newmark was offered the position?
11   A.    Yes.
12   Q.    When did that occur?
13   A.    Late February.
14   Q.    To your knowledge, how did the
15   offer -- how was that offer communicated to
16   Ms. Newmark?
17   A.    Through human resource.
18   Q.    Did you ever advise her in words or
19   substance either by telephone or in person
20   concerning an offer of employment?
21   A.    Human resources makes the offer of
22   employment.
23   Q.    I understand that is what you are
24   saying, but I'm asking a specific question with
25   respect to you.

*COMPU-TRAN SHORTHAND REPORTING*

55

*Catherine Magone*

1
2         Did you ever communicate the fact that
3    she was going to be offered the position?
4    A.    Prior to human resources offering
5    it to her?  No.
6    Q.    When you say prior to, were you
7    there when human resources made the offer to
8    Ms. Newmark?
9    A.    No.
10   Q.    Did you ever communicate that the
11   offer was going to be forthcoming to
12   Ms. Newmark?
13        MR. KEIL:  Excuse me.
14   Communicate to whom?
15        MS. NICAJ:  To Ms. Newmark.
16   A.    I don't recall.
17   Q.    With whom did you communicate, if
18   anyone, concerning hiring Ms. Newmark prior to
19   the offer being made to her?
20   A.    Denise Galloway.
21   Q.    Anyone else?
22   A.    Diane Lantz.
23   Q.    Anyone else?
24   A.    The medical director.
25   Q.    Anyone else?

*COMPU-TRAN SHORTHAND REPORTING*

56

*Catherine Magone*

1
2    A.    No.
3    Q.    Did you communicate with human
4    resources about your intended offer to
5    Ms. Newmark?
6    A.    Yes.
7    Q.    And with whom did you communicate
8    with at that time?
9    A.    Jasmine.
10   Q.    Jasmine's last name is what?
11   A.    I don't remember.
12   Q.    Is she still employed at HR?
13   A.    No.
14   Q.    Have you communicated with
15   Ms. Galloway since she ceased being employed at
16   Lawrence?
17   A.    Yes.
18   Q.    On how many occasions?
19   A.    Well, she's come to the hospital a
20   couple of times to visit, and I've seen her.
21   Q.    On how many occasions have you
22   communicated with Ms. Galloway since her
23   retirement?
24   A.    I don't understand what you mean by
25   communicate.

*COMPU-TRAN SHORTHAND REPORTING*

**57**

**Catherine Magone**

2　　**Q.**　Talked to, write, things of that
3　nature.
4　　**A.**　**Maybe twice.**
5　　**Q.**　When was the first time?
6　　**A.**　**I don't recall.  I met her in the**
7　**cafeteria on two occasions.**
8　　**Q.**　Do you recall what you spoke about?
9　　**A.**　**Pleasantries.**
10　　**Q.**　Was Ms. Newmark still employed
11　there?
12　　**A.**　**I believe so.**
13　　**Q.**　Apart from those two occasions, did
14　you ever seek to speak to her at her home or in
15　correspondence since she retired?
16　　**A.**　**Maybe once on the phone early on**
17　**after she retired.**
18　　**Q.**　Do you recall communicating with
19　her over the phone?
20　　**A.**　**I vaguely do.**
21　　**Q.**　What do you recall the substance of
22　your communication concerning?
23　　**A.**　**I don't recall.  It might have been**
24　**a question I had.  I don't recall.**
25　　**Q.**　Prior to Ms. Newmark's employment,

**58**

**Catherine Magone**

2　did anyone ever communicate to you that
3　employees at the hospital had communicated their
4　concerns about you to them?
5　　**A.**　**No.**
6　　**Q.**　Did anyone in HR ever speak to you
7　about the fact that employees had complained
8　about you?
9　　**A.**　**No.**
10　　**Q.**　Apart from communicating with
11　Ms. Galloway concerning Ms. Newmark prior to an
12　offer being extended to Ms. Newmark, did you
13　ever seek to ascertain any of Ms. Newmark's
14　references and call them?
15　　**A.**　**No.  Human resources checks**
16　**references.**
17　　**Q.**　Did you ever communicate with
18　anyone at the hospital apart from Ms. Galloway
19　in connection with their previous working
20　relationship with Ms. Newmark?
21　　**A.**　**No.**
22　　**Q.**　Did there come a time that the
23　palliative care program was actually established
24　or developed?
25　　**A.**　**Well, somebody was hired.  That**

**59**

**Catherine Magone**

2　would have been --
3　　**Q.**　When was that person hired?
4　　**A.**　**The end of May.**
5　　**Q.**　And was that position created?
6　　**A.**　**Yes.**
7　　**Q.**　What was the position?
8　　**A.**　**It's a nurse practitioner.**
9　　**Q.**　Was there a specific title apart
10　from nurse practitioner?
11　　**A.**　**I believe her title is nurse**
12　**practitioner for the palliative care program.**
13　　**Q.**　And she -- you said she
14　specifically was hired for this program, is that
15　right?
16　　**A.**　**That's correct.**
17　　**Q.**　Who interviewed her?
18　　**A.**　**I wasn't privy to that information.**
19　**I could assume who interviewed her.**
20　　**Q.**　Did you interview her?
21　　**A.**　**No, no.**
22　　**Q.**　Apart from your assumption, you
23　don't know who interviewed her?
24　　**A.**　**No, I was never told.**
25　　**Q.**　You didn't participate in her hire

**60**

**Catherine Magone**

2　or anything of that nature?
3　　**A.**　**No, no.**
4　　**Q.**　And this person is who?
5　　**A.**　**Maura Del Bene.**
6　　**Q.**　To your knowledge, what was
7　Ms. Del Bene's background prior to her being
8　hired in May of 2006?
9　　**A.**　**She is -- her background, I**
10　**believe, was psychiatric nurse practitioner.**
11　　**Q.**　To your knowledge, did she have any
12　experience in the palliative care program
13　elsewhere?
14　　**A.**　**I believe so, but I'm not -- I**
15　**never saw her resume.**
16　　**Q.**　And the basis of your belief is
17　what?
18　　**A.**　**That she came with an incredible**
19　**amount of knowledge regarding palliative care,**
20　**so I'm assuming that she did have.**
21　　**Q.**　Apart from your assumption, you
22　don't know what her experience was?
23　　**A.**　**No.**
24　　**Q.**　Again, I don't want you to assume
25　or guess or anything like that.  If you --

61

**Catherine Magone**

2   because of -- if you can estimate certain

3   things, of course, you are more than welcome to

4   do that.

5        A.   Okay.

6        Q.   Is she still employed there?

7        A.   Yes.

8        Q.   And her position is the same?

9        A.   Yes.

10       Q.   Is there anyone in that department

11  apart from her?

12       A.   She works in conjunction with

13  Dr. Kerrianne Page who is the medical director

14  for the program.

15       Q.   Is Dr. Page exclusively assigned to

16  the palliative care program or is she assigned

17  to other departments as well?

18       A.   She is a private practitioner.

19       Q.   Do you know how much time she

20  assigns to the palliative care program?

21       A.   I do not know.

22       Q.   Anyone else that works in

23  palliative care currently?

24       A.   Currently, no.  However, there was

25  a position -- there is a position, a social work

*COMPU-TRAN SHORTHAND REPORTING*

62

**Catherine Magone**

2   position, that is posted for that program.  They

3   had somebody there for a short period of time.

4   I believe it is a part-time position.

5        Q.   Are you responsible for hiring

6   someone from there?

7        A.   No.

8        Q.   Did there come a time when there

9   were any openings in the palliative care program

10  for the position of social worker while

11  Ms. Newmark was employed there?

12       A.   No.

13       Q.   Was there ever a time that while

14  Ms. Newmark was employed there that you ever

15  communicated to her concerning your decision

16  assigning a social worker in the palliative care

17  program?

18       A.   Communicate to Ms. Newmark?

19       Q.   Yes.

20       A.   Yes.

21       Q.   On how many occasions did you

22  communicate with Ms. Newmark while she was

23  employed at the hospital center about assigning

24  a social worker in the palliative unit?

25       A.   My decision?

*COMPU-TRAN SHORTHAND REPORTING*

63

**Catherine Magone**

2        Q.   I'm not talking about your

3   decision.  I'm saying communicate with her

4   concerning assigning a social worker in that

5   program.

6             MR. KEIL:  I'm going to

7        object to form.  Do you understand the

8        question?

9             THE WITNESS:  I don't

10       understand the question.

11       Q.   If you don't understand, you let me

12  know.

13            When was the first time you ever

14  communicated with Ms. Newmark about assigning a

15  social worker at the palliative care unit while

16  she was employed there?

17       A.   I don't recall.

18       Q.   Do you recall how long after she

19  became employed there, approximately a month or

20  two, a week or two, that that matter was first

21  communicated?

22       A.   I still don't understand the

23  question about communicating.  Communicating

24  what?

25       Q.   Communicating about the subject of

*COMPU-TRAN SHORTHAND REPORTING*

64

**Catherine Magone**

2   assigning a social worker in the palliative care

3   program.

4        A.   I don't believe it ever came up.

5        Q.   Was there a time that another

6   social worker was hired after Ms. Newmark was?

7        A.   Yes.

8        Q.   And that person is who?

9        A.   Nicole Serra.

10       Q.   Who recommended Ms. Serra?

11       A.   Ms. Newmark.

12       Q.   When was Ms. Serra hired?

13       A.   I believe it was May.  It may have

14  been the end of April.

15       Q.   Was anyone else interviewed apart

16  from Ms. Serra?

17       A.   No.

18       Q.   Did she have any case management --

19       A.   No.

20       Q.   -- experience?  Hold on.  I'm not

21  finished.  I'll withdraw that portion and ask

22  the question again.

23            Did she have any case management

24  experience?

25       A.   No.

*COMPU-TRAN SHORTHAND REPORTING*

65

1    *Catherine Magone*

2    Q.    How many times did you interview

3    Ms. Serra?

4    A.    **I believe two. I'm not a hundred**

5    **percent.**

6    Q.    Did anyone else interview Ms. Serra

7    apart from you?

8    A.    **Diane Lantz.**

9    Q.    Diane Lantz, I apologize. What is

10    her position again?

11    A.    **She was the assistant director for**

12    **case management at the time.**

13    Q.    Did Ms. Lantz interview Ms. Newmark

14    to your knowledge?

15    A.    **Yes.**

16    Q.    Was she part of one of the

17    interviews with you or she interviewed

18    Ms. Newmark separate and apart from you?

19    A.    **Separate.**

20    Q.    What about with respect to

21    Ms. Serra?

22    A.    **Separate.**

23        (Recess taken.)

24        (Record read.)

25    Q.    What position was Ms. Serra

COMPU-TRAN SHORTHAND REPORTING

66

1    *Catherine Magone*

2    interviewed for?

3    A.    **Social work.**

4    Q.    Where was she assigned?

5    A.    **We don't assign units.**

6    Q.    Who is responsible for giving the

7    social workers their assignments then? You said

8    you don't assign units.

9    A.    **Necessarily. They get their**

10    **referrals in a number of ways.**

11    Q.    How?

12    A.    **Case manager sees every patient.**

13    **Based on her assessment, she will refer a case**

14    **to a social worker. They also can get referrals**

15    **from physicians which come through the**

16    **department.**

17    Q.    Which department?

18    A.    **Case management department. And**

19    **what is supposed to happen is that prior to --**

20    **physicians don't necessarily understand the**

21    **difference between a case manager and a social**

22    **worker. So sometimes they make referrals to a**

23    **social worker, where it is really a case manager**

24    **function. So the social worker gets the**

25    **referral, confers with the case manager, prior**

COMPU-TRAN SHORTHAND REPORTING

67

1    *Catherine Magone*

2    to taking the case.

3    Q.    You indicated that the social

4    workers get referrals in a number of ways. You

5    just listed two. I just want to make sure those

6    are the only two ways. You said referrals

7    through case managers and referrals through

8    physicians.

9    A.    **Correct.**

10    Q.    Any other ways?

11    A.    **So nursing can refer as well.**

12    Q.    When you say nursing, in all

13    departments or specific departments?

14    A.    **All departments.**

15    Q.    Any other ways in which social

16    workers get referrals?

17    A.    **You can get referrals from the**

18    **emergency room.**

19    Q.    Any other ways?

20    A.    **No.**

21    Q.    In order -- is there a way in which

22    a social worker determines whose referral to

23    respond to first if there is a number of

24    referrals from the different areas?

25    A.    **They would be expected to**

COMPU-TRAN SHORTHAND REPORTING

68

1    *Catherine Magone*

2    prioritize.

3    Q.    Meaning what, prioritize as to

4    seriousness?

5    A.    **Prioritizing to the work,**

6    **seriousness, type of referral. For instance, if**

7    **it was a psychiatric referral, you would want to**

8    **see that patient first unless they were in a**

9    **coma in the unit.**

10    Q.    Is that set forth anywhere in

11    writing in terms of how social workers should

12    prioritize with different referrals?

13    A.    **No. It would be my expectation**

14    **that as a social worker you should be able to do**

15    **that on your own.**

16    Q.    But what I'm saying, apart from

17    your expectations, is this prioritizing set

18    forth anywhere in writing?

19    A.    **Prioritizing, no.**

20    Q.    In other words, there is no you

21    take the physician's referral above the nurse's

22    referrals and so forth and so on?

23    A.    **No.**

24    Q.    Did there come a time that you

25    communicated with Ms. Magone concerning the

COMPU-TRAN SHORTHAND REPORTING

73

**Catherine Magone**

1
2  training.  She would have had that information,
3  not me.
4      Q.    So do you know whether there were,
5  in fact, timelines reduced to writing?
6      A.    There were.  There were,
7  absolutely.
8      Q.    You saw them?
9      A.    I've seen something, yes.
10     Q.    When you say you've seen something,
11  what is the something you've seen?
12     A.    Communication when it originally --
13  when I was told that I had to send somebody, I
14  got this communication from our -- one of our
15  vice-presidents that told me that this was a
16  requirement for 2006.  2006, so we were going to
17  have to have a program in place.
18     Q.    Do you know what stage the program
19  needed to be in in 2006?
20     A.    It had to be completed, the
21  training.
22     Q.    That's the communication you
23  received?
24     A.    Yes.
25          MS. NICAJ: I'm going to call

*COMPU-TRAN SHORTHAND REPORTING*

74

**Catherine Magone**

1
2  for the production of that communication.
3      A.    I don't know if I have it still.
4          MR. KEIL:  I'll take it
5  under advisement.
6  -DOCUMENT/DATA REQUESTED: Communication
7  concerning 2006 timeline for disaster training
8  plan.
9      Q.    What was that communication again?
10  What exactly did you receive?
11     A.    It is a -- it was a new regulation.
12  I don't recall exactly what the regulation is,
13  but it was communicated to me by a
14  vice-president that it needed to be done.
15     Q.    In writing?
16     A.    E-mail.
17     Q.    And the vice-president whose name
18  is what?
19     A.    James Keogh.
20     Q.    Can you spell it?
21     A.    K E O G H.
22     Q.    When did Ms. Newmark go to the
23  disaster training, mental health disaster
24  training?
25     A.    June.

*COMPU-TRAN SHORTHAND REPORTING*

75

**Catherine Magone**

1
2      Q.    How long was this disaster
3  training?
4      A.    Two days.
5      Q.    Where?
6      A.    I don't recall.
7      Q.    Who else attended if you know from
8  the hospital?
9      A.    A per diem nurse.
10     Q.    And that nurse's name is?
11     A.    I don't know her name.
12     Q.    Did the nurse have any duties and
13  responsibilities in connection with this mental
14  health disaster program?
15     A.    They were supposed to be doing it
16  collaboratively.
17     Q.    Did you ever communicate with the
18  nurse --
19     A.    No.
20     Q.    -- concerning this?
21     A.    Did I communicate with the nurse?
22     Q.    Yes.
23     A.    No.  I communicated with her
24  supervisor.
25     Q.    Did you ever communicate with the

*COMPU-TRAN SHORTHAND REPORTING*

76

**Catherine Magone**

1
2  nurse?
3      A.    I've never met the nurse.
4      Q.    And the supervisor is who?
5      A.    Cathie Enright.
6      Q.    Cathie?
7      A.    Enright, E N R I G H T.
8      Q.    Apart from Ms. Enright, you never
9  communicated with the nurse since that training
10  whatsoever concerning the mental health disaster
11  program, is that right?
12     A.    That's correct.  I would have
13  expected that to be done by Carole.
14     Q.    I'm not asking what you expect.
15  I'm asking whether you, in fact, communicated.
16     A.    I did not.
17     Q.    Okay.
18     A.    Yes.
19     Q.    With respect to Ms. Enright, what
20  is her position?
21     A.    She is director of patient care
22  services.
23     Q.    You said the nurse was per diem?
24     A.    Per diem.
25     Q.    What does that mean exactly?

*COMPU-TRAN SHORTHAND REPORTING*

77

Catherine Magone

2  A.    That means she is not a full-time
3  employee.
4  Q.    Do you know how many hours she
5  devoted to the hospital?
6  A.    I don't know.
7  Q.    Do you know whether she worked
8  there every other week, once a month?  Do you
9  know what the arrangement was with that per diem
10  nurse?
11  A.    I do not know.
12  Q.    Did you ever seek to ascertain that
13  from Ms. Enright?
14  A.    I just knew that she was per diem.
15  Q.    Did you ever seek to ascertain that
16  from Ms. Enright whether how many hours that
17  nurse devoted to Lawrence?
18  A.    No.
19  Q.    Did you ever discuss with
20  Ms. Enright the disaster program that you sent
21  Ms. Newmark to?
22  A.    Yes.
23  Q.    Did you ever reduce your
24  communications to her in writing?
25  A.    No.

COMPU-TRAN SHORTHAND REPORTING

78

Catherine Magone

2  Q.    On how many occasions did you
3  communicate with Ms. Enright about the disaster
4  program?
5  A.    Ms. Enright communicated with me
6  that she was concerned that the nurse was trying
7  to get in touch with Carole and Carole wasn't
8  returning her calls.
9  Q.    Did you ever speak to the nurse
10  personally about that issue?
11  A.    No.
12  Q.    Did you ever ask her for the
13  telephone number of this nurse?
14  A.    No.
15  Q.    Did you ever speak to Ms. Newmark
16  about what Ms. Enright communicated to you?
17  A.    No.
18  Q.    So you never ascertained whether
19  what Ms. Enright communicated with you was
20  accurate or not, is that right?
21  A.    That conversation took place after
22  Carole was gone.
23  Q.    Do you know when in June that
24  mental health disaster training was held?
25  A.    Where it was held?

COMPU-TRAN SHORTHAND REPORTING

79

Catherine Magone

2  Q.    When in June was it, In the end,
3  the beginning, middle?
4  A.    I believe the end.
5  Q.    The end of June?  Did you have an
6  understanding what Ms. Newmark was required to
7  do in connection with the training?
8  A.    It was to train the trainer.
9  Q.    What does that mean?  I'm sorry.
10  A.    Well, you get the training and then
11  you train other people to assist with the
12  training.
13  Q.    Which other people was she -- was
14  Ms. Newmark expected to train?
15  A.    That hadn't even been discussed.
16  Q.    Did Ms. Enright ever communicate
17  with you as to the number of times that per diem
18  nurse --
19  A.    No.
20  Q.    -- tried to contact Ms. Newmark?
21  A.    I just know it was more than once.
22  Q.    Do you know how many times?
23  A.    No.
24  Q.    You indicated you only learned of
25  this after Ms. Newmark left, is that right?

COMPU-TRAN SHORTHAND REPORTING

80

Catherine Magone

2  A.    Yes.
3  Q.    When did you have this
4  communication with Ms. Enright about this
5  matter?
6  A.    Probably in October.  I don't
7  recall exactly.
8  Q.    How did it come about?
9  A.    Because Carole was gone.  We were
10  discussing how we were going to move forward.
11  Q.    Move forward with what?
12  A.    With the program, since Carole had
13  gone for the training.  So it was the per diem
14  nurse that put together the -- to train the
15  trainer.
16  Q.    When did that happen?
17  A.    In 2006.
18  Q.    Was this more than one day?
19  A.    I don't -- I was not a part of it.
20  Q.    Were you part of the train the
21  trainer?
22  A.    No.
23  Q.    Do you know who was trained?
24  A.    I don't know.
25  Q.    Do you know the number of people

COMPU-TRAN SHORTHAND REPORTING