81

*Catherine Magone*

2  that were trained?

3      A.    I don't know.

4      Q.    Do you know how long the training

5  took place?

6      A.    I don't know.

7      Q.    Do you know where it took place?

8      A.    I don't know.

9      Q.    Do you know apart from this per

10  diem nurse anyone involved in that training?

11      A.    No.

12      Q.    Did you assign anyone to this

13  training?

14      A.    No.

15      Q.    Do you know whether Nicole Serra

16  was trained?

17      A.    No.

18      Q.    Do you know whether any of your

19  nurses under your supervision were?

20      A.    No, none of them were.

21      Q.    Did you see any writing in

22  connection with completing this training?

23      A.    I don't know if it's been

24  completed to be honest.

25              MS. NICAJ: I'm going to call

*COMPU-TRAN SHORTHAND REPORTING*

82

*Catherine Magone*

2  for production of documents in connection

3  with this program and the training of the

4  trainer and so forth.

5  -DOCUMENT/DATA REQUESTED: All documents

6  concerning disaster training program.

7              MR. KEIL:    I'll take it

8  under advisement.

9      Q.    You indicated that more than one

10  person would be assigned to the palliative care

11  service as a social worker, is that right?

12      A.    More than one person could be

13  involved in palliative care.

14      Q.    Whether they could be, did you, in

15  fact, ever advise Ms. Newmark that you were

16  appointing Nicole Serra to the palliative care

17  service?

18      A.    No.  I told her that I was sending

19  Nicole for the training and that she would be

20  the lead person because she was going for the

21  training.

22              MS. NICAJ:  Can you mark

23  this as Plaintiff's Exhibit 2.

24              (Plaintiff's Exhibit 2

25  8/15/06 Memo marked for identification, as

*COMPU-TRAN SHORTHAND REPORTING*

83

*Catherine Magone*

2  of this date.)

3      Q.    I'm going to show you what's been

4  marked Plaintiff's Exhibit 2 for identification.

5  Do you recognize that document?

6      A.    Sure.

7      Q.    What do you recognize it to be?

8      A.    A note to my file.

9      Q.    The first sentence, the first full

10  sentence, of that document there is a date of

11  8/15/06:  "I met with Carole Newmark today to

12  inform her of my decision to appoint Nicole

13  Serra the social worker for the palliative care

14  service."  Do you see that?

15      A.    Mm-hmm.

16      Q.    Do you want to change your earlier

17  response?

18      A.    Yes.

19      Q.    And how would you like to change

20  that?

21      A.    All right.  I told Carole that I

22  was going to appoint Nicole to the palliative

23  care service.

24      Q.    So when you testified before it was

25  not true, is that right?

*COMPU-TRAN SHORTHAND REPORTING*

84

*Catherine Magone*

2      A.    Well, semantics.

3      Q.    What do you mean?

4      A.    Because the palliative care

5  service, even though I was appointing her with

6  the palliative care, that would not mean that

7  Carole would not be involved with palliative

8  care.  Her patients needed palliative care; she

9  would be expected to be a part of the palliative

10  care program.

11      Q.    Is that contained anywhere in

12  Plaintiff's Exhibit 2 for identification?

13      A.    I don't know what you mean.

14      Q.    You just testified that Carole

15  would be expected if any of her patients were

16  part of this program to be part of the -- to

17  participate in that.  Is that contained anywhere

18  in Plaintiff's Exhibit 2?

19      A.    No.

20              MR. KEIL:   She is referring

21  to the document in front of you.

22      A.    Right.  No.

23      Q.    You met with her in your office;

24  you told her to come over, is that right?

25      A.    Correct.

*COMPU-TRAN SHORTHAND REPORTING*

85

*Catherine Magone*

2  Q.  Was it right away that she came
3  over after you called her?
4  A.  I believe so.
5  Q.  And who spoke first?
6  A.  I did.
7  Q.  What in words or substance did you
8  say?
9        MR. KEIL:  I'm going to
10  object.  This is all -- you've already
11  asked this question.
12        MS. NICAJ:  I'm permitted
13  to ask it again, and I am just warning you
14  you are violating the federal rules by
15  making a speaking objection.  So you can
16  make, state your objection but that's it.
17  Go ahead.
18  Q.  What in words or substance did you
19  say?
20  A.  I told her that I was assigning
21  Nicole Serra to be the person that would be
22  appointed to the palliative care service and
23  would be traveling to Ohio with Roseanne O'Hare
24  and Maura Del Bene.  I told her I made this
25  decision based on input from Maura Del Bene and

*COMPU-TRAN SHORTHAND REPORTING*

86

*Catherine Magone*

2  Roseanne and that I felt that Carole would be
3  busy with her disaster mental health training
4  and that Nicole being young in her career would
5  need to have something that I think that she
6  would call her own.
7  Q.  What do you mean, young in her
8  career?  What do you mean by that?
9  A.  She is a relatively new social
10  worker.  She has only been working for four
11  years, and she showed a lot of interest in the
12  palliative care program.
13  Q.  Wasn't Ms. Newmark also relatively
14  new in the social work career as you put it?
15  A.  Twice as long.
16        MS. NICAJ:  Plaintiff's
17  Exhibit 3.
18        (Plaintiff's Exhibit 3
19  5-page Resume of Nicole Serra marked for
20  identification, as of this date.)
21  Q.  When you said twice as long, what do
22  you mean by twice as long in her career?
23  A.  I believe that Nicole had four
24  years' experience.
25  Q.  What about her counseling

*COMPU-TRAN SHORTHAND REPORTING*

87

*Catherine Magone*

2  experience at the JCC Westchester?
3  A.  I didn't believe that she was a
4  social worker at the time.
5  Q.  Do you know whether she had any
6  social work responsibilities?
7  A.  From what is described, I would say
8  no.
9  Q.  Did she advise you of such during
10  the course of your interview with Ms. Serra?
11  A.  Well, it appears here that she
12  received her master's in social work in 2001.
13  Q.  I'm asking you, did Ms. Serra
14  advise you in words or substance that she had
15  social work responsibilities at the JCC
16  Westchester?
17  A.  No.
18  Q.  Did you ask her about that?  Did
19  you ask her about her experience there?
20  A.  Yes.
21  Q.  What did you ask her?
22  A.  I would have asked her to describe
23  her -- whatever -- whenever I interview
24  somebody, I ask them to describe their resume.
25  Q.  I'm not asking what you would have

*COMPU-TRAN SHORTHAND REPORTING*

88

*Catherine Magone*

2  done.
3  A.  I don't remember.
4  Q.  Hold on.  I'm asking what do you
5  recall asking her.
6  A.  I don't remember.
7  Q.  In response to what you advised
8  Ms. Newmark about assigning Ms. Serra to the
9  palliative care service, what, if anything, did
10  she say?
11  A.  She was very angry.
12  Q.  What did she say?
13  A.  I'm very disappointed.
14  Q.  Anything else?
15  A.  Just visibly angry and
16  disappointed.
17  Q.  When you say visibly angry, what
18  was her expression?
19  A.  Anger.
20  Q.  How did that manifest itself?
21  A.  Huffing and puffing.
22  Q.  Huffing and puffing?
23  A.  Mm-hmm.
24  Q.  Can you demonstrate that for us?
25  A.  (Indicating) visibly angry.  Carole

*COMPU-TRAN SHORTHAND REPORTING*

89

**Catherine Magone**

1
2 was a very angry woman.
3    Q.    Apart from this communication with
4 Ms. Newmark, did you ever -- concerning
5 Ms. Newmark, did you ever document her anger?
6    A.    No.
7    Q.    When you say she was a very angry
8 woman, what do you mean by that?
9    A.    Well, part of the reason why I
10 chose not to appoint Carole to the position of
11 the palliative care was her input from Maura
12 Del Bene who stated to me that she is a very
13 angry woman, and her demeanor would not lend
14 itself to taking care of dying patients.
15    Q.    Did Ms. Del Bene ever express any
16 similar concerns about Ms. Serra?
17    A.    No.
18    Q.    Did you ever see any E-mails
19 concerning Ms. Serra's demeanor that Maura
20 Del Bene submitted?
21    A.    No.
22    Q.    Did you ever ask her?
23    A.    If she felt that Maura -- that
24 Nicole had a negative angry demeanor?
25    Q.    Did you ever ask her about Nicole's

90

**Catherine Magone**

1
2 performance?
3    A.    Yes.
4    Q.    In words or substance what did she
5 say?
6    A.    You are talking about Maura
7 Del Bene?
8    Q.    Yes.
9    A.    Oh, she highly recommended Nicole
10 to be the person that would be in the palliative
11 care program for a number of reasons. Okay.
12 Nicole sought her out, always willing to learn,
13 takes copious notes whenever you are teaching
14 her anything. Made it a point of corroborate --
15 collaborating with Maura on cases that involved
16 palliative care, showed an interest in
17 palliative care, unlike Carole who Maura told me
18 had made -- Maura had made many attempts to meet
19 with Carole to talk about palliative care. She
20 apparently had set up weekly meetings which
21 Carole did not show up. I believe she only
22 showed up twice.
23    Q.    Out of how many weekly meetings?
24    A.    I don't know. I don't know.
25    Q.    Do you know whether she failed to

91

**Catherine Magone**

1
2 show up at one?
3    A.    No. Ten.
4    Q.    She failed to show up at ten?
5    A.    Eight. I'm guessing the number.
6    Q.    Don't guess.
7    A.    Okay. I don't know. I don't know.
8 I don't -- I don't know but it was --
9    Q.    Did you ask her how many meetings
10 did Ms. Newmark fail to attend after having
11 those scheduled meetings?
12    A.    I don't remember what she told me.
13 She probably -- she might have given me a
14 number, but I don't remember what it was.
15    Q.    I don't want you to guess.
16    A.    Okay. She also told me that
17 despite attempts to get Carole involved in
18 policy writing and procedure writing related to
19 palliative care, specifically for a bereavement
20 policy, she didn't do anything.
21    Q.    Did you ever see that in writing
22 anywhere, that Ms. Del Bene attempted to get
23 Ms. Newmark involved in writing as you put it?
24    A.    Did I see anything in writing?  No.
25    Q.    Did you ever ask her for any

92

**Catherine Magone**

1
2 documents, incidents wherein she requested from
3 Ms. Newmark her participating in this writing
4 process?
5         MR. KEIL:  Could you read
6    the question back, please.
7         (Record read.)
8    A.    No.
9    Q.    Who supervised Ms. Serra?
10    A.    Diane Lantz.
11    Q.    You indicated that Ms. Newmark's
12 position was what?
13    A.    Senior social worker.
14    Q.    Was she, in fact, Ms. Serra's
15 direct supervisor?
16    A.    She was the lead social worker with
17 some --
18    Q.    Was she her direct supervisor?
19    A.    Not on paper.
20    Q.    When you say not on paper?
21    A.    Not part of the job description.
22    Q.    What was her job description?
23    A.    She was senior social worker.
24    Q.    Was her position as senior social
25 worker reduced to writing?

93

**Catherine Magone**

2  A.  No.

3  Q.  Did you have an understanding that

4  Ms. Newmark was Ms. Serra's direct supervisor?

5  A.  No.

6  Q.  Did you ever communicate with

7  Ms. Newmark that she would supervise Ms. Serra?

8  A.  **Well, she did, in fact, supervise**

9  **her.**

10  Q.  So she was her supervisor.  Did you

11  ever --

12  MR. KEIL:  Was that a

13  question?

14  MS. NICAJ:  No.  I'm just --

15  we finally got to it.  So I apologize.

16  Withdraw that.

17  Q.  Do you know how many cases or

18  patients were referred to in the social

19  worker -- were referred to Ms. Serra while

20  Ms. Newmark was employed there?

21  MR. KEIL:  I'm going to

22  object as to form.

23  Q.  How many patient referrals were

24  there to your knowledge to Ms. Serra while

25  Ms. Newmark was employed there?

*COMPU-TRAN SHORTHAND REPORTING*

---

94

**Catherine Magone**

2  A.  **It could vary day to day.  It could**

3  **be four one day eight the next.**

4  Q.  What about with Ms. Newmark?

5  A.  **Same.**

6  Q.  And that was the limit; eight was

7  the most?

8  A.  **We don't have a number on the**

9  **limit.  But I would say that their caseload was**

10  **probably an average of six to eight.**

11  Q.  Were there any statistics ever kept

12  in reference to the caseload or maintained by

13  your office?

14  A.  **No.**

15  Q.  Did anyone ever seek to compile

16  statistics in reference to the number of cases

17  each social worker was assigned?

18  A.  **I would know that on a daily basis**

19  **pretty much because I was -- I would ask the**

20  **question.**

21  Q.  Did anyone seek to compile

22  information concerning the number of cases or

23  patients each social worker was assigned each

24  day?

25  A.  **No, no.**

*COMPU-TRAN SHORTHAND REPORTING*

---

95

**Catherine Magone**

2  Q.  Are there any records to your

3  knowledge regarding that?

4  A.  **No.**

5  Q.  Apart from what you've already

6  testified to, what, if anything else, do you

7  recall communicating with Ms. Newmark about

8  assigning Nicole Serra to the palliative care

9  services?

10  A.  **Nothing.**

11  Q.  Apart from what you've already

12  testified to, what, if anything, do you recall

13  Ms. Newmark stating in words or substance with

14  respect to your decision?

15  A.  **Nothing else.**

16  Q.  Did there come a time that anyone

17  communicated with you concerning your decision

18  to appoint Nicole Serra to the palliative care

19  services?

20  A.  **I don't understand the question.**

21  Q.  Did anyone ever communicate with

22  you that Ms. Newmark had gone to them about your

23  decision?

24  A.  **To human resources, yes.**

25  Q.  Apart from human resources did

*COMPU-TRAN SHORTHAND REPORTING*

---

96

**Catherine Magone**

2  anyone else ever communicate with you that

3  Ms. Newmark had expressed concern about that?

4  A.  **No.**

5  Q.  I'm going to show you again what's

6  marked as Plaintiff's Exhibit 2 for

7  identification.  You have it underneath some of

8  those documents.

9  When did human resources first

10  communicate with you concerning Ms. Newmark

11  expressing her concern about your decision?

12  A.  **I don't know the exact date.**

13  Q.  Can you approximate how many days?

14  A.  **It was a few days after our**

15  **discussion.**

16  Q.  Who communicated with you?

17  A.  **Pat Orsaia.**

18  Q.  Was this verbally, in writing or

19  some other manner?

20  A.  **I believe E-mail.**

21  Q.  What was the substance of the

22  E-mail?

23  A.  **I believe that Pat was going on**

24  **vacation and she just E-mailed me that Carole**

25  **Newmark had come to her with some concerns and**

*COMPU-TRAN SHORTHAND REPORTING*

---

97

### Catherine Magone

2 that she would be in touch with me when she
3 returned.
4    Q.  What was stated in the E-mail?
5    **A.  Something to that effect.**
6    MS. NICAJ:  Four.
7    (Plaintiff's Exhibit 4
8    8/22/06 E-mail marked for identification,
9    as of this date.)
10    Q.  I'm going to direct your attention
11 to what is marked as Plaintiff's Exhibit 4 for
12 identification.  Do you see that?
13    A.  Yes.
14    It appears to be an E-mail from you
15 to Pat Orsaia and the subject is accept that
16 Carole Newmark's concerns.  Do you know what her
17 E-mail to you was?
18    MR. KEIL:  I object as to
19 form.  Do you understand the question?
20    THE WITNESS:  No.
21    Q.  You said she E-mailed you.  What
22 was the substance of her E-mail to you?
23    A.  Well, this is back in -- this is
24 August.
25    Q.  Right.

*COMPU-TRAN SHORTHAND REPORTING*

98

### Catherine Magone

2    **A.  This is July.  It's a month later.**
3 **But it wouldn't be related.**
4    Q.  What is July?  What is July?  Both
5 of them are August.
6    **A.  Oh, August.  I'm sorry, I'm sorry.**
7 **I'm sorry.  I'm sorry.**
8    Q.  It's okay.
9    What were you referring to as July, by
10 the way?
11    **A.  I was just thinking it was July.**
12 **You know.  It wasn't July.  It's August.**
13    Q.  What E-mail did Ms. Orsaia send to
14 you?
15    **A.  This E-mail was probably when she**
16 **came back setting up a meeting with Carole and**
17 **I.**
18    Q.  I'm not asking about probably.  I'm
19 asking -- you indicated that Ms. Orsaia first
20 sent you an E-mail and you read it and related
21 it to Ms. Newmark's concerns.
22    **A.  At that time she didn't elaborate.**
23    Q.  Do you know where that E-mail is,
24 because we don't have it.
25    **A.  Maybe it wasn't an E-mail then.**

*COMPU-TRAN SHORTHAND REPORTING*

99

### Catherine Magone

2 **Maybe it was a phone call.**
3    Q.  But what did you mean, accept that
4 Carole Newmark's concerns, if you didn't receive
5 the communication in E-mail form?
6    **A.  No.  I had a call from -- I don't**
7 **know if it was a call from Pat or an E-mail from**
8 **Pat a few days after the 8/15 encounter with**
9 **Carole.  And if my memory has it, Pat was going**
10 **to be away so she couldn't set up a meeting**
11 **until she got back.  So this one must have been**
12 **when she got back.**
13    Q.  You testified earlier that she
14 E-mailed you.
15    **A.  I'm not a hundred percent sure.  It**
16 **was either an E-mail or a phone call.  I don't**
17 **recall.**
18    Q.  Was there a reason why you would
19 have only a simple subject accepted Carole
20 Newmark's concerns if she wasn't the one that
21 E-mailed you about those concerns?
22    **A.  No.  Accepted would be if I was**
23 **getting -- this is probably a -- what do you**
24 **call it -- to your calendar, an appointment**
25 **regarding her concerns.**

*COMPU-TRAN SHORTHAND REPORTING*

100

### Catherine Magone

2    Q.  The subject concerned an
3 appointment, your subject in Exhibit 4?
4    **A.  I believe so.**
5    Q.  Does it indicate anywhere the date
6 the appointment would be?  You said an
7 appointment for what?
8    **A.  No, no.  When you -- in outlook**
9 **when someone sends you an E-mail, if they are**
10 **setting up an appointment to meet, it**
11 **automatically goes in your calendar if you**
12 **accept it.**
13    Q.  So there was an E-mail from Pat
14 Orsaia.  That's what I'm trying to get to.
15    **A.  Two different times, you are**
16 **talking about two different things.  She either**
17 **called me or E-mailed me that there was going to**
18 **be a meeting, and this one appears to be the**
19 **setting up of the meeting.**
20    Q.  Accepting her E-mail, or no?  I'm
21 not trying to put words in your mouth, but you
22 said ordinarily something like that, that would
23 indicate someone E-mailed you through outlook
24 with an appointment.
25    **A.  Yes.**

*COMPU-TRAN SHORTHAND REPORTING*

101

*Catherine Magone*

2  Q.  So she did in fact E-mail you?

3  A.  Yes.  Here.  But I don't remember

4  if it was -- if she had E-mailed me earlier or

5  she just called me earlier.  There was a

6  difference in time here.

7  Q.  What was the substance of that

8  E-mail?

9  A.  I don't recall.

10  MS. NICAJ:  I'm going to

11  call for the production of it, because we

12  don't have it and it would be enlightening

13  to know what the E-mail was.

14  MR. KEIL:  I'm not sure

15  there was such an E-mail, but it would be

16  something we can discuss off the record.

17  But I will take the request under

18  advisement.

19  MS. NICAJ:  It is more than

20  a request.  We previously requested this

21  information.

22  -DOCUMENT/DATA REQUESTED: Pat Orsaia E-mail

23  Q.  Do you recall the substance of that

24  E-mail?

25  A.  I don't recall.

*COMPU-TRAN SHORTHAND REPORTING*

102

*Catherine Magone*

2  Q.  Prior to any meeting with

3  Ms. Newmark, do you know what those concerns

4  Ms. Newmark had expressed to Patricia Orsaia

5  were?

6  A.  Yes.

7  Q.  What?

8  A.  That she felt that the conversation

9  that I had with her when I told her that I

10  was appointing Nicole Serra to the program,

11  palliative care program, that in using the word

12  "young" that implied ageism.

13  Q.  Well, she doesn't exactly say you

14  just used the word "young," did she, to your

15  knowledge?

16  A.  Using the word "young" implied

17  ageism is what she said.

18  Q.  Did she identify what comment she

19  exactly attributed to you in connection with

20  using the word "young" to your knowledge?

21  A.  Yes.

22  Q.  What?

23  A.  She said that I said, which I deny,

24  that Nicole was younger therefore could do a

25  better job.

*COMPU-TRAN SHORTHAND REPORTING*

103

*Catherine Magone*

2  Q.  When did you learn that she had

3  communicated this concern to Pat Orsaia?

4  A.  I don't recall.

5  Q.  Was this around the time you

6  received the appointment for August, accepted

7  Carole Newmark's concerns?

8  A.  Pardon me?

9  Q.  Verbal response, she said.

10  A.  I don't know the exact date.

11  Q.  Do you recall communicating with

12  Ms. Orsaia prior or around August 21 about

13  Ms. Newmark's concerns about --

14  A.  Yes.

15  Q.  So if it wasn't August 21, it was

16  around that time, is that right?

17  A.  Yes.

18  Q.  When was the next communication

19  that you had with anyone concerning Ms. Newmark

20  after your August 21, 2006 E-mail?

21  A.  I don't recall exact dates.

22  Q.  With whom?

23  A.  Pat Orsaia.

24  Q.  Was this at a meeting with

25  Ms. Orsaia?

*COMPU-TRAN SHORTHAND REPORTING*

104

*Catherine Magone*

2  A.  Yes.

3  Q.  Was anyone else present?

4  A.  No.

5  Q.  Did Ms. Orsaia take notes?

6  A.  I don't recall.

7  Q.  Did she have you write a statement

8  as to what you actually told Ms. Newmark?

9  A.  No.

10  Q.  How did you come to meet with

11  Ms. Orsaia?

12  A.  She asked to meet with me.

13  Q.  Do you know how long after the

14  August 21, 2006 E-mail?

15  A.  I don't recall.

16  Q.  What did she say?

17  A.  I just told you.

18  Q.  She asked to meet with you?

19  A.  She asked to meet with me to

20  discuss Carole's concerns.

21  Q.  When she asked you to meet with her

22  to discuss Carole's concerns, did she identify

23  what those concerns were?

24  A.  I don't recall.

25  Q.  Did you meet -- then meet with her?

*COMPU-TRAN SHORTHAND REPORTING*

105

**Catherine Magone**

1
2    A.    Yes.
3    Q.    Apart from what you've already
4 testified to, did you say anything else to her
5 or did she say anything else to you?
6    A.    No.
7    Q.    How long after your telephone
8 conversation with her did you meet with
9 Ms. Orsaia?
10    A.    I don't recall.
11    Q.    Was it the same day, the next day,
12 sometime after?
13    A.    Probably sometime after.
14    Q.    Who spoke first at this meeting?
15    A.    At the meeting that Pat Orsaia and
16 myself were at?
17    Q.    That's correct.
18    A.    I don't recall who spoke first.
19    Q.    What do you recall her saying in
20 words or substance?
21    A.    That Carole had come to meet with
22 her, that she -- and that she had indicated --
23 Carole had indicated that I had said that I was
24 giving the position to Nicole because she was
25 younger and better able to do the job and that

107

**Catherine Magone**

1
2 and I'm close to her age myself.
3    Q.    Who is close to Carole's age?
4    A.    (Indicating).
5    Q.    How old are you?
6    A.    I'm going to be 55.
7    Q.    Do you know how old Ms. Newmark is?
8    A.    I think she's 62. I also have many
9 staff in the department that are over 55 and 60.
10    Q.    Did Ms. Orsaia take any notes as
11 far as you can tell of what you told her?
12    A.    I don't recall.
13    Q.    Did you request that she document
14 your response in writing?
15    A.    No.
16    Q.    Did she ever ask you to reduce what
17 you in fact told Ms. Newmark in writing?
18    A.    Yes.
19    Q.    When?
20    A.    After our meeting with Carole.
21    Q.    So you actually met with
22 Ms. Newmark. How long did your meeting with Pat
23 Orsaia last, the one in which you and she were
24 by yourselves?
25    A.    40 minutes.

106

**Catherine Magone**

1
2 this was constituting ageism.
3    Q.    What, if anything, did you say in
4 response?
5    A.    I totally denied that. I in no way
6 implied or inferred that age had anything to do
7 with my decision.
8    Q.    Did you reduce that to writing at
9 that time to Ms. Orsaia?
10    A.    No, I did not.
11    Q.    Did Ms. Orsaia take any notes of
12 your meeting with her?
13    A.    I don't recall.
14    Q.    Did she record the conversation?
15    A.    No.
16    Q.    Was anyone else present?
17    A.    No.
18    Q.    What else was said by you or her at
19 this meeting?
20    A.    She told me that she had expressed
21 to Carole that she had worked with me for the
22 past -- for four years and that no -- at no time
23 during that period had age ever been an issue.
24 She also told Carole -- she also told me that
25 she told Carole that I hired her knowing her age

108

**Catherine Magone**

1
2    Q.    When was the next time any
3 communications were held in your presence or
4 which you participated in concerning Carole
5 Newmark following this meeting with Pat Orsaia?
6    A.    I don't recall. I don't believe
7 there were any.
8    Q.    Pardon?
9    A.    I don't believe there were any
10 other meetings, but I don't recall.
11    Q.    I didn't ask for any meeting. Any
12 communications after your meeting with Pat
13 Orsaia did you participate in any communications
14 or were there any communications in your
15 presence concerning Carole Newmark?
16    A.    I don't recall. Can I ask a
17 question?
18         MR. KEIL:   No.
19    Q.    What was the question you wanted to
20 ask?
21    A.    When you are asking me if I met
22 with Pat Orsaia at any other time --
23    Q.    No, I didn't ask that.
24    A.    Okay. Then I need you to rephrase
25 the question for me.

109

**Catherine Magone**

1
2     **Q.** Did you have any communications
3 with anyone or were there any communications in
4 your presence concerning Ms. Newmark after your
5 meeting with Pat Orsaia?
6     **A.** Yes.
7     **Q.** When was the next time?
8     **A.** I don't recall.
9     **Q.** With whom?
10     **A.** Pat Orsaia.
11     **Q.** Was this in writing, via telephone
12 or in some other manner?
13     **A.** I'm trying to get my time frames
14 confused. I believe I met with her to
15 discuss -- but I'm not -- to discuss Carole's
16 unscheduled time off.
17     **Q.** When after the meeting?
18     **A.** See, I'm not sure if it is before
19 or after.
20     **Q.** Before or after what?
21     **A.** That meeting. At some point I met
22 with her about Carole's unscheduled time off.
23     **Q.** Did you ever send any E-mails or
24 anything in connection with that?
25     **A.** No.

*COMPU-TRAN SHORTHAND REPORTING*

---

110

**Catherine Magone**

1
2     **Q.** Before you learned that Ms. Newmark
3 had expressed concern to Pat Orsaia about what
4 she perceived as ageism, did you ever document
5 her issue with attendance?
6     **A.** Yes.
7     **Q.** When?
8     **A.** I don't recall.
9     **Q.** Is it fair to say that if there is
10 none in her personnel file then you didn't?
11     **A.** No.
12     **Q.** It is not fair to say. Where would
13 your documentation of her attendance then appear
14 if it is not in her personnel file?
15     **A.** In human resources?
16     **Q.** Yes.
17     **A.** Or in my office?
18     **Q.** In either one.
19     **A.** In my office it would be.
20     **Q.** It would be in your office.
21 Are there records concerning Ms. Newmark
22 that you have but the personnel office does not?
23     **A.** I think we gave everything to them.
24     MR. KEIL: Just answer the
25 question.

*COMPU-TRAN SHORTHAND REPORTING*

---

111

**Catherine Magone**

1
2     **A.** Yeah, I gave everything to them.
3     **Q.** So is it fair to say if there is
4 nothing documented concerning Ms. Newmark's
5 absences prior to her expressing her concern to
6 Pat Orsaia about your comments or comments she
7 attributed you making, that there aren't any?
8     **A.** I don't recall if what is
9 documented in her file was prior to or after. I
10 just can't recall when it was. But I do have
11 documentation in her file regarding a discussion
12 about issues with time off.
13     **Q.** Was that after she had complained
14 about you?
15     **A.** I don't recall.
16     **Q.** You indicated you met with Pat
17 Orsaia about Ms. Newmark's unscheduled time off.
18 When you say unscheduled time off, what do you
19 mean by that?
20     **A.** Calling in sick.
21     **Q.** Do you know whether those -- the
22 calling in sick were legitimate?
23     **A.** Legitimate?
24     **Q.** Yes.
25     **A.** She was sick.

*COMPU-TRAN SHORTHAND REPORTING*

---

112

**Catherine Magone**

1
2     **Q.** Did you have any doubt that she was
3 sick?
4     **A.** We don't ask. It's a policy,
5 unscheduled time off. The policy is that you
6 don't -- my concern was that she was only there
7 a short period of time, and she had already had
8 three unscheduled times off. And one day she
9 left after an hour and a half, went home sick,
10 and then she was requesting an additional day
11 off to have a procedure.
12     **Q.** And did she document that procedure
13 that she was having? Did she submit a doctor's
14 note?
15     **A.** She did.
16     **Q.** Now, are there any rules and
17 regulations with respect to unscheduled time
18 off?
19     **A.** The rule is that if anything over
20 five unscheduled time off in a year is
21 considered excessive.
22     **Q.** Is there a certain amount of
23 discretion that is allotted to managers in
24 determining the scheduled be -- the unscheduled
25 time off?

*COMPU-TRAN SHORTHAND REPORTING*

113

**Catherine Magone**

1
2  A.  **No, black and white.**
3  Q.  It is black and white.  Okay.
4  Where is that contained?
5  A.  **It is policy.**
6  Q.  What is the policy?
7  A.  **It is a human resource policy.**
8  Q.  What is the name of the policy?
9  A.  **Unscheduled time off, I believe.**
10  Q.  When did you last review it?
11  A.  **Yesterday.**
12  Q.  What does that policy say?
13  A.  **That any unscheduled time off, five**
14  **is considered excessive.**
15  Q.  Did she have five?
16  A.  **No.  I was concerned.  I didn't**
17  **write her up for it.  She had --**
18  Q.  Pardon me?
19  A.  **She had three in less than a**
20  **year -- in less than four months.**
21  Q.  She was hired in February.  And she
22  had three as of when?
23  A.  **I don't recall exactly.**
24  Q.  There is a probationary policy,
25  right?

114

**Catherine Magone**

1
2  A.  **Correct.**
3  Q.  Does the probationary policy
4  concern any reference to unscheduled time off?
5  MR. KEIL:  Object as to
6  form.  Answer if you can.
7  A.  **I don't know.**
8  Q.  Did you ever review that?
9  A.  **Probationary policy?  Yes.**
10  Q.  Does it contain any provisions for
11  unscheduled time off?
12  A.  **I don't know.  I can't recall.**
13  Q.  Do you recall where you met with
14  Pat Orsaia about Ms. Newmark's unscheduled time
15  as you put it?
16  A.  **In her office.**
17  Q.  When?
18  A.  **I don't recall.**
19  Q.  Do you recall whether it was in
20  August, September, some other month?
21  A.  **I don't recall.**
22  Q.  Do you recall -- do you maintain a
23  calendar?
24  A.  **Yes.**
25  Q.  Does your calendar reflect when you

115

**Catherine Magone**

1
2  met with Pat Orsaia in reference to Ms. Newmark?
3  A.  **Not necessarily.**
4  Q.  Did you ever send anything in
5  writing to Ms. Orsaia with respect to your
6  concern relating to Ms. Newmark's time off?
7  A.  **No.**
8  Q.  Are there any employees at the
9  hospital that have more -- have had more than
10  five unscheduled time, days off?
11  A.  **In my department?**
12  Q.  Yes.
13  A.  **Yes.**
14  Q.  Have you submitted anything in
15  connection with them --
16  A.  **Yes.**
17  Q.  -- all of these?
18  Can you identify each employee who has
19  had unscheduled time off of more than five days,
20  five or more days --
21  A.  **Yes.**
22  Q.  -- since you've become the
23  director?
24  A.  **Yes.**
25  Q.  Which ones?

116

**Catherine Magone**

1
2  A.  **Actually, only one.**
3  Q.  Who?
4  A.  **Cheryl Anderson.**
5  Q.  There has been no other employees
6  that have had more than five or more days?
7  A.  **My employees don't take sick time.**
8  Q.  Hold on.  I'm not finished.
9  There have been no employees that have
10  had more than five days absence or unscheduled
11  absences?
12  A.  **Not to my knowledge.**
13  Q.  No, not to your knowledge?
14  A.  **Not to my knowledge.**
15  Q.  What about employees in hospital
16  that are not necessarily under your supervision?
17  Do you know whether there have been employees
18  with five or more days absent?
19  A.  **I don't know.**
20  Q.  Have you ever communicated with
21  anyone concerning that?
22  A.  **I don't understand the question.**
23  Q.  Have you ever learned through any
24  source that there have been employees who have
25  been absent more than five days?

117

**Catherine Magone**

2    A.    No.

3    Q.    Cheryl Anderson is who?

4    A.    **She is the assistant director for**

5    **risk management.**

6    Q.    Is she still employed there?

7    A.    **Yes.**

8    Q.    How many days has she been absent?

9         MR. KEIL:  Over what period

10    of time?

11         MS. NICAJ:  Withdrawn.

12    Q.    When was Ms. Anderson absent more

13    than five days that was unscheduled?

14    A.    **2007.**

15    Q.    What about for any prior years?

16    A.    **No.**

17    Q.    How many days was she absent?

18    A.    **It was actually the period 2006 to**

19    **2007, it was whatever month.**

20    Q.    How many days was she absent?

21    A.    **They're episodes, not days, just to**

22    **clarify. And there were, I believe, six.**

23    Q.    When you say episodes, what do you

24    mean by that?

25    A.    **Each -- it could be three days is**

*COMPU-TRAN SHORTHAND REPORTING*

118

**Catherine Magone**

2    **only one episode.**

3    Q.    Oh, so you are distinguishing it.

4    How many episodes were there?

5    A.    **Six.**

6    Q.    And there are six different

7    episodes that she was absent?

8    A.    **Yes.**

9    Q.    How many days in total was she

10    absent?

11    A.    **Oh, I don't recall. You are only**

12    **counted -- you only count the episode. You**

13    **don't penalize. If it's three days they are out**

14    **sick, it is considered one episode. So you are**

15    **allowed to have five -- you can't have any more**

16    **than five episodes.**

17    Q.    So she had six episodes?

18    A.    **Yes.**

19    Q.    What were the circumstances? Was

20    she fired?

21    A.    **No.**

22    Q.    Did you submit any warnings to

23    Ms. Anderson?

24    A.    **Yes.**

25    Q.    By way of what?

*COMPU-TRAN SHORTHAND REPORTING*

119

**Catherine Magone**

2    A.    **By --**

3    Q.    Was it a reprimand?

4    A.    **Yes.**

5    Q.    What was it?

6    A.    **It was a corrective action.**

7    Q.    Did you ever submit any such

8    corrective action with respect to Ms. Newmark?

9    A.    **No.**

10    Q.    And Ms. Anderson has been the only

11    employee who has had five or more episodes since

12    you've been hired as director?

13    A.    **To my knowledge.**

14    Q.    Is there a reason why you wouldn't

15    have learned of that, an employee's absences?

16    A.    **No, I know of them.**

17    Q.    How many employees do you

18    supervise?

19    A.    **21.**

20    Q.    How many episodes did Ms. Newmark

21    have, three?

22    A.    **Three.**

23    Q.    And there were three separate

24    incidents, that means, right?

25    A.    **Yes.**

*COMPU-TRAN SHORTHAND REPORTING*

120

**Catherine Magone**

2    Q.    Do you know how many days in total

3    that amounted to?

4    A.    **No.**

5    Q.    Was Ms. Anderson a probationary

6    employee at the time she had six episodes?

7    A.    **No.**

8    Q.    Going back to Ms. Newmark now, when

9    was the -- because you -- although you testified

10    about that communication about unscheduled time

11    off, you don't recall the time frame, whether it

12    was before or after your meeting with Pat Orsaia

13    to discuss Ms. Newmark's concerns about you, is

14    that right?

15    A.    **I don't recall. I don't want to**

16    **say something that I'm not a hundred percent**

17    **sure of.**

18    Q.    What I'm trying to do, however, is

19    now go back to your -- that meeting in which

20    Ms. Orsaia told you that Ms. Newmark expressed

21    concerns about ageism in reference to you. When

22    was the next time you, in fact, recall

23    communicating with anyone concerning Ms. Newmark

24    after that?

25         MR. KEIL:  Just to clarify,

*COMPU-TRAN SHORTHAND REPORTING*

121

**Catherine Magone**

1
2  on any subject?
3        MS. NICAJ:  On any subject.
4     A.  **I met with Pat Orsaia to discuss**
5  **some of my issues regarding Carole's**
6  **performance.**
7     Q.  When, it was after, after this?
8     A.  Yes.
9     Q.  Do you recall attending a meeting
10  with Ms. Newmark and Pat Orsaia concerning
11  Ms. Newmark's concerns?
12     A.  Yes.
13     Q.  Do you recall when that was?
14     A.  **Somewhere around August 22,**
15  **perhaps.  I don't recall the exact date.**
16        (Plaintiff's Exhibit 5
17        9/29/06 Memo marked for identification, as
18        of this date.)
19     Q.  I'm going to show you what has been
20  marked as Plaintiff's Exhibit 5.  Do you
21  recognize that document?
22     A.  **I do.**
23     Q.  And when did you first see that
24  document, what is marked as Plaintiff's Exhibit
25  5?

*COMPU-TRAN SHORTHAND REPORTING*

123

**Catherine Magone**

1
2  that E-mail to Pat Orsaia?
3     A.  **Yes.**
4     Q.  So you saw Ms. Newmark's September
5  29 E-mail to Pat Orsaia, is that right?
6     A.  **Yes, yes.**
7     Q.  And you were responding to that?
8     A.  **Yes.**
9     Q.  Now, I'm going to direct your
10  attention to -- you indicated that you had
11  discussed with Pat Orsaia some issues concerning
12  Ms. Newmark, is that right?
13     A.  **Yes.**
14     Q.  Now, you also at one point met with
15  Ms. Newmark, is that right, and Pat Orsaia --
16     A.  **Yes.**
17     Q.  -- concerning Ms. Newmark's concern
18  with respect to Nicole Serra and the comments
19  she attributed you making?
20     A.  **Yes.**
21     Q.  And that occurred on September 28,
22  2006, is that right?
23     A.  **Yes.**
24     Q.  Where did you, Ms. Newmark and
25  Ms. Orsaia meet?

*COMPU-TRAN SHORTHAND REPORTING*

122

**Catherine Magone**

1
2     A.  **I don't recall if it was — I don't**
3  **recall if I got this or if it was given to me**
4  **recently.  I don't recall.**
5     Q.  I'm going to show you what is going
6  to be marked as Plaintiff's Exhibit 6.
7        (Plaintiff's Exhibit 6
8        10/4/06 Memo marked for identification, as
9        of this date.)
10     Q.  I direct your attention to what is
11  marked as Plaintiff's Exhibit 6.  Do you see
12  that?
13     A.  **Yes.**
14     Q.  Do you recognize this document?
15     A.  **Yes.**
16     Q.  What do you recognize it to be?
17     A.  **A memo to Carole Newmark and cc'd**
18  **to Pat Orsaia.**
19     Q.  Is this a memo or an E-mail?
20     A.  **E-mail.**
21     Q.  Now, you see, "Carole, I'm writing
22  in response to an E-mail that you sent to Pat
23  Orsaia," do you see that?
24     A.  **Yes.**
25     Q.  Do you now recall actually seeing

*COMPU-TRAN SHORTHAND REPORTING*

124

**Catherine Magone**

1
2     A.  **Her office, Pat Orsaia's office.**
3     Q.  Was this a prearranged meeting?
4     A.  **Yes.**
5     Q.  Did you get to the meeting before
6  Ms. Newmark?
7     A.  **I don't recall.**
8     Q.  Do you recall who spoke first
9  during the meeting?
10     A.  **I don't recall.**
11     Q.  What in words or substance did
12  Ms. Newmark say at this meeting?
13     A.  **Well, she reiterated the issue of**
14  **ageism, and I attempted to clarify what it was**
15  **what I meant when I used the word "young."**
16     Q.  I'm going to direct your attention
17  to paragraph No. 3 of Ms. Newmark's E-mail to
18  Pat Orsaia which you received and you responded
19  to.  No. 3 reads, "When we went over the issue
20  of ageism, Cathie denied that she said 'Nicole
21  was younger and could handle the job better than
22  I could.'  She stated that she did say that
23  Nicole was young and could take things in like a
24  sponge."  Did you say that at the meeting with
25  Pat Orsaia and Ms. Newmark?

*COMPU-TRAN SHORTHAND REPORTING*

125

**Catherine Magone**

1
2   A.  Not that exact word.
3   Q.  What did you say about Ms. Serra
4 being young and taking things up like a sponge?
5   A.  I said that she was young in her
6 career and that she took things in like a
7 sponge. I did say that.
8   Q.  Did you ever deny in your other --
9 in your correspondence to Ms. Newmark that what
10 you said about Nicole being young and could take
11 things up like a sponge being stated at the
12 meeting with Ms. Orsaia?
13   A.  Did I ever deny it?
14   Q.  Yes.
15   A.  That she could take things in like
16 a sponge in --
17   Q.  No. At the meeting with
18 Ms. Orsaia, she, Ms. Newmark, attributed that
19 you said at that meeting that Nicole Serra was
20 young and could take things up -- could take
21 things in like a sponge, close quote. Do you
22 see that?
23   A.  Yes.
24   Q.  Did you -- and you were responding
25 to her E-mail, is that right, Ms. Newmark's

*COMPU-TRAN SHORTHAND REPORTING*

126

**Catherine Magone**

1
2 E-mail to Pat Orsaia?
3   A.  Yes.
4   Q.  Did you ever deny saying -- stating
5 that quote at the meeting with Ms. Orsaia?
6   A.  Yes.
7   Q.  You denied it?
8   A.  Yes.
9   Q.  Where is that contained?
10      MR. KEIL:  Just to clarify,
11 you are referring to Plaintiff's Exhibit
12 5?
13      Five with respect to Ms. Newmark's
14 E-mail and then her response in Plaintiff's
15 Exhibit 6.
16   A.  I don't understand your question.
17 This is Carole's recollection of that meeting,
18 not mine.
19   Q.  Did you ever deny stating in your
20 subsequent E-mail in response that you told her
21 in the meeting with Pat Orsaia that Nicole was
22 young and could take things in like a sponge?
23   A.  No.
24   Q.  I'm going to direct your attention
25 to No. 1 of Plaintiff's Exhibit 5, the paragraph

*COMPU-TRAN SHORTHAND REPORTING*

127

**Catherine Magone**

1
2 that is numbered No. 1. It states, "I would
3 like to know how long my probation has been
4 extended. This should not be held from me until
5 I receive my performance evaluation." Did the
6 fact that her probation was extended, was that
7 communicated to her on September 28?
8   A.  I believe it was before that.
9   Q.  Did you ever put that in writing to
10 her?
11   A.  No.
12   Q.  Did you ever advise the human
13 resources in writing that you were extending
14 Ms. Newmark's probation?
15   A.  No.
16   Q.  How long was her probationary
17 period?
18   A.  Six months.
19   Q.  And when was it due to expire?
20   A.  The end of September.
21   Q.  Was it, in fact, September 20 that
22 it had expired?
23   A.  Yes.
24   Q.  So at the meeting on September 28
25 there was a discussion on the probationary

*COMPU-TRAN SHORTHAND REPORTING*

128

**Catherine Magone**

1
2 period being extended, is that right?
3   A.  Yes.
4   Q.  Along with the meeting, along with
5 it, Ms. Newmark also expressed her concern about
6 ageism, is that right?
7   A.  Yes.
8   (Off the record discussion.)
9      MS. NICAJ:  Plaintiff's
10 Exhibit 7.
11      (Plaintiff's Exhibit 7
12 10/5/06 Memo marked for identification, as
13 of this date.)
14   Q.  I'm going to direct your attention
15 to Plaintiff's Exhibit 7 for identification. Do
16 you recognize that document?
17   A.  I do.
18   Q.  What do you recognize it to be?
19   A.  An E-mail that I sent to Pat
20 Orsaia.
21   Q.  What is that in reference to?
22   A.  It's in reference to Exhibit 6.
23   Q.  What did you mean, "I just wanted
24 you to know that Carole picked up her E-mail at
25 5:30 last night"? How did you know that?

*COMPU-TRAN SHORTHAND REPORTING*

129

*Catherine Magone*

2   A.   How did I know she picked up her
3   E-mail at 5:30?
4   Q.   Yes.
5   A.   Because I can tell on my E-mail.
6   Q.   Did you request a receipt, is that
7   what you did?
8   A.   I get receipts on everybody.
9   Q.   Do you default to get a receipt?
10   A.   Yes.
11   Q.   "Has not responded to me or spoken
12   to me about it." What were you referring to,
13   about what, your E-mail?
14   A.   About my E-mail.
15   Q.   Did you know what her schedule was
16   between 5:30 on October 4 through 10:50, October
17   5?
18   A.   No.
19   Q.   Did you know whether she had, in
20   fact, an opportunity to respond to your E-mail?
21   A.   No.
22   Q.   Ms. Newmark was fired on October 5,
23   wasn't she?
24   A.   Yes, she was.
25   Q.   When was that -- you were present

*COMPU-TRAN SHORTHAND REPORTING*

130

*Catherine Magone*

2   for when her termination was communicated to
3   her?
4   A.   Yes.
5   (Lunch recess taken.)
6   Q.   There was a time Ms. Newmark was
7   terminated?
8   A.   Yes.
9   Q.   Whose decision was that?
10   A.   Mine.
11   Q.   When did you make the decision?
12   A.   The week of — I don't remember
13   exactly the exact date.
14   Q.   After that meeting with Ms. Orsaia
15   and Ms. Newmark?
16   A.   Yes.
17   Q.   Who had the authority to terminate
18   Ms. Newmark's employment?
19   A.   I did.
20   Q.   Did you communicate your intent
21   with anyone before you decided?
22   A.   Pat Orsaia.
23   Q.   Anyone else?
24   A.   No.
25   Q.   When did you communicate with

*COMPU-TRAN SHORTHAND REPORTING*

131

*Catherine Magone*

2   Ms. Orsaia your intent to terminate
3   Ms. Newmark's employment?
4   A.   I don't recall.
5   Q.   It was after that meeting on
6   September 28, 2006?
7   A.   We had been talking about it prior
8   to that.
9   Q.   When did you first talk about it?
10   A.   Well, I had concerns for some time
11   about Carole's performance.
12   Q.   When did you first start talking to
13   Pat Orsaia about possibly terminating
14   Ms. Newmark's employment?
15   A.   After that meeting.
16   Q.   After the September 28 meeting?
17   A.   No. Actually, I believe it was
18   before that.
19   Q.   When?
20   A.   I don't recall the exact date. It
21   was that week.
22   Q.   That week prior to the meeting?
23   A.   Yes.
24   Q.   You already learned that she had --
25   you already learned at that point that she had

*COMPU-TRAN SHORTHAND REPORTING*

132

*Catherine Magone*

2   expressed -- Ms. Newmark had expressed concern
3   about possible ageism on your part, is that
4   right?
5   A.   Yes.
6   Q.   When did you first document your
7   intent to explore terminating Ms. Newmark's
8   employment?
9   A.   I have no documentation of that.
10   Q.   When did you, in fact, decide to
11   terminate her employment?
12   A.   I don't recall the exact date.
13   Q.   Was this before or after that
14   meeting with Ms. Newmark and Ms. Orsaia?
15   A.   The September 28 --
16   Q.   Yes.
17   A.   -- meeting? There was some
18   discussion before that.
19   Q.   I understand there was discussion.
20   When did you, in fact, decide that she was going
21   to be terminated?
22   A.   It would have been after that
23   meeting.
24   Q.   What happened from the point of
25   that meeting to the point of Ms. Newmark's

*COMPU-TRAN SHORTHAND REPORTING*

133

*Catherine Magone*

2  termination that prompted you to decide to, in

3  fact, terminate her employment?

4      A.    Well, there actually had been a

5  number of things that I was concerned over

6  several months -- let me finish. Let me finish.

7      Q.    You can. Go ahead.

8      A.    A number of things that had

9  concerned me for months prior to this event that

10 I have documented. But I think that the thing

11 that really drove it was Carole's inability to

12 accept a management decision and letting go of

13 her anger. It affected how she was performing

14 her duties.

15     Q.    What happened between September 28

16 meeting and when you, in fact, decided to

17 terminate her that made you decide?

18     A.    Because I decided that during her

19 probationary period she didn't pass her

20 probationary period.

21     Q.    Nothing happened from the period of

22 the September 28 meeting, in which you advised

23 her that her probation was being extended, to

24 October 5 when her termination was communicated

25 to her, is that right?

*COMPU-TRAN SHORTHAND REPORTING*

134

*Catherine Magone*

2      A.    Not to my knowledge.

3      Q.    So on September 28, you indicated

4  her probation was being extended?

5      A.    Yes.

6      Q.    And on October 5 you communicated

7  her termination?

8      A.    Yes.

9      Q.    No new incidents occurred from

10 September 28 through October 5, is that right?

11     A.    I don't recall. There might have

12 been.

13     Q.    As you sit here today, can you

14 recall any incidents which made you decide to

15 terminate her employment on October 5?

16     A.    I believe there were additional

17 complaints about Carole.

18     Q.    What is the basis of your belief?

19     A.    Chronologically I just can't recall

20 if they were that week or the week before.

21 There were many of them.

22     Q.    Well, again, September 28 you

23 communicated that her probationary period was

24 being extended, right?

25     A.    Correct.

*COMPU-TRAN SHORTHAND REPORTING*

135

*Catherine Magone*

2      Q.    From September 28 which was a

3  Thursday if I'm not mistaken, take a look at

4  Plaintiff's Exhibit 5 for identification,

5  because it says from, and the date is Friday,

6  September 29. The meeting was on the 28th, so

7  I'm assuming it was a Thursday, is that a fair

8  assumption?

9      A.    Yes.

10     Q.    From Thursday, September 28,

11 through Wednesday -- Thursday, October 5, what,

12 if any, incidents do you recall relating to

13 Ms. Newmark that made you decide to, in fact,

14 terminate her employment?

15     A.    I don't recall.

16     Q.    We are going to go into the

17 instances of her performance shortly. When did

18 you first have any issues concerning

19 Ms. Newmark's performance?

20     A.    July.

21     Q.    July. And did you document that?

22     A.    Yes.

23     Q.    Did you ever notify her?

24     A.    Yes.

25     Q.    Did you put your notice in writing

*COMPU-TRAN SHORTHAND REPORTING*

136

*Catherine Magone*

2  to her?

3      A.    No.

4      Q.    Did you ever express your concerns

5  about her performance in writing to her?

6      A.    No.

7      Q.    What issues did you have about her

8  performance in July?

9      A.    It was very clear to me -- well,

10 first of all, it was -- it was really in July

11 that I began to directly supervise Carole.

12 Prior to that Diane Lantz was supervising her.

13 So upon Diane's resignation, I started to take

14 more notice of what Carole was doing. I found

15 that there was very little follow up of a lot of

16 her cases. There was a meeting, that we have

17 weekly meetings that we talk about cases and

18 length of stay and issues regarding that. There

19 was one particular meeting which is held at 1

20 o'clock where every case that I asked her about,

21 she claimed that she did not -- had not seen

22 yet. There were -- and I talked to her about

23 that. I talked to her about her -- my concern

24 that she was not adjusting to a case management

25 model that we had at Lawrence. She complained

*COMPU-TRAN SHORTHAND REPORTING*

137

*Catherine Magone*

2  that her workload was too high and that she --
3  you know, she had so much work to do. That's
4  why she hadn't done anything with the mental
5  health training. We discussed that she needed
6  to prioritize better.
7      Q.    The mental health training you are
8  referring to had happened in the end of June?
9      A.    Yes.
10      Q.    And you are stating you made these
11  expressions of concern to her in July?
12      A.    Oh, let me take that back. That
13  wouldn't have been July. That wouldn't have
14  been July, no. That wouldn't have been July.
15  No. July my concerns were her follow up on
16  cases, her response to staff, asking for
17  information or request on her part. Her lack of
18  documentation in the medical record was a real
19  concern for me. And we had a discussion about
20  that. And Carole knew that it was serious
21  enough that she E-mailed me the following day,
22  asking if I was considering that a verbal
23  warning.
24      Q.    You said no, right?
25      A.    I said no because it wasn't at the

138

*Catherine Magone*

2  time. But I was concerned.
3      Q.    Well, was it not -- if it wasn't a
4  verbal warning, then what was it?
5      A.    It was a little counseling session,
6  because I wanted her to be successful.
7      Q.    Didn't she, in fact, ask to meet
8  with you prior to this what you call work
9  session with her prior?
10      A.    No.
11      Q.    She didn't ask to meet with you?
12      A.    No. I asked to meet with her.
13      Q.    So -- but correct me if I'm wrong.
14  There was no verbal warning. You never warned
15  her, is that right?
16      A.    No, I just expressed my concerns.
17      Q.    You never warned her, is that
18  right?
19      A.    That's right.
20      Q.    And you put that in writing, isn't
21  that right?
22      A.    I put the discussion --
23      Q.    The fact that it wasn't -- you said
24  you put what discussion that you had in writing?
25      A.    That I had met with her and what we

139

*Catherine Magone*

2  had discussed I put in writing.
3      Q.    You put it and you gave it to her?
4      A.    No, no.
5      Q.    Why not? Why didn't you if you had
6  concerns about her?
7      A.    I expressed them verbally.
8      Q.    Why wouldn't you give it to her and
9  have her sign off acknowledging that -- hold
10  on one second -- acknowledging the fact that you
11  had expressed these verbal concerns and she was
12  aware of them? Why wouldn't you do that?
13      A.    It's not my practice.
14          MS. NICAJ: Plaintiff's
15  Exhibit 8.
16          (Plaintiff's Exhibit 8
17  7/18/06 Memo marked for identification, as
18  of this date.)
19          (Plaintiff's Exhibit 9
20  7/20/06 Memo marked for identification, as
21  of this date.)
22          (Plaintiff's Exhibit 10
23  7/20/06 Memo marked for identification, as
24  of this date.)
25      Q.    Directing your attention to

140

*Catherine Magone*

2  particularly Exhibits 8 and 9 for
3  identification, what do you recognize those to
4  be?
5      A.    Letters to my file.
6      Q.    "Your file," meaning were those
7  placed in Ms. Newmark's personnel file?
8      A.    In human resources?
9      Q.    Yes.
10      A.    No.
11      Q.    Is there any way of knowing when --
12  did you ever have these letters -- you are
13  saying letters to your file --
14      A.    Yes.
15      Q.    -- do you mean notes to your file?
16      A.    Yes.
17      Q.    Notes to your file, right?
18      A.    Yes.
19      Q.    Is there any way of knowing when
20  you, in fact, submitted those notes to your
21  file? Are there any stamped copies saying it
22  was received by your department or an HR
23  indicating they were received on or about the
24  dates that are indicated?
25      A.    No.

141

Catherine Magone

2  Q.  I'm going to show you what is
3  actually Plaintiff's Exhibit 10 for
4  identification. Do you see that?
5  A.  Yes.
6  Q.  That one you confirmed there was no
7  verbal warning to Ms. Newmark, is that right?
8  A.  That's correct.
9  Q.  Was there anything inaccurate about
10  what your response was to her?
11  A.  No.
12  Q.  Did you ever meet with Ms. Newmark
13  concerning her performance?
14  A.  Yes.
15  Q.  When?
16  A.  In July.
17  Q.  When you say July, when in July?
18  A.  July 20.
19  Q.  And that, the E-mail that you have
20  before you, Exhibit 10, that relates to that
21  same meeting, isn't that right?
22  A.  Yes.
23  Q.  Wherein you say there was no verbal
24  warning, is that right?
25  A.  That's correct.

*COMPU-TRAN SHORTHAND REPORTING*

142

Catherine Magone

2  Q.  When was the next time you meet
3  with Ms. Newmark about her performance?
4  A.  In length of stay meetings, we meet
5  weekly. If there are issues I raise them right
6  there. If she can't -- on several occasions I
7  meet with her not necessarily documenting
8  anything.
9  Q.  Did you ever submit anything in
10  writing to her wherein you expressed your
11  concerns in writing and had her sign --
12  A.  No.
13  Q.  -- hold on -- that she acknowledged
14  receiving your concerns?
15  A.  No.
16  Q.  Prior to July were there ever any
17  issues to your knowledge relating to
18  Ms. Newmark's performance?
19  A.  Yes.
20  Q.  What?
21  A.  Diane Lantz voiced concerns over
22  her performance to me. Diane would keep me
23  abreast of what was going on with the case
24  managers and the social workers. And she did
25  have concerns but she never put them in writing.

*COMPU-TRAN SHORTHAND REPORTING*

143

Catherine Magone

2  Q.  How many occasions did Ms. Lantz
3  express concern to you?
4  A.  Six, seven.
5  Q.  When was the first time?
6  A.  Early on.
7  Q.  Where was it?
8  A.  Where?
9  Q.  Where did she express her concerns
10  to you?
11  A.  In my office.
12  Q.  What did she say?
13  A.  She said that she felt that Carole
14  was having a hard time adjusting to the case
15  management model.
16  Q.  Did she document that to you?
17  A.  No, she did not.
18  Q.  Did you document her communication
19  to you?
20  A.  No. I thought that she was
21  documenting it.
22  Q.  I'm not concerned with what you
23  thought. I'm saying, did you document?
24  A.  No, I did not.
25  Q.  Do you know if she did?

*COMPU-TRAN SHORTHAND REPORTING*

144

Catherine Magone

2  A.  No.
3  Q.  Did you meet with Ms. Newmark about
4  this?
5  A.  No.
6  Q.  Did you ask her what she meant by
7  difficulty in adjusting to the case management
8  program?
9  MR. KEIL:  Objection as to
10  form. By "her" you mean Ms. Lantz?
11  MS. NICAJ:  Yes.
12  A.  Diane was concerned that she
13  couldn't carry a decent caseload.
14  Q.  And she said that to you?
15  A.  Yes.
16  Q.  Did you document that?
17  A.  No.
18  Q.  Now, did anyone train Ms. Newmark
19  on this case management caseload and the new
20  program that was formulated after she came back
21  to Lawrence?
22  A.  Diane worked with her.
23  Q.  Diane?
24  A.  Lantz.
25  Q.  What was Diane's position again?

*COMPU-TRAN SHORTHAND REPORTING*

145

*Catherine Magone*

2    A.    She was the assistant director.
3    Carole reported directly to her.
4    Q.    Do you know what training she in
5    fact received?
6    A.    Hands-on training, you know, not
7    anything working side-by-side.
8    Q.    Did Ms. Galloway offer to stay on
9    for two weeks to help train Ms. Newmark but you
10    advised her that she wasn't needed to do that?
11    A.    I don't believe it was two weeks.
12    I don't believe it was two weeks.  Yes.  I
13    advised her it wasn't necessary.
14    Q.    And Ms. Galloway's position at the
15    time was what?
16    A.    Ms. Galloway had already resigned,
17    retired and was down in North Carolina.
18    Q.    She had offered to come and help
19    Ms. Newmark?
20    A.    She did, but instead we chose to
21    have her have telephone conference with her for
22    questions and concerns.  I did not have money in
23    my budget to have her back and forth from North
24    Carolina.
25    Q.    Do you know whether she would

*COMPU-TRAN SHORTHAND REPORTING*

146

*Catherine Magone*

2    require the travel back and forth or was it just
3    salary?
4    A.    (No response.)
5    Q.    You indicated you didn't have money
6    in your budget for travel back and forth.  Did
7    she ask you -- did she ask for travel?
8    A.    No, but I would expect to pay for
9    her travel.
10    Q.    Did she ask you to?
11    A.    We never got that far.
12    Q.    So Ms. Galloway offered to train
13    but you said no?
14    A.    Right, because she was already
15    gone.
16    Q.    When was the next time that
17    Ms. Lantz communicated any concerns to you?
18    A.    She communicated them on an ongoing
19    basis.  But, you know, I don't have any
20    documentation of dates and times.  She was just
21    concerned.
22    Q.    What did she say the second time
23    she communicated with you?
24    A.    She said she didn't really know
25    where Carole spent her day.

*COMPU-TRAN SHORTHAND REPORTING*

147

*Catherine Magone*

2    Q.    Where did Ms. Lantz spend her day?
3    A.    Out on the floors.
4    Q.    So was Ms. Newmark also expected to
5    spend her day on the floors?
6    A.    Yes.
7    Q.    And the floors being what floor
8    numbers was she expected to spend her days?
9    A.    I don't recall what units she was
10    covering at the time.
11    Q.    Wasn't she covering all the units
12    as a social worker?
13    A.    No, she was not.
14    Q.    Which units was she not covering?
15    A.    I don't recall how I made the
16    assignments.
17    Q.    Who made the assignments, you did?
18    A.    No, Diane Lantz would have made the
19    assignments.
20    Q.    Her responsibilities included a
21    number of units on a number of floors -- this is
22    Ms. Newmark -- isn't that right?
23    A.    It could.
24    Q.    It could?  Did you, in fact,
25    ascertain whether she was in those units doing

*COMPU-TRAN SHORTHAND REPORTING*

148

*Catherine Magone*

2    her job?
3    A.    Diane felt that she was in her
4    office too much.
5    Q.    She felt it or she expressed that
6    to you?
7    A.    She expressed that to me.
8    Q.    Did she document that in writing?
9    A.    No, she did not.
10    Q.    Did you document that in writing?
11    A.    No, I did not.
12    Q.    Where was Diane if she was in her
13    units that she knew that Ms. Newmark was in her
14    office too much?
15    A.    She would be looking for her and
16    that's where she would find her.
17    Q.    So she did find her?
18    A.    In her office.
19    Q.    You said she was looking for her --
20        MR. KEIL:  Objection.
21    Q.    -- and she was able to find her?
22    A.    Yes.
23    Q.    So when you said she had been
24    looking for Ms. Newmark, you weren't meaning to
25    suggest she wasn't able to find her, were you?

*COMPU-TRAN SHORTHAND REPORTING*

149

**Catherine Magone**

2  A.   Well, she wasn't very receptive
3  about returning people's calls.
4  Q.   Did she return your phone calls?
5  A.   Not always.
6  Q.   Did you ever document that in
7  writing?
8  A.   No, but I did speak to her about
9  it.
10  Q.   Did you ever document it in writing
11  as you were good enough to document some
12  incidents --
13  MR. KEIL:   Objection.
14  Q.   Hold on a second.
15  -- some incidents in writing about
16  Ms. Newmark's various issues?  Did you ever
17  document that fact in writing, that she wasn't
18  good in returning phone calls?
19  A.   No.  Because I only started
20  documenting when I had the direct supervision of
21  her.
22  Q.   Ms. Lantz ceased being her direct
23  supervisor when?
24  A.   In July.
25  Q.   Did you ever send E-mails to

*COMPU-TRAN SHORTHAND REPORTING*

150

**Catherine Magone**

2  Ms. Newmark indicating she was amazing?
3  A.   Yes, I did.
4  MS. NICAJ:   Can you mark
5  this as 11.
6  A.   Actually, what I said is will be
7  amazing.
8  (Plaintiff's Exhibit 11
9  5/11/06 Memo marked for identification, as
10  of this date.)
11  Q.   I'm going to direct your attention
12  to Plaintiff's Exhibit 11.  Do you see that?
13  A.   Yes, I do.
14  Q.   Now, it says, "Unfortunately I
15  don't have all the right answers, but I will
16  always try and help you to find the resources
17  that you need."  What were you referring to?
18  A.   Well, I -- first of all, it is my
19  style to try to bring positive moments when
20  people are new at a job and try to support them
21  when I see they are struggling.  And at that
22  time Carole was still struggling, getting used
23  to her job, so I decided to send her a nice
24  E-mail.
25  Q.   Where do you say here that she was

*COMPU-TRAN SHORTHAND REPORTING*

151

**Catherine Magone**

2  struggling?
3  A.   No.  That's what I was perceiving.
4  That's why this was kind of like a little
5  cheerleader.
6  Q.   Does it say that anywhere?  Does it
7  say anywhere in words or substance that she was
8  struggling and you were being a little
9  cheerleader as you put it?
10  A.   No.
11  Q.   Can I have that back?
12  MS. NICAJ:   12, please.
13  (Plaintiff's Exhibit 12
14  4/17/06 Nomination for Big Heart Award
15  marked for identification, as of this
16  date.)
17  Q.   I'm going to direct your attention
18  to Plaintiff's Exhibit 12.  Do you recognize
19  that?
20  A.   Yes.
21  Q.   Did you ever see this prior to
22  today?
23  A.   Yes.
24  Q.   When was the first time?
25  A.   I don't recall the exact date.

*COMPU-TRAN SHORTHAND REPORTING*

152

**Catherine Magone**

2  Q.   Do you know whether Ms. Newmark
3  received more than one nomination for a big
4  heart award?
5  A.   Not to my knowledge.
6  Q.   Did you ever do anything in
7  connection with receiving the nomination for big
8  heart award with respect to Ms. Newmark?
9  A.   No.
10  Q.   Did you ever have a procedure by
11  which you did do that for other employees?
12  MR. KEIL:   Objection as to
13  form.
14  A.   It is my style if I think about it,
15  I will try to give recognition to people, but it
16  is not always.
17  Q.   When you say you give recognition
18  to people, what do you do?
19  A.   If I knew about it and thought
20  about it, I might bring it up in line up.  But I
21  don't do that all the time.
22  Q.   Did you do that with respect to
23  Ms. Newmark?
24  A.   No.
25  Q.   Apart from Plaintiff's Exhibit 8

*COMPU-TRAN SHORTHAND REPORTING*

153

**Catherine Magone**

2 and 9, did you ever submit anything else in
3 writing prior to August of 2006 concerning
4 Carole Newmark in her file?
5    **A.  No.**
6           (Plaintiff's Exhibit 13
7    8/31/06 Memo marked for identification, as
8    of this date.)
9           (Plaintiff's Exhibit 14
10   9/1/06 Memo marked for identification, as
11   of this date.)
12          (Plaintiff's Exhibit 15
13   9/7 Memo marked for identification, as of
14   this date.)
15          (Plaintiff's Exhibit 16
16   9/12/06 Memo marked for identification, as
17   of this date.)
18    **Q.**  I'm going to direct your attention
19 to what is marked as Plaintiff's Exhibit 13.  Do
20 you recognize that?
21    **A.  Yes, I do.**
22    **Q.**  Exhibit 13, did you ever show this
23 to Ms. Newmark?
24    **A.  No, I did not.**
25    **Q.**  You recount what someone by the

*COMPU-TRAN SHORTHAND REPORTING*

154

**Catherine Magone**

2 name of Susan relayed to you, is that right?
3    **A.  Yes.**
4    **Q.**  Did you ever ask Ms. Newmark about
5 her side of the story, so to speak?
6    **A.  No, I did not.**
7    **Q.**  Did you ever attempt to ask
8 Ms. Newmark about her side of the story?
9    **A.  No.**
10    **Q.**  It says one of the CM staff.  Is
11 that case management?
12    **A.  Correct.**
13    **Q.**  Susan is -- what is her position?
14    **A.  Case manager.**
15    **Q.**  Did you ever speak to Ms. Newmark
16 at any of the meetings you attended with Pat
17 Orsaia about the issue that is relayed in
18 Plaintiff's Exhibit 13?
19    **A.  No.**
20    **Q.**  Directing your attention to
21 Plaintiff's Exhibit 14, do you see that?
22    **A.  Yes.**
23    **Q.**  This case manager that you are
24 referring to, there are how many case managers
25 in the case management department?

*COMPU-TRAN SHORTHAND REPORTING*

155

**Catherine Magone**

2    **A.  Nine.**
3    **Q.**  Colette in this instance, did you
4 ever ask Ms. Newmark about what her view of this
5 incident was, Plaintiff's Exhibit 14?
6    **A.  No, I did not.**
7    **Q.**  Is there a reason why not?
8    **A.  Because I called her and asked her**
9 **to do the PRI.**
10    **Q.**  Did you ask Ms. Newmark?
11    **A.  I did ask her why she didn't**
12 **respond.**
13    **Q.**  What did she say to you?
14    **A.  She said to me that she didn't get**
15 **the message.**
16    **Q.**  Did you put that anywhere in
17 writing?
18    **A.  No, I did not.**
19    **Q.**  Directing your attention to
20 Plaintiff's Exhibit 15, what does Plaintiff's
21 Exhibit 15 relate to?
22    **A.  It relates to evidence of poor**
23 **documentation.  Patients should not remain in**
24 **the ICU for two weeks with only one social work**
25 **note.**

*COMPU-TRAN SHORTHAND REPORTING*

156

**Catherine Magone**

2    **Q.**  Was that placed in Nicole Serra's
3 file?
4    **A.  This was a case that Carole was**
5 **working on.**
6    **Q.**  How do you know it was a case that
7 Carole was working on?
8    **A.  Because this was told to me by a**
9 **case manager.**
10    **Q.**  Where is that stated anywhere in
11 Plaintiff's Exhibit 15?  Where is the reference
12 to the particular social worker, Ms. Newmark,
13 Ms. Serra, hold on a second, or the case manager
14 for --
15    **A.  That was involved in --**
16    **Q.**  Yes.
17    **A.  I have access to MIDAS (ph).  We**
18 **are on Meditech.  We are electronic.  And I can**
19 **go in to see what, who is the social worker and**
20 **when the note was written, so it is a fact.**
21    **Q.**  Why wasn't that stated anywhere in
22 what is Plaintiff's Exhibit 15?
23    **A.  I didn't feel it was necessary.**
24    **Q.**  You didn't feel identifying the
25 social worker was necessary?

*COMPU-TRAN SHORTHAND REPORTING*

157

**Catherine Magone**

2    A.    If it is in her file.

3    Q.    Whose file?

4    A.    Carole's file.

5    Q.    What about the case manager you
6    said you referred to?

7    A.    I didn't include that.

8    Q.    Why not?

9    A.    Well, I felt it was really
10    irrelevant, because I went into the medical
11    record myself and saw that what the person told
12    me was actually true.

13    Q.    What was this person?

14    A.    The case manager when she got to
15    the floor.

16    Q.    Who is the case manager?

17    A.    I don't recall which case manager
18    it was.

19    Q.    Okay.

20    A.    It showed no follow up.

21    Q.    Incidentally, by August 31, 2006,
22    you had been aware that Ms. Newmark had
23    complained about you about ageism, isn't that
24    right?

25    A.    That's correct.

COMPU-TRAN SHORTHAND REPORTING

158

**Catherine Magone**

2    Q.    So there is no reference to which
3    social worker or case manager. Did you speak to
4    Ms. Newmark about this?

5    A.    Yes.

6    Q.    Where is that documented?

7    A.    I didn't document it.

8    Q.    What did she say?

9    A.    Over worked, unable to get to all
10    her cases.

11    Q.    Where is that documented?

12    A.    It is not documented.

13    Q.    Going to Plaintiff's Exhibit 16,
14    you indicate in this that you spoke to
15    Ms. Newmark regarding her attendance?

16    A.    That's correct.

17    Q.    UTO is -- what does it stand for?

18    A.    Unscheduled time off.

19    Q.    What did she say with respect to
20    her need for the time off?

21    A.    She had E-mailed me that she was
22    taking time off for this procedure. And that's
23    not the procedure that we follow when you are
24    requesting time off. There is a form to be
25    filled out, and it has to be approved by me.

COMPU-TRAN SHORTHAND REPORTING

159

**Catherine Magone**

2    Q.    Did she fill that form out?

3    A.    She did afterwards.

4    Q.    So at that point it wasn't an
5    unscheduled time off?

6    A.    No. But originally I had wanted to
7    think about whether or not I was going to
8    approve it.

9    Q.    What was the reason for her taking
10    time off that you came to learn?

11    A.    I don't understand the question.

12    Q.    Why did she request the time off?

13    A.    Which time off?

14    Q.    In reference to the --

15    A.    The three --

16    Q.    No. You said I spoke --

17    A.    Oh, she had a procedure, yes,
18    needed a procedure.

19    Q.    What was the procedure?

20    A.    A colonoscopy.

21    Q.    Did you ever show Ms. Newmark any
22    of this correspondence concerning her?

23    A.    No.

24    Q.    Did you ever give her a performance
25    evaluation?

COMPU-TRAN SHORTHAND REPORTING

160

**Catherine Magone**

2    A.    At her termination meeting.

3    Q.    Prior to her termination meeting,
4    did you ever sit with her and go over her
5    performance?

6    A.    The performance evaluation, per se?

7    Q.    Performance evaluation, yes.

8    A.    No.

9    (Plaintiff's Exhibit 17
10    10/5/06 Memo marked for identification, as
11    of this date.)

12    Q.    Directing your attention to
13    Plaintiff's Exhibit 17, what was the purpose of
14    this memo to file and copy to Pat Orsaia?

15    A.    I did this at the request of Pat
16    Orsaia.

17    Q.    And was this to delineate the
18    reasons you decided to terminate Ms. Newmark's
19    employment?

20    A.    To recap.

21    Q.    And was one of the reasons Carole's
22    reaction to a business decision to assign
23    another team member to a palliative program was
24    unacceptable?

25    A.    Correct.

COMPU-TRAN SHORTHAND REPORTING

161

**Catherine Magone**

2    Q.    And her reaction involved going to
3  Pat Orsaia and complaining about ageism?
4    A.    No.
5    Q.    What did it involve?
6    A.    Negativity.
7    Q.    What negativity are you referring
8  to?
9    A.    Negative behavior in general.
10  Going around -- I got information from Maura
11  Del Bene that she could not let it go.  She was
12  harping on it all day long, unable to perform
13  her duties because she was so upset about it,
14  about not getting the palliative care position.
15    Q.    Where was that communicated by you
16  concerning what Ms. Del Bene said to you?
17    MR. KEIL:    Objection as to
18  form.
19    Q.    Did you reduce what Ms. Del Bene
20  said to you in writing anywhere?
21    A.    No.
22    Q.    Did you ask Ms. Newmark what her
23  reaction as relayed to you by Ms. Del Bene was?
24    A.    No.
25    MR. KEIL:  Objection.

*COMPU-TRAN SHORTHAND REPORTING*

162

**Catherine Magone**

2    Q.    So Carole's reaction to a business
3  decision didn't mean Ms. Newmark repeatedly
4  asking to meet with Pat Orsaia and you
5  concerning the fact that she believed you were
6  subjecting her to an age discrimination?
7    A.    No.
8    Q.    It wasn't based on that?
9    A.    No.
10    Q.    What happened, if anything, between
11  the September 28 meeting and the October 5
12  meeting -- termination of Ms. Newmark's
13  employment?
14    A.    She started to decompensate.
15    Q.    Decompensate, what do you mean?
16    A.    She was so angry that she couldn't
17  get her work done.  She was visibly angry.
18    Q.    Where is that contained in writing
19  that she was visibly angry and couldn't get her
20  work done?
21    A.    She was visibly angry and she was
22  talking amongst the other case managers and
23  social workers.
24    Q.    In your presence?
25    A.    No, but I was hearing about it.

*COMPU-TRAN SHORTHAND REPORTING*

163

**Catherine Magone**

2    Q.    September 28 was the date in which
3  she expressed her concern about the fact that
4  you advised her you were selecting Ms. Serra
5  because of her age, and October 5 she was
6  decompensating.  Is that what you are saying?
7    A.    No.  She was decompensating ever
8  since she found out that Nicole, before Pat and
9  I even ever met to -- with me to discuss it.
10    Q.    Where was that ever in writing?
11  Where did you ever reduce that to writing?
12    A.    It is not in writing.
13    Q.    In her E-mail to Pat Orsaia, which
14  Pat Orsaia forwarded to you, you never accused
15  her of being angry or anything of that nature
16  with respect to appointing Nicole Serra, right?
17    MR. KEIL:    Objection as to
18  form.  Can you read the question back?
19    MS. NICAJ:  I'll withdraw
20  it.
21    Q.    September 28 was the meeting with
22  Pat Orsaia.
23    A.    Correct.
24    Q.    Ms. Newmark followed up with her
25  again her concerns about age related ageism

*COMPU-TRAN SHORTHAND REPORTING*

164

**Catherine Magone**

2  which you selected Nicole Serra, is that right?
3    A.    That's correct.
4    Q.    You received that communication --
5    A.    Yes.
6    Q.    -- from Pat Orsaia?
7    A.    Yes.
8    Q.    Did you ever in any subsequent
9  communication to Ms. Newmark indicate in words
10  or substance that she was handling the matter
11  irrationally, that she was being angry, that you
12  heard from other people that she was
13  decompensating?  I don't know what that means,
14  but I'm using your word, decompensating.
15    A.    No.
16    (Plaintiff's Exhibit 18
17    5/23/06 Memo marked for identification, as
18    of this date.)
19    Q.    I'm going to direct your attention
20  to Plaintiff's Exhibit 18 for identification.
21  Do you recognize that document?
22    A.    I do.
23    Q.    Did you ever respond to Ms. Newmark
24  in writing?
25    A.    I don't recall.

*COMPU-TRAN SHORTHAND REPORTING*

1    *Catherine Magone*

2        (Plaintiff's Exhibit 19

3        9/19/06 Memo marked for identification, as

4        of this date.)

5    Q.    I'm going to show you what's been

6    marked as Exhibit 19 for identification. Do you

7    see that?

8    A.    Yes.

9    Q.    Did you communicate with

10    Ms. Newmark about what is marked as Plaintiff's

11    Exhibit 19?

12    A.    **I communicated with her regarding**

13    **that there had been no note and no plan on this**

14    **patient.**

15    Q.    Did you reduce that in writing?

16    A.    **I did not.**

17    Q.    Do you know what Colette Gelardi

18    meant by just thought you might like to know,

19    hope you are having a good time if you pick this

20    up?

21    A.    **I was on vacation.**

22        (Plaintiff's Exhibit 20

23        9-page Performance Evaluation marked for

24        identification, as of this date.)

25    Q.    I'm going to direct your attention

*COMPU-TRAN SHORTHAND REPORTING*

1    *Catherine Magone*

2    to what's been marked as Plaintiff's Exhibit 20

3    for identification. Do you recognize that

4    exhibit?

5    A.    **Yes.**

6    Q.    What do you recognize it to be?

7    A.    **It is the performance evaluation**

8    **for Carole Newmark.**

9    Q.    Do you see on the very first page

10    of that document, I'm going to direct your

11    attention, it says "Date of hire," very first

12    page. Date of hire is March 20, 2006?

13    A.    **Correct.**

14    Q.    How long was the probationary

15    period?

16    A.    **Six months.**

17    Q.    And that expired September 20,

18    2006, is that right?

19    A.    **That's correct.**

20    Q.    And you communicated an extension

21    of probationary period on September 28, 2006?

22    A.    **Actually, it is the policy of the**

23    **hospital that you have 30 days from the time the**

24    **evaluation is due to give the evaluation.**

25    Q.    The evaluation or the probationary

*COMPU-TRAN SHORTHAND REPORTING*

1    *Catherine Magone*

2    period?

3    A.    **I don't know.**

4        (Plaintiff's Exhibit 21

5        24-page Human Resource Policies and

6        Procedures Guide marked for

7        identification, as of this date.)

8    Q.    I'm going to show you what has been

9    marked as Plaintiff's Exhibit 21 for

10    identification. Directing your attention to --

11    I'm going to read to you, it is Lawrence

12    Hospital Human Resources Policies and Procedures

13    Guide. I have them Bates stamped N 423 through

14    N 446. To your knowledge, was Ms. Newmark a

15    non-exempt employee or an exempt employee?

16    A.    **Exempt.**

17    Q.    That means what?

18    A.    **Where are you? I'm asking you.**

19    Q.    That means what?

20    A.    **What does an exempt employee mean?**

21    Q.    Yes.

22    A.    **It's a salaried employee.**

23    Q.    To your knowledge, how long is

24    probationary period for a salaried employee?

25    A.    **Six months.**

*COMPU-TRAN SHORTHAND REPORTING*

1    *Catherine Magone*

2    Q.    For 180 days?

3    A.    **Yes.**

4    Q.    It says here probationary period

5    may be extended. I direct your attention to 424

6    at the bottom, overview of probationary periods,

7    1.2. And the third sentence of that paragraph

8    which reads -- or the fourth, actually --

9    "Extensions should have the approval of human

10    resources." Do you see that?

11    A.    **Yes.**

12    Q.    Did you ever receive the approval

13    of human resources?

14    A.    **Yes.**

15    Q.    Did you document it? Did you put

16    your request in writing?

17    A.    **No.**

18    Q.    Did you notify Ms. Newmark in

19    writing?

20    A.    **No.**

21    Q.    It says, 1.3, if at any time prior

22    to the completion of the probationary period

23    either the employee or the manager has reason to

24    believe that successful completion is not

25    possible, then it lists two alternatives, and

*COMPU-TRAN SHORTHAND REPORTING*

169

**Catherine Magone**

1
2   one of the alternatives is if an opportunity for
3   transfer does not exist, then employment will be
4   terminated. Do you see that?
5       A.   Yes.
6       Q.   Was Ms. Newmark ever terminated
7   during that probationary period that expired on
8   September 20, 2006?
9       A.   **As far as I am concerned, she was**
10  **still in the probationary period.**
11      Q.   You communicated to her that
12  period?
13              MR. KEIL:   Objection to the
14      form.
15      Q.   Did you communicate with
16  Ms. Newmark that her probationary period was
17  going to be extended after -- before September
18  20, on or before September 20, 2006?
19      A.   No.
20      Q.   When did you first communicate with
21  her that her probationary period was going to be
22  extended, at the September 28 meeting, isn't
23  that right?
24      A.   **I think it was prior to that.**
25      Q.   When prior to that?

170

**Catherine Magone**

1
2       A.   **It's in one of these memos. I**
3   **don't recall.**
4       Q.   You saw in her E-mail on September
5   29, expressing concern about how her
6   probationary period had not been explained in
7   terms of the extension to her until the
8   September 28 meeting, isn't that right?
9              MR. KEIL:   Objection. Could
10      you rephrase that?
11              MS. NICAJ:   It's okay. I'm
12      going to show you her E-mail.
13      Q.   I'm going to direct your attention
14  to what has been previously marked Plaintiff's
15  Exhibit 5.
16      A.   **I thought that there was another**
17  **meeting prior to this where I had mentioned it.**
18  **Now I'm like -- I thought it was reiterated**
19  **again at that meeting. I didn't see anything**
20  **today that reflected that? I thought I did. I**
21  **don't recall.**
22      Q.   Did you ever put anything in
23  writing to her that you were extending her
24  probationary period, Ms. Newmark?
25      A.   **No.**

171

**Catherine Magone**

1
2       Q.   What interactions, if any, did you
3   have with Ms. Newmark from September 28 until
4   October 5?
5       A.   **I don't recall.**
6       Q.   Did the appointment of Nicole Serra
7   by you to the palliative care unit or care
8   services come with any additional money, salary?
9       A.   **No.**
10      Q.   Any additional benefits,
11  compensation?
12      A.   **No.**
13      Q.   Apart from what you've already
14  testified to, do you recall ever meeting with
15  Pat Orsaia to communicate your concerns about
16  Carole Newmark?
17      A.   **I don't recall.**
18      Q.   Were you ever interviewed in
19  connection with Ms. Newmark's complaint about
20  age discrimination on your part?
21              MR. KEIL:   Apart from
22      discussions with counsel?
23              MS. NICAJ:   I'm not talking
24      about -- I mean during her employment at
25      the hospital.

172

**Catherine Magone**

1
2       A.   **I don't understand the question.**
3       Q.   Were you ever interviewed in
4   connection with Ms. Newmark's complaint about
5   age discrimination?
6       A.   **Well, Pat Orsaia and I had a**
7   **discussion about it. I wouldn't call that an**
8   **interview.**
9       Q.   What was the discussion exactly,
10  what you already related to me?
11      A.   **Yes.**
12      Q.   That was the extent of it?
13      A.   **Yes.**
14      Q.   Did anyone else from human
15  resources ever communicate with you about that
16  issue, while Ms. Newmark was employed at the
17  hospital?
18      A.   **No.**
19      Q.   Did the head of HR ever speak to
20  you about that issue while she was employed at
21  the hospital?
22      A.   **Not to my knowledge. Not to my**
23  **recollection, no.**
24      Q.   Were you about to say something?
25      A.   **I remember a name.**

173

*Catherine Magone*

2  Q.   What name did you remember?

3  A.   The VP for HR. The in between VP

4  from HR before Tom is Bob Greco.

5       (Plaintiff's Exhibit 22

6       6-page Management Performance Appraisal

7       marked for identification, as of this

8       date.)

9  Q.   I'm going to direct your attention

10 to what has been marked Plaintiff's Exhibit 22

11 for identification. Do you see that?

12 A.   Yes.

13 Q.   Do you recognize that document?

14 A.   I do.

15 Q.   What do you recognize it to be?

16 A.   It is my 2004 performance

17 appraisal.

18 Q.   I'm going to direct your attention

19 specifically to page or Bates stamp No. N 384.

20 That is the second page of that exhibit.

21 A.   Correct.

22 Q.   Under the comments section of it,

23 under people development and management --

24 A.   Correct.

25 Q.   -- on the right-hand side, it says,

*COMPU-TRAN SHORTHAND REPORTING*

---

175

*Catherine Magone*

2  Q.   Which staff members?

3  A.   Case managers, social workers there

4  is always --

5  Q.   Their names?

6  A.   Oh, I don't have any recollection

7  of who it might be at that time. It could be

8  any one of them on any given day. It's a

9  difficult job, case management. So it is very

10 stressful. It involves a lot of interaction

11 with one another. Social workers and case

12 managers historically have issues with one

13 another. Nurses and social workers, that's just

14 history.

15 Q.   Whose writing, if you know, is

16 below that?

17 A.   That is Dr. Roeder.

18 Q.   Did you meet with Dr. Roeder with

19 respect to that?

20 A.   He gives me my performance

21 evaluation. This was a self evaluation that he

22 either agrees with or not.

23 Q.   Did he ask you why the staff

24 unrest, what the issue was?

25 A.   I'm sure we discussed it.

*COMPU-TRAN SHORTHAND REPORTING*

---

174

*Catherine Magone*

2  "Attempt to promote teamwork but have been

3  unsuccessful in eliminating staff unrest." What

4  does that relate to?

5  A.   I wrote that. That's my statement.

6  Q.   What did you mean by that?

7  A.   Because I was -- at the time we had

8  some personality issues within the department,

9  and I was working hard to improve them. So I

10 was a little hard on myself.

11 Q.   What personality issues?

12 A.   Just like in any kind of -- any

13 department, where you are trying to build

14 teamwork particularly in --

15 Q.   It says staff unrest. What did you

16 mean by "staff unrest"?

17 A.   Staff unrest, from 2004, I don't

18 recall. Just people not necessarily getting

19 along, not being happy.

20 Q.   With you?

21 A.   No, no, not with me. With one

22 another, with one another.

23 Q.   What was the staff unrest coming

24 from?

25 A.   Change.

*COMPU-TRAN SHORTHAND REPORTING*

---

176

*Catherine Magone*

2  Q.   Do you recall what you said?

3  A.   Just staff unrest as a whole.

4  Not -- it's an ongoing issue.

5  Q.   It says at the very last page of

6  that -- I'm gathering it should be appraiser's

7  comments instead of praiser's comments. It is

8  cut off, it looks like.

9  A.   Yes.

10 Q.   It says, "Discussed methods to

11 define and/or eliminate staff unrest."

12 A.   Right.

13 Q.   What did Dr. Roeder say with

14 respect to that?

15 A.   Well, at the time the two of us

16 were unclear on why there was some staff unrest.

17 There were some members of the department that

18 were having a difficult time still with the new

19 case management model -- I had people from the

20 old model mixed with people from the new

21 model -- and discussed how we could do better

22 with team building skills.

23 Q.   So there was an issue with the case

24 management model?

25 A.   No, no issue with the case

*COMPU-TRAN SHORTHAND REPORTING*

177

**Catherine Magone**

2 management model, just as a manager trying to
3 promote teamwork.
4       Q.    So you said there were issues.  Now
5 there no issues with the case management model?
6       A.    No, there were no issues.  This is
7 personalities and letting women and men, people
8 getting along with one another.
9       Q.    Which men and women?
10       A.    There were no men.  I'm just
11 saying.
12       Q.    Which staff members?
13       A.    Nobody in particular.  We had a
14 very -- we had a very tough year.  We had to get
15 length of stay down, so we had to play hard
16 ball.  And sometimes people get stressed and get
17 upset.  So we -- Dr. Roeder -- I put this in
18 myself.  I'm recognizing that myself.  It
19 wasn't a criticism on his part.
20       Q.    I'm asking you simply what --
21       A.    I don't recall at the time.  It was
22 2004.
23       Q.    Let me finish asking the question.
24       I'm asking you what you meant by staff
25 unrest, and then I also asked you what was

178

**Catherine Magone**

2 discussed as to the discussed methods to define
3 and/or eliminate staff unrest?
4       A.    It is one of the things we decided
5 to do is we put money in the budget so we could
6 get case managers to get to go on conferences so
7 they would feel more fulfilled and rewarded.
8 That was one of the things we did that year.
9       Q.    Did anyone ever advise you in words
10 or substance that the staff was communicating
11 their concerns about you --
12       A.    No.
13       Q.    -- to anyone?
14       A.    No.
15       Q.    You are considered a manager as a
16 director, is that right?
17       A.    Right.
18       Q.    Have you had any discrimination
19 complaints brought by any employees in your
20 department apart from Ms. Newmark?
21       A.    Yes.
22       Q.    Which employees?
23       A.    It wasn't a formal complaint.
24       Q.    It doesn't matter.
25       A.    It was an informal complaint.

179

**Catherine Magone**

2 Cheryl Anderson.
3       Q.    With respect to what?
4       A.    Racial.
5       Q.    Against you?
6       A.    Yes.  There was no formal written
7 complaint.
8       Q.    When did she bring the racial
9 complaint against you?
10       A.    In September.
11       Q.    Of?
12       A.    Of '07.
13       Q.    To whom?
14       A.    Linda Smith.
15       Q.    Ms. Smith's position is what?
16       A.    Director of HR.
17       Q.    Were you interviewed for that in
18 reference to that complaint?
19       A.    Yes.
20       Q.    Did you provide a written
21 statement?
22       A.    No.
23       Q.    What was Ms. Anderson's allegation?
24       A.    Ms. Anderson had been out with a
25 broken leg for twelve weeks.  And when she

180

**Catherine Magone**

2 returned -- I covered for her while she was
3 gone.  When she returned -- I can't even
4 remember what it was that she said.  When she
5 returned we met and I went over some changes
6 that I was going to be instituting in her
7 keeping me abreast of what was going on.
8 Because she was gone for so long, I had to
9 basically do the job.  And she made a comment to
10 HR that I criticized her for the way she was
11 standing at line up because black people stand
12 that way.
13       Q.    That was the nature of her
14 complaint?
15       A.    Yeah.
16       Q.    That was as far as you know the
17 entirety of her complaint?
18       A.    Yeah.
19       Q.    What happened in connection with
20 that complaint?
21       A.    It was found unfounded.
22       Q.    When you say it was found
23 unfounded, what do you mean by that?
24       A.    Nothing went with it.
25       Q.    Who found it unfounded?

181

### Catherine Magone

A.   Well, there was no merit to it, so nothing happened.

Q.   When you say it was found unfounded, who determined it was unfounded?

A.   HR. But the decision was made to have her report directly to the medical director at that time.

Q.   Who in HR found that it was unfounded?

A.   Linda Smith.

Q.   Did she ever communicate that in writing to you?

A.   No. Well, I guess it wasn't unfounded. I denied it.

Q.   Do you know whether Ms. Anderson was interviewed?

A.   Yes.

Q.   You were interviewed?

A.   Yes.

Q.   Was anyone else interviewed in connection with her complaint?

A.   No.

Q.   So you don't know whether it was in fact unfounded, is that right, or whether HR

182

### Catherine Magone

found, is that right?

MR. KEIL:   Objection as to form. Can you rephrase that, please?

MS. NICAJ:   Sure.

Q.   When you say it was found unfounded, what is the basis of your statement for it?

A.   Well, I wasn't counseled for it. So --

Q.   As a manager what is the process by which employees can make a complaint of discrimination about a supervisor or fellow employee?

A.   Whenever they have any concerns, they can go to human resources with their concerns. Specifically for discrimination, I do not know.

Q.   Have you been trained in connection with that, how to handle discrimination complaints?

A.   No, I have not.

Q.   Do you know what, if anything, was found in connection with Ms. Newmark's complaint while she was an employee in the hospital of age discrimination?

183

### Catherine Magone

A.   I don't know what you mean.

Q.   Did Pat Orsaia ever state to you what Ms. Newmark accused you of was unfounded?

A.   Well, he said/she said, isn't it?

Q.   I'm asking you a question.

MR. KEIL:   Listen. Could you read the question back, please.

(Record read.)

A.   No.

(Recess taken.)

(Plaintiff's Exhibit 23 4/12/06 Memo marked for identification, as of this date.)

Q.   I'm going to direct your attention to Plaintiff's Exhibit 23 for identification. Do you recognize that document?

A.   I do.

Q.   What do you recognize it to be?

A.   An E-mail sent from Carole to me.

Q.   Concerning?

A.   Social work coverage.

Q.   It indicates here that there was -- was there a time that Joanne Reed worked as a social worker?

184

### Catherine Magone

A.   She was an agency social worker, yes.

Q.   She was going to be covering 5N, 5S and ER. And it indicates that I, meaning Ms. Newmark, will be covering all of the other floors and Joanne will help me if needed.

Do you know which floors she was referring to, Ms. Newmark?

A.   She would be referring to 3 north -- all the other floors, 3 north, 5 north -- she said 5. 5 north, 5 south, ER. It would be 3 north, 6 north, and -- what's left -- the ICU. I think that's it.

Q.   I'm sorry. Are you done with your response?

A.   Yes.

Q.   Are there any changes or things you want to supplement to your previous testimony?

A.   No.

MR. KEIL:   Are we done?

MS. NICAJ:   Yes.

(Examination concluded at 2:55 p.m.)

185

```
 1
 2   STATE OF NEW YORK        )
 3                     ss:
 4   COUNTY OF WESTCHESTER    )
 5
 6
 7        I, CATHERINE MAGONE, the witness
 8   herein, having read the foregoing testimony of
 9   the pages of this deposition, do hereby certify
10   it to be a true and correct transcript, subject
11   to the corrections, if any, shown on the
12   attached page.
13
14
15              oOo
16
17
18
19              _____
20
21              CATHERINE MAGONE
22
     Subscribed and sworn to before me
22   this ____ day of ____, 20   .
23   _____
24
25
```

187

```
 1
 2   CORRECTION SHEET
     Re:  Newmark v. Lawrence Hospital
 3
 4        The following corrections, additions
     or deletions were noted on the transcript of the
     testimony which I gave in the above- captioned
 5   matter, held on February 20, 2008.
 6   PAGE(S)        LINE(S)        SHOULD READ
 7
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24
25
                    CATHERINE MAGONE
```

186

```
 1
 2   STATE OF NEW YORK     )
 3                   ) ss
 4   COUNTY OF WESTCHESTER )
 5
 6           I, Nina Purcell, Notary
 7   Public within and for the State of New
 8   York, do hereby certify:
 9
10        That I reported the proceedings in the
11   within entitled matter, and that the within
12   transcript is a true record of said
13   proceedings.
14
15        I further certify that I am not
16   related to any of the parties to the action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 25th day of February, 2008.
22
23              _____
                    NINA PURCELL,
24                  NOTARY PUBLIC
25
```

188

```
 1
 2              I N D E X
 3
 4   EXAMINATION                    PAGE
 5        CATHERINE MAGONE
 6   EXAMINATION BY MS. NICA):           4
 7              E X H I B I T S
 8
 9   PLAINTIFF'S                    PAGE
```

| | | PAGE |
|---|---|---|
| 1 | 5-page Resume of Carole Newmark | 37 |
| 2 | 8/15/06 Memo | 82 |
| 3 | 5-page Resume of Nicole Serra | 86 |
| 4 | 8/22/06 E-Mail | 97 |
| 5 | 9/29/06 Memo | 121 |
| 6 | 10/4/06 Memo | 122 |
| 7 | 10/5/06 Memo | 128 |
| 8 | 7/18/06 Memo | 139 |
| 9 | 7/20/06 Memo | 139 |
| 10 | 7/20/06 Memo | 139 |
| 11 | 5/11/06 Memo | 150 |
| 12 | 4/17/06 Nomination for Big Heart Award | 151 |
| 13 | 8/31/06 Memo | 153 |
| 14 | 9/1/06 Memo | 153 |
| 15 | 9/7 Memo | 153 |
| 16 | 9/12/06 Memo | 153 |
| 17 | 10/5/06 Memo | 160 |
| 18 | 5/23/06 Memo | 164 |
| 19 | 9/19/06 Memo | 165 |
| 20 | 9-page Performance Evaluation | 165 |
| 21 | 24-page Human Resource Policies and Procedures Guide | 167 |
| 22 | 6-page Management Performance Appraisal | 173 |
| 23 | 4/12/06 Memo | 183 |

```
24        (Continued next page.)
25
```

.

**EXHIBIT 25**

1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   -----------------------------------x
 5   CAROLE NEWMARK,
 6              Plaintiff,
 7        -against-
 8   LAWRENCE HOSPITAL CENTER,
     PAT ORSAIA, individually &
 9   CATHY MAGONE, individually,
10              Defendants.
11   -----------------------------------x
12
13
14              222 Bloomingdale Road
                White Plains, New York
15              March 3, 2008
                10:00 a.m.
16
17
18        Examination Before Trial of PAT ORSAIA, a
19   Defendant held pursuant to Court Order, at the
20   above time and place, before a Notary Public
21   of the State of New York.
22
23
24
25              Lisa Regen,
                Court Reporter
```

*COMPU-TRAN SHORTHAND REPORTING*

---

3

```
 1
 2   FEDERAL STIPULATIONS
 3
 4
 5
 6        IT IS HEREBY STIPULATED AND AGREED, by and
 7   between the attorneys for the respective parties
 8   herein, that the sealing and filing of the
 9   within deposition be waived; that such
10   deposition may be signed and sworn to before any
11   officer authorized to administer an oath, with
12   the same force and effect as if signed and sworn
13   to before the officer before whom said
14   deposition is taken.
15
16
17
18        IT IS FURTHER STIPULATED AND AGREED, that
19   all objections, except as to form, are reserved
20   to the time of trial.
21
22
23
24
25
```

*COMPU-TRAN SHORTHAND REPORTING*

---

2

```
 1
 2   A P P E A R A N C E S :
 3
 4   LOVETT & GOULD, ESQUIRES
         Attorneys for the Plaintiff
 5       222 Bloomingdale Avenue
         White Plains, New York 10605
 6   BY:  DRITA NICAJ, ESQUIRE
 7
 8   COLLAZO, CARLING & MISH, LLP
         Attorneys for the Defendants
 9       747 Third Avenue
         New York, New York 10017
10   BY:  JOHN P. KEIL, ESQUIRE
11
12
13   A L S O  P R E S E N T :
13   CAROLE NEWMARK
14
15
16
17
18
19
20
21
22
23
24
25
```

*COMPU-TRAN SHORTHAND REPORTING*

---

4

```
 1
 2              P A T  O R S A I A ,
 3        having been duly sworn by Lisa Regen,
 4        a Notary Public within and for the State
 5        of New York, was examined and testified
 6                   as follows:
 7
 8                      oOo
 9
10   EXAMINATION BY MS. NICAJ:
11        Q.   Good morning, Ms. Orsaia. My name
12   is Drita Nicaj. I represent the plaintiff in
13   this action, Carole Newmark. I will be asking
14   you a series of questions today. I'm looking for
15   truthful and responsive answers. Okay?
16        A.   Uh-huh.
17        Q.   Is that a yes?
18        A.   Yes.
19        Q.   If there is anything that you don't
20   understand, haven't heard the question, or want
21   the question read back, let me know. Okay?
22        A.   I will.
23        Q.   Also, the court reporter can't take
24   down "uh-huhs." All your responses need to be
25   verbal. That is, yes or no if applicable, or
```

*COMPU-TRAN SHORTHAND REPORTING*

5

*Pat Orsaia*

2 just full responses. Okay?

3    **A.    Yes.**

4    Q.    She also can't take nods of the head

5 down. Okay?

6    **A.    I understand.**

7    Q.    If at any time you want to take a

8 break, you can do so; but I would ask you to, if

9 there are any pending questions - that is, any

10 questions that have not been fully responded to -

11 first answer the question, and then you can take

12 your break. Okay?

13    **A.    Yes.**

14    Q.    If at any time you want to add,

15 change, or otherwise supplement a response, let

16 me know. I will be happy to give you an

17 opportunity to do that. Okay?

18    **A.    Yes.**

19    Q.    And if you have answered a question,

20 I'm going to assume that you have understood it.

21    Is that a fair assumption?

22    **A.    Yes. If I have not understood it,**

23 **I'll ask you to clarify for me.**

24    Q.    Okay. So, you have answered. Then,

25 you would have understood the question; is that

*COMPU-TRAN SHORTHAND REPORTING*

7

*Pat Orsaia*

2    Q.    Do you work in any other offices for

3 Meridian?

4    **A.    In the course of my job**

5 **responsibilities, I actually can travel to more**

6 **than thirty Meridian locations across Monmouth**

7 **and Ocean Counties in New Jersey.**

8    Q.    That is your central location?

9    **A.    That is where my office is located,**

10 **yes.**

11    Q.    How long have you worked there?

12    **A.    Since January of 2007.**

13    Q.    Previous to that, where did you

14 work?

15    **A.    I worked -- previous to my current**

16 **place of employment, I worked at Lawrence**

17 **Hospital Center.**

18    Q.    At the time you ceased working at

19 Lawrence Hospital Center, what was your position?

20    **A.    Director of human resources.**

21    Q.    When was your last day of employment

22 at Lawrence?

23    **A.    I believe the date was January 12,**

24 **2007.**

25    Q.    When did you commence employment at

*COMPU-TRAN SHORTHAND REPORTING*

6

*Pat Orsaia*

2 right?

3    **A.    Yes.**

4    MR. KEIL: Also, just wait

5 for Ms. Nicaj to finish her complete

6 question before you respond because the

7 court reporter can't take down two people

8 talking at once.

9    Q.    When I'm talking and asking

10 questions, there is a fair chance you may know

11 what I'm about to ask you, but I may go to a

12 different area. So, also wait for my question on

13 that basis, too. Okay?

14    **A.    Yes.**

15    Q.    Are you employed?

16    **A.    Yes, I am.**

17    Q.    By whom?

18    **A.    Meridian Healthcare.**

19    Q.    And in what capacity?

20    **A.    Site manager, human resources.**

21    Q.    Where do you work?

22    **A.    You're asking me the address?**

23    Q.    Yes.

24    **A.    The address is 1430 Route 34,**

25 **Neptune, New Jersey.**

*COMPU-TRAN SHORTHAND REPORTING*

8

*Pat Orsaia*

2 Lawrence?

3    **A.    January 29th, 2007 -- I'm sorry**

4 **commence employment at Lawrence?**

5    Q.    Yes.

6    **A.    I believe the date was April 6,**

7 **2002.**

8    Q.    At the commencement of your

9 employment at Lawrence, what was your position

10 there?

11    **A.    My title when I began employment at**

12 **Lawrence was manager, human resources**

13 **development.**

14    Q.    Was there a change in title, or what

15 were the circumstances in which you went from

16 being manager of HR development, to director of

17 HR?

18    **A.    I was promoted to director of human**

19 **resources.**

20    Q.    When were you promoted?

21    **A.    I don't recall the exact date. As**

22 **near as I can recall, it was approximately a year**

23 **after I started employment at Lawrence.**

24    Q.    Did anyone previously occupy the

25 director of HR position?

*COMPU-TRAN SHORTHAND REPORTING*

9

Pat Orsaia

2    A.    No.  I believe it was a newly
3 created level in the human resources department
4 at Lawrence at that time.
5    Q.    Do you know who created the
6 position?
7    A.    The vice-president of human resources.
8    Q.    That person is who -- or was, at
9 that time?
10    A.    The person at that time, was Deborah
11 Gogliettino.
12    Q.    What were the circumstances in which
13 you ceased employment at Lawrence?
14    A.    I resigned my position at Lawrence
15 Hospital Center, because I was relocating with my
16 husband to go out of state.
17    Q.    Do you know someone by the name of
18 Carole Newmark?
19    A.    Yes.
20    Q.    How do you know Ms. Newmark?
21    A.    Ms. Newmark was employed at Lawrence
22 Hospital Center during my tenure there.
23    Q.    Do you know whether Ms. Newmark had
24 been employed by Lawrence Hospital previous to
25 your tenure at some point or another?

COMPU-TRAN SHORTHAND REPORTING

10

Pat Orsaia

2    A.    I don't know for sure, but I do
3 recall some conversation -- I believe that
4 Ms. Newmark told me, herself, that she had been
5 employed at Lawrence previous to the time when we
6 were employed there together.
7    Q.    Do you recall when Ms. Newmark told
8 you?
9    A.    I believe she told me the first time
10 we met, which was, I believe, after she had
11 accepted the offer of employment and before she
12 actually started work.  I recall that we were
13 introduced in the waiting area of the human
14 resources office.
15    Q.    Do you recall what words, in
16 substance, she said?
17    A.    I'm sorry; I didn't hear the
18 question.
19    Q.    What, in words or substance, did she
20 say to you at that time?
21    A.    We were introduced.  We were
22 introduced actually by Ms. Newmark's daughter,
23 who was also employed at Lawrence Hospital
24 Center.
25    We were introduced.  I was told

COMPU-TRAN SHORTHAND REPORTING

11

Pat Orsaia

2 that -- she shared that she was starting work
3 there, I believe to do some new-hire paperwork.
4 I welcomed her.  That was really it.
5    Q.    What is Ms. Newmark's daughter's
6 name?
7    A.    Janice.  I believe her last name was
8 Powers.
9    Q.    At that time, what was her position?
10    A.    Janice was one of two people
11 employed in the -- I'm trying to remember the
12 exact name of the department.  The person that
13 Janet reported to was the director of service
14 excellence.  I don't recall Janice's title,
15 exactly.  She was employed in a clerical
16 capacity, reporting to the director of service
17 excellence.
18    Q.    At the time of Ms. Newmark's hire,
19 who was her supervisor, if you know?
20    Q.    Who was Ms. Newmark's supervisor?
21    Q.    Yes.
22    A.    The director of the department was
23 Cathy Magone.
24    Q.    And the department which Ms. Newmark
25 was hired to, was what?

COMPU-TRAN SHORTHAND REPORTING

12

Pat Orsaia

2    A.    Case management and social work.
3    Q.    Was Ms. Magone already hired when
4 you started your employment at Lawrence?
5    A.    Yes.
6    Q.    Prior to your deposition here today,
7 did you review any documents in connection with
8 preparing for your deposition?
9    A.    Yes.
10    Q.    What documents?
11    A.    I reviewed the probationary
12 performance evaluation that was issued to
13 Ms. Newmark.  I reviewed a piece of correspondence,
14 which was the termination letter that I had sent
15 to Ms. Newmark.  I reviewed some e-mails that had
16 either been sent to me directly, or I had been
17 copied on.
18    Q.    Anything else?
19    A.    Not that I recall.
20    Q.    Did you meet with anyone, or discuss
21 with anyone your deposition, before you came here
22 today?
23    A.    Yes.
24    Q.    With whom?
25    A.    John Keil.

COMPU-TRAN SHORTHAND REPORTING

13

Pat Orsaia

2  Q.  Was this by telephone or at a
3  meeting?
4  A.  By telephone.
5  Q.  When?
6  A.  It was prior to the original date of
7  this deposition. The original date, I believe,
8  was February 22nd, and I spoke with John the day
9  prior to that.
10  Q.  How long did you speak to Mr. Keil?
11  A.  Somewhere between 60 and 90 minutes.
12  Q.  Apart from your communication with
13  Mr. Keil, did you communicate with anyone else in
14  connection with your deposition here?
15  A.  No.
16  Q.  Have you communicated with
17  Ms. Magone relating to the claims in this?
18       MR. KEIL:  At any time or --
19       MS. NICAJ:  At any time.
20  A.  I guess I would need some
21  clarification on the question; because when you
22  say this action, does that include the complaint
23  to the EEOC prior to this?
24  Q.  Let me -- okay. Have you spoken to
25  Ms. Magone since you ceased your employment at

COMPU-TRAN SHORTHAND REPORTING

14

Pat Orsaia

2  Lawrence?
3  A.  Yes.
4  Q.  Okay. Relating to what?
5  A.  I spoke with Cathy Magone -- the
6  first time I spoke to her since my employment,
7  was to ask her help with a personal friend of
8  mine, who was a patient at Lawrence Hospital
9  Center. And I asked for her help to -- not help
10  so much as to make her aware that I had a
11  personal friend, who was a patient at Lawrence
12  and might need some help from her area, from her
13  department.
14  Q.  Apart from that communication, have
15  you had any other communications with Ms. Magone
16  since you ceased employment at Lawrence?
17  A.  Yes.
18  Q.  On how many occasions have you
19  communicated with Ms. Magone?
20  A.  Since I left employment at Lawrence,
21  I have communicated with Cathy Magone twice, that
22  I can recall.
23  Q.  The first, referencing your friend?
24  A.  Yes.
25  Q.  And the second was what?

COMPU-TRAN SHORTHAND REPORTING

15

Pat Orsaia

2  A.  Repeat the question.
3  Q.  You indicated previously that the
4  first communication was with reference to your
5  friend, who was a patient at Lawrence; right?
6  A.  Correct.
7  Q.  What was the second communication
8  with Ms. Magone?
9  A.  The second communication was with
10  Cathy Magone, and it was after her deposition in
11  this matter.
12  Q.  When? Do you recall what date that
13  occurred?
14  A.  I don't recall the exact date.
15  Q.  What, in words or substance, did she
16  say to you?
17  A.  In substance, she said that she had
18  completed her deposition. She had an awareness
19  that mine was scheduled. There wasn't much more
20  substance to the conversation.
21  Q.  How long was your communication with
22  Ms. Magone?
23  A.  How long was the telephone conversation?
24  Q.  Yes.
25  A.  Ten minutes, approximately.

COMPU-TRAN SHORTHAND REPORTING

16

Pat Orsaia

2  Q.  So, in that ten-minute time, she
3  said she had completed her deposition, and that
4  was the substance of your ten-minute
5  communication with her?
6  A.  Well, we also talked about some
7  mutual colleagues, who were still at Lawrence.
8  And I inquired about them, how they were doing,
9  how things generally were at the hospital, et
10  cetera. We talked about family a little bit.
11  Q.  When did you communicate with Miss --
12  withdrawn.
13       Who communicated with whom? Who
14  telephoned who?
15  A.  I telephoned Cathy; I left her a
16  voice message, and she telephoned me back.
17  Q.  Do you recall when you telephoned
18  her?
19  A.  I don't recall the exact date.
20  Q.  Do you know whether it was, in fact,
21  the day after her deposition or the day of her
22  deposition that you communicated with her?
23  A.  It was not the day of her
24  deposition. It was sometime after that.
25  Q.  You indicated that you communicated

COMPU-TRAN SHORTHAND REPORTING

17

*Pat Orsaia*

2  with Mr. Keil the day before your deposition,

3  which was scheduled on February -- your

4  originally scheduled deposition, which was on

5  February 22nd; is that right?

6  A.    Yes.

7  Q.    Do you recall whether Ms. Magone's

8  deposition was on February 20th?

9  A.    I don't recall the exact date of

10  Cathy's deposition, no.

11  Q.    Do you know whether you communicated

12  with Ms. Magone prior to your scheduled

13  deposition?

14  A.    The originally scheduled deposition?

15  Q.    Yes.

16  A.    Yes.

17  Q.    Did you or she speak about what it

18  was she testified to during your deposition?

19  A.    Not the detail of it, no.

20  Q.    What did you speak about concerning

21  her deposition?

22  A.    She shared that it had been a long

23  day, that her deposition had lasted several

24  hours. It was tiring. I think she used the word

25  "tiring." She shared with me who had been

18

*Pat Orsaia*

2  present at the deposition. She said John was

3  there, Ms. Newmark, yourself. We may have talked

4  about the location, the fact that I was coming

5  from New Jersey, and the location of your

6  offices, et cetera.

7  That's what I recall of our

8  conversation.

9  Q.    Do you recall whether she told you

10  anything about the substance of any testimony she

11  provided during her deposition?

12  A.    No.

13  Q.    Are there any documents you can use

14  to refresh your recollection?

15  A.    No.

16  Q.    What was the purpose in your calling

17  Ms. Magone?

18  A.    You're talking about the second time

19  I called her?

20  Q.    No. You indicated that you left her

21  a voicemail and --

22  A.    Yes.

23  Q.    What was the purpose of that

24  telephone communication?

25  A.    I believe I said in my message that --

19

*Pat Orsaia*

2  I identified myself. I said, I would like to say

3  hi to you. I hope you're doing well. I left her

4  my number, where I could be reached at work.

5  She left -- she received my

6  voicemail message. She left me a message back.

7  Said, hi; it was nice to hear from you. It would

8  be nice to chat if we can connect.

9  And then I think I called her back

10  again, and that is when we actually spoke live.

11  Q.    The purpose was because you -- of

12  your communication was -- withdrawn.

13  The purpose of your communication

14  with Ms. Magone was, what?

15  MR. KEIL:  Why did you call

16  Ms. Magone in the first place?

17  THE WITNESS:  I called her

18  to-- because I had an awareness that her

19  deposition had happened. I wanted to

20  touch base with her, let her know that

21  mine had been scheduled, see how she was,

22  say hello as a colleague.

23  Q.    How did you know that she had her

24  deposition?

25  A.    I had an awareness of the dates from

20

*Pat Orsaia*

2  Mr. Keil.

3  Q.    Apart from Ms. Newmark, during the

4  course of your employment at Lawrence, did anyone

5  ever communicate any concern they had concerning

6  Cathy Magone?

7  A.    In what regard?

8  Q.    In any regard.

9  A.    I recall there was one individual, a

10  case manager who came to see me after she had

11  been issued a formal corrective action by Cathy

12  Magone, and she came to see me in my capacity as

13  director of human resources, to -- I believe she

14  had the document with her, a copy of the document

15  with her. And she asked me to clarify for her,

16  just the nature of the corrective action. I

17  believe she wanted me to verify that it was done

18  as per policy, et cetera.

19  Q.    Who was this person?

20  A.    First name was Barbara. I don't

21  recall her last name.

22  Q.    At the time you ceased employment at

23  Lawrence, was Barbara still employed there, to

24  your knowledge?

25  A.    Yes.

21

*Pat Orsaia*

2  Q.  What was the nature of the corrective
3  action?
4  A.  I believe it was for conduct that
5  she had overheard in a verbal exchange that was
6  thought to be unacceptable in its content.
7  Q.  What was the verbal exchange?
8  A.  I don't recall the details.
9  Q.  What was the substance of the verbal
10  exchange?
11  A.  I don't recall.
12  Q.  Apart from Barbara and Ms. Newmark,
13  were there any employees to your knowledge that
14  ever came to you, or someone else in human
15  resources, with respect to Cathy Newmark?
16  MR. KEIL:  Objection. I
17  believe you mean Cathy Magone.
18  MS. NICAJ:  I'm sorry;.
19  Cathy Magone.
20  A.  I believe there were two questions
21  there.  I don't have any knowledge of anyone at
22  Lawrence going to anyone else in human resources,
23  with a concern about Cathy Magone.  I do recall
24  meeting with a social worker who had resigned,
25  and I met with her, as was the practice, for what

*COMPU-TRAN SHORTHAND REPORTING*

22

*Pat Orsaia*

2  we called an exit interview.
3  Q.  And that social worker was, who?
4  A.  First name was Elizabeth.  Last name
5  was, I believe Basil, B-a-s-i-l-e.  I may not be
6  spelling that correctly.
7  Q.  What did Ms. Basil say with respect
8  to Cathy Magone?
9  A.  Elizabeth expressed concern that
10  with her resignation and exit, and shortly before
11  that, the exit of the supervisor of social work,
12  Denise Galloway, who actually had retired and was
13  relocating to the Carolinas after many years with
14  Lawrence, Elizabeth as I recall, felt that Denise
15  Galloway had been a mentor to her and that the
16  loss to Lawrence Hospital of Ms. Galloway was
17  going to be substantial because of her years of
18  experience and her history, et cetera.  And
19  Elizabeth told me that Denise's decision to
20  retire was, in part -- was part of the reason
21  that Elizabeth had decided to resign.  And I
22  can't recall if Elizabeth was -- had another job
23  to go to at that point or if her plan was to
24  resign and stay at home for a while.
25  In any case, the only discussion

*COMPU-TRAN SHORTHAND REPORTING*

23

*Pat Orsaia*

2  specific to Cathy Magone that I had with
3  Elizabeth was during this same conversation,
4  where Elizabeth shared that she, Elizabeth, felt
5  that the staffing complement in the social work
6  department needed to be increased.  And she
7  referenced the fact that Cathy Magone was aware
8  of this, and Elizabeth expressed her own concern
9  that there didn't appear to be any additional
10  social work positions approved.
11  Q.  Did Ms. Basil say anything, as well,
12  with respect to Cathy Magone, apart from what you
13  have already testified to?
14  A.  No.
15  Q.  Did you ever communicate
16  Ms. Basil's concerns to Cathy Magone?
17  A.  I believe I did tell Cathy Magone
18  that -- about Elizabeth's concern as to the
19  staffing levels in the social work department.
20  Q.  And what, if anything, did Ms. Magone
21  say to you?
22  A.  I believe that when we discussed it,
23  both of us being at the director level and having
24  responsibility for recommendations around
25  staffing in our departments, that Cathy

*COMPU-TRAN SHORTHAND REPORTING*

24

*Pat Orsaia*

2  acknowledged that that may be a concern that
3  Elizabeth had.  However, we, as leaders at
4  Lawrence, had a budget that we had to manage to
5  and positions that were not approved.
6  Q.  At the time of Elizabeth's exit
7  interview, was Mrs. Newmark employed there?
8  A.  I don't believe so; I can't say for
9  sure.
10  Q.  To your knowledge, did Denise
11  Galloway ever communicate with you, or anyone
12  else at HR, concerning Cathy Magone?
13  A.  Not that I recall.
14  Q.  Are there any documents you can use
15  to refresh your recollection?
16  A.  No, not that I know of.
17  Q.  Did anyone else ever communicate
18  with you concerning Cathy Magone?
19  A.  Not that I recall.
20  Q.  Are there any documents that you can
21  use to refresh your recollection?
22  A.  Not that I know of.
23  Q.  Did there come a time that Carole
24  Newmark communicated with you concerning Cathy
25  Magone?

*COMPU-TRAN SHORTHAND REPORTING*

**25**

Pat Orsaia

2  A.  Yes.

3  Q.  When was the first instance?

4  A.  I believe it was late in the month

5  of August of 2006.

6  Q.  You believe it was because of what?

7  A.  I believe it was late in the month

8  of August; because in my review of documents that

9  I have already mentioned earlier, that appears to

10  be about the time that Carole requested to meet

11  with me for the first time.

12  Q.  What documents are you referring to?

13  A.  E-mails.

14  Q.  From who, to who?

15  A.  E-mails from Carole to myself,

16  myself to Carole, Cathy Magone, as well.

17  Q.  Do you know how Ms. Newmark first

18  communicated her wish to meet with you?  Was it

19  in e-mail form or in person?

20  A.  For our first meeting, Carole did

21  not ask via e-mail to meet with me.  I believe

22  she either came to my office physically and asked

23  to meet, and then maybe we set up an appointment

24  for another time, or called me.  But to the best

25  of my recall, it seems to me I have a sense that

*COMPU-TRAN SHORTHAND REPORTING*

**26**

Pat Orsaia

2  she dropped by my office and said, I would like

3  to meet with you.  I don't think the meeting took

4  place immediately.  I don't think either or both

5  of us was available immediately; but soon after

6  that, we set a time and we met.

7  Q.  When did she approach you in person

8  and stop by your office to meet with you?

9  A.  I don't recall the exact date.

10  Q.  Were you there when she dropped by

11  your office to schedule a meeting?

12  A.  I can't say for sure.  It's possible

13  that Carole stopped by -- and it would not be

14  unusual for any employee to stop by and set an

15  appointment with me through someone else in my

16  department, who had access to my schedule; I

17  can't say for sure.  I have a sense that maybe

18  she dropped by herself; but it was a long time

19  ago, and I don't have exact recall about it.

20  Q.  Do you recall maintaining any notes

21  in connection with her wanting to meet with you --

22  A.  No.

23  Q.  -- when she dropped by?

24  A.  No.

25  Q.  Do you recall whether she advised

*COMPU-TRAN SHORTHAND REPORTING*

**27**

Pat Orsaia

2  you, or someone else, what the nature of the

3  meeting was going to be?

4  A.  I wasn't aware of the nature of what

5  she wanted to talk about until we actually met,

6  the detail of it.

7  Q.  And when did you meet with

8  Ms. Magone -- when did you meet with Ms. Newmark?

9  A.  Once again, I believe it to be late

10  in the month of August of 2006.

11  Q.  Who else was present?

12  A.  No one.

13  Q.  You believe this meeting was

14  scheduled in person by Ms. Newmark; is that

15  right?

16  A.  Possibly.

17  Q.  But you're not certain?

18  A.  I'm not certain.

19  Q.  How long was your meeting with

20  Ms. Newmark?

21  A.  Our initial meeting was probably,

22  approximately, fifteen to twenty minutes.

23  Q.  Did you take any notes?

24  A.  I did not.

25  Q.  Is there a reason why not?

*COMPU-TRAN SHORTHAND REPORTING*

**28**

Pat Orsaia

2  A.  No particular reason.

3  Q.  At that point, you were the director

4  of HR; right?

5  A.  Correct.

6  Q.  At this meeting, what, in words or

7  substance, did Ms. Newmark say?

8  A.  At this meeting, Carole shared with

9  me that she had met with Cathy Magone, and she

10  had been told by Cathy that another social

11  worker, Nicole, had been selected to work on a

12  particular project.  Carole told me that she was

13  disappointed that Nicole had been assigned to

14  this project because it was an area that she,

15  Carole, had an interest in; namely, palliative

16  care area.

17  Carole presented to me that

18  initial meeting as being disappointed, as being

19  angry, and as having a concern about Nicole's

20  selection for the project.

21  Q.  Did Ms. Newmark indicate, herself,

22  that Ms. Magone had not selected her for that

23  project because Nicole was younger?

24  A.  At some point during the conversation,

25  after we had spoken about the fact that Carole

*COMPU-TRAN SHORTHAND REPORTING*

29

*Pat Orsaia*

2  had been assigned to a different project -- which
3  was, I believe, in the area of behavioral health
4  or mental health, and Carole reminded me because
5  I had not -- I was not aware of her résumé or
6  experience; but she reminded me at that time that
7  she had come most recently to Lawrence from
8  employment in the mental health area. And Carole
9  indicated to me that she had been assigned to a
10 mental health project at Lawrence by Cathy
11 Magone, but that Nicole had been assigned to the
12 palliative-care project. I think that we had this
13 discussion in the context of Carole trying to
14 explain to me why, or speculating with me about
15 reasons why she had not been assigned to the
16 palliative-care project.
17     Q.    Are you done with your response?
18     A.    No.
19     Q.    Go ahead.
20     A.    I believe your question was, did
21 Carole share with me that she had a concern about
22 Cathy making a comment that involved the use of
23 the word "young." And Carole did share that
24 concern with me at that meeting.
25          MS. NICAJ:   I'm going to

*COMPU-TRAN SHORTHAND REPORTING*

30

*Pat Orsaia*

2  strike that portion of the response that
3  was not responsive to my original
4  question.
5     Q.    And from there, I'm going to ask
6  you: What, in words or substance, did Ms. Newmark
7  say to you with respect to Ms. Magone's use of
8  the word "young" or "younger"?
9     A.    Ms. Newmark told me, at our initial
10 meeting, that she -- that Cathy Magone had used
11 the word "young" in reference to Nicole during
12 their meeting. And this was the meeting where
13 Carole was told by Cathy Magone that Nicole had
14 been assigned to the palliative-care project.
15     Q.    Did Ms. Newmark indicate, in words
16 or substance, that Ms. Magone had advised her
17 that one of the reasons she was selecting
18 Ms. Serra for that palliative-care project was
19 because she was young or younger?
20     A.    Carole told me that was her
21 perception of Cathy Magone's comment.
22     Q.    Did she say that that's what
23 Ms. Magone said to her?
24     A.    What Carole said to me was that --
25 she asked me -- she told me what her recall was

*COMPU-TRAN SHORTHAND REPORTING*

31

*Pat Orsaia*

2  of Cathy's comment, and then she asked me if that
3  was ageism.
4     Q.    During the course of this meeting,
5  did you, when Ms. Newmark mentioned the
6  young, and "younger," and "ageism," did you ever
7  write this down?
8     A.    I did not.
9     Q.    Why?
10    A.    I asked Carole to clarify for me
11 what she thought this meant. I asked her to
12 clarify what ageism was. I have already
13 testified, I did not write it down.
14    Q.    Why didn't you?
15    A.    I didn't feel it was necessary.
16    Q.    Why not?
17    A.    In my role I have conversations with
18 team members all day long in my office and at
19 other locations around the hospital. They will
20 oftentimes share a concern. I don't write notes
21 or ask them to write a statement about everything
22 they talk to me about.
23    Q.    Is there a discrimination policy at
24 Lawrence that was present when you were HR
25 director?

*COMPU-TRAN SHORTHAND REPORTING*

32

*Pat Orsaia*

2     A.    Yes.
3     Q.    What is it?
4     A.    What is what?
5     Q.    What was the discrimination policy?
6     A.    The discrimination policy is a
7  standard policy that you would find in almost
8  every organization that basically states that
9  Lawrence Hospital Center does not discriminate in
10 its employment practices.
11    Q.    Does it provide for what the
12 procedure is if an employee believes they have
13 been discriminated against?
14    A.    The policy encourages any team
15 member or employee, who feels they're being
16 discriminated against in employment practices, to
17 bring their concern forward.
18    Q.    To whom?
19    A.    To their manager, to human resources,
20 to a senior leader in the organization.
21    Q.    Is there a policy with respect to
22 what is done from that point on, what the
23 procedure is?
24    A.    I don't believe there is a specific
25 procedure spelled out in the policy. The

*COMPU-TRAN SHORTHAND REPORTING*

33

*Pat Orsaia*

2  expectations and, I think, the intent of the
3  policy is that the person be heard and their
4  concern be addressed.
5      Q.   There is nothing that says that
6  these concerns should be reduced to writing?
7      A.   Not that I'm aware of.
8      Q.   You never, yourself, put anything in
9  writing concerning Ms. Newmark's complaints about
10 Cathy Magone; is that right?
11     A.   That's right.
12          Can I ask to revisit that question?
13     Q.   You can.
14     A.   In terms of having put anything in
15 writing about Ms. Newmark's concerns to Cathy
16 Magone, I believe there was at least one e-mail.
17     Q.   Not to Cathy Magone.
18          Did you ever put anything in writing
19 relating to what Ms. Newmark said to you,
20 relating to Cathy Magone?
21     A.   Other than the e-mails I was about
22 to mention, no.
23     Q.   When you say "the e-mails," in what
24 e-mails did you reference what Ms. Newmark said?
25          MR. KEIL:  I object as to

*COMPU-TRAN SHORTHAND REPORTING*

34

*Pat Orsaia*

2  form.
3      Q.   Did you -- in the e-mails you're
4  referencing, did you ever say, this is what
5  Ms. Newmark said, in those e-mails?
6      A.   I believe there is one e-mail that I
7  sent to Cathy Magone, where I referenced that I
8  had provided Cathy's clarification around the
9  comment to Carole and that Carole remained upset
10 about it and not accepting of Cathy's explanation.
11     Q.   Did --
12     A.   And I put that in an e-mail to Cathy
13 Magone.
14     Q.   Did you use the word "young" or
15 "younger;" or anything of that nature?
16     A.   I believe I said, Carole was still
17 unclear or upset about Cathy's use of the word
18 "young."
19     Q.   That was in reference to the second
20 meeting with Ms. Magone?  There was a second
21 meeting where Ms. Magone was present, as well as
22 Ms. Magone?
23     A.   That's correct.
24     Q.   Following that meeting, Ms. Newmark
25 had written to you that she still had concerns;

*COMPU-TRAN SHORTHAND REPORTING*

35

*Pat Orsaia*

2  isn't that right?
3      A.   Ms. Newmark wrote to me that she
4  still -- that the concern after I telephoned her
5  and gave her Cathy's initial clarification of the
6  comment --
7      Q.   Initial -- what comment are you
8  referring to?
9      A.   When Carole first met with me.
10     Q.   Right.
11     A.   She voiced a concern that Cathy
12 Magone had used the word "young" --
13     Q.   Right.
14     A.   -- as part of her explanation about
15 the project assignment, and Carole referenced
16 that to me as ageism.
17     Q.   Well, you testified earlier that
18 Ms. Newmark had, in fact, said that Ms. Magone
19 had selected Nicole Serra because she was young;
20 isn't that right?
21     A.   No.
22     Q.   That is not what you said?
23     A.   No.
24     Q.   What did you say with respect to
25 what Ms. Newmark said to you at that time?

*COMPU-TRAN SHORTHAND REPORTING*

36

*Pat Orsaia*

2      A.   Could you be more specific in the
3  question?
4      Q.   What did Ms. Newmark say to you when
5  she first communicated her concern about Cathy
6  Magone's reference to "young" and Nicole Serra?
7      A.   Ms. Newmark told me that in her
8  explanation of why Nicole was selected for the
9  palliative-care project, that Cathy Magone had
10 used the word "young" in reference to Nicole.
11     Q.   Did she say how Ms. Magone had used
12 the word "young"?
13     A.   I believe Carole said it was
14 something to the effect of, Cathy told her Nicole
15 was young and eager to learn, or could use the
16 experience, or something like that.  It was
17 really the use of the word "young" that Carole
18 was focused on.
19     Q.   As you sit here today, do you recall
20 what Ms. Newmark said in reference to the word
21 "young"?
22     A.   Just what I have just stated.
23     Q.   Apart from that, anything else you
24 recall she said to you at that time?
25     A.   In reference to the use of the word

*COMPU-TRAN SHORTHAND REPORTING*

37

Pat Orsaia

2  "young"?

3     Q.   Yes.

4     A.   Only that she, Carole, questioned

5  me. Something like, isn't that ageism, is the

6  way she put it to me.

7     Q.   What response, if any, did you have

8  for her?

9     A.   I actually asked her to clarify what

10  she meant by "ageism."

11    Q.   Why?

12    A.   Because it wasn't a term I was

13  familiar with.

14    Q.   And what was her response?

15         You were not familiar with the word

16  "ageism"?

17    A.   Correct.

18    Q.   What was her response?

19    A.   Her response was that her perception

20  was that Cathy was telling her that Nicole had

21  been selected for the palliative-care project

22  because she was younger in age than Carole.

23    Q.   As the HR director at that time, you

24  didn't know what "ageism" meant?

25    A.   I thought it was important for

*COMPU-TRAN SHORTHAND REPORTING*

---

38

Pat Orsaia

2  Carole to clarify.

3     Q.   I'm asking, at the time when you

4  asked her what "ageism" meant, you didn't know

5  what that word meant?

6     A.   I was not familiar with the use of

7  the word "ageism" as a term that could be used

8  interchangeably with age discrimination, no.

9     Q.   Did you ever -- did you look up the

10  definition?

11    A.   No. I asked Carole to clarify for

12  me what she meant by the term "ageism" in the

13  context that she was presenting it to me.

14    Q.   What did she say to you?

15    A.   I believe I just stated what she

16  said to me.

17    Q.   What did she say?

18    A.   She said what she meant by "ageism"

19  is that her perception is that Cathy's use of the

20  word "young" in the explanation as to why Nicole

21  was selected for the palliative-care project, was

22  a reference to the fact that Nicole was younger

23  than Carole, and that is why she was selected for

24  the approach.

25    Q.   Didn't she, in fact, say that

*COMPU-TRAN SHORTHAND REPORTING*

---

39

Pat Orsaia

2  Ms. Magone told her that the reason she was

3  hiring Nicole was because she was young?

4     A.   The reason she was hiring Nicole?

5     Q.   The reason that Ms. Serra was being

6  selected for that care unit was because she was

7  young?

8     A.   Carole told me that was her

9  perception, yes.

10    Q.   Did she say that's what Ms. Magone

11  told her, in words or substance, that the reason

12  Ms. Serra was being selected over Ms. Newmark was

13  because Ms. Serra was young?

14    A.   Carole said that Cathy used the word

15  "young" as part of her explanation.

16         MS. NICAJ:  I'm going to

17    move to strike as not responsive.

18         Read back the question.

19         (Question read).

20         MR. KEIL: Do you understand

21    the distinction that Ms. Nicaj is making

22    in her questions?

23         THE WITNESS:  No.

24         MR. KEIL:  Perhaps, approach

25    it differently.

*COMPU-TRAN SHORTHAND REPORTING*

---

40

Pat Orsaia

2         MS. NICAJ: Well, I gave her

3    instructions. I think she understands

4    perfectly, but I will be happy to rephrase

5    the question.

6     Q.   Did Ms. Newmark tell you that

7  Ms. Magone told her the reason she was selecting

8  Ms. Nicole Serra for that care unit, was because

9  Ms. Serra was young?

10    A.   Carole told me that that's what she

11  thought Cathy meant by her comments, yes.

12         MS. NICAJ: Move to strike as

13    not responsive.

14         MR. KEIL:  She answered the

15    question.

16         MS. NICAJ:  No, she has

17    not.

18    Q.   Did Ms. Newmark say, in words or

19  substance to you, that Ms. Magone told her the

20  reason she was selecting Ms. Serra as compared to

21  Ms. Newmark, was because Ms. Serra was young?

22    A.   I believe I have answered this

23  question already; but to the best of my recall,

24  Ms. Newmark told me that she was concerned about

25  Cathy Magone's use of the word "young" in her

*COMPU-TRAN SHORTHAND REPORTING*

**41**

*Pat Orsaia*

2  explanation about why Nicole was selected for the
3  palliative-care project.
4      MS. NICAJ:  I'm going to
5  move to strike as nonresponsive.
6      Can you read the question back.
7      (Question read)
8      A.    No.
9      Q.    What, if anything else, did she say
10 to you during this initial exchange with
11 Ms. Newmark?
12      A.    Ms. Newmark told me in this same
13 conversation that -- I don't remember her exact
14 words, but she indicated to me that she was not
15 entirely comfortable with her role in the
16 department with Cathy Magone as her director and
17 wasn't entirely comfortable -- or maybe had not
18 entirely adjusted to the case-management model of
19 work that was used at Lawrence.  And that may
20 have been when Ms. Newmark reminded me that she
21 had come most recently from the mental-health
22 work environment, and it was different in the
23 acute-care environment; there is no question
24 about it.  And I believe that Carole, during that
25 initial conversation, even said to me that she

*COMPU-TRAN SHORTHAND REPORTING*

---

**42**

*Pat Orsaia*

2  wasn't sure if her job at Lawrence was the right
3  one for her at that point.  And I believe she
4  said something like, maybe it's too soon to tell;
5  or, you know, I'm early in my tenure.  Whatever
6  it was.
7      Q.    Did you write any of this down?
8      A.    No.
9      Q.    Okay.  Did you communicate that with
10 anyone?
11      A.    No.
12      Q.    Did she say anything else to you?
13      And when you say you believe, and
14 you believe, what is the basis of your belief?
15 Because with all due respect, I don't care about
16 your belief; I'm interested in your memory.  So,
17 what is the basis of your belief?
18      A.    When I say "I believe," what I'm
19 providing is my best recall of what was shared in
20 that conversation.
21      Q.    So, it's more than your belief; it's
22 your actual recollection?  Is that what you're
23 saying?
24      A.    Yes.
25      Q.    And what, if anything, did you tell

*COMPU-TRAN SHORTHAND REPORTING*

---

**43**

*Pat Orsaia*

2  her in response?
3      A.    In response to everything that
4  Carole had shared with me in that initial
5  conversation, I suggested to her that it was
6  important that we clarify -- address her concern
7  and clarify what Cathy had said and what the
8  intent of her comments were.
9      And I told Ms. Newmark that I
10 understood her concern; that we should definitely
11 follow up on it.  And I offered her a couple of
12 optional ways to do that.
13      Q.    What were those?
14      A.    I offered her the option of -- if
15 she was comfortable doing so, I suggested to her
16 that a first option would be for Ms. Newmark to
17 schedule some private time with Cathy Magone and
18 ask for clarification, and let her know what her
19 perception was of their discussion and how she
20 was feeling about the assignment of the projects.
21      I offered her another option of the
22 three of us meeting - Cathy Magone, Ms. Newmark
23 and myself - for a similar discussion.
24      And I offered her a third option of
25 my taking her concern to Cathy Magone separately,

*COMPU-TRAN SHORTHAND REPORTING*

---

**44**

*Pat Orsaia*

2  seeking the clarification that she was asking and
3  coming back to her with a response.
4      Those were the options.
5      Q.    Did you say anything during this
6  interchange with Ms. Newmark?
7      A.    I may have.  After presenting the
8  options, I may have asked Carole if she wanted to
9  think about the options and let me know at some
10 later time how she wanted to proceed; or we may
11 have determined it right there, because the
12 option that she chose was for me to contact Cathy
13 Magone, separately, seek the clarification to
14 address her concerns and come back to her with a
15 response.
16      And that's what we actually did.
17 That's what I actually did.
18      Q.    Do you recall anything else that was
19 said by you or Ms. Newmark at this meeting?
20      A.    No.
21      Q.    How long did this meeting last?
22      A.    To the best of my recollection,
23 fifteen to twenty minutes.
24      Q.    You indicated that she took the
25 third option of you speaking to Ms. Magone,

*COMPU-TRAN SHORTHAND REPORTING*

45

Pat Orsaia

2 separately?

3    A.    Yes.

4    Q.    Did she communicate the third option

5 to you at that meeting or at some other point?

6    A.    Well, I have already stated that I

7 don't recall exactly if she said to me at that

8 point, I'm not comfortable meeting with Cathy; I

9 would prefer that you go back and get the

10 clarification, or whether she called me sometime

11 shortly thereafter and suggested that I contact

12 Cathy, separately.

13    Q.    Did you do that, communicate with

14 Ms. Magone?

15    A.    I did.

16    Q.    How long after your meeting with

17 Ms. Newmark?

18    A.    I don't recall exactly.  What I do

19 recall is, being the time of year that all this

20 was happening, it is possible that Cathy Magone

21 may have been actually on vacation at the time

22 that Carole saw me initially about her concerns

23 or had been going on vacation.

24        I know in this time frame, over the

25 six-week period or so from the end of August

COMPU-TRAN SHORTHAND REPORTING

---

46

Pat Orsaia

2 to -- or four-week period from the end of August

3 to the end of September, that I believe I had a

4 full week planned vacation.

5        I believe that Cathy Magone was out

6 for some period of time, and I believe that

7 Carole was out for some period of time.  So, I

8 don't remember exactly.  We may have had to delay

9 my initial conversation with Cathy Magone because

10 of availability.

11    Q.    Did you communicate with Ms. Magone

12 what the intent of your meeting with her was

13 going to be, separate and apart from the fact

14 that you wanted to meet with her to discuss these

15 concerns?  Did you tell her what they were going

16 to be about?

17    A.    Yes.

18    Q.    When?  When did you first do so?

19    A.    I don't recall the exact date.

20    Q.    How was this - by e-mail, or

21 telephone, or something else?

22    A.    My best recollection is that I

23 contacted Cathy by telephone, first, to tell her

24 that I had met with Carole and that Carole had

25 voiced some concerns and that I would like to

COMPU-TRAN SHORTHAND REPORTING

---

47

Pat Orsaia

2 meet with her and go into detail about it.

3    Q.    Did you tell her, Ms. Magone, what

4 those concerns were?

5    A.    I don't recall if we spoke in detail

6 on the phone.  I don't believe so.  I believe

7 that we spoke in person.

8    Q.    Did you discuss anything on the

9 telephone concerning Ms. Newmark, expressing what

10 she had related to you about Nicole Serra's

11 appointment to the position?

12    A.    I don't recall.  It's possible that

13 I did.

14    Q.    I'm going to direct your attention

15 to what has been marked as Plaintiff's Exhibit 4,

16 which was previously marked at Ms. Magone's

17 deposition.

18        Directing your attention to

19 Plaintiff's Exhibit 4, have you seen that?

20    A.    Yes.

21    Q.    What is that?

22    A.    This is a printout from our e-mail

23 system, Microsoft Outlook, used at Lawrence

24 Hospital Center.  And it tells me that -- it's

25 the e-mail system, telling me that a meeting I

COMPU-TRAN SHORTHAND REPORTING

---

48

Pat Orsaia

2 had proposed in this case to Cathy Magone, was

3 accepted into her calendar.

4    Q.    Where is your e-mail?  Did you

5 e-mail her asking for a meeting?

6    A.    Well, this would have been in

7 response to my e-mailing her -- not e-mailing so

8 much as proposing a meeting, using the

9 calendaring aspect of Microsoft Outlook.

10    Q.    Do you know where that is located?

11 In other words, I don't have a copy of your

12 invitation to Ms. Magone.  What I'm asking

13 for is, is there a reason why it's no longer in

14 existence, to your knowledge?

15    A.    Well, there wouldn't be a hard copy

16 of that meeting proposal.  It's done through the

17 system.

18        I'm not sure if you're familiar with

19 calendaring and Outlook.

20    Q.    I am, but is there a printing

21 function?

22    A.    There is a printing function to

23 print out the calendar.

24    Q.    Right.  So, when you sent her the

25 invitation, there would have been a printing

COMPU-TRAN SHORTHAND REPORTING

49

**Pat Orsaia**

2  function to print it out; right?

3  A.  I would not have a reason to print

4  out the invitation.

5  Q.  Did you spell out what those -- what

6  Ms. Newmark's concerns were to Ms. Magone?

7  A.  It appears as if in this -- in the

8  subject line of the meeting proposal, I typed in

9  Carole Newmark's concerns, because that's what

10  would come back as the subject where it says,

11  "Accepted."

12  Q.  When you communicated with

13  Ms. Magone by telephone, was this before or after

14  August 21, 2006?

15  A.  The date August 21, 2006, on this

16  document to me, represents the date and time when

17  Cathy Magone accepted, via the Outlook system, my

18  meeting proposal.

19  Q.  When you communicated with

20  Ms. Magone via telephone, was this before or

21  after August 21, 2006?

22  A.  I'm not sure.  It could have been

23  the same day.

24  Q.  Is it fair to say that Ms. Newmark

25  had communicated to you, on or before August 21,

*COMPU-TRAN SHORTHAND REPORTING*

50

**Pat Orsaia**

2  2006, about her concerns relating to Cathy Magone?

3  A.  Yes.

4  Q.  Do you know when, in relation to

5  August 21, 2006, Ms. Newmark had met with you to

6  discuss these concerns?

7  A.  I don't know the exact date.

8  Q.  Would that be in your calendar, too?

9  A.  Possibly.

10  Q.  When did you meet with Ms. Magone?

11  A.  I don't know the exact date.  I can

12  only assume from this that it was after August

13  21st.

14  Q.  How long was your meeting with

15  Ms. Magone?

16  A.  To the best of my recollection,

17  approximately, fifteen minutes.

18  Q.  Did you reduce anything she said to

19  you or you said to her at this meeting, in

20  writing?

21  A.  No.

22  Q.  Did you take any notes?

23  A.  No.

24  Q.  Was there anyone else present?

25  A.  No.

*COMPU-TRAN SHORTHAND REPORTING*

51

**Pat Orsaia**

2  Q.  Who spoke first at this meeting?

3  A.  Who spoke first at the meeting?  I'm

4  not sure what you mean.  Did we greet each other?

5  Did I say hello first?  Did she say hello first?

6  I'm not sure what you mean.

7  Q.  Who spoke first?

8  A.  I don't recall.

9  Q.  What did -- withdrawn.

10  What, in words or substance, did you

11  say at this meeting?

12  A.  At my meeting with Cathy Magone, I

13  relayed to her the concerns that Carole Newmark

14  had shared with me.

15  Q.  What did you say to Ms. Magone?

16  A.  I told Cathy Magone that Carole had

17  asked to see me, that she was upset about the

18  assignment of the project to Nicole, and that her

19  perception was that decision to assign

20  Nicole to the project may have something to do

21  with Nicole's age or Carole's age.

22  I then asked Cathy Magone if she had

23  used the word "young" in her discussion with

24  Carole.  And I explained to Cathy that Carole

25  seemed to be focused on her use of the word

*COMPU-TRAN SHORTHAND REPORTING*

52

**Pat Orsaia**

2  "young," and I asked her if she used the word.

3  Q.  And was there anything else you said

4  to her at this meeting?

5  A.  Yes.  We -- Cathy answered my

6  question.

7  Q.  What did she say?

8  A.  She said that -- she thought for a

9  minute, and she said that, as she recalled, she

10  had referenced the fact that Nicole was younger

11  in her career and eager to learn.  And Cathy told

12  me that she thought that her use of the word

13  "young" had been taken out of context by Carole.

14  Q.  Did she say anything else to you?

15  A.  She expressed her surprise.  She

16  said that -- she talked to me about the decision

17  to assign Nicole to the palliative-care project.

18  She told me that she had made the decision based

19  on input from others - specifically, Roseanne

20  O'Hare, vice-president of patient-care services,

21  and also feedback from Maura DelBene, who was the

22  registered nurse assigned to the palliative-care

23  program.  And that the feedback from both of them

24  was that they were looking for Nicole to be

25  assigned to the project.

*COMPU-TRAN SHORTHAND REPORTING*

53

*Pat Orsaia*

2　　Q.　Whose decision was it?

3　　A.　It was Cathy Magone's decision, as

4　far as I know.

5　　Q.　Anything else that she said to you

6　at this meeting --

7　　　　MS. NICAJ: Withdrawn.

8　　Q.　Was there anything else that Cathy

9　Magone said to you at this meeting?

10　　A.　Yes.

11　　Q.　What?

12　　A.　She explained to me that Carole had

13　been previously assigned to another project,

14　based on Carole's experience in that area, that

15　was a mental-health project. And Cathy shared

16　with me at that time that Carole had been

17　assigned to the mental-health project and had not

18　begun to do whatever work was involved with that

19　project.

20　　Q.　Did she tell you when she had been

21　assigned to do this project?

22　　A.　Not at that meeting, I don't believe

23　she did. It was prior to the assignment of the

24　palliative-care project to Nicole.

25　　Q.　Do you know when that project was

*COMPU-TRAN SHORTHAND REPORTING*

---

54

*Pat Orsaia*

2　due?

3　　A.　No, I don't.

4　　Q.　Do you know what Ms. Newmark had to

5　do with respect to the project?

6　　A.　No.

7　　Q.　Did you ask her? Did you ask

8　Ms. Magone?

9　　A.　No.

10　　Q.　In connection with your duties and

11　responsibilities as director of HR, did you see

12　any communications with respect to Ms. Newmark's

13　failure to do something concerning that mental-

14　health project, prior to your meeting with

15　Ms. Magone?

16　　A.　No.

17　　Q.　What else did Ms. Magone say to you

18　during this meeting?

19　　A.　She indicated that they thought it

20　was important that her comment and use of the

21　word "young" be clarified to Carole and her

22　concerns be addressed.

23　　Q.　Whose concerns?

24　　A.　Ms. Newmark's.

25　　Q.　What, if anything, did you say to

*COMPU-TRAN SHORTHAND REPORTING*

---

55

*Pat Orsaia*

2　Ms. Magone?

3　　A.　I told her that, as promised to

4　Ms. Newmark, that I was going to take her

5　clarification of the use of the word "young" back

6　to Ms. Newmark as soon as I could.

7　　Q.　What, if anything, did you do?

8　　A.　That is what I did.

9　　Q.　So, when you said you told her, you

10　then communicated what Ms. Magone said to

11　Ms. Newmark?

12　　A.　Yes.

13　　Q.　How?

14　　A.　I believe it was by phone.

15　　Q.　You believe it was, or was it?

16　　A.　Yes; to my best recall, it was by

17　telephone initially.

18　　Q.　And did you, in fact, speak to

19　Ms. Newmark?

20　　A.　Yes.

21　　Q.　What, in words or substance, did you

22　say to her?

23　　A.　I told Ms. Newmark that I had spoken

24　with Cathy Magone. I relayed her concerns of

25　Cathy's use of the word "young" in relation to

*COMPU-TRAN SHORTHAND REPORTING*

---

56

*Pat Orsaia*

2　the assignment of the project.

3　　　I told Ms. Newmark that Cathy

4　Magone's clarification was that she thought

5　Carole had taken the word -- her use of the word

6　"young" out of context. And what she, in fact,

7　remembered saying, and what the tenor of her

8　statement was, was that Nicole was younger in her

9　career, and this was a good learning opportunity

10　for her. She was eager to learn, et cetera.

11　　Q.　What did Ms. Newmark say to you?

12　　A.　Ms. Newmark indicated that she

13　didn't find that clarification by Cathy Magone to

14　be acceptable.

15　　Q.　Did she tell you why?

16　　A.　Ms. Newmark disagreed with what

17　Cathy stated as to her use of the word "young."

18　　Q.　What did she say with respect to

19　that?

20　　A.　She said that Cathy Magone did not

21　say that Nicole was younger in her career.

22　　Q.　What did she say that Ms. Magone

23　said?

24　　A.　As I recall, Ms. Newmark simply said

25　that Cathy Magone had used the word "young" in

*COMPU-TRAN SHORTHAND REPORTING*

---

57

*Pat Orsaia*

2   reference to Nicole.

3   **Q.**   Apart from -- did she -- withdrawn.

4         Did she say anything else to you at

5   this time -- Ms. Newmark?

6   **A.   Yes.  We agreed, during that**

7   **telephone conversation, that the three of us**

8   **should meet and continue to discuss it.**

9         MS. NICAJ:  Can you mark

10  this.

11        (Whereupon, e-mail exchange between

12  *Pat Orsaia and Carole Newmark, marked as*

13  *Plaintiff's Exhibit Number 24, for*

14  *identification.)*

15  **Q.**   I'm going to show you what is marked

16  as Plaintiff's Exhibit 24, for identification.

17  *(Handing)*

18        Do you recognize Exhibit 24?

19  **A.   I recognize it as an e-mail exchange**

20  **between Carole Newmark and myself.**

21  **Q.**   Was this the e-mail -- if you can

22  remember, was this before or after your

23  communication with Ms. Newmark to relay her

24  what Ms. Magone's position was?

25  **A.   This is after.**

*COMPU-TRAN SHORTHAND REPORTING*

---

58

*Pat Orsaia*

2   **Q.**   Do you recall, in relation to this,

3   the date of the various e-mails?  Because there

4   are three different e-mails, with the original

5   message from Ms. Newmark and what appears to be

6   your response to that e-mail the same day,

7   September 12th; then, her response to your

8   e-mail.  Do you see that?

9   **A.   Yes.**

10  **Q.**   Do you recall how long prior to

11  September 12, 2006, you met with Ms. Magone

12  concerning what Ms. Newmark had told you?

13  **A.   No, I don't know the exact date that**

14  **I met with Cathy Magone prior to this e-mail.**

15  **Q.**   Did you ever reduce what Ms. Magone

16  told you to writing, whether it was on the date

17  of the meeting with her or sometime after?

18  **A.   Not that I recall.**

19  **Q.**   Did you ever send anything to

20  Ms. Newmark in writing as to what Ms. Magone told

21  you?

22  **A.   Not that I recall.**

23  **Q.**   Did there come a time that there

24  was, in fact, this meeting between the three of

25  you - you, Ms. Newmark and Ms. Magone?

*COMPU-TRAN SHORTHAND REPORTING*

---

59

*Pat Orsaia*

2   **A.   Yes.**

3   **Q.**   Prior to the meeting, did you meet

4   with Ms. Newmark separately?

5   **A.   Not that I recall.**

6   **Q.**   Did you have any communications with

7   Ms. Magone prior to the meeting, concerning

8   Ms. Newmark?

9   **A.   Yes.**

10  **Q.**   When?

11  **A.   I don't recall the exact date.**

12  **Q.**   Did you reduce anything she said to

13  you or you said to her, in writing?

14  **A.   No.**

15  **Q.**   Did your communication with Magone

16  occur before or after September 12, 2006?

17  **A.   I'm sorry.  Could you repeat the**

18  **question?**

19  **Q.**   Did your communication with

20  Ms. Magone occur before or after September 12,

21  2006, concerning Carole Newmark?

22        MR. KEIL:  Could we clarify

23  which communication?

24        MS. NICAJ:  There was a

25  meeting between the three women.

*COMPU-TRAN SHORTHAND REPORTING*

---

60

*Pat Orsaia*

2   **Q.**   Prior to that meeting but on or

3   after September 12th, 2006, did you communicate

4   with Ms. Magone concerning Carole Newmark?

5   **A.   Yes.**

6   **Q.**   So, between the meeting with all

7   three of you and the e-mail that is marked

8   Plaintiff's Exhibit 24 -- the e-mails, rather --

9   you spoke with Ms. Magone concerning Ms. Newmark;

10  is that right?

11  **A.   I just need to take a step back a**

12  **little bit.**

13  **Q.**   Sure.

14  **A.   The first in this series of e-mails**

15  **from Carole to me on September 12th at 11:45**

16  **a.m., she says, "This is the follow-up to our**

17  **meeting of approximately two weeks ago."**

18        **At this point, I believe Ms. Newmark**

19  **and I had already had our telephone conversation,**

20  **where I provided her with Cathy's response to her**

21  **concern.**

22  **Q.**   Right.

23  **A.   Then, we had talked about setting up**

24  **a meeting with the three of us.**

25  **Q.**   Right.

*COMPU-TRAN SHORTHAND REPORTING*

61

*Pat Orsaia*

2    A.    So, in between that and the time the

3    three of us met, I must've communicated with

4    Cathy to set up the meeting time for the three of

5    us to get together.

6    Q.    Okay --

7    A.    And I do recall speaking with

8    Cathy Magone to let her know that I had spoken to

9    Carole after my initial meeting with Cathy

10    Magone, provided Carole with Cathy's

11    clarification of her use of the word "young" and

12    that Carole was not in agreement with it and was

13    not yet comfortable with the explanation.

14    Q.    Did you have this second communication

15    with Ms. Magone before or after September 12th?

16    A.    I'm not certain.

17    Q.    Did you do so in writing or some

18    other manner?

19    A.    I spoke to her on the phone.

20    Q.    What did you say to Ms. Magone, in

21    words or substance?

22    A.    I told Cathy that I had contacted

23    Carole and I had given Carole, Cathy

24    Magone's explanation of the word "young" and that

25    Carole did not find it acceptable; she was not in

*COMPU-TRAN SHORTHAND REPORTING*

62

*Pat Orsaia*

2    agreement with it. And that Carole and I both

3    thought it would be helpful for the three of us

4    to meet and continue to discuss it.

5    Q.    What, if anything, did Ms. Magone

6    say to you?

7    A.    She agreed.

8    Q.    Was there anything else said?

9    A.    Not that I recall.

10    Q.    During this interchange --

11    A.    Not that I recall. Once again,

12    there may have been some discussion about trying

13    to set up the meeting because of people's

14    availability.

15    Q.    Between that telephone conversation

16    with Ms. Magone, and the actual meeting with

17    Ms. Magone and Ms. Newmark, did you have any

18    other communications with Ms. Magone relating to

19    Ms. Newmark?

20    A.    To my best recollection, I did;

21    because at some point prior to the meeting that

22    the three of us had, I had some conversation with

23    Cathy Magone about Ms. Newmark's attendance and

24    performance concerns on Cathy Magone's part.

25    Q.    When did you have those? How many

*COMPU-TRAN SHORTHAND REPORTING*

63

*Pat Orsaia*

2    communications did you have with Ms. Magone

3    concerning that?

4    A.    I believe it was one conversation.

5    Q.    When?

6    A.    I don't know the exact date.

7    Q.    After September 12th?

8    A.    I don't know exactly. I believe it

9    was after September 12th.

10    Q.    Was this in writing?

11    A.    No.

12    Q.    Did you reduce anything she said to

13    you in writing?

14    A.    No.

15    Q.    Did you ask her for anything in

16    writing?

17    A.    No.

18    Q.    So, between your -- after you spoke

19    to Ms. Magone about Ms. Newmark telling you that

20    she didn't find Ms. Magone's statements --

21    withdrawn.

22        She disagreed with Ms. Magone's

23    statements, after that statement that Ms. Newmark

24    made to you and the actual meeting between the

25    three of you, at some point Ms. Magone spoke to

*COMPU-TRAN SHORTHAND REPORTING*

64

*Pat Orsaia*

2    you about Ms. Newmark's performance?

3    A.    Yes.

4    Q.    Prior to that time, had she

5    communicated with you about Ms. Newmark's

6    performance?

7    A.    Prior to that, when I had spoken to

8    Cathy about the project assignment and Cathy had

9    explained to me that she had gotten feedback from

10    the two sources I have already mentioned -

11    Roseanne O'Hare and Maura DelBene - about who

12    they would prefer to have assigned to the

13    project, at that time, Cathy indicated to me that

14    part of their feedback in relation to Carole was

15    not positive. And that was part of the feedback

16    that they gave to Cathy about their preference to

17    have Nicole assigned to the project, instead of

18    Carole.

19    Q.    Apart from that, was that

20    communication that you had with Ms. Magone --

21    that was in reference to when Ms. Newmark had

22    expressed her concern to you about Ms. Magone

23    referring to the reasons Ms. Nicole Serra was

24    selected instead of her; is that right?

25    A.    Yes.

*COMPU-TRAN SHORTHAND REPORTING*

65

Pat Orsaia

2  Q.  So, once you communicated what
3  Ms. Newmark said to you, Ms. Magone then
4  mentioned the reason for the selection of
5  Ms. Serra; is that right?
6  A.  In my telephone conversation after
7  my first meeting with Ms. Newmark, when I went
8  back to Cathy Magone by telephone to seek
9  clarification about Carole's concern over her use
10  of the word "young," Cathy Magone was talking to
11  me about her decision process of assigning Nicole
12  to the palliative-care project. And after she
13  clarified for me her use of the word "young," she
14  was talking to me about her decision process, and
15  she talked about Carole having already been
16  assigned to a project.
17  Now, this new project for palliative
18  care had come about, and it was her decision she
19  had selected Nicole to be assigned to that
20  project. She had gotten two feedbacks, from
21  Roseanne O'Hare and Maura DelBene, who were both
22  closely involved with the project, and that they
23  had voiced some concern to Cathy about Carole's
24  performance in her role to date. And they
25  basically had said to Cathy, our preference would

COMPU-TRAN SHORTHAND REPORTING

66

Pat Orsaia

2  be to have Nicole assigned to the palliative-care
3  project. Cathy shared that with me.
4  Q.  Did Maura DelBene supervise
5  Ms. Newmark?
6  A.  She did not.
7  Q.  Did she have any role in the social
8  work department?
9  A.  She would, in the course of her job
10  duties, need to relate to people in the social
11  work and case management department, as they
12  might be -- as they may have some
13  responsibilities to a case she was -- she might
14  already be involved in.
15  Q.  Did you receive any communications
16  from her concerning Ms. Newmark?
17  A.  From Ms. DelBene?
18  Q.  Yes.
19  A.  No.
20  Q.  What about Ms. O'Hare? Did you
21  receive any communications from her concerning
22  Carole Newmark?
23  A.  No.
24  Q.  Prior to that initial communication
25  with Ms. Magone, which was for the purposes of

COMPU-TRAN SHORTHAND REPORTING

67

Pat Orsaia

2  discussing those age-related comments that
3  Ms. Newmark had expressed concern about, had
4  Ms. Magone ever come to you, concerning
5  Ms. Newmark?
6  A.  Not that I recall.
7  Q.  Getting back to the second time
8  where you say there was -- withdrawn.
9  You indicated that Ms. Magone
10  expressed to you some concern about Ms. Newmark's
11  performance and her unplanned absences at some
12  point.
13  A.  Yes. At some point, Cathy brought
14  that to my attention.
15  Q.  That was after September 12th, 2006;
16  is that right?
17  A.  I don't know.
18  Q.  Was that after your communication
19  with her, your initial communication with her
20  concerning Ms. Newmark's expression of concern?
21  A.  I think I first became aware of
22  concerns with Ms. Newmark's attendance pattern
23  after Ms. Newmark told me that she had
24  requested -- or not requested; she had advised
25  Cathy Magone that she needed some time off for

COMPU-TRAN SHORTHAND REPORTING

68

Pat Orsaia

2  some medical testing. And I think at that point,
3  Ms. Newmark told me that Cathy had spoken to her
4  in regard to this request, in regards to the fact
5  that she had already been some unplanned time off,
6  and that I believe it had been communicated --
7  according to Ms. Newmark -- to her, by Cathy
8  Magone at that point, that the time off she was
9  requesting for the medical testing, was not
10  approved.
11  And that at some point -- I'm not
12  sure if in this same conversation -- Carole told
13  me then Cathy had reconsidered and it was
14  approved, or if that happened later on.
15  Q.  Do you know when that occurred?
16  A.  No, I don't.
17  Q.  Was it around the time of September
18  12, 2006?
19  A.  I don't know exactly.
20  Q.  Do you know whether it was before or
21  after -- withdrawn.
22  Getting back to your communication
23  with Ms. Magone, what did she say to you were her
24  concerns about Ms. Newmark's performance?
25  A.  Cathy Magone told me that in

COMPU-TRAN SHORTHAND REPORTING

69

**Pat Orsaia**

2  considering her decision to assign Nicole to the
3  palliative-care project, that she had gotten
4  feedback from Roseanne --
5      Q.    I don't mean to interrupt you.  Was
6  this the conversation you relayed during your
7  telephone -- was this the communication wherein
8  you expressed to Ms. Magone what Ms. Newmark had
9  told you about the age-related comments, or was
10  this at some other point?
11      A.    It was during that conversation.
12      Q.    Okay.  I'm not going to rehash it,
13  unless you haven't told me something about that
14  conversation.
15      A.    I believe I have told you what I
16  recall about it.
17      Q.    There was a second communication.
18  You relayed to me that you -- that Ms. Magone
19  expressed some concern about performance and
20  unplanned absences on the part of Ms. Newmark
21  after that.  And you said it was sometime between
22  September 12th, and the meeting with the three of
23  you - Ms. Newmark, Ms. Magone and yourself?
24      A.    Yes.  To the best of my recall, at
25  the time that Carole and Cathy and I met, the

*COMPU-TRAN SHORTHAND REPORTING*

70

**Pat Orsaia**

2  three of us, I already had some sense of a
3  concern about attendance and performance prior to
4  that meeting.  I don't know exactly when I became
5  aware of it.
6      Q.    You had some sense.
7          Did you meet with Ms. Magone about
8  this?
9      A.    Well, as I have stated, I believe it
10  was Carole Newmark, herself, who first brought up
11  the issue of her attendance pattern with me.
12      Q.    I'm not asking about Carole Newmark.
13  I'm asking you a specific question relating to
14  Cathy Magone, okay?
15          So, going back to my previous
16  question --
17      A.    I don't know if I met with her or if
18  we spoke by telephone or -- I don't recall.
19      Q.    Do you recall when the meeting took
20  place between you, Ms. Newmark, and Ms. Magone?
21      A.    I believe it was September 28th.
22      Q.    Do you recall how long prior to
23  September 28th, you communicated with Ms. Magone
24  concerning Ms. Newmark's performance, apart from
25  that initial exchange that was the result of

*COMPU-TRAN SHORTHAND REPORTING*

71

**Pat Orsaia**

2  explaining to you why she had not selected
3  Ms. Newmark?
4      A.    I don't know exactly when that took
5  place.  I do know at some point Cathy Magone, as
6  department leader, shared with me that she had
7  performance and attendance concerns with
8  Ms. Newmark.
9          We discussed that Ms. Newmark was
10  still in her probationary period.  We talked
11  about the number of occurrences of unplanned
12  absences to date.  We talked specifically about
13  the performance concerns.  I don't recall exactly
14  when that was.
15      Q.    Is there any clear-cut rule about
16  the unplanned absences, the number and so forth?
17      A.    Yes.
18      Q.    What is it?
19      A.    In our policy on attendance, it
20  states that five or more occurrences -- well,
21  five -- actually, five occurrences of lateness
22  and/or unplanned absence, in a rolling,
23  consecutive twelve-month period, is considered
24  excessive.
25      Q.    At the time that you communicated

*COMPU-TRAN SHORTHAND REPORTING*

72

**Pat Orsaia**

2  with Ms. Magone, how many had Ms. Newmark had?
3      A.    Four.
4      Q.    Do you know whether the last absence
5  was, in fact, planned or unplanned?
6      A.    I don't know.
7      Q.    You indicated previously that there
8  was an issue of a doctor's procedure that
9  Ms. Newmark had gone to you about because
10  Ms. Magone had initially denied her request?
11      A.    Yes; there was a medical testing.
12      Q.    Medical testing?
13      A.    Yes.
14      Q.    Do you know what the nature of the
15  medical testing was?
16      A.    I believe Carole told me it was for
17  a colonoscopy.
18      Q.    Was that considered planned or
19  unplanned?
20      A.    I can't really make that
21  distinction, because she would have needed to
22  make the request for planned time off through her
23  department process.  That is not something that
24  would come through human resources.
25      Q.    So, if she made her request and it

*COMPU-TRAN SHORTHAND REPORTING*

73

*Pat Orsaia*

2 was granted, it was a planned absence; is that
3 correct?
4      A.    Yes; if she made the request in a
5 timely fashion, and it was approved, and it was
6 communicated to her, that would be considered a
7 planned absence, and she would use her paid time
8 off appropriately for it.
9      Q.    What do you mean by "timely"?
10     A.    Well, depending on what the
11 departmental process was, and I'm not -- I don't
12 know that for every single department at the
13 hospital.
14     Q.    So, it could vary from department to
15 department? There is not a unified rule as to
16 how much time you need to advise someone of an
17 absence?
18     A.    Most departments had a written
19 process through which you would fill out a form
20 for requested time off. The employee would
21 submit that for the appropriate approval. The
22 manager would -- or supervisor/manager/director,
23 whoever was responsible to consider those
24 requests, would look at the written request,
25 compare that against staffing, compare it against

*COMPU-TRAN SHORTHAND REPORTING*

74

*Pat Orsaia*

2 whatever business-need criteria there might be,
3 then communicate back to the employee whether or
4 not the day or days had been approved.
5      Q.    Prior to the meeting with
6 Ms. Newmark, and Ms. Magone, on September 28th,
7 2006, was there any discussion about terminating
8 Ms. Newmark's employment?
9      A.    Prior to the discussion on September
10 28th?
11     Q.    Yes.
12     A.    No.
13     Q.    Did Ms. Magone ever tell you that
14 she was seeking to terminate Ms. Newmark's
15 employment prior to September 28th?
16     A.    Ms. Magone told me that there were
17 attendance and performance concerns, that
18 Ms. Newmark was in her probationary period. And
19 she may have said to me, I'm not sure this is
20 going to work out.
21     Q.    I'm not asking --
22          MS. NICAJ:  Move to strike
23          as non-responsive.
24     Q.    I'm not asking you what she may have
25 said to you. I'm asking you what you recall her

*COMPU-TRAN SHORTHAND REPORTING*

75

*Pat Orsaia*

2 saying to you.
3          So, prior to September 28th, 2006,
4 did Ms. Magone ever advise you, in words or
5 substance, that she was going to recommend
6 Ms. Newmark's termination?
7      A.    She told me that was a possibility,
8 yes.
9      Q.    She did, okay.
10          When did she tell you it was a
11 possibility?
12     A.    I can't say an exact date; I don't
13 recall.
14     Q.    Did you reduce it in writing
15 anywhere?
16     A.    No.
17     Q.    Why not?
18     A.    It would not be something that is
19 required, nor was it my practice to do so.
20     Q.    You didn't reduce the fact that
21 Ms. Newmark complained to you about ageism in
22 writing; right?
23     A.    I have already answered that
24 question.
25     Q.    Is that right?

*COMPU-TRAN SHORTHAND REPORTING*

76

*Pat Orsaia*

2      A.    I did not reduce it in writing.
3      Q.    You didn't reduce the fact that once
4 you explained to Ms. Newmark about Ms. Magone's
5 explanation of her use of the word "young," that
6 she was not satisfied; did you?
7      A.    No. I communicated it to the
8 appropriate people that were involved in the
9 discussion then and going forward.
10     Q.    Did you ever communicate what was
11 happening to your supervisors?
12     A.    I may have; I don't recall.
13     Q.    Did you?
14     A.    I don't know for sure.
15     Q.    Who is your direct supervisor?
16     A.    Deborah Gogliettino.
17     Q.    And what is her position?
18     A.    She was, at that time, vice-
19 president of human resources.
20     Q.    Is she still there?
21     A.    She is not.
22     Q.    Who assumed her position?
23     A.    Bob Greco.
24     Q.    September 28th, 2006, there was a
25 meeting. Where?

*COMPU-TRAN SHORTHAND REPORTING*

77

**Pat Orsaia**

2　　A.　Yes, there was a meeting.

3　　Q.　Where was it?

4　　A.　In my office.

5　　Q.　And present were Ms. Magone and

6　Ms. Newmark; right?

7　　A.　Yes.

8　　Q.　Anyone else?

9　　A.　Just the three of us.

10　　Q.　Did you take any notes at this

11　meeting?

12　　A.　No, I did not.

13　　Q.　Incidentally, did you ever take any

14　statements down as to what Ms. Magone told you in

15　reference to her communication relating to the

16　selection of Nicole Serra?

17　　A.　No.

18　　Q.　Did you ever take any statements

19　down in connection with what Ms. Newmark told you

20　pertaining to Nicole Serra's selection?

21　　A.　No.

22　　Q.　How long was the meeting?

23　　A.　Approximately, twenty to thirty

24　minutes.

25　　Q.　Do you recall who spoke first at the

78

**Pat Orsaia**

2　meeting?

3　　A.　As I recall, I spoke first at the

4　meeting.

5　　Q.　What did you say?

6　　A.　I introduced the meeting by saying

7　that -- thanking both of them for coming, and

8　saying that we were there to try to address

9　Carole's concerns and that we had all agreed that

10　that was best done probably in person.  That is

11　the substance of what I said.

12　　Q.　What happened next?

13　　A.　As I recall, Cathy offered her

14　explanation to Carole of her use of the word

15　"young."

16　　Q.　What did Ms. Magone say?

17　　A.　She said that she wanted to be clear

18　that Nicole's age or Carole's age had nothing to

19　do with her decision for the assignment of the

20　palliative-care project.  She said that she

21　thought Carole had taken her use of the word

22　"young" out of context.  And what she recalled

23　saying was that Nicole was younger in her career;

24　she was eager to learn; was soaking things up

25　like a sponge.

79

**Pat Orsaia**

2　　She reminded Carole that Carole had

3　been assigned to the mental-health project, as it

4　was thought to be appropriate to her experience.

5　　She advised Ms. Newmark that she had

6　gotten feedback or input from Roseanne O'Hare and

7　Maura DelBene regarding the assignment of a

8　social worker to the palliative-care project.

9　　At some point in the conversation,

10　Cathy Magone referenced to Ms. Newmark the fact

11　that her attendance pattern had not been

12　acceptable to that point.  She had concerns about

13　it.  And she referenced that she had some

14　performance concerns, as well.

15　　Q.　Did she say anything else at this

16　point?  This is Ms. Magone.

17　　A.　When Cathy Magone referenced that

18　she had some attendance and performance concerns,

19　Ms. Newmark responded by saying that she would

20　like to have detail about the performance

21　concerns.

22　　And Cathy Magone responded by

23　telling her that that particular discussion, the

24　particular discussion we were having was for a

25　different purpose, and that she was prepared to

80

**Pat Orsaia**

2　provide her with detail, and that would happen

3　during her performance evaluation discussion.

4　　Q.　So, you understood that she had not

5　had any performance discussion with her until

6　that time, based on what Ms. --

7　　A.　No.

8　　Q.　-- what did you understand that to

9　be, then?

10　　A.　What I understood it to be was

11　Carole, at that point in time, at that meeting,

12　wanted to go over the detail of performance

13　concerns; and her director telling her that she

14　would be sharing the detail with her in another

15　forum, which was a performance-evaluation

16　discussion.

17　　Q.　Well, you mentioned that Ms. Magone

18　was the one who raised the issue of performance;

19　right?

20　　A.　She stated that she had attendance

21　and performance concerns, yes.

22　　Q.　Isn't it fair to say that

23　Ms. Newmark was just responding to what

24　Ms. Magone had herself raised, her director, as

25　you say?

81

Pat Orsaia

2  MR. KEIL: Objection. Could
3  you rephrase that?
4  MS. NICAJ: I'll withdraw
5  it.
6  Q.  You said that she, Ms. Magone,
7  didn't want to address these issues with
8  Ms. Newmark at this meeting. Yet, Ms. Magone is
9  the one who first raised the issue at the
10  meeting; isn't that right?
11  A.  Cathy Magone made the statement that
12  she had concerns with Ms. Newmark's attendance
13  and performance during this meeting. She said
14  that.
15  Q.  So, when Ms. Newmark asked her about
16  that, Ms. Magone said what, then? It wasn't the
17  time for that discussion to take place? Isn't
18  that right, in substance?
19  A.  That was — words to that effect -
20  that that discussion wasn't for that particular
21  meeting; that she would be happy to provide her
22  with the details and any clarification she wanted
23  during a performance-evaluation discussion, which
24  is normally held between the manager and the team
25  member privately. I would not normally be in on

82

Pat Orsaia

2  that discussion.
3  Q.  Did you ask her why she mentioned
4  performance, then, at that meeting - Ms. Magone?
5  A.  To the best of my recall, she may
6  have mentioned it because Carole referenced the
7  fact that her probation had been extended. And
8  Cathy may have responded to that by saying, yes,
9  your probation has been extended, due to my
10  concerns with your attendance and performance, or
11  words to that effect.
12  Q.  Okay. Now, what else was said
13  during this meeting?
14  A.  I'm trying to recall if it was at
15  this particular meeting, but I do remember at
16  some point the three of us having a discussion --
17  so, I'm assuming it was at this meeting -- that
18  when we were -- when they were talking about
19  Cathy's use of the word "young" and she was
20  offering her explanation or clarification, that
21  at some point, Cathy pointed out to Carole that
22  if one looks at the complexion of the department
23  of case management and social work department,
24  it's obvious that it's made up of women who I
25  would call my peers. And Cathy may have even

83

Pat Orsaia

2  used that phrase, her peers, in terms of age, et
3  cetera. I believe the point she was trying to
4  make was that -- I believe she was trying to
5  point out to Carole that age was not a factor in
6  her decision for the program.
7  Carole had been hired a short time
8  prior to that. So, obviously, in the interview
9  process, you know, one can see, just through the
10  interview process, who they are hiring. And that
11  in fact, if one were to look at the complexion of
12  the group overall, the department, there were
13  many females that Cathy would consider her
14  contemporaries in terms of age. So, I do
15  remember comments to that substance. And I
16  believe it was at that meeting, to the best of my
17  recall.
18  Q.  Do you know how many people were
19  interviewed in connection with the position for
20  which Ms. Newmark had been hired?
21  A.  No.
22  Q.  Do you recall anything else said
23  during this meeting?
24  A.  No.
25  Q.  I'm going to direct your attention

84

Pat Orsaia

2  to what has been identified previously as
3  Plaintiff's Exhibit 5, for identification.
4  (Handing)
5  Do you recognize Plaintiff's 5, for
6  identification?
7  A.  It's an e-mail sent to me by Carole
8  Newmark on September 29th.
9  Q.  And do you recall seeing this e-mail
10  prior to today?
11  A.  Yes.
12  Q.  Do you recall seeing it on or about
13  September 29, 2006?
14  A.  Yes.
15  Q.  This e-mail, as you see here,
16  purports to relay things that occurred at the
17  September 28th meeting; isn't that right?
18  A.  Yes.
19  Q.  Is there anything that is not truthful
20  that is contained in Plaintiff's Exhibit 5?
21  A.  Well, in number two, I was not
22  present when Cathy and Carole discussed her
23  probation being extended; so, I don't know what
24  was stated by either of them.
25  Q.  Okay.

85

*Pat Orsaia*

2    A.   Also in number two, where Carole

3   states "This was a surprise to me, as she has

4   never brought up any work issues until our

5   meeting yesterday," I can't say that that is

6   true.

7    Q.   Go ahead.

8    A.   Once again, her final statement

9   under number two that "She should not have to

10   wait until my evaluation to hear what the work

11   issues are," I don't have firsthand knowledge of

12   what communication happened between Ms. Newmark

13   and her director about the work issues.

14    Number three, where it says, "This

15   statement is tantamount to saying that I am old

16   and am not able to absorb information as well,"

17   I do not recall Cathy Magone saying that during

18   our meeting.

19    Q.   Okay. Apart from, "This statement

20   is tantamount to saying that I'm old and are not

21   able to absorb information as well," is

22   everything else in paragraph three truthful?

23    A.   The final sentences in three, "Cathy

24   does not know what my capabilities are. She has

25   not taken the time to learn about who I am and

*COMPU-TRAN SHORTHAND REPORTING*

86

*Pat Orsaia*

2   learn exactly what my strengths are," I don't

3   know that that is true.

4    Q.   Okay. So, with respect to

5   paragraph three, the first two sentences -- the

6   first three sentences are truthful?

7    A.   Cathy did deny that she said that

8   Nicole could handle the job better than Carole

9   could.

10    MR. KEIL:  Is your answer

11   finished?

12    Q.   Are the first three sentences -- are

13   the first two sentences in paragraph three

14   truthful; yes or no?

15    MR. KEIL:  Just take them

16   one at a time.

17    MS. NICAJ:  I'll ask the

18   questions. If you want to follow up with

19   your witness, you can. You're more than

20   free to.

21    MR. KEIL:  I object to the

22   form of the question as being compound.

23    A.   I have already stated that I don't --

24   the third statement that says -- this statement,

25   the third sentence that, "This statement is

*COMPU-TRAN SHORTHAND REPORTING*

87

*Pat Orsaia*

2   tantamount to saying that I'm old and are not

3   able to absorb information as well," that is

4   Carole's opinion. I'm not in a position to state

5   whether or not it's a truth.

6    MS. NICAJ:  I'm going to

7   move to object on the basis it's

8   nonresponsive.

9    Can you repeat my last question.

10    (Question read)

11    A.   To the best of my recall, the first

12   two sentences of item number three are accurate.

13    Q.   What else do you recall concerning

14   the meeting?

15    A.   Well, I recall that my impression,

16   as I listened to the dialogue between Carole and

17   Cathy, was that Carole was fixated on Cathy's use

18   of the word "young," that Carole was -- Carole

19   remained visibly angry about Nicole's assignment

20   to the palliative-care project.

21    Q.   What do you recall being said at

22   this meeting?

23    A.   Being said by everyone at the

24   meeting?

25    Q.   Yes.

*COMPU-TRAN SHORTHAND REPORTING*

88

*Pat Orsaia*

2    A.   You're asking me to recount the

3   entire meeting again?

4    Q.   Apart from what you have already

5   said; this was the sum and substance of what you

6   recall about this meeting?

7    A.   Yes.

8    Q.   And when -- getting back to

9   paragraph three, the second sentence states,

10   "She --" referring to Ms. Magone, "-- stated that

11   she did say that Nicole was young and could take

12   things in like a sponge."

13    Do you see that?

14    A.   Yes.

15    Q.   That was truthful that Ms. Magone

16   said at that meeting -- that she did say Nicole

17   was young and could take things in like a sponge?

18    A.   Cathy did say she had used the word

19   "young" in her initial discussion with Carole.

20   And I remember her saying that part of what she

21   meant was that Nicole was eager to learn and

22   could take things in like a sponge.

23    Q.   Did Ms. Magone say what is contained

24   in the second sentence of paragraph three?

25    MR. KEIL:  I believe the

*COMPU-TRAN SHORTHAND REPORTING*

89

**Pat Orsaia**

2 question is, are those the words, the
3 precise words that Ms. Magone used?
4    Q.    At the meeting.
5    A.    I don't recall that as being an
6 exact quote from Cathy Magone.
7    Q.    Did you ever dispute what
8 Ms. Newmark wrote in the e-mail to you?
9    A.    Dispute in what sense?
10    Q.    Did you relay and say, your
11 recollection of the meeting was inaccurate?
12    A.    No.
13    Q.    Do you recall anything else that was
14 said by Ms. Newmark at this meeting?
15    A.    Not that I recall, no.
16    Q.    Do you recall anything else that was
17 said by Ms. Magone at this meeting?
18    A.    I think that during this meeting,
19 that when Cathy was speaking to Carole about her
20 assignment to the mental-health project, that
21 Cathy made a statement to the effect that
22 regarding the mental-health project, that Carole
23 had not advanced the project or been proactive,
24 or words to that effect, to make any progress on
25 the project, to date.

*COMPU-TRAN SHORTHAND REPORTING*

---

90

**Pat Orsaia**

2    Q.    Anything else that was said during
3 this meeting?
4    A.    Not that I recall.
5    Q.    So, when you testified earlier that
6 the issue at this meeting wasn't performance;
7 yet, Ms. Magone addressed several performance-
8 related matters, did you interrupt Ms. Magone at
9 all at this point to say, that is not what this
10 meeting is about?
11    A.    My statement is not that Cathy
12 Magone addressed several performance issues in
13 detail at this meeting.
14    Q.    I'm not asking details. I'm asking,
15 you mentioned several issues that were addressed
16 by Ms. Magone concerning performance; right?
17    A.    No.
18    Q.    Did you ever interrupt -- that is
19 not what you said?
20    A.    At this meeting?
21    Q.    Right.
22    A.    Cathy Magone, as I recall, did not
23 address, in detail, several performance issues.
24    Q.    I'm not asking about, in detail.
25 Did you ever interrupt Ms. Magone to

*COMPU-TRAN SHORTHAND REPORTING*

---

91

**Pat Orsaia**

2 say, this meeting concerns the comments you made
3 relating to Nicole Serra's selection?
4    A.    No.
5    Q.    Did you ever reduce this meeting in
6 writing?
7    A.    No.
8    Q.    Why not?
9    A.    I didn't feel it was necessary.
10    Q.    Why didn't you believe it was
11 necessary?
12    A.    My role during this meeting was to
13 facilitate the meeting between an employee who
14 had a concern and the person who could best
15 address that concern. That was my role in the
16 meeting, as facilitator. The substance of what
17 was shared between the two people was between a
18 team-member employee and the person they reported
19 to, and the clarification of a comment.
20    Q.    Anything else?
21    A.    No.
22    Q.    You didn't see your role, apart from
23 being a facilitator, doing anything else with
24 respect to your HR responsibilities?
25    A.    I don't understand your question.

*COMPU-TRAN SHORTHAND REPORTING*

---

92

**Pat Orsaia**

2    Q.    In connection with discrimination
3 complaints, do you have any responsibilities?
4    A.    This was not, in my view, a formal
5 complaint of discrimination.
6    Q.    Where is there a requirement that
7 there be a formal complaint of discrimination
8 before in your view, that comes to terms with a
9 formal complaint of discrimination?
10         MR. KEIL:  Objection as to
11    form.
12         MS. NICAJ: Withdrawn.
13    Q.    Where is the distinction drawn?  Is
14 there anywhere in the policies or procedures at
15 Lawrence?
16         MR. KEIL:  Objection as to
17    form.
18         Answer, if you can.
19    A.    Your question is, where is the
20 distinction drawn?  I don't understand what your
21 question is.
22    Q.    You said, in your view, it wasn't a
23 formal complain of discrimination.
24    A.    Correct.
25    Q.    Where is that contained, that

*COMPU-TRAN SHORTHAND REPORTING*

**Page 93**

Pat Orsaia

1
2 distinction, in any policies and procedures as to
3 how to proceed?
4        MR. KEIL:  Object as to
5 form, again.
6        A.    If you're asking me, is there a
7 distinction written in the policy, in our
8 nondiscrimination policy, as to when something
9 should be reduced to writing, I'm not aware of
10 any distinction.
11        Q.    Is there any distinction between
12 formal and informal complaints of discrimination
13 contained in any policies or procedures at
14 Lawrence?
15        A.    There is, in the sexual-harassment
16 policy where there -- you're asking me if there
17 is anything in any policy at Lawrence?
18        Q.    Yes.
19        A.    In the policy on sexual harassment,
20 there was a form, actually, a formal written
21 form, complaint form, attached to that policy
22 that an employee could submit if they felt that
23 sexual harassment was going on.
24        Q.    That didn't apply to other forms of
25 discrimination?

*COMPU-TRAN SHORTHAND REPORTING*

**Page 94**

Pat Orsaia

1
2        A.    You're asking me if it was in the
3 policy, and I'm telling you that is the only one
4 I'm aware of.
5        Q.    I'm asking you, did that form apply
6 to any other forms of discrimination?
7        A.    No.  As I recall, the form
8 specifically was noted as being sexual-harassment
9 policy, for a harassment complaint.
10        Q.    So, how would an employee, who
11 wanted to file any discrimination complaint that
12 had nothing to do with sexual harassment --
13 either race, or gender, or age -- go about
14 following the procedures?
15        A.    Well, a discrimination complaint for
16 any reason is typically attached to some sort of
17 job action.  So, if someone were to come forward
18 and say, I applied for a promotion but didn't get
19 it, or, you know, some other action - I wasn't
20 hired into a particular position to begin with -
21 and there was an accusation of some type of
22 discrimination in employment practices, then, you
23 know, I would consider that a formal complaint.
24        Q.    Wasn't there a job action here?
25 Ms. Newmark wasn't appointed to the palliative-

*COMPU-TRAN SHORTHAND REPORTING*

**Page 95**

Pat Orsaia

1
2 care services.
3        A.    That is not a job action.
4        Q.    What is it?
5        A.    Assignment of a project to a team
6 member.
7        It happens all the time in the
8 department.
9        Q.    Assignments aren't generally
10 perceived as job actions?
11        A.    No.  This was not something that had
12 additional compensation attached to it.  Or
13 promotional opportunity, or change of hours, or
14 schedule.  It was simply an additional duty.
15        Q.    You're saying that it would
16 typically involve a job action.
17        What about in reference to claims
18 that there have been age- or racist-related
19 comments made in a work place?  How is that
20 treated?
21        A.    Treated exactly the way I treated
22 it - by following up on the concern, seeking
23 clarification from the person who allegedly made
24 the comment, and hoping that the two can
25 reconcile when the person comes forward and says:

*COMPU-TRAN SHORTHAND REPORTING*

**Page 96**

Pat Orsaia

1
2 That was not my intent.  I believe you used the
3 word out of context.  Here is what I said.  Here
4 is what I meant.  And the fact is, you know, your
5 age played absolutely no part in this decision.
6        Q.    Is that contained anywhere in
7 writing?
8        A.    Is what contained anywhere in
9 writing?
10        Q.    The procedure by which you just
11 articulated how you handled these sorts of
12 actions, as you said.
13        A.    Well, all of our policies say that
14 the initial step is to try to resolve whatever
15 the concern is.
16        Q.    There was the initial step;
17 Ms. Newmark came to you?
18        A.    Yes.
19        Q.    Is that right?
20        A.    Correct.
21        Q.    And then, she communicated -- after
22 she wasn't satisfied with your meeting with
23 Ms. Magone, she communicated that to you again;
24 right?
25        A.    Yes, she did.

*COMPU-TRAN SHORTHAND REPORTING*

97

*Pat Orsaia*

2  Q.   And then the third time, there was a

3  meeting with you, Ms. Magone, and Ms. Newmark;

4  right?

5  A.   Yes.

6  Q.   And she, again, communicated her

7  dissatisfaction of the results of it; is that

8  right?

9  A.   Yes.

10  Q.   What did you do after you received

11  what is marked as Plaintiff's 5?

12  **A.   After receiving this e-mail, I went**

13  **back to Cathy Magone and advised her that**

14  **Carole's concern remained; she was still not**

15  **accepting of Cathy's explanation and that she had**

16  **some additional questions.**

17  Q.   Did you communicate this in writing

18  or verbally?

19  **A.   I think I forwarded Carole's e-mail**

20  **to Cathy.**

21  Q.   Apart from forwarding that e-mail --

22  well, withdrawn.

23  You actually told Ms. Magone all

24  these things about Ms. Newmark's remaining

25  concerns?

98

*Pat Orsaia*

2  **A.   I don't recall if I spoke to her and**

3  **reiterated what was in the e-mail, or forwarded**

4  **the e-mail so that she could see the detail,**

5  **herself.**

6  Q.   So, when you said you advised her,

7  that is not accurate; is that right?

8  A.   I'm sorry.  Could you rephrase the

9  question?

10  Q.   When you told -- when you previously

11  testified that you advised Cathy Magone of

12  Ms. Newmark's continued concerns, that is not

13  accurate; is that right?

14  A.   Are we talking about subsequent to

15  my receipt of this e-mail dated September 29th?

16  Q.   That's correct.

17  A.   When I say I advised Cathy, what I

18  mean is, I made her aware.  Whether I made her

19  aware verbally, or forwarded Carole's e-mail to

20  her directly, or both, I don't recall

21  specifically.

22  Q.   Did you communicate -- apart from

23  the e-mails, did you communicate, by telephone or

24  in person, with Ms. Magone about Ms. Newmark's

25  continued concerns?

99

*Pat Orsaia*

2  A.   I don't recall.

3  MS. NICAJ:  Let's take a

4  short break.

5  (Recess held)

6  CONTINUED EXAMINATION BY MS. NICAJ:

7  Q.   Getting back to the September 28th,

8  meeting.  Prior to the actual meeting with

9  Ms. Magone and Ms. Newmark, did you meet with

10  Ms. Newmark separately that day just preceding

11  your meeting with Ms. Magone, too?

12  A.   Not that I recall.

13  Q.   Do you recall Ms. Newmark ever

14  communicating that she was, quote, "over the fact

15  that Nicole Serra had been selected for that

16  palliative-care unit"?

17  A.   No.

18  Q.   Are there any documents you can use

19  to refresh your recollection?

20  A.   Not that I know of.

21  Q.   Did there come a time you

22  communicated with anyone after this September

23  28th meeting concerning Ms. Newmark?

24  **A.   I'm sure I must have had direct**

25  **communication with Cathy Magone prior to our**

100

*Pat Orsaia*

2  **final meeting with Carole.**

3  Q.   Do you recall having any

4  communication with Ms. Magone, as you sit here

5  today, prior to what you term as the final

6  meeting with Ms. Newmark?

7  **A.   Yes.  I recall speaking with Cathy**

8  **about the fact that, in her estimation, Carole**

9  **was not going to successfully complete her**

10  **probationary period and that it was her decision,**

11  **based on the attendance and ongoing performance**

12  **concerns, to separate employment.**

13  Q.   When did you communicate with

14  Ms. Magone concerning that?

15  **A.   I don't recall exactly, but it would**

16  **have been prior to the final meeting, because we**

17  **would have scheduled a final meeting.  So, I'm**

18  **sure we had to communicate about when and where**

19  **we would meet with Carole.**

20  Q.   Do you recall what the communication

21  was - was it by telephone, in person, via e-mail,

22  some other form - with Ms. Magone?

23  **A.   I don't recall that it was by**

24  **e-mail.  To my best recall, it was probably a**

25  **combination of telephone and perhaps brief,**