101

Pat Orsaia

2    one-on-one meeting between Cathy and myself.

3        Q.    I don't want you to speculate.

4            Do you recall actually meeting with

5    Ms. Magone to the best of your --

6        A.    To the best of my recall, we

7    communicated by telephone.

8        Q.    Prior to what you term as the final

9    meeting with Ms. Newmark, on how many occasions

10    from September 28th - the day in which you met

11    with both Ms. Newmark and Ms. Magone - and that

12    final meeting, did you communicate with

13    Ms. Magone?

14        A.    I can't say for sure how many times.

15        Q.    Can you approximate the number?

16        A.    Approximately two, possibly three.

17        Q.    Are you including, as a source of

18    communication, the e-mail you forwarded to

19    Ms. Magone, or something else?

20        A.    No, I was not including that e-mail.

21        Q.    So, the two to three communications

22    concerned Ms. Newmark's termination; is that

23    right?

24        A.    Yes.

25        Q.    How long after that meeting did you

*COMPU-TRAN SHORTHAND REPORTING*

102

Pat Orsaia

2    have the first communication with Ms. Magone?

3        A.    I don't recall the exact date.

4        Q.    What do you recall Ms. Magone

5    saying, in words or substance?

6        A.    I recall going through the detail

7    involving the -- involving Ms. Newmark's

8    attendance. I recall Cathy providing me with the

9    exact dates of Ms. Newmark's unplanned absences,

10    which were not inclusive of the time off that had

11    been approved for the colonoscopy. And I recall

12    speaking with Cathy Magone specifically about the

13    performance concerns.

14        Q.    What do you recall her saying about

15    the performance concerns to you?

16        A.    She told me that she had counseled

17    Carole about -- let me back up for a second. She

18    told me that they had been at -- I believe what

19    they call the length-of-stay meeting that

20    involved Carole and other social work -- members

21    of the social work and case management

22    department. This was, I think, a regular meeting.

23    I'm not sure if it was daily. My sense is that

24    it was. And that at that meeting, Cathy came

25    away concerned because, as was the practice at

*COMPU-TRAN SHORTHAND REPORTING*

103

Pat Orsaia

2    those meetings, she would ask people about

3    specific cases and progress on specific patient

4    cases. And that when she asked Carole

5    specifically about her cases, that Carole had not

6    responded in a way that Cathy thought indicated

7    that Carole was familiar with her cases or had

8    made the appropriate progress on them.

9            I believe Cathy said she -- Cathy

10    happened to have a list of all the patient cases

11    with her. And when she first asked Carole,

12    Carole could not even provide her with the name

13    of one patient that she was working with. And

14    Cathy produced the list to Carole and reminded

15    her who the cases were.

16            And Cathy was very concerned that

17    Carole didn't have at her fingertips the names of

18    the patients whose cases she was actively working

19    on at that point. And in Cathy's estimation,

20    that was unusual and indicated that Carole was

21    not on top of her responsibilities.

22        Q.    When did this meeting take place?

23            MR. KEIL:  Which meeting?

24            MS. NICAJ:  Length-of-stay

25    meeting.

*COMPU-TRAN SHORTHAND REPORTING*

104

Pat Orsaia

2        A.    Cathy told me it had happened

3    earlier in Carole's tenure.

4        Q.    Okay.

5        A.    Sometime over the summer, I think.

6        Q.    Do you recall whether she asked

7    Ms. Magone why she didn't know -- withdrawn.

8            Did Ms. Magone state whether she had

9    asked Ms. Newmark why she didn't know the status

10    of these cases?

11        A.    She didn't state that she had asked

12    Carole directly, in front of that group, why she

13    didn't know the status of the case.

14        Q.    I'm not asking that.

15            I'm asking, did Ms. Magone state

16    that she had asked Ms. Newmark why she didn't

17    know the status of those cases, whether it was in

18    that meeting or sometime after?

19        A.    I'm sorry. Why Cathy Magone

20    didn't --

21        Q.    Why Ms. Newmark didn't know the

22    status of the cases.

23        A.    She did not. Ms. Magone did not

24    state that.

25        Q.    Did you inquire as to whether

*COMPU-TRAN SHORTHAND REPORTING*

105

Pat Orsaia

2  Ms. Magone had asked?

3     A.   No, I did not inquire.

4     Q.   Apart from this issue concerning a

5  length-of-stay meeting, which was attended by

6  Ms. Magone and Ms. Newmark, did Ms. Magone say

7  anything else with reference to performance?

8     A.   Yes.  She told me that there had

9  been concerns brought by case managers, who were

10  part of the same team as Ms. Newmark, regarding

11  Ms. Newmark's handling of particular patient

12  circumstances.  One involved a patient leaving

13  the hospital without the appropriate clothing.

14  And there were concerns about -- concerns stated

15  by other members of the team directly to Cathy,

16  regarding Ms. Newmark's lack of appropriate

17  responsiveness.

18     Q.   Do you know how many cases

19  Ms. Newmark was responsible for?

20     A.   The only information I have about

21  the number of cases she was responsible for, was

22  I believe -- as I recall, when Ms. Magone was

23  talking to me about her concern -- about her

24  concern about the discussion at the length-of-

25  stay meeting, I recall that Cathy Magone used the

*COMPU-TRAN SHORTHAND REPORTING*

---

106

Pat Orsaia

2  number, four cases, when she said to me that --

3  and I believe she said it in the regard of, you

4  know, Ms. Newmark only has four cases, or

5  something like that, which, to Ms. Magone,

6  emphasized the fact that she ought to know who

7  those people are.  Ms. Newmark should have known

8  who those people are and be actively engaged and

9  be able to give details as to the progress of

10  those patients.

11         MS. NICAJ:  Move to strike

12     the nonresponsive --

13         MR. KEIL:  Object to the

14     motion.

15     Q.   How many cases, to your knowledge,

16  did Ms. Newmark have at the time you and

17  Ms. Magone discussed termination after September

18  28th?

19         MR. KEIL:  Just to clarify,

20     what was the plaintiff's caseload during

21     that period.

22         MS. NICAJ:  Yes, absolutely.

23     A.   I would have no way of knowing that.

24     Q.   Apart from the case -- the number of

25  cases that are assigned, what is your knowledge

*COMPU-TRAN SHORTHAND REPORTING*

---

107

Pat Orsaia

2  with respect to what other responsibilities

3  Ms. Newmark had in her position as social worker?

4     A.   I have a general understanding of

5  what the job is of a social worker at Lawrence

6  Hospital Center.  I do not have the specifics of

7  caseload or what their length-of-stay

8  requirements are or -- that is really the

9  leader's responsibility to monitor.

10     Q.   What is your general knowledge as to

11  what the duties and responsibilities of a social

12  worker is at Lawrence Hospital?

13     A.   My general knowledge of the duties

14  of the social worker is to -- is as an integral

15  part of the case management and social work team,

16  is to, in a timely fashion, see the needs of

17  the patient, including participating in the

18  discharge plan and providing resource and

19  referral information to the patients and their

20  families for care, resources available outside of

21  Lawrence and inside of Lawrence, and basically,

22  have the patient set up for appropriate discharge

23  plan and care post-discharge.

24     Q.   Did you ever see any written

25  guidelines as to the responsibilities of the

*COMPU-TRAN SHORTHAND REPORTING*

---

108

Pat Orsaia

2  social worker were at Lawrence?

3     A.   In my tenure at Lawrence, I had

4  occasion to review many of the job descriptions.

5  It's entirely possible that I had read the job

6  description of the social worker.  I may have

7  also seen the job posting for whenever we had a

8  vacancy of social worker, which would have given

9  some information about the role and

10  responsibilities.

11     Q.   Going back to your first

12  communication with Ms. Magone, concerning --

13  after September 28th, concerning Ms. Newmark,

14  what, if anything else, did Ms. Magone relate to

15  you with respect to Ms. Newmark?

16     A.   Ms. Magone pointed out to me that at

17  that time, she had become aware that Ms. Newmark

18  had failed to bring her up to speed regarding

19  some communication from -- I believe it was from

20  an RN, who was also assigned to the mental-health

21  project that Ms. Newmark was responsible for.

22  Ms. Magone expressed that as a concern, because

23  she had been prompting Ms. Newmark to say, what

24  progress have you made on this project, and was

25  disappointed that there was no progress that

*COMPU-TRAN SHORTHAND REPORTING*

**109**

*Pat Orsaia*

2 Ms. Newmark could refer to.

3 Q. What was the project?

4 A. The mental-health project that

5 Ms. Newmark was assigned to.

6 Q. Do you know when she was assigned to

7 that project? Did Ms. Magone tell you?

8 A. I don't know the exact date. I

9 believe there was a training that Ms. Newmark and

10 one of the registered nurses attended. I don't

11 know the exact date of it.

12 Q. Did you seek to ascertain when that

13 training was held?

14 A. I recall asking Ms. Magone if enough

15 time had elapsed from the time that Ms. Newmark

16 was assigned to the mental-health project, to the

17 time we were speaking, that she would have

18 expected some progress to be documented.

19 And she said, yes, it had been -- I

20 don't recall exactly what she said, but it had

21 been at least several weeks.

22 Q. What does "enough time" mean? What

23 do you mean by "enough time"?

24 MR. KEIL: Objection as to

25 form. Rephrase.

*COMPU-TRAN SHORTHAND REPORTING*

**110**

*Pat Orsaia*

2 Q. You recalled asking her if there was

3 enough time? She recalled you asking her if

4 there was enough time; right?

5 A. To your earlier question, I didn't

6 ask her the date of Ms. Newmark's assignment to

7 the mental-health project. But when Cathy Magone

8 told me she continued to be very concerned that

9 there was no progress on Ms. Newmark's part to

10 date with the project -- and then Cathy had

11 brought it up again because something had

12 happened much closer to my conversation with

13 Cathy Magone, where Cathy was telling me that she

14 had found out -- not from Ms. Newmark, but from

15 some other source -- that there had been some

16 communication between, my understanding is,

17 another nurse who had attended the initial

18 training, was assigned to the project with

19 Ms. Newmark, there had been some communication,

20 and Ms. Newmark had not made Ms. Magone aware of

21 that.

22 And my comment to her was -- it was

23 my way of asking, well, how long has she been

24 assigned to this project.

25 Basically, when I said "enough

*COMPU-TRAN SHORTHAND REPORTING*

**111**

*Pat Orsaia*

2 time," basically, I was trying to ascertain if it

3 was a reasonable assumption on Ms. Magone's part

4 that there would have been some progress on the

5 project by Ms. Newmark at that point.

6 And she told me that she felt it was

7 reasonable; that she had been assigned to the

8 project for several weeks with no progress to

9 date.

10 Q. What was the project? What did that

11 entail, to your knowledge?

12 A. I can't tell you exactly.

13 Q. Did you ask about that, what the

14 project about?

15 A. I knew that it was on the topic of

16 mental health, just like I knew the palliative-

17 care project was on the topic of palliative care.

18 Q. Did you seek to determine what

19 exactly the project encompassed?

20 A. No. That would have been her

21 leader's responsibility to determine.

22 MS. NICAJ: I'll move to

23 strike as nonresponsive.

24 Q. Did you ask Ms. Magone what that

25 project encompassed, apart from knowing it was

*COMPU-TRAN SHORTHAND REPORTING*

**112**

*Pat Orsaia*

2 about mental health?

3 A. No.

4 Q. Any other concerns that Ms. Magone

5 raised to you?

6 A. Ms. Magone said that she felt that

7 Carole had not adjusted -- or maybe wasn't suited

8 to the case-management model that was used at

9 Lawrence Hospital Center, that we had a

10 discussion about Carole's having come from a very

11 different work environment. Just prior to working

12 at Lawrence, she had been, I believe, in an

13 outpatient behavioral-health or mental-health

14 setting. And Cathy and I talked about the

15 differences between the daily work

16 responsibilities in that setting, versus an

17 inpatient, acute-care setting, as it relates to

18 the goals of the department length-of-stay

19 requirements, the insurance consideration for

20 someone's discharge plan, et cetera.

21 We talked about some business

22 criteria for success in the role of social work.

23 And Cathy told me that she really did not feel

24 that Carole had demonstrated that she was either

25 willing to, or capable of being successful, given

*COMPU-TRAN SHORTHAND REPORTING*

113

*Pat Orsaia*

1
2 our model of work.
3      Q.    Did you seek to ascertain what
4 Ms. Newmark's employment performance was prior,
5 in her prior employment at Lawrence?
6      A.    Did I, personally?
7      Q.    Yes.
8      A.    No.
9      Q.    Is it fair to say that if
10 Ms. Newmark's employment performance in the
11 earlier employment wasn't satisfactory, she would
12 not have been rehired at Lawrence?  Is that fair
13 to say?
14      A.    I don't know what her role was in
15 her previous performance.
16      Q.    Are you saying that there are
17 instances where unsatisfactory employees are
18 rehired at Lawrence?
19           MR. KEIL:  I object as to
20 form.
21           Answer, if you can.
22      A.    I'm going to have to ask you to
23 rephrase the question.
24      Q.    Are you saying, in the case where an
25 employee's performance was not satisfactory and

*COMPU-TRAN SHORTHAND REPORTING*

114

*Pat Orsaia*

1
2 that employee left the hospital, that employee
3 could later be rehired?
4      A.    In a different capacity, yes.  There
5 are instances where that happens.
6      Q.    Has that happened at Lawrence?
7      A.    I can't recall a particular case,
8 but when we looked -- at Lawrence when we look at
9 someone's eligibility for rehire, which is, I
10 think, what we're talking about here, we would
11 look not only at their performance in the
12 previous role, but we would look at, you know, if
13 it was the same role they were coming in --
14 sometimes people are not the right fit in one
15 job, and they are the right fit in another job.
16 Sometimes people leave for a time; they get more
17 education; they get a different certification.
18 They come back with different credentials than
19 they had the first time.
20      Q.    To your knowledge, Ms. Newmark
21 voluntarily left her employment at Lawrence when
22 she was previously employed there the first time;
23 isn't that right?
24      A.    To the best of my knowledge, yes.
25      Q.    Therefore, she was eligible to be

*COMPU-TRAN SHORTHAND REPORTING*

115

*Pat Orsaia*

1
2 rehired at Lawrence; isn't that right?
3      A.    Yes.
4      Q.    Had she been terminated for any
5 reason, she would not have been eligible to be
6 rehired; is that right?
7      A.    That is not necessarily correct, no.
8      Q.    Why isn't that necessarily correct?
9      A.    Well, there could be a situation
10 where someone is hired into a particular position
11 and perhaps during the probationary period
12 resigns, or is told that it is not a good fit by
13 the organization and leaves, and then sometime
14 later, comes back and applies for a job, as I
15 said, having gotten different credentials, a
16 different job, a different situation.  It's
17 possible the person could be rehired.
18      Q.    Has that happened in Lawrence?
19      A.    I can't say for certain if it has
20 happened or not happened.  I'm speaking more
21 toward the philosophy of what the rehire practice
22 would be.
23      Q.    Going back to your communication
24 with Ms. Magone after the first time following
25 this first meeting on September 28th, with

*COMPU-TRAN SHORTHAND REPORTING*

116

*Pat Orsaia*

1
2 Ms. Newmark and Ms. Magone, what else, if
3 anything, did she say concerning Ms. Newmark?
4      A.    Ms. Magone told me that she was
5 preparing the performance-evaluation
6 documentation that would be delivered to
7 Ms. Newmark during the separation discussion.
8      Q.    Anything else that was said by her
9 that you can recall?
10      A.    Not that I recall at this time.
11      Q.    What, if anything, as you sit here
12 today -- you said "at this time."
13           Are there any documents you can use
14 to refresh your recollection?
15      A.    No.
16      Q.    Did you reduce anything that
17 Ms. Magone told you during this time, in writing?
18      A.    No.
19      Q.    What, if anything, did you say to
20 Ms. Magone?
21      A.    As I have already stated, we talked
22 about the details of the performance concerns.
23      Q.    What did you say?  Not what you both
24 said.  What did you say, specifically, in words
25 or substance?

*COMPU-TRAN SHORTHAND REPORTING*

117

*Pat Orsaia*

2      A.    I asked her to provide me with the
3  specific dates for the attendance, the unplanned
4  absences. And she did.
5          I asked her to tell me about the
6  performance concerns. And she did.
7          I asked some clarifying questions
8  during our discussion of the performance
9  concerns.
10         I stated to Cathy that, as Ms.
11 Newmark was in her probationary period, as per
12 our policy, either Ms. Newmark or Lawrence
13 Hospital Center could decide to separate
14 employment.
15         I asked Cathy, what would be a
16 convenient time to schedule Ms. Newmark's
17 separation discussion. I asked her about
18 Ms. Newmark's work schedule for that day, as we
19 thought it would be best to, if possible,
20 schedule the separation discussion toward the end
21 of her shift.
22         I asked Ms. Magone if she had had
23 any response from Ms. Newmark, to Ms. Magone's
24 e-mail to Ms. Newmark, which, again, addressed
25 Ms. Magone's intent and use of the word "young."

*COMPU-TRAN SHORTHAND REPORTING*

118

*Pat Orsaia*

2          That's all I recall.
3      Q.    Why did ask you her if there was a
4  response?
5      A.    Ms. Magone had copied me on the
6  e-mail she sent to Ms. Newmark, offering her
7  clarification, and I was curious to know if or
8  how Carole responded to the e-mail.
9      Q.    Why?
10     A.    Because it was an ongoing dialogue
11 that had happened. And again, you know, at this
12 point, I'm still trying to facilitate a
13 resolution of this employee's concern with her
14 manager.
15     Q.    At that time, you knew she was being
16 fired, though; right?
17     A.    Right.
18     Q.    So, what do you mean by facilitate a
19 concern that she had with her manager when she
20 was being fired?
21     A.    What do you mean, what do I mean by
22 it? Exactly what I said. It's still -- in my
23 role as HR manager, I'm hoping they will be able
24 to reconcile that point.
25     Q.    Even though that she is being fired,

*COMPU-TRAN SHORTHAND REPORTING*

119

*Pat Orsaia*

2  reconcile the point?
3      A.    The fact that she was being
4  separated from employment, had nothing to do with
5  the alleged comment, using the word "young."
6      Q.    And that is based on what Cathy
7  Magone told you; isn't that right - that it had
8  nothing to do with that?
9      A.    It's based on the documentation in
10 the specific detail that the manager gave me
11 regarding her reasons for separating employment.
12     Q.    Who is the manager again?
13     A.    Cathy Magone.
14     Q.    And who did Ms. Newmark complain
15 about?
16     A.    She complained about an alleged
17 comment from Cathy Magone.
18     Q.    So, you're saying, with respect to
19 Magone, these are not allegations; but with
20 respect to Ms. Newmark's alleged comment --
21     A.    I'm not sure what you mean.
22     Q.    When you characterize what
23 Ms. Magone tells you, it's a statement of fact.
24 When you characterize what Ms. Newmark related to
25 you what Ms. Magone told her, you use the word

*COMPU-TRAN SHORTHAND REPORTING*

120

*Pat Orsaia*

2  "alleged."
3          Why is there a difference?
4      A.    The information that was provided to
5  me by Cathy Magone as to the rationale behind
6  Ms. Newmark not successfully completing her
7  probation, was documented information. That is
8  why I asked Ms. Magone for the dates of unplanned
9  absence, which she took right off her time sheets
10 and showed me, and the information about the
11 complaint about Ms. Newmark's performance, the
12 lack of progress on the project, et cetera.
13     Q.    What was documented? What did you
14 see that was documented?
15     A.    Ms. Magone had notes of the
16 complaints from the other case managers that she
17 shared with me.
18     Q.    She had notes?
19     A.    Yes.
20     Q.    Did you see any documents or
21 complaints from those case managers?
22     A.    Yes. I believe there were one or
23 two, at least, that were actually maybe e-mails
24 to Cathy Magone, expressing concern over
25 Ms. Newmark's lack of responsiveness.

*COMPU-TRAN SHORTHAND REPORTING*

121

**Pat Orsaia**

2    Q.    Well, did anyone seek to inquire of

3    Ms. Newmark's position on those points?

4    A.    You would have to ask Ms. Magone

5    that.

6    Q.    I'm asking, did you?

7    A.    Not that I know of.

8    Q.    Did you ask Ms. Magone whether she

9    did?

10    A.    I asked Ms. Magone if she had

11    followed up with Carole after receiving the

12    various complaints from case managers and others.

13    And she said, yes.

14    Q.    She did say, yes?

15    A.    Yes.

16    Q.    Did you communicate with Ms. Magone

17    at any other time, apart from what you have

18    testified to, concerning Ms. Newmark?

19    A.    On the date of the separation

20    discussion, I believe I contacted Cathy to be

21    sure that Carole was actually at work that day

22    and our meeting was still planned for the same

23    time.

24    Q.    Do you know who communicated with

25    Ms. Newmark about the meeting?  Was it you, or

*COMPU-TRAN SHORTHAND REPORTING*

122

**Pat Orsaia**

2    Ms. Magone, or someone else?

3    A.    It was not me.

4    Q.    Where did the meeting take place?

5    A.    In my office.

6    Q.    What time?

7    A.    I don't recall.

8    Q.    Who was present there?

9    A.    Cathy Magone, and Carole Newmark,

10    and myself.

11    Q.    Who spoke during this meeting first?

12    A.    To the best of my recall, I spoke

13    first.

14    Q.    What did you say, in words or

15    substance?

16    A.    I stated to Carole that we were

17    meeting because Cathy had ongoing concerns about

18    her attendance and performance, and then I turned

19    the conversation over to Ms. Magone, who provided

20    the details.

21    Q.    What did she, Ms. Magone, say, in

22    words or substance?

23    A.    She had the prepared probationary

24    performance-evaluation document with her, which

25    had already been completed and signed by

*COMPU-TRAN SHORTHAND REPORTING*

123

**Pat Orsaia**

2    Ms. Magone.  She went through it, although

3    briefly, with Ms. Newmark.

4    Cathy advised Ms. Newmark that she

5    had not successfully completed her probation and

6    that we were separating employment.

7    And to the best of my recall at that

8    point, Carole was not interested in going through

9    the document or, you know, reading through it, or

10    taking the time to do that.

11    It was my sense that Carole wanted

12    the meeting to end as quickly as possible after

13    she knew that it was a separation discussion.

14    Q.    What, if anything, did Ms. Newmark

15    say?

16    A.    I don't recall her saying very much.

17    I recall that she understood where the

18    conversation was going.  I believe she said, "I

19    understand I'm being separated from employment."

20    I offered her at that point the

21    option of submitting a letter of resignation.

22    And I told Ms. Newmark that we were going to

23    separate employment, but she did have a choice

24    about whether it would officially be on the

25    record as a termination of employment or

*COMPU-TRAN SHORTHAND REPORTING*

124

**Pat Orsaia**

2    resignation.

3    I pointed out to her that, should

4    she decide to resign, that Lawrence Hospital

5    Center would not stand in the way of any claim

6    for unemployment insurance that she might put

7    forth and that would otherwise be determined by

8    the Department of Labor as being a legitimate

9    claim.

10    And I told her that in terms of any

11    prospective employment, that, as was our

12    practice, we'll only share dates of employment

13    and job title.

14    And I offered her the opportunity to

15    decide whether she wanted it to be a resignation

16    as opposed to a termination.  I offered her the

17    opportunity to make that determination -- take

18    overnight to make that determination.

19    And we agreed that she would contact

20    me the next day with her decision.

21    Q.    Was there anything else discussed at

22    the meeting, apart from what you have already

23    testified to?

24    A.    Yes.  I advised Ms. Newmark that,

25    when our meeting concluded, that Cathy would

*COMPU-TRAN SHORTHAND REPORTING*

125

Pat Orsaia

2  accompany her back to her work station so she
3  could collect her personal belongings; that if
4  she had anything that needed to be packed up -
5  for instance, books, you know, personal items, et
6  cetera, that she could not take with her right
7  then - that they would be happy to pack them up
8  and send to her or arrange for her to come back
9  and get it at another time.
10        I had Ms. Newmark's letter of
11  termination prepared in advance of the meeting.
12  I had it with me. And as I recall, I told her I
13  had the letter of termination, but she had this
14  option. And when I had her decision, then,
15  should she decide to resign, that she would be --
16  she would need to submit a letter of resignation
17  to me, and I would destroy the letter of
18  termination; or if she -- if her decision was to
19  have this be a termination, I would send the
20  letter of termination to her.
21    Q.    Was there anything else said by
22  anyone at the meeting, apart from what you have
23  already testified to?
24    A.    Not that I recall.
25    Q.    Did there come a time, you --

COMPU-TRAN SHORTHAND REPORTING

126

Pat Orsaia

2  withdrawn.
3        Following the meeting, what happened
4  in connection with Ms. Newmark?
5    A.    Following the meeting, at some
6  point -- at some point after Ms. Newmark left
7  Lawrence Hospital premises, I spoke with Cathy
8  Magone. She relayed to me that Carole's final
9  comments to her had been very inappropriate and
10  involved profanity. She told -- Cathy Magone
11  told me specifically what had happened.
12        And I suggested to her that she note
13  that in an e-mail and send it to me.
14    Q.    Why?
15    A.    Because I thought it was important
16  that that be documented.
17    Q.    Why?
18    A.    Because it was completely
19  inappropriate.
20    Q.    She was fired; she had been
21  terminated; is that right - Ms. Newmark?
22    A.    Well, at that point, she was told
23  she was separating employment. It was up to her
24  whether it was a termination or resignation.
25    Q.    Well, no, it wasn't. She was going

COMPU-TRAN SHORTHAND REPORTING

127

Pat Orsaia

2  to be terminated; right? Her resignation would
3  have been involuntary; isn't that right? She had
4  no choice but to either quit or be fired?
5    A.    She was leaving our employment;
6  that's correct.
7    Q.    She had no other choice; right? It
8  was one option or the other - forced resignation
9  or termination? She didn't have the decision to
10  remain at Lawrence; isn't that right?
11    A.    No, she did not.
12    Q.    So, she had been fired at this
13  point; is that right?
14    A.    That is not the terminology I would
15  use. She had been told that we were separating
16  employment, effective immediately.
17    Q.    And she had been told this by
18  Ms. Magone; is that right?
19    A.    In my presence, yes.
20    Q.    The person that she made these
21  allegations concerning; isn't that right?
22    A.    "These allegations;" could you
23  clarify?
24    A.    Sure. Allegations concerning
25  ageism.

COMPU-TRAN SHORTHAND REPORTING

128

Pat Orsaia

2    A.    Yes. Ms. Newmark made an allegation
3  that Ms. Magone used the word "young," and she
4  considered that to be ageism.
5    Q.    That is the only allegation she
6  made?
7    A.    Yes.
8    Q.    So, when you saw the e-mail that you
9  referenced, when you read the e-mail from her
10  relating to the statements that Ms. Magone said
11  to her, in reference to "young," and "could take
12  things in like a sponge" and "Nicole was younger,
13  and she could handle the job better than she
14  could" -- she didn't make those allegations to
15  you?
16    A.    May I see that document, please?
17    Q.    Of course.
18        MR. KEIL: Would you like me
19  to show Ms. Orsaia my copy of Plaintiff's
20  Exhibit 5?
21        MS. NICAJ: Thank you.
22    A.    Would you like me to look at that
23  one instead?
24    Q.    It doesn't matter. I'm going to
25  direct your attention to the fact that

COMPU-TRAN SHORTHAND REPORTING

129

*Pat Orsaia*

2 Ms. Newmark didn't merely allege that Ms. Magone
3 used the word "young." She, in fact, alleged
4 that Ms. Magone said Nicole was younger and could
5 handle the job better than she could; isn't that
6 right?
7     A.    **Could you rephrase the question,**
8 **please?**
9     Q.    She, in fact, told you that Nicole
10 was younger and could handle the job better than
11 she could; isn't that right?
12     A.    **Who told me this? What are you**
13 **asking?**
14     Q.    Ms. Newmark --
15     A.    **I'm sorry. I'm going to have to ask**
16 **you to rephrase. I'm not sure if you're reading**
17 **from number three -- and I'm trying to respond to**
18 **what you're reading -- or you're asking a**
19 **separate question.**
20     Q.    Didn't Ms. Newmark advise you, in
21 words or substance, that Ms. Magone told her that
22 the reason Nicole was being appointed to that
23 palliative-care unit was because Nicole was
24 younger and could handle the job better than
25 Ms. Newmark could?

*COMPU-TRAN SHORTHAND REPORTING*

130

*Pat Orsaia*

2     A.    **Ms. Newmark's -- Ms. Newmark stated,**
3 **her allegation to me, that Ms. Magone had used**
4 **the word "young" when explaining to her why**
5 **Nicole was assigned to the palliative-care**
6 **project.**
7     Q.    I'm going to direct your attention
8 to what is marked as Plaintiff's Exhibit 5.
9 Here, I'm going to show you the formal exhibit.
10 (Handing)
11     Do you see paragraph three?
12     A.    **I do.**
13     Q.    She made that allegation in your
14 presence, didn't she, that "Nicole was younger
15 and could handle the job better than I could," in
16 reference to Ms. Newmark; is that right?
17     MR. KEIL: I'm going to
18 object. Your question seems to be
19 ambiguous. Are you asking the witness --
20     MS. NICAJ: I'm going to
21 rephrase the question.
22     Please don't make a speaking
23 objection, okay?
24     Q.    Did Ms. Newmark state to you at any
25 time, that Ms. Magone told her Nicole was younger

*COMPU-TRAN SHORTHAND REPORTING*

131

*Pat Orsaia*

2 and could handle the job better than she could,
3 in words or substance?
4     A.    **That is not a direct quote that I**
5 **recall hearing from Ms. Newmark.**
6     Q.    Well, did she ever write that to
7 you, for example, like Plaintiff's Exhibit 5?
8     MR. KEIL: Object. The
9 document speaks for itself.
10     You may answer if you can.
11     A.    **Plaintiff's 5, number three says,**
12 **when we went over the issue --**
13     Q.    I'm asking you a question.
14     A.    **You're asking me what the document**
15 **says. I'm reading it back.**
16     Q.    Did she; yes or no?
17     A.    **Please rephrase. Did who, what?**
18     Q.    Did Ms. Newmark ever advise you,
19 whether it's in writing, or verbally, or in
20 person, or in any manner, that Ms. Magone told
21 her, "Nicole was younger and could handle the job
22 better than I could"?
23     A.    **Not in those exact words, she did**
24 **not.**
25     Q.    In writing?

*COMPU-TRAN SHORTHAND REPORTING*

132

*Pat Orsaia*

2     A.    **What Ms. Newmark says in this**
3 **document --**
4     Q.    I'm asking --
5     A.    **-- that Cathy denied that she said**
6 **that, quote, "Nicole was younger and could handle**
7 **the job better than I could."**
8     Q.    Did she ever advise you, yes or no,
9 that Ms. Magone told her that Nicole was young
10 and could handle -- was younger and could handle
11 the job better than she could?
12     A.    **No.**
13     Q.    She never did. Okay.
14     Did Ms. Magone ever, at the
15 September 29th, meeting, ever state, in words or
16 substance, Nicole was young and could take things
17 in like a sponge?
18     MR. KEIL: I object as to
19 form.
20     Answer if you can.
21     A.    **I do not recall that as a direct**
22 **quote from Cathy Magone.**
23     Q.    You see how there is a quote that
24 Ms. Newmark wrote? She stated that she did say
25 that Nicole was quote, "young and could take

*COMPU-TRAN SHORTHAND REPORTING*

133

*Pat Orsaia*

2  things in like a sponge." Do you see that?

3    A.    Yes, I do.

4    Q.    Do you dispute that's what

5  Ms. Magone said at the September 28th meeting?

6    A.    I do.

7    Q.    You do dispute that?

8    A.    Yes.

9    Q.    Did you submit your dispute or --

10  withdrawn.

11        Did you reply to Ms. Newmark,

12  disputing her recollection of what Ms. Magone

13  said at the meeting?

14    A.    No.

15    Q.    Have there been claims of

16  discrimination brought against Lawrence Hospital

17  by other employees?

18        MR. KEIL:    Over what period

19  of time?

20        MS. NICAJ:    Since her

21  employment, to the time she ceased

22  employment.

23    A.    For the almost five years that I was

24  employed at Lawrence Hospital?

25    Q.    Yes.

*COMPU-TRAN SHORTHAND REPORTING*

---

134

*Pat Orsaia*

2    A.    Yes.

3    Q.    On how many occasions?

4    A.    We're talking, any kind of

5  discrimination?

6    Q.    Any form of discrimination.

7    A.    I'm not in a position to give you an

8  exact number. In terms of those that I was

9  directly involved in and would have knowledge of,

10  I would say approximately three.

11    Q.    Apart from plaintiff, who are the

12  other three?

13    A.    I don't know that I'm allowed to

14  provide you with that information.

15    Q.    You're certainly -- these could be

16  cases that are pending?

17        MR. KEIL:    If you are aware

18  of any claims, name the employee involved

19  if you can recall it.

20    A.    Mary Maicovski.

21    Q.    Can you spell Maicovski.

22    A.    I think it's M-a-i-c-o-v-s-k-i.

23        Elizabeth; I can't remember the last

24  name.

25    Q.    Is it the social worker you were

*COMPU-TRAN SHORTHAND REPORTING*

---

135

*Pat Orsaia*

2  referring to?

3    A.    No. It seems to me there is a

4  third, but I'm not able to put a name to it.

5    Q.    Since I couldn't possibly pronounce

6  Mary's last name, I'm going to refer to her as

7  Mary. You'll know who I'm referring to; is that

8  right?

9    A.    Yes.

10    Q.    What was the nature of her claims?

11    A.    As I recall, Mary Maicovski's

12  complaint was based on gender.

13    Q.    What department does she work in?

14    A.    Security.

15    Q.    When did she make her complaint?

16    A.    I don't recall the exact date.

17    Q.    What, in reference to gender, did

18  she complain about?

19    A.    She alleged that we terminated her

20  employment based on the fact that she was a

21  female.

22    Q.    When was her position terminated?

23    A.    I don't recall the exact date.

24    Q.    Do you recall -- withdrawn.

25        What was -- did she file a formal

*COMPU-TRAN SHORTHAND REPORTING*

---

136

*Pat Orsaia*

2  complaint in court?

3    A.    As I recall, she first filed a

4  complaint with the Division of Human Rights and

5  Opportunities, and then she brought a private

6  lawsuit.

7    Q.    Do you know what forum she brought

8  that in - federal or state court?

9    A.    I don't know.

10    Q.    Do you know whether the case was

11  resolved while you were still employed at

12  Lawrence?

13    A.    It was.

14    Q.    How so?

15    A.    The original complaint to the EEOC

16  or the State Division of Human Rights, was found

17  to have no merit. In terms of the lawsuit, I

18  believe it was settled as a nuisance -- for

19  nuisance value. I'm trying to remember exactly.

20    Q.    What about Elizabeth's?

21    A.    Elizabeth's complaint was for an

22  allegation of sexual harassment.

23    Q.    When?

24    A.    Approximately, three years ago.

25    Q.    Which employee or employees did it

*COMPU-TRAN SHORTHAND REPORTING*

137

*Pat Orsala*

2  concern?

3      A.  Her allegation was against a

4  co-worker in the pharmacy department, whose name

5  I don't recall.

6      Q.  Male worker?

7      A.  Yes.

8      Q.  Did she bring that -- withdrawn.

9          Was that -- did she file a lawsuit,

10  to your knowledge?

11      A.  I believe she filed a complaint as

12  well, which was dismissed.

13      Q.  When you say "a complaint," where?

14      A.  I believe, with EEOC.

15      Q.  And you say it was dismissed.

16          Did she, thereafter, file a federal

17  lawsuit?

18      A.  I don't believe so.

19      Q.  Is she still an employee, to your

20  knowledge?

21      A.  No.

22      Q.  Did she leave -- what were the

23  circumstances in which she ceased employment?

24      A.  She resigned.

25      Q.  Was this rather than face

*COMPU-TRAN SHORTHAND REPORTING*

---

138

*Pat Orsala*

2  termination?

3      A.  No.

4      Q.  Were you employed at Lawrence at the

5  time?

6      A.  Yes.

7      Q.  Did she have an exit interview?

8      A.  Yes, she did.

9      Q.  Did she indicate why she was

10  resigning?

11      A.  Yes.  She provided me with, as I

12  recall, a one- or two-page letter indicating her

13  reasons for leaving.

14      Q.  What was the substance of the

15  reasons of her leaving?

16      A.  The substance of it was that after

17  we had done our internal investigation and found

18  that her allegation could not be corroborated by

19  any of the witnesses she named, her department

20  director agreed, at Elizabeth's request, to do

21  her best to schedule Elizabeth and the person she

22  made the allegations against, to try to not have

23  them in the same schedule or be in the department

24  alone whenever possible.

25          Shortly thereafter, Elizabeth was

*COMPU-TRAN SHORTHAND REPORTING*

---

139

*Pat Orsala*

2  scheduled to work with several other people in

3  the department.

4          She came in; she saw that the person

5  she made the allegations against was in the same

6  department, physically.  And she said that that

7  was unacceptable to her, and she decided to

8  resign.

9      Q.  Apart from what turns out to be

10  formal complaints with the EEOC and the one filed

11  in court, did anyone, while you were HR director

12  or in your previous position, ever come to you,

13  making claims of discrimination?

14      A.  There were many occasions in the

15  course of my employment at Lawrence and similar

16  positions with other institutions, where

17  employees would come forward and discuss a

18  concern that might involve a comment made by a

19  co-worker or by a leader in the department, or a

20  question regarding enforcement of a policy, a

21  question regarding corrective action that had

22  been issued to them, or seeking to clarify our

23  corrective-action policy.

24          There were times during those

25  discussions when employees would use the word

*COMPU-TRAN SHORTHAND REPORTING*

---

140

*Pat Orsala*

2  "harassment," or say things like, I feel like my

3  co-worker is harassing me, or ask me a question

4  if something constituted harassment.

5          And we would have that discussion,

6  and I would answer their questions.  And most

7  typically, we were able to come to some

8  resolution where the individual understood that

9  an isolated incident or comment did not

10  constitute harassment.  And we were able to --

11  and I was able to facilitate some sort of

12  resolution of their concern with the other

13  person.

14      Q.  Did you ever reduce any of those

15  communications in writing?

16      A.  I can't say I never did; but

17  typically in those situations, I would not reduce

18  it to writing.

19      Q.  As you sit here today, can you

20  recall any instance in which an employee came to

21  you about what they perceived to be

22  discrimination and you reduced it to writing,

23  while you were at Lawrence Hospital?

24      A.  Not that I can recall.

25      Q.  Do you know who Ed Dinen is?

*COMPU-TRAN SHORTHAND REPORTING*

141

Pat Orsaia

1
2    A.    President and CEO of Lawrence
3 Hospital Center.
4    Q.    Did Ms. Galloway ever come to you to
5 express any concerns she had relating to Cathy
6 Magone?
7    A.    Talking about Denise Galloway?
8    Q.    Denise Galloway.
9    A.    Denise Galloway came to me -- Denise
10 Galloway was a supervisor in the social work
11 department, who had been at Lawrence Hospital
12 Center for many years. At one point, there was
13 an open position created. It was a new position
14 reporting to Cathy Magone. I believe the title
15 was assistant director of case management and
16 social work. The recruitment process was
17 ongoing. And an individual was selected to fill
18 that position.
19        Denise Galloway came to see me -- I
20 believe it was shortly after this person started
21 work. And Denise was concerned that because this
22 new position had been created, that it was
23 somehow a threat to her own job security. She
24 specifically asked me to clarify why it was that
25 both of them had similar supervisory types of

COMPU-TRAN SHORTHAND REPORTING

142

Pat Orsaia

1
2 titles in the same department.
3        And Cathy Magone's name came up
4 because Denise appropriately said that Cathy had
5 created this position in the department and had
6 made a hiring decision to hire this other person.
7 Denise had not applied for that job,
8 but she had some concern about where she fit in
9 the overall scheme of things in the department,
10 now that this other position had been created.
11        And that is what we talked about.
12    Q.    Did Ms. Galloway ever express any
13 other concerns relating to Cathy Magone?
14    A.    Denise said to me -- that wasn't at
15 the same meeting, but I do recall Denise telling
16 me that she would have liked to have seen the
17 department expanded - meaning, more positions,
18 more social work positions created.
19    Q.    How many social work positions were
20 there at the time Ms. Galloway was working at
21 Lawrence?
22    A.    I believe it was Denise plus two
23 social workers. It may have been Denise plus one
24 social worker; I'm not positive.
25    Q.    Was Elizabeth one of those social

COMPU-TRAN SHORTHAND REPORTING

143

Pat Orsaia

1
2 workers?
3    A.    Elizabeth was a social worker there,
4 yes.
5    Q.    Did Ms. Galloway ever express any
6 other concerns with respect to Ms. Magone?
7    A.    Not that I recall, no.
8    Q.    Did you ever advise Ms. Newmark, in
9 words or substance, that other employees had
10 complained about Ms. Magone to you or in your
11 presence?
12    A.    No.
13    Q.    Did the social worker, as opposed to
14 Elizabeth --
15    A.    Elizabeth Basil?
16    Q.    Yes; did she ever express her
17 concerns to you about Cathy Magone?
18    A.    Only as I have already stated, in
19 terms of during her exit discussion and the
20 staffing, her concerns about the staffing, and in
21 the social work department.
22    Q.    Who is Diane Lance?
23    A.    Diane Lance is the person who was
24 hired into the new position that I just spoke
25 about, that Denise Galloway came to see me about.

COMPU-TRAN SHORTHAND REPORTING

144

Pat Orsaia

1
2    Q.    Do you know whether Diane Lance ever
3 expressed concern to you or anyone else about
4 Cathy Magone?
5    A.    Diane Lance met with me, but it was
6 not about Cathy Magone.
7    Q.    What was it concerning?
8    A.    It was concerning the fact that she,
9 Diane, was responsible to manage the case
10 managers and social workers; and within the group
11 of case managers, there were -- this was early in
12 Diane's tenure -- there were -- there was some
13 level of dysfunction with two or three of the
14 case managers. And Diane was venting to me, as a
15 new manager, about the challenges she faced in
16 trying to get them to accept her as the leader
17 and cooperate with what she set out in terms of
18 their work assignments.
19        MS. NICAJ:  Mark this as 25.
20        (Whereupon, 10/5/06 e-mail from Cathy
21    Magone to Pat Orsaia was marked as
22    Plaintiff's Exhibit 25, for identification.)
23    Q.    I'm going to direct your attention
24 to what has been marked as Plaintiff's Exhibit
25 25, for identification. (Handing)

COMPU-TRAN SHORTHAND REPORTING

145

*Pat Orsaia*

2    Do you recognize that document?

3        A.    It's an e-mail from Cathy Magone to

4    me, sent on October 5.

5        Q.    Did you receive it on or about

6    October 5th, 2006?

7        A.    I would assume I did, yes.

8        Q.    The subject is Carole Newmark.  It

9    says, "Pat, just wanted you to know that Carole

10    picked up her e-mail at 5:30 last night and has

11    not responded or spoken to me about it."

12        Do you see that?

13        A.    Yes.

14        Q.    Was that in reference to your

15    earlier testimony when you -- when I asked you a

16    series of questions about Ms. Magone and you

17    mentioned that there was an e-mail exchange

18    concerning Ms. Newmark's receipt of responsive

19    e-mail from Ms. Magone --

20            MR. KEIL:  Objection as to

21    form.

22            MS. NICAJ:  Withdrawn.

23        Q.    What do you -- taking a look at

24    Plaintiff's Exhibit 25, do you know what

25    Ms. Magone references mean by, "Carole picked up

*COMPU-TRAN SHORTHAND REPORTING*

146

*Pat Orsaia*

2    her e-mail"?  What e-mail is she referring to?

3        A.    I think Cathy is referring to the

4    e-mail she sent Carole, which again attempted to

5    clarify, in writing, what went into Cathy's

6    decision to assign Nicole to the palliative-care

7    program.

8        Q.    And you asked her for a -- to find

9    out when, if she received any response from

10    Ms. Newmark?

11        A.    I asked Cathy if her e-mail had

12    prompted any further dialogue with Carole.

13        Q.    October 5th, the date in which

14    Ms. Magone e-mailed you, is the date in which

15    Ms. Newmark was terminated; isn't that right?

16        A.    Yes.

17        Q.    To your knowledge, did anything

18    occur from September 29th, 2006, until October

19    5th, 2006, concerning Ms. Newmark's performance -

20    anything new; additional absences, anything?

21        A.    I do recall Cathy told me that she

22    became aware during that time period, through

23    some other source, that there had been some

24    communication to Ms. Newmark from the registered

25    nurse assigned to the palliative-care project,

*COMPU-TRAN SHORTHAND REPORTING*

147

*Pat Orsaia*

2    and that Cathy was concerned that Carole had not

3    brought Cathy into the loop about that.

4        Q.    I'm sorry.  I'm not -- what are you

5    referring to?  What communication?

6        A.    I don't know exactly what the nature

7    of the communication was.  Cathy told me that she

8    had already stated to me and to Carole that Cathy

9    was concerned that Carole had not made any

10    progress to date on the project that she had been

11    assigned to, the mental-health project.  I'll

12    call it that for lack --

13        Q.    You knew that already; you had known

14    that already?

15        A.    Yes, I knew that already.

16        Q.    What are you referring to about the

17    palliative care?

18        A.    I'm not referring to palliative

19    care.

20        Q.    I'm sorry; I misheard you, then.

21    What palliative-care project are you referring

22    to?

23        A.    I need to clarify that.  I misspoke.

24    I meant the mental-health project.

25        Q.    You knew about that previous to

*COMPU-TRAN SHORTHAND REPORTING*

148

*Pat Orsaia*

2    that; right - about the issue with the mental-

3    health project you testified to?

4        A.    I knew that Cathy had performance

5    concerns in terms of Carole not making any

6    progress on the mental-health program.

7        Q.    Right.

8        A.    In response to your question - what,

9    if anything, new from a performance perspective

10    was brought to my attention during that time

11    period - what I'm saying is that during that time

12    period, Cathy told me that she was even more

13    concerned about Carole's lack of progress in

14    regards to the mental-health project, because she

15    had become aware that, in fact, Carole didn't

16    share with her that the nurse, who was supposed

17    to be working with Carole on this and had

18    attended the training with her on the mental-

19    health project, had communicated with Carole

20    about the project.  And Carole failed to tell

21    Cathy that there had been this communication.

22        Q.    So, there had been some progress

23    or --

24        A.    No; not only had there been no

25    progress, Carole, knowing that Cathy was keenly

*COMPU-TRAN SHORTHAND REPORTING*

149

**Pat Orsaia**

2  interested in seeing progress and had prompted
3  Carole about it, Carole received some
4  communication from the RN she was supposed to be
5  working with on the project and did not go to
6  Cathy to give her an update, and Cathy was
7  concerned about that.
8      Q.   So, the fact that she didn't relay a
9  communication she had with a nurse, she was
10 concerned about?
11     A.   Yes, yes.  Cathy was concerned that
12 Carole did not relay to Cathy that there had been
13 some communication or some update regarding the
14 project.  I don't know the specifics of it.
15     Q.   Do you know when Carole Newmark
16 communicated with that nurse?
17     A.   I don't.
18     Q.   Do you know what the nurse's name
19 is?
20     A.   No.
21     Q.   Do you know where she works or where
22 she is assigned to?
23     A.   No, I don't.
24     Q.   So, in fact, there had been
25 communications concerning the mental-health

COMPU-TRAN SHORTHAND REPORTING

---

150

**Pat Orsaia**

2  department with Ms. Newmark and the nurse, and I
3  just want to clarify something:  You're saying
4  that Ms. Magone had an issue because Ms. Newmark
5  had been communicating with the nurse and hadn't
6  relayed that communication to her?
7      A.   Not exactly.  I'm saying that
8  Ms. Magone relayed to me that she was concerned
9  because it came to her attention that the nurse
10 had initiated communication with Carole Newmark
11 about the project, and Carole had not updated her
12 director about that.
13     Q.   About the fact that the nurse called
14 her about the project?
15     A.   I don't know if it was a call, an
16 e-mail, written correspondence.  I don't know
17 what the nature of the communication was or what
18 the specifics of it were.
19     Q.   And that was her concern?
20     A.   That was her concern.
21     Q.   Anything else?  Was there anything
22 else from September 28th, until October 5th --
23 withdrawn.
24          When did Ms. Magone decide to
25 terminate Ms. Newmark's employment?

COMPU-TRAN SHORTHAND REPORTING

---

151

**Pat Orsaia**

2      A.   I don't know exactly.
3      Q.   When did she communicate that to
4  you?
5      A.   Sometime between September 28th and
6  October 5th.
7      Q.   Apart from -- withdrawn.
8          Didn't she communicate with you
9  sooner than October 5th?
10     A.   She communicated that she had
11 concerns about Carole's attendance and
12 performance prior to September 28th.
13     Q.   When did she do so for the first
14 time, to you?
15     A.   I don't recall exactly.
16     Q.   From September 28th through
17 October 5th, any other communications with
18 Ms. Magone about Ms. Newmark's performance, any
19 that you have not testified to?
20     A.   No.
21     Q.   Any other concerns?
22     A.   No.
23     Q.   Have you communicated with anyone
24 concerning your deposition here today, apart from
25 Mr. Keil?

COMPU-TRAN SHORTHAND REPORTING

---

152

**Pat Orsaia**

2      A.   About the deposition?
3      Q.   About the deposition.
4      A.   No.
5      Q.   Have you been in contact with any
6  former employees of Lawrence Hospital since you
7  left, apart from the two communications you have
8  had with Ms. Magone?
9      A.   Yes; I have communicated with some
10 of my former colleagues at Lawrence Hospital
11 Center.
12     Q.   With whom?
13     A.   With members of the human resources
14 department; with the former vice-president of
15 human resources who left Lawrence, before I did;
16 I have communicated with her.  I spoke with the
17 nurse manager at the ER at the time when I had a
18 friend who was a patient at Lawrence.  I spoke
19 with another former member of the human resources
20 department who left Lawrence before I did.  I
21 spoke with people at the switchboard.
22          That's all I can recall.
23     Q.   Do you know whether -- how long the
24 probationary period for Ms. Newmark's employment
25 is?

COMPU-TRAN SHORTHAND REPORTING

153

Pat Orsaia

2    A.    Yes.

3    Q.    Or was?

4    A.    Yes.

5    Q.    How long?

6    A.    Six months.

7    Q.    Do you know when her date of hire

8    was?

9    A.    I don't know the precise date, no.

10    Q.    Do you know whether she was hired on

11    or about March 20th, 2006?

12    A.    That sounds correct.

13    Q.    And she was fired after that six-

14    month probationary period?

15    A.    Her probationary period had been

16    extended.

17    Q.    By whom?

18    A.    By her department director, as per

19    policy.

20    Q.    Was it required that she -- when you

21    say "per policy," what policy are you referring

22    to?

23    A.    The policy is called Probationary

24    Periods. It's a human resources policy.

25    Q.    What does it say, in words or

154

Pat Orsaia

2    substance, the policy?

3    A.    It says that the probationary period

4    for exempt-level employees is six months. It says

5    the probationary period for non-exempt employees

6    is three months. It says that at the department

7    manager's discretion, probation can be extended

8    for a period of up to three months. It says that

9    the probationary period is meant to introduce the

10    individual to the organization, and vice versa.

11    And that at any time during the probation, either

12    party can determine that they do not want to

13    continue the employment relationship.

14    Q.    Does that require approval from

15    anyone to extend the probationary period?

16    A.    I think it says -- the policy says

17    it's with discussion with human resources.

18    Q.    Discussion or approval?

19    A.    I don't know. You have the policy

20    in front of you. Maybe you can tell me what it

21    says - discussion or approval.

22    Q.    To your knowledge, as the director

23    of HR, are there any requirements that the head

24    of a department needs the approval of the HR

25    department?

155

Pat Orsaia

2    A.    Are there any occasions in which --

3    Q.    No. Does it have to be approved

4    by --

5    A.    Does what have to be approved?

6    Q.    The probationary extension period.

7    A.    The actual practice is that any time

8    a department leader is recommending that a

9    probationary period be extended, there is a

10    discussion with human resources.

11    Q.    Is that discussion anywhere in

12    writing about the extension of a probationary

13    period of an employee?

14    A.    Not necessarily.

15    Q.    Was that done in Ms. Newmark's case?

16    A.    Yes.

17    Q.    Did you submit anything in writing,

18    extending her probationary period?

19    A.    Did I? No.

20    Q.    Did Ms. Magone?

21    A.    It would have been Ms. Magone's

22    responsibility to communicate the extension for

23    Ms. Newmark. Which, as far as I know, she did.

24    Q.    Did Ms. Magone send anything to you

25    in writing, which requested an extension of the

156

Pat Orsaia

2    probationary period?

3    A.    Well, she would not have requested

4    it.

5    Q.    Did she?

6    A.    She would have discussed it with me.

7    Q.    Did she submit anything in writing

8    requesting an extension of probation?

9    A.    No.

10    Q.    Did you submit anything in writing

11    approving an extension of a probationary period?

12    A.    No.

13    Q.    Did Ms. Magone ever recommend

14    Ms. Newmark's termination in writing?

15    A.    No.

16    Q.    Do you know if there are any

17    policies at Lawrence concerning that?

18    A.    The policy suggests that any

19    decision to terminate employment, would be

20    discussed with human resources. And there is a

21    policy, I believe, on termination, that states

22    that the person who can approve terminations, is

23    the vice-president of human resources or her

24    designee.

25    Q.    I'm going to show you what was

157

Pat Orsaia

2 previously marked as Plaintiff's Exhibit 21, for

3 Identification.

4         I would like to direct your

5 attention to Plaintiff's Exhibit 1, N425,

6 directing your attention to 4.3, Paragraph 4.3:

7 "During the last week of the probationary period,

8 the supervisor will conduct a performance-review

9 discussion with the employee."

10         Do you see that?

11    **A.    Yes.**

12    Q.    Do you know whether Ms. Magone, the

13 last week before the probationary period, the

14 original probationary period for Ms. Newmark

15 ended, had that meeting with her?

16    **A.    Well, the probationary period being**

17 **extended, I don't know that she did or didn't,**

18 **but I don't believe that is the scenario that is**

19 **discussed --**

20    Q.    I'm asking you --

21    **A.    -- in the policy.**

22    Q.    I'm asking you a question:  Do you

23 know whether Ms. Magone met with Ms. Newmark a

24 week prior to the original probationary period

25 ending, to discuss her performance?

COMPU-TRAN SHORTHAND REPORTING

---

158

Pat Orsaia

2    **A.    I don't know that.**

3    Q.    I'm going to direct your attention

4 to 4.5, of the same page.  It says, "The

5 supervisor may recommend termination of

6 employment at any time during the probationary

7 period.  This recommendation must be submitted in

8 writing to human resources and the department

9 head."

10         Did Ms. Magone ever submit her

11 recommendation prior to the termination in

12 writing?

13    **A.    No, but she is the department head.**

14    Q.    I understand, but this says this

15 recommendation must be submitted in writing to

16 human resources.  I'm asking --

17    **A.    This is referencing what the**

18 **supervisor of the department is supposed to do at**

19 **the supervisory level.**

20    Q.    I'm asking you:  Did Ms. Magone

21 submit a request, a recommendation for

22 termination to you prior to Ms. Newmark's

23 termination?

24    **A.    Not in writing, no.**

25    Q.    Apart from Ms. Magone, did you

COMPU-TRAN SHORTHAND REPORTING

---

159

Pat Orsaia

2 communicate with anyone else concerning Carole

3 Newmark while you were employed at Lawrence?

4    **A.    Yes.**

5    Q.    With who?

6    **A.    Deb Gogliettino, vice-president of**

7 **human resources.**

8    Q.    Anyone else?

9    **A.    Not that I recall.**

10    Q.    When did you communicate with

11 Ms. Gogliettino?

12    **A.    I don't recall the exact date.**

13    Q.    Was it in or around the time that

14 Ms. Newmark's employment was terminated?

15    **A.    It would have been before**

16 **Ms. Newmark separated employment.**

17    Q.    How do you know it would have been

18 before?

19    **A.    Because it was my practice to speak**

20 **to the person who I reported to, who was**

21 **Ms. Gogliettino, about any recommendations for**

22 **termination or similar job actions.**

23    Q.    Do you recall doing so in this

24 instance?

25    **A.    Yes.**

COMPU-TRAN SHORTHAND REPORTING

---

160

Pat Orsaia

2    Q.    Was your communication with

3 Ms. Gogliettino in writing, verbally, or some

4 other manner?

5    **A.    Verbally.**

6    Q.    And was that in person or via

7 telephone?

8    **A.    In person.**

9    Q.    And whose office was that in?

10    **A.    Deb's office.**

11    Q.    Was this before or after the

12 September 28th, meeting?

13    **A.    I don't recall.**

14    Q.    What did you say to Ms. Gogliettino?

15    **A.    I told her that I had spoken with**

16 **Cathy Magone about performance and attendance**

17 **issues with Ms. Newmark, who was still in her**

18 **probationary period; and that Cathy's decision,**

19 **which I supported, was to separate employment.**

20    Q.    Did you communicate with

21 Ms. Gogliettino, that plaintiff, Ms. Newmark, had

22 expressed concern about Ms. Magone's using the

23 word or words, "young" or "younger," in reference

24 to her selection of Nicole Serra?

25    **A.    Yes.**

COMPU-TRAN SHORTHAND REPORTING

161

**Pat Orsaia**

2  Q.   At this meeting or some other
3  meeting?
4      A.   To the best of my recall, I told
5  Ms. Gogliettino that prior to this, prior to this
6  separation meeting.
7      Q.   You advised Ms. Gogliettino of what
8  Ms. Newmark had said prior to the separation
9  meeting with Ms. Gogliettino?
10     A.   Yes.
11     Q.   On how many occasions did you
12  communicate on the subject of Carole Newmark to
13  Ms. Gogliettino?
14     A.   Probably three, which would have
15  included when I told her about Carole's
16  perception of Cathy's use of the word
17  "young." A second time was when -- as I just
18  mentioned, when I advised her about Cathy's
19  concerns of attendance and performance with
20  Carole during probation and that we were going to
21  separate employment. And then, after Carole's
22  exit.
23     Q.   The first time you communicated with
24  Ms. Gogliettino was about Ms. Newmark's concerns;
25  is that right?

*COMPU-TRAN SHORTHAND REPORTING*

162

**Pat Orsaia**

2      A.   Yes.
3      Q.   When did that happen?
4      A.   I don't know the exact date.
5      Q.   Was this at her office, or did the
6  communication take place in some other manner?
7      A.   To the best of my recall, it was in
8  her office.
9      Q.   What, in words or substance, did you
10  say to her?
11     A.   I told her that -- I told Deb that I
12  was attempting to facilitate a resolution of
13  Carole's concern about Cathy's use of the word
14  "young" in relation to Carole not being assigned
15  to the palliative-care project.
16     Q.   When did you communicate this to
17  Ms. Gogliettino? Was it before or after the
18  September 28th meeting?
19     A.   To the best of my recall, it was
20  before.
21     Q.   What was Ms. Gogliettino's response,
22  if any?
23     A.   She asked me the specifics: What
24  was Carole's perception? What was Cathy's
25  response? Sort of, you know, how the events had

*COMPU-TRAN SHORTHAND REPORTING*

163

**Pat Orsaia**

2  unfolded.
3      Q.   What else did she say, if anything?
4      A.   I provided her with the details
5  about what I had communicated to Carole. I
6  advised her that it was my impression that Carole
7  was disappointed about not having been assigned
8  to the palliative-care program. That although
9  Cathy had tried to clarify her use of the word
10  "young," Carole did not appear to accept Cathy's
11  explanation. And that we would continue to try
12  and resolve it.
13         Can I ask for a break or some idea
14  of how much longer you will be?
15             MS. NICAJ:   Sure. Let's
16         take a break.
17      (Recess held)
18  CONTINUED EXAMINATION BY MS. NICAJ:
19     Q.   Going back to the first discussion
20  with Ms. Gogliettino, what else did you say at
21  this meeting, apart from what you have already
22  testified to?
23     A.   That's all I recall.
24     Q.   What else do you recall her saying,
25  apart from what you have already testified to?

*COMPU-TRAN SHORTHAND REPORTING*

164

**Pat Orsaia**

2      A.   That's all I recall her saying.
3      Q.   Do you know whether she reduced
4  anything you said to her, in writing?
5      A.   Not to my knowledge.
6      Q.   Going back to the second meeting
7  with her, you said you raised -- it was around
8  the time of Ms. Newmark's exit; is that right?
9      A.   Prior to her exit discussion.
10     Q.   What did you say to Ms. Gogliettino?
11     A.   I told her that I had spoken with
12  Cathy Magone, and Cathy had provided me with the
13  specifics to support her concerns in the areas of
14  attendance and performance for Carole Newmark,
15  that Carole was still in her extended
16  probationary period, and that the decision was to
17  separate her from employment.
18         And I probably told her the date and
19  time of the meeting.
20     Q.   You indicated also that --
21  withdrawn.
22         Did she say anything to you at this
23  meeting?
24     A.   She just indicated that she
25  understood, and thanked me for the information.

*COMPU-TRAN SHORTHAND REPORTING*

165

**Pat Orsaia**

2    Q.  How long between the two meetings -

3  the first one you testified to and the second

4  one?

5    A.  Approximately, two to four weeks. I

6  can't say exactly.

7    Q.  And you had a third communication

8  with her after Ms. Newmark was terminated?

9    A.  Yes.

10    Q.  How long after?

11    A.  Either the same day or the next day.

12    Q.  What, in words or substance, did you

13  say to her, and what did she say to you?

14    A.  I told her that Cathy and I had had

15  the exit discussion with Carole, depending on

16  when I spoke with her, that day or the next day.

17  I either told her that Carole was going to relay

18  her decision to me about the option of resigning,

19  or that she already had relayed her decision to

20  me. I told Ms. Gogliettino that Cathy had

21  contacted me to say that Carole's final words to

22  Ms. Magone upon her exit were inappropriate and

23  involved profanity, and that I had asked Cathy to

24  put that in an e-mail.

25    I told Deb -- it may have been the

*COMPU-TRAN SHORTHAND REPORTING*

166

**Pat Orsaia**

2  second time I spoke with her, regarding Carole's

3  attendance and performance and the decision to

4  have her exit -- it may have been at that

5  meeting that I told Deb, that Cathy had again

6  attempted to help Carole understand her use of

7  the word "young" and that it had not played any

8  part in her decision about the project

9  assignments, that no one's age played a part in

10  it. I gave Deb that information.

11    Q.  Apart from what you have already

12  testified, did you or she say anything else at

13  the third meeting with Ms. Gogliettino?

14    A.  Yes. I told Deb that we, in human

15  resources, had a heightened sensitivity to the

16  fact that Carole had now been exited and that her

17  daughter Janice was still an employee at Lawrence

18  Hospital Center; and that Janice, in the course

19  of her work, would come into the human resources

20  department almost daily. And we just wanted to

21  be sensitive to that fact and, you know, careful

22  about making sure that Carole Newmark's situation

23  was held in confidence when her daughter

24  attempted to discuss it.

25    I told Deb that I was sending Carole

*COMPU-TRAN SHORTHAND REPORTING*

167

**Pat Orsaia**

2  Newmark the termination letter, as per her

3  decision.

4    To the best of my recall, I stated

5  to Deb that it was our intention to pay out

6  whatever accrued PTO time Carole had in her bank

7  at the time that she left, even though I was

8  not obligated to do so.

9    Q.  What is PTO time?

10    A.  Paid time off.

11    Q.  Did she have any accrued pay time off?

12    A.  I don't know. It would have been up

13  to her department to assess those accruals and

14  arrange for payment.

15    Q.  Do you know if she was paid for any

16  PTO?

17    A.  I don't know for sure.

18    Q.  Apart from Deb and Ms. Magone, did

19  you communicate with anyone else concerning

20  Carole Newmark while you were employed at

21  Lawrence?

22    A.  I communicated with John Keil.

23    Q.  Did you communicate with Mr. Keil

24  while Ms. Newmark was employed there?

25    A.  Yes.

*COMPU-TRAN SHORTHAND REPORTING*

168

2    Q.  Without getting into the substance

3  of any communications with Mr. Keil, when did you

4  first communicate with him concerning Carole

5  Newmark?

6    A.  I don't recall exactly.

7    Q.  Was this before or after September

8  28th?

9    A.  It would have been after Carole

10  separated.

11    Q.  Was that in connection with the EEOC

12  charge?

13    A.  Yes.

14    Q.  Apart from Mr. Keil, anyone else you

15  communicated with concerning Carole Newmark?

16    A.  Not that I recall.

17    Q.  As you sit here today, are there any

18  changes or things you want to supplement to your

19  previous testimony?

20    A.  No.

21    MS. NICAJ: I think I'm about

22  done. Just give me one moment.

23    (Pause in the record)

24    Thank you. I have nothing further.

25    (Time noted: 2:50 p.m. )

*COMPU-TRAN SHORTHAND REPORTING*

169

1
2  STATE OF NEW YORK    )
3                       ) ss:
4  COUNTY OF WESTCHESTER )
5
6
7        I, PAT ORSAIA, the witness herein,
8  having read the foregoing testimony of the pages
9  of this deposition, do hereby certify it to be a
10 true and correct transcript, subject to the
11 corrections, if any, shown on the attached page.
12
13
14              oOo
15
16
17
18        _____
19              PAT ORSAIA
20
21 Subscribed and sworn to before me
22 this _____ day of _____, 2008.
23
24 _____
25

170

1
2  STATE OF NEW YORK    )
3                       ) ss:
4  COUNTY OF WESTCHESTER )
5
6
7        I, Lisa Regen, Notary Public within
8  and for the State of New York, do hereby
9  certify:
10
11       That I reported the proceedings in the
12 within entitled matter, and that the within
13 transcript is a true record of said proceedings.
14
15       I further certify that I am not
16 related to any of the parties to the action by
17 blood or marriage, and that I am in no way
18 interested in the outcome of this matter.
19
20       IN WITNESS WHEREOF, I have hereunto
21 set my hand this ___ day of _____, 2008.
22
23
24        _____
              LISA REGEN,
              NOTARY PUBLIC
25

171

1
2            ***INDEX***
3
4                   PAGE#    LINE#
5  EXAMINATION BY:
6  MS. NICAJ            4       10
7
8  DOCUMENT/DATA REQUESTED:
9        NONE
10
11 PLAINTIFF'S EXHIBITS:
12 24 - E-mail exchange
        between Pat Orsala and
13      Carole Newmark        57      11
14
15 25 - 10/5/06 e-mail from
        Cathy Magone to
16      Pat Orsaia            144     20
17
18 DEFENDANT'S EXHIBITS:
        NONE
19
20
21 RULINGS CONTEMPLATED:
        NONE
22
23
24
25

172

1
2  CORRECTION SHEET
3
4  Re: Carole Newmark -v- Lawrence Hospital, et al
5
6        The following corrections, additions
7  or deletions were noted on the transcript of
8  the testimony which I gave in the above-
9  captioned matter, held on March 3, 2008.
10
11 PAGE(S) LINE(S) SHOULD READ
12 ___*___*_____
13 ___*___*_____
14 ___*___*_____
15 ___*___*_____
16 ___*___*_____
17 ___*___*_____
18 ___*___*_____
19 ___*___*_____
20
21
22              PAT ORSAIA
23 Subscribed and sworn to before me
24 this___day of_____ 2008.
25 _____

**EXHIBIT 26**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

CAROLE NEWMARK,

      Plaintiff,

  -against-               INDEX NO.
                        07-CIV-2861(CLB)

LAWRENCE HOSPITAL CENTER AND PAT ORSAIA,

      Defendants.

-------------------------------------x

                       222 Bloomingdale Road
                       White Plains, New York
                       March 18, 2008
                       9:59 a.m.

      EXAMINATION BEFORE TRIAL of NICOLE A. SERRA,

a witness testifying on behalf of the Defendant,

LAWRENCE HOSPITAL CENTER in the above-captioned

matter, held at the above time and place, before a

Notary Public of the State of New York.

                       Lisa M. Rosso,
                       Shorthand Reporter

Page 2

2  APPEARANCES:
3

      LOVETT & GOULD, LLP
      Attorneys for Plaintiff
5     222 Bloomingdale Road
      White Plains, New York 10605
6  BY: DRITA NICAJ, ESQ.
7

8

9     COLLAZO, CARLING & MISH, LLP
      Attorneys for Defendants
10    747 Third Avenue
      New York, New York 10017
11 BY: JOHN P. KEIL, ESQ.
12
13
14
15
16
17
18    ALSO PRESENT:
19       CAROLE NEWMARK
20
21          oOo
22
23
24
25

---

Page 4

2       221. UNIFORM RULES FOR THE
          CONDUCT OF DEPOSITIONS
3  221.3 Communication with the deponent.
4       An attorney shall not interrupt the deposition
   for the purpose of communicating with the deponent
5  unless all parties consent or the communication is
   made for the purpose of determining whether the
6  question shall not be answered on the grounds set
   forth in section 221.2 of these rules and, in such
7  event, the reason for the communication shall be
8  stated for the record succinctly and clearly.
          IT IS FURTHER STIPULATED AND AGREED that
9  the transcript may be signed before any Notary
   Public with the same force and effect as if signed
10 before a clerk or a Judge of the court.

11        IT IS FURTHER STIPULATED AND AGREED that
   the Examination Before Trial may be utilized for all
12 purposes as provided by the CPLR.

13        IT IS FURTHER STIPULATED AND AGREED that
   all rights provided to all parties by the CPLR
14 cannot be deemed waived and the appropriate sections
   for the CPLR shall be controlling with respect
   hereto.
15
16        IT IS FURTHER STIPULATED AND AGREED by
   and between the attorneys for the respective parties
   hereto that a copy of this examination shall be
17 furnished, without charge, to the attorneys
   representing the witness testifying herein.
18
19
20
21
22
23
24
25

---

Page 3

2       221. UNIFORM RULES FOR THE
          CONDUCT OF DEPOSITIONS 221.1
3
4  221.1 Objections at Depositions.
      (a) Objections in general: No objections
5  shall be made at a deposition except those which,
   pursuant to subdivision (b), (c), or (d) of Rule
6  3115 of the Civil Practice Law and Rules, would be
   waived if not interposed, and except in compliance
7  with subdivision (e) of such rule. All objections
   made at a deposition shall be noted by the officer
8  before whom the deposition is taken, and the answer
   shall be given and the deposition shall proceed
9  subject to the objections and to the right of a
   person to apply for appropriate relief pursuant to
10 Article 31 of the CPLR.
      (b) Speaking objections restricted. Every
11 objection raised during a deposition shall be stated
   succinctly and framed so as not to suggest an answer
12 to the deponent and, at the request of the
   questioning attorney, shall include a clear
13 statement as to any defect in form or other basis of
   error or irregularity. Except to the extent
14 permitted by the CPLR Rule 3115 or by this rule,
   during the course of the examination persons in
15 attendance shall not make statements or comments
   that interfere with the questioning.
16 221.2 Refusal to answer when objection is made.
      A deponent shall answer all questions at a
17 deposition, except (i) to preserve a privilege or
   right of confidentiality, (ii) to enforce a
18 limitation set forth in an order of the court, or
   (iii) when the question is plainly improper and
19 would, if answered, cause significant prejudice to
   any person. An attorney shall not direct a
20 deponent not to answer except as provided in CPLR
   Rule 3115 or this subdivision. Any refusal to
21 answer or direction not to answer shall be
   accompanied by a succinct and clear statement of the
   basis therefor. If the deponent does not answer a
22 question, the examining party shall have the right
   to complete the remainder of the deposition.
23
24
25

---

Page 5

2          NICOLE A. SERRA,
3  having been duly sworn by Lisa M. Rosso,
4  a Notary Public within and for the State
5  of New York, was examined and testified
6                 as follows:
7                   oOo
8
9  EXAMINATION BY MS. NICAJ:
10    Q.   Please state your name and address for
11 the record.
12    A.   **Nicole A. Serra, 95 Beekman Avenue,**
13 **Apartment 213-G, Sleepy Hollow, New York 10591.**
14    Q.   Good morning, Ms. Serra. My name is
15 Drita Nicaj. I represent the plaintiff in this
16 action, Carole Newmark. I will be asking you a
17 series of questions today. I'm looking for truthful
18 and responsive answers; okay?
19    A.   **Okay.**
20    Q.   All of your responses need to be verbal
21 because the court reporter can't take nods of the
22 head or uh-huhs or ut-uhs; okay?
23    A.   **Okay.**
24    Q.   If at any time you don't understand the
25 question, haven't heard the question or want the

Page 6

NICOLE A. SERRA

1
2 question read back, let me know; okay?
3    A.  Okay.
4    Q.  If at any time you want to take a
5 break, what I would ask you to do first, you can
6 take your break --
7    A.  Uh-huh.
8    Q.  -- but answer any pending questions.
9 That is, any questions that have not been fully
10 responded to.  Answer the question, then you can
11 take your break; okay?
12    A.  Okay.
13    Q.  If there is anything that you don't
14 understand, let me know.
15    A.  Okay.
16    Q.  If at any time during the course of
17 your deposition you want to add, change, or
18 otherwise supplement a previous response, let me
19 know; I will be happy to give you an opportunity to
20 do that.
21    A.  Okay.
22    Q.  Is there anything that I have said so
23 far that you do not understand?
24    A.  No.
25    Q.  Okay.  In addition, from time to time,

Page 7

NICOLE A. SERRA

1
2 given the nature of the deposition, I may be asking
3 the question, and you may think you know what I'm
4 about to ask you; what I would ask you to do,
5 though, is wait for me to finish and then you can
6 respond; okay?
7    A.  Okay.
8    Q.  One, sometimes I ask a totally
9 different question from the one that you believe I
10 was going to ask.  And, two, the court reporter
11 can't take us both talking at once; okay?
12    A.  Sure.
13    Q.  Are you employed?
14    A.  Yes, I am.
15    Q.  By whom are you employed?
16    A.  Lawrence Hospital Center.
17    Q.  For how long?
18    A.  It will be two years on April 24, I
19 think is the exact date.
20    Q.  In what capacity?
21    A.  I'm a social worker there.
22    Q.  Has your title changed at all?
23    A.  No.
24    Q.  What's your educational background?
25    A.  I have a master's degree in social

Page 8

NICOLE A. SERRA

1
2 work.  I have a license by taking an exam.  I'm a
3 licensed clinical social worker.
4    Q.  When did you receive that license?
5    A.  Let's see, initially, my license was --
6 I need to think.
7    Q.  That's okay.
8    A.  Because I'm not exactly certain.  I was
9 grandfathered into the licensed clinical social
10 worker prior to working at Lawrence Hospital.  So I
11 would say probably two-and-a-half, two and three-
12 quarter years ago.  My initial license was October
13 of '04, I believe.
14    Q.  What do you mean by "grandfathered in"?
15    A.  Because I had all of the criteria, I
16 didn't have to re-take a second test.  So I filled
17 out paperwork, and that was submitted, and I
18 received my updated license.
19    Q.  What were the circumstances in which
20 you came to be hired at Lawrence?
21    A.  Actually, through Carole.
22    Q.  Okay.
23    A.  Carole and I worked together
24 previously.  I was at Phelps Memorial Hospital
25 Center in Sleepy Hollow.  Carole came there about a

Page 9

NICOLE A. SERRA

1
2 year before I had left, a year or so.  And her and I
3 were friends at work, and she was looking, at some
4 point, for another job.  She told me about her new
5 position, that she was looking at Lawrence Hospital
6 Center, doing something different than what her and
7 I were doing at the time, which was mental health.
8 This was hospital social work which was different.
9 So she had gone over, she had gotten the position,
10 and she had asked me if I was interested, and I was.
11 I had gone over.  I interviewed and they hired me.
12    Q.  Okay.  Who did you interview with?
13    A.  Cathy Magone, and Diane Lantz; I think
14 it's L-A-N-T-Z.
15    Q.  And after you were interviewed, then
16 what happened?
17    A.  I left.  I waited a couple of days.
18 Carole was helpful in facilitating kind of
19 call-backs for me, and they offered me the position.
20    Q.  And that was for a hospital social
21 worker?
22    A.  Uh-huh.
23    Q.  Is that a yes?
24    A.  Yes, I'm sorry.
25    Q.  It's okay.

Page 10

NICOLE A. SERRA

1
2    A.   Yes.
3    Q.   What did you understand that to mean as
4  compared to what you were doing at Phelps?
5    A.   Well, Phelps is psychotherapy.  They do
6  mental health counseling in an outpatient clinic
7  setting with psychiatrists and other social workers.
8  And at Lawrence Hospital, we do discharge planning
9  mainly and deal with, basically, any and all social
10  issues that could come up, whether it be someone is
11  homeless, someone needs money, someone has problems
12  at home.  So you are giving small doses of
13  supportive counseling to people, but you're not
14  developing a longstanding relationship.  Where at
15  Phelps, I would have clients for three, four years.
16  Here, when they're in there for their stay at the
17  hospital, they get discharged, and sometimes you
18  have connection with them for a follow-up or
19  community referral.
20    Q.   How long had Ms. Newmark been employed
21  prior to your start date of April 24th, 2006?
22    A.   About one month.  She had gone in
23  March.  I think it was the middle to the end of
24  March.  We're about a month apart.
25    Q.   And when you were hired, did you

Page 11

NICOLE A. SERRA

1
2  receive any training?
3    A.   I caught unofficial training.  What I
4  feel, that Carole did the best that she could do to
5  train me with the resources that she was provided
6  with.
7    Q.   What do you mean by that?
8    A.   Meaning that I understood, in
9  conversation, with Carole, between her and I, that
10  there was supposed to be a social worker there to —
11  that she would be shadowing.  Someone that she had
12  known professionally previously.  When Carole had
13  come there, I don't believe that she was there.  And
14  she was kind of learning a lot of stuff, you know,
15  by experience, more or less.  I know she had
16  previous hospital experience, but that was ten,
17  eleven years before that, and that model has
18  changed.  It used to be social-work model, now it's
19  more a case-management-driven department.
20    Q.   What do you understand that to mean as
21  opposed to a social-work model?
22    A.   With social-work model, it was — you
23  had several social workers covering, doing the
24  discharge planning primarily on all of the cases.
25  Now, it's more specified cases.  Managers deal with

Page 12

NICOLE A. SERRA

1
2  the majority of the cases, and we get called in for
3  more specific types of situations, social issues.
4  You know, like I said, homeless patients,
5  psychiatric patients, and if there is difficulty
6  within the case or the discharge plan because of a
7  safety issue at home or whatever.
8    Q.   Did there come a time that there was a
9  patient that was due to be discharged, while Ms.
10  Newmark was employed there, that was homeless?
11    A.   I can't speak specifically.  But yes, I
12  know that there — we deal with several, many
13  homeless patients.
14    Q.   Was there ever a time that there was a
15  proposal to discharge the homeless patient to a
16  supermarket parking lot?
17    A.   I don't recall that.
18    Q.   Do you recall having any communications
19  with Ms. Newmark in which there was discussion that
20  Cathy Magone wanted a homeless person discharged to
21  a supermarket?
22    A.   No, I don't recall that.
23    Q.   Are there any documents that you can
24  use to refresh your recollection?
25    A.   That I have on myself?

Page 13

NICOLE A. SERRA

1
2    Q.   No, not necessarily on yourself.  Is
3  there anything that you can think of that would
4  refresh your recollection, whether it's here or
5  whether it would be in your notes at the hospital,
6  or anywhere else?
7    A.   There might be.  Was it a patient of
8  mine?
9    Q.   I'm asking.
10    A.   Okay.
11    Q.   As you sit here today, can you recall
12  anything that would refresh your memory?
13    A.   No.
14    Q.   Okay.
15    A.   I don't.
16    Q.   Did you have an understanding what your
17  job as a social worker in the case management system
18  would be?
19    A.   It always was changing.  There was
20  never a — it was supposed to be one thing at times.
21  At other times it was other things.  It was — we
22  had lots of difficulty establishing social-work
23  position within a department.  We actually had sat
24  down, Carole and I, at some point with our boss with
25  a document for social work that was supposed to be

Page 14

NICOLE A. SERRA

1
2  kind of revised to reflect what it is, in fact, we
   were supposed to be doing.
4      Q.   And did that occur?
5      A.   Yes, it did.
6      Q.   Okay.  What document are you talking
7  about?
8      A.   It's -- it was a document for basically
9  like your job description as social worker.
10     Q.   And your boss was who?
11     A.   Cathy Magone.
12     Q.   And what — you said this was at a
13 meeting —
14     A.   Uh-huh.
15     Q.   -- with her?  Is that a yes?
16     A.   Yes, yes.
17     Q.   And what was said during this meeting?
18     A.   I don't recall the content of the
19 meeting.  I know the meeting was generally about
20 reviewing the documents, seeing how we felt about
21 what was in the document.  And if, you know, we felt
22 it was appropriate or not appropriate.
23     Q.   And what response, if any, did you or
24 Ms. Newmark have?
25     A.   We felt it was appropriate.

Page 15

NICOLE A. SERRA

1
2      Q.   What was the document -- withdrawn.
3  What did the document contain specifically, if you
4  recall?
5      A.   Different types of, like, overheads
6  about if there is a patient with psychiatric
7  illness, or if their need was to be transferred to
8  another facility, talking about — just the
9  different types of patients that would be labeled as
10 social-work cases versus the typical patient that
11 comes in that will need a short-term rehab, or will
12 need to have home-care services.  Generally, we
13 would not deal with those unless there was a social
14 issue.  But oftentimes we would get into situations
15 with our case managers about what they were supposed
16 to be doing, what we were supposed to be doing,
17 whose case it actually was, and that is what drove
18 this meeting.  Because there was a lot of confusion,
19 I don't think on my boss's part, but more or less in
20 our departments, about who was supposed to be doing
21 what.
22     Q.   When you say your boss's part, who is
   that?
24     A.   Cathy Magone.
25     Q.   Okay.  And "our department," meaning

Page 16

NICOLE A. SERRA

1
2  who?
3      A.   Case management.
4      Q.   Okay.  Apart from you, Ms. Newmark and
5  Cathy Magone, were there any case managers at the
6  meeting?
7      A.   No, not that I recall, no.
8      Q.   Was there anything in writing as to
9  what the nature of your responsibilities as a social
10 worker would be as compared to the case managers?
11     A.   I'm not sure what you're asking.
12     Q.   Was there anything in writing
13 concerning what your job function would be in the
14 case management model?
15     A.   That's what this list was that I was
16 talking to you about.
17     Q.   What about with respect to what the job
18 responsibilities would be for the case managers and
19 the other staff in the case management model?
20     A.   That wasn't really brought into our
21 meeting, because it was more specific about what we
22 were to be doing with those cases.
23     Q.   When did this meeting take place?
24     A.   I don't recall.  It was before --
25 Carole was not there.  So it was within the time

Page 17

NICOLE A. SERRA

1
2  between March and October of '06.
3      Q.   Who currently supervises you?
4      A.   Cathy Magone.
5      Q.   Okay.
6      A.   And Laurie Bachman.
7      Q.   Laurie Bachman is who?
8      A.   Laurie Bachman was a case manager.  She
9  has been at the hospital for a very long time.  And
10 she's within — I don't want to, I don't know
11 exactly how many months she has been doing this, she
12 moved into the position that Diane Lantz used to
13 occupy, which is like director under my boss.
14 Basically, the person that is dealing with what is
15 going on in our department and issues.  So Cathy is
16 not as involved as she was when Laurie was not
17 there.
18     Q.   Are there any other social workers
19 employed there?
20     A.   No.  I'm the only licensed clinical
21 social worker.  So when you ask me about
22 supervisions, I'm not really being supervised by
23 someone of my background.
24     Q.   When Ms. Newmark was employed there,
25 was she your supervisor?

5  (Pages 14 to 17)

Page 18

1        NICOLE A. SERRA
2        A.   Yes, she was.
3        Q.   Are there any per diem social workers
4   employed?
5        A.   No.  When I first came, there was
6   somebody that was per diem for about two weeks, I
7   guess, in helping the transition with me coming and
8   Carole trying to help me, but that was the last of
9   that situation.
10       Q.   How did your job responsibilities
11  change from the time Ms. Newmark was employed to the
12  present?
13       A.   From when she had left employment?
14       Q.   Yes.
15       A.   It just became a lot more.  I was alone
16  for almost seven months, covering the entire
17  hospital.
18       Q.   How did you receive your assignments?
19       A.   How do I receive my assignments?
20       Q.   How did you receive your assignments
21  when Ms. Newmark was employed at the hospital?
22       A.   There is two ways to receive an
23  assignment.  One of them is -- actually, there is
24  more than two ways, there is three ways.  A doctor
25  can verbally ask you, you know, Can you see my

Page 19

1        NICOLE A. SERRA
2   patient, I have some concerns about social issues?
3   Kind of not the proper way, which is to put an order
4   in the computer for social-work consult; those get
5   faxed over to my office at this point.  When Carole
6   was there, we did not have a fax.  So now our office
7   secretary will fax them over to my office, and they
8   get divvied out between myself and the other person
9   that is now working there, or case management will
10  make referrals.  They will look at cases, and they
11  will decide that there is some particular reason
12  why -- well, they should be deciding on some
13  particular reason why, but they will call us in to
14  help on a case, or take the case, or however you
15  want to look at it.
16       Q.   You said that cases currently get
17  divvied up between you and the other person.
18       A.   Right.
19       Q.   Who's the other person that you're
20  referring to?
21       A.   Elaine Tolentino is a new person that
22  came to work for me.  She was there a year in
23  January.
24       Q.   So she started when; in 2007?
25       A.   She started in -- yes.

Page 20

1        NICOLE A. SERRA
2        Q.   January 2007?
3        A.   Yes.
4        Q.   In what capacity?
5        A.   We identify her as the social service
6   coordinator.  She is not a social worker.  She has a
7   bachelor's in sociology.
8        Q.   And the cases get referred to both you
9   and her?
10       A.   Right.  When she came, I gave -- I
11  was -- I asked, you know, how we can divvy it up,
12  because there was certain floors or units that I
13  preferred to cover.  So I specifically asked for her
14  to take the fourth floor, which is postpartum, the
15  NIC-U, maternity and labor and delivery.  So she
16  gets all the consults that come from that floor.
17  She also takes consults on one of the wings on Five
18  South, which is med/surge.  A lot of people that
19  have hip replacements go onto that floor.  And she
20  will cover half of Six North.  There is like two
21  sides of the hallway.  So she will take the higher
22  side, I take the lower side, in terms of room
23  number.
24       Q.   Are there any things that she is unable
25  to do in her capacity?

Page 21

1        NICOLE A. SERRA
2        A.   I personally think there are.  She is
3   not trained as a social worker.  And I see things
4   that, you know, are difficult for her.  One of the
5   main issues I see is her establishing boundaries
6   with families.  You deal with a lot of stress in
7   difficult situations, death of patients, people that
8   are in the critical care unit for a long time.  And
9   a lot of the times, I know it's hard for her to
10  manage keeping boundaries with families in terms of
11  times that she is spending, things she is doing for
12  the patients.
13       Q.   Getting back to when Ms. Newmark was
14  employed there --
15       A.   Uh-huh.
16       Q.   Actually prior, did there come a
17  time -- did she communicate to you prior to her
18  actual working at Lawrence that she was very
19  interested in the position?
20       A.   Did Carole ask me --
21       Q.   Yes.
22       A.   -- tell me that she was interested in
23  getting the position at Lawrence Hospital?
24       Q.   Yes.
25       A.   Yes.

6  (Pages 18 to 21)

Page 22

NICOLE A. SERRA

1
2      Q.   Did she tell you why?
       A.   I think it was something that would
4  be — I can't recall specifically what she had said,
5  why it would be, but I know that it would put her in
6  a better position as a supervisory position. I know
7  the salary was better. So those are the things that
8  I can recall specifically.
9      Q.   Do you recall her mentioning anything
10 to you about the formation of palliative care unit
11 being formed at the hospital?
12     A.   I do.
13     Q.   Do you recall whether she expressed an
14 interest in working at that unit?
15     A.   She did.
16     Q.   That was prior to her actually starting
17 in Lawrence?
18     A.   Yes. In between the time when I was,
19 you know — she was telling me about what was going
20 on, telling me about the job, telling me about the
21 other position as social worker. She also talked
22 about — there was a new person coming to start
23 palliative care program and she had expressed
24 interest in working in that type of environment.
25     Q.   Was there a palliative care unit that

Page 23

NICOLE A. SERRA

1
2  was eventually formed?
3      A.   No unit, no.
4      Q.   Or division or program?
5      A.   Programs, right, was developed. Maura
6  Del Bene was the nurse practitioner that came in
7  May, so right after me. And she was working on
8  establishing a palliative care program or service.
9      Q.   Are you involved in that service now?
10     A.   Currently, I'm not the palliative care
11 social worker.
12     Q.   Do you know if there is one?
13     A.   There is one that was just recently
14 hired. I'd say about — within a month or so, month
15 and a half she has been working for us.
16     Q.   And her name is?
17     A.   Mary O'Donnell, two N's and two L's.
18     Q.   And do you know whether Ms. O'Donnell's
19 duties included anything else apart from that
20 program?
21     A.   They do not. They're strictly for
22 palliative care.
23     Q.   And what do you understand palliative
24 care to be?
25     A.   Well, palliative care is a service

Page 24

NICOLE A. SERRA

1
2  that's for patients, you know, there is kind of like
3  a little flow sheet that we can look at, some
4  medical terminology that would refer someone to
5  palliative care. Oftentimes, people associate it
6  with end-of-life or terminal care, which oftentimes
7  it is. But it's also for patients that have, like,
8  MS, longstanding illnesses, helping to deal with
9  their pain management, comfort, it encompasses
10 everything, almost from a psycho-social aspect of
11 all of the different, you know, types of situations
12 that would be going on in that patient's life. And
13 palliative care is utilized to help coordinate and
14 organize the patients and their family or their
15 environment.
16     Q.   Did there come a time that you learned
17 that you would be an active part of the palliative
18 care service?
19     A.   Uh-huh.
20     Q.   Is that a yes?
21     A.   Yes, sorry.
22          MR. KEIL: That's okay.
23     Q.   That is okay.
24          MR. KEIL: It's very human to
25 do that.

Page 25

NICOLE A. SERRA

1
2          THE WITNESS: Sorry.
3      Q.   How did you come to learn that?
4      A.   I came to learn one day, and I can't
5  recall the date of the day, but it was before
6  October, it might have been in the beginning of
7  September of '06, I was — somehow Carole and I were
8  actually near each other on the floor, which was not
9  normal, because normally we're separate, doing
10 separate things. And I know our boss had called her
11 and she said, I have to go to Cathy's office. I
12 said, Fine. I continued on. She left and went off.
13     About fifteen, twenty minutes later, my
14 phone rang — we have these phones that we have to
15 carry — and it was my boss, and she said that she
16 wanted me to come — my boss, Cathy Magone, wanted
17 me to come to her office, she had to speak with me.
18 So I arrived, I didn't see Carole in between. But I
19 went in there and, basically, that is when she told
20 me that the palliative care service had requested
21 that I be the social worker for the program.
22     Q.   What, if anything, did you say to Ms.
23 Magone?
24     A.   I mean, I told her I was happy, because
25 I, you know, I had been working with Maura. I found

NICOLE A. SERRA

1
2  Maura to be like a mentor to me, as well as she was
3  very intelligent, and she kind of made it easy for
4  me to be interested in the program. I never had
5  intention of, or wasn't even sure that they were
6  choosing one or the other, kind of just came out. I
7  didn't — I thought that maybe, at some point, they
8  were even going to be asking for like another social
9  worker to be hired strictly for that program. So I
10 thanked her and I agreed to take the position. Not
11 really knowing, you know, what had happened
12 previously, until after when I met up with Carole.
13     Q.  You didn't know that Ms. Newmark had
14 been interested in the palliative care service?
15     A.  Uh-huh.
16     Q.  Is that right?
17     A.  Yes.
18     Q.  Okay.  And when you said you didn't
19 know what happened until later when you met up with
20 Carole —
21     A.  Uh-huh.
22     Q.  — did there come a time you discussed
23 it with Ms. Newmark?
24     A.  I'm sure we had discussion about the
25 program and the fact that, you know, I believe that

NICOLE A. SERRA

1
2  she was not happy. I think that she had wanted the
3  social work position.
4      Q.  And when you say you believe she was
5  not happy, what, in words or substance, did she say?
6      A.  I don't recall exact words.  But I
7  know, you know, we had conversations about, you
8  know, what the program was.  And I know that she
9  expressed to me that she had been told by our boss,
10 Cathy, that she would be the person for the
11 palliative care when she was first coming in; that
12 is what Carole had told me.
13     Q.  And do you recall any communications
14 with Ms. Newmark when — after you learned that Ms.
15 Magone had selected you for that service?
16     A.  Communications in general?
17     Q.  Yes.
18     A.  Oh, yeah.
19     Q.  Relating to the palliative care.
20     A.  Oh, okay, because Carole and I always
21 talked.
22     Q.  Of course, of course.
23     A.  We always talked.  Yes, I mean, and I
24 don't recall specific-like content or conversation,
25 but I know — I know somewhere that there is

NICOLE A. SERRA

1
2  conversations about what happened.  I know that, you
3  know, she was unhappy about the situation.  But
4  also, she reassured me that she was not angry at me.
5  I never felt that she was angry at me for the
6  situation.  It was kind of the thing that was
7  decided that was out of our hands.
8      Q.  Did she ever advise you, in words or
9  substance, what Ms. Magone told her?
10     A.  No.
11     Q.  Okay.  Do you recall ever stating —
12 her ever stating to you that Ms. Magone told her, in
13 words or substance, that the reason you were
14 selected was because you were younger?
15     A.  I did recall Carole saying something to
16 me along the lines about that, you know, longevity
17 or age or something along the lines of that.  Carole
18 had — Carole did say that to me.
19     Q.  But you don't recall exactly what?
20     A.  I don't.  It was a long time ago.
21     Q.  Sure.  And but Ms. Newmark made it
22 clear to you that she wasn't angry at you?
23     A.  Absolutely.
24     Q.  Okay.  When did you cease being
25 involved in the palliative care service?

NICOLE A. SERRA

1
2      A.  I'm sorry?
3      Q.  When did you stop being involved —
4      A.  Oh.
5      Q.  — in the palliative care service?
6      A.  I had gone to Ohio with Maura Del Bene,
7  RoseAnn O'Hare and Susan Shepp — she was the
8  finance person — to begin looking at how to
9  formulate the program.  Because the program was not
10 yet formulated.  It was in the process of being
11 formulated, and we were still looking at other
12 people's programs.  What were you asking me?
13     Q.  When did you cease or stop being
14 involved?
15     A.  More or less after — when Carole was
16 no longer at the hospital, my responsibilities of
17 being a social worker for the entire hospital, it
18 was taking precedence, and my boss was more
19 interested in me focusing on — because I was the
20 only social worker, which makes sense — the
21 responsibilities of the hospital.  I continued to
22 work with Maura and still do to this day.  But at
23 some point, her and I just kind of talked to each
24 other about it, and I was not able to do the things
25 that she was needing me to do, because of all of the

NICOLE A. SERRA

2  other responsibilities that I had. So we kind of
just unofficially, you know, a few months down the
4  line after Carole had left, you know, decided that
5  Maura was basically doing everything on her own, but
6  when Maura was on vacation, I would be covering for
her, I would be taking on her palliative care
8  responsibilities to the best of my ability to do so.
9      Q.  Do you know when there was the decision
10  to hire someone full-time, a full-time social worker
11  for the palliative care service?
12      A.  There is no full-time social worker.
13      Q.  Okay. Mary O'Donnell is part-time?
14      A.  Yes, she is part-time. She works
15  almost every day, but it's part-time. It's
16  considered a part-time position. I know that they
17  have been looking for awhile, it's been in the
18  newspapers for months and months. They had another
19  person, Laura Hanlin, who had been hired for
20  part-time, and she did not work out. So she was
21  only there for a short while. And that was last
22  year. She was maybe toward the end of the year, so
23  September, October maybe.
24      Q.  Of 2007 or six?
25      A.  Yeah, seven.

NICOLE A. SERRA

2      Q.  How long had she been employed?
3      A.  Employed in palliative care, it was, I
4  would say months, sure, it wasn't long at all. But
5  she is a hospice social worker. She works for
6  Jansen Hospice, which is part of Lawrence Hospital.
7          MS. NICAJ: I'm going to mark
8      some e-mails, and I would just like to mark
9      them as Plaintiff's Exhibit 26, please.
10      (Whereupon, Plaintiff's Exhibit 26, E-MAILS,
11  was marked for identification.)
12      Q.  I'm going to direct your attention to
13  what's been marked as Plaintiff's Exhibit 26.
14      A.  Okay.
15      Q.  Do you recognize that document?
16      A.  Uh-huh.
17      Q.  Is that a yes?
18      A.  Yes, yes.
19      Q.  Okay.
20      A.  Sorry.
21      Q.  It's okay. What do you recognize it to
22  be?
23      A.  Well, obviously, it's communication
24  from me to Maura, and then Maura back to me, and
25  Maura sending something to Carole and I on Website

NICOLE A. SERRA

2  Connection.
3      Q.  Directing your attention to that first
4  page of Exhibit 26.
5      A.  Okay.
6      Q.  Toward the bottom, it appears to be an
7  e-mail from you --
8      A.  This one down here (indicating)?
9      Q.  Yes.
10      A.  Okay.
11      Q.  -- from you to Maura Del Bene. In the
12  middle of the text of the e-mail it says: (Reading)
13  "Once again, thanks for the -- for understanding my
14  bad attitude last week."
15      A.  Uh-huh.
16      Q.  With -- what were you referring to?
17      A.  I don't know.
18      Q.  Okay.
19      A.  I can't tell you right now.
20      Q.  Is there anything that would refresh
21  your recollection?
22      A.  I'm sure if you had something to show
23  me, maybe it would, but I don't know.
24      Q.  I'm going to direct your attention
25  to -- above that, it says -- now it's an e-mail from

NICOLE A. SERRA

2  Maura Del Bene to you --
3      A.  Okay.
4      Q.  The last paragraph of the text states:
5  (Reading) "You have good energy and enthusiasm in
6  your work here, don't let one slip-up cloud the
7  picture of your real spirit."
8      A.  Uh-huh.
9      Q.  Do you remember what she is referring
10  to there?
11      A.  I don't, not now. I don't. I'm sure I
12  did at the time.
13      Q.  Okay. The next sentence reads:
14  (Reading) "We all need to help and support each
15  other, and I am glad to be part of the team." Close
16  quotes. Do you know what she was referring to at
17  that time?
18      A.  Probably -- no, I'm not going to
19  speculate. No, I don't know.
20      Q.  At the very top of the e-mail -- of the
21  first page of the document, it's another e-mail from
22  you?
23      A.  Uh-huh.
24      Q.  Dated July 20th, 2006 to Maura Del
25  Bene. It starts: (Reading) "Maura, thanks for

NICOLE A. SERRA

1
2    your -- I think it should've been your e-mail, but
3    it says you e-mail -- I'm glad you are part of the
4    team also, dot dot dot.  It is often hard work in
5    this environment when you don't know who you can
6    trust."  Close quotes.  What were you referring to?
7        A.  I would be referring to the case
8    manager.
9        Q.  Okay.
10       A.  In that situation.
11       Q.  Why?
12       A.  Because they're -- well, some of them
13   are very difficult to work with and they are more
14   interested in talking about other people's work and
15   this and that, versus paying attention to their own
16   situations.
17       Q.  "Other people" meaning social workers
18   or --
19       A.  Just everybody.
20       Q.  Which of the case managers were you
21   referring to?
22       A.  It probably would have been Colette
23   Gilardi or Barbara Moyack.
24       Q.  Was this in response to something
25   Colette Gilardi did or said?

NICOLE A. SERRA

1
2        A.  May have been, it's probably possible,
3    because any issues that I really had working there
4    were about Colette Gilardi, so -- but I can't say
5    for sure if that is the case but --
6        Q.  Is she still employed there?
7        A.  Yes, she is.
8        Q.  Do you still have similar issues with
9    her?
10       A.  No, because she's now recently taking a
11   new position, still in case management, but not as a
12   case manager, she's doing something, reviewing
13   documentation of doctors, so she no longer has --
14   you know, requests stuff from me to do.
15       Q.  What sort of issues did you have with
16   Ms. Gilardi?
17       A.  I feel that Ms. Gilardi is a very
18   anxious person.  I feel that she -- I feel that
19   she's unnecessarily involved in everything in that
20   department, especially cases that -- especially for
21   social work.  I don't know what her issue is in
22   social work.  I would go to my boss Cathy Magone and
23   make complaints about her.  She made me feel I --
24   never encountered anybody that made me feel the way
25   she made me feel.

NICOLE A. SERRA

1
2        Q.  Which is in what way?
3        A.  Uncertain, always in question.  I felt
4    like she thought she was my boss and I had to like
5    report to her.  I don't think she understands social
6    work, nor does she care.  I feel that she would just
7    kind of like give cases over that had difficult
8    aspect of it.  And then when I would be needing her
9    medical support, because I'm not a doctor, and I'm
10   not a nurse, and our bosses directed case managers
11   specifically to assist social workers with the
12   medical piece, because we don't have that
13   background, and she would hand over a case to me and
14   then I would -- basically, go ask other case
15   managers that I was comfortable with about the
16   medical status, because she made it that difficult
17   to work with.  And I feel that she turned -- because
18   of the way that she is, and she always -- she talks
19   about everybody's business all the time, she makes
20   situations grander and larger then they would ever,
21   ever be if it was just you or I dealing with it.
22       Q.  Do you know whether she ever complained
23   to Cathy Magone about you?
24       A.  Oh, I'm sure she did.
25       Q.  Okay.  Do you know whether she ever

NICOLE A. SERRA

1
2    complained to Cathy Magone about Carole Newmark?
3        A.  I'm sure she did.
4        Q.  Why are you sure she did?
5        A.  Because I would have an issue or there
6    would be an issue with Carole or something.  And the
7    next thing we would know, our boss would be
8    questioning us about it.  So we knew like where it
9    was coming from, because that is where the problem
10   stemmed from.
11       Q.  When did you get your CSW?  Off the
12   record.
13           (Discussion off the record)
14       A.  That would have been, I think it was --
15   hold on, I believe it was October of '04, yeah,
16   might have been the 4th or the 6th.
17       Q.  On how many occasions did Ms. Newmark
18   communicate to you that -- prior to her being
19   hired -- that one of the reasons she was interested
20   in working at Lawrence was because of the formation
21   of palliative care service?
22       A.  I would say, like, maybe two or three
23   times she had told me about it.
24       Q.  Okay.  And she told you that she was
25   told that she would be involved in the palliative

Page 38

NICOLE A. SERRA

1
2    care service?
       A.   Uh-huh.
4      Q.   Is that right?
5      A.   Yes, yes.
6           MS. NICAJ:  Okay.  I think
7    I'm pretty much done.  I just want to
8    consult my notes and my client.
9           THE WITNESS:  Okay.
10          MS. NICAJ:  And then,
11   hopefully, you will be on your way.
12          THE WITNESS:  Okay.
13          MS. NICAJ:  Off the record.
14   (Discussion off the record)
15     Q.   Apart from Colette Gilardi, did you
16   have any other issues with other case managers while
17   you and Ms. Newmark were employed at Lawrence?
18     A.   I'm trying to think.  Yeah, I mean, I
19   didn't cover Five North, but Thelma Gordon and
20   Barbara Moyack are up there, and they would also be
21   part of the -- they have been there for a very long
22   time, so Colette and Barbara were -- I wouldn't call
23   friends, but they were -- they kind of feed off of
24   each other.  And I know Carole had worked on Five
25   North and I know that there was probably, you know,

Page 39

NICOLE A. SERRA

1
2    some issues there with Barbara and Thelma.
3      Q.   When you say Colette and Barbara worked
4    with one another and they feed off one another --
5      A.   Yeah, we wouldn't even want to eat at
6    the same table with them, because you go down there,
7    and all they would do was talk negatively about
8    other people in the department as they're sitting
9    two feet away from them, talk about patients and
10   reveal names in public places.  And it's not
11   something that -- Carole and I come from mental
12   health background, and I know we respect people's
13   privacy and would not be talking about cases in the
14   middle of the cafeteria.
15     Q.   Did you ever communicate any concerns
16   you had with a case manager named Kitty?
17     A.   Did I ever -- yeah, I have.
18     Q.   Okay.
19     A.   I have.  I have done it now because now
20   I'm covering that floor.
21     Q.   What sort of concerns did you have with
22   Kitty?
23     A.   Kitty is -- I think Kitty is a very
24   good person.  I think she gets very overwhelmed and
25   she kind of likes to throw the hot potatoes at you.

Page 40

NICOLE A. SERRA

1
2    For example, she called me the other day, said,
3    "There is a case for you."  I said, "Okay."  I come
4    on.  I tell her I'm having a meeting with the family
5    the next day.  She calls me during the meeting, "The
6    family is waiting for you."  I said, "I know, I'm
7    waiting -- I'm meeting with the family right now."
8           And then they called me ten minutes
9    after that, as I was still meeting, saying that the
10   doctor is discharging the patient, where are they
11   going?  It's a long term patient, a patient that's
12   going to be living in a nursing home that has
13   dementia, families have to go and look at -- this is
14   where the breakdown of case management and social
15   work comes in, because we look at it as a life
16   transition.  You can't just say, "By the way, dad is
17   demented, he has to go to long-term care."  People
18   get upset.  They have feelings behind that.
19          So, you know, she gets into that a lot,
20   and then she will tell you, you know, swear up and
21   down that she would never talk about you to the
22   boss.  She is always like very adamant to tell you
23   that.  I have never said anything to her about, you
24   know -- it's like she feels like she needs to repeat
25   these certain reminders about herself.  I don't know

Page 41

NICOLE A. SERRA

1
2    if it's like self-reassurance or whatever it is.
3    But there are issues with her doing stuff like that,
4    giving a case and then expecting it to be addressed
5    and taken care of, and always putting her hand back
6    in the pile all the time constantly and also
7    confusing cases.
8           Like, I would go to call to set up
9    transportation and call Westchester EMS and they
10   would say, "Thelma Gordon already set up the
11   ambulance."  What?  When did that happen?  So there
12   is a lot of miscommunication because of her
13   impulsiveness.
14     Q.   Were there ever times that there were
15   multiple calls put in to you from various sources
16   asking you to consult as a social worker?
17     A.   You mean like from several different
18   people?
19     Q.   Like at the same time?
20     A.   Yeah, sure.
21          MR. KEIL:  You mean regarding
22   the same case?
23     Q.   No, regarding different cases.
24     A.   Yeah.
25     Q.   And how do you prioritize?

Page 42

NICOLE A. SERRA

1
2     A.    You kind of -- this is, you know,
3  another thing that was kind of -- our boss kind of
4  leaves us to prioritize what's important; even
5  though she knows what we're prioritizing, case
6  managers don't know.  And they feel when they call,
7  what they're telling you is the most important
8  situation, and that can cause problems.  Because I
9  look at, if there is a patient that is a psychiatric
10 patient that needs to be -- that came in from a
11 suicide, overdose or attempted, they're in the
12 hospital, we medically stabilized them and they're
13 ready to go, that is my priority for the day.
14        Because what happens is they have to
15 have a one-to-one sitter with them because they're
16 risk.  The hospital is paying for that.  So I'm
17 getting calls from administrative: "That patient
18 needs to get out of here.  What are you doing?
19 What's happening?"  I have to get authorization from
20 the insurance if they have, you know, an insurance
21 company.  You have to find a bed.  I have to fax all
22 the paperwork.  And that is the most important
23 agenda for me on that day.  But then I can get a
24 call from the emergency room saying that "We have a
25 rape case down here," and then I have to go, which I

Page 43

NICOLE A. SERRA

1
2  had experience not that long ago, I had to drop
3  everything that I was doing and I spent five hours
4  down in the emergency room.  So people can make an
5  opinion about what I'm doing and where I'm not, but
6  they really don't know where you are.  And then,
7  again, my answer is, "I have my phone, you can
8  always call me."  You know, it's a lot of --
9     Q.    Are there any guidelines as to what
10 cases you need to prioritize in what order?
11    A.    Well, we're always told the length of
12 stay is very important, so -- and you have to look
13 at the longer someone has been there, the more
14 pressure there is on you to do something, even
15 though most of the times it's out of your hands
16 because, ultimately, the doctor must come in and
17 write a discharge plan or order, and there is
18 nothing that anybody can do until that's done.  We
19 call them.  We can harass them.  We can do all of
20 that, but when they're ready, they will do it.
21    Q.    This is the doctors?
22    A.    Uh-huh.
23    Q.    Is that a yes?
24    A.    Yes.
25        MS. NICAJ:  Do you have any

Page 44

NICOLE A. SERRA

1
2  questions?
3        MR. KEIL:  No.
4        MS. NICAJ:  That is it.
5        oOo
6
7        (Time noted:  10:47 a.m.)

Page 45

2  STATE OF NEW YORK          )
3                            )  ss:
4  COUNTY OF NEW YORK         )
5
6
7        I, NICOLE A. SERRA, the witness herein,
8  having read the foregoing testimony on the pages of
9  this deposition, do hereby certify it to be a true
10 and correct transcript, subject to the corrections,
11 if any, shown on the attached page.
12
13
14        oOo
15
16
17        _____
18        NICOLE A. SERRA
19
20 Subscribed and sworn to before me
21 this _____ day of _____, 2008.
22
23 _____
24
25

**EXHIBIT 27**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



------------------------------------------x

CAROLE NEWMARK,

      Plaintiff,

  -against-                   INDEX NO.

                           07-CIV-2861(CLB)


LAWRENCE HOSPITAL CENTER AND PAT ORSAIA,

      Defendants.

------------------------------------------x

                      222 Bloomingdale Road

                      White Plains, New York

                      March 18, 2008

                      11:53 a.m.


      EXAMINATION BEFORE TRIAL of ROSEANN O'HARE, a

witness testifying on behalf of the Defendant,

LAWRENCE HOSPITAL CENTER in the above-captioned

matter, held at the above time and place, before a

Notary Public of the State of New York.


                    Lisa M. Rosso,

                    Shorthand Reporter

2

A P P E A R A N C E S:


LOVETT & GOULD, LLP

    Attorneys for Plaintiff

    222 Bloomingdale Road

    White Plains, New York  10605

BY:  DRITA NICAJ, ESQ.



COLLAZO, CARLING & MISH, LLP

    Attorneys for Defendants

    747 Third Avenue

    New York, New York  10017

BY:  JOHN P. KEIL, ESQ.





ALSO PRESENT:

    CAROLE NEWMARK

              oOo

5

ROSEANN O'HARE,

having been duly sworn by Lisa M. Rosso,

a Notary Public within and for the State

of New York, was examined and testified

as follows:

oOo

EXAMINATION BY MS. NICAJ:

 Q. Please state your name and address for the record.

 A. RoseAnn O'Hare, 4401 Victoria Drive, Mt. Kisco, New York 10549.

 Q. Good morning.  My name is Drita Nicaj. I represent the plaintiff in this action, Carole Newmark.  I will be asking you a series of questions today.  I'm looking for truthful and responsive answers; okay?

 A. Okay.

 Q. If at any time you want to take a break, you can do so.  But just answer the question first and then you can take your break; okay?

 A. Okay.

 Q. Also, all of your responses need to be verbal.  No nods of the head or uh-huhs or ut-uhs;

ROSEANN O'HARE

okay?

      A.    Okay.

      Q.    If at any time you don't understand the question, haven't heard the question, or want the question read back, let me know; okay?

      A.    Yes.

      Q.    And if there is any testimony that you want to either add or amend or supplement, you let me know; okay?

      A.    Okay.

      Q.    Are you currently employed?

      A.    Yes.

      Q.    By whom are you employed?

      A.    Lawrence Hospital.

      Q.    How long have you been employed at Lawrence?

      A.    Ten years.

      Q.    And what is your current position?

      A.    Vice President, Patient Care Service.

      Q.    And at the time you first started at Lawrence, what was your position?

      A.    Same title.

      Q.    And what are your duties and responsibilities in connection with that?

1

2    A.    I'm responsible for patient care issues

3  within the hospital.  I oversee the nursing

4  department, hospice agency, home care agency, and

5  bereavement center.

6    Q.    Okay.  Who's Cathy Magone?

7    A.    Cathy Magone, I think, is Director of

8  Quality Case Management.

9    Q.    Do you supervise Ms. Magone?

10    A.    No.

11    Q.    Do you know who her direct supervisor

12  is?

13    A.    She reports to Dr. Broder.

14    Q.    Do you know an employee by the name of

15  Carole Newmark?

16    A.    Yes.

17    Q.    Okay.  How do you know Ms. Newmark?

18    A.    Carole is a social worker at the

19  hospital.  So there would be times that Carole would

20  come to me regarding a patient, because I -- my role

21  is also as the administrator on duty.  And if there

22  was a patient that needed to be placed in a

23  psychiatric facility, Carole would come and tell me

24  about that patient.

25    Q.    Do you know when Ms. Newmark commenced

1                        ROSEANN O'HARE

2    employment?

3          A.     No.

4          Q.     Do you know whether she had previously

5    been employed at Lawrence before?

6          A.     I don't know.

7          Q.     Okay.  Did there come a time there was

8    a palliative care service or a program that was

9    formed at the hospital?

10         A.     Right.  That was my program that we

11   were starting at the hospital.

12         Q.     And that program started when?

13         A.     We officially started in May of 2006

14   when we hired the nurse practitioner.  But we were

15   planning for it probably a year prior to that.

16         Q.     Who's the "we" that were planning,

17   apart from yourself?

18         A.     Myself.  We had some fund board members

19   from Jansen Hospice.  Dr. Page was part of it.  I

20   think, at the time, the previous social worker might

21   have been on that team as well.

22         Q.     And the social worker was who?

23         A.     I'm forgetting her name.

24         Q.     Denise Galloway?

25         A.     Yeah, Denise Galloway.  I think she was

```
 1                     ROSEANN O'HARE
 2   part of that group as well.
 3          Q.    Was Cathy Magone --
 4          A.    No.
 5          Q.    Wait -- I didn't finish the question.
 6          A.    Sorry.
 7          Q.    That's okay.  We need a clear record,
 8   I'm going to withdraw the question and just ask it
 9   again.
10                Was Cathy Magone active in any way --
11          A.    No.
12          Q.    -- in the formation of the palliative
13   care service?
14          A.    No.
15          Q.    Okay.  There was a time that Maura Del
16   Bene was hired?
17          A.    Yes.
18          Q.    And she -- you supervise Ms. Del Bene?
19          A.    Yes.
20          Q.    Did there come a time that you
21   participated in any way in the recommendation of a
22   social worker to be active in the palliative care
23   service?
24          A.    Yes.
25          Q.    Okay.  In what way?
```

ROSEANN O'HARE

1
2     A.     When we first started the program in
3   May of 2006, it was Maura Del Bene, Dr. Page and
4   myself who were trying to develop the program.  And
5   as we started the program, we were trying to build a
6   team, because there were some patients who had some
7   social work needs.  And during our conversations
8   when we were talking about palliative care service,
9   because it was a new service at the hospital, we
10  thought that we needed a social worker to be part of
11  our team as well.
12     Q.     Did there come a time there was a
13  decision to appoint a social worker to the
14  palliative care?
15     A.     No, I don't think there was a decision.
16  It was -- we had two social workers at the time, and
17  we didn't appoint anyone.  It was -- I think Maura
18  probably spoke with Carole about being part of the
19  team.  But there was no -- we didn't have a
20  discussion about who would be appointed to it,
21  because the social worker has other duties within
22  the hospital as well, so they wouldn't be appointed
23  solely for that.
24     Q.     That is -- withdrawn.  I'm not asking
25  solely for the palliative care.  Did you ever

ROSEANN O'HARE

1

2  participate in any communications concerning

3  appointing one of the two social workers to the

4  palliative care services unit as part of their

5  duties?

6       A.    The only conversation that I had was

7  after Maura had been working with Carole, and she

8  came -- because I met with Maura on a regular basis

9  about the program -- she came to me to say that she

10 didn't feel that Carole was following up with some

11 things that she had given her.  And she was going to

12 approach, I think, the other social worker.

13      Q.    Did you ever communicate with Cathy

14 Magone concerning the selection of a social worker

15 to the palliative care service?

16      A.    No.

17      Q.    When did you have this communication

18 with Ms. Del Bene about her communication with Ms.

19 Newmark?

20      A.    I don't remember when.  We started the

21 program in May of 2006, that is when Maura was first

22 hired, and it was probably some time within the --

23 I'm sure the first six months; I don't know exactly

24 when we talked about that.

25      Q.    Did that -- did there come a time where

ROSEANN O'HARE

1

2    you and Ms. Del Bene and some others went to

3    Columbus, Ohio for training?

4        A.    Yes.

5        Q.    Were any social workers also in

6    attendance at that meeting --

7        A.    Yes.

8        Q.    -- or training?

9        A.    Right.

10        Q.    Which one?

11        A.    Nicole Serra.

12        Q.    Do you know how she came to be

13    selected?

14        A.    We had planned going to that program

15    even before Maura was hired, because it was a

16    program to teach us how to grow our program.  And I

17    think Nicole was just selected because she had been

18    working with Maura as her social work colleague.

19        Q.    Did you participate in any way in the

20    selection of Nicole Serra to go to that training?

21        A.    No.  I mean, it was -- she was working

22    with Maura as part of the team as a social worker.

23    So the decision was made about who we were going to

24    take with us.  We took a financial person with us.

25    We took myself.  They wanted an administrator to go.

ROSEANN O'HARE

So I don't remember any -- I just remember that
Nicole had been working with Maura at that time.

Q.    Did you ever communicate with -- with
Cathy McDonald concerning the selection of a social
worker to the palliative care service, between
Carole Newmark and Nicole Serra?

A.    No.  There was no position for it, it
was just part of the team.  So Maura was just
working with the social workers.

Q.    I understand.  In other words, you're
distinguishing it from what it is nowadays.  There
is a social worker that is solely assigned to the
palliative care service; is that right?

A.    Yes, right.

Q.    And previous to that, while Ms. Newbark
was employed at the hospital, there was specific --
there was no social worker assigned primarily to the
palliative care service?

A.    Right.

Q.    Okay.  But you've understood that the
selection of Nicole Serra to the -- for the training
would mean that she would participate in the
palliative care service unit; correct?

A.    Right.  Well, there is no unit.

14

ROSEANN O'HARE

Q.    Or service program.

A.    Right, right.

Q.    Okay.  And you never had any communications concerning Ms. Serra's selection with Cathy Magone?

A.    Well, the only conversation after it was presumed that Nicole would go, I did speak to Cathy Magone and told her that we were going to Columbus, Ohio for training for this program.  And, you know, that Nicole was part of the team and could she go, because Nicole didn't report to me.

Q.    Okay.  And what, if anything, did Ms. Magone say?

A.    She said -- I guess she said yes.

Q.    Okay.  Did you ever participate in any way in the selection of Nicole Serra to be part of the palliative care service?

A.    No.  There was discussion between Maura and I about social work needed to be part, because we had patients that required that.  But I didn't say to Maura to pick one social worker over the other.

Q.    Okay.  Did you have any opinion as to which -- withdrawn.  Did you ever express an

ROSEANN O'HARE

opinion?

        A.    No.

        Q.    Did you ever express which social
worker should be selected?

        A.    No.

                MS. NICAJ:  Okay.  I think
        we're wrapping up.  So I'm going to take a
        quick break, and we can hopefully wrap up
        pretty quickly; okay?

                --    THE WITNESS:  Okay.

                (Short break)

        Q.    In your capacity as a VP of Patient
Services, did you ever have occasion to interact
with Carole Newmark?

        A.    Yes.

        Q.    Okay.  What were the circumstances in
which you interacted with Ms. Newmark?

        A.    There were -- mostly there were
patients that might have to be placed in a
psychiatric facility.  And the social worker,
Carole, would follow up with those patients and come
to me and tell me about the patients.  And then I
would have to sign an agreement that that patient
would be placed based on the attendant's

ROSEANN O'HARE

1

2  recommendation.

3        Q.    Did you have any issues concerning her

4  performance or anything like that in your capacity

5  as VP for patient services?

6        A.    I don't remember.  I mean, the only

7  thing that I remember is about Maura telling me that

8  she had given Carole some things to follow up, I

9  think a policy, and she didn't follow up with that.

10        Q.    Okay.  But with you directly?

11        A.    I don't remember.  I mean, it was only

12  one other time that -- I think Carole and Nicole

13  were fairly new at the same time, and -- but I don't

14  remember that I had any conversation about it.  I

15  did think that it was a little odd one day when

16  Carole came to me to sign off on one of those, and

17  the other social worker was with her, which I just

18  thought was -- you know, why were two social

19  workers -- seemed to me a little waste of time, two

20  social workers to be doing it for you, one patient.

21        Q.    So your perception was the two -- the

22  two of them weren't needed at that time to do this

23  one task?

24        A.    Oh, I never seen two do it before or

25  since.

ROSEANN O'HARE

Q.    Did you have an understanding that
Nicole Serra was shadowing Ms. Newmark?

A.    I think she was, because I think she
was the newer social worker.  Carole had been there.

Q.    Apart from that example you provided
just now, anything else?

A.    No, I don't remember anything else.

Q.    Okay.  Are there any documents that you
can use to refresh your recollection?

A.    No.

MS. NICAJ:  That's it.

MR. KEIL:  Can I just ask one
question of the witness?

MS. NICAJ:  Sure.

EXAMINATION BY MR. KEIL:

Q.    Did you communicate any of the concerns
Maura Del Bene had expressed to you about Carole
Newmark to Cathy Magone?

A.    Yeah, I could have done that.  I could
have expressed that to Cathy.

Q.    Do you remember doing so?

A.    I remember having a conversation with
Cathy Magone about -- about the fact that Maura felt
that Carole was not following up on some of the work

18

ROSEANN O'HARE

1

2   that she had given her.  And that Maura was probably

3   going to be -- to start working with Nicole.

4                    MR. KEIL:  Thank you.

5                    MS. NICAJ:  I have nothing

6   further.  Thank you.

7                    THE WITNESS:  Thank you.

8                    oOo

9

10          (Time noted:  12:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 28**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

CAROLE NEWMARK,

      Plaintiff,

  -against-                      *   INDEX NO.
                                      07-CIV-2861(CLB)

LAWRENCE HOSPITAL CENTER AND PAT ORSAIA,

      Defendants.

-------------------------------------------x

                     222 Bloomingdale Road
                     White Plains, New York
                     March 18, 2008
                     10:51 a.m.

      EXAMINATION BEFORE TRIAL of MAURA DEL BENE, a
witness testifying on behalf of the Defendant,
LAWRENCE HOSPITAL CENTER in the above-captioned
matter, held at the above time and place, before a
Notary Public of the State of New York.

                     Lisa M. Rosso,

                     Shorthand Reporter

Page 2

APPEARANCES:

LOVETT & GOULD, LLP
  Attorneys for Plaintiff
  222 Bloomingdale Road
  White Plains, New York 10605
BY: DRITA NICAJ, ESQ.

COLLAZO, CARLING & MISH, LLP
  Attorneys for Defendants
  747 Third Avenue
  New York, New York 10017
BY: JOHN P. KEIL, ESQ.

ALSO PRESENT:
  CAROLE NEWMARK

oOo

---

Page 4

221. UNIFORM RULES FOR THE
CONDUCT OF DEPOSITIONS:
221.3 Communication with the deponent.
  An attorney shall not interrupt the deposition
for the purpose of communicating with the deponent
unless all parties consent or the communication is
made for the purpose of determining whether the
question should not be answered on the grounds set
forth in section 221.2 of these rules and, in such
event, the reason for the communication shall be
stated for the record succinctly and clearly.

  IT IS FURTHER STIPULATED AND AGREED that
the transcript may be signed before any Notary
Public with the same force and effect as if signed
before a clerk or a Judge of the court.

  IT IS FURTHER STIPULATED AND AGREED that
the Examination Before Trial may be utilized for all
purposes as provided by the CPLR.

  IT IS FURTHER STIPULATED AND AGREED that
all rights provided to all parties by the CPLR
cannot be deemed waived and the appropriate sections
for the CPLR shall be controlling with respect
hereto.

  IT IS FURTHER STIPULATED AND AGREED by
and between the attorneys for the respective parties
hereto that a copy of this examination shall be
furnished, without charge, to the attorneys
representing the witness testifying herein.

---

Page 3

221. UNIFORM RULES FOR THE
CONDUCT OF DEPOSITIONS 221.1

221.1 Objections at Depositions:
  (a) Objections in general.  No objections
shall be made at a deposition except those which,
pursuant to subdivision (b), (c), or (d) of Rule
3115 of the Civil Practice Law and Rules, would be
waived if not interposed, and except in compliance
with subdivision (e) of such rule.  All objections
made at a deposition shall be noted by the officer
before whom the deposition is taken, and the answer
shall be given and the deposition shall proceed
subject to the objections and to the right of a
person to apply for appropriate relief pursuant to
Article 31 of the CPLR.
  (b) Speaking objections restricted.  Every
objection raised during a deposition shall be stated
succinctly and framed so as not to suggest an answer
to the deponent and, at the request of the
questioning attorney, shall include a clear
statement as to any defect in form or other basis of
error or irregularity.  Except to the extent
permitted by the CPLR Rule 3115 or by this rule,
during the course of the examination persons in
attendance shall not make statements or comments
that interfere with the questioning.
  221.2 Refusal to answer when objection is made.
  A deponent shall answer all questions at a
deposition, except (i) to preserve a privilege or
right of confidentiality, (ii) to enforce a
limitation set forth in an order of the court, or
(iii) when the question is plainly improper and
would, if answered, cause significant prejudice to
any person.  An attorney shall not direct a
deponent not to answer except as provided in CPLR
Rule 3115 or this subdivision.  Any refusal to
answer or direction not to answer shall be
accompanied by a succinct and clear statement of the
basis therefor.  If the deponent does not answer a
question, the examining party shall have the right
to complete the remainder of the deposition.

---

Page 5

MAURA DEL BENE,
having been duly sworn by Lisa M. Rosso,
a Notary Public within and for the State
of New York, was examined and testified
as follows:
oOo

EXAMINATION BY MS. NICAJ:
  Q.  Please state your name and address for
the record.
  A.  **Maura Del Bene, 42 Vernon Parkway, Mt.
Vernon, New York 10552.**
  Q.  Good morning, Ms. Del Bene.  My name is
Drita Nicaj.  I represent the plaintiff in this
action, Carole Newmark.  I will be asking you a
series of questions today, and I'm looking for
truthful and responsive answers; okay?
  A.  **(Nodding head yes)**
  Q.  Is that a yes?
  A.  **Yes, it is.  I'm sorry.**
  Q.  All responses need to be verbal.
  A.  **I'm sorry.**
  Q.  It's okay.  All responses need to be
verbal; that is, the court reporter can't take nods

MAURA DEL BENE

1
2  of the head or uh-huhs or ut-uhs; okay?
3      A.  Yes, thank you.
4          MR. KEIL:  We'll do our best
5      to remind you.
6      Q.  If at any time you want to add, change,
7  or otherwise supplement a previous response --
8      A.  Okay.
9      Q.  -- let me know; I will be happy to give
10  you an opportunity to do that.
11     A.  Uh-huh.
12     Q.  Is that a yes?
13     A.  Yes, it is, I'm sorry.  I'm not used to
14  talking like this.
15     Q.  It's a natural thing, we'll try our
16  best to remind you.  If at any time you don't
17  understand a question, haven't heard the question,
18  let me know; okay?
19     A.  I will.
20     Q.  If you want to take a break, you can do
21  so, but what I would ask you to do first is answer
22  any pending questions that haven't been fully
23  responded to; okay?
24     A.  Okay.
25     Q.  Is there anything that I said so far

MAURA DEL BENE

1
2  that you do not understand?
3      A.  No.
4      Q.  Okay.  You're employed?
5      A.  Yes, I am.
6      Q.  By whom are you employed?
7      A.  Lawrence Hospital Center.
8      Q.  In what capacity?
9      A.  I'm the nurse practitioner to the
10  palliative care service.
11     Q.  When did you commence employment at
12  Lawrence?
13     A.  May of '06.
14     Q.  And apart from your being the nurse
15  practitioner at the palliative care service, do you
16  have any duties and responsibilities at Lawrence?
17     A.  Could you ask that again?
18     Q.  Apart from your duties at this service,
19  do you have any other duties?
20     A.  No, that is my prime responsibility to
21  the hospital.
22     Q.  Is that a full-time position?
23     A.  Yes, it is.
24     Q.  Are there any other employees that are
25  assigned to palliative care service?

MAURA DEL BENE

1
2      A.  Yes.
3      Q.  Currently?
4      A.  Yes.
5      Q.  Who?
6      A.  There is a social worker; her name is
7  Mary O'Donnell.
8      Q.  Anybody else?
9      A.  The medical director, Dr. Page.
10     Q.  And Mary O'Donnell has been employed
11  how long?
12     A.  Approximately a month.
13     Q.  Prior to that, did anyone occupy that
14  position?
15     A.  Nicole Serra.
16     Q.  Was there anyone by the name of Laura
17  Hanlin?
18     A.  Oh, yes, I'm sorry, I totally forgot
19  about her.  Yes, Laura Hanlin is a social worker
20  that was hired.  She worked with the service, I
21  think for probably two months or so.
22     Q.  When did she start her employment?
23     A.  I don't have those dates in front of
24  me, I'm sorry.
25     Q.  Can you approximate which month?

MAURA DEL BENE

1
2      A.  I can't.
3          MR. KEIL:  Estimate to the
4      best of your recollection, but don't guess.
5      A.  I think it was summer of last year,
6  summer of '07.
7      Q.  Was this -- was her position, Ms.
8  Hanlin's, full or part-time?
9      A.  Part-time, and shared with the hospice.
10     Q.  And the hospice name is Jansen?
11     A.  Jansen Memorial.
12     Q.  What do you mean by shared with the
13  hospice?
14     A.  She was a full-time employee of the
15  hospital.  Part-time for the service, part-time for
16  the hospice.
17     Q.  Okay.  And was that the same --
18  withdrawn.  Is that the same with Mary O'Donnell?
19     A.  No, it is not.  She is only part-time
20  for the service and part-time for the hospital.
21     Q.  What were the circumstances in which
22  Ms. Hanlin ceased being employed there?
23     A.  She decided to stay with -- wanted to
24  devote her time with the hospice side.  She wasn't
25  as comfortable in the palliative care hospital bay

Page 10

MAURA DEL BENE

1
2  side. It wasn't an arena she had felt she had
3  enough experience in, or comfort level in.
4      Q.  Did she remain at Jansen then?
5      A.  Yes, she is still at Jansen.
6      Q.  You mentioned Nicole Serra.
7      A.  So Nicole is an employee at the
8  hospital.
9      Q.  Right.
10     A.  And she filled in as the palliative
11 care social worker when we started the program, a
12 couple of months into it.
13     Q.  When did she -- withdrawn.  Did there
14 come a time she no longer was involved at the
15 palliative care?
16     A.  No.  She continues to be involved, but
17 just not formally identified as -- her resources
18 were spread too thin to be the palliative care
19 social worker and a social worker in the hospital.
20 And so she provides backup to the service.  Prior to
21 Mary O'Donnell being hired recently, she provided
22 backup and ancillary support, interdisciplinary type
23 of care, but she is not devoted to the service.
24     Q.  Okay.  When did that cease?
25     A.  When did that cease?

Page 11

MAURA DEL BENE

1
2      MR. KEIL:  Objection as to
3  the form.
4      Q.  When did she stop being identified as
5  part of the palliative care service?  I understand
6  she provided supportive care, as you said --
7      A.  Uh-huh.
8      Q.  -- prior to Ms. O'Donnell being hired?
9      A.  Uh-huh.
10     Q.  But did there come a time that she was
11 no longer identified as part of the palliative care
12 service?
13     A.  No, never really happened formally.
14     Q.  Okay.  Did there come a time she or you
15 communicated concerning her no longer being actively
16 involved in the palliative care service?
17     A.  I recall we had conversations about how
18 her resources were spread thin, and it was
19 increasingly more difficult for her to be able to
20 provide the attention and the time to the service
21 that she would like.  And that -- and that's when,
22 you know, we sort of evolved into not having her as
23 the primary palliative care social worker and, you
24 know, sought employment through another, you know,
25 part-time employee, Ms. Hanlin, and then Ms.

Page 12

MAURA DEL BENE

1
2  O'Donnell.
3      Q.  That was in the summer?
4      A.  Probably in the spring or summer of
5  last year, recently.
6      Q.  When did you commence employment --
7  withdrawn.  You commenced employment in May of 2006?
8      A.  Yes.
9      Q.  And for which position?
10     A.  The nurse practitioner to the
11 palliative care service.
12     Q.  Okay.  And it's the position you
13 currently hold today; is that correct?
14     A.  Yes.
15     Q.  Who interviewed you?
16     A.  Dr. Page and RoseAnn O'Hare.
17     Q.  RoseAnn O'Hare's position is what?
18     A.  She's the VP of Patient Services.
19     Q.  At the time you were interviewed, did
20 you have an understanding about what the position
21 was going to be?
22     A.  Yes.
23     Q.  How did you learn that?
24     A.  Through discussions with Ms. O'Hare, as
25 well as Dr. Page, and through the endorsement that

Page 13

MAURA DEL BENE

1
2  took place.
3      Q.  Did there come a time you commenced --
4  withdrawn.  When you commenced employment, was there
5  social workers assigned to the palliative care?
6      A.  No.
7      Q.  Was there a palliative care service
8  actually started at the time you started
9  employment --
10     A.  No.
11     Q.  -- at Lawrence?  Was that one of your
12 responsibilities as --
13     A.  Supposed to start up the program.
14     Q.  Was to start it?
15     A.  Yes, or as they called it, roll-out.
16     Q.  Roll-out.  And did you have any
17 interactions with Carole Newmark during this time
18 concerning the formation of palliative care?
19     A.  Yes.
20     Q.  At the time, what was Ms. Newmark's
21 position?
22     A.  Social worker.
23     Q.  Do you know whether she was a senior
24 social worker or social worker?
25     A.  By title, I don't know.  But I knew

## MAURA DEL BENE

2 that she was a senior social worker in her
experience.

4    Q.    What was her experience, to your
5 knowledge?
6    A.    I believe that she had worked at
7 Phelps, and I knew that she had worked at Lawrence
8 Hospital once before.
9    Q.    And how did you know that?
10    A.    I think from discussions with her.
11    Q.    Did you have an understanding that she
12 had an interest in participating in the palliative
13 care service?
14    A.    Yes.
15    Q.    And who advised you of that interest?
16    A.    That was -- came up in conversation
17 between Carole and I.
18    Q.    What, in words or substance, did she
19 say to you and what, if anything, did you say to
20 her?
21    A.    Can you repeat that again?
22    Q.    What did she say to you in terms of
23 that interest?
24    A.    I think we had discussions that she
25 had, you know, wanted and had an interest in being

## MAURA DEL BENE

2 part of the palliative care service. She had been
3 told, I think by the prior social worker, Denise
4 Galloway, that she was, you know, the person to
5 fulfill that role. We had talked extensively about
6 things that she could do to be more involved in the
7 service. It wasn't my responsibility to name the
8 social worker; that was an administrative
9 decision -- but -- between department heads.
10       But I know we extensively talked about
11 the things that Carole could do to participate and
12 be active in the palliative care service during its
13 early inception and formation. And that was the
14 conversations and through e-mail.
15    Q.    And what, if anything, was done in that
16 connection, to your knowledge?
17       MR. KEIL:    Objection as to
18    the form.
19    Q.    -- for her to actively participate in
20 the palliative care service?
21    A.    Are you asking how she -- what things
22 Carole did to be more active in the palliative care
23 service?
24    Q.    What did you request and what, if
25 anything, did she do?

## MAURA DEL BENE

2    A.    I think we had talked about policy
3 development for bereavement. We had talked about
4 enrollment in social work, networking for palliative
5 care that Beth Israel had. There were other
6 associations and informational websites that I had
7 encouraged her to look at. And a form for -- I
8 don't know if it was with both of them or maybe just
9 Nicole and/or Carole, I'm not sure -- but talking
10 about a social worker evaluation form to formalize
11 the social worker, you know, role on the
12 interdisciplinary team, those kind of things.
13    Q.    Was there any guidelines as to, you
14 know, when things would be -- would have to be
15 formed by? In other words -- I will withdraw the
16 question. Were -- was there any understanding as to
17 when the palliative care service would be up and
18 running?
19    A.    Well, it was up and running. I mean,
20 we had a start-up time of a few weeks to get me
21 acclimated to Lawrence Hospital. But the service
22 started very quickly thereafter with consultations,
23 educational forums for nurses, and quickly
24 in-service the, you know, different departments in
25 the hospital, as well as started patient

## MAURA DEL BENE

2 consultations. There was a formalization of going
3 to a meeting in the fall, I think it was October.
4    Q.    Where was the meeting held?
5    A.    Columbus, Ohio.
6    Q.    Was there an area of the hospital that
7 was devoted to the palliative care service?
8    A.    No. It was a consultation service, and
9 so you go and do consults wherever they exist in the
10 hospital.
11    Q.    Okay. And how would the palliative
12 care service receive those consults?
13    A.    Through -- any member of the hospital
14 could call -- a social worker, a nurse, a doctor,
15 unit clerk -- anybody could recommend a
16 consultation. And so then you respond to them as
17 the calls come in clearing them with the physician.
18    Q.    Now, would the calls have to go first
19 through you, or it varied?
20    A.    Well, I was the palliative care service
21 designated employee so that was -- I was the prime
22 contact for referrals.
23    Q.    Okay. You indicated that there was a
24 meeting at Columbus --
25    A.    Yes.

Page 18

MAURA DEL BENE

1
2    Q. – Ohio. What was the meeting for?
3    A. It was a training meeting through part
4  of a center to advance palliative care initiative
5  that the hospital had engaged in, I think, a year
6  before I was hired, to help form a palliative care
7  service that was hospital-wide. Integrating both
8  clinical, as well as physical imperatives and
9  administrative imperatives, to make a palliative
10 care program successful within the institution. And
11 it was a three-day training where our team, our
12 designated team of members, clinical and
13 administrative and financial, would go to a similar
14 hospital setting in Columbus and learn more about
15 how they established their service and have an open
16 forum for exchange and discussion and exercises of
17 sorts.
18   Q. Did they have a -- did the hospital in
19 Columbus, Ohio have a separate palliative care
20 service unit?
21   A. They had a very developed system. So
22 they had a consultation service and also a dedicated
23 unit and they had three different hospital bases
24 that they worked with. So three community hospitals
25 that they oversaw.

Page 19

MAURA DEL BENE

1
2    Q. Which hospital was this?
3    A. Oh, I don't remember the name of the
4  hospital, unfortunately.
5    Q. Okay.
6    A. It will come to me. I just --
7    Q. Who went to Columbus, Ohio for this
8  training?
9    A. RoseAnn O'Hare, Dr. Page, Susan
10 Shepp – she is our finance person -- myself and
11 Nicole Serra.
12   Q. Did there come a time that there were
13 any communications concerning the appointment of a
14 social worker for the palliative care service while
15 Ms. Newmark was employed there?
16        MR. KEIL: Objection as to
17     the form. Can you just read it back?
18   Q. Withdrawn. Did there come a time that
19 there were any communications by your -- that were
20 held, in your presence, concerning appointing a
21 social worker to the palliative care service?
22   A. Yes.
23   Q. Okay. With whom?
24   A. I had those discussions with Cathy
25 Magone at her request, RoseAnn O'Hare, and I think,

Page 20

MAURA DEL BENE

1
2  generally, with Carole.
3    Q. On how many occasions, if you recall,
4  did you engage in communications with Ms. Magone
5  concerning appointing the social worker to the
6  service?
7    A. To the best of my recollection, once or
8  twice. Formally discussed, yeah.
9    Q. By the way, it's whether it's formally
10 or not; it doesn't have to be a formal
11 communication.
12   A. Once or twice, to the best of my
13 knowledge.
14   Q. Okay. And with RoseAnn O'Hare?
15   A. Again, once or twice.
16   Q. With Ms. Newmark?
17   A. I think we had multiple discussions
18 about her interest, and the things that she could do
19 to be a part of the palliative care service before
20 the identification of the social worker. So I can't
21 count how many.
22   Q. Did you ever communicate with Cathy
23 Magone and RoseAnn O'Hare at a meeting with all
24 three of you concerning --
25   A. No, they were separate.

Page 21

MAURA DEL BENE

1
2    Q. – concerning the social worker
3  position?
4    A. No, ma'am.
5    Q. Okay. When was the first communication
6  that you had with RoseAnn O'Hare, if you recall
7  concerning appointing a social worker to the
8  palliative care service unit?
9    A. I think shortly after I was hired, it
10 was discussed that we would be preparing for the
11 meeting in Ohio. And one of the reasons they had
12 delayed the meeting was because they didn't have the
13 nurse practitioner hired, and they wanted to get
14 sort of a start before they went, to have some
15 experiences to share. So I knew, at that point,
16 they were looking to identify a social worker, and
17 then probably closer to September, I guess.
18   Q. And incidentally, when you went on the
19 trip to Columbus, Ohio, was this training for
20 Lawrence Hospital only, or was it en masse for all
21 hospitals interested in forming such a service?
22   A. They were -- there was one other
23 hospital there at the time that we met there.
24   Q. Okay. During your first communications
25 with Ms. O'Hare, did you and she communicate

Page 22

MAURA DEL BENE

2 concerning your opinion as to who should be
3 appointed to social -- as a social worker to the
4 palliative care unit?
5      A.  In my first consultation, no, because I
6 was -- it was shortly after being hired.
7      Q.  Okay.  And then you indicated that you
8 spoke to Ms. O'Hare another time --
9      A.  Uh-huh.
10      Q.  -- closer to the trip to Ohio?
11      A.  Yes.
12      Q.  Is that right?
13      A.  Yes.
14      Q.  And at which point was -- withdrawn.
15 What did you and she communicate about?
16      A.  She asked me what, at this point --
17 based on experience and interactions -- between the
18 two social workers, which person I thought was a
19 better candidate.
20      Q.  And what, if anything, did you say?
21      A.  I shared with her my experiences in
22 conversations and e-mail with Carole and Nicole, and
23 that I felt that Nicole was a better candidate
24 because of her enthusiasm and response to her
25 interactions.

Page 23

MAURA DEL BENE

2      Q.  Did she say anything -- withdrawn.  Did
3 you say anything else to you?
4      MR. KEIL:  Objection as to
5      the form.
6      MS. NICAJ:  Withdrawn.
7      Q.  Did she say anything else to her?
8      A.  Related to that issue?
9      Q.  Related to that issue.
10      A.  Other than it was something that she
11 and Cathy Magone were going to have to confer on,
12 no, nothing specific that I can recall.
13      Q.  Did you communicate, prior to this
14 communication with Ms. O'Hare, with Ms. Newmark
15 about your concerns?
16      A.  Can you ask that again?
17      Q.  Did you communicate with Ms. Newmark,
18 prior to this interaction with Ms. O'Hare, about
19 your concerns as to who would be a better candidate?
20      A.  No, I don't think it ever came up in
21 direct discussion with Carole.  And I think she had
22 stated that she felt she was the incumbent, as well
23 as her interest, but there was never a direct
24 discussion that I recall between Carole and I
25 regarding that.

Page 24

MAURA DEL BENE

2      Q.  What do you mean by incumbent?
3      A.  Well, when she was hired, she shared
4 with me that the prior social worker told her she
5 would be the palliative care social worker and
6 heading up the program, or something to that effect,
7 and that is what I mean by incumbent.  She was the
8 expected person to be part of this service and to be
9 on the development team.
10      Q.  The service hadn't been formed yet;
11 right?
12      A.  No.  But clearly there were discussions
13 about it that Carole had shared with me.
14      Q.  Did Carole Newmark communicate to you
15 any communications she had had with Cathy Magone on
16 the topic of being part of the palliative care
17 service unit?
18      A.  I can't remember exactly if there were
19 those conversations.
20      Q.  Do you recall the substance of any such
21 communications?
22      A.  I think, probably, we discussed in --
23 as we discussed the palliative care program
24 development, and ways in which she could
25 participate.  I'm sure it came up in conversation

Page 25

MAURA DEL BENE

2 how -- that she -- that, I know I had made
3 recommendations to Carole about doing certain things
4 to formalize, you know, social roles within the
5 institution to help lay the groundwork for better
6 evolving and definition of their role -- a social
7 worker's role -- in the palliative care service.
8 But I don't recall her sharing with me or Cathy
9 Magone, I don't remember that part coming up --
10      Q.  Did she ever --
11      A.  -- any specifics.
12      Q.  Did she ever -- did Carole Newmark
13 advise you, in words or substance, that she had
14 spoken to Cathy Magone about the fact that she would
15 eventually be appointed as a social worker to the
16 palliative care unit?
17      A.  I don't recall a specific conversation
18 about that.
19      Q.  Do you recall the substance of any such
20 communications about that?
21      A.  I recall Carole speaking with me, but I
22 don't recall her reporting that she had had a
23 conversation with Cathy Magone about her interest.
24 I just remember her talking directly about --
25 Carole -- about her interest.

Page 26

MAURA DEL BENE

1
2      Q.   You indicated that there were -- one of
the reasons that you were recommending Nicole --
4  withdrawn.  Whose ultimate decision was it to
5  appoint Nicole Serra to the palliative care?
6      A.   Cathy Magone.
7      Q.   Okay.  And you indicated that you
8  recommended Ms. Serra because of what?
9      A.   Because of her response to different
10  discussions regarding this service, recommendations
11  for investigating resources, making referrals to the
12  service she had made, and interacted with several of
13  the patients that I had seen for the service, which
14  was not the situation with Carole.
15         We had very few referrals and shared
16  cases together.  Nicole and I had had an experience
17  base of working on patient cases together from the
18  service perspective.  And her enthusiasm with the
19  program, and her positivism.  This is a new program
20  that needed to be represented well; she was very
21  positive.
22      Q.   And what did you find with respect to
23  Ms. Newmark about the program?
24         MR. KEIL:  Objection to the
25  form.

Page 27

MAURA DEL BENE

1
2      Q.   Withdrawn.  She wanted also to be
3  involved in the program; is that correct?
4      A.   You're saying "she"; Carole?
5      Q.   Carole Newmark?
6      A.   Yes.  She wanted to be involved in the
7  program.
8      Q.   And did you take that as a positive
9  aspect of --
10      A.   Absolutely.
11      Q.   You indicated that you also
12  communicated with Cathy Magone once or twice
13  concerning the appointment of the social worker --
14      A.   Yes.
15      Q.   -- to the palliative care service?
16      A.   Yes.
17      Q.   When was the first occasion?
18      A.   I think it was close to the
19  September --
20      Q.   September -- close to the September --
21      A.   September time frame.
22      Q.   Okay.  And when was the second
occasion?
4      A.   Probably shortly thereafter.
25      Q.   What do you mean "shortly thereafter"?

Page 28

MAURA DEL BENE

1
2      A.   Probably within a week of each other,
3  the communications.
4      Q.   Okay.  What was your first
5  communication with Ms. Magone?
6      A.   To the best of my recollection, she
7  asked me if -- she wanted to identify that she was
8  in the process of making this decision.  She wanted
9  some input as to my experience thus far with the
10  social workers.  She identified that she had -- she
11  was leaning in a direction because of the
12  distribution of projects and efforts from her
13  departmental perspective.  Carole was given a mental
14  health disaster -- I think that's what it was
15  called -- project that she felt was not being
16  attended to.  And that adding another piece to that
17  was going to not allow her to fulfill that
18  obligation.
19         She asked me what my thoughts were.  I
20  told her what RoseAnn O'Hare and I had discussed, as
21  my direct supervisor, and my experiences thus far
22  with -- although Carole stated her interest, she did
23  not respond to many of the e-mail requests or
24  project, you know, offerings.
25      Q.   Who did she identify as the person she

Page 29

MAURA DEL BENE

1
2  was leaning toward?
3      A.   I think, at that point, I inferred that
4  she was leaning toward Nicole, because of the mental
5  health project that Carole was assigned to and she
6  felt needed to be attended to.
7      Q.   Anything else?
8      A.   Not that I can recall.
9      Q.   Did she advise -- did Miss Magone
10  advise you, in words or substance, what Ms.
11  Newmark's performance was -- what the level of her
12  performance was?
13      A.   May I ask a question?  Do you mean
14  generally what her performance was?
15      Q.   Generally?
16      A.   No, I think she only spoke in relation
17  to her obligation to the mental health disaster plan
18  and lack thereof.  And she felt that would be --
19  that was the only inference that she wasn't
20  participating and following up on that assigned
21  project.  And therefore, it would be best for her
22  not to have a second project possibly.  In addition,
23  to her feeling that Nicole was a better candidate
24  because of some of the input that I had offered
25  through RoseAnn.

8  (Pages 26 to 29)

MAURA DEL BENE

1
2   Q.   When was your second communication --
withdrawn.  Was there anything else said by you or
4   her during this first communication with her?
5   A.   No, not that I can recall.
6   Q.   When was the second communication?
7   A.   Probably within a couple days or a
8   week.
9   Q.   Where were you and where was she?
10  A.   To the best of my recollection, we were
11  on the sixth floor in her office, her old office.
12  Q.   Was this a prearranged meeting?
13  A.   No, spontaneous, actually.
14  Q.   What, in words or substance, did she
15  say?
16  A.   Excuse me?
17  Q.   What, in words or substance, did she
18  say?
19  A.   What, in words of substance, I'm sorry?
20  Q.   -- words or substance did she say?
21  A.   In asking me for the meeting or --
22  Q.   No.
23  A.   -- just in general?
24  Q.   At the meeting.
25  A.   She said that she was -- under -- she

MAURA DEL BENE

1
2   was in the process of considering which social
3   worker would be appropriate to assign to the
4   palliative care service.  She shared that she was
5   leaning toward Nicole because of the mental health
6   disaster project outstanding for Carole.  She too
7   agreed that Nicole was more positive in her efforts.
8   Carole did not show enthusiasm in participation from
9   a disciplinary perspective thus far in the service.
10  And that her general -- that, generally, it may not
11  be in the best interest of the service to not have a
12  positive participating individual.
13  Q.   This is what she said?
14  A.   That was the essence of our discussion.
15  Q.   What did she say?  I'm concerned at
16  this junction what she said, not what the essence of
17  it -- of both of your collective statements, because
18  I'm going to get to what you said during these
19  meetings.  I'm interested in what she said.
20  A.   Well, it was an exchange of
21  conversations in which she shared with me the mental
22  health disaster project.  She shared with me that
23  she was leaning toward Nicole.  She agreed with some
24  points that I had made through RoseAnn O'Hare about
25  positivism participation, but I don't recall

MAURA DEL BENE

1
2   verbatim what she said.
3   Q.   What, in words or substance, did she
4   say?
5   A.   I just shared that with you.
6   Q.   What did you say?
7   A.   What did I say?
8   Q.   Yes.
9   A.   I said that ultimately it was an
10  unfortunate situation.  I said it was a decision
11  that she and RoseAnn were in the position to make.
12  I contributed my input in terms of what I felt thus
13  far, different attributes that would be of benefit
14  to the service.  I offered the different attributes
15  that I felt would be of benefit to the service.
16  Would you like me to share those?
17  Q.   Of course.
18  A.   I felt that Nicole was more engaging,
19  enthusiastic and positive, in both her patient care
20  referrals, her verbal communications and e-mail
21  communications.  Whereas Carole was generally
22  negative, less responsive and not interactive
23  regarding patient care activities.
24  Q.   Anything else?
25  A.   No, I don't think so.

MAURA DEL BENE

1
2   Q.   Did you ever share what you observed
3   about Ms. Newmark with Ms. Newmark?
4   A.   Directly, no.  I don't think she ever
5   asked me, nor did I offer that.
6   Q.   Okay.  Did there come a time you
7   learned that Ms. Newmark had expressed concern that
8   Ms. Magone made age-related comments in connection
9   with Nicole Serra's appointment to the palliative
10  care service?
11  A.   I don't know if it was in relation to
12  the palliative care service.  I know there was a
13  concern about a general ageism statement from
14  Carole.
15  Q.   How did you learn of that?
16  A.   I think it was either through --
17  through Carole or Nicole.  I think Cathy had said
18  something to the relation of she is younger, but I
19  don't -- I mean that was the best that I can recall.
20  Q.   Did you ever recall communicating with
21  Ms. Magone about any meetings she had with either
22  Carole Newmark or Human Resources in which Ms.
23  Newmark made a complaint about her?
24  A.   I knew that -- yes, I knew that Carole
25  had made a complaint.  I think that was from Carole,

MAURA DEL BENE

2 maybe one day in rounds or something in the ICU, I
3 think Carole made a mention that she was making a
4 complaint.
5      Q.   What, if anything, did you ever
6 communicate with Ms. Magone about the fact that Ms.
7 Newmark had complained about her?
8      A.   I don't think I ever communicated with
9 Ms. Magone about that directly, no.
10     Q.   Did you ever communicate with her
11 indirectly about it?
12     A.   I think we're all aware that -- of
13 what's going on now.  So there is a general, you
14 know, understanding of that.  And -- but in terms of
15 specific conversations at the time, I can't recall
16 what communications Cathy Magone --
17     Q.   Now, you indicated that Ms. Newmark was
18 generally negative.  What do you mean by that?
19     A.   She wasn't happy in her position.  She
20 made that very clear verbally and non-verbally.
21     Q.   What did she say?
22     A.   I can't remember her exact words, but
23 she was very verbal in her discontent with case
24 management leadership, the department structure,
25 utilization of social work or lack thereof,

MAURA DEL BENE

1 appropriate utilization of social work.  And just
2 her double of expressed -- I mean, she was very free
3 in her frustration with all of those things.
4      Q.   So she expressed her concerns about
5 these areas to you?
6      A.   Directly to me and generally in public,
7 in rounds, and different things.
8      Q.   You were present when she generally
9 expressed her communications -- her concerns about
10 this?
11     A.   Yeah, there are times when she would,
12 you know, breathe heavily and sigh, make gestures,
13 you know, she was very emphatic in her gum-chewing
14 when she was upset, things like that.
15     Q.   She was emphatic in her gum-chewing?
16     A.   Uh-huh.
17     Q.   Is that a yes?
18     A.   Yes.
19     Q.   Where would she be emphatic with her
20 gum-chewing?
21     A.   In rounds, interdisciplinary rounds.
22     Q.   And you were present when she was
23 emphatic in her gum-chewing in interdisciplinary
24 rounds?

MAURA DEL BENE

1      A.   Yes.
2      Q.   Now, so she participated in palliative
3 care service?
4      A.   No, the interdisciplinary rounds are a
5 hospital-wide experience that happens on each unit
6 where different people come; social work, physical
7 therapy, nursing.  These are rounds that happen in
8 the ICU and in the different nursing units.
9      Q.   So when she expressed her concern about
10 the case management model, what did she say with
11 respect to the issue?
12     A.   She would be very verbal about her
13 discontent with Cathy Magone's leadership, with the
14 infrastructure case management, with the role or
15 lack thereof definition of social work within the
16 case management system.  That there was not an
17 understanding of how social workers performed their
18 duties, and that there was a level of -- I don't
19 want to say disorganization -- but a level of
20 discontent with -- with she and Nicole's role within
21 case management.
22     Q.   Did Nicole Serra ever express those
23 same concerns to you?
24     A.   I think Nicole had concerns about the

MAURA DEL BENE

1 social work.
2      Q.   Did she express those concerns to you;
3 yes or no?
4      A.   She expressed similar concerns, yes.
5      Q.   Okay.  Did you ever express any
6 concerns to Ms. Newmark about what you observed in
7 Cathy Magone's interaction with other employees?
8      A.   I can't think of specifics.  I know we
9 discussed Cathy Magone's leadership style.
10     Q.   Did you ever express any concerns about
11 Cathy Magone's leadership style to Ms. Newmark?
12     A.   I'm sure we discussed the fact that it
13 was less than optimal at times.
14     Q.   Did you express those concerns, not
15 "we."  Did you ever express concerns about Ms.
16 Magone's leadership style?
17     A.   I think I may have, yes.  I probably
18 did in the context of our discussion, yes.
19     Q.   And what were those concerns,
20 specifically?
21     A.   I don't remember specific concerns,
22 other than there were strategies and things that
23 Nicole and Carole could do to improve their position
24 within the case management department, given Cathy's

Page 38

MAURA DEL BENE

1
2 lack of understanding of social work role, and how
3 they could advocate for themselves in more of a
4 formal way. And I remember having that discussion
5 with Carole in the Chinese Restaurant. One day we
6 had lunch together and talked about that. So I know
7 we did -- we talked about the leadership challenges.
8 And I did speak specifically to Annette and
9 encouraged her to do certain things to maybe pave
10 the way for the social workers, which would then
11 pave the better way for their involvement in the
12 palliative care service.
13     Q.    Did you ever express any concerns to
14 Ms. Newmark, based on any observations that you had,
15 with Ms. Magone's interaction with other employees?
16     A.    Not that I can -- I think you're asking
17 me for specific circumstance.
18     Q.    I'm asking, did you ever express any
19 concern, based on your personal observations, of Ms.
20 Magone's interaction with other employees?
21     A.    I don't think I ever experienced Ms.
22 Magone personally with other employees. I think I
23 could comment on things that were described to me
24 and my own experience with Ms. Magone, but I don't
25 think I've ever seen her interact with other

Page 39

MAURA DEL BENE

1
2 employees.
3     Q.    What was your own experience with Ms.
4 Magone?
5     A.    Mine were positive. I personally
6 didn't have challenges with her leadership. She
7 wasn't my supervisor. I didn't report to her in
8 that way. It wasn't that kind of a relationship.
9     Q.    Apart from Ms. Newmark, did anyone ever
10 express their concerns about Ms. Magone to you?
11     A.    I think Nicole did.
12     Q.    She did. And what, in words or
13 substance, did Nicole say to you about Ms. Magone?
14     A.    I think generically her lack of
15 understanding about the social work role and
16 utilization of such within the case management
17 department.
18     Q.    Okay. And those were similar concerns
19 that Ms. Newmark expressed?
20     A.    Uh-huh.
21     Q.    Is that a yes?
22     A.    Yes, sorry.
23     Q.    That's okay. It's okay, everyone does
24 it.
25     A.    I'm a nodder.

Page 40

MAURA DEL BENE

1
2     Q.    I'm going to direct your attention to
3 what's been previously marked as Plaintiff's Exhibit
4 26 for identification. Do you recognize that
5 document?
6     A.    Yes, I do.
7     Q.    What do you recognize it to be?
8     A.    An e-mail that I had sent out regarding
9 mental health services in -- I don't know if it was
10 just the county or in the area, might have been
11 nationwide, a link that I had sent to Carole and
12 Nicole.
13     Q.    And specifically, I'm going to direct
14 your attention to the first page of that document
15 toward the bottom there?
16               MR. KEIL:  Under 11:55 a.m.?
17               MS. NICAJ:  That's correct.
18     Q.    I am going to direct your attention
19 to -- it's Wednesday, July 19.
20     A.    Uh-huh.
21     Q.    It appears to be an e-mail from Nicole
22 Serra to you?
23     A.    Uh-huh.
24     Q.    In the middle of the text of that
25 e-mail reads, quote, "Once again, thanks for

Page 41

MAURA DEL BENE

1
2 understanding my bad attitude last week." Close
3 quotes. Do you see that?
4     A.    Yes, I do.
5     Q.    Do you recall what that was in
6 reference to?
7     A.    No, I don't.
8     Q.    Okay. Do you know whether you ever
9 documented Ms. Serra's bad attitude?
10     A.    It wasn't my position to do so.
11     Q.    Do you know what the circumstances were
12 for the bad attitude?
13     A.    No.
14     Q.    Do you know whether you were present
15 when she exhibited bad attitude?
16     A.    From reading the e-mail, I must've
17 been. But I don't recall it.
18     Q.    Okay. I'm going to direct your
19 attention further up. It appears to be an e-mail
20 from you to Ms. Serra. Do you see that?
21     A.    Yes.
22     Q.    It reads, quote, "You have good energy
23 and enthusiasm in your work here -- dash -- don't
24 let one slip-up cloud the picture of your real
25 spirit." Do you see that?

Page 42

MAURA DEL BENE

1
2    A.    Yes, I do.
3    Q.    What were you referring to?
4    A.    I don't remember exactly.  It was
5  obviously something related to the bad attitude
6  reference that she made below.
7    Q.    Okay.  Did there come a time that Ms.
8  Newmark communicated to you the decision that had
9  been made concerning Ms. Serra's appointment?
10   A.    I don't ever recall ever discussing it
11  directly with Carole actually.
12   Q.    Okay.  Did she ever advise you, in
13  words or substance, that she had no hard feelings
14  about the issue of Ms. Serra's appointment to you?
15   A.    I don't remember a direct conversation.
16  But I do not remember any hard feelings after the
17  naming of Nicole.
18   Q.    Do you call your relationship with her;
19  was it cordial before the naming of Nicole Serra to
20  the palliative --
21   A.    Cordial throughout her employment, yes.
22   Q.    And even after?
23   A.    Yes.
24   Q.    Okay.  Directing your attention to the
25  very first e-mail of that, of Exhibit 26?

Page 43

MAURA DEL BENE

1
2    A.    Here?
3    Q.    No, top page, first page?
4          MR. KEIL:  July 28th, 1:38
5  p.m.?
6          MS. NICAJ:  That's correct.
7    Q.    Do you know what this e-mail refers to?
8  In -- part of the e-mail reads, quote, "It is often
9  hard to work in this environment when you don't know
10  who you can trust."  Close quote.
11   A.    Can you ask your question again?
12   Q.    Do you know what this was referring to?
13  This is an e-mail Nicole Serra sent to you, quote,
14  "It is often hard to work in this environment when
15  you don't know who you can trust."  Close quotes.
16   A.    I think she was referring to within the
17  case management department.
18   Q.    What about within the case management
19  department?
20   A.    I think the interactions and exchanges
21  that occur amongst the nurse case managers and
22  social workers and department in general.
23   Q.    Did you consider this a negative
24  attitude on her part?
25   A.    No.  I found it to be very positive,

Page 44

MAURA DEL BENE

1
2  amidst the distress that she expressed.
3    Q.    What distress are you referring to?
4    A.    "It's often hard to work in this
5  environment when you don't know who you can trust."
6  I mean, that's a distressing statement to say.
7    Q.    And it's positive, in your view?
8    A.    But I think she was positive in that,
9  you know, "I'm glad you're part of the team, let me
10  know what I can do for you on the cases."  You know,
11  I consider that supportive and also personal and
12  professionally.  I mean, she was always very
13  positive in her turn-around of a situation, trying
14  to improve -- Yes, there are challenges, but let's
15  keep moving forward, how can we continue to work
16  together and do different things.
17   Q.    You weren't part of the case management
18  team; were you?
19   A.    No.
20   Q.    So when you understood she was
21  expressing her concern about the case management
22  team --
23   A.    Uh-huh.
24   Q.    -- and you later used the supportive --
25  she was talking about you in supportive terms; isn't

Page 45

MAURA DEL BENE

1
2  that right?
3    A.    Yes.
4    Q.    She wasn't referring to the case
5  management team in supportive terms; was she?
6    A.    No.  I think she was referring to my
7  presence --
8    Q.    Okay.
9    A.    -- in the hospital and interfacing with
10  her.
11   Q.    Okay.  On how many occasions did Nicole
12  Serra express her concern to you about the case
13  management team?
14   A.    I can't quantify that.  I would say on
15  several occasions.
16   Q.    Okay.  And on how many occasions did
17  Ms. Newmark express her concern to you about the
18  case management team?
19   A.    On many occasions, several occasions.
20   Q.    Many or several?
21   A.    Several.
22   Q.    Okay.  Do you recall each instance in
23  which Ms. Serra expressed her concern about the case
24  management team?
25   A.    Not each instance.

Page 46

MAURA DEL BENE

1
2      Q.    And what about Ms. Newmark?
3      A.    Not each instance.
4      Q.    Okay. Did Ms. Newmark, as a social
5   worker, ever interact with you in connection with
6   your responsibilities at the palliative care
7   service? In other words, did she ever have any
8   interaction with patients that -- that you would
9   have been responsible for?
10     A.    Very infrequently. I recall one
11  patient that we crossed over on.
12     Q.    Do you recall what the circumstances
13  were?
14     A.    It was a situation, I think, in which
15  the patient or family were considering hospice or
16  placement in a hospice-like facility for the
17  individual. It was late in the afternoon, early
18  end-of-day time, Carole had already met with the
19  family, identified their interest in that piece, and
20  passed over the case to me, which I accepted.
21     Q.    Were you satisfied with her work on
22  that particular project?
23     A.    I think I would have been more
24  satisfied had she shown participation in the
25  palliative care piece within the discussion with the

Page 47

MAURA DEL BENE

1
2   family and done a joint family meeting; that's what
3   I had expected, but that didn't occur.
4      Q.    Did she tell you why?
5      A.    No, she did not.
6      Q.    Did you ask her to participate in the
7   joint meeting with the family?
8      A.    No, I did not specifically ask, though
9   it was a natural evolution from which occurs --
10  well, had occurred in past. So I sort of expected
11  when she said, I have this family, they would like
12  to talk about hospice, and end of life issues, and
13  she expressed her interest in palliative care, it
14  would've been a natural fit to have a sit-down
15  together with the family since she had started the
16  conversation with them. And then I was coming in
17  formally for the palliative care service, for us to
18  sit down and do that together, it would be a good
19  chance for us to work together and see our fit.
20     Q.    Did you invite her to do so?
21     A.    I don't recall inviting her to do so,
22  no. I clearly read that she was handing the case
23  over to me and she was leaving.
24     Q.    Do you know whether that -- that
25  patient was the only patient that she had that day?

Page 48

MAURA DEL BENE

1
2      A.    I don't supervise Carole, so I wouldn't
3   know.
4      Q.    You don't know what she had to do
5   following the meeting in connection with her
6   responsibilities as a social worker?
7      A.    She did not share that with me.
8      Q.    Okay. And did she ever tell you that
9   she had to see another patient?
10     A.    No, she did not.
11     Q.    Okay. Going back to the selection of
12  Nicole Serra, whose decision was it ultimately?
13     A.    Cathy Magone's.
14     Q.    Okay. Whose decision was it for Cathy
15  Magone to no longer be an active participant in the
16  palliative care service?
17            MR. KEIL: Objection to the
18       form. Cathy Magone?
19     Q.    I mean -- Cathy Magone, sorry -- Nicole
20  Serra. Whose decision was it to -- for Nicole Serra
21  to no longer be involved actively in the palliative
22  care service?
23     A.    I think it was a general decision that
24  was made primarily by Nicole and myself because of
25  the expectations from the hospital system. After

Page 49

MAURA DEL BENE

1
2   Carole's leaving it left her only as the social
3   worker and really just spread her too thin in terms
4   of her ability to attend to the needs of the
5   hospital, as well as the service. And Nicole didn't
6   want to do something if she wasn't able to do it
7   well. So we reverted to, you know, soft presence
8   and backup system, it was joint.
9      Q.    You indicated that there was an issue
10  about -- withdrawn. Cathy Magone mentioned to you
11  about a mental health disaster in which Ms. Newmark
12  was in charge of?
13     A.    Was assigned, yes.
14     Q.    Was assigned. Do you know anything
15  about that project?
16     A.    Just generically from overhearing it
17  from, I think, Nicole and Carole, as well as from
18  Cathy, just generically saying she was assigned to
19  this project.
20     Q.    Do you know whether that project was
21  ever completed?
22     A.    To my understanding, it was not.
23     Q.    Do you know how long the project had to
24  be completed by; was there a deadline?
25     A.    I think there was a time frame, but I'm

Page 50

```
 1          MAURA DEL BENE
 2  not privy to what the time frames were.
 3       Q.   Do you know whether it was completed on
 4  or after Ms. Newmark left?
 5       A.   I don't know if it ever has been
 6  completed. I'm not privy to that information.
 7       Q.   Apart from your interactions with Ms.
 8  Newmark on that one occasion with the patient --
 9       A.   Uh-huh, yes.
10       Q.   -- did you have any other interactions
11  with her in her capacity as a social worker in the
12  palliative care service?
13       A.   Could you rephrase the question?
14       Q.   Sure. You indicated that you just
15  recall one interaction with Ms. Newmark relating to
16  the patient --
17       A.   Uh-huh.
18       Q.   -- and palliative care; is that
19  correct?
20       A.   Yes.
21       Q.   Do you recall any other instances in
22  which you interacted with Ms. Newmark on a patient
23  involving palliative care?
24       A.   No, I do not.
25       Q.   Okay. I think I'm winding down. I
```

Page 51

```
 1          MAURA DEL BENE
 2  just want to consult with my notes and my client
 3  and, hopefully, you can go; okay?
 4       A.   Shall I step out?
 5          MS. NICAJ:  No, I'm going to
 6  step out.
 7          (Short Break)
 8       Q.   Do you know whether Carole Newmark ever
 9  referred patients to the palliative care by calling
10  Jansen?
11       A.   I wouldn't know that.
12          MS. NICAJ:  Okay. I have no
13  further questions.
14       Q.   Are there any changes or things that
15  you want to supplement to your testimony here today?
16       A.   No, ma'am.
17          MS. NICAJ:  That's it.
18          THE WITNESS:  Thank you.
19          MS. NICAJ:  Sure.
20          oOo
21
22       (Time noted: 11:50 am.)
23
24
25
```

Page 52

```
 2  STATE OF NEW YORK        )
 3                    )  ss:
 4  COUNTY OF NEW YORK       )
 5
 6
 7          I, MAURA DEL BENE, the witness herein,
 8  having read the foregoing testimony on the pages of
 9  this deposition, do hereby certify it to be a true
10  and correct transcript, subject to the corrections,
11  if any, shown on the attached page.
12
13
14          oOo
15
16
17  _____
18          MAURA DEL BENE
19
20  Subscribed and sworn to before me
21  this _____ day of _____, 2008.
22
23
24  _____
25
```

Page 53

```
 2  STATE OF NEW YORK    )
 3               ) SS
 4  COUNTY OF ULSTER     )
 5
 6          I, Lisa M. Rosso, Notary Public within and
 7  for the State of New York, do hereby certify:
 8
 9          That I reported the proceedings in the within
10  entitled matter, and that the within transcript is a
11  true record of said proceedings.
12
13          I further certify that I am not related to
14  any of the parties to the action by blood or
15  marriage, and that I am in no way interested in the
16  outcome of this matter.
17
18          IN WITNESS WHEREOF, I have hereunto set my
19  hand this 23rd day of April, 2008.
20
21
22  _____
                LISA M. ROSSO,
                NOTARY PUBLIC
23
24
25
```